UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,<br><br>                              Plaintiff,<br><br>     v.<br><br>MYRON KREIDLER, Insurance Commissioner for the State of Washington, and JAY INSLEE, Governor of the State of Washington,<br><br>                              Defendants. | CASE NO. C19-5181 BHS<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT, GRANTING DEFENDANTS' MOTION TO DISMISS, AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

This matter comes before the Court on Plaintiff Cedar Park Assembly of God of Kirkland, Washington's ("Cedar Park") second motion for preliminary injunction, Dkt. 49, and Defendants Myron Kreidler, Insurance Commissioner for the State of Washington, and Jay Inslee, Governor of the State of Washington's ("State") motion to dismiss, Dkt. 53, and Cedar Park's motion for leave to supplement, Dkt. 51. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants Cedar Park's motion for leave to supplement,

grants the State's motion to dismiss, and denies Cedar Park's motion for preliminary

injunction for the reasons stated herein.

## I.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Since at least 1995, Washington law has provided conscience exemptions for

participants in the health care and health insurance markets. The dispute in this case

involves the differences between the conscience exemptions for different market

participants, a provision in the conscience exemptions stating health carriers, facilities,

and providers do not have to provide services for free, and a new law which requires that

health insurance cover comprehensive reproductive health services including abortion

and all Food and Drug Administration-approved ("FDA") contraceptive drugs, devices,

and products.[1]

**A.    Legal and Regulatory Background**

For health insurance purchasers, Washington law provides that "[n]o individual or

organization with a religious or moral tenet opposed to a specific service may be required

to purchase coverage for that service or services if they object to doing so for reasons of

conscience or religion." RCW 48.43.065(3)(a). While individuals and organizations do

not have to purchase that coverage, enrollees must still be able to access it:

> The provisions of this section shall not result in an enrollee being denied
> coverage of, and timely access to, any service or services excluded from
> their benefits package as a result of their employer's or another individual's
> exercise of the conscience clause in (a) of this subsection.

---

[1] The Court will use the term "reproductive health services" in this opinion to refer to
FDA-approved contraceptive drugs, devices, and products as well as abortion and abortion-
related drugs, procedures, and services.

RCW 48.43.065(3)(b). Implementing regulations require each relevant insurance carrier to file "a full description of the process it will use to recognize an organization or individual's exercise of conscience based on a religious belief or conscientious objection to the purchase of coverage for a specific service." WAC 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(1).

Regarding health insurance carriers and providers, RCW 48.43.065(2)(a) provides in part that "[n]o individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to doing so for reasons of conscience or religion." Religiously sponsored carriers which for reasons of religious belief offer plans which exclude certain services covered in the model insurance plan "shall file for such plan a description of the process by which enrollees will have timely access to all services in the model plan." WAC 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(2).

Finally, RCW 48.43.065(4) provides that "[n]othing in this section requires a health carrier, health care facility, or health care provider to provide any health care services without appropriate payment of premium or fee."

In 2002, the Washington Office of the Attorney General ("AGO") issued an advisory opinion interpreting RCW 48.43.065 in response to an inquiry from the Washington Office of the Insurance Commissioner ("OIC"), setting forth its opinion in relevant part that "[t]he insurance commissioner has authority to require health care insurance carriers to include the cost of prescription contraceptives as a component in the rate[-]setting actuarial analysis, where an employer raises a conscientious objection to paying these costs directly as a part of that employer's employee health care benefit

1  package." AGO 2002 No. 5. The opinion explained in part that "conceptually, OIC could

2  require a carrier include the cost of contraceptive coverage as an expense component in

3  its rate setting actuarial analysis; a more definite answer would have to be tailored to a

4  more specific proposal." *Id*. In 2006, the AGO issued another opinion analyzing the

5  extent of an employer's option to provide employee health insurance without including

6  coverage of prescription contraceptives in response to an inquiry from two Washington

7  State legislators. AGO 2006 No. 10. The 2006 opinion explained that the AGO had

8  reviewed the 2002 opinion, stating in part that:

9       The upshot of our 2002 analysis is that, while employers may exercise their
        'conscience clause' rights under RCW 48.43.065(3), they may not do so by
10      contracting with a state-regulated health carrier for a benefits package that
        excludes contraceptives while including coverage of other prescription
11      drugs, or a package requiring employees to pay for their own contraceptive
        coverage. There may be other, lawful ways in which employers may
12      exercise their 'conscience clause' option . . . Perhaps they might also offer a
        health care benefits plan that does not involve purchasing a health plan
13      from a state-regulated carrier. An Attorney General's Opinion is not an
        appropriate vehicle to examine how that might be done as a matter of
14      employment and insurance practices, or whether there would be legal
        pitfalls in any particular approach. We simply note that the statutes and
15      WAC do not foreclose the exercise of 'conscience clause' rights by
        employers.

16 *Id*.

17      In 2018, the State enacted SB 6219. 2018 Wash. Sess. Laws 1. Relevant here, SB

18 6219 was codified as RCW 48.43.072 and RCW 48.43.073. Dkt. 20, ¶ 4. RCW 48.43.072

19 requires all health plans issued or renewed on or after January 1, 2019 to cover all FDA-

20 approved prescription and over-the-counter contraceptive drugs, devices, and products.

21 RCW 48.43.073 requires all health plans issued or renewed on or after January 1, 2019

22

1  which provide coverage for maternity care or services to provide the covered person

2  "with substantially equivalent coverage to permit the abortion of a pregnancy."

3        On September 20, 2018, OIC published a stakeholder draft of proposed rules

4  ("OIC Rulemaking Draft") implementing SB 6219 for public comment. OIC, "Health

5  plan coverage of reproductive healthcare and contraception (R 2018-10) (R 2019-07),"

6  https://www.insurance.wa.gov/health-plan-coverage-reproductive-healthcare-and-

7  contraception-r-2018-10-r-2019-07. The draft was available for comment through

8  October 23, 2018. OIC, "Health Plan Coverage of Reproductive Healthcare &

9  Contraception Rulemaking," September 20, 2018,

10 https://www.insurance.wa.gov/sites/default/files/2018-09/2018-10-stakeholder-draft.pdf.

11 The "Coverage required" section of the OIC Rulemaking Draft pertaining to coverage for

12 reproductive health services required by SB 6219 provides in subsection four that "[t]his

13 subchapter does not diminish or affect any rights or responsibilities provided under RCW

14 48.43.065." *Id.*

15 **B.**    **The Instant Dispute**

16       On March 8, 2019, Cedar Park filed a complaint alleging that SB 6219 violates the

17 Free Exercise and Establishment Clauses of the First Amendment, violates Cedar Park's

18 right to religious autonomy guaranteed by those clauses, and violates the Equal

19 Protection Clause of the Fourteenth Amendment. Dkt. 1.

20       On April 17, 2019, the State moved to dismiss. Dkt. 25. On May 13, 2019, Cedar

21 Park moved for a preliminary injunction. Dkt. 29. On July 3, 2019, Cedar Park moved for

22 leave to file an amended complaint. Dkt. 42. On August 2, 2019, the Court granted the

1   motion to dismiss concluding that Cedar Park lacked standing and asserted claims that

2   were unripe. Dkt. 45. The Court also denied Cedar Park's motion for preliminary

3   injunction and granted Cedar Park leave to file an amended complaint. *Id.*

4        On August 15, 2019, Cedar Park filed a second amended complaint ("SAC").

5   Dkt. 46. Cedar Park is a Christian church in Kirkland, Washington. *Id.* ¶ 5. In

6   furtherance of its "deeply held religious belief that abortion is the ending of a human life,

7   and is a grave sin," Cedar Park alleges that it "does not provide coverage for abortion or

8   abortifacient contraceptives in its employee health insurance plan." *Id*. Cedar Park also

9   alleges that it "offers health insurance coverage to its employees in a way that does not

10   also cause it to pay for abortions or abortifacient contraceptives, including, *inter alia*,

11   emergency contraception and intrauterine devices" and that its "current group health plan

12   excludes coverage for abortions or abortifacient contraceptives." *Id.* ¶¶ 46–47.[2]

13   Approximately 185 of Cedar Park's employees are eligible for its health insurance

14   coverage. *Id.* ¶ 20.

15        On September 13, 2019, Cedar Park filed a second motion for preliminary

16   injunction. Dkt. 49. In support of that motion, Cedar Park filed the declaration of Jason

17   "Jay" Smith ("Smith"), who is the Senior Pastor of Cedar Park. Dkt. 50, ¶ 2. Smith

18   attached an email exchange between Cedar Park and its current health insurance provider,

19   Kaiser Permanente. *Id.*, Exh. A. After Cedar Park inquired about health insurance that

20   complied with its religious beliefs, Kaiser Permanente responded that it would not

21   _____

22        [2] Cedar Park admits that its current plan includes coverage for "abortifacient contraceptives."  Dkt. 46, ¶ 48.

1  provide such a product. *Id.* ¶ 4. Based on that refusal, Smith contends that "Kaiser

2  therefore will not permit Cedar Park to invoke the limited religious exemption in RCW

3  §48.43.065, which allows Cedar Park to refuse to directly provide coverage for abortion

4  or abortifacient contraceptives." *Id.*  Smith also contends that "Kaiser Permanente has

5  informed Cedar Park that, if an exception to SB 6219 were made for churches or houses

6  or worship for Cedar Park, such as by court order, it would remove abortion coverage

7  from Cedar Park's health care plan." *Id.* ¶ 7 (citing Exh. A at 1). The email exchange

8  does not support Smith's contention. Instead, Kaiser Permanente responded as follows:

9  "Due to how [Kaiser Permanente] has to file with the [Washington] OIC for fully insured

10  groups we cannot retro exclude covered back to 9/1/2019 (ex. If a member received

11  services, they would be denied with the retro change and the member would pay in full

12  for the cost) HOWEVER, we can support a mid-year change." *Id.*, Exh. A at 1.

13      On October 3, 2019, Cedar Park filed a motion for leave to supplement its

14  complaint to add these new facts regarding the renewal of its health care plan and

15  communications with Kaiser Permanente. Dkt. 51.

16      On October 4, 2019, the State responded to Cedar Park's motion for preliminary

17  injunction and filed a motion to dismiss. Dkt. 53. In support of its response and motion,

18  the State provided a declaration and news release stating that "Providence Health Plan

19  (Providence) of Portland, OR" will offer a new health care plan that will "limit coverage

20  of abortion services to its enrollees." Dkt. 54-1 at 2. The State contends that Providence's

21  plan conforms to Cedar Park's requirements.

22

On October 14, 2019, the State responded to the motion for leave. Dkt. 56. On October 18, 2019, Cedar Park replied. Dkt. 57.

On October 25, 2019, Cedar Park replied to the State's response on preliminary injunction and responded to the State's motion to dismiss. Dkt. 58. On November 8, 2019, the State replied. Dkt. 59.

## II.   DISCUSSION

### A.   Motion to Dismiss

Although the State moves to dismiss for multiple theories, Cedar Park's lack of standing is apparent and dispositive. Moreover, standing is a jurisdictional issue and, without jurisdiction, there is no need to offer advisory opinions on any other issue in this matter. *See, e.g.*, *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F. 3d 786, 799 (D.C. Cir. 2004) (The "cardinal principle of judicial restraint" is that "if it is not necessary to decide more, it is necessary not to decide more.") (Roberts, J., concurring in part and concurring in judgment).

First, however, the Court must address Cedar Park's procedural errors and misunderstandings. Cedar Park explicitly bases its motion for preliminary injunction on "recently discovered facts." Dkt. 58 at 11. These new facts and allegations are not in the operative complaint, and Cedar Park's position is that these new facts establish actual injury for the majority of its claims. *Id.* at 11–13. Thus, Cedar Park implicitly concedes that actual injury is not alleged in the complaint, which could be dispositive of the motion to dismiss and the motion for preliminary injunction. To correct this obvious error, Cedar Park filed a motion to supplement its complaint three weeks after it filed its motion for a

1   preliminary injunction and one day before the State's response was due. Dkt. 51. The

2   State opposes the motion for leave to supplement arguing that the new facts/allegations

3   are futile. Dkt. 56. The Court agrees with the State but will grant the motion because the

4   State is not prejudiced by consideration of the new facts/allegations and because it does

5   not alter the ultimate determination of the issues. Therefore, the Court grants Cedar

6   Park's motion for leave to supplement and will consider the proposed supplemental

7   complaint as the operative complaint for the purposes of the motion to dismiss and

8   motion for preliminary injunction.

9        Cedar Park's procedural misunderstanding is its position that "[i]n ruling on a

10  motion to dismiss, the Court cannot consider evidence outside of the pleadings."  Dkt. 58

11  at 13 (citing *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542,

12  1555 & n. 19 (9th Cir. 1989)). A party mounting a Rule 12(b)(1) challenge to the court's

13  jurisdiction may do so either on the face of the pleadings or by presenting extrinsic

14  evidence for the court's consideration. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

15  2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual"). Although

16  Cedar Park requests that the Court accept its new evidence in opposition to the motion to

17  dismiss, it objects to the State's evidence establishing that Providence offers a plan that

18  conforms with Cedar Park's desired needs. Regardless of these inconsistent positions, the

19  Court will accept the additional evidence from both parties because neither party attacks

20  the truthfulness of the offered facts. "A factual attack requires a factual dispute, and there

21  is none here." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir.

22

1  2014).  Therefore, in the absence of a factual dispute, the Court will consider the

2  evidence in the record when analyzing the issue of standing.

3        **1.  Standard**

4        In order to have standing in federal court, a plaintiff must show that she has

5  suffered an injury-in-fact that is fairly traceable to the actions of the defendant and that

6  her injury is likely to be redressed by a favorable decision. *See, e.g., Ass'n of Public*

7  *Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013). The

8  injury must be concrete and particularized, as well as actual or imminent, not conjectural

9  or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal

10  quotations and citations omitted). The party invoking federal jurisdiction has the burden

11  to establish standing. *Id.* Standing is "claim-and-relief-specific, such that a plaintiff must

12  establish Article III standing for each of her claims and for each form of relief sought." *In*

13  *re Adobe Systems, Inc. Privacy Litig.*, 66 F.Supp.3d 1197, 1218, 2014 WL 4379916, at

14  *10 (N.D. Cal. Sept. 4, 2014); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

15  352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for

16  each claim he seeks to press.").

17        **2.  Analysis**

18        For purposes of standing, Cedar Park separates its Equal Protection claim from its

19  other claims. Dkt. 49 at 15–16; Dkt. 58 at 11–13. Regarding the latter, Cedar Park argues

20  that it is "suffering injury because it is being forced to provide insurance coverage for

21  abortion." Dkt. 58 at 11. The fallacy of this argument is apparent and even the alleged

22  injury is not fairly traceable to the State or SB 6219. Cedar Park is a consumer in the

1    marketplace. Kaiser Permanente and Providence are relevant businesses in the

2    marketplace. Kaiser Permanente does not offer a product that meets Cedar Park's

3    requirements, while Providence does offer such a product. Cedar Park chose to purchase

4    Kaiser Permanente's product "under protest." In other words, Cedar Park has chosen to

5    maintain a business relationship with a company that fails to provide a service meeting

6    Cedar Park's preference despite the potential availability of suitable alternatives.

7            Cedar Park then argues without citation that it was impossible to do business with

8    Providence as of September 19, 2019 and, even if it did, there is no evidence that

9    Providence's plan is comparable as to all other aspects of Cedar Park's current plan. Dkt.

10   58 at 13. Despite being unsupported by any fact or plausible allegation, this argument

11   fails to recognize that Cedar Park has the burden to establish jurisdiction.

12   *DaimlerChrysler*, 547 U.S. at 352. Thus, it is Cedar Park's burden to establish some

13   unrecoverable injury in leaving the current plan it bought "under protest" and obtaining a

14   comparable plan from Providence. The record is silent as to any penalty that Cedar Park

15   faces if it chose to switch providers. Moreover, Kaiser Permanente represented that it

16   could support an appropriate mid-year change if approved by the OIC. Dkt. 50-1 at 2. If

17   Kaiser Permanente seeks to maintain its business relationship with Cedar Park, it would

18   seem that Kaiser Permanente would be seeking approval of an appropriate plan to

19   accommodate Cedar Park. There are no facts in the record to establish that Kaiser

20   Permanente is proceeding on this basis as Providence has done.[3] Therefore, these facts

21

22          [3] It is unclear whether the OIC would allow Kaiser Permanente the opportunity to refer a
     client's employees seeking reproductive health services to the Washington Department of Health

1    establish an absence of products in the marketplace as opposed to government directed or

2    sanctioned religious discrimination.

3         Finally, on these claims, Cedar Park has failed to establish that any injury is fairly

4    traceable to SB 6219. When Cedar Park needed to renew its health insurance plan on

5    September 1, 2019, there was no product in the marketplace that complied with Cedar

6    Park's preferred requirements. Cedar Park has failed to establish that this absence of a

7    product was *because of* SB 6219. In fact, Cedar Park's previous plan did not conform to

8    its beliefs despite SB 6219 not having legal effect when Cedar Park purchased that plan.

9    Now, Providence offers what appears to be an acceptable product despite the continued

10   applicability of SB 6219. Thus, Cedar Park has failed to establish an injury or an injury

11   that is fairly traceable to SB 6219.

12        Regarding Cedar Park's Equal Protection claim, Cedar Park argues that "unequal

13   treatment is sufficient injury to confer standing." Dkt. 58 at 12. The problem with this

14   argument is that Cedar Park has failed to establish that it is similarly situated to health

15   care providers. "The groups need not be similar in all respects, but they must be similar in

16   those respects relevant to the Defendants' policy." *Ariz. Dream Act Coalition v. Brewer*,

17   757 F.3d 1053, 1063 (9th Cir. 2014). The only thing that Cedar Park has in common with

18   the providers or insurance carriers is the same religious beliefs regarding reproductive

19   health services, and the statute does not discriminate based on a specific belief. Instead,

20

21   Family Planning Program as it did Providence based on Providence's religious beliefs or whether
     Kaiser Permanente could absorb these costs through inclusion in its general overhead and
22   approved through its actuarial rate setting process.  Dkt. 54-1 at 2.

1  the statute allows nonparticipation for a health care provider, religiously sponsored health

2  carrier, or health care facility based on conscience or religion because these entities are in

3  the business of providing health care instead of purchasing health care. Dkt. 53 at 12–15.

4  These entities could seemingly refuse to provide immunizations based on conscience or

5  religion, which is not similar to Cedar Park in any relevant manner. Thus, Cedar Park has

6  failed to establish that the State's policy separates entities based on the religious belief at

7  issue. Having failed to establish such "unequal treatment" results in failure to establish an

8  injury based on a violation of the Equal Protection Clause.

9      In sum, Cedar Park has failed to meet its burden in establishing an injury in fact on

10  any of its claims, and the Court grants the State's motion to dismiss for lack of

11  jurisdiction.

12  **B.    Motion for Preliminary Injunction**

13      "A plaintiff seeking a preliminary injunction must establish that he is likely to

14  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

15  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

16  the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

17  Without standing, the Court is unable to conclude that Cedar Park is likely to succeed on

18  the merits. Moreover, as the Court has found that on the facts before it Cedar Park has not

19  demonstrated injury required for standing, the Court is unable to conclude that Cedar

20  Park has shown "irreparable injury is *likely* in the absence of an injunction." *Id*. at 22.

21  Therefore, the Court denies Cedar Park's motion for preliminary injunction.

22

1

### III.  ORDER

2      Therefore, it is hereby **ORDERED** that Cedar Park's motion for leave to file a

3 supplemental complaint, Dkt. 51, is **GRANTED**; the State's motion to dismiss, Dkt. 53,

4 is **GRANTED**; and Cedar Park's motion for preliminary injunction, Dkt. 49, is

5 **DENIED**.

6      The Clerk shall enter a JUDGMENT and close this case.

7      Dated this 6th day of May, 2020.

8

9                                            _____

10                                           BENJAMIN H. SETTLE
                                             United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22