WAWD – Praecipe (Revised 6/2021)

1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CEDAR PARK ASSEMBLY OF GOD
OF KIRKLAND, WASHINGTON,

                    Plaintiff(s),

          v.

MYRON "MIKE" KREIDLER, et.
al.,

                    Defendant(s).

CASE NO. 3:19-cv-05181-BHS

PRAECIPE

    To the Clerk of the above-entitled court:
    You will please:

Please replace the attached Exhibits A-Q with the those filed with the Declaration
of Paul M. Crisalli filed on January 6, 2023, Dkt. # 89-1. The original exhibits had
cut off the side of the text because the originals were landscape justified. The
attached are complete and do not cut off the sides.

1/25/2023                          *s/ Paul M. Crisalli*
    Dated                          Sign or use an "s/" and your name

PAUL M. CRISALLI, WSBA #40681
Assistant Attorney General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

                              Name, Address, and Phone number of Counsel or Pro Se

PRAECIPE - 1

# Exhibit A

# Deposition of 30(b)(6) Steven Orcutt

# Cedar Park Assembly of God of Kirkland v Kreidler, et al.

# November 21, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____
                              )
CEDAR PARK ASSEMBLY OF GOD OF )
KIRKLAND, WASHINGTON,         )
                              )
                              )
                  Plaintiff,  )
                              )
         v.                   ) No. 3:19-cv-05181-BHS
                              )
MYRON "MIKE" KREIDLER, et al.,)
                              )
                              )
                  Defendants. )
_____


30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON

REPRESENTED BY STEVEN ORCUTT - VOLUME I

_____

Taken at Kirkland, Washington

(All participants appearing via videoconference.)




DATE TAKEN:   November 21, 2022

REPORTED BY:   Nicole A. Bulldis, RPR
               AZ No. 50955 | CA No. 14441 | WA No. 3384

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                    30(b)(6) Steven Orcutt

Page 2

1                       A P P E A R A N C E S

2

3    FOR PLAINTIFF:

4      (via Zoom)          KEVIN H. THERIOT
                           Alliance Defending Freedom
5                          15100 N. 90th Street
                           Scottsdale, AZ 85260
6                          (480) 444-0020
                           ktheriot@adflegal.org

7

8    FOR DEFENDANTS:

9      (via Zoom)          PAUL M. CRISALLI
                           Office of the Attorney General
10                         800 Fifth Avenue, Suite 2000
                           Seattle, WA 98104
11                         (206) 464-7744
                           paul.crisalli@atg.wa.gov

12

13

14   ALSO PRESENT:         JASON SMITH, Cedar Park

15                            --o0o--

16

17

18

19

20

21

22

23

24

25

Crisalli Decl., p.0004

c295376b-5358-4733-bac0-a5db45f51f89

Page 3

1        30(b)(6) DEPOSITION OF STEVEN ORCUTT – VOLUME I

2

3                          EXAMINATION INDEX

4     EXAMINATION BY                                         PAGE

5     Mr. Crisalli...................................... 5

6

7

8                            EXHIBIT INDEX

9     EXHIBITS FOR IDENTIFICATION                            PAGE

10     1   Cedar Park 30(b)(6) Notice of Deposition........ 10

11     2   Kaiser Permanente Group Coverage Agreement 2019. 24

12     3   Kaiser Permanente Evidence of Coverage 2021..... 25

13     4   Kaiser Permanente Evidence of Coverage 2020..... 25

14     5   Hansen Email String - 6/12/19................... 38

15     6   Orcutt Email String - 6/17/19................... 40

16     7   Orcutt Email String - 6/25/19................... 41

17     8   Knauss Email String - 7/8/19.................... 44

18     9   Orcutt Email String - 7/15/19................... 47

19    10   Knauss Email String - 7/16/19................... 48

20    11   Hansen Email String - 7/18/19................... 50

21    12   Orcutt Email String - 7/22/19................... 52

22    13   Knauss Email String - 8/13/19................... 54

23    14   Gallagher 2019/2020 Employee Benefit Analysis... 54

24    15   Orcutt Email String - 5/18/20................... 65

25    16   Gallager 2020/2021 Employee Benefit Analysis.... 68

c295376b-5358-4733-bac0-a5db45f51f89

Page 4

1          30(b)(6) DEPOSITION OF STEVEN ORCUTT – VOLUME I

2

3                          EXHIBIT INDEX (Cont'd)

4     EXHIBITS FOR IDENTIFICATION                           PAGE

5     17   Hansen Email String - 7/14/20................... 70

6     18   Hansen Email String and Attachment - 7/14/20.... 72

7     19   Knauss Email String - 3/24/21................... 77

8     20   Gallager 2021/2022 Employee Benefit Analysis.... 79

9     21   Cedar Park Church 2022 Employee Benefit Renewal. 82

10

11                          --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Crisalli Decl., p.0006

c295376b-5358-4733-bac0-a5db45f51f89

Page 5

1          REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA

2              Monday, November 21, 2022; 9:01 a.m.

3                          --o0o--

4

5    STEVEN ORCUTT,              witness herein, having been

6                               first duly sworn on oath,

7                               was examined and testified

8                               as follows:

9

10                  E X A M I N A T I O N

11   BY MR. CRISALLI

12       Q.   Hello.  My name is Paul Crisalli.  I'm an

13   Assistant Attorney General for the State of Washington

14   and I'm here to take your deposition.

15          Could you please state your name and spell the

16   last for the record.

17       A.   My name is Steven Glenn Orcutt, O-r-c-u-t-t.

18       Q.   Have you ever had your deposition taken

19   before?

20       A.   Not to my knowledge.

21       Q.   All right.  Well, welcome to your first.  So

22   I'll lay out some ground rules.  You've probably talked

23   with your attorney about these, but just to let you know

24   how I'm going to conduct this deposition.

25          There's going to be a court reporter who is

Page 6

1    going to be writing down everything that's said in this

2    deposition, so it's important -- she's the most

3    important person online right now, aside from you,

4    because she's the person who is tasked with trying to

5    make as accurate of a transcript of this deposition as

6    possible.  As a result -- you've done great thus far --

7    it's important that we not step on each other when

8    talking, and waiting 'til I'm done with my question for

9    you to answer.  And, likewise, I'll do everything that I

10   can to wait 'til you are done with your answer before I

11   ask the next question.

12            Does that work for you?

13       A.   Yes.

14       Q.   Next is because it's being transcribed, it's

15   important that nonverbal or nonwords are not used.  Use

16   words in answering the question.  This means avoiding

17   like "uh-huh" or "huh-uh," and I use that example

18   intentionally because you'll see in the transcript it's

19   going to read the same even though the intonations would

20   have different results if that were to be used.

21            Does that make sense?

22       A.   Yes.

23       Q.   And I like to take a break, oh, every hour or

24   so depending on where we're at in the deposition.  If

25   you ever need a break, please don't hesitate to ask.

c295376b-5358-4733-bac0-a5db45f51f89

Page 7

1    We'll provide it.  The only thing I ask is that you --

2    if there's a question being asked, that you answer the

3    question before taking the break.

4            Does that work for you?

5        A.   Yes.

6        Q.   Is there anything preventing you from

7    testifying truthfully today?

8        A.   No.

9        Q.   And this is a unique circumstance where you're

10   not testifying individually, but on behalf of an

11   organization.  Do you understand that?

12       A.   Yes.

13       Q.   And you understand that the purpose of my

14   questions are largely going to be towards what Cedar

15   Park Assembly of God's positions are and facts

16   surrounding Cedar Park.

17           Throughout this deposition, I'm going to use

18   the term "Cedar Park" to describe Cedar Park Assembly of

19   God of Kirkland, Washington.  Does that work for you?

20       A.   Yes.

21       Q.   Do you understand what that entity is?

22       A.   Yes.

23       Q.   Okay.  And do you understand that your answers

24   could -- in this deposition, could be binding upon Cedar

25   Park for purposes of establishing fact?

c295376b-5358-4733-bac0-a5db45f51f89

Page 8

1     A.   Yes.

2     Q.   What did you do to prepare for the deposition

3  today?

4     A.   I prayed.  I reviewed the information that we

5  provided in the request for proposals, I believe, is

6  what it was called.

7     Q.   Would that be request for production?

8     A.   Production, yes.

9     Q.   Would those be the documents that Cedar Park

10  produced in the course of this case?

11     A.   Yes, specifically the ones I produced.

12     Q.   All right.  Did you review any pleadings like

13  the complaint or supplemental complaint or the motions

14  and the declarations that were filed in this case?

15     A.   Yes.

16     Q.   Did you talk to anyone in preparation for this

17  case?

18     A.   Yes.

19     Q.   Who did you talk with?

20     A.   I spoke with our insurance broker who provides

21  us with our medical plans and my director of human

22  resources who also works with me on renewing our medical

23  plans.

24     Q.   And who is the insurance broker you spoke

25  with?

Page 9

1      A.    Jami Hansen.

2      Q.    Is Jami Hansen with AJG?

3      A.    Gallagher benefits.

4      Q.    Okay.  It was unclear from the email addresses

5   in reviewing the documents.

6            So do you use Galbreath [phonetic] as your

7   broker for insurance?

8      A.    Yes, Gallagher.

9      Q.    Oh, thank you.

10           And what did you talk with Jami about?

11     A.    The process of the renewal after State

12   Bill 6219 was enacted.

13     Q.    And who is the director of HR that you spoke

14   with?

15     A.    Melissa Knauss.

16     Q.    And what did you speak with Melissa about?

17     A.    The emails that we had and the process of our

18   renewal for the 2019 year after House Bill 6219 was put

19   into effect.

20     Q.    You testified that you reviewed the documents

21   that you helped put together for the responses to the

22   requests for production.  What general category of

23   documents did you pull together for purposes of

24   responding to the requests for production?

25     A.    I don't recall which specific requests for

c295376b-5358-4733-bac0-a5db45f51f89

Page 10

1    production.

2        Q.   Were there particular categories of documents

3    that you searched and looked for for purposes of

4    responding to requests for production?

5        A.   Could I see the specific questions for the

6    requests for productions?  Refresh my memory?

7        Q.   Okay.  We'll move along at this point.  Maybe

8    we'll get back to that.

9             Aside from talking with Melissa and Jami, did

10   you talk to anyone else in preparation for this

11   deposition?

12       A.   I talked with Pastor Jay Smith.

13       Q.   Okay.  And what did you talk with Pastor Smith

14   about?

15             MR. THERIOT:  I'm going to object to this

16   line of questioning to the extent that it calls for

17   conversations that took place while counsel was

18   pregnant -- present.  Sorry about that.  That was a

19   little bit of a Freudian slip -- present.  But you may

20   testify as to conversations you had when I or -- or

21   in-house counsel weren't present.

22             THE DEPONENT:  My conversations with

23   Pastor Jay were primarily about the process, the

24   logistics, timing of when we would be deposed.

25                  (Exhibit No. 1 marked.)

c295376b-5358-4733-bac0-a5db45f51f89

Page 11

1     Q.   (By Mr. Crisalli) Okay.  I have in the chat

2   Exhibit 1.  Can you -- you should be able to access

3   that.  And so you'll know, and hopefully I won't have to

4   repeat this for the deposition with the pastor, the way

5   we have worked it is that we will put the exhibit into

6   chat for all those present who would like it to download

7   and view it on their own computer so that way we can

8   have it right there.  If you need a share screen to

9   focus on particular language, please let me know.

10  Hopefully, that will not be required just because of

11  logistics, but we can make that work.  And if you need

12  me to repost it, let me know.

13                     (Pause in the proceedings.)

14                MR. THERIOT:   Okay.  It's up now for him.

15     Q.   (By Mr. Crisalli) Please take a moment to

16  review if you like.  Let me know when you're ready.

17     A.   All right.  I reviewed that.

18     Q.   All right.  And if you'll go to Page 5.

19                Before we do that, do you recognize this

20  document?

21     A.   Yes.

22     Q.   And do you understand this to include the

23  topics for today's deposition?

24     A.   Yes.

25     Q.   Okay.  On Page 5, it lists the topics.  My

c295376b-5358-4733-bac0-a5db45f51f89

Page 12

1    understanding from discussions with counsel is you are

2    designated to talk -- to testify regarding Topic No. 3;

3    is that correct?

4         A.   Yes.

5         Q.   You are designated to testify regarding Topic

6    No. 4; is that correct?

7         A.   Yes.

8         Q.   You are designated to discuss the Topic 5; is

9    that correct?

10        A.   Yes.

11        Q.   You are designated to testify regarding

12   Topic 6; is that correct?

13        A.   Yes.

14        Q.   And you are designated to testify regarding

15   Topic 8; is that correct?

16        A.   Yes.

17        Q.   There are a couple topics that were left out.

18   I'm just confirming, are there any other topics with

19   which you are designated to testify today?

20        A.   Not to my knowledge.

21        Q.   What is your position at Cedar Park?

22        A.   I'm the chief financial officer.

23        Q.   And how long have you been the chief financial

24   officer at Cedar Park?

25        A.   Approximately, 14 and a half years.

c295376b-5358-4733-bac0-a5db45f51f89

Page 13

1      Q.   Did you have employment before becoming the

2   chief financial officer at Cedar Park?

3      A.   Yes.

4      Q.   Where did you work?

5      A.   Immediately prior to working at Cedar Park, I

6   was a consultant for several small businesses.

7      Q.   What kind of consulting did you do?

8      A.   Financial and general management consulting.

9      Q.   What are your job responsibilities as the

10  chief financial officer for Cedar Park?

11     A.   To oversee the financial operations of Cedar

12  Park, prepare budgets, monitor revenues and expenses.

13  In addition, I'm responsible for human resources and

14  payroll.

15     Q.   And could you briefly describe your education,

16  like, college-level, maybe grad school, and the like?

17     A.   I have a master's degree.

18     Q.   And what's your master's in?

19     A.   Hospital and healthcare administration.

20     Q.   Did any of that focus on insurance coverage

21  for healthcare?

22     A.   To a certain degree, yes.

23     Q.   In which respect?

24     A.   When I got my degree, there was a difference

25  between an MBA and a master's in hospital and healthcare

Page 14

1  administration, most of the business courses were the

2  same, but there were specific courses relating to topics

3  specific to operating a hospital.

4      Q.   And where did you obtain this degree from?

5      A.   Saint Louis University.

6      Q.   And when did you obtain that degree?

7      A.   1979.

8      Q.   And I take it you have an undergraduate

9  degree?

10     A.   Yes.

11     Q.   And where did you get that from?

12     A.   Wheaton College.

13     Q.   And what's the degree in?

14     A.   Economics.

15     Q.   And what year did you obtain that degree?

16     A.   1977.

17     Q.   As part of either your master's or your

18  bachelor degree, do you have any expertise in actuary

19  analyses?

20     A.   The topics were covered in classes, but I

21  can't recall specifics.

22     Q.   Have you personally used any of those classes

23  in the last ten years as your job as CFO for Cedar Park?

24     A.   Yes, I would say.

25     Q.   In which respect?

c295376b-5358-4733-bac0-a5db45f51f89

Page 15

1      A.   The business classes, how to analyze

2  financials, how to read documents, how to set goals in

3  the short-term and long-term based on my job

4  responsibilities.

5      Q.   What is Cedar Park?

6              MR. THERIOT:  Objection.  Vague.

7      Q.  (By Mr. Crisalli) Do you understand the

8  question?

9      A.   Not really.

10     Q.   Okay.  What is Cedar Park Assembly of God of

11  Kirkland, Washington?  What kind of entity is it?

12     A.   It's a church.

13     Q.   Does it conduct services?

14     A.   Yes.

15     Q.   Does it -- and by services, I mean church

16  services where people attend.  Does that make sense?

17  Does that change your answer?

18     A.   No, it does not change my answer.

19     Q.   Does it provide other functions?

20     A.   Yes.

21     Q.   What kinds of functions does Cedar Park

22  provide?

23     A.   Cedar Park offers several ministry services.

24     Q.   Are they broken up in different ways?

25     A.   Yes.

Page 16

1    Q.   How -- how are they broken up?

2    A.   There are primarily churches, outreach

3  ministries, and schools.

4    Q.   Does Cedar Park have any licensed businesses?

5    A.   I believe so.

6    Q.   What are those?

7    A.   I believe we have licenses to operate our

8  churches and schools or ministries in the various towns

9  where we conduct business.

10    Q.   What kind of businesses does Cedar Park have?

11    A.   We operate churches and we operate Christian

12  schools as well as several outreach ministries.

13    Q.   And what do the outreach ministries do?

14    A.   All the ministries support the mission of

15  Cedar Park, to bring the good news of Jesus Christ to

16  anyone we have contact with.

17    Q.   And how do the outreach ministries serve that

18  purpose?  Do they provide services to individuals?  Do

19  they hire individuals?  What -- how do they effectuate

20  that?

21    A.   They provide services, but not necessarily

22  church services like we discussed before.

23    Q.   Is the term there, services, more akin to,

24  like, goods and services as compared to, like, a church

25  service?

Page 17

1          MR. THERIOT:  Objection.  Vague.

2          THE DEPONENT:  I'm not quite sure.  Can

3  you restate that?

4      Q.  (By Mr. Crisalli) I'll restate that.

5          When you say they provide services but not the

6  traditional church services, what kind of services do

7  they provide?

8      A.   We have a chapel of the resurrection funeral

9  home that provides funeral-related services.  We have a

10 missionary car ministry that provides cars to

11 missionaries home on furlough, things like that.

12     Q.   And it sounds like, from your answers, Cedar

13 Park has several churches; is that right?

14     A.   There are several branch churches, yes.

15     Q.   How many?

16     A.   I believe five.

17     Q.   Do you -- aside from the funeral home,

18 missionary car ministry, are there any other outreach

19 ministries that Cedar Park provides?

20     A.   Yes.

21     Q.   And what are those?

22     A.   We provide a Christian counseling network and

23 a Christian club sports program.

24     Q.   Does Cedar Park have a membership?

25     A.   There are members of Cedar Park Church.

c295376b-5358-4733-bac0-a5db45f51f89

Page 18

1    Q.   And how many members are there at Cedar Park
2  Church?

3    A.   I'm not exactly sure.  Probably, somewhere
4  around 400.

5    Q.   For these services -- nonchurch services that
6  are being provided, does Cedar Park pay B&O taxes?

7         MR. THERIOT:  Objection.  Vague.

8    Q.   (By Mr. Crisalli) Do you understand what B&O
9  taxes are?

10   A.   Yes.

11   Q.   Does Cedar Park pay business -- B&O taxes in
12  any way?

13   A.   Yes, as required by law.

14   Q.   And does Cedar Park pay sales taxes to the
15  State?

16   A.   Yes.

17   Q.   What is the estimated yearly revenue of Cedar
18  Park?

19   A.   I should know this off the top of my head.
20  I'm not 100 percent sure.

21   Q.   Is it over a million dollars?

22   A.   Yes.

23   Q.   Is it over $10 million?

24   A.   Yes.

25   Q.   Is it over $20 million?

c295376b-5358-4733-bac0-a5db45f51f89

Page 19

1        A.    Yes, it is.

2        Q.    Is it over $50 million?

3        A.    No.

4        Q.    Is it -- would you guess it's between, like,

5    20 and 25 or 20 and 30?  Is that -- would that be the

6    rough estimate?

7        A.    I think between 25 and 30.

8        Q.    Okay.  And since 2018, have -- has those

9    revenues remained constant?  Have they decreased or have

10   they increased?

11       A.    Since 2019.

12       Q.    Just to make sure we're clear, 2018.

13       A.    '18.  Okay.  They fluctuated, obviously, with

14   COVID in the middle.  And what -- what was your specific

15   question?

16       Q.    Whether the revenues increased, decreased, or

17   remained roughly the same during that time.

18       A.    My recollection is that for the first couple

19   of years, they remained the same.  Last year and this

20   year, they've been higher than norm.

21       Q.    What's the source of revenues for Cedar Park?

22       A.    Primarily, revenues from the ministries for

23   those that charge and tithes and offerings given to all

24   of the ministries.

25       Q.    How many employees does Cedar Park employ

c295376b-5358-4733-bac0-a5db45f51f89

Page 20

1    presently?  Let's start there.

2         A.   Another question I should know, but I'm not

3    positive.  I would say probably 3- to 400.

4         Q.   And since 2018 has that number increased,

5    decreased, or remained fairly the same?

6         A.   It was fairly static in '18 and '19, and has

7    increased in the subsequent years.

8         Q.   You mentioned timing during COVID.  Did any of

9    Cedar Park's businesses apply for and receive what's

10   called a PPP loan?

11             MR. THERIOT:  Objection.  Vague.

12             THE DEPONENT:  Can you clarify what

13   exactly you're asking?

14        Q.  (By Mr. Crisalli) Right.  Are you familiar with

15   the -- or heard about the PPP loans that were provided

16   by the federal government during the Coronavirus

17   pandemic?

18        A.   Yes.

19        Q.   Did any of Cedar Park's businesses apply for

20   and receive a PPP loan?

21        A.   Yes.

22        Q.   Did Cedar Park pay back that loan?

23        A.   No.

24        Q.   Was the loan forgiven?

25        A.   Yes.

Page 21

1      Q.   Does Cedar Park offer insurance, just broadly

2   insurance, as a benefit to its employees?

3      A.   What -- what type of insurance are you

4   referring to?

5      Q.   Well, that's -- does Cedar Park offer multiple

6   types of insurance as a benefit to its employees?

7      A.   Yes.

8      Q.   And what types of insurance are included as

9   benefits to its employees?

10      A.   Medical, dental, life insurance, and then some

11   optional insurances that employees can purchase on their

12   own.

13      Q.   For the medical, dental, life insurance, the

14   group of insurance that you talked about that's

15   non-optional, do all the employees receive this benefit?

16           MR. THERIOT:  Objection.  Assumes facts

17   not in evidence.

18           THE DEPONENT:  Repeat your question.

19   There was something you said that I didn't understand.

20      Q.   (By Mr. Crisalli) Okay.  Do all employees

21   receive the benefits of medical insurance at Cedar Park?

22      A.   No.

23      Q.   How does Cedar Park determine who receives

24   medical insurance benefits versus not?

25      A.   We provide the option for medical insurance to

c295376b-5358-4733-bac0-a5db45f51f89

Page 22

1    full-time employees.

2         Q.   Are there full-time employees who do not

3    accept that option at Cedar Park?

4         A.   Yes.

5         Q.   Can you estimate how many employees at Cedar

6    Park receive medical insurance coverage as a benefit

7    presently?

8         A.   Approximately, 135.

9         Q.   Okay.  Has that number increased or decreased

10   or remained the same since 2018?

11        A.   I believe it's increased slightly.

12        Q.   What is your role in terms of procuring health

13   insurance for Cedar Park?

14        A.   I'm responsible to obtain bids, structure,

15   healthcare plan, and present options to Pastor Jay for

16   approval.

17        Q.   And how long have you had that responsibility?

18        A.   I believe for 13 of the last years I've been

19   here.

20        Q.   And you testified your use of Gallagher as a

21   broker; is that right?

22        A.   Yes.

23        Q.   And how long have you used Gallagher as a

24   broker?

25        A.   I believe Gallagher was used prior to my

c295376b-5358-4733-bac0-a5db45f51f89

Page 23

1    assuming the responsibilities.

2         Q.    And what do they do as compared to you for

3    purposes of procuring health insurance for Cedar Park?

4         A.    They obtain bids from different companies

5    providing the type of healthcare I request.

6         Q.    And are they on a yearly contract, or is it

7    automatically renewed?  How do you structure the

8    business relationship with Gallagher?

9         A.    It's a yearly contract.

10        Q.    Okay.  Please generally describe the process

11   for how Cedar Park purchases or renews health insurance

12   for its employees.

13        A.    Throughout the year, we review our healthcare

14   utilization with our broker.  And prior to our renewal,

15   usually four months prior, we begin discussions on any

16   changes that have occurred in the healthcare market and

17   our experience and what options the broker feels we have

18   for renewing our medical plan.

19        Q.    And just a question from earlier, did you

20   assist in providing facts for the complaints in this

21   matter?

22        A.    I believe so, yes.

23        Q.    And what's the kind of information you

24   generally provided in the preparation of the complaints

25   in this matter?

c295376b-5358-4733-bac0-a5db45f51f89

Page 24

1    A.   As I recall, the specifics of the additional

2   costs to Cedar Park to provide a plan that would allow

3   us to uphold our convictions to exclude abortions and

4   abortifacient medications.

5    Q.   And have you signed a declaration or complaint

6   in this matter?

7    A.   I don't believe so.

8    Q.   I just wanted to double-check.  In reviewing

9   the case file, I didn't see it, but I just wanted to

10   make sure I wasn't missing something.

11        Okay.  Let me -- I've got some documents that

12   I'd like to discuss.  These first several I'm hoping we

13   can -- they're somewhat voluminous.  I'm hoping you'll

14   recognize them.  I don't really have many questions

15   regarding them.  I just want to confirm what they are.

16    A.   Okay.

17              (Exhibit No. 2 marked.)

18    Q.  (By Mr. Crisalli) That said, you know, take as

19   long as you need to -- we can start with Exhibit 2.

20    A.   I hope I don't have to read all 61 pages.

21    Q.   I hope not too.

22        And if you want to briefly look through

23   Exhibit 2 and just let me know whether you recognize

24   this document.  And I can represent that this was

25   produced in discovery from Cedar Park.

c295376b-5358-4733-bac0-a5db45f51f89

Page 25

1     A.   Yes.  This looks like the document we get

2  annually from Kaiser when we renew our medical plan with

3  them.

4     Q.   And is -- my apologies.

5          Is this for the year beginning in -- on

6  September 1, 2019?

7     A.   Yes.

8                    (Exhibit No. 3 marked.)

9     Q.   (By Mr. Crisalli) And I apologize that these

10 are out of order.  If you'll look at Exhibit 3.  They

11 were produced out of order.  I don't know why, but I'm

12 just going to keep them in that order for consistency.

13 I suspect, you know, just how filing occurred or

14 something.

15         If you want to take a look at Exhibit 3.

16    A.   It looks like the same, somewhat shorter

17 document for the 2021 year.

18                    (Exhibit No. 4 marked.)

19    Q.   (By Mr. Crisalli) Okay.  And then same for

20 Exhibit 4.

21    A.   Okay.

22    Q.   I think Exhibit 4 -- let me just scroll down.

23 I thought that it had 2020 in it as well.  That's why I

24 had to --

25         Yeah.  If you go to page -- on Exhibit 4,

c295376b-5358-4733-bac0-a5db45f51f89

Page 26

1    Page 116 of the document.

2        A.    Okay.

3        Q.    Okay.  Is it the same document, like Exhibit 2

4    and 3?  It's the plan with Kaiser Permanente for Cedar

5    Park for the year beginning September 1, 2020, starting

6    on Page 116 of Exhibit 4?

7        A.    Yes, that's what it looks like to me.

8        Q.    Okay.  I just want to confirm Exhibits 2, 3,

9    and 4, they appear to be Cedar Park's insurance plan

10   through -- health insurance plan through Kaiser

11   Permanente for the years 2019, 2020, 2021, all of which

12   starting on September 1st of those years; is that right?

13       A.    That's what it appears to be, yes.

14       Q.    Is there a reason -- any reason to doubt that

15   these aren't the insurance plans for Cedar Park during

16   those years?

17       A.    They were plans we provided during the

18   requests for whatever it was?

19       Q.    Yes.  You can see the Bates numbers from Cedar

20   Park to identify that.

21       A.    No.  I would say that -- they appear to be the

22   correct documents.

23       Q.    How long has Cedar Park used Kaiser Permanente

24   as its health insurance carrier?

25       A.    I'm not 100 percent sure.  I would say

Page 27

1    probably at least six years.

2         Q.   Would that be six years total, or six years

3    preceding 2019?

4         A.   Kaiser bought Group Health Cooperative here in

5    the State of Washington.  We had been with Group Health

6    prior to being with Kaiser.

7         Q.   Okay.  And how long were you with Group Health

8    before they did that transition to Kaiser Permanente?

9         A.   I'm not totally sure.

10        Q.   Was it a significantly long time?  Like, let's

11   say -- I'll back up.

12             Would it be -- would you estimate ten years?

13        A.   I would say less than that.

14        Q.   Okay.  As far as you are aware, before the

15   plan that took effect on September 1, 2019, did the

16   health plan for Cedar Park include coverage for abortion

17   services?

18        A.   I believe it did not.

19        Q.   And before the plan taking effect

20   September 1, 2019, did the Kaiser Permanente plans

21   include coverage for all contraceptive services?

22        A.   I believe it did.

23        Q.   Okay.  And as far as you're aware, you used --

24   Cedar Park used Gallagher to purchase these plans; is

25   that right?

c295376b-5358-4733-bac0-a5db45f51f89

Page 28

1      A.   Yes.

2      Q.   In looking at the 2019, 2020, 2021 plan, do

3   those plans include coverage for abortion services?

4      A.   Those were big legal documents that were

5   reviewed by attorneys, but it is my understanding that

6   they do.

7      Q.   And for the 2019, 2020, 2021 plans that we

8   covered, do those plans also include coverage for all

9   contraceptive services?

10      A.   Yes, they do.

11      Q.   And including within that -- you've used the

12   term "abortifacient" already in this deposition.  Would

13   you please define that for your purposes?

14      A.   My understanding is an abortifacient is a

15   pill, device that prevents a fertilized embryo from

16   developing into a child.

17      Q.   And so we're on the same page, is it your

18   understanding -- Cedar Park's understanding that for

19   the 2019, 2020, and 2021 plan, that the plans also

20   include coverage for those kinds of contraceptives

21   within its plan?

22      A.   I believe so.

23      Q.   And I don't think you produced this because of

24   the timing of when the document production occurred.

25   Did Cedar Park renew its plan with Kaiser Permanente

Page 29

1    for 2022 beginning September 1, 2022?

2         A.   Yes, we did.

3         Q.   And does -- do you know whether that plan

4    includes coverage for abortion services?

5         A.   I believe it does.

6         Q.   And do you know whether that plan includes

7    coverage for all contraceptive services including those

8    for what you have defined as abortifacient?

9         A.   I believe it does, yes.

10        Q.   Do you know whether Cedar Park could exercise

11   its -- a religious objection for contraceptives with

12   Kaiser Permanente?

13        A.   We were informed we could not.

14        Q.   Well, is there an option with Kaiser

15   Permanente in any of the times you renewed the plans

16   since -- beginning 2019, where you can express a

17   religious objection to all contraceptives with Kaiser

18   Permanente?

19        A.   We have expressed our objection, but those

20   abortifacients and abortion services are included in our

21   plan.

22        Q.   I understand.  I understand that.  I want to

23   focus on the question that I was asking there which is

24   whether Cedar Park could, had the ability to, express an

25   objection to Kaiser Permanente excluding all

c295376b-5358-4733-bac0-a5db45f51f89

Page 30

1   contraceptives from its plan during 2019 through 2022.

2        A.   I'm still not understanding.  Can you try to

3   rephrase that?

4        Q.   Can -- does Cedar Park know whether it could

5   tell Kaiser Permanente, voice an objection to receiving

6   all contraceptives from Kaiser in its plan?

7        A.   I believe we have done that.

8        Q.   Do you know why Kaiser Permanente will not

9   provide for specific contraceptives to be excluded from

10  Cedar Park's healthcare plan?

11       A.   I believe they informed us that that would be

12  too much -- too much paperwork or too complicated a

13  process, so it was either all contraceptives or no

14  contraceptives.

15       Q.   Okay.  And would Cedar Park agree that

16  that's --

17            THE DEPONENT:  My speaker's not working.

18            MR. CRISALLI:  Can you hear me?

19            THE DEPONENT:  It says my speaker's not

20  working, please check my connection.

21            MR. CRISALLI:  We can -- we can hear you.

22            MR. THERIOT:  I'm not hearing anything.

23            Jeff, can you hear us?

24            MR. CRISALLI:  I can hear you.

25            MR. THERIOT:  We can't hear you, Jeff.

Page 31

1          MR. CRISALLI:  It's Paul, but that's --

2          MR. THERIOT:  I'm not sure what's going

3    on.  Yeah, I can't hear him either.

4               It may be something with your connection,

5    Paul.

6          MR. CRISALLI:  Nicole, can you -- let's

7    go off the record.

8                    (Discussion off the record.)

9                    (A break was taken from

10                    9:53 a.m. to 9:56 a.m.)

11        Q.  (By Mr. Crisalli) Would Cedar Park agree that a

12   business decision -- deciding not to offer a specific

13   service because it involves too much paperwork and would

14   be difficult is a business decision?

15              MR. THERIOT:  Objection.  Vague.

16              THE DEPONENT:  Yeah.  I'm not -- I'm not

17   quite sure what you're asking of me.

18        Q.  (By Mr. Crisalli) Was there any indication to

19   Cedar Park that Kaiser's -- Kaiser Permanente's decision

20   to not offer specific exclusions for contraceptives was

21   based on religion?

22        A.   I don't believe so.

23        Q.   Okay.  What are Cedar Park's goals when

24   purchasing a health insurance policy?

25        A.   We try to purchase the most comprehensive

c295376b-5358-4733-bac0-a5db45f51f89

Page 32

1    policy possible in keeping with our deeply-held

2    religious beliefs that provides our staff with

3    affordable, high-quality healthcare.

4         Q.   Do you have anyone who directly reports to

5    you?

6         A.   Yes.

7         Q.   And how many people directly report to you?

8         A.   Two.

9         Q.   And who are they?

10        A.   The director of human resources and the

11   accounting manager.

12        Q.   Does Cedar Park have an outside accounting or

13   tax accounting firm at all?

14        A.   I'm not sure what you mean.

15        Q.   Does Cedar Park utilize an outside accounting

16   firm for its business?

17        A.   No.  We -- we have an annual audit by an audit

18   firm but not an accounting firm.

19        Q.   Okay.  And which auditing firm is that?

20        A.   Battershell & Nichols.

21        Q.   Okay.  And could you please summarize what

22   that auditing firm does for Cedar Park?

23        A.   As part of our mortgage, we have, for many

24   years, been required to have a full annual audit

25   conducted by an outside CPA firm.

c295376b-5358-4733-bac0-a5db45f51f89

Page 33

1          Q.   And does that annual audit examine all of the

2    business operations or business entities of Cedar Park?

3          A.   Yes.

4          Q.   And do you receive reports from the auditing

5    firm regarding those audits?

6          A.   Yes, we receive an annual audited report.

7          Q.   I think I cut out there.

8          A.   You did.

9                    MR. CRISALLI:   Okay.   Could the court

10   reporter repeat the question and --

11         Q.  (By Mr. Crisalli) Did you -- excuse me.   I'll

12   back up.

13              Did you provide a complete response to my

14   question --

15         A.   I think so.

16         Q.   -- before I cut out?

17         A.   I think so.

18                   MR. CRISALLI:   Okay.   Could the court

19   reporter please read back the answer?

20                        (Record read back as requested.)

21         Q.  (By Mr. Crisalli) And when you receive these

22   reports, do you read them carefully?

23         A.   Yes.

24         Q.   And is it part of your job responsibilities to

25   review them carefully?

Page 34

1      A.   I would say yes.

2      Q.   And why does your job require you to review

3   these reports carefully?

4             MR. THERIOT:  I'm going to object to this

5   line of questioning because it seems to be outside of

6   the scope of the 30(b)(6) notice.

7      Q.  (By Mr. Crisalli) You may continue.

8      A.   Re -- I just am -- I'm not clear what exactly

9   you're asking me.  Can you --

10      Q.   Why is it part of your job to -- why -- I'll

11   restart.

12             Why does your job require you to review these

13   reports carefully?

14      A.   My job is to oversee the finances of Cedar

15   Park.  The audit is an outside entity that examines how

16   we conduct our business and insures that we are doing

17   everything in accordance with generally accepted

18   accounting principles.

19      Q.   Would you say you have an expertise in

20   sophisticated financial management?

21             MR. THERIOT:  Objection.  Vague.

22             THE DEPONENT:  Yeah.  I'm not sure what

23   you mean by "sophisticated."

24      Q.  (By Mr. Crisalli) Would you classify Cedar

25   Park's business as a sophisticated business relative for

c295376b-5358-4733-bac0-a5db45f51f89

Page 35

1    a church in particular?

2         A.   It certainly is more -- has more facets than a

3    normal church would -- would have.

4         Q.   And you testified that it has revenues of

5    between $25- and $30 million.  Would you consider that

6    to be a substantial revenue for a church?

7         A.   Because Cedar Park's ministries encompass so

8    many different ministries, primarily, the school,

9    it's -- it's a large number, but I -- I don't think

10   it's -- what was the term you used in the question?

11        Q.   Substantial revenues relative to a church.

12        A.   I can't speak to what would be substantial

13   revenue compared to any church but Cedar Park.

14        Q.   All right.  I'm going to move topics now to

15   the 2019 renewal process.  When did Cedar Park start the

16   process to renew its health plan that would begin

17   September 1, 2019?

18        A.   As I believe I stated, we generally start four

19   months prior with a pre-renewal meeting.

20        Q.   For the -- is it okay if I refer to this as

21   the 2019 renewal when we're both talking about the

22   renewal that ultimately took effect September 1, 2019?

23        A.   Yes.

24        Q.   For that renewal, did Cedar Park consider

25   changing from Kaiser Permanente at any point?

c295376b-5358-4733-bac0-a5db45f51f89

Page 36

1      A.   Yes.

2      Q.   Why?

3      A.   Kaiser informed us that they would no longer

4  be able to provide the abortion exemption that they had

5  previously provided because of the Washington 6219 law.

6      Q.   And how did you look at other plans aside from

7  Kaiser?  Who brought those plans in for your review?

8      A.   Our broker.

9      Q.   Did you independently research for any plans

10 for 2019 other than Kaiser Permanente?

11     A.   Not personally, no.

12     Q.   Did you give your broker any instructions when

13 searching for plans for that 2019 renewal other -- that

14 were other than Kaiser Permanente?

15     A.   I believe so.

16     Q.   What were those instructions?

17     A.   We wanted to explore any option that would

18 allow us to provide a quality healthcare plan to our

19 employees that would exclude abortions.

20     Q.   And what was your understanding of the steps

21 that your broker took to effect that?

22     A.   I believe that in 2019, we approached several

23 plans other than the normal plans that we had examined

24 in prior years.

25     Q.   And do you know how many plans you approached

c295376b-5358-4733-bac0-a5db45f51f89

Page 37

1    during that 2019 renewal process other than Kaiser

2    Permanente?

3         A.   I believe there were at least seven others.

4         Q.   And do you recall their names?

5         A.   It should be in the information we provided.

6    Do you want me to --

7         Q.   So is that a no?  You don't recall right now,

8    but you could refer me to the -- your responses to

9    discovery?

10        A.   Yeah.  There's a couple.

11        Q.   Okay.  Was Cigna one of them?

12        A.   Yes.

13        Q.   Was Premera one of them?

14        A.   Yes.

15        Q.   And was it -- just to make sure I'm clear,

16    your broker was the one who searched for these plans;

17    right?

18        A.   Yes, that's true.

19        Q.   And then the broker would present the plans to

20    you as options; is that right?

21        A.   Yes.

22        Q.   When were they -- when was your broker first

23    asked to look for these kinds of plans?

24        A.   During -- we're just talking about the 2019?

25        Q.   2019, yeah.

Page 38

1     A.   I'm not exactly sure.  I'm assuming during the
2  pre-renewal.
3     Q.   Okay.  Did your broker present any plans that
4  provided services consistent with Cedar Park's religious
5  beliefs for the 2019 renewal?
6     A.   Yes.
7     Q.   Do you recall which plans those were?
8     A.   I believe our broker said that the -- the
9  primary way to exclude abortions based on our
10 deeply-held religious beliefs would be to do a
11 self-insured plan.
12    Q.   So did you also examine whether Kaiser
13 Permanente would provide a self-insured plan?
14    A.   Yes, we did.
15    Q.   Was that the only self-insured plan that you
16 looked at during the 2019 renewal?
17    A.   I'm not certain.
18              (Exhibit No. 5 marked.)
19    Q.  (By Mr. Crisalli) All right.  We're going to go
20 through a few emails.  I'm hoping this will be, again, a
21 shorter process than others, but we shall see.
22              THE DEPONENT:  So I do click on this to
23 see the file?
24              MR. THERIOT:  On the chat, do you see the
25 chat?  It's the one with the red dot on it.  It says

Page 39

1    chat.

2                     THE DEPONENT:  Not the one that says

3    leave.

4                     MR. THERIOT:  Right.

5                     THE DEPONENT:  So Exhibit 5.

6         Q.  (By Mr. Crisalli) Please take a moment to

7    review this.

8                          (Pause in the proceedings.)

9         Q.  (By Mr. Crisalli) Now, one thing about these

10   emails is my read of them is that they are in

11   chronological order, not reverse chronological order.

12   So as you go through, it actually gets later in the

13   thread unless there was an email attached that it's

14   referring to.

15        A.   Okay.  That looks right.

16        Q.   Okay.  Now, first some background.  The first

17   page, this appears to be an email from Jami Hansen to

18   you with a cc to Melissa Knauss and Melinda Hansen; is

19   that right?

20        A.   Yes, that's what it appears.

21        Q.   And this is Jami who's been your broker

22   through Gallagher for Cedar Park's health insurance

23   plans; right?

24        A.   Correct, yes.

25        Q.   And the -- Melissa Knauss is the director of

c295376b-5358-4733-bac0-a5db45f51f89

Page 40

1   HR for Cedar Park; correct?

2        A.   Yes.

3        Q.   And as you read through these emails, these

4   are emails between, it appears, Wednesday, June 12th at

5   8:41, through Wednesday, June 12th, at 4:46 discussing

6   the possibility of using Cigna; is that correct?

7        A.   Okay.  Sorry.  I -- I wanted to read those

8   through.  Can you restate your question?

9                  MR. CRISALLI:  Could the court reporter

10  please repeat the question?

11                       (Record read back as requested.)

12                  THE DEPONENT:  That's what it appears.

13                       (Exhibit No. 6 marked.)

14       Q.  (By Mr. Crisalli) Okay.  Adding the next

15  exhibit.

16            If you want to take a quick minute to

17  familiarize yourself with this document.

18       A.   When it opens.

19            Okay.  And what's your question?

20       Q.   No question yet.

21       A.   Okay.

22       Q.   First, it appears that you received this email

23  on Monday, June 17, at 12:37 p.m.; is that right?

24       A.   That's what the email says, yes.

25       Q.   And it appears to be in response to an email

c295376b-5358-4733-bac0-a5db45f51f89

Page 41

1    from you dated June 16, 2019, about the coverage for

2    Kaiser; is that right?

3         A.    I don't see June 16th anywhere.

4         Q.    If you go under -- still on the first page.

5         A.    Oh.

6         Q.    Right under Jami's signature line.

7         A.    Yup.  I would agree with that, yes.

8         Q.    Okay.  It appears from this document that

9    Cedar Park was still considering and trying to -- strike

10   that.

11              At this time, June 17, Cedar Park was still

12   considering whether to use Kaiser Permanente as an

13   option for its insurance plan; is that right?

14        A.    I would say yes.

15        Q.    And this is around the same time as there was

16   the previous email just a couple days after from --

17   regarding Cigna.  So -- correct?

18        A.    Okay.  That looks correct, yes.

19                         (Exhibit No. 7 marked.)

20        Q.   (By Mr. Crisalli) Exhibit 7.  Please let me

21   know when you're ready.

22        A.    Okay.  Now, what's your question?

23        Q.    My question is:  Is this an email string -- it

24   appears, just judging from the bottom, to start on

25   June 21, 2019, through June 25, 2019, regarding

Page 42

1    different options for express -- for Cedar Park to

2    express its religious objections in purchasing a health

3    plan?

4        A.    And what are the dates you're saying again?

5        Q.    What I see are June 21, which is down --

6    second-to-last email at the bottom part of the string,

7    and then at the top, it appears to be, or I guess bottom

8    now, it appears to be June 25, 2019.

9        A.    That's what it appears to be.

10       Q.    Okay.  Looking at Page 1 and 2, does Cedar

11   Park understand the text beginning with, "Here is

12   Cigna's legal response for both ASO and fully-insured

13   business.  Let me know if you have any questions,"

14   through to Jami Hansen's signature line in the middle of

15   the second page.

16           If you'd look at that, please.  We'll start

17   there.

18       A.    Okay.  Sorry to always be asking this, but

19   what exactly was your question again?

20       Q.    The starting point was to review that part.

21           The question is:  Does Cedar Park understand

22   that part to be Jami Hansen communicating an option from

23   Cigna in which Cedar Park could express its religious

24   objections to abortions and certain contraceptives in

25   purchasing its plan?

c295376b-5358-4733-bac0-a5db45f51f89

Page 43

1      A.   I understand that we could express our
2    objections.
3      Q.   And could you do so by purchasing the Cigna
4    plans that are described in this email?
5      A.   It is my understanding from my discussions
6    with Jami that even if we -- if we expressed our desire
7    to not cover abortions or specific contraceptives, they
8    would be included in our plan.
9      Q.   Where does that -- where -- where does this
10   email state that?
11     A.   Well, it says:  "For an insured plan situated
12   in Washington, policies must cover maternity care and
13   this includes coverage for abortions."
14     Q.   Okay.  What about the third paragraph of that,
15   same section?  Does that provide that an employer with a
16   religious or moral tenet opposed to a specific service
17   is not required to purchase coverage for that service if
18   they object for reason of religion or conscience?  Did I
19   read that correctly?
20     A.   Yes.
21     Q.   There's the next sentence:  "In other words,
22   an employer may exclude coverage for contraceptives and
23   abortion if that employer objects to providing that
24   coverage due to religious or other beliefs."
25          Did I read that section correctly?

Page 44

1      A.   Yes.

2      Q.   As I read that section, it covers both

3   contraceptives and abortion and provides that Cedar Park

4   as an employer with a religious objection may be -- may

5   exclude coverage for those types of services; is that

6   correct?

7      A.   To me, it seems contradictory.  That paragraph

8   says -- or that sentence you read says, "We may exclude

9   coverage," and yet above it, it says, "Our policies must

10  cover maternity care including abortions."

11     Q.   But an employer may exclude coverage for

12  contraceptives and abortion.  That is expressly within

13  this paragraph; is it not?

14     A.   It says we are not required to purchase

15  coverage which seems different to me than what you

16  stated.

17     Q.   I read:  "In other words, an employer may

18  exclude coverage for contraceptives and abortions."

19          Did I read that correctly?

20     A.   Yes.

21     Q.   And this is an email dated June 25, 2019, when

22  you received it; is that right?

23     A.   Yes.

24               (Exhibit No. 8 marked.)

25     Q.   (By Mr. Crisalli) Adding Exhibit No. 8.

c295376b-5358-4733-bac0-a5db45f51f89

Page 45

1          And please let me know when you're ready.

2     A.   Okay.  I've reviewed it.

3     Q.   Okay.  Is this a series of emails beginning

4  July 8, 2019, at 3:48 p.m., and it appears the last one

5  is July 18, 2019, at 2:22 p.m.?

6     A.   That's what it appears to me, yes.

7     Q.   Okay.  Turning to the first page, this appears

8  to be an email from Ms. Knauss; is that right?

9     A.   That's what it appears to be, yes.

10     Q.   Did you assist in drafting this or review it

11  at all?

12     A.   I don't recall.

13     Q.   And the reason why I ask, it appears to

14  mention your -- what I think is probably your name,

15  "Steve and I are trying to read between the carriers'

16  mumbo-jumbo, legalese, and just get really clear

17  unequivocal answers," in the body of that first email.

18          Did I read that correctly?

19     A.   Yes.

20     Q.   You're probably the Steve that she's

21  referencing in this; right?

22     A.   Yes.

23     Q.   Okay.  And this appears to ask for

24  clarification from both Kaiser and Cigna about how to

25  cover or exclude abortion services and certain

c295376b-5358-4733-bac0-a5db45f51f89

Page 46

1    contraceptive services from a health plan; right?

2        A.   Yes, I would say.

3        Q.   And then it looks like a response was provided

4    by Jami Hansen on July 8, 2019, at 4:16 p.m.; is that

5    right?  I think that's the next email.

6        A.   Yes.

7        Q.   And he appears -- is Jami a he?  She?  They?

8        A.   She.

9        Q.   She -- my apologies -- at least virtually

10   appeared to forward an email from Cigna answering the

11   questions; right?

12       A.   Yeah.  I'm not familiar with Mark Croff, but

13   it says he's from Cigna.  That seems correct.

14       Q.   Yeah.  And then the next email appears to be

15   from July 8, 2019, at 4:29 p.m., from Melissa describing

16   her understanding of Cigna's plan and exclusions; is

17   that right?

18       A.   Yes, that's what that email states.

19       Q.   And then the next email, which is just a few

20   minutes later from Jami says "correct," likely in

21   reference to Melissa's last email.

22       A.   That seems logical.

23       Q.   Okay.  And then down at the bottom, page -- I

24   think it's Page 3 of 4 -- 3 and 4, that appears to be in

25   red, the responses from Kaiser Permanente with respect

c295376b-5358-4733-bac0-a5db45f51f89

Page 47

1    to your questions; right?

2         A.   Yes.

3                         (Exhibit No. 9 marked.)

4         Q.  (By Mr. Crisalli) Okay.  Next, Exhibit No. 9.

5         A.   I've read a lot of emails.  I've read that.

6         Q.   Okay.  And is this an email string between

7    Monday, July 15, at 5:44 p.m., through Tuesday, July 16,

8    at 10:59 a.m.?

9         A.   That's what it appears to be, yes.

10        Q.   And is the discussion on this basically

11   whether Cedar Park would -- was evaluating options

12   between Cigna and Kaiser Permanente for its health

13   insurance plan?

14        A.   That's what it appears, yes.

15        Q.   And these emails discuss the various options

16   with respect to coverage for abortifacient services or

17   abortion services?

18        A.   Yes.

19        Q.   Okay.  Go to the bottom, the one with -- in

20   red.  It has a red line.  I think it's Page 3, Bates

21   stamped Cedar Park 000223.

22        A.   Okay.

23        Q.   I'll try and use those Bates Stamps more often

24   just for both of our ease.

25        A.   Okay.  Thank you.

c295376b-5358-4733-bac0-a5db45f51f89

Page 48

1    Q.   The first response in red talks about:  "If we

2    changed to Cigna, we would need decisions by this

3    Friday, July 19th"; is that correct?

4    A.   That's what it appears Jami's saying, yes.

5    Q.   So did that deadline change at all?

6         And then:  "If we stay with Kaiser, we could

7    go out to July 26th"; is that correct?

8    A.   That's what it says.

9    Q.   Was it actually later?

10   A.   I don't recall.

11                    (Exhibit No. 10 marked.)

12   Q.  (By Mr. Crisalli) Next -- here's the next,

13   Exhibit No. 10.

14        Since it's just one page, I'll start with a

15   question.  It's a string of emails between Tuesday,

16   July 16, at 3:02 p.m., to Wednesday, July 17, 2019, at

17   4:26 p.m.  Does that appear to be correct?

18   A.   Yes.

19   Q.   And it appears to discuss what options Cedar

20   Park would have if it chose Cigna with respect to

21   coverage for its employees.

22   A.   That's not really correct.

23   Q.   Okay.  How is that incorrect?

24   A.   The first email at 3:02, this only is

25   attempting to determine the impact on PPO employees

c295376b-5358-4733-bac0-a5db45f51f89

Page 49

1   comparing Cigna's network to Kaiser's.

2       Q.   Okay.  And did Kaiser have both an HMO and a

3   PPO?

4       A.   Yes.

5       Q.   Do you understand what those terms mean, HMO

6   and PPO?

7       A.   Actually, I do.

8       Q.   What is an HMO?

9       A.   An HMO is a health maintenance organization

10  where care is provided generally through a primary care

11  physician.

12      Q.   And what is a PPO?

13      A.   Again, I'm not a total expert in this, but

14  it's a preferred provider organization with the most

15  significant difference between that and an HMO being

16  that an employee on a PPO plan can choose their own

17  providers.

18      Q.   And do you know whether the employees at Cedar

19  Park have a preference of being in an HMO versus PPO?

20      A.   I can make an assumption based on the number

21  of employees enrolled at that time.  40 percent were

22  enrolled in an HMO and 60 percent were enrolled in a

23  PPO.

24           MR. CRISALLI:  We've been going for a

25  little while.  I know we had a break because of Zoom.

c295376b-5358-4733-bac0-a5db45f51f89

Page 50

1   Do you want to keep going or do you want to take a

2   break?

3                   MR. THERIOT:  I guess, that's a -- I was

4   just going to ask the question:  Do you want to take one

5   break before lunch and then come back?

6                   MR. CRISALLI:  That's fine by me.  I can

7   go forever, but I know other people can't.

8                   MR. THERIOT:  Yeah.  Do you want to take

9   about ten minutes?

10                  THE DEPONENT:  Yeah, I think that'd be

11  great.

12                  MR. CRISALLI:  Off the record.  We'll do

13  a ten-minute break, back at 10:55.

14                          (A break was taken from

15                           10:44 a.m. to 10:55 a.m.)

16                          (Exhibit No. 11 marked.)

17      Q.  (By Mr. Crisalli) And do you still understand

18  that you are under oath for purposes of this deposition?

19      A.   Yes.

20      Q.   Okay.  I put in the chat Exhibit No. 11.

21  Please take a moment to review.  Let me know when you're

22  ready.

23      A.   All right.

24           Okay.

25      Q.   Is this an email string between July 18, at

c295376b-5358-4733-bac0-a5db45f51f89

Page 51

1    11:38 p.m., through July 22nd, 8:06 a.m. of 2019?

2         A.   Yeah, that's the string.

3         Q.   And this string appears to be discussing

4    different kinds of services offered by Cigna's plan; is

5    that correct?

6         A.   Yes.

7         Q.   Including in the email dated July 22, 2019;

8    right?

9         A.   What's your question?

10        Q.   Oh, that -- that email on July 22, 2019,

11   includes discussion about preventative prescription

12   coverage in -- with Cigna.

13        A.   Yes.

14        Q.   Okay.  I think, and I'll get to this later,

15   but on the first page, there appears to be a PDF

16   attached; is that right?

17        A.   Yeah, that's what it looks like.

18        Q.   Okay.  I'll cover this in a subsequent

19   exhibit.  I just wanted to make sure that there was an

20   attachment.

21             Second is -- so you received a proposal for

22   Cigna on July 18, 2019, for purchasing a health plan.

23        A.   Well, I can't see the proposal, but that

24   appears to be what it would look like.

25        Q.   And even notwithstanding this email, did Cedar

c295376b-5358-4733-bac0-a5db45f51f89

Page 52

1    Park receive a proposal for a health plan for 2019 from

2    Cigna?

3        A.    In the summary from the broker listing the

4    plans that we were considering, there were Kaiser plans

5    and Cigna plans.

6                        (Exhibit No. 12 marked.)

7        Q.   (By Mr. Crisalli) All right.  I'm putting in

8    Exhibit 12.  And my only hope -- this is a lengthier

9    group of emails, it appears to be one string from what

10   I've been able to assess from when I reviewed it.

11           Is that just -- this is a string regarding the

12   choice of Cedar Park to renew with Kaiser Permanente for

13   the 2019 health plan.

14       A.    And so the earliest one's at the beginning,

15   the latest one's at the end?

16       Q.    Yeah, I think so.

17       A.    Okay.

18       Q.    Which is at least August 8th, but there

19   might -- that might be in a response to something.

20           It looks like there might be emails even into

21   August 13th.  Really, I'm just hoping that this verifies

22   the communications that were going on at the time for

23   purposes of selecting Kaiser Permanente and not

24   selecting Cigna.

25       A.    Okay.  This just goes forever.  Sorry, I'm

Page 53

1   reading as fast as I can.

2        Q.  (By Mr. Crisalli) No worries.  I think this is

3   the longest one.

4        A.   Praise God.

5                    (Pause in the proceedings.)

6        Q.  (By Mr. Crisalli) What page are you on in your

7   review, because I may be able to shorten this up?

8        A.   31.

9        Q.   Okay.  Let's go to the first -- oh, sorry.

10  That was the next exhibit.  Please continue on.  Sorry,

11  I was trying.

12       A.   Yeah.  A little more than half.

13                    (Pause in the proceedings.)

14            THE DEPONENT:  Okay.  Well, I at least

15  got to the bottom.

16       Q.  (By Mr. Crisalli) Okay.  And this series of

17  emails discusses Cedar Park's choice to pick Kaiser

18  Permanente over -- to pick -- renew its plan with Kaiser

19  Permanente; correct?

20       A.   There's emails in there talking about us

21  picking Kaiser.  I think that email's repeated a few

22  times.  Then, there's other ones about questions that

23  would indicate we were looking at switching to another

24  plan.

25       Q.   Okay.  All right.  We're done with that one.

c295376b-5358-4733-bac0-a5db45f51f89

Page 54

1       A.   Praise God.

2                      (Exhibit No. 13 marked.)

3       Q.  (By Mr. Crisalli) Yes.

4            Exhibit 13, fortunately, much shorter.  And

5  let me just take a quick look.  If you want to just give

6  me a minute, please.

7                      (Pause in the proceedings.)

8       Q.  (By Mr. Crisalli) Okay.  These appear to be

9  emails discussing -- let me pull that up, sorry -- Cedar

10 Park's selection to renew Kaiser Permanente and then how

11 to implement that; correct?

12      A.   Yeah.  That's what it appears to be from my

13 cursory review.

14      Q.   And that includes some discussion on Cedar

15 Park's objection to coverage for abortion and certain

16 contraceptives; right?

17      A.   Yes, that's what it appears.

18                     (Exhibit No. 14 marked.)

19      Q.  (By Mr. Crisalli) Okay.  Now, to -- finally,

20 it's not an email.

21      A.   Yeah.

22      Q.   And, really, I mean, this is a 32-page

23 document.  Do you recognize the document?

24      A.   It looks like the renewal document we get

25 every year after we've made a selection.

c295376b-5358-4733-bac0-a5db45f51f89

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                30(b)(6) Steven Orcutt

Page 55

1    Q.   Okay.  Is it after you make a selection or

2  proposals for how to determine what your selection's

3  going to be?

4    A.   We receive portions of this, primarily, the

5  cost outlines, prior to making a decision and this kind

6  of summarizes everything decided.

7    Q.   Okay.  This was presented in June -- on

8  June 10, 2019 -- is that correct? -- looking at the

9  first page?

10   A.   Well, then my previous answer was incorrect

11  then.  If this was -- I didn't see the date June 10th,

12  so this would've been a document prior to our making a

13  decision.

14   Q.   Okay.  And the reason why I ask that is go to

15  Page 2.

16   A.   Okay.

17   Q.   Is this a discussion of potential plans for

18  Cedar Park to purchase for 2019?

19   A.   Yes, that's what it appears to be.

20   Q.   And it looks like it provides four different

21  fields; right?

22   A.   Yes.

23   Q.   Do you know whether Cedar Park had this

24  information at least in June of 2019?

25   A.   I'm not positive, but I would assume so since

Page 56

1   it's dated June.

2       Q.   But at least Cedar Park probably had this

3   information sometime between June of 2019 and

4   September 1 of 2019; right?

5       A.   Yes.  Yeah.

6       Q.   Okay.  And this covers -- is it providing

7   three different options for a health plan?

8       A.   Yes.

9       Q.   And there's a negotiated Kaiser Permanente, do

10  you know what that is?

11      A.   Yes.

12      Q.   What is that?

13      A.   That is the best proposal that our broker was

14  able to negotiate with Kaiser to renew our prior year's

15  plan.

16      Q.   Okay.  And just to make sure I understand the

17  fields for how one thing you might be looking to

18  evaluate would be combined annual costs.  What does that

19  field represent?  What's your understanding of that

20  field?

21      A.   So are you referring to the one right above

22  the little reminder in blue there at the bottom?

23      Q.   Yeah.  Do you have the -- the field that

24  says -- above that in bold, you've got the combined

25  medical/HSA/HRA annual cost.

c295376b-5358-4733-bac0-a5db45f51f89

Page 57

1       A.    And what's your question?

2       Q.    Do you understand what -- what the field

3    represents?

4       A.    Yes.

5       Q.    What does it represent?

6       A.    That field represents the estimated cost for

7    the next year based on the premiums for employees on a

8    PPO plan, HMO plan, Cedar Park's contribution to a

9    health savings account, and Cedar Park's contribution

10   for health reimbursement arrangements.

11      Q.    Is it appropriate to generally think of this

12   as the total cost for the health insurance plans for

13   Cedar Park?  Excluding dental, how about that?

14      A.    Not -- it's an estimate.

15      Q.    Okay.  That's fair.  But it's an estimate of

16   what the total cost for medical insurance for Cedar Park

17   would be based on prior trend?

18      A.    Yes.

19      Q.    Okay.  And in looking at that, it looks like

20   the negotiated Kaiser Permanente plan would be $916,314.

21   Did I read that correctly?

22      A.    Yes.

23      Q.    And then there's two alternatives that are

24   provided; is that right?

25      A.    Yes.

c295376b-5358-4733-bac0-a5db45f51f89

Page 58

1      Q.   One is from Cigna fully insured.  Did I read
2   that correctly?
3      A.   Yes.
4      Q.   What is your understanding of what that plan
5   would offer?
6      A.   That's a -- a huge question.  Can you be more
7   specific?
8      Q.   Do you know what it -- well, I'll backtrack.
9           The other option is a Cigna alternative --
10  excuse me -- Alternative 2 is Cigna level-funded.  Did I
11  read that correctly?
12     A.   Yes.
13     Q.   Do you have a rough understanding of the
14  difference between a level-funded and a fully funded
15  plan?
16     A.   Well, you mean a fully insured plan and a
17  level --
18     Q.   Yeah.  Fully insured.  Excuse me.  Let me
19  repeat that question so I got the terminology correct.
20          Do you have a rough understanding of the
21  difference between a fully insured plan and a
22  level-funded plan?
23     A.   Yes.
24     Q.   What's the difference?
25     A.   My understanding of the main difference is

Page 59

1    that a fully insured plan provides specific costs for

2    employees on an HMO or a PPO plan per month per

3    employee.  And a level-funded plan is somewhat similar

4    except there is a degree of potential higher risk or

5    gain for an organization with a level-funded plan.

6        Q.   And -- oh, go ahead.

7        A.   I just didn't hear you for a minute.  I

8    thought you might have been muted.

9        Q.   Okay.  Was your answer complete?

10       A.   Yes.

11       Q.   Okay.  Did you understand whether this

12   Alternative 1, fully insured Cigna plan, would be able

13   to accommodate Cedar Park's religious objections to

14   abortion and/or certain contraceptives?

15       A.   I'm not sure that Cigna ever addressed our

16   objections to abortions and abortifacient medications

17   for their fully funded plan.

18       Q.   Okay.  In the remember section, can you read

19   the last bullet point?

20       A.   Okay.

21       Q.   And does that point provide elective abortions

22   are not covered for both the Cigna fully insured and the

23   Cigna level-funded plan?

24       A.   That's what it states.

25       Q.   Okay.  So would you understand the same

c295376b-5358-4733-bac0-a5db45f51f89

Page 60

1    offering to be with -- going back to the question:  Does

2    that change your testimony as to whether you understand

3    the fully insured -- or Cigna alternative plan to

4    accommodate your religious objections to abortion and

5    certain contraceptives?

6         A.   This proposal was June 10th.  And if Jami and

7    the brokers had written that that's what they are

8    excluding there, I believe we requested documentation

9    from Cigna regarding that, in writing, because we were

10   being told by Kaiser and other carriers they would not

11   do that.

12        Q.   And did you receive a response that Cigna

13   would be able to accommodate that in writing?

14        A.   To my understanding, not for a fully insured

15   plan.

16        Q.   Okay.  For the level-funded plan provided by

17   Cigna, would that -- was your understanding -- Cedar

18   Park's understanding that that plan could provide

19   exclusions for abortion and certain contraceptives

20   consistent with Cedar Park's religious beliefs?

21        A.   Yes.

22        Q.   And, in reviewing this, the combined

23   medical/HSA/HRA annual cost for the Alternative 1 Cigna,

24   was that 894 -- $890,408 for 2019?

25        A.   Based on all the same assumptions as the other

c295376b-5358-4733-bac0-a5db45f51f89

Page 61

1    alternates.

2        Q.    And then for the level-funded Cigna,

3    Alternative 2, was estimated at $913,381; is that right?

4        A.    That's what this states, yes.

5        Q.    And you would agree, as a matter of math, that

6    those are both less than $916,314?

7        A.    Mathematically, looking at the numbers, yes.

8        Q.    And Cedar Park did not select either the

9    fully -- did not select the fully insured Cigna plan;

10   correct?

11       A.    Correct.

12       Q.    And Cedar Park did not select the level-funded

13   Cigna plan; correct?

14       A.    Yes, that's correct.

15       Q.    Why did Cedar Park decide not to purchase

16   either of those plans in 2019?

17       A.    Our broker had advised us that Cigna generally

18   brings in a low rate in the first year and then

19   significantly increases rates in future years, so the

20   ability for Cedar Park in future years to provide

21   high-quality health plans for our employees would've

22   been in question because of increased costs among other

23   things.

24       Q.    So Cedar Park selected -- or elected not to

25   purchase Cigna because of the increased costs it thought

c295376b-5358-4733-bac0-a5db45f51f89

Page 62

1    might occur later.  Is that a fair statement of your

2    testimony?

3                MR. THERIOT:  Objection.

4    Mischaracterization of his testimony.

5        Q.  (By Mr. Crisalli) You may answer.

6        A.    That was one consideration.

7        Q.    What other considerations were there?

8        A.    Kaiser does not provide services to any other

9    preferred provider organization, meaning that a switch

10   to Cigna would require all Cedar Park employees and

11   family members using the Kaiser HMO to find new

12   providers.

13       Q.    Would you agree that it is a choice for Cedar

14   Park whether to make a switch based on preferred

15   providers?  In other words, it's not mandated to make a

16   switch or stay with Kaiser Permanente based on whether

17   they use preferred providers or not?

18       A.    I -- I would agree that it's Cedar Park's

19   choice to select its healthcare provider.

20       Q.    And -- and is the selection of -- based on

21   finances related to Cedar Park's religious beliefs?

22       A.    That seems like two questions.

23       Q.    Okay.  You stated that, from what I've heard,

24   the two reasons that Cedar Park did not select Cigna was

25   it thought -- it believed that the cost would increase

c295376b-5358-4733-bac0-a5db45f51f89

Page 63

1   years later.  That's one; correct?

2       A.   That's what we were advised by our broker.

3       Q.   And the other was that the employees would

4   have to change their preferred providers because of

5   switching from the Kaiser system to a Cigna system; is

6   that correct?

7       A.   To Cigna's preferred provider network.  Those

8   were the two I mentioned so far.

9       Q.   Are there other reasons why you decided not to

10  go with Cigna?

11      A.   Yes.

12      Q.   What are those?

13      A.   A fully funded plan -- in a fully funded

14  insurance plan, all risk for claims exceeding premiums

15  is borne by the carrier.  That is not true with a

16  self-funded plan, a level-funded plan.

17      Q.   And when you talk about risk, you're talking

18  about financial risk in paying for the services; is that

19  correct?

20      A.   No.

21      Q.   What kind of risk are you talking about?

22      A.   One of the main criteria that insurance

23  companies use when bidding a fully insured plan or a

24  level-funded plan for Cedar Park is our experience,

25  which is the amount of claims in the -- annually

c295376b-5358-4733-bac0-a5db45f51f89

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                30(b)(6) Steven Orcutt

Page 64

1   compared to the annual premiums.

2        Q.   And you would agree that that analysis is a

3   mathematical technical analysis, not one done based on

4   Cedar Park's religious beliefs; correct?

5        A.   I believe so.

6        Q.   And are there any other reasons why Cedar Park

7   did not select Cigna?

8        A.   Which Cigna plan are we talking about?

9        Q.   Either of them.

10       A.   With the level- -- with any level-funded plan,

11   there is risk and reward to the company with a

12   level-funded plan.  If Cedar Park's utilization of

13   high-cost claims increased, with a level-funded plan,

14   the majority of those costs would likely be passed on to

15   Cedar Park in higher future premiums.

16       Q.   And the analysis of that risk, again, is based

17   on market principles instead of Cedar Park's religious

18   beliefs; correct?

19       A.   I can't speak for the insurance companies, but

20   I would think so.

21       Q.   You have no reason to believe that it's

22   because of Cedar Park's religious beliefs that that risk

23   calculation would -- is altered because Cedar Park's a

24   church as compared to anything else, do you?

25       A.   No.

c295376b-5358-4733-bac0-a5db45f51f89

Page 65

1      Q.   Have you reviewed the complaints and

2    supplemental complaints in preparation for this

3    deposition?

4      A.   I have read them.

5      Q.   Would Cedar Park agree that no complaint or

6    pleading filed by Cedar Park mentions that Cedar Park

7    looked at or considered Cigna as a potential insurance

8    carrier?

9              MR. THERIOT:  Objection to the extent

10   that it calls for a legal conclusion.

11              THE DEPONENT:  Yeah.  I -- I'm not sure.

12              (Exhibit No. 15 marked.)

13      Q.  (By Mr. Crisalli) I have Exhibit 15.

14              Before we go to 15, and this is -- 15's a

15   quick one.  But in your discussions, did you primarily

16   communicate with Jami about the plans and then some

17   Melissa from Gallagher?  Or, excuse me, I think I said

18   Melissa.  I think I meant Melinda.

19      A.   Okay.

20      Q.   Yeah.

21      A.   That was confusing.

22      Q.   Yeah.

23      A.   Primarily, yes, with Jami and Melinda.

24      Q.   Were your communications primarily via email?

25      A.   Primarily.

c295376b-5358-4733-bac0-a5db45f51f89

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                    30(b)(6) Steven Orcutt

Page 66

1    Q.   Did you have phone calls with them or

2    in-person meetings with them from time to time?

3    A.   Yes.

4    Q.   And do you -- do you recall any meetings where

5    you discussed Cigna as a potential plan for 2019?

6    A.   I assume, based on your exhibit with the

7    June 10th document, that we would've met in person and

8    had those discussions, yes.

9    Q.   Okay.  That was going to be my next question

10   is:  Were they the kinds of meetings where they present

11   their options to you like what's in Exhibit 14?

12   A.   Was 14 the one we just looked at?

13   Q.   Yes.

14   A.   Yes.

15   Q.   All right.  Turning to Exhibit 15.

16   A.   Well, that was a quick one.  I'm through it.

17   Q.   I'll try and keep those large ones away from

18   you from here on out, but I make no promises.

19        Is this an email string dated May 18, 2020, at

20   8:54 a.m. to May 18, I think, at 9:13 a.m.?

21   A.   Yes, that's what it appears to be.

22   Q.   And it looks, from the first email, that you

23   had forwarded a declaration from me filed in this

24   matter, and I asked questions about a potential plan.

25   Do you recall this?

Page 67

1      A.   I don't recall this specific attachment, but I

2  believe this was in reference to new information from

3  either -- there might have been a Providence health plan

4  that we did not receive a bid on.

5      Q.   And was your understanding the reason you did

6  not receive a bid on it was that Providence had chosen

7  not to enter the King County market?

8      A.   Well, my understanding was that they were only

9  offering -- or maybe that is it.  Hold on.

10         They were only offering individual plans in

11  our service area, yes.

12     Q.   And did you understand that Providence had

13  offered, in other counties, plans that would be

14  consistent with Cedar Park's religious beliefs towards

15  abortion and certain contraceptives?

16     A.   I don't know what relevance that would have,

17  but, no, I wasn't.

18     Q.   Okay.  Are you aware of that now?

19     A.   No.

20     Q.   Then why did you forward this particular plan?

21     A.   Because I wanted to make sure that the plans

22  we reviewed, we had not missed a plan that would have

23  allowed us to provide a health care plan excluding

24  abortions and abortifacients in keeping with our

25  deeply-held religious beliefs.

Page 68

1       Q.   I would like to turn now to the 2020 renewal.

2  Was the process the same for the 2020 renewal as far as

3  seeking -- strike that.

4            Did Cedar Park solicit bids from its broker

5  for plans that excluded abortion or certain

6  contraceptive services in the health plan?

7       A.   For the next year, for 2020?

8       Q.   For the next year beginning September 1, 2020.

9       A.   Based on numerous prior conversations with our

10 broker, I think it's safe to say that Jami knew that if

11 there was a plan that was affordable, did not include

12 significant risk or negatively impact our employees, we

13 would want to know about those plans.

14                      (Exhibit No. 16 marked.)

15      Q.   (By Mr. Crisalli) I think we're on 16 on the

16 current exhibit, so I'm trying to make sure my numbering

17 is staying consistent.

18            Just looking at the first page, is this

19 document like Exhibit 14 but for the 2020 renewal cycle?

20      A.   Yes, this would be a mid-process document.

21      Q.   And it appears that it was presented on

22 July 9, 2020?

23      A.   Yes, now that I know where to look for the

24 date.

25      Q.   Okay.  And looking at the second page, is the

c295376b-5358-4733-bac0-a5db45f51f89

Page 69

1    second page an outline of the costs for options for

2    medical plans for starting September 1, 2020?

3         A.    Yes.   This is showing four -- four columns,

4    essentially two options.

5         Q.    Yeah.   And this one, compared to 2019, it

6    looks to have two options for Kaiser Permanente and then

7    one Cigna option; is that correct?

8         A.    Yes.

9         Q.    And is your understanding that for the 2020,

10   the version -- the Cigna option would exclude abortion

11   and contraceptive services consistent with Cedar Park's

12   religious beliefs?

13        A.    Yes.   Because that is a level-funded plan, we

14   could exclude specific procedures.

15        Q.    And do you know what the difference is between

16   the renewal and the negotiated options from Kaiser

17   Permanente?

18        A.    Yes.

19        Q.    What is it?

20        A.    The second column renewal was Kaiser's

21   original rate increase based on prior years'

22   utilization, and the third column negotiated was a lower

23   rate that our broker was able to negotiate with Kaiser

24   for us.

25        Q.    And the renewal rate was $1,149,384 for the

c295376b-5358-4733-bac0-a5db45f51f89

Page 70

1    estimated annual cost; is that right?  That was combined

2    costs.

3        A.   That was Kaiser's original proposal.

4        Q.   And then the negotiated rate was -- from

5    Kaiser was $1,099,092; is that correct?

6        A.   Yes.

7        Q.   And then the Cigna fund was 1,140,925;

8    correct?

9        A.   According to this document, yes.

10       Q.   Do you know if there were any other plans for

11   the 2020 cycle that your broker reviewed that -- aside

12   from Providence, it sounds like, and Cigna, we'll say,

13   that provided for an exclusion for services to which

14   Cedar Park had a religious objection?

15       A.   So the -- that's seems like two questions

16   again.  Can you clarify?

17       Q.   Yeah.  Were there any other plans, aside from

18   those that we've talked about already, that your broker

19   reviewed as potential plans for 2020 that were

20   consistent with Cedar Park's religious beliefs?

21       A.   There are -- there were no plans other than a

22   level-funded plan or self-funded plan that would allow

23   us to exclude abortions or abortifacient drugs based on

24   Washington State Bill 6219.

25                    (Exhibit No. 17 marked.)

c295376b-5358-4733-bac0-a5db45f51f89

Page 71

1    Q.   (By Mr. Crisalli) Putting in Exhibit 17.

2    A.   This is the same one or a new one?

3    Q.   This is a new one.

4    A.   Okay.  Well, that one I read fast.

5    Q.   Great.

6         Do you recognize this document?

7    A.   Yes.

8    Q.   And this are an email received July 14, 2020?

9    A.   That's what it appears to be.

10   Q.   And it appears to describe, from Cigna's

11   compliance team, their policies towards dealing with

12   religious objections, particularly to contraceptives and

13   abortion; correct?

14   A.   Yes.

15   Q.   And this includes the same language of that

16   other document where we talked about Cigna's compliance

17   or how Cigna implemented a religious objection; is that

18   correct?

19   A.   It appears to be stating that the policy must

20   cover abortions and contraceptives.

21   Q.   But it also includes that third paragraph that

22   provides:  "An employer with a religious or moral tenet

23   opposed to a specific service is not required to

24   purchase coverage for that service if they object for

25   reason of religion or conscience."

c295376b-5358-4733-bac0-a5db45f51f89

Page 72

1          Did I read that first sentence of the third

2    bullet correctly?

3          A.   Yes.

4          Q.   And then the next sentence:  "In other words,

5    an employer may exclude coverage for contraceptives and

6    abortion if that employer objects to providing that

7    coverage due to religious or other beliefs."

8          Did I read that correctly?

9          A.   Yes.

10         Q.   And this is likely with regard to the

11   level-funded plan that was submitted in the 2020

12   alternative presentation; is that correct?

13         A.   Let me check.  July 9th was that proposal.

14   This is July 14th, so that's likely correct.

15         Q.   Hold on a second.  I need to rename a document

16   because my numbering is a little off.

17         A.   Okay.

18                    (Exhibit No. 18 marked.)

19         Q.  (By Mr. Crisalli) And do you recognize this

20   document?

21         A.   I don't recall getting the email, but I

22   recognize the content of it.  And it's sent to me, so

23   I'd say yes.

24         Q.   And it appears that -- particularly, beginning

25   on Page 2 through 7 is providing based on different --

Page 73

1   let me take a step back for a bigger picture.

2           What's going on, in your understanding, in

3   Pages 2 through 7 by all the different alternatives?

4   And if you want to speak generally to that, I just want

5   to kind of make sure I know what this document's doing

6   and how it was used by Cedar Park.

7       A.   One of the strategies that -- that Cedar

8   Park's used successfully in the past is, whenever

9   allowed by law, increasing the deductible amount to

10  decrease premium costs, and that, I believe, is what we

11  were doing this year.

12      Q.   So as I read the different alternatives, it's

13  looking at if you change the deductible or premium rate,

14  what the total cost might end up being based on the

15  assumptions built within the model; is that correct?

16      A.   Essentially, yes.

17      Q.   And included within this analysis, beginning

18  on Bates Stamp -- it looks like Cedar Park 000479, they

19  included an analysis with respect to Cigna; right?

20      A.   Yes.

21      Q.   And the same with -- it looks like throughout

22  the document, there's both a Kaiser with multiple

23  alternatives and Cigna with multiple alternatives; is

24  that right?

25      A.   Yes.

c295376b-5358-4733-bac0-a5db45f51f89

Page 74

1      Q.   And this is probably building in the same

2   assumptions about the Cigna plan with respect to the

3   exercise of Cedar Park's objections to abortion and

4   certain contraceptives; correct?

5      A.   What do you mean by that specifically?

6      Q.   In looking at the Cigna plans, embedded is an

7   assumption that there will be an exemption for abortion

8   services and certain contraceptives consistent with

9   Cedar Park's religious beliefs.

10     A.   Yes.  Along with all of the other

11  considerations of a level-funded versus a fully-insured

12  plan, which Cigna chose not to bid that year.

13     Q.   And in the end, for 2020, Cedar Park renewed

14  with Kaiser; right?

15     A.   Yes.

16     Q.   Using the negotiated plan, I would assume?

17     A.   Oh, man.

18     Q.   Or did the -- I'll take a step back.

19          Did Cedar Park purchase the renewed plan or

20  the negotiated plan?

21     A.   What page are you on?  Which page?

22     Q.   It's not a page on this document.  I'm just

23  asking generally.

24          So if you need this document to help refresh

25  your recollection, please feel free to take a look.

c295376b-5358-4733-bac0-a5db45f51f89

Cedar Park Assembly of God of Kirkland v Kreidler, et al.          30(b)(6) Steven Orcutt

Page 75

1      A.   Yeah.  In looking at it, I believe we went

2  with Alternative 2 or 3 because they had higher

3  deductibles and, thus, the total cost was slightly less.

4      Q.   But looking at the -- so as I read that one,

5  on Page 2, which is Bates Stamp 000478, Cedar Park, the

6  combined medical/HSA/HRA annual cost was $1,001,027 for

7  Alternative 2; is that correct?

8      A.   That's what I see, yes.

9      Q.   And then for Alternative 3 it was 1,007,352 or

10  -62?

11      A.   I enlarged my screen, it's -352.

12      Q.   Yeah, we're all getting old.

13          And so, in the end, Cedar Park selected one of

14  these, likely either Alternative 2 or 3, as its plan for

15  the 2020 year; correct?

16      A.   I am almost positive that we went with a

17  higher-deductible plan that year.  I would have to

18  double-check to be certain, but that could be

19  Alternative 2 or 3.  I can't remember what those

20  differences are.

21      Q.   Okay.  Are the reasons that Cedar Park did not

22  select Cigna the same as the reasons it did not select

23  Cigna in 2020 -- or 2019?

24      A.   Primarily, I would say yes.

25      Q.   Okay.  Were there any different reasons why

c295376b-5358-4733-bac0-a5db45f51f89

Page 76

1   Cedar Park did not select Cigna in 2020, either new or

2   situations that didn't apply than those in 2019?

3        A.   Let me check something here.

4             Okay.  I was checking in the proposal.  Repeat

5   the question for me, please?

6        Q.   Were there any reasons why that are different

7   from 2019 as to why Cedar Park did not select Cigna

8   in 2020?

9        A.   There may have been.

10       Q.   Okay.  What might those have been, those

11  different reasons?

12       A.   The fact that Cigna, this year, would not bid

13  a fully funded plan may have been a consideration, and

14  our increased stop-loss experience in the prior fiscal

15  year compared to other fiscal years.

16       Q.   And what's a stop-loss?

17       A.   Those are plans under -- those are plans, I

18  guess, under any of the insurance options where the

19  carrier either puts money into a pool for claims that

20  reach a certain threshold or they buy outside stop-loss

21  insurance where once a claim hits a particular amount,

22  it is paid for by that policy or pool rather than

23  costing the carrier dollar for dollar for all of those

24  claims.

25       Q.   No part of that calculation involves or

Page 77

1  relates to whether Cedar Park has religious beliefs;

2  correct?

3      A.   I don't believe so.

4      Q.   For 2021, the plan beginning in 2021,

5  September 1, 2021, did Cedar Park follow, generally, the

6  same process it had the previous years on using a broker

7  to purchase that insurance plan?

8      A.   Essentially, yes.

9      Q.   Okay.  And, in the end, Cedar Park purchased a

10  Kaiser Permanente plan again; right?

11      A.   Do you have the 2021 proposal from our broker?

12      Q.   I do.  I'm going to first talk about an email

13  then we'll do that, okay?  Just to set up the...

14          Apologies.  I'm renaming something so it takes

15  a minute.

16      A.   Okay.

17              (Exhibit No. 19 marked.)

18              MR. THERIOT:  Do you see it there, Steve?

19      Q.  (By Mr. Crisalli) Yeah, sorry.  Exhibit 19 is

20  in there.

21      A.   I'm enjoying my water too much.

22      Q.   And, really, I'm focusing on Page 1 starting

23  at the -- your email March 24, 2021, at 11:22 a.m.

24      A.   Okay.  I've read that.

25      Q.   In your -- this is an email from you to

c295376b-5358-4733-bac0-a5db45f51f89

Page 78

1    Melissa Knauss on Wednesday, March 24, at 11:22 a.m.; is

2    that correct?

3         A.   Yes, that's what it appears.

4         Q.   And you start off with:  "This is a toned-down

5    email I would like to send to Jami.  I don't want to

6    send it until you and I have had a chance to talk about

7    but I'm hopping mad.  Steve."

8              Do you recall saying that?

9         A.   Well, typing it, I mean, that sounds like me.

10        Q.   Why did you say that you were hopping mad?

11        A.   Because prior to this, every single month, we

12   would get a 12-month rolling report from Kaiser showing

13   our utilization of premiums versus claim costs, and they

14   have just notified us that they wouldn't be doing that

15   anymore.

16        Q.   And what did you use those reports for?

17        A.   Those reports gave us an idea for budgeting

18   purposes of how our utilization looked.  And by

19   calculating the claims utilization to premiums, that

20   would give me an idea of whether or not we seem to be on

21   track for higher premiums or we were in a position to

22   ask for lower premiums in the next plan year.

23        Q.   In the last paragraph, you say:  "You can ask

24   what rate they will give if we don't shop, but I'm

25   pretty done with Kaiser based on this nonsense if I

c295376b-5358-4733-bac0-a5db45f51f89

Page 79

1    don't get my utilization reports, at least for April

2    like before, if that's when they're giving us our

3    proposed rates."

4            Did I read that correctly?

5        A.    Mm-hmm.

6        Q.    So at this point, were you seriously -- was

7    Cedar Park considering leaving Kaiser Permanente?

8        A.    Based on the lack of information I was getting

9    and other points that I referenced here, there was

10   something I can't recall the details about, obesity

11   rates that they were throwing and it seemed to me this

12   was just a play to be able to give us their maximum

13   annual rate increase.

14       Q.    And none of these rates are related to Cedar

15   Park's expression of its religious beliefs; right?

16       A.    I don't believe so.

17       Q.    Did Cedar Park solicit bids for the 2021 year

18   from plans other than Kaiser Permanente?

19       A.    I believe I did.  Do you have our -- is that

20   the thing you just --

21                      (Exhibit No. 20 marked.)

22       Q.    (By Mr. Crisalli) Yes.  I put in Exhibit 21 --

23   or, 20, excuse me.  I'm looking at the first page.

24       A.    Yeah, I'm trying to get the thing to open.

25            Oh, there we are.  Okay.

c295376b-5358-4733-bac0-a5db45f51f89

Page 80

1      Q.   Is this exhibit like Document 18 and, what,

2   16?  Excuse me, Documents 16 and 14?

3      A.   Which are the documents for the '19 and '20

4   plan years from Gallagher?

5      Q.   Yes.

6      A.   Yes.  This would be the similar, not

7   pre-renewal but mid-renewal document from them.

8      Q.   And this is a document that's dated

9   June 28, 2021; right?

10      A.   Yup.

11      Q.   And if you go to the second page, this appears

12   to be the proposal for medical for a different option;

13   is that right?

14      A.   Just a second.  I'm scrolling to make sure I

15   know everything in here.

16          Okay.  Sorry, your question, then, was on

17   Page 2?

18      Q.   Yeah, Page 2.  Is that the presentation of

19   different options for medical for 2021?

20      A.   Yes.

21      Q.   And this appears to just have two options is

22   my read; is that right?

23      A.   Oh, I see.  The Kaiser -- the second column,

24   the Kaiser Permanente, and the Regence BlueShield

25   column, yes.

c295376b-5358-4733-bac0-a5db45f51f89

Page 81

1     Q.    Correct.

2           Do you know if your broker solicited bids from

3     any other healthcare insurance carrier?

4     A.    Yes.

5     Q.    And did they?

6     A.    Yes.

7     Q.    How many did they solicit bids from?

8     A.    Five plans other than Kaiser Permanente.

9     Q.    Okay.  Were you reading anything -- and I'm

10    trying to figure out your counting, but if you were just

11    thinking to yourself and counting?  I didn't know if you

12    were reading something.

13    A.    No, it's Page 17 of the document you just sent

14    me.

15    Q.    Okay.  Okay.  And do you know whether any of

16    those plans included an exception for abortion or

17    contraceptive -- certain contraceptives consistent with

18    Cedar Park's religious beliefs?

19    A.    I don't believe any did with the exception of

20    Cigna.  It doesn't state here, but I believe they were

21    requoting their level-funded plan from the year before.

22    Everything else was fully insured.

23    Q.    And do you know whether the Regence plan,

24    provided on Page 2 as an alternative, whether that plan

25    offered an exemption for abortion and certain

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                    30(b)(6) Steven Orcutt

Page 82

1    contraceptive services consistent with Cedar Park's

2    religious belief?

3        A.    My understanding is they did not.

4        Q.    And Cedar Park again renewed with Kaiser

5    Permanente for 2021; is that correct?

6        A.    Yes.

7        Q.    And why did it choose Kaiser Permanente over

8    Regence BlueShield?

9        A.    All the same factors that we consider always,

10   the cost of the plan, the access to providers that it

11   provides our staff, the likelihood of future increases

12   being exorbitant.  Those are kind of my big three.

13       Q.    And for the 2022 cycle, the plan taking effect

14   September 1, 2022, did Cedar Park approach its broker

15   about soliciting additional bids?

16       A.    Yes.

17       Q.    And did it receive any alternatives?

18       A.    I would have to check.  I don't...

19                      (Exhibit No. 21 marked.)

20       Q.    (By Mr. Crisalli) Okay.  I put in Exhibit 21.

21            So, first, this document looks to me a little

22   different from Exhibits 21 -- or, excuse me -- 20, 16,

23   and 14.  I'm trying to figure out if this is the same

24   kind of presentation that occurred with respect to those

25   documents.

c295376b-5358-4733-bac0-a5db45f51f89

Page 83

1      A.   Okay.  Let me...

2           Okay.  So what's your question again?  Now,

3  I --

4      Q.   Okay.  Just so I -- I'll start over.

5           Do you recognize this document?

6      A.   Yes.

7      Q.   What is this document?

8      A.   It is a mid-renewal document outlining all of

9  our options from Gallagher for the plan beginning

10  September 1, 2022.

11      Q.   And this document's dated June 1, 2022; is

12  that correct?

13      A.   Yup.

14      Q.   As I reviewed this document, I did not see any

15  options provided for health -- a health insurance

16  carrier.  Is there -- is that correct?

17      A.   This document does not include a list of

18  carriers that -- other carriers that were solicited.

19  That's correct.

20      Q.   Okay.  I think it's likely I don't have the

21  analysis document that happens later in the cycle

22  through the course of discovery.  At least, I haven't

23  seen it in my review of the documents for 2022.

24           Can you tell me if you recall what other plans

25  Cedar Park considered for the 2022 purchase?

c295376b-5358-4733-bac0-a5db45f51f89

Page 84

1      A.   Hang on.  Let me check one thing here.

2      Q.   And before you go and check, I just want to --

3  are you looking at Exhibit 21, or are you looking at

4  something else?

5      A.   Yes, 21.  Yeah, I was just -- so go on.

6      Q.   Oh, what -- do you recall what health

7  insurance carriers Cedar Park reviewed for the 2022

8  purchase?

9      A.   I believe that my instruction to my broker --

10 well, my instruction to my broker is always, "Get me

11 options," unless it's in a year where we are negotiating

12 a rate reduction with Kaiser that nobody else would be

13 able to do.  And, in those cases, it's, generally, we

14 won't go out to bid, but you drop your prices to where

15 we feel we couldn't do any better.

16      I believe my broker did go to other carriers

17 this year, and I believe all of them declined to

18 cover -- to quote or felt that they would be

19 noncompetitive.

20      Q.   And, in the end, Cedar Park purchased a Kaiser

21 plan or renewed its Kaiser plan as negotiated; correct?

22      A.   Yes.

23      Q.   Has Cedar Park ever reached out to the Office

24 of Insurance Commissioner to determine whether there was

25 a plan available in the market that would accommodate

c295376b-5358-4733-bac0-a5db45f51f89

Page 85

1   Cedar Park's religious beliefs?

2        A.   I'm not sure.

3        Q.   Did Cedar Park ever access the Office of

4   Insurance Commissioner's website and research what plans

5   are available that might be consistent with Cedar Park's

6   religious beliefs?

7        A.   I don't know.

8        Q.   Did Cedar Park reach out to any other state

9   agency to determine whether there is a health plan

10  available on the market that would accommodate Cedar

11  Park's religious belief?

12       A.   I don't know.

13              MR. CRISALLI:  All right.  So let's go

14  off the record.

15              MR. THERIOT:  Okay.

16                  (Discussion off the record.)

17                  (A break was taken from

18                   12:26 p.m. to 12:34 p.m.)

19       Q.  (By Mr. Crisalli) Sir, do you understand you

20  are still under oath?

21       A.   Yes.

22       Q.   Did Cedar Park conduct any independent

23  research into different ways it could purchase health

24  insurance while exercising its religious objections to

25  abortion and certain contraceptives?

c295376b-5358-4733-bac0-a5db45f51f89

Page 86

1           MR. THERIOT:  Objection.  Vague.

2           THE DEPONENT:  Yeah.  I'm not quite sure

3    what you mean.  Other ways?

4       Q.  (By Mr. Crisalli) To what degree did Cedar Park

5    investigate ways in which it could purchase health

6    insurance consistent with its religious objection to

7    abortion and certain contraceptives?

8       A.   Gallagher is a large, nationwide broker.  They

9    said there were none in King County.  We talked to two

10   other insurance brokers, smaller companies who are eager

11   for our business, to see if they could offer any

12   alternatives, and they could not.

13           We talked to, actually, a nonmedical insurance

14   person in our congregation who just has knowledge of

15   medical to see if there were anything else, and we'd

16   consistently come up to the fact that because of State

17   Bill 6219, there are no plans other than level-funded or

18   self-funded that would allow us to enact a plan in

19   keeping with our deeply-held religious convictions.

20       Q.   Is Cedar Park aware that there are plans

21   currently on the market that offer services consistent

22   with Cedar Park's religious belief?

23       A.   Plans on the market, what do you mean?

24       Q.   I mean health plans -- health insurance plans

25   on the market consistent with Cedar Park's religious

Page 87

1  beliefs.

2      A.   I'm aware of self-funded plans -- level-funded

3  plans or self-insured plans.

4      Q.   Has Cedar Park had any discussions with

5  carriers about offering a plan that would be

6  consistent -- I'm talking carriers, not the broker, but

7  you, yourself, with carriers about offering a plan

8  consistent with Cedar Park's religious beliefs?

9      A.   No, not directly.

10     Q.   And you don't know of different methods in

11  which carriers could effect an exclusion in a plan for

12  abortion or contraceptives while being consistent with

13  Senate Bill 6219?

14     A.   No, I don't.

15     Q.   Have you ever contacted Kaiser Permanente

16  directly about its exclusion -- about whether it could

17  exclude abortion care in its plan?

18     A.   I believe there are documents that we

19  submitted that -- that do address that.

20     Q.   What's your understanding as to why Kaiser

21  Permanente will not offer a plan consistent with Cedar

22  Park's religious beliefs?

23     A.   I believe that perhaps in that 61-page giant

24  email or in other communications, Kaiser has said that

25  after 6219 was enacted, they would not be able to do

c295376b-5358-4733-bac0-a5db45f51f89

Page 88

1    that, exclude abortions or abortifacients.  But if 6219

2    was overturned, they would be able to, mid-plan, exclude

3    those abortion services.

4         Q.   Do you think that -- does Cedar Park take the

5    position that the defendants violate its rights by if

6    Kaiser Permanente engages in an incorrect legal

7    analysis?

8              MR. THERIOT:  Objection.  Calls for a

9    legal conclusion.

10             THE DEPONENT:  Yeah.  I'm not even sure

11   what you're question is.

12        Q.   (By Mr. Crisalli) Let's say Kaiser's wrong in

13   the law and their advice is bad.  I want you to accept

14   that premise.  Okay?  Does that work?

15        A.   Okay.

16        Q.   Are the defendants, in this matter -- does

17   Cedar Park take the position that the defendants, in

18   this matter, are violating Cedar Park's religious rights

19   for that flawed assumption?

20             MR. THERIOT:  Objection.  Calls for a

21   legal conclusion and speculation.

22             THE DEPONENT:  I -- that doesn't make

23   sense to me.

24        Q.   (By Mr. Crisalli) What about it doesn't make

25   sense?

c295376b-5358-4733-bac0-a5db45f51f89

Page 89

1      A.   I don't understand what you're -- why you're

2    talking about Kaiser's lawyers and Cedar Park.

3      Q.   I'm saying what if Kaiser's wrong --

4                MR. THERIOT:  Same objection.

5      Q.  (By Mr. Crisalli) -- is that --

6                MR. CRISALLI:  I'll finish the sentence

7    and allow you to get your objection.

8                MR. THERIOT:  Sorry.

9                MR. CRISALLI:  No worries.

10     Q.  (By Mr. Crisalli) What if Kaiser's wrong on its

11   legal analysis?  There are other plans that have been

12   approved that recognize individuals' or organizations'

13   religious objections.  Is it -- are defendants

14   nonetheless violating Cedar Park's religious rights

15   because Kaiser has engaged in that flawed analysis?

16               MR. THERIOT:  Same objection.

17               THE DEPONENT:  We're not basing our

18   opinion on what Kaiser said.  We're basing it on what

19   every single carrier has told our broker and our reading

20   of the law and our attorney's advice.

21     Q.  (By Mr. Crisalli) Okay.  Then, the same

22   question goes with respect to what if your broker is

23   wrong.  Are the defendants liable or violating your

24   religious rights for a bad opinion by a broker?

25               MR. THERIOT:  Objection.  Vague.  Calls

Page 90

1    for a legal conclusion.

2              THE DEPONENT:  Again, it's -- it's the

3    broker, but it's also our attorney who has told us that

4    that's what the law says, and our experience that no

5    other -- no one will provide a plan like we had before

6    House Bill 6219 precluded us from excluding abortions as

7    we have in the past.

8        Q.  (By Mr. Crisalli) I don't have any further

9    questions at this point.  Thank you very much for your

10   time.  I appreciate it.

11             MR. CRISALLI:  Can go off the record?

12             MR. THERIOT:  Okay.

13                  (Deposition concluded at 12:42 p.m.)

14                  (Signature reserved.)

15                       --o0o--

16

17

18

19

20

21

22

23

24

25

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                30(b)(6) Steven Orcutt

Page 91

1                      C E R T I F I C A T E

2

3    STATE OF ARIZONA      )
                            )
4    COUNTY OF MARICOPA  )

5

6            I, Nicole A. Bulldis, RPR, a Certified Court
     Reporter, do hereby certify under the laws of the State
7    of Washington:

8            That the foregoing 30(b)(6) deposition upon
     oral examination of Cedar Park Assembly of God of
9    Kirkland, Washington designee, Steven Orcutt, was taken
     stenographically by me on November 21, 2022 and
10   transcribed under my direction;

11           That the witness was duly sworn by me to
     testify truthfully, and that the transcript of the
12   deposition is full, true, and correct to the best of my
     ability;

13

14           That I am not a relative, employee, or counsel
     of any party to this action or relative or employee of
     such counsel, and that I am not financially interested
15   in the said action or the outcome thereof.

16

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 1st day of December 2022.

20

21

22

23   _____
     Nicole A. Bulldis, RPR
24   AZ CCR No. 50955
     WA CCR. No. 3384

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

c295376b-5358-4733-bac0-a5db45f51f89

# Exhibit B

# Deposition of 30(b)(6) Jason Smith

# Cedar Park Assembly of God of Kirkland v Kreidler, et al.

# November 21, 2022



**206.287.9066 l 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 92

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____
                                    )
CEDAR PARK ASSEMBLY OF GOD OF       )
KIRKLAND, WASHINGTON,               )
                                    )
                                    )
                      Plaintiff,    )
                                    )
            v.                      )  No. 3:19-cv-05181-BHS
                                    )
MYRON "MIKE" KREIDLER, et al.,      )
                                    )
                                    )
                      Defendants.   )
_____


     30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON

     REPRESENTED BY JASON SMITH - VOLUME II

_____

          Taken at Kirkland, Washington

   (All participants appearing via videoconference.)


DATE TAKEN:   November 21, 2022

REPORTED BY:  Nicole A. Bulldis, RPR
              AZ No. 50955 | CA No. 14441 | WA No. 3384

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 93

1                    A P P E A R A N C E S

2

3  FOR PLAINTIFF:

4     (via Zoom)          KEVIN H. THERIOT
                          Alliance Defending Freedom
5                         15100 N. 90th Street
                          Scottsdale, AZ 85260
6                         (480) 444-0020
                          ktheriot@adflegal.org

7

8  FOR DEFENDANTS:

9     (via Zoom)          PAUL M. CRISALLI
                          Office of the Attorney General
10                        800 Fifth Avenue, Suite 2000
                          Seattle, WA 98104
11                        (206) 464-7744
                          paul.crisalli@atg.wa.gov

12

13

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 94

1        30(b)(6) DEPOSITION OF JASON SMITH - VOLUME II

2

3                        EXAMINATION INDEX

4    EXAMINATION BY                                          PAGE

5    Mr. Crisalli....................................... 95

6

7

8                          EXHIBIT INDEX

9    EXHIBITS FOR IDENTIFICATION                            PAGE

10   22  Cedar Park By-Laws............................ 103

11   23  Smith Letter to Kaiser Permanente - 7/19/19..... 109

12   24  Smith Letter to Kaiser Permanente - 8/23/19..... 110

13   25  Second Amended Verified Complaint for

14       Injunctive and Declaratory Relief............... 112

15   26  Declaration of Jason "Jay" Smith................ 117

16   27  Exhibit A to Declaration of Jason "Jay" Smith... 117

17   28  Supplemental Verified Complaint for Injunctive

18       and Declaratory Relief.......................... 119

19   29  Orcutt Email String - 3/5/19.................... 123

20

21                          --o0o--

22

23

24

25

Crisalli Decl., p.0098

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 95

1       REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA

2              Monday, November 21, 2022; 1:45 p.m.

3                          --oOo--

4

5   JASON SMITH,                    witness herein, having been

6                                   first duly sworn on oath,

7                                   was examined and testified

8                                   as follows:

9

10                  E X A M I N A T I O N

11  BY MR. CRISALLI

12       Q.   And could you please state your name and spell

13  the last name for the record?

14       A.   Jason Smith, S-m-i-t-h.

15       Q.   Okay.  And you sat in on the deposition that

16  occurred this morning with Mr. Orcutt; is that correct?

17       A.   Yes, that's correct.

18       Q.   And you heard me give a little preview of some

19  of the ground rules for the deposition; is that right?

20       A.   Yeah.

21       Q.   Do you recall those?  I'm asking whether you

22  want me to repeat all those, or if we could just have a

23  general agreement that those ground rules will apply

24  equally here.

25       A.   I recall them, and I -- I agree that they

Page 96

1   would be applied here.

2          Q.   Okay.  Great.  Thank you.

3               I have Exhibit 1 in the chat for you to

4   download and review.  And we are using consecutive

5   exhibits, so you'll see what's going to happen is

6   there's going to be an Exhibit 1, and then the next for

7   you will be, like, Exhibit 22.

8          A.   Okay.  Yes, I have Exhibit 1.

9          Q.   And do you understand that you have been

10  designated by Cedar Park to testify on its behalf as an

11  organization today?

12         A.   Yes.

13         Q.   Okay.  And do you understand that your answers

14  can be binding as to Cedar Park for purposes of this

15  case?

16         A.   Yes.

17         Q.   All right.  And my understanding is that you

18  have been designated to testify as to Topic 1; is that

19  right?

20         A.   Yes.

21         Q.   That you have been designated to testify as to

22  Topic 2; is that correct?

23         A.   That's correct.

24         Q.   And then Number 6; is that correct?

25         A.   Yes.

Page 97

1     Q.   And Topic 7; is that correct?

2     A.   Yes.

3     Q.   Are there any other of these topics that you

4   believe you have been designated to testify on behalf of

5   Cedar Park today?

6     A.   Not to my knowledge.

7     Q.   What is your position at Cedar Park?

8     A.   Senior pastor.

9     Q.   And how long have you been senior pastor at

10  Cedar Park?

11    A.   Seven years.

12    Q.   And going back, one more clarification.  As we

13  did in the last dep, I'm going to use the term "Cedar

14  Park."  Do you understand that to be Cedar Park Assembly

15  of God of Kirkland, Washington, the plaintiff in this

16  matter?

17    A.   Yes, I do.

18    Q.   Okay.  Could you briefly describe your

19  education?

20    A.   I have an undergraduate degree, a Bachelor of

21  Arts in Biblical Literature and New Testament Greek,

22  and -- and that's the extent of degrees that I have.

23  I've had some seminary that I've worked with in various

24  things, but a bachelor of arts in Bible.

25    Q.   Okay.  Did you obtain any certification

Page 98

1    through seminary to become a pastor?

2        A.   I -- I am ordained with the Assemblies of God

3    as a minister.

4        Q.   And the Assemblies of God, is that -- how

5    would you describe what that is compared to other

6    branches of the Christian religion?

7        A.   It is a denomination.

8        Q.   That's the word I was looking for.  Thank you.

9             And who ordained you as a minister through the

10   Assemblies of God, as in, is there a council or a test

11   or some sort of group of individuals who review and make

12   those kind of determinations that you can be ordained as

13   a minister?

14       A.   Yes.  It's a combination of the Northwest

15   District Executive Presbytery and the National

16   Presbytery for our denomination.

17       Q.   And are you involved presently with either of

18   those as far as -- well, I'll leave it there.

19             Are you involved with either of those two

20   organizations?

21       A.   I'm a minister in good standing with both of

22   those organizations.

23       Q.   Not fully knowing the structure of how

24   Assemblies of God works, but are you in any kind of

25   leadership position with respect to those two

Page 99

1   organizations as opposed to just Cedar Park?

2         A.   I am not.

3         Q.   Before becoming a senior pastor at Cedar Park,

4   what did you do before that?

5         A.   Over the last 22 years, I have served in

6   various ministerial positions with Cedar Park, with

7   youth, young adults, as well as pastoring one of our

8   campus locations.

9         Q.   And who makes the decision for you to be

10  appointed to those particular positions?

11        A.   Each of those positions were in the hiring

12  discretion of the previous senior pastor.

13        Q.   Okay.  And what process did you undergo to be

14  selected as senior pastor with Cedar Park Church?

15        A.   It was a process of interviewing with a

16  selection committee as well as our Board of Directors,

17  and then, eventually, a process with -- which requires a

18  vote of our entire membership or congregational body.

19        Q.   And that would be Cedar Park, as a whole,

20  having a vote?  Whoever voted would make that decision;

21  is that right?  That ultimate vote you're describing.

22  I'm just trying to make sure it's Cedar Park's

23  membership that's making that decision.

24        A.   Yes, that's correct.  The membership of Cedar

25  Park has the prerogative to vote on the appointment of a

Page 100

1    new senior pastor.

2         Q.    What is the senior pastor's relationship with

3    the Board of Directors?

4         A.    The senior pastor serves as the president of

5    the organization as well as of the Board and works in

6    cooperation with the official Board in making many

7    decisions as well as in cooperation with our

8    congregational vote in making other decisions.

9         Q.    Does the senior pastor have veto power of

10   decisions of the Board of Directors?

11        A.    Not as such.

12        Q.    Does the Board of Directors theoretically have

13   veto power over decisions made by the senior pastor?

14        A.    Those are not words that are used in our

15   nomenclature.

16        Q.    That's fair.

17              To what extent do those two Assembly of God

18   organizations review the teachings and views of Cedar

19   Park?

20        A.    There is no official review via denomination

21   of the teachings of Cedar Park Assembly of God, as such,

22   but the affiliation is with the minister themselves.

23        Q.    And I'm trying to understand, like, if Cedar

24   Park took a position that's contrary to the position of

25   one of these affiliations, would there be potentially

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 101

1   any consequence to Cedar Park?

2       A.    Well, being that the official doctrinal

3   positions of the Assemblies of God are the official

4   doctrinal position of Cedar Park Assembly of God, if

5   there were discrepancies, then that would be a matter of

6   discipline with the individual minister.  And the bylaws

7   of the church state clearly our agreement with the

8   doctrinal positions of the denomination.

9       Q.    Thank you.

10          Part of what I'm trying to just get out is the

11  difference or how the Assembly of God Doctrine works

12  from the affiliates to the church itself to understand

13  the level of difference that might occur or not occur,

14  so appreciate it.

15          Do you have any expertise in actuary analyses?

16      A.    No.

17      Q.    Do you have any expertise in market economics?

18      A.    No.

19      Q.    Okay.  You listened to Mr. Orcutt describe

20  what Cedar Park does in its various business

21  organizations; right?

22      A.    Yes.

23      Q.    Do you agree with his description of Cedar

24  Park, the organization, and the testimony that he

25  provided?

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 102

1    A.   Yes.  However, the title of business

2  organization isn't something that we use broadly to

3  describe our activities.  As such, we view every

4  activity of Cedar Park as an official reach of ministry

5  and of the church.  Even though it may look like

6  business in the eyes of, you know, a school is a school

7  is a school, but our underlying mission is the gospel of

8  Christ.

9    Q.   Well, and thanks for that.

10         I just want to make sure I understand that

11  there are arms of Cedar Park where they accept payment

12  for goods and services like school, like the missionary

13  car program, et cetera; is that correct?

14    A.   To an extent, that is correct, with the

15  exception, for instance, the missionary car is

16  exclusively on a donation basis.

17    Q.   Okay.  But you don't dispute that Cedar Park

18  pays B&O taxes, for example, on -- or sales taxes;

19  correct?

20    A.   I'll let Mr. Orcutt's response satisfy that

21  there.

22    Q.   That's all I need.  Thank you.

23         What are Cedar Park's beliefs with respect to

24  abortion?

25    A.   Cedar Park's beliefs with respect to human

Page 103

1   life is that it is indeed created in the image of God

2   and that any means to harm that life is an affront to

3   God and to his ways.  Specifically, on the issue of

4   abortion, Cedar Park's beliefs and explicitly-stated

5   teachings are that abortion itself is a sin and that --

6   for the reason that it -- it is the harming of an

7   innocent human life.

8        Q.   Okay.  Thank you.

9             And is this part of Cedar Park's Doctrine as a

10  member of the Assembly of God?

11       A.   Yes.  It is in agreement with the teachings of

12  the Bible and of the doctrinal statements of the

13  Assemblies of God.

14                    (Exhibit No. 22 marked.)

15       Q.  (By Mr. Crisalli) Okay.  I have Exhibit 22 in

16  there, if you'd like to take a look at it.

17       A.   There we go.

18            Hold on here.  I see all of the previous

19  exhibits from Mr. Orcutt.

20       Q.   Yes.

21       A.   Let me see if I can pull that up one more

22  time.

23       Q.   And you may -- or, you know, I won't be

24  returning back to, I think, any of them unless I bring

25  them up separately.

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 104

1       A.   Okay.  I have Exhibit 22.

2       Q.   Okay.  Do you recognize this document?

3       A.   Yes.

4       Q.   What is this document?

5       A.   It is a portion of Cedar Park's Constitution

6   and Bylaws.

7       Q.   Okay.  And I take it Page 2 is -- includes

8   provisions regarding sanctity of human life; is that

9   correct?

10      A.   Yes, that's correct.

11      Q.   And would this be where, at least within the

12  bylaws, you could find the doctrine of Cedar Park with

13  respect to its views on human life and potentially

14  abortion?

15      A.   Yes.

16      Q.   Are there any other provisions that you're

17  aware of within its bylaws that cover this subject?

18      A.   This is the -- the section that abortion

19  itself is explicitly stated.

20      Q.   And do you know if this is identically worded

21  to what the -- those affiliate organizations might

22  include as part of their constitution or bylaws?

23      A.   I'm not aware of that.

24      Q.   Okay.  Do you know who wrote this?

25      A.   I'm not specifically aware of who penned these

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 105

1   exact words.

2       Q.   Are you familiar with the process that was

3   undertaken to adopt these bylaws?

4       A.   Broadly, yes.

5       Q.   Is it a similar kind of process as used for,

6   like, selection of a senior pastor where there's a vote

7   by the membership to adopt these bylaws?

8       A.   As far as the original adoption of bylaws, it

9   would have been an agreement of the founding members.

10  And as per any changes to those bylaws, a supermajority,

11  two-thirds majority of the voting body of our members

12  would be required along with all of the conditional

13  discussion, debate, and so forth.

14      Q.   I'm trying to understand, for Cedar Park, what

15  does it consider constitutes its doctrine?  Is it the

16  bylaws and constitution?

17      A.   The doctrine of the church or, essentially,

18  the teachings of the church are informed by the

19  scriptures themselves and they are outlined and

20  explicitly stated in the documents of the church.  But

21  the constitution and bylaws, as is stated in the

22  position immediately below our position regarding

23  sanctity of human life, states that the constitution and

24  bylaws do not exhaust the extent of our beliefs, but the

25  Bible itself as the inspired and infallible word of God

Page 106

1    that speaks with final authority concerning issues of

2    truth, morality, and conduct, is the sole and final

3    source of all that we believe.

4        Q.   And the reason why I'm -- do you deliver

5    sermons at your church?

6        A.   I do.

7        Q.   Do you consider -- does Cedar Park consider

8    every sermon you've ever given to be the doctrine of the

9    church?

10       A.   Every sermon is given in light of the doctrine

11   of the church, and thereby should be in agreement with

12   the doctrines of the church, but do not carry the same

13   matters of final authority that the scriptures

14   themselves, nor even our legal documents of our

15   constitution and bylaws.

16       Q.   Okay.  Thank you.  I just wanted to draw that

17   line and make sure I understood when it became doctrine

18   versus not.

19            Does Cedar Park have a doctrinal view with

20   respect to contraceptives?

21       A.   Insomuch as contraceptives deal with a formed

22   human life, our statement on the sanctity of human life

23   would, as well, inform any teachings that the church

24   might have on contraceptives themselves.

25       Q.   Okay.  So in layman's terms, this means that

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 107

1  some -- it believes that some contraceptives constitute

2  a sin based on how they affect their purpose and others

3  are not deemed a sin.  Would that be a correct

4  statement?

5       A.   The measuring line that we would hold of where

6  sin comes into the equation wouldn't have much to do

7  with contraception itself, but has everything to do with

8  the ending of a fertilized embryo, which, in the

9  teachings of the scripture and the belief of the church,

10  is the definition of a life.  So life itself is the

11  measuring line for us rather than contraception

12  specifically.

13       Q.   Okay.  Thank you.

14            What are Cedar Park's beliefs with respect to

15  maternity care?

16       A.   That maternity care insofar as it is in

17  support of human life being that of both the conceived

18  infant and of the mother and family that she represents

19  is a moral obligation.

20       Q.   And is part of the basis for that belief from

21  the same provision in the bylaw that we've been talking

22  about?

23       A.   Certainly.

24       Q.   Does Cedar Park have any doctrinal beliefs on

25  whether there should be a regulated free market for

Page 108

1  goods and services?

2      A.   Not specifically, no.

3      Q.   What was your involvement in Cedar Park's

4  procurement of health insurance for its employees

5  since 2018?

6      A.   My involvement was to instruct our CFO and

7  human resources to gather the best information so that I

8  could make a final decision as to what plans were going

9  to be in the best pursuit of caring for our employees in

10  alignment with our doctrinal beliefs and our

11  religiously-held convictions.

12      Q.   In 2019, were you the individual who

13  ultimately made the decision whether to purchase Kaiser

14  Permanente versus Cigna?

15      A.   Yes.   That decision is in the authority of the

16  senior pastor.

17      Q.   We heard Mr. Orcutt lay out the reasoning in

18  his deposition as to why Cedar Park purchased a

19  particular plan in 2019 through 2022.   Do you have any

20  different reasons for why those particular plans were

21  chosen other than what -- when you made your decision

22  other than what Mr. Orcutt decided -- or, excuse me --

23  testified to?

24      A.   I agree with the analysis of Mr. Orcutt in his

25  testimony, and I would add that all of the decisions

Page 109

1    that we have made have been in pursuit of what we deem,

2    based on our doctrinal positions, based on our

3    understanding of best business practices, would be in

4    the best interest of Cedar Park and its employees.  Yes.

5                    (Exhibit No. 23 marked.)

6         Q.  (By Mr. Crisalli) In 2019, did you find --

7    well, I'll just put this in here so it's nice and

8    simple.  I'm putting in Exhibit 23.

9         A.   I'm looking at Exhibit 23.

10        Q.   All right.

11                    (Pause in the proceedings.)

12              THE DEPONENT:  Is there a question?

13        Q.  (By Mr. Crisalli) I wanted to make sure you had

14   an opportunity to review.

15             Do you recognize this document?

16        A.   I do.

17        Q.   And is this a letter with -- dated

18   July 19, 2019, with your signature at the bottom?

19        A.   Yes, it is.

20        Q.   And did you write this letter yourself, or did

21   someone else write it for your signature?

22        A.   The letter was the product of my direct

23   concerns in consulting and working with others.

24        Q.   So did you write the letter yourself, or did

25   someone else write it for you at your direction?

Page 110

1      A.   To my recollection, the letter was a
2  collaborative effort written by myself along with voice
3  from legal counsel and others.
4      Q.   Okay.  And do you recall why this letter was
5  sent?
6      A.   Yes.
7      Q.   Why is that?
8      A.   It was sent upon discovering that forms of
9  contraception that we were under the assumption that
10 were excluded from our plan were, indeed, not excluded
11 from our plan.  And so discovering that, we promptly
12 made the request to our insurance carrier to exclude
13 those from our plan, exempt them from our -- our
14 coverage.
15     Q.   And how did you come to learn that your plan
16 did not include those exclusions?  How did Cedar Park
17 come to learn that its plan did not include those
18 exclusions for certain contraceptives?
19     A.   I don't recall the exact happenings of that.
20 I could review and get back to you on that.
21                    (Exhibit No. 24 marked.)
22     Q.  (By Mr. Crisalli) Okay.  Exhibit 24.
23     A.   Okay.
24     Q.   Okay.  Do you recognize this document?
25     A.   I do, yes.

Page 111

1      Q.   Is this a letter dated August 23, 2019, with

2   your signature at the bottom?

3      A.   It is, yes.

4      Q.   And do you recall whether you drafted this

5   letter or whether it was drafted for you for your

6   signature?

7      A.   I believe that I did write this letter.

8      Q.   At the bottom -- do you recall why you sent

9   this letter?

10     A.   We sent this letter at the time when we were

11  needing to renew our insurance plan for the calendar

12  year ahead, under the knowledge that the previous

13  understanding that our religious beliefs would allow us

14  to not include coverage for abortion or abortion-causing

15  drugs would no longer be possible in any fully insured

16  plan.  Knowing that that was not an option because of

17  Senate Bill 6219, we had no other choice than to renew

18  our plan but to do so under protest.

19     Q.   Well, were you presented with the options from

20  Mr. Orcutt for different plans that you could purchase

21  for 2019?

22     A.   I was.

23     Q.   Did that include the Cigna plan?

24     A.   It did.

25     Q.   Taking the last paragraph:  "Please consider

Page 112

1    this a formal request that Kaiser Permanente separately

2    pay for the cost of all contraceptives."

3           Did I read that correctly?

4       A.   Yes.

5       Q.   Do you know whether Cedar Park has ever

6    utilized the conscience or religious objection for

7    contraceptives for Kaiser Permanente -- through Kaiser

8    Permanente?

9       A.   Can you clarify the question in terms of the

10   timeframe that you're referring to?

11      Q.   Since 2019, has Cedar Park ever utilized the

12   religious objection -- its religious objection for all

13   contraceptives through Kaiser Permanente's plan?

14      A.   At this point, I don't believe that we have

15   for the reason that we do not object to all forms of

16   contraceptives, merely those that interfere with and

17   prohibit the development of a fertilized human life.

18                   (Exhibit No. 25 marked.)

19      Q.   (By Mr. Crisalli) Okay.  I'm going to be

20   changing subjects.  So if you want to put these away,

21   that's fine.

22           I'll go through this more fully, but let's

23   start with the first page.  This is a document entitled

24   the "Second Amended Verified Complaint for Injunctive

25   and Declaratory Relief."  It's Cedar Park Assembly of

Page 113

1   God of Kirkland versus Myron "Mike" Kreidler and

2   Jay Inslee.

3           Do you recognize this pleading at all?

4       A.   Yes, I do.

5       Q.   If you go down, let's make sure it's the

6   last -- I believe it's the last page -- not last, of

7   course.  Page 29.

8           Are you down on Page 29?

9       A.   Yes.

10      Q.   Is that your declaration under penalty of

11  perjury?

12      A.   Yes, that is my signature.

13      Q.   Okay.  Did you review this document in signing

14  it -- before signing it?

15      A.   Yes, of course.

16      Q.   And did you assist in adding or providing

17  facts that were ultimately put into this document?

18      A.   Yes.

19      Q.   Okay.  Without telling me what you told

20  counsel, what I'm most focused on is what facts you

21  provided to -- are in this complaint.  And you can speak

22  generally, if you'd like, at first, and then we can get

23  into some of the specifics.

24      A.   I believe, generally, it would be the biblical

25  and doctrinal positions, beliefs of Cedar Park Church.

Page 114

1      Q.   And did you provide any of the information
2  about, like, what Cedar Park does, or would that have
3  come through, like, Mr. Orcutt?
4                MR. THERIOT:  Objection.  Vague.
5                THE DEPONENT:  Would you mind rephrasing
6  that question?
7      Q.  (By Mr. Crisalli) Yeah.  In looking at, like --
8  as I read this complaint, I'm assuming -- let me know if
9  I'm wrong.  Like a lot -- the legal analysis is not
10  coming from you or anyone at Cedar Park that's legal, a
11  lawyer's legal analysis; right?  So I'm looking at the
12  facts, which begin on Page 5.  Is that roughly the first
13  part where facts provided by Cedar Park appear in this
14  pleading?
15      A.   Yes.
16      Q.   Now, does this pleading mention anywhere that
17  Cedar Park had been considering purchasing a plan from
18  Cigna?
19      A.   Can -- am I understanding you to ask if the --
20  this amended complaint references a Cigna plan in it?
21  Is that what your question is?
22      Q.   Correct.
23      A.   Well, I don't have it memorized, but I
24  don't -- I don't believe it refers specifically to them
25  as a carrier.

Page 115

1      Q.   And going to Page 8, the Paragraph 43, my

2   understanding from reviewing this is this is the only

3   discussion of Cedar Park considering an alternative plan

4   for a health care plan.  Is that a fair reading of the

5   complaint?  Do you have any reason to disagree with

6   that?

7                MR. THERIOT:  Objection in that it

8   calls -- to the extent that it calls for a legal

9   conclusion.

10               THE DEPONENT:  In my understanding, this

11  paragraph in the complaint is a reference to the --

12  other than a fully insured plan, which is what we have

13  and what we have had previous to Senate Bill 6219, which

14  allowed us to exclude things that were morally

15  reprehensible to us, the only option available to us

16  that would allow us to exercise those rights would be a

17  self-insured -- either fully self-insured or

18  level-funded plan.

19               So what you read in this paragraph is

20  what the analysis of what the potential initial

21  first-year increase of expense with that plan as opposed

22  to a fully insured plan, which we had previous to there

23  with religious convictions intact and which we currently

24  have under the current arrangement which makes those

25  religious exemptions impossible.

Page 116

1      Q.   (By Mr. Crisalli) Well, all right.  So this

2   states, second sentence:  "It would cost Cedar Park

3   approximately $243,125 in additional annual costs to

4   become self-insured."

5            Do you know where that number came from?

6                 MR. THERIOT:  Object to the extent it's

7   outside of the scope of the topics that he's been

8   designated to.

9      Q.   (By Mr. Crisalli) Well, you signed this

10   document; right?

11     A.   The number is on the basis of some analysis

12   that our broker did at our request based on where in the

13   year that this was signed, where our current utilization

14   was, and it was an estimate and analysis of what the

15   next year under those same assumptions would -- would

16   cost us additional to what we were paying.

17     Q.   Was this number, the $243,125 in increased

18   costs referenced only to a self-insured plan provided by

19   Kaiser Permanente?

20     A.   I don't know the specifics of what it was --

21   which plan it was in reference to.

22     Q.   Were you aware at the time of signing this

23   that Cigna had offered a plan that was cheaper than

24   Kaiser's plan and would allow for Cedar Park to exercise

25   its religious objections to abortion and certain

Page 117

1    contraceptives?

2         A.    I don't recall that.

3                        (Exhibit Nos. 26 and 27 marked.)

4         Q.   (By Mr. Crisalli) Let's go to Exhibit 26.

5              All right.  I'm doing 26 and 27.  They're --

6    the reason why I have them as two exhibits is because of

7    how they are in the filing system with the federal

8    courts, but they're connected documents in that 27 is

9    the -- should be the exhibit to 26.

10             Let's start with 26 and we can get to 27 if

11   it's needed.

12        A.    Okay.

13        Q.    All right.  Do you recognize this document?

14        A.    I do.

15        Q.    And is this your declaration signed on

16   September 13, 2019?

17        A.    Yes, it is.

18        Q.    And in this document, you discuss your

19   communications with Kaiser Permanente regarding

20   purchasing a health plan through that carrier; is that

21   correct?

22        A.    Yes.

23        Q.    And Exhibit A, which is Exhibit 27 to this

24   deposition, if you want to take a quick look there.

25        A.    Is there a specific portion of that or should

Page 118

1    I review the entire document?

2         Q.   It's just a brief skim to confirm these are

3    the emails referenced in your exhibit discussing what

4    Kaiser's plan would be like with respect to coverage for

5    abortion services and certain contraceptives.

6              Are you ready?

7         A.   Sure, yes.

8         Q.   Okay.  I didn't know if you were done yet.

9    I'm sorry.

10        A.   Sorry.  No, I just finished and was awaiting.

11        Q.   Zoom, it's still awkward.

12             Going -- so does -- is Exhibit 27 the emails

13   discussed in the declaration which is provided as

14   Exhibit 26?

15        A.   Yes.

16        Q.   In reviewing Exhibit 26, at any point, does

17   this declaration mention that Cedar Park had considered

18   a plan from Cigna for 2019?

19        A.   It broadly refers to self-insured plans of

20   which the level-funded plan offered by Cigna is a form

21   of self-insurance.

22        Q.   But is there any reference in there that this

23   is -- have you done any analysis to see whether that

24   243,125 in costs connects to the cost it would be for

25   Cigna?

Page 119

1    A.   I have no reason to doubt that the 243- was on

2  the best assumptions of our broker as they analyzed what

3  we put before them.

4    Q.   Did you review, in 2019, the comparison of

5  benefits and costs that were provided by the broker to

6  determine whether to purchase Kaiser or Cigna?

7    A.   Yes, in coordination with Mr. Orcutt.

8                    (Exhibit No. 28 marked.)

9    Q.  (By Mr. Crisalli) Okay.  I have put in

10 Exhibit 28.  At least this is a shorter version than the

11 second supplemental -- or second verified complaint, so

12 if you want to take a quick moment.

13   A.   Okay.

14   Q.   Okay.  Is -- on the last page of Exhibit 28,

15 is that your declaration under penalty of perjury dated

16 the 2nd day of October 2019?

17   A.   It is.

18   Q.   And did -- do you recall reviewing this

19 document before signing that?

20   A.   Yes, I do.

21   Q.   And in -- anywhere in this document, does it

22 reference that Cedar Park considered purchasing Cigna

23 for 2019 as its health insurance carrier?

24   A.   It does not mention Cigna or any other carrier

25 that we declined to purchase coverage from.

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 120

1    Q.   And my next question:  At any point in this,

2   does it reference that Cedar Park had reviewed and

3   considered other carriers aside from Cigna or Kaiser

4   Permanente that would provide plans consistent with its

5   religious beliefs?

6    A.   This document does not state as such.

7    Q.   Okay.  We can put these to the side so you

8   don't need to worry about these anymore.

9         What burdens does Cedar Park believe exist

10  when exercising its religious beliefs when purchasing a

11  healthcare plan for its employees?

12             MR. THERIOT:  Objection.  Calls for a

13  legal conclusion.

14    Q.   (By Mr. Crisalli) You may answer.

15    A.   The fact that in order to purchase a plan that

16  meets the needs of our employees, the only option that

17  we have viable or available to us in the fully insured

18  plans precludes us from exempting abortion and/or

19  abortion-causing drugs.  It is indeed a great burden to

20  us.  It violates the expression of our understandings of

21  the Bible and it forces us to make the only choice that

22  we have is to purchase a plan and to do so under --

23  under great objection because we have really been

24  shoehorned into purchasing a product that there was no

25  other -- no other viable choice.

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 121

1       Q.   Does Cedar Park have in its doctrine any

2   religious tenet which requires it to purchase a fully

3   insured plan as opposed to any other kind of plan?

4       A.   In the official doctrinal statements of the

5   church, there is no reference to insurance, fully

6   funded, or otherwise, but it would be an extrapolation

7   of our understanding of the things needed to support our

8   moral and doctrinal obligation to support human life.

9       Q.   Do you believe -- does Cedar Park believe that

10  a level-funded plan does not support human life?

11      A.   That is not a statement I would make.

12      Q.   What religious burden is there on Cedar Park

13  to have to negotiate, if it has to negotiate with

14  carriers, in order to conform with its -- for them to

15  present plans that conform with its religious beliefs?

16                  MR. THERIOT:  Objection.  Vague.

17                  THE DEPONENT:  I was -- would you mind

18  restating that question?

19      Q.   (By Mr. Crisalli) I'll restate it.

20      A.   Sure.

21      Q.   Is there any burden to Cedar Park's religious

22  beliefs in having to negotiate with carriers to develop

23  a plan that conforms with Cedar Park's religious

24  objections?

25      A.   No.  In fact, that's what we've been

Page 122

1    endeavoring to do for these last four years.

2        Q.   Does Cedar Park have a doctrinal or dogmatic

3    view as to whether it must use a large group health

4    plan?

5        A.   No.  And, again, our choice based on large

6    group plan and/or otherwise is merely in pursuit of the

7    greatest means for us to support life in a manner that

8    is consistent with biblical teaching.

9        Q.   So you would have the same answer if I were to

10   ask regarding small health plans, small group health

11   plans?

12       A.   I'm not familiar with the details of small

13   group health plans.  Sorry.

14       Q.   Is Cedar Park taking the position that it

15   cannot exercise its religious views unless all

16   businesses must provide services consistent with Cedar

17   Park's religious beliefs?

18       A.   No, our -- our argument is not with any

19   business.

20       Q.   Have you ever -- well, strike that.

21            Is Cedar Park aware of any law, statutes or

22   rule that mandates Cedar Park to use Kaiser Permanente

23   as its insurance carrier?

24       A.   No.

25            MR. CRISALLI:  Okay.  So let's take

Page 123

1    ten minutes so I can go over my notes, and then that

2    might be it.  I might have some follow-up.  We'll see.

3                  MR. THERIOT:  Thanks.

4                  THE DEPONENT:  Okay.

5                  MR. CRISALLI:  Thanks.  Off the record.

6                       (A break was taken from

7                        2:43 p.m. to 2:52 p.m.)

8        Q.  (By Mr. Crisalli) Do you understand that you're

9    still under oath?

10       A.   Yes.

11                       (Exhibit No. 29 marked.)

12       Q.  (By Mr. Crisalli) Okay.  I have Exhibit 29, and

13   do you recall ever seeing this document?

14       A.   Yes.

15       Q.   When did you -- what's your recollection of

16   reviewing this document?

17       A.   I don't recall a specific time or instance.

18       Q.   Okay.  And this is an email from Steve Orcutt

19   to Melissa Knauss and Jami Hansen.  I realize you're not

20   on this, but I'll represent I, during the break, went

21   through and searched all the discovery in this matter to

22   determine whether -- where the 243,125 came from, and

23   this was the only place in the document production from

24   plaintiffs that I found this number.

25             Do you believe that this might have been the

Page 124

1  source of that number that was in the pleadings?  Does

2  Cedar Park believe -- did Cedar Park base its number for

3  additional costs of 243,125 from this email?

4      A.   I'm not sure that the basis of it would come

5  from this email.  It appears that this email is

6  referencing a number that Gallagher has confirmed in

7  their analysis of what self-insurance would cost

8  additionally.

9      Q.   And --

10      A.   So --

11      Q.   Sorry.  Go ahead.  I don't want to interrupt

12  you.

13      A.   That was a complete answer.

14      Q.   Okay.  And this email nowhere describes what

15  it means to be self-insured let alone who would

16  administrate it; correct?

17      A.   This email does not appear to be a

18  comprehensive description of self-insurance, no.

19      Q.   Okay.  Do you know of any other place -- does

20  Cedar Park know of any other place where this 243,125

21  might have come from after March 5, 2019?

22           MR. THERIOT:  Object to the extent that

23  it's outside of the scope of what he's been designated

24  to testify as to.

25           THE DEPONENT:  I'm not aware of that.

Page 125

1           MR. CRISALLI:  Okay.  Those are all the

2      questions I have.  I'm going to leave it open on this

3      just one -- well, any subsequent issues just because --

4      but we'll leave it at that.

5                   Thank you very much for your time.

6                   Do you have any questions, Kevin?

7           MR. THERIOT:  I don't have any questions.

8      I -- actually, let me take five minutes and then come

9      back.  I may have one question.

10          MR. CRISALLI:  Okay.

11                      (A break was taken from

12                       2:56 p.m. to 2:59 p.m.)

13                      (Deposition concluded at 2:59 p.m.)

14                      (Signature reserved.)

15                          --o0o--

16

17

18

19

20

21

22

23

24

25

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                    30(b)(6) Jason Smith

Page 126

1                      C E R T I F I C A T E

2

3    STATE OF ARIZONA    )
                         )
4    COUNTY OF MARICOPA  )

5

6            I, Nicole A. Bulldis, RPR, a Certified Court
     Reporter, do hereby certify under the laws of the State
7    of Washington:

8            That the foregoing 30(b)(6) deposition upon
     oral examination of Cedar Park Assembly of God of
9    Kirkland, Washington designee Jason Smith was taken
     stenographically by me, via Zoom, on November 21, 2022,
10   and transcribed under my direction;

11           That the witness was duly sworn by me to
     testify truthfully, and that the transcript of the
12   deposition is full, true, and correct to the best of my
     ability;

13

14           That I am not a relative, employee, or counsel
     of any party to this action or relative or employee of
     such counsel, and that I am not financially interested
15   in the said action or the outcome thereof.

16

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 1st day of December 2022.

20

21

22   _____
     Nicole A. Bulldis, RPR
23   WA CCR. No. 3384

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Crisalli Decl., p.0130

6dd1ef90-c703-4fca-8857-71e9b1c1b352

# Exhibit C

                                                Melissa Knauss <melissa.k@cedarpark.org>

---

## Follow up information
3 messages

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Wed, Jun 12, 2019 at 8:41 AM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Good morning,

I have confirmed that if you go with Cigna and only offer 1 plan the PPO rates would drop by 1.5%.  The fully insured Cigna rates will
have the same issue as Kaiser if the abortion law is passed.  With Cigna's level funded plan, you can remove coverage for abortions.  In
addition, Kaiser does not have a higher deductible then what you have currently.  Cigna has up to a $7900 deductible however, because
of the HSA rules your out of pocket maximum cannot exceed where you are currently which means you wouldn't be able to increase
your deductible any further.

Let me know if you have any questions.

*Jami M. Hansen,*
*Area Vice President*

Health and Welfare Consulting



Insurance | Risk Management | Consulting

777 108th Avenue NE, Suite 200 | Bellevue, WA 98004

P: 425.974.3275 | F: 425.201.2774

www.ajg.com



*This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material
protected by law.*
*Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any
computer.*

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                Wed, Jun 12, 2019 at 3:14 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Hi Jami,                                         Crisalli Decl., p.0132

Do you think Kaiser would offer us a better rate if we only went with a PPO too?  It's not our first choice of options since the HMO may be responsible for the reduced utilization, but it's worth asking.  Also, can you let Steve and I know how the Cigna network compares to the First Choice Network?  If we were to go with Cigna we'd want the change to be as seamless as possible for the claimants covered by the PPO.

Thanks,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                                      Wed, Jun 12, 2019 at 4:46 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Hi Melissa!

Unfortunately, eliminating the HMO would eliminate the managed care piece and put greater emphasis on contracted providers. Eliminating the HMO would not decrease the PPO rates. First Choice and Cigna networks are very similar however, anytime you change carriers there may be some disruption.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jun 12, 2019, at 3:15 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

Hi Jami,

Do you think Kaiser would offer us a better rate if we only went with a PPO too?  It's not our first choice of options since the HMO may be responsible for the reduced utilization, but it's worth asking.  Also, can you let Steve and I know how the Cigna network compares to the First Choice Network?  If we were to go with Cigna we'd want the change to be as seamless as possible for the claimants covered by the PPO.

Thanks,



On Wed, Jun 12, 2019 at 8:41 AM Jami Hansen <Jami_Hansen@ajg.com> wrote:

Good morning,

I have confirmed that if you go with Cigna and only offer 1 plan the PPO rates would drop by 1.5%.  The fully insured Cigna rates will have the same issue as Kaiser if the abortion law is passed.  With Cigna's level funded plan, you can remove coverage for abortions.  In addition, Kaiser does not have a higher deductible then what you have currently. Cigna has up to a $7900 deductible however, because of the HSA rules your out of pocket maximum cannot exceed where you are currently which means you wouldn't be able to increase your deductible any further.

Let me know if you have any questions.

*Jami M. Hansen,*
*Area Vice President*

Health and Welfare Consulting

Cedar Park 000139

[Quoted text hidden]

---



**image001.png**
12K

Cedar Park 000140

# Exhibit D

 **Gmail**

**Melissa Knauss <melissa.k@cedarpark.org>**

## Fwd: Clarification on Abortifacients in Our Current Kaiser Plan
2 messages

**Steve Orcutt** <steve.o@cedarpark.org>                                          Mon, Jun 17, 2019 at 12:37 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

---------- Forwarded message ----------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
Date: Mon, Jun 17, 2019 at 12:33 PM
Subject: Re: Clarification on Abortifacients in Our Current Kaiser Plan
To: Steve Orcutt <steve.o@cedarpark.org>

The current plan does cover IUDs and contraceptives.

The current plan does not cover abortion. I'm double checking on any abortion medications such as the morning after pill as the contracts do not specifically speak to that.  However, I have an Email from last year where Kaiser was asking you to confirm your religious exemption.  I'll confirm and get back to you!

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jun 16, 2019, at 9:11 PM, Steve Orcutt <steve.o@cedarpark.org> wrote:

> **Be Aware:** You are receiving this e-mail from someone outside of the organization. Do NOT click links or open attachments unless you recognize the sender's e-mail address and know the content is safe.

Hi Jamie sorry to bug you on a Sunday, but I need to clarify one more time what our current Kaiser Plan does NOT cover.

I know we don't cover abortions and we've talked several times about not covering abortifacient medications.

Can you confirm that our plan currently does not cover any of those "morning after" medications? I think sometimes they're called "*emergency contraceptives*".

I know it does cover contraceptives though, correct?  Would that include IUDs?

Thanks! Steve.

**Melissa Knauss** <melissa.k@cedarpark.org>                                        Tue, Jun 18, 2019 at 5:04 PM
To: Steve Orcutt <steve.o@cedarpark.org>

TO Jami.  See Below.

All the best,



[Quoted text hidden]

Cedar Park 000141

# Exhibit E



**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Coverage Question
2 messages

---

Steve Orcutt <steve.o@cedarpark.org>                                     Tue, Jun 25, 2019 at 2:03 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

How long has CP covered Abortifacient medications?  Was it just with Kaiser?  Or also with Group Health?  Thanks.  Steve.

On Tue, Jun 25, 2019 at 12:52 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:

Here is Cigna's legal response for both ASO and Fully Insured business. Let me know if you have any questions.

For a self-funded plan:

·      Plans must cover contraceptives under the ACA;

·      Under the ACA, an organization that objects to coverage of contraceptives based on religious beliefs or moral objections cannot be required to provide coverage for contraceptives.

·      A client that qualifies for a religious or moral exemption (e.g. "eligible organization") must notify Sales who must ensure that the proper indicator is selected in ePRO so that contraceptive benefits can be excluded from their plan, and an accommodation set up, if applicable (see * below). Only the employer can determine if they qualify for the full exemption. Cigna will not require proof.

·      For abortion coverage, the Pregnancy Discrimination Act (PDA) requires the coverage of therapeutic abortions (where the life of the mother is endangered). However, the PDA does not apply to tax exempt church groups. (Cigna's standard policy is to apply these requirements to all plans, including non-ERISA tax-exempt church plans.  Upon request of a church plan, coverage of these benefits can be excluded.)


For an insured plan sitused in WA:


·      Policies must cover maternity care and this includes coverage for abortions;

·      Policies must cover contraceptives;

·      An employer with a religious or moral tenet opposed to a specific service is not required to purchase coverage for that service if they object for reason of religion or conscience. In other words, an employer may exclude coverage for contraceptives and abortion if that employer objects to providing that coverage due to religious or other beliefs.

·      Enrollees shall not be denied coverage to any service excluded from their benefit package as a result of the employer's opposition to providing a specific service.

·      Cigna will send a letter to enrollees notifying them of their rights to access these excluded services outside of their plan.


**\*_Eligible Organizations and Optional Contraceptive Accommodation; Disclosure Requirements_**


If a fully insured client is eligible for and voluntarily elects an optional contraceptive accommodation (opt out), Cigna will pay for all FDA-approved contraceptive coverage for eligible employees (subscribers and dependents) under a separate contraceptive-only PPO account that is set up for these customers.  For self-insured clients, the current administrator for that client must arrange for an insurer to pay for the coverage.  In both cases, Cigna will fund the contraceptive coverage regardless of funding type. Cigna will segregate premium revenue collected from the client from the monies used to provide payment for contraceptives.


Cigna will only pay for in-network medical contraceptive procedures and generic prescription contraceptives or brand prescription contraceptives with no generic equivalent or alternative. Out of network medical services and brand prescription drugs that have a generic equivalent or alternative are not covered under these plans.

Crisalli Decl., p.0138

Cedar Park 000155

The client will be responsible for certifying that they will not be covering contraceptives due to their religious or moral beliefs and eligibility for the optional accommodation. If a client elects the accommodation, they will not have the option to pick and choose which contraceptives they will cover and exclude due to the complexity of administering a variable customized benefit for each client.  Clients must sign and return the attached self-certification or notify HHS using the attached model notice or other alternate written notification.

Cigna will notify the employees of the eligible clients of the availability of separate payments for contraceptive coverage by providing them with a custom letter substantially similar to the model notice.  The notice will be sent to subscribers (and to dependents with privacy restrictions) annually at renewal and to new hires once eligibility has been finalized on the employer's group plan.

Existing clients who are under a current accommodation arrangement may keep or revoke this accommodation. If the client chooses to revoke, Cigna will provide notice to the affected employees explaining that they will no longer have contraceptive coverage through Cigna.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jun 25, 2019, at 11:30 AM, Steve Orcutt <steve.o@cedarpark.org> wrote:

> [EXTERNAL]

> Kaiser seems to be quite focused on answering the question they want to answer rather than the one we keep asking.
>
> So I'll ask a different question that hopefully should be simple enough that they can give us a yes or no answer.
>
> 1. Under the **Eligible organization** option, is Kaiser currently paying for all contraceptive coverage options for any of their clients.  And by "paying for" I mean that all approved contraceptives are paid for 100% by Kaiser, not by the employee (as they are currently being paid for under our present Kaiser policy since no religious employer of eligible organization options are signed and in place.
> 2. Can you please check with Cigna to see what options we would have with them to exclude abortions and abortifacient but continue to provide all other contraceptives?
>
> Thanks!  And of course, I need this ASAP!  Steve.
>
> On Mon, Jun 24, 2019 at 4:42 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:
> I heard back from Kaiser:
>
> We have provided the definitions for religious employer and eligible organization via previous emails. We do not know the corporate structure of the group and cannot make the determination for the group on whether they are a religious employer or eligible organization.
>
> **Religious employer** is defined to include any nonprofit entity that is described under the existing tax code definition which applies to group health plan houses of worship. This would include a house of worship that operates a soup kitchen or parochial school.
> ·       Required to execute a form that certifies that the entity meets the requirements of a full "religious employer" definition to claim the exemption.
>
> **Eligible organization** is a non-profit organization that hold itself out as a religious organization and opposes providing coverage for some or all contraceptive services on account of religious objections. This could include hospitals, universities or other entities with religious affiliations.
> Required to execute a form self-certifying the entity qualifies for an accommodation
>
> Let me know if you have any additional questions.
>
> Jami Hansen
> Area Vice President
> Arthur J Gallagher
> 425-891-1325

Cedar Park 000156

On Jun 24, 2019, at 2:14 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> **Be Aware:** You are receiving this e-mail from someone outside of the organization. Do NOT click links or open attachments unless you recognize the sender's e-mail address and know the content is safe.

Hi Jami,

It sure sounds to me as if *Kaiser* doesn't fully understand what it is asking us to sign, which makes it pretty difficult for *us* to know what we're signing.  What do you advise?

All the best,



On Mon, Jun 24, 2019 at 1:13 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:
See below from Kaiser:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

**Hi Jami –**

**Regarding the questions below, I was able to confirm that KP will not provide legal advice to the group. We cannot answer the questions regarding legal interpretation.  I have responded to the questions regarding benefits.**

1)   It would seem that all Religious Employers would also be Eligible Organizations but not all Eligible Organizations would be Religious Employers. Please see above

2)   In further clarifying #1, while an Eligible Organization would not have the option of the Religious Employer, it appears that a Religious Employer would have the option of either. Please see above

3)   It appears that Cedar Park can sign the Eligible Organization without jeopardizing their status as a Religious Employer.  Nothing about signing the Eligible Organization form, or within its mentioned CFRs, would cause Cedar Park to inadvertently: Please see above

   a)   State that Cedar Park *does not qualify* as a Religious Employer.

   b)   *Denounce* their Religious Employership.

   c)   Effect any other religious exemptions they receive *inside* of medical, such as, but not limited to, their ability to preclude coverage of domestic partners.

Crisalli Decl., p.0140

d)   Effect any other religious exemptions they receive *outside* of medical, such as, but not limited to, the exemptions they receive with regard to hiring decisions under the Equal Employment Opportunity Act.

5.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering abortifacients, included Copper IUDs, and abortions? KPWA is still working to understand the new WA state mandate and the impact it has on groups.

6.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering birth control that is *not* deemed medically necessary? KPWA is still working to understand the new WA state mandate and the impact it has on groups.

7.)  If the Eligible Organization Form is signed and KFHPWA, as the fully-insured issuer, provides coverage for an item that is not covered under the Cedar Park Assembly of God group plan, and such provision results in an out-of-pocket expense to the claimant, does the out-of-pocket amount go toward the claimants deductible under the Cedar Park Assembly of God group plan? If a service is not covered it does not count toward deductible or out of pocket max.

8.)  If the Religious Employer Form is signed and a claimant pays out-of-pocket for a precluded item, does *that* amount go toward the claimant's deductible under the Cedar Park Assembly of God group plan? If a service is not covered it does not count toward deductible or out of pocket max.

9.)  Does the Religious Employer Form allow Cedar Park to provide birth control if it is deemed *medically necessary*?  (Abortifacients, included Copper IUDs, and abortions must still be excluded.) Per earlier conversations coverage is all or nothing. Groups may not pick and choose which preventive birth control services to include and which to exclude. Additionally KPWA is still working to understand the new state mandate, how this impacts large group employer plans and what carriers are required to cover.

If questions 1 or 2 above are not correct, please also answer these questions as well:

On the bottom half of the Eligible Organization document it states:  Please see above, KPWA cannot advise

"Note: An organization that offers coverage through the same group health plan as a religious employer **and/or** an eligible organization, and that is part of the same group of corporations as, or under common control with, such employer **and/or** organization, may certify that it holds itself out as a religious organization."

1.)  It would appear that the "**and/or**" statements in the Note above would allow a Religious Employer to also be the Eligible Organization. Please describe the error in this logic.

2.)  Within that text the Eligible Organization document states an eligible employer is defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); and 45 CFR 147.131(b) and that a Religious Employer is defined in 45 CFR 147.131(a).  What factors should Cedar

Cedar Park 000158

Park look at that preclude it, or may preclude it, from qualifying as
both?

---

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Friday, June 21, 2019 2:13 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Steve Orcutt <steve.o@cedarpark.org>
**Subject:** More Questions about the forms

> **Be Aware:** You are receiving this e-mail from someone outside of the organization. Do NOT
> click links or open attachments unless you recognize the sender's e-mail address and know
> the content is safe.

Hi Jami,

Steve and I are still trying to understand the complete ramifications of each form.
Thank you for bearing with us as we do.  While **we understand that we can and will
only sign one form**, we're trying to understand each form from an integrity
standpoint as well as the potential consequences of choosing one form over the
other.  Can you please work with Kaiser's legal team and/or GBS's legal team to
**confirm or correct** the following statements and questions?

   1)   It would seem that all Religious Employers would also be Eligible
Organizations but not all Eligible Organizations would be Religious Employers.

   2)   In further clarifying #1, while an Eligible Organization would not have the
option of the Religious Employer, it appears that a Religious Employer would
have the option of either.

   3)   It appears that Cedar Park can sign the Eligible Organization without
jeopardizing their status as a Religious Employer.  Nothing about signing the
Eligible Organization form, or within its mentioned CFRs, would cause Cedar
Park to inadvertently:

      a)   State that Cedar Park *does not qualify* as a Religious Employer.

      b)   *Denounce* their Religious Employership.

      c)   Effect any other religious exemptions they receive *inside* of medical,
such as, but not limited to, their ability to preclude coverage of domestic
partners.

      d)   Effect any other religious exemptions they receive *outside* of medical,
such as, but not limited to, the exemptions they receive with regard to
hiring decisions under the Equal Employment Opportunity Act.

   5.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as
the fully-insured issuer, from covering abortifacients, included Copper IUDs, and
abortions?

Cedar Park 000159

6.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering birth control that is *not* deemed medically necessary?

7.)  If the Eligible Organization Form is signed and KFHPWA, as the fully-insured issuer, provides coverage for an item that is not covered under the Cedar Park Assembly of God group plan, and such provision results in an out-of-pocket expense to the claimant, does the out-of-pocket amount go toward the claimants deductible under the Cedar Park Assembly of God group plan?

8.)  If the Religious Employer Form is signed and a claimant pays out-of-pocket for a precluded item, does *that* amount go toward the claimant's deductible under the Cedar Park Assembly of God group plan?

9.)  Does the Religious Employer Form allow Cedar Park to provide birth control if it is deemed *medically necessary*?  (Abortifacients, included Copper IUDs, and abortions must still be excluded.)

If questions 1 or 2 above are not correct, please also answer these questions as well:

On the bottom half of the Eligible Organization document it states:

"Note: An organization that offers coverage through the same group health plan as a religious employer **and/or** an eligible organization, and that is part of the same group of corporations as, or under common control with, such employer **and/or** organization, may certify that it holds itself out as a religious organization."

1.)  It would appear that the "**and/or**" statements in the Note above would allow a Religious Employer to also be the Eligible Organization. Please describe the error in this logic.

2.)  Within that text the Eligible Organization document states an eligible employer is defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); and 45 CFR 147.131(b) and that a Religious Employer is defined in 45 CFR 147.131(a).  What factors should Cedar Park look at that preclude it, or may preclude it, from qualifying as both?

Thank you!



**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error,

Cedar Park 000160

> please notify the sender immediately by reply e-mail and permanently delete this e-mail and any
> attachments without reading, forwarding or saving them.  Thank you.

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                            Tue, Jun 25, 2019 at 3:23 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Steve,

KP/Group health has always covered this.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

[Quoted text hidden]

Cedar Park 000161

# Exhibit F

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Direct Answers
7 messages

---

**Melissa Knauss** <melissa.k@cedarpark.org>                          Mon, Jul 8, 2019 at 3:48 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

I know you're working working really hard on this and we truly appreciate it.  Steve and I are trying to read between the carriers' mumbo-jumbo, legaleese, and just get really clear unequivocal answers.  Please ask the carrier(s) to answer the following by selecting Yes or No and providing the details if they select Yes.

FOR KAISER
Is there anything Cedar Park Assembly of God can do between now and renewal to ensure abortifacient, including Copper IUDs, are excluded from our current 2018-2019 plan?
[ ] YES, this is what must be done: _____
[ ] NO, there is nothing that can be done to exclude abortifacients, including Copper IUDs, from the current 2018-2019 plan based on the information we have at this time.

FOR KAISER AND CIGNA
Will Cedar Park Assembly of God be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives, at renewal for the 2019-2020 plan year?
[ ] YES, this is what must be done: _____
[ ] NO, at renewal for the plan effective 9/2019 you will *not* be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives based on the information we have at this time.

All the best,



---

**Jami Hansen** <Jami_Hansen@ajg.com>                               Mon, Jul 8, 2019 at 4:16 PM
To: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>

See below:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325


Begin forwarded message:

> **From:** "Croff, Mark R     303" <Mark.Croff@Cigna.com>
> **Date:** July 8, 2019 at 4:09:39 PM PDT
> **To:** Jami Hansen <Jami_Hansen@AJG.com>
> **Subject: Re: [External] Fwd: Direct Answers**
>
> ┌─────────────────────────────┐
> │ [EXTERNAL]                  │
> └─────────────────────────────┘
>
> Yes. Legal and administrative approval from CIGNA.
>
> ---
>
> > **From:** Melissa Knauss <melissa.k@cedarpark.org>
> > **Date:** July 8, 2019 at 3:48:55 PM PDT
> > **To:** Jami Hansen <Jami_Hansen@ajg.com>
> > **Cc:** Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Cedar Park 000200

Subject: Direct Answers

[EXTERNAL]

[Quoted text hidden]

--------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error,
please immediately notify the sender by e-mail at the address shown.
This email transmission may contain confidential information.  This
information is intended only for the use of the individual(s) or entity to
whom it is intended even if addressed incorrectly.  Please delete it from
your files if you are not the intended recipient.  Thank you for your
compliance.  Copyright (c) 2019 Cigna
========================================================================

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Mon, Jul 8, 2019 at 4:29 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Ok.  So Cigna is on board for our 2019 plan year to allow us to exclude our current exclusions plus expand the Plan B exclusion to all
ages, add Copper IUDs to the exclusion, and exclude any other abortifacients.  Thanks, Jami!

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Mon, Jul 8, 2019 at 4:33 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Correct!

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jul 8, 2019, at 4:30 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

[EXTERNAL]

[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Mon, Jul 15, 2019 at 10:37 AM
To: Melissa Knauss <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

See below from Kaiser:

*Jami M. Hansen,*
*Area Vice President*

Health and Welfare Consulting

Crisalli Decl., p.0147

Cedar Park 000201



777 108th Avenue NE, Suite 200 | Bellevue, WA 98004

P: 425.974.3275 | F: 425.201.2774

www.ajg.com



*This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law.*
*Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.*

**From:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Sent:** Monday, July 15, 2019 10:36 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Subject:** RE: Direct Answers

[EXTERNAL]

Hi Jami,

Please see responses below in red.

FOR KAISER

Is there anything Cedar Park Assembly of God can do between now and renewal to ensure abortifacient, including Copper IUDs, are excluded from our current 2018-2019 plan?

[ ]  YES, this is what must be done:  _____

[ ]  NO, there is nothing that can be done to exclude abortifacients, including Copper IUDs, from the current 2018-2019 plan based on the information we have at this time. No, there is nothing that can be done within the 2018-2019 plan year at this time as the group did not self-certify prior to the plan year (2018). KP cannot retroactively make plan changes to 9/1/2018. As a reminder termination of pregnancy (abortion) is not covered by Cedar Park in the 2018 plan year.

FOR KAISER AND CIGNA

Will Cedar Park Assembly of God be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives, at renewal for the 2019-2020 plan year?

[ ]  YES, this is what must be done:  _____

Cedar Park 000202

[  ]  NO, at renewal for the plan effective 9/2019 you will *not* be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives based on the information we have at this time. At this time KP is waiting for further clarification regarding exclusions of abortions for 2019. KP does have the ability to remove contraceptives. Please note that the group must self-certify prior new plan year 9/1/2019-9/1/2020 in order to remove contraceptives. Removal of contraceptives is all or nothing. KP does not have the ability to carve out specific contraceptives/abortifacient contraceptives at the groups request. If the group self-certifies, the group does not pay for contraceptives within the plan, however KP would cover the cost of all contraceptives for members that were seeking these services.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Date:** July 8, 2019 at 3:48:55 PM PDT
**To:** Jami Hansen <Jami_Hansen@ajg.com>
**Cc:** Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>
**Subject: Direct Answers**

[EXTERNAL]

Hi Jami,

[Quoted text hidden]

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                Thu, Jul 18, 2019 at 2:00 PM
To: Steve Orcutt <steve.o@cedarpark.org>

  [Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                Thu, Jul 18, 2019 at 2:22 PM
To: Jay Smith <jay.s@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>


  ---------- Forwarded message ---------
  From: **Jami Hansen** <Jami_Hansen@ajg.com>
  [Quoted text hidden]
  [Quoted text hidden]

Cedar Park 000204

# Exhibit G



Melissa Knauss <melissa.k@cedarpark.org>

## 15 Minute Call Tomorrow Morning @ 9:30?
6 messages

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Mon, Jul 15, 2019 at 5:44 PM
To: Jami_Hansen <Jami_Hansen@ajg.com>
Cc: melissa.k@cedarpark.org

I appreciate the information from Kaiser, I need to know what they will or will not do depending on whether the Washington state I think it's 6219 is in effect September 1 or if an injunction is granted. I need the same information from Cigna I have to have it in writing from them and we need to talk about whether Jay needs to write another letter to them to get super super super clear answers.

At this point in time if Kaiser is unwilling to give us what we want regarding excluding abortifacients only and CIGNA is, that may make our decision. Thanks Steve

Sent from my iPhone

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                      Mon, Jul 15, 2019 at 5:51 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>

Hi Steve!
We're meeting on Thursday.  I sent Melissa both Cigna & Kaiser's response.  You're correct, Kaiser is unable to give for sure information at this time until something is final.  The only reason Cigna is confirming, is because it's a self funded plan.  I have a meeting at 9:30 tomorrow, but can you join our meeting on Thursday?

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

> On Jul 15, 2019, at 5:44 PM, Steve Orcutt <steve.o@cedarpark.org> wrote:
>
> [EXTERNAL]
[Quoted text hidden]

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Mon, Jul 15, 2019 at 6:07 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>

This is extremely important and Thursday is too late.  Let me know when you have time for a conference call tomorrow.  Steve.

[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                      Mon, Jul 15, 2019 at 6:29 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>

Can you call me at 11:00?  I'll be in my car.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

[Quoted text hidden]

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Tue, Jul 16, 2019 at 10:59 AM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Jami - we'll call you at 11:00 on your cell.  This is what I need to get from you today so I'm copying Melinda:

Crisalli Decl., p.0152

1. Drop Dead date for decision on plan to be effective 9/1/19 for Cedar Park.
2. Total dollar amount of paid claims annually for Cedar Park for last 10 years.
3. Number of covered lives that hit pool level annually for Cedar Park for last 10 years.
4. Number of Cedar Park employees on medical plan for last 10 years.
5. Number of covered lives on medical plan for last 10 years.

At Thursday's meeting we want to also discuss these topics:

1. We would like you to schedule separate face to face meeting for us with Kaiser & Cigna to clarify Cedar Park medical plan's coverage of Abortions, abortifacients and  copper IUDs as impacted by:
   1. WA 6219 as currently written or
   2. WA 6219 if an injunction is granted delaying implementation of these rules to Cedar Park and
   3. The IRS, DOR & HHS Obamacare rules clarification as it applies to Cedar Park if the Pennsylvania injunction if overturned.
2. Names of Cedar Park employees who have hit pool level in the last 12 months (we can provide a list of terminated employees to Kaiser if needed, because all we want to know is how many pool claims we'd be starting with if we went self insured as of 9/1/19).
3. How would a CIGNA deductible would work from Sept-Dec 2019 if we switched plans from Kaiser.  Would everyone start from zero?  Or would the Kaiser deductible be counted toward the 2019 CIGNA deductible?
4. How would a Self-Insured deductible would work from Sept-Dec 2019 if we switched plans from Kaiser?
5. How would our 6 month COBRA-type of coverage work for any of our staff currently on the Kaiser plan if we switched to CIGNA or a self insured plan?

Thanks.  Steve.

[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                             Tue, Jul 16, 2019 at 3:51 PM
To: Steve Orcutt <steve.o@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>
Cc: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>

Hi Steve and Melissa,

See below for my comments in red.

Let us know if anything else is needed.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

Cedar Park 000222

 

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Steve Orcutt <steve.o@cedarpark.org>
**Sent:** Tuesday, July 16, 2019 10:59 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** melissa.k@cedarpark.org; Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: 15 Minute Call Tomorrow Morning @ 9:30?

[EXTERNAL]

Hi Jami - we'll call you at 11:00 on your cell.  This is what I need to get from you today so I'm copying Melinda:

1. Drop Dead date for decision on plan to be effective 9/1/19 for Cedar Park. If we change to Cigna we would need decisions by this Friday, July 19th. If we stay with Kaiser we could go out to July 26th.
2. Total dollar amount of paid claims annually for Cedar Park for last 10 years. We will bring data (experience reports) from September 2010 to current to the meeting on Thursday
3. Number of covered lives that hit pool level annually for Cedar Park for last 10 years. We will bring data (experience reports) from September 2010 to current to the meeting on Thursday
4. Number of Cedar Park employees on medical plan for last 10 years. We will bring data (experience reports) from September 2010 to current to the meeting on Thursday
5. Number of covered lives on medical plan for last 10 years.  We will bring data (experience reports) from September 2010 to current to the meeting on Thursday

At Thursday's meeting we want to also discuss these topics:

1. We would like you to schedule separate face to face meeting for us with Kaiser & Cigna to clarify Cedar Park medical plan's coverage of Abortions, abortifacients and  copper IUDs as impacted by:

   1. WA 6219 as currently written or
   2. WA 6219 if an injunction is granted delaying implementation of these rules to Cedar Park and
   3. The IRS, DOR & HHS Obamacare rules clarification as it applies to Cedar Park if the Pennsylvania injunction if overturned.

2. Names of Cedar Park employees who have hit pool level in the last 12 months (we can provide a list of terminated employees to Kaiser if needed, because all we want to know is how many pool claims we'd be starting with if we went self insured as of 9/1/19).
3. How would a CIGNA deductible would work from Sept-Dec 2019 if we switched plans from Kaiser.  Would everyone start from zero?  Or would the Kaiser deductible be counted toward the 2019 CIGNA deductible? Cigna would give deductible and out of pocket credit.
4. How would a Self-Insured deductible would work from Sept-Dec 2019 if we switched plans from Kaiser?   Could you clarify? Deductibles would work the same on fully insured as self-insured.
5. How would our 6 month COBRA-type of coverage work for any of our staff currently on the Kaiser plan if we switched to CIGNA or a self insured plan? Cigna would honor the current set up with the 6 month extension.

Thanks.  Steve.

Cedar Park 000223

[Quoted text hidden]

---

 **image004.png**
19K

Cedar Park 000224

# Exhibit H

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Cigna network question
3 messages

---

**Melissa Knauss** <melissa.k@cedarpark.org>                    Tue, Jul 16, 2019 at 3:02 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

We understand moving to Cigna would require all of our HMO employees to lose their providers; what we are trying to determine is the impact on our PPO employees.  How does Cigna's network compare to the First Choice Network we have under Kaiser?

All the best,



---

**Jami Hansen** <Jami_Hansen@ajg.com>                    Tue, Jul 16, 2019 at 6:54 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Melissa!

Cigna has 100% overlap on hospitals, 100% overlap on provider groups, 98% overlap on individual providers. Your members will experience a slightly larger network with Cigna in WA vs First Choice.

Hope that helps!

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jul 16, 2019, at 3:05 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> [EXTERNAL]

[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                    Wed, Jul 17, 2019 at 4:26 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Thank you, Jami!  That's great to know that very few PPO employees will lose their providers!

All the best,



[Quoted text hidden]

---

Cedar Park 000228

# Exhibit I

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

## Updated Proposal
6 messages

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                              Thu, Jul 18, 2019 at 11:38 AM
To: Steve Orcutt <steve.o@cedarpark.org>, Melissa Knauss <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Here is the updated proposal with the lower Cigna rates.

Jami M. Hansen,
Area Vice President
Health and Welfare Consulting


777 108th Avenue NE, Suite 200 | Bellevue, WA 98004
P: 425.974.3275 | F: 425.201.2774
www.ajg.com


This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain
confidential material and/or material protected by law.
Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and
delete the material from any computer.

---

📄 **CPAG_Proposal_201909.pdf**
872K

---

**Steve Orcutt** <steve.o@cedarpark.org>                                            Thu, Jul 18, 2019 at 2:46 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Thanks.  Any response from Nicole on specific Kaiser current coverage yet?

RU 486, Plan B, Ella and all generic equivalents and copper IUDs.  Thanks!  Steve.
[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                              Thu, Jul 18, 2019 at 4:22 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Not yet but she Emailed me saying she's working on it.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325


On Jul 18, 2019, at 2:47 PM, Steve Orcutt <steve.o@cedarpark.org> wrote:

 [EXTERNAL]
[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                        Fri, Jul 19, 2019 at 7:47 AM
To: Steve Orcutt <steve.o@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Cedar Park 000236

Hi Steve and Melissa,

Cigna would cover the diabetes prescriptions at 100% as Kaiser does today.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Insurance | Risk Management | Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004





This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Steve Orcutt <steve.o@cedarpark.org>
**Sent:** Thursday, July 18, 2019 2:47 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melissa Knauss <melissa.k@cedarpark.org>; Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Updated Proposal

[EXTERNAL]

Cedar Park 000237

[Quoted text hidden]

 **image003.png**
19K

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Fri, Jul 19, 2019 at 7:52 AM
To: Melinda Hansen <Melinda_Hansen@ajg.com>
Cc: Jami Hansen <Jami_Hansen@ajg.com>, Melissa Knauss <melissa.k@cedarpark.org>

Super thanks!  Were you able to check the whole list from Kaiser? I think it also had high blood pressure medications and was a total of about 100 different preventative medications.  Thanks!  Steve.

On Jul 19, 2019, at 7:47 AM, Melinda Hansen <Melinda_Hansen@ajg.com> wrote:

Hi Steve and Melissa,

Cigna would cover the diabetes prescriptions at 100% as Kaiser does today.

Thank you,

**Melinda Hansen**    Client Manager

Health & Welfare Consulting

<image001.png>

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

<image002.jpg> <image004.png>

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                    Mon, Jul 22, 2019 at 8:06 AM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Jami Hansen <Jami_Hansen@ajg.com>, Melissa Knauss <melissa.k@cedarpark.org>

Hi Steve,


All preventative prescription on the HSA are covered at 100% at Cigna. The attached two list is favorable to what you have today. These are the standard list and do not reflect any exclusions approvals already made.


Let me know if you have any other questions.


Thank you,


**Melinda Hansen**   Client Manager

Health & Welfare Consulting





Insurance | Risk Management | Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004


                                             

[Quoted text hidden]
[Quoted text hidden]

---

**3 attachments**

**image003.png**
19K

Cedar Park 000239



**Pharmacy%202019%20Generics%20Only%20Preventive%20Drug%20List%20Without%2....pdf**
335K

**Pharmacy%202018%20No%20Cost%20Share%20Preventive%20Drug%20List.pdf**
92K

Cedar Park 000240

# Exhibit J

 **Gmail**

Melissa Knauss <melissa.k@cedarpark.org>

## Fwd: Cedar Park Request to Kaiser
26 messages

**Steve Orcutt** <steve.o@cedarpark.org>                                    Mon, Jul 22, 2019 at 2:27 PM
To: Jay Smith <jay.s@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Kaiser letter received by Gallagher & forwarded to Kaiser.  Steve.

---------- Forwarded message ----------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
Date: Mon, Jul 22, 2019 at 1:49 PM
Subject: Re: Cedar Park Request to Kaiser
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Thank you Steve! I'm sending to Kaiser now and Melinda will send to our Compliance Team.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jul 22, 2019, at 1:31 PM, Steve Orcutt <steve.o@cedarpark.org> wrote:

> [EXTERNAL]

> Hi Jami,

> Thank you for your assistance to help us clarify Kaiser's position regarding our request to specifically exclude abortifacient medications and copper IUDs (which can be prescribed specifically for use as an abortifacient) from our medical plan with Kaiser.

> Based on Nicole's July 16th email (below) it is my understanding that Kaiser is stating that we have to choose "all or nothing" regarding contraceptive coverage (excluding abortions).  Additionally, Kaiser's July 2nd correspondence responding to Pastor Jay's June 27th letter stated that "the final regulations Cedar Park Church referenced are not effective in light of the aforementioned nationwide injunction".  Therefore, Kaiser will not allow us to exclude abortifacients and copper IUD coverage during the remainder of our current plan year through August 31, 2019.

> We have conferred with our legal counsel regarding Federal and State regulations affecting our request and have been assured that the injunction Kaiser referenced in their July 2nd correspondence does not apply to Cedar Park because we are a House of Worship.  Regulations exempting houses of worship from the contraceptive coverage requirement pre-date the November 15, 2018 regulations and are still currently in force.  Therefore, Pastor Jay has drafter the attached letter to Kaiser.  In the letter, Cedar Park is requesting that Kaiser immediately exclude abortifacient medications as listed in the letter and copper IUDs from our medical plan based on the currently applicable Federal and State regulations cited in his letter.

> Please forward this letter to Kaiser ASAP.  Please also forward the letter to Gallagher's compliance and legal department.  Can you also please confirm your receipt of this email and when you have forwarded the email to Kaiser?  Thanks!  Steve.

> ---------- Forwarded message ----------
> From: **Jami Hansen** <Jami_Hansen@ajg.com>
> Date: Tue, Jul 16, 2019 at 3:56 PM
> Subject: Fwd: Transgender Services-Cedar Park

Crisalli Decl., p.0165

Cedar Park 000244

To: melissa.k@cedarpark.org <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>


From Kaiser:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325


Begin forwarded message:

**From:** "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
**Date:** July 16, 2019 at 2:41:29 PM PDT
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Cc:** Jami Hansen <Jami_Hansen@AJG.com>
**Subject: RE: Transgender Services-Cedar Park**

[EXTERNAL]

Hi Melinda,


Unfortunately not. We cannot carve out specific medications. It is all or nothing. I really appreciate you two being so upfront, we want what is best for the group but we cannot accommodate the request to exclude abortifacients specifically.


**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales


**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org

 be_kp_advocate_turquoise


*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

Crisalli Decl., p.0166

<Kaiser Letter 7-19-2019.pdf.secure>

 **Kaiser Letter 7-19-2019.pdf**
364K

---

**Steve Orcutt** <steve.o@cedarpark.org>                                      Tue, Jul 23, 2019 at 8:29 AM
To: Melissa Knauss <melissa.k@cedarpark.org>

---------- Forwarded message ---------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
Date: Tue, Jul 23, 2019 at 8:05 AM
Subject: Re: Cedar Park Request to Kaiser
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Steve,

Per Kaiser:  KP does not have the system ability to carve out specific drugs/copper IUDs like the group is requesting below. This part has nothing to do with any regulations, we simply do not have the system capability.

[Quoted text hidden]

---

**Steve Orcutt** <steve.o@cedarpark.org>                                      Tue, Jul 23, 2019 at 2:52 PM
To: Jay Smith <jay.s@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Should have Kaiser legal reply by Thursday.  Keep praying!  Steve.

---------- Forwarded message ---------
From: **Melinda Hansen** <Melinda_Hansen@ajg.com>
Date: Tue, Jul 23, 2019 at 2:45 PM
Subject: RE: Cedar Park Request to Kaiser
To: Steve Orcutt <steve.o@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>

Hi Steve,

Yes, Nicole has sent the letter to their legal team. Their goal is to have a response by Thursday. We will provide additional information as soon as possible.

Let us know if you have any other questions.

Thank you,

**Melinda Hansen**    Client Manager

Health & Welfare Consulting

Cedar Park 000246



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

  

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Steve Orcutt <steve.o@cedarpark.org>
**Sent:** Tuesday, July 23, 2019 2:10 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Cedar Park Request to Kaiser

[EXTERNAL]

Thanks Jami, this looks like Nicole's response to my email.  Will we be getting a response from KP legal like we did to Pastor Jay's letter last time?  Thanks.  Steve.

[Quoted text hidden]

> Steve,
>
> [Quoted text hidden]
>
> [EXTERNAL]

Cedar Park 000247

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[EXTERNAL]

[Quoted text hidden]
[Quoted text hidden]

*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:*
*http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

&lt;Kaiser Letter 7-19-2019.pdf.secure&gt;



**image003.png**
19K

---

**Steve Orcutt** &lt;steve.o@cedarpark.org&gt;                                          Thu, Jul 25, 2019 at 5:57 PM
To: Melissa Knauss &lt;melissa.k@cedarpark.org&gt;

FYI

---------- Forwarded message ----------
From: **Melinda Hansen** &lt;Melinda_Hansen@ajg.com&gt;
Date: Thu, Jul 25, 2019 at 3:38 PM
Subject: RE: Cedar Park Request to Kaiser
To: Steve Orcutt &lt;steve.o@cedarpark.org&gt;
Cc: Jami Hansen &lt;Jami_Hansen@ajg.com&gt;


Hi Steve,

Cedar Park 000248

Kaiser will be having a second meeting on Monday with their leadership team to discuss your letter. They did meet today, but decided leadership oversight was needed. We should have additional information at that time.

Let us know if you have any other questions.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Insurance | Risk Management | Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

  

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melinda Hansen
**Sent:** Tuesday, July 23, 2019 2:46 PM
**To:** 'Steve Orcutt' <steve.o@cedarpark.org>; Jami Hansen <Jami_Hansen@AJG.com>
**Subject:** RE: Cedar Park Request to Kaiser

Hi Steve,

[Quoted text hidden]

Crisalli Decl., p.0170



**image007.png**
19K

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Fri, Jul 26, 2019 at 8:10 AM
To: Steve Orcutt <steve.o@cedarpark.org>

Hmmm....so hopefully we'll know something by late on Monday?

All the best,

[Quoted text hidden]

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Tue, Jul 30, 2019 at 1:02 PM
To: Melinda Hansen <Melinda_Hansen@ajg.com>
Cc: Jami Hansen <Jami_Hansen@ajg.com>

Any update?  Thanks.  Steve.

On Jul 25, 2019, at 6:38 PM, Melinda Hansen <Melinda_Hansen@ajg.com> wrote:

Hi Steve,

Kaiser will be having a second meeting on Monday with their leadership team to discuss your letter. They did meet today, but decided leadership oversight was needed. We should have additional information at that time.

Let us know if you have any other questions.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting

<image005.png>

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

Cedar Park 000250

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

<image006.jpg> **<image008.png>**

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

---

**From:** Melinda Hansen
**Sent:** Tuesday, July 23, 2019 2:46 PM
**To:** 'Steve Orcutt' <steve.o@cedarpark.org>; Jami Hansen <Jami_Hansen@AJG.com>
**Subject:** RE: Cedar Park Request to Kaiser

Hi Steve,

Yes, Nicole has sent the letter to their legal team. Their goal is to have a response by Thursday. We will provide additional information as soon as possible.

Let us know if you have any other questions.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting

<image009.png>

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

Cedar Park 000251

[Quoted text hidden]
[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Mon, Aug 5, 2019 at 2:27 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Jami,

When can we expect a response from Kaiser on the letter?  It is getting awful close to when I normally start open enrollment and their response is what is holding things up right now.  Thanks!

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                          Mon, Aug 5, 2019 at 3:14 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

I'm checking again right now!

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Aug 5, 2019, at 2:28 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> [EXTERNAL]

[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                          Tue, Aug 6, 2019 at 7:23 AM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Melissa,

Kaiser said we will have an answer today or tomorrow.  I'll stay on top of this and let you know as soon as I hear anything.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Aug 5, 2019, at 2:28 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> [EXTERNAL]

[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Tue, Aug 6, 2019 at 9:00 AM
To: Jami Hansen <Jami_Hansen@ajg.com>

Awesome!  Thank you!

Crisalli Decl., p.0173

Cedar Park 000252

[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Tue, Aug 6, 2019 at 3:54 PM
To: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

See below: this is really frustrating and I have elevated it again but I don't think it will matter.

Let me know if you have any questions.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

Begin forwarded message:

**From:** "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
**Date:** August 6, 2019 at 3:46:18 PM PDT
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>, "Keva K. Peairs" <Keva.K.Peairs@kp.org>
**Subject: RE: Cedar Park Request to Kaiser**

> [EXTERNAL]

Hi Jami,

Please see KP's response below. As you can see, we do not have an additional update regarding the exclusion of abortion at this time, however I wanted to provide a response as the group has requested an update and because we are very close to the renewal date.

Contraceptive carve out:

- KP does not have the **system capability** at this time to carve out only specific contraceptives (copper IUD/plan B etc.).  KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives.
- The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.
- KP would cover and pay for contraceptives for member's wishing to utilize these services.
- Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Exclude Abortion:

- KP cannot provide an update at this time.
- Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

Crisalli Decl., p.0174

Cedar Park 000253

**Office**: 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Tue, Aug 6, 2019 at 4:18 PM
To: Jami Hansen <Jami_Hansen@ajg.com>

Hi Jami,

One of the main concerns some individuals have is that if Kaiser pays for abortions and contraceptives they will essentially charge us for those next year in premium increases and thus we WILL be paying for those things in essence.  Can you speak to that?

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                           Tue, Aug 6, 2019 at 4:23 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Honestly, contraceptives won't even register in claims dollars. Abortions are also so limited in how many are done and the dollar amount isn't considered a high claim.  If that was the only concern, I wouldn't worry about it however, I know the concern is bigger than that.

Let me know if you have any questions.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Aug 6, 2019, at 4:18 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:



[EXTERNAL]

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[EXTERNAL]

[Quoted text hidden]
[Quoted text hidden]

**<image001.jpg>**

[Quoted text hidden]

Crisalli Decl., p.0175

Cedar Park 000254

 **image001.jpg**
4K

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                          Wed, Aug 7, 2019 at 8:25 AM
To: Jami Hansen <Jami_Hansen@ajg.com>

Thank you, Jami.  You're right the concern is much greater than cost but if we're in an All or Nothing situation it's good information to have.

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                          Thu, Aug 15, 2019 at 1:29 PM
To: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>

Is this what you're looking for?

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

---

**From:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Sent:** Tuesday, August 6, 2019 3:46 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>; Keva K. Peairs <Keva.K.Peairs@kp.org>
**Subject:** RE: Cedar Park Request to Kaiser

[EXTERNAL]

Hi Jami,

Please see KP's response below. As you can see, we do not have an additional update regarding the exclusion of abortion at this time, however I wanted to provide a response as the group has requested an update and because we are very close to the renewal date.

Contraceptive carve out:

- KP does not have the **system capability** at this time to carve out only specific contraceptives (copper IUD/plan B etc.).  KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives.

Crisalli Decl., p.0176

Cedar Park 000255

- The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.

- KP would cover and pay for contraceptives for member's wishing to utilize these services.

- Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Exclude Abortion:

- KP cannot provide an update at this time.

- Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office:** 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license; Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license; Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:* http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

**From:** Steve Orcutt <steve.o@cedarpark.org>
**Date:** July 22, 2019 at 1:30:59 PM PDT
**To:** Jami_Hansen <Jami_Hansen@ajg.com> Crisalli Decl., p.0177

**Cc:** Melinda Hansen <Melinda_Hansen@ajg.com>
**Subject: Cedar Park Request to Kaiser**

[EXTERNAL]

Hi Jami,

Thank you for your assistance to help us clarify Kaiser's position regarding our request to specifically exclude abortifacient medications and copper IUDs (which can be prescribed specifically for use as an abortifacient) from our medical plan with Kaiser.

Based on Nicole's July 16th email (below) it is my understanding that Kaiser is stating that we have to choose "all or nothing" regarding contraceptive coverage (excluding abortions).  Additionally, Kaiser's July 2nd correspondence responding to Pastor Jay's June 27th letter stated that "the final regulations Cedar Park Church referenced are not effective in light of the aforementioned nationwide injunction".  Therefore, Kaiser will not allow us to exclude abortifacients and copper IUD coverage during the remainder of our current plan year through August 31, 2019.

We have conferred with our legal counsel regarding Federal and State regulations affecting our request and have been assured that the injunction Kaiser referenced in their July 2nd correspondence does not apply to Cedar Park because we are a House of Worship.  Regulations exempting houses of worship from the contraceptive coverage requirement pre-date the November 15, 2018 regulations and are still currently in force.  Therefore, Pastor Jay has drafter the attached letter to Kaiser.  In the letter, Cedar Park is requesting that Kaiser immediately exclude abortifacient medications as listed in the letter and copper IUDs from our medical plan based on the currently applicable Federal and State regulations cited in his letter.

Please forward this letter to Kaiser ASAP.  Please also forward the letter to Gallagher's compliance and legal department.  Can you also please confirm your receipt of this email and when you have forwarded the email to Kaiser?  Thanks!  Steve.

---------- Forwarded message ---------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
Date: Tue, Jul 16, 2019 at 3:56 PM
Subject: Fwd: Transgender Services-Cedar Park
To: melissa.k@cedarpark.org <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

From Kaiser:

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325

Begin forwarded message:

> From: "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
> Date: July 16, 2019 at 2:41:29 PM PDT
> To: Melinda Hansen <Melinda_Hansen@AJG.com>
> Cc: Jami Hansen <Jami_Hansen@AJG.com>
> Subject: RE: Transgender Services-Cedar Park

Crisalli Decl., p.0178

[EXTERNAL]

Hi Melinda,

Unfortunately not. We cannot carve out specific medications. It is all or nothing. I really appreciate you two being so upfront, we want what is best for the group but we cannot accommodate the request to exclude abortifacients specifically.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office:** 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org

 be_kp_advocate_turquoise

*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:* http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Thu, Aug 15, 2019 at 1:52 PM
To: Jami Hansen <Jami_Hansen@ajg.com>

Hi Jami,

Crisalli Decl., p.0179

Cedar Park 000258

No, we're looking for the one where they say,

"The current exclusion cannot continue as is. This is a state mandated change- which we are still interpreting. KP was stating that they could not provide more updates regarding abortion exclusions and whether or not we could find a solution to requested exclusion at this time. KP is working hard to understand what we can and cannot do for fully insured groups. As of now we don't have an update on exclusion, therefore if the group renews they would be renew WITH an abortion benefit. "

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                              Thu, Aug 15, 2019 at 2:13 PM
To: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Let me know if this is what you're looking for:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

> **From:** "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
> **Date:** August 15, 2019 at 2:02:48 PM PDT
> **To:** Jami Hansen <Jami_Hansen@AJG.com>
> **Subject: RE: Cedar Park Request to Kaiser**
>
> [EXTERNAL]
>
> Hi Jami,
>
> Please see attached. Also please note that my latest update was sent 8/14 where KP had stated that KP will not be accommodating any abortion exclusions for fully insured groups. Upon review of SSB 6219, fully insured health plans issued after 1/1/2019 that cover maternity care or services must cover substantially equivalent coverage for abortion.
>
> [Quoted text hidden]

---------- Forwarded message ----------
From: "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
To: Melinda Hansen <Melinda_Hansen@ajg.com>
Cc: Jami Hansen <Jami_Hansen@ajg.com>
Bcc:
Date: Tue, 13 Aug 2019 20:56:25 +0000
Subject: RE: Cedar Park
Hi Melinda,

Sorry for the back and forth but I want to be super clear on this one as it has been a sensitive renewal.

*    Currently the group covers all contraceptives (this includes copper IUD, plan b, etc.)
*    Currently in 2018 the group excludes abortion, in 2019 the group may no longer have the abortion exclusion rider  until we hear otherwise from our legal/compliance department. Email sent last week attached for reference

    *    KP cannot provide an update at this time.

\*   Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

The rates and benefits sent in the renewal email do not include the abortion exclusion rider. Can you verify exactly how the group is intending to renew? Are they renewing with the fully insured rates and benefits that currently do NOT exclude abortion?

Thank you!

Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources/>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

From: Melinda Hansen <Melinda_Hansen@AJG.com>
Sent: Tuesday, August 13, 2019 1:30 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
Cc: Jami Hansen <Jami_Hansen@AJG.com>
Subject: RE: Cedar Park

Hi Nicole,

Renewing as is, so no benefit changes. They currently do not cover abortions or the one prescription for abortions-this will remain as is.

Cedar Park 000260

Melinda Hansen    Client Manager

Health & Welfare Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHI-FQAHmJD4&m=FnTzu3Rm8q8PPvAOwFGjUJ_mnJmLRx1-2JZCatZEYKs&s=6kHvLsS2EFkbsfe7zMm6wP3K3q4i_mpXhmN4MawJt9w&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

From: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Sent: Tuesday, August 13, 2019 12:57 PM
To: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>; Jami Hansen <Jami_Hansen@AJG.com<mailto:Jami_Hansen@AJG.com>>
Cc: Heejin Kim <Heejin_Kim@ajg.com<mailto:Heejin_Kim@ajg.com>>
Subject: RE: Cedar Park

[EXTERNAL]

Hi Jami and Melinda,

Great news! Just to make sure I understand, the group has chosen to renew with KP as is (no benefit changes)? What is the group's current status of their contraceptive ask/abortion exclusion ask? Are they utilizing a wait and see approach?

I was under the impression they might move carriers, so wanted to get feedback if possible.

Thanks!!

Nicole Nieswand (Gomez)

Cedar Park 000261

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.insurance.wa.gov_for-2Dproducers_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqlYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=FnTzu3Rm8q8PPvAOwFGjUJ_mnJmLRx1-2JZCatZEYKs&s=OJBgou8yC8QbG9vWIqQ-y5w_tiQhW8PHoWMVQb7-8fk&e=>

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

From: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Sent: Tuesday, August 13, 2019 12:21 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Cc: Heejin Kim <Heejin_Kim@ajg.com<mailto:Heejin_Kim@ajg.com>>
Subject: Cedar Park

Caution: This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

———

Hi Nicole,

We will get you the official renewal letter, but Cedar Park will be renewing with Kaiser. Renewing as is with the two plans they currently have. I have cc'd Heejin (client coordinator) on this email as she will be sending the renewal letter to you. Can you please send us any paperwork that will need to be completed?

Thank you!

Melinda Hansen   Client Manager

Cedar Park 000262

Health & Welfare Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMFAg&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHI-FQAHmJD4&m=fEMTnXxtJOEOCmKS9LDzfUq1_APwriEK292s7r-QjHU&s=XbUxDhXpETRO7jan0u-26Q3mUu_6IL1tjCPyLQj3fYw&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

   This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

   NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

Hi Melinda,

Sorry for the back and forth but I want to be super clear on this one as it has been a sensitive renewal.

- Currently the group covers all contraceptives (this includes copper IUD, plan b, etc.)
- Currently in 2018 the group excludes abortion, in 2019 the group may no longer have the abortion exclusion rider  until we hear otherwise from our legal/compliance department. Email sent last week attached for reference
  - KP cannot provide an update at this time.
  - Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

The rates and benefits sent in the renewal email do not include the abortion exclusion rider. Can you verify exactly how the group is intending to renew? Are they renewing with the fully insured rates and benefits that currently do NOT exclude abortion?

Thank you!

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

Cedar Park 000263

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office:** 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:* http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

---

**From:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Sent:** Tuesday, August 13, 2019 1:30 PM
**To:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Cc:** Jami Hansen <Jami_Hansen@AJG.com>
**Subject:** RE: Cedar Park

Hi Nicole,

Renewing as is, so no benefit changes. They currently do not cover abortions or the one prescription for abortions-this will remain as is.

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Cedar Park 000264

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004


WME_FORBES_EMAIL_SIGNATURE_Option_A-07

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

---

**From:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Sent:** Tuesday, August 13, 2019 12:57 PM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>; Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Heejin Kim <Heejin_Kim@ajg.com>
**Subject:** RE: Cedar Park

> [EXTERNAL]

Hi Jami and Melinda,

Great news! Just to make sure I understand, the group has chosen to renew with KP as is (no benefit changes)? What is the group's current status of their contraceptive ask/abortion exclusion ask? Are they utilizing a wait and see approach?

I was under the impression they might move carriers, so wanted to get feedback if possible.

Thanks!!

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell:** 206-218-6395

Cedar Park 000265

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

---

**From:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Sent:** Tuesday, August 13, 2019 12:21 PM
**To:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Cc:** Heejin Kim <Heejin_Kim@ajg.com>
**Subject:** Cedar Park

---

**Caution:** This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

---

Hi Nicole,


We will get you the official renewal letter, but Cedar Park will be renewing with Kaiser. Renewing as is with the two plans they currently have. I have cc'd Heejin (client coordinator) on this email as she will be sending the renewal letter to you. Can you please send us any paperwork that will need to be completed?


Thank you!


**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Cedar Park 000266

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004


WME_FORBES_EMAIL_SIGNATURE_Option_A-07

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

---------- Forwarded message ----------
From: "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>, "Keva K. Peairs" <Keva.K.Peairs@kp.org>
Bcc:
Date: Tue, 6 Aug 2019 22:46:18 +0000
Subject: RE: Cedar Park Request to Kaiser
Hi Jami,

Please see KP's response below. As you can see, we do not have an additional update regarding the exclusion of abortion at this time, however I wanted to provide a response as the group has requested an update and because we are very close to the renewal date.

Contraceptive carve out:

*      KP does not have the system capability at this time to carve out only specific contraceptives (copper IUD/plan B etc.).  KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives.
*      The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.
*      KP would cover and pay for contraceptives for member's wishing to utilize these services.
*      Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Exclude Abortion:

*      KP cannot provide an update at this time.
*      Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

Nicole Nieswand (Gomez)

Cedar Park 000267

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

From: Jami Hansen <Jami_Hansen@AJG.com>
Sent: Monday, July 22, 2019 1:50 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
Cc: Melinda Hansen <Melinda_Hansen@AJG.com>
Subject: Fwd: Cedar Park Request to Kaiser

Caution: This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

⎯⎯⎯⎯

See below:

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325

Begin forwarded message:

From: Steve Orcutt <steve.o@cedarpark.org<mailto:steve.o@cedarpark.org>>
Date: July 22, 2019 at 1:30:59 PM PDT
To: Jami_Hansen <Jami_Hansen@ajg.com<mailto:Jami_Hansen@ajg.com>>

Crisalli Decl., p.0189

Cedar Park 000268

Cc: Melinda Hansen <Melinda_Hansen@ajg.com<mailto:Melinda_Hansen@ajg.com>>
Subject: Cedar Park Request to Kaiser

[EXTERNAL]


Hi Jami,


Thank you for your assistance to help us clarify Kaiser's position regarding our request to specifically exclude abortifacient medications and copper IUDs (which can be prescribed specifically for use as an abortifacient) from our medical plan with Kaiser.


Based on Nicole's July 16th email (below) it is my understanding that Kaiser is stating that we have to choose "all or nothing" regarding contraceptive coverage (excluding abortions).  Additionally, Kaiser's July 2nd correspondence responding to Pastor Jay's June 27th letter stated that "the final regulations Cedar Park Church referenced are not effective in light of the aforementioned nationwide injunction".  Therefore, Kaiser will not allow us to exclude abortifacients and copper IUD coverage during the remainder of our current plan year through August 31, 2019.


We have conferred with our legal counsel regarding Federal and State regulations affecting our request and have been assured that the injunction Kaiser referenced in their July 2nd correspondence does not apply to Cedar Park because we are a House of Worship. Regulations exempting houses of worship from the contraceptive coverage requirement pre-date the November 15, 2018 regulations and are still currently in force.  Therefore, Pastor Jay has drafter the attached letter to Kaiser.  In the letter, Cedar Park is requesting that Kaiser immediately exclude abortifacient medications as listed in the letter and copper IUDs from our medical plan based on the currently applicable Federal and State regulations cited in his letter.


Please forward this letter to Kaiser ASAP.  Please also forward the letter to Gallagher's compliance and legal department.  Can you also please confirm your receipt of this email and when you have forwarded the email to Kaiser?  Thanks!  Steve.


---------- Forwarded message ---------
From: Jami Hansen <Jami_Hansen@ajg.com<mailto:Jami_Hansen@ajg.com>>
Date: Tue, Jul 16, 2019 at 3:56 PM
Subject: Fwd: Transgender Services-Cedar Park
To: melissa.k@cedarpark.org<mailto:melissa.k@cedarpark.org> <melissa.k@cedarpark.org<mailto:melissa.k@cedarpark.org>>,
Steve Orcutt <steve.o@cedarpark.org<mailto:steve.o@cedarpark.org>>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com<mailto:Melinda_Hansen@ajg.com>>


From Kaiser:

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325


Begin forwarded message:

From: "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Date: July 16, 2019 at 2:41:29 PM PDT
To: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Cc: Jami Hansen <Jami_Hansen@AJG.com<mailto:Jami_Hansen@AJG.com>>
Subject: RE: Transgender Services-Cedar Park

[EXTERNAL]

Hi Melinda,

Unfortunately not. We cannot carve out specific medications. It is all or nothing. I really appreciate you two being so upfront, we want what is best for the group but we cannot accommodate the request to exclude abortifacients specifically.

Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.insurance.wa.gov_for-2Dproducers_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=MBmukRoWvUu2blSURubf5a98J6bNOqg3jSheepyUnMU&s=Z-mhIxYN5nI6IgLhIwZHLG19cqTt7WnW2A_NIRK7ZkE&e=>

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

Hi Jami,

Please see KP's response below. As you can see, we do not have an additional update regarding the exclusion of abortion at this time, however I wanted to provide a response as the group has requested an update and because we are very close to the renewal date.

Contraceptive carve out:

- KP does not have the **system capability** at this time to carve out only specific contraceptives (copper IUD/plan B etc.). KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives. Crisalli Decl., p.0191

Cedar Park 000270

- The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.
- KP would cover and pay for contraceptives for member's wishing to utilize these services.
- Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Exclude Abortion:

- KP cannot provide an update at this time.
- Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license; Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:* http://www.insurance.wa.gov/for-producers/

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

---

**From:** Jami Hansen <Jami_Hansen@AJG.com>
**Sent:** Monday, July 22, 2019 1:50 PM
**To:** Nicole M. Gomez < Nicole.M1.Gomez@kp.org >
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Fwd: Cedar Park Request to Kaiser

**Caution:** This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

Crisalli Decl., p.0192

Cedar Park 000271

See below:

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325


Begin forwarded message:

> **From:** Steve Orcutt <steve.o@cedarpark.org>
> **Date:** July 22, 2019 at 1:30:59 PM PDT
> **To:** Jami_Hansen <Jami_Hansen@ajg.com>
> **Cc:** Melinda Hansen <Melinda_Hansen@ajg.com>
> **Subject: Cedar Park Request to Kaiser**
>
> [EXTERNAL]
>
> Hi Jami,
>
> Thank you for your assistance to help us clarify Kaiser's position regarding our request to specifically exclude abortifacient medications and copper IUDs (which can be prescribed specifically for use as an abortifacient) from our medical plan with Kaiser.
>
> Based on Nicole's July 16th email (below) it is my understanding that Kaiser is stating that we have to choose "all or nothing" regarding contraceptive coverage (excluding abortions). Additionally, Kaiser's July 2nd correspondence responding to Pastor Jay's June 27th letter stated that "the final regulations Cedar Park Church referenced are not effective in light of the aforementioned nationwide injunction". Therefore, Kaiser will not allow us to exclude abortifacients and copper IUD coverage during the remainder of our current plan year through August 31, 2019.
>
> We have conferred with our legal counsel regarding Federal and State regulations affecting our request and have been assured that the injunction Kaiser referenced in their July 2nd correspondence does not apply to Cedar Park because we are a House of Worship. Regulations exempting houses of worship from the contraceptive coverage requirement pre-date the November 15, 2018 regulations and are still currently in force. Therefore, Pastor Jay has drafter the attached letter to Kaiser. In the letter, Cedar Park is requesting that Kaiser immediately exclude abortifacient medications as listed in the letter and copper IUDs from our medical plan based on the currently applicable Federal and State regulations cited in his letter.
>
> Please forward this letter to Kaiser ASAP. Please also forward the letter to Gallagher's compliance and legal department. Can you also please confirm your receipt of this email and when you have forwarded the email to Kaiser? Thanks! Steve.
>
>
> ---------- Forwarded message ---------
> From: **Jami Hansen** <Jami_Hansen@ajg.com>
> Date: Tue, Jul 16, 2019 at 3:56 PM
> Subject: Fwd: Transgender Services-Cedar Park
> To: melissa.k@cedarpark.org <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
> Cc: Melinda Hansen <Melinda_Hansen@ajg.com>
>
>
> From Kaiser:

Cedar Park 000272

Jami Hansen

Area Vice President

Arthur J Gallagher

425-891-1325

Begin forwarded message:

> **From:** "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
> **Date:** July 16, 2019 at 2:41:29 PM PDT
> **To:** Melinda Hansen <Melinda_Hansen@AJG.com>
> **Cc:** Jami Hansen <Jami_Hansen@AJG.com>
> **Subject: RE: Transgender Services-Cedar Park**

[EXTERNAL]

Hi Melinda,

Unfortunately not. We cannot carve out specific medications. It is all or nothing. I really appreciate you two being so upfront, we want what is best for the group but we cannot accommodate the request to exclude abortifacients specifically.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell**: 206-218-6395

**Email**: Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

**Language Assistance**

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

---------- Forwarded message ----------
From: "Nicole M. Gomez" <Nicole.M1.Gomez@kp.org>
To: Melinda Hansen <Melinda_Hansen@ajg.com>
Cc: Jami Hansen <Jami_Hansen@ajg.com>
Bcc:
Date: Wed, 14 Aug 2019 00:03:51 +0000
Subject: RE: Cedar Park
Hi Melinda,


Please see my answer below in red.


So, the group (not Melissa), thought their rider and current exclusions would continue until Kaiser had more information about the new laws. So the rider and one prescription for excluding abortion would no longer be in effect as of 9/1/19. The below supersedes how abortion and RX is currently covered. Is this correct? The current exclusion cannot continue as is. This is a state mandated change- which we are still interpreting. KP was stating that they could not provide more updates regarding abortion exclusions and whether or not we could find a solution to requested exclusion at this time. KP is working hard to understand what we can and cannot do for fully insured groups. As of now we don't have an update on exclusion, therefore if the group renews they would be renew WITH an abortion benefit.


It seems like we might want to wait to renew the group until the group responds that they acknowledge the above.


Thanks!



Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales


Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>



The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:
http://www.insurance.wa.gov/for-producers/

Crisalli Decl., p.0195

Cedar Park 000274

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

From: Melinda Hansen <Melinda_Hansen@AJG.com>
Sent: Tuesday, August 13, 2019 4:04 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
Cc: Jami Hansen <Jami_Hansen@AJG.com>
Subject: RE: Cedar Park
Importance: High

Hi Nicole,

So, the group (not Melissa), thought their rider and current exclusions would continue until Kaiser had more information about the new laws. So the rider and one prescription for excluding abortion would no longer be in effect as of 9/1/19. The below supersedes how abortion and RX is currently covered. Is this correct?

Jami- if the above is correct, Melissa and Steve need an email asap confirming. Melissa, thought it would be best coming from you, even though I said you were on vacay.

Thanks,

Melinda Hansen    Client Manager

Health & Welfare Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHI-FQAHmJD4&m=KdUP0KfGNQ0qFh2iicmapbcpgzGy_bNTWl9mTk47Zuo&s=tonG_kh1VhGBMooAaYO3OXPB4dcjjpwKEW49f3YltcY&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

Crisalli Decl., p.0196

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

From: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Sent: Tuesday, August 13, 2019 2:59 PM
To: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Subject: RE: Cedar Park

[EXTERNAL]

Hi Melinda,

There are no forms. I consulted with legal and this is what they requested. See below in red.

Thanks!

Contraceptive carve out:

*       KP does not have the system capability at this time to carve out only specific contraceptives (copper IUD/plan B etc.).  KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives.
*       The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.
*       KP would cover and pay for contraceptives for member's wishing to utilize these services.
*       Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing

Cedar Park 000276

directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information:
http://www.insurance.wa.gov/for-producers/<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.insurance.wa.gov_for-2Dproducers_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=KdUP0KfGNQ0qFh2iicmapbcpgzGy_bNTWl9mTk47Zuo&s=t9fbl3rn_3aNi_SLeZlhDcOSLdlDTM700767QFlX8ME&e=>

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).


From: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Sent: Tuesday, August 13, 2019 2:57 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Subject: RE: Cedar Park


Ok, I have talked and sent an email to the group on the below for confirmation!
Question for you, do they need to complete the religious exemption forms back to you? Is one due at a certain time?


Thanks!


Melinda Hansen    Client Manager

Health & Welfare Consulting


Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=OcLR8ngxcWRicN09TFP0BAtAnOOmPGMkcb8s462sF9s&s=7yGjvYkuL-CW2WcSw0gtZMj4aGLwRCXQR1I53KrWIvU&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004


This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you

Crisalli Decl., p.0198

received this in error, please contact the sender and delete the material from any computer.

From: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Sent: Tuesday, August 13, 2019 2:00 PM
To: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Subject: RE: Cedar Park

[EXTERNAL]

Hi Melinda,

I think it's best we hold off on sending the renewal paperwork for now as it appears the group is wanting to exclude certain benefits.

There were a ton of back and forth emails, but on my latest email from 8.6 I stated how KP would prefer the group tell us of their preference.  Attached and below. We would need this information prior to generating the renewal paperwork. The contraceptive piece would require a rider built in to remove the cost from the group and pass the cost to KP. Has the information below been shared with the group?

Contraceptive carve out:

*      KP does not have the system capability at this time to carve out only specific contraceptives (copper IUD/plan B etc.).  KP is however able (upon Cedar Park's request) to carve out the cost of all contraceptive services from Cedar Park's plan such that KP will separately pay the cost of such contraceptives.
*      The group may formally request in writing that KP separately pay for the cost of all contraceptives that may be accessed by enrollees of the Cedar Park plan.
*      KP would cover and pay for contraceptives for member's wishing to utilize these services.
*      Cedar Park would NOT pay for these services via their premiums, KP would cover the cost of contraceptives.

Exclude Abortion:

*      KP cannot provide an update at this time.
*      Please note that KP is currently drafting a group-facing document on this topic, which we hope to share shortly.

Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales

Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>

The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.insurance.wa.gov_for-2Dproducers_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=OcLR8ngxcWRicN09TFP0BAtAnOOmPGMkcb8s462sF9s&s=UFY15-tkSoMBB_gt6UkpXtUhF8vMTt1PilMOJz8Pfak&e=>

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).


From: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Sent: Tuesday, August 13, 2019 1:54 PM
To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Subject: RE: Cedar Park


Hi Nicole,


Is there a deadline for self-certifying for a religious organization? Would you have this information?


Thanks!


Melinda Hansen    Client Manager

Health & Welfare Consulting


Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=fXbWY9zi-6C5I0wcuqPgTSqWNu52iLyKoatn2HnJ8XA&s=qp86OWYUlczOcPJc5z1JpGLK2818WmllQ2rOZmPFkpk&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

Cedar Park 000279

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

From: Melinda Hansen
Sent: Tuesday, August 13, 2019 1:30 PM
To: 'Nicole M. Gomez' <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Cc: Jami Hansen <Jami_Hansen@AJG.com<mailto:Jami_Hansen@AJG.com>>
Subject: RE: Cedar Park

Hi Nicole,

Renewing as is, so no benefit changes. They currently do not cover abortions or the one prescription for abortions-this will remain as is.

Melinda Hansen     Client Manager

Health & Welfare Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=fXbWY9zi-6C5I0wcuqPgTSqWNu52iLyKoatn2HnJ8XA&s=qp86OWYUlczOcPJc5z1JpGLK2818WmllQ2rOZmPFkpk&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

From: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Sent: Tuesday, August 13, 2019 12:57 PM
To: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>; Jami Hansen <Jami_Hansen@AJG.com<mailto:Jami_Hansen@AJG.com>>

Cedar Park 000280

Cc: Heejin Kim <Heejin_Kim@ajg.com><mailto:Heejin_Kim@ajg.com>>
Subject: RE: Cedar Park


[EXTERNAL]


Hi Jami and Melinda,


Great news! Just to make sure I understand, the group has chosen to renew with KP as is (no benefit changes)? What is the group's current status of their contraceptive ask/abortion exclusion ask? Are they utilizing a wait and see approach?


I was under the impression they might move carriers, so wanted to get feedback if possible.


Thanks!!


Nicole Nieswand (Gomez)

Account Manager II, Large Group Sales


Kaiser Foundation Health Plan of Washington

601 Union Street, Suite 3100

Seattle, WA 98101

Office: 206-448-2845

Cell: 206-218-6395

Email: Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>



The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.insurance.wa.gov_for-2Dproducers_&d=DwMGaQ&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHl-FQAHmJD4&m=fXbWY9zi-6C5I0wcuqPgTSqWNu52iLyKoatn2HnJ8XA&s=ERUakgtv9YLXhFp0zT9bl3o9y_8iV_JFVw08fX2-SMs&e=>

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance<https://www.ghc.org/html/public/language-resources>

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).


From: Melinda Hansen <Melinda_Hansen@AJG.com<mailto:Melinda_Hansen@AJG.com>>
Sent: Tuesday, August 13, 2019 12:21 PM

Crisalli Decl., p.0202

Cedar Park 000281

To: Nicole M. Gomez <Nicole.M1.Gomez@kp.org<mailto:Nicole.M1.Gomez@kp.org>>
Cc: Heejin Kim <Heejin_Kim@ajg.com<mailto:Heejin_Kim@ajg.com>>
Subject: Cedar Park

Caution: This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

_____

Hi Nicole,

We will get you the official renewal letter, but Cedar Park will be renewing with Kaiser. Renewing as is with the two plans they currently have. I have cc'd Heejin (client coordinator) on this email as she will be sending the renewal letter to you. Can you please send us any paperwork that will need to be completed?

Thank you!

Melinda Hansen     Client Manager

Health & Welfare Consulting

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com<mailto:melinda_hansen@ajg.com>

www.ajg.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.ajg.com_&d=DwMFAg&c=V-WiB07a9ZG9AUogGPqIYBXfVnjryhYX1W_SjITv1Oo&r=iOgizl302gAyCixDupKPMPum_SmUCP3hHI-FQAHmJD4&m=fEMTnXxtJOEOCmKS9LDzfUq1_APwriEK292s7r-QjHU&s=XbUxDhXpETRO7jan0u-26Q3mUu_6IL1tjCPyLQj3fYw&e=>

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.


...

[Message clipped]  View entire message

**15 attachments**



**image001.jpg**
4K

**image001.jpg**
4K

**image001.jpg**
4K

**image002.png**
11K

**image003.jpg**
9K

**image004.png**
19K



**image005.png**
7K

**ATT00001.htm**
15K

**ATT00002.htm**
21K

**RE: Cedar Park.eml**
188K

**ATT00003.htm**
1K

**RE: Cedar Park.eml**
227K

**ATT00004.htm**
1K

**RE: Cedar Park.eml**
219K

**ATT00005.htm**
1K

Cedar Park 000283

**Melissa Knauss** <melissa.k@cedarpark.org>                Thu, Aug 15, 2019 at 2:47 PM
To: Jami Hansen <Jami_Hansen@ajg.com>

I think so.  Thank you!

All the best,



[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                Fri, Aug 16, 2019 at 10:22 AM
To: Melinda Hansen <melinda_hansen@ajg.com>

Hi Melinda,

Steve would like to set up a phone call with Jami and/or you for later today to talk about the emails and make sure we're clear on some things.  I am here until 4pm.  Let me know what works.

All the best,



---------- Forwarded message ----------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
[Quoted text hidden]
[Quoted text hidden]

---

**9 attachments**

 **image001.jpg**
4K

 **ATT00001.htm**
15K

 **ATT00002.htm**
21K

 **RE: Cedar Park.eml**
188K

 **ATT00003.htm**
1K

 **RE: Cedar Park.eml**
227K

 **ATT00004.htm**
1K

 **RE: Cedar Park.eml**
219K

 **ATT00005.htm**
1K

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                Fri, Aug 16, 2019 at 10:30 AM
To: Melissa Knauss <melissa.k@cedarpark.org>

HI Melissa,

Cedar Park 000284

I am checking with Jami on a call. I won't be available until later in the afternoon, closer to 3-3:30.

**Melinda Hansen**    Client Manager

Health & Welfare Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

       

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Friday, August 16, 2019 10:23 AM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Fwd: Cedar Park Request to Kaiser

[EXTERNAL]

[Quoted text hidden]

**image004.png**
19K

Crisalli Decl., p.0206

Cedar Park 000285



---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                         Fri, Aug 16, 2019 at 10:34 AM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,

Jami won't be able to do a call today. We can set up a call for later this afternoon if that works for everyone.

Let me know!

Thanks!

**Melinda Hansen**    Client Manager

Health & Welfare Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004





This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the

Cedar Park 000286

material from any computer.

---

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Friday, August 16, 2019 10:23 AM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Fwd: Cedar Park Request to Kaiser

| [EXTERNAL] |
|---|

[Quoted text hidden]

---

 **image003.png**
19K

---

**Melissa Knauss** <melissa.k@cedarpark.org>                          Fri, Aug 16, 2019 at 1:37 PM
To: Melinda Hansen <Melinda_Hansen@ajg.com>

Yes.  We will give you a call at 3pm.

All the best,



[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                          Fri, Aug 16, 2019 at 1:42 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,

Can you please call my cell? 425 359 3458.

I am not in the office.

Thank you!

Sent from Email+ secured by MobileIron

[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                          Fri, Aug 16, 2019 at 1:46 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,

Can you please call my cell? 425 359 3458.

I am not in the office.

Crisalli Decl., p.0208

Cedar Park 000287

Thank you!

Sent from Email+ secured by MobileIron

-------- Original Message --------
From: Melissa Knauss <melissa.k@cedarpark.org>
Date: Fri, Aug 16, 2019, 1:38 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                    Fri, Aug 16, 2019 at 1:54 PM
To: Melinda Hansen <Melinda_Hansen@ajg.com>

You got it!
All the best,



[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                    Fri, Aug 16, 2019 at 3:16 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,

I want to make sure  didn't miss your call.

[Quoted text hidden]

---

**image003.png**
19K

Cedar Park 000288

          **Melissa Knauss <melissa.k@cedarpark.org>**

---

## Kaiser users
6 messages

---

**Melissa Knauss <melissa.k@cedarpark.org>**      Tue, Jul 23, 2019 at 9:22 AM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melinda Hansen <melinda_hansen@ajg.com>

Can you tell how many people who are NOT in the HMO use Kaiser doctors?

All the best,



---

**Melinda Hansen <Melinda_Hansen@ajg.com>**      Tue, Jul 23, 2019 at 10:45 AM
To: Melissa Knauss <melissa.k@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>

Hi Melissa,

I am checking with Kaiser on the question below. I will let you know what I find out shortly.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Direct 425.974.4459 | fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

           

Cedar Park 000289

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Tuesday, July 23, 2019 9:22 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Kaiser users

[EXTERNAL]

[Quoted text hidden]



image003.png
19K

---

Melinda Hansen <Melinda_Hansen@ajg.com>                     Tue, Jul 23, 2019 at 11:09 AM
To: Melissa Knauss <melissa.k@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>

Hi Melissa,

Requesting the report below can take 2-3 weeks as it is not a standard report that Kaiser runs.

What they were able to tell me is the 16% of paid claims are within Kaiser providers and 70% of paid claims are within the External Delivery System-this includes Access PPO network, but those providers can also be contracted with the HMO network (it excludes all Kaiser owned and operated).

I can request the report as urgent and we may be able to get it back in a week. Let me know if you would still like the report.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting

Cedar Park 000290



Direct 425.974.4459 | fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004




This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Tuesday, July 23, 2019 9:22 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Kaiser users

[EXTERNAL]

Can you tell how many people who are NOT in the HMO use Kaiser doctors?

All the best,



**image004.png**      Crisalli Decl., p.0212

Cedar Park 000291

19K



---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Fri, Jul 26, 2019 at 1:54 PM
To: Melinda Hansen <Melinda_Hansen@ajg.com>

Thank you, Melinda.  Yes, we'd like to know both the number of (or percentage of) claims for the HMO vs the PPO, as well the dollar amount of claims for both the HMO and PPO.  Is that possible?

For example:
| | | |
|---|---|---|
| PPO | 100 claims (45% | $150,000 |
| HMO | 120 claims (55%) | $130,000 |
| TOTAL | 220 claims | $180,000 |

All the best,



[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                    Mon, Jul 29, 2019 at 7:14 AM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,


I have reached out to my contact at Kaiser to see if we can get the below information. I will let you know what I find out shortly.


Thank you,


**Melinda Hansen**   Client Manager

Health & Welfare Consulting





Insurance | Risk Management | Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

Cedar Park 000292

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

  

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Friday, July 26, 2019 1:55 PM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Kaiser users

[EXTERNAL]

[Quoted text hidden]

 **image003.png**
19K

**Melissa Knauss** <melissa.k@cedarpark.org>                                     Mon, Jul 29, 2019 at 11:13 AM
To: Melinda Hansen <Melinda_Hansen@ajg.com>

Sounds good, thank you.
All the best,



[Quoted text hidden]

Cedar Park 000293

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Objected Coverage Logistics
2 messages

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                    Thu, Aug 8, 2019 at 11:11 AM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

I have two important questions regarding objected coverages:

1.)  For companies that have gone with the option for the carrier to cover contraceptives +, how does this work on the user/employee side.  For instance, does the employee still present the medical center/hospital with the same insurance card or do they have a different card they use?

2.)  For companies that have gone with the option for the carrier to cover contraceptives +, can you confirm that the cost of the services/prescriptions the carrier is covering are excluded from the Deductible Met amount and are therefore ineligible for HRA reimbursements by that company?

All the best,



---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Thu, Aug 8, 2019 at 12:23 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Melissa!

On question #1 there wouldn't be different ID Cards.  It would work the same way and is an internal process.  On question #2 if it's covered at 100% the deductible and HRA wouldn't apply.

Let me know if you have any additional questions.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Aug 8, 2019, at 11:11 AM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> [EXTERNAL]

[Quoted text hidden]

Cedar Park 000294

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Open Enrollment Timeline
7 messages

---

**Melissa Knauss** <melissa.k@cedarpark.org>                    Thu, Aug 8, 2019 at 11:38 AM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

I also have a few questions regarding Open Enrollment:

1.)  What is the process and timeline on your side for when we select a policy?

2.)  If we are able to give you and answer on the morning of the 16th, how soon would the SBCs, enrollment form, and Benefits Guides be available in:
     a.) *electronic* format for digital delivery to our employees?
     b.) *printed* materials for physical availability to our employees?

3.)  Scenario:  Open Enrollment runs from the 20th of August to the 3rd of September.  Forms are submitted to GBS as early as 8/20 or as late s 9/6. Given this data and considering the 8/20-9/6 time range:
     a.)  What is the time range providers would be able to see them the employee in their system by searching carrier, name, DOB, and SSN?
     b.)  What is the time range employees could expect their new cards in the mail?

4.)  GBS (including vChoice) has not requested a census.  Do you need one this year for any reason?

Thank you!

All the best,



---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                    Thu, Aug 8, 2019 at 12:13 PM
To: Melissa Knauss <melissa.k@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Hi Melissa,


Please see my notes below, next to each questions in blue. Of course, we will work as quickly as we can to get everything done timely. I wanted to give approximate timeframes especially if we have any changes.


The vChoice census can be completed now and we need back within one week of open enrollment. Codes below:

| Location name | Location code |
|---|---|
| 40600.01 - Pastoral - Bothell | 010 |

| | |
|---|---|
| 40600.03 - Pastoral - NS | 020 |
| 40600.04 - Pleasant Bay | 024 |
| 40600.09 - Pastoral - Stillwater | 040 |
| 40600.14 - Church - Liberty Lake | 042 |
| 40600.40 - Cathedral Pastor | 050 |
| 40600.52 | 058 |
| 40610.01 - Church | 070 |
| 40610.03 - Church Northshore | 071 |
| 40610.06 - Family Church | 072 |
| 40610.40 - Cathedral | 080 |
| 40610.50 - CPCS - Bothell/Staff | 090 |
| 40610.51 - CPCS - Bellevue/Staff | 100 |
| 40610.52 - CPCS - Everett/Staff | 110 |
| 40610.55 - CPCS - MLT/Staff | 120 |
| 40610.56 - CPCS - Lynnwood/Staff | 130 |
| 40610.58 - School District - Staff | 140 |
| 40610.59 | 141 |
| 40610.70 - Counseling Network | 150 |
| 40610.80 - Chapel of Res | 190 |
| 6 Month Continuation of Coverage - | 500 |
| 70915.40 - Mechanics Ministry | 400 |

Let me know if you have any other questions.


Thank you,

Cedar Park 000296

**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

   

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

---

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Thursday, August 8, 2019 11:38 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Steve Orcutt <steve.o@cedarpark.org>; Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Open Enrollment Timeline

[EXTERNAL]

Hi Jami,

I also have a few questions regarding Open Enrollment:

Cedar Park 000297

1.)  What is the process and timeline on your side for when we select a policy?  We have started the process of all other carriers renewing as is and holding off on medical. Is this ok to do? This will allow us to make updates to the Guide and consolidated enrollment forms.


2.)  If we are able to give you and answer on the morning of the 16th, how soon would the SBCs, enrollment form, and Benefits Guides be available in:

a.) *electronic* format for digital delivery to our employees?  1-2 weeks

b.) *printed* materials for physical availability to our employees? 2-3 weeks

Guides need to be updated(which we have started some of the updates), internal reviews and then carrier reviews. The consolidated enrollment forms need at least 5 days as they have to be sent to all carriers for review. The SBCs may not be available prior to the end of August.

3.)  Scenario:  Open Enrollment runs from the 20th of August to the 3rd of September.  Forms are submitted to GBS as early as 8/20 or as late s 9/6. Given this data and considering the 8/20-9/6 time range:

a.)  What is the time range providers would be able to see them the employee in their system by searching carrier, name, DOB, and SSN?

Inforce carrier(Kaiser) receive forms by 9/6 send eligibility by 9/13 approx. Non inforce carrier (change in carrier), receive forms by 9/6, changes to the carrier would be sent sometime the week of 9/16. When there is a carrier change it can take a bit longer as we have to set up file feeds potentially and make changes in our system. I don't think we would be able to start open enrollment on 8/20.

b.)  What is the time range employees could expect their new cards in the mail?  ID cards then would take approx. another 10 business days from when the carrier processes the file in their system.


4.)  GBS (including vChoice) has not requested a census.  Do you need one this year for any reason? Census attached with the coding.

[Quoted text hidden]

---

**2 attachments**


**image004.png**
19K


**CensusTemplate SIMPLIFIED.XLS**
34K

---

Cc: Jami Hansen <Jami_Hansen@ajg.com>, Steve Orcutt <steve.o@cedarpark.org>

See my answers in Green below and the  attached complete census.

All the best,



[Quoted text hidden]
   [Quoted text hidden]
   [Quoted text hidden]

1.)  What is the process and timeline on your side for when we select a policy?  We have started the process of all other carriers renewing as is and holding off on medical. Is this ok to do? Yes.  This will allow us to make updates to the Guide and consolidated enrollment forms.

2.)  If we are able to give you and answer on the morning of the 16th, how soon would the SBCs, enrollment form, and Benefits Guides be available in:

a.) *electronic* format for digital delivery to our employees?  1-2 weeks  Yikes!  So if the soonest we could actually plan to start Open Enrollment (OE) is a week from when we give the green light so that we can provide our Employees with the materials, right?  In a scenario where we're able to tell you on the Aug. 16th I'd be able to hold OE from Aug. 23rd through September 6th in a best case scenario; Aug. 30th through September 13th in a worst case scenario?

b.) *printed* materials for physical availability to our employees? 2-3 weeks  I'm okay with this as long as they had digital copies and I could print Enrollment Forms, as needed.

Guides need to be updated(which we have started some of the updates), internal reviews and then carrier reviews. The consolidated enrollment forms need at least 5 days as they have to be sent to all carriers for review. Okay  The SBCs may not be available prior to the end of August.  We don't have to wait for these to have OE, right?

3.)  Scenario:  Open Enrollment runs from the 20th of August to the 3rd of September. Forms are submitted to GBS as early as 8/20 or as late s 9/6. Given this data and considering the 8/20-9/6 time range:

a.)  What is the time range providers would be able to see them the employee in their system by searching carrier, name, DOB, and SSN?

Inforce carrier(Kaiser) receive forms by 9/6 send eligibility by 9/13 approx. Non inforce carrier (change in carrier), receive forms by 9/6, changes to the carrier would be sent sometime the week of 9/16. When there is a carrier change it can take a bit longer as we have to set up file feeds potentially and make changes in our system. I don't think we would be able to start open enrollment on 8/20.   So if we had an OE of 8/23-9/6 with a final submission to GBS on the following business day of 9/9, employees would be able to go to the doctor around 9/16 and have claims run normally.  They'd need to self-file a manual claim for any appointments between 9/1 and that 9/15 date, right?  If OE was 8/30-9/13, with a final submission to GBS on 9/16, they'd be able to go to the doc on 9/23 to have claims run normally, and self-file in between, right?

Crisalli Decl., p.0220

b.)  What is the time range employees could expect their new cards in the mail?  ID cards then would take approx. another 10 business days from when the carrier processes the file in their system.  So, employees would get their cards from the insurance carrier somewhere between 9/23 and 9/30 with the adjusted OEs above, does that sound right?

4.)  GBS (including vChoice) has not requested a census.  Do you need one this year for any reason? Census attached with the coding.  Completed attached.

[Quoted text hidden]

 **CensusTemplate SIMPLIFIED - 2019.xls**
89K

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                          Thu, Aug 8, 2019 at 3:26 PM
To: Melinda Hansen <Melinda_Hansen@ajg.com>

I just printed this out and say that I transposed the first and last name for our employee Terry Carter.  Carter is his LAST name.  Can you please make the correction?  Thanks!

All the best,



[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                          Thu, Aug 8, 2019 at 3:39 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Hi Melissa,

See below my answers to your questions.

Thank you,

**Melinda Hansen**    Client Manager

Health & Welfare Consulting



Insurance | Risk Management | Consulting

Direct 425.974.4459  |  fax: 425.201.2730

Cedar Park 000300

melinda_hansen@ajg.com

www.ajg.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

 

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Thursday, August 8, 2019 3:27 PM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Open Enrollment Timeline

[EXTERNAL]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

a.) *electronic* format for digital delivery to our employees?  1-2 weeks  Yikes!  So if the soonest we could actually plan to start Open Enrollment (OE) is a week from when we give the green light so that we can provide our Employees with the materials, right? Correct In a scenario where we're able to tell you on the Aug. 16th I'd be able to hold OE from Aug. 23rd through September 6th in a best case scenario; Aug. 30th through September 13th in a worst case scenario? I am more concerned about if there are changes and that we need 5 days for the enrollment forms. We could push to get electronic done by Aug 23- but if there are carrier changes start the 26th might me more realistic. Part of what makes the process longer is all our reviews.

b.) *printed* materials for physical availability to our employees? 2-3 weeks  I'm okay with this as long as they had digital copies and I could print Enrollment Forms, as needed.

Crisalli Decl., p.0222

Cedar Park 000301

Guides need to be updated(which we have started some of the updates), internal reviews and then carrier reviews. The consolidated enrollment forms need at least 5 days as they have to be sent to all carriers for review. Okay  The SBCs may not be available prior to the end of August.  We don't have to wait for these to have OE, right? Correct, technically we need to provide during open enrollment, but we can still proceed.

3.)  Scenario:  Open Enrollment runs from the 20th of August to the 3rd of September. Forms are submitted to GBS as early as 8/20 or as late s 9/6. Given this data and considering the 8/20-9/6 time range:

a.)  What is the time range providers would be able to see them the employee in their system by searching carrier, name, DOB, and SSN?

Inforce carrier(Kaiser) receive forms by 9/6 send eligibility by 9/13 approx. Non inforce carrier (change in carrier), receive forms by 9/6, changes to the carrier would be sent sometime the week of 9/16. When there is a carrier change it can take a bit longer as we have to set up file feeds potentially and make changes in our system. I don't think we would be able to start open enrollment on 8/20.  So if we had an OE of 8/23-9/6 with a final submission to GBS on the following business day of 9/9, employees would be able to go to the doctor around 9/16 and have claims run normally.  They'd need to self-file a manual claim for any appointments between 9/1 and that 9/15 date, right?  If OE was 8/30-9/13, with a final submission to GBS on 9/16, they'd be able to go to the doc on 9/23 to have claims run normally, and self-file in between, right? Employees would still be effective and have coverage on 9/1 however, they may not be showing eligible and may have to pay out of pocket for prescriptions. Your assessment however is correct.

b.)  What is the time range employees could expect their new cards in the mail? ID cards then would take approx. another 10 business days from when the carrier processes the file in their system.  So, employees would get their cards from the insurance carrier somewhere between 9/23 and 9/30 with the adjusted OEs above, does that sound right? yes

4.)  GBS (including vChoice) has not requested a census.  Do you need one this year for any reason? Census attached with the coding.  Completed attached. Thank you.

[Quoted text hidden]



**image003.png**
19K

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                          Thu, Aug 8, 2019 at 3:39 PM
To: Melissa Knauss <melissa.k@cedarpark.org>

Cedar Park 000302

Yes, no problem. Thanks!


**Melinda Hansen**   Client Manager

Health & Welfare Consulting





Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.ajg.com

777 – 108<sup>th</sup> Ave NE, Suite 200, Bellevue, WA 98004


 


This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.


---

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Thursday, August 8, 2019 3:27 PM
**To:** Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Open Enrollment Timeline


> [EXTERNAL]


I just printed this out and say that I transposed the first and last name for our employee Terry Carter.  Carter is his LAST name.  Can you please make the correction?  Thanks!


All the best,

Cedar Park 000303

# Exhibit K



Insurance | Risk Management | Consulting

 
 

# 2019/2020 Employee Benefit Analysis and Recommendations

Proposed Effective Date: September 1, 2019
Jami Hansen, Area-Vice President/Client Consultant
*Melinda Hansen, Client Manager*
*James Stanek, Benefit Analyst*
Date Presented: June 10, 2019

**IMPORTANT:** This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc. This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts. See your policy or contact us for specific information or further details in this regard.



Cedar Park 000082

# Medical
### *Cost Outline*

## *PPO Plan*

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna | Alternative 2<br>Cigna |
|---|---|---|---|---|---|
| | | | | *Fully Insured* | *Level-Funded* |
| Employee Only | 48 | $396.85 | $431.99 | $399.41 | $411.76 |
| Employee + Spouse | 5 | $876.79 | $954.44 | $882.26 | $909.55 |
| Employee + Child(ren) | 7 | $740.31 | $805.87 | $744.87 | $767.91 |
| Employee + Family | 9 | $1,220.25 | $1,328.31 | $1,228.16 | $1,266.14 |
| **PPO Plan Annual Cost** | **69** | **$475,166** | **$517,243** | **$478,204** | **$492,994** |
| *% Change* | | | *8.9%* | *0.6%* | *3.8%* |
| *$ Change* | | | *$42,077* | *$3,038* | *$17,828* |

## *HMO Plan*

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna | Alternative 2<br>Cigna |
|---|---|---|---|---|---|
| | | | | *Fully Insured* | *Level-Funded* |
| Employee Only | 37 | $345.53 | $371.70 | $391.13 | $403.23 |
| Employee + Spouse | 4 | $763.40 | $821.22 | $864.03 | $890.75 |
| Employee + Child(ren) | 4 | $644.58 | $693.39 | $729.47 | $752.03 |
| Employee + Family | 1 | $1,062.45 | $1,142.91 | $1,202.73 | $1,239.93 |
| **HMO Plan Annual Cost** | **46** | **$233,748** | **$251,451** | **$264,584** | **$272,767** |
| *% Change* | | | *7.6%* | *13.2%* | *16.7%* |
| *$ Change* | | | *$17,703* | *$30,836* | *$39,019* |

| | Current | Negotiated | Alternative 1 | Alternative 2 |
|---|---|---|---|---|
| **HSA Annual Contribution** | $72,500 | $72,500 | $72,500 | $72,500 |
| **HRA Annual Contribution** | $70,537 | $75,120 | $75,120 | $75,120 |

| | | Current | Negotiated | Alternative 1 | Alternative 2 |
|---|---|---|---|---|---|
| **Combined Medical/HSA/HRA Annual Cost** | **115** | **$851,951** | **$916,314** | **$890,408** | **$913,381** |
| *% Change* | | | *7.6%* | *4.5%* | *7.2%* |
| *$ Change* | | | *$64,363* | *$38,457* | *$61,430* |

 **Remember**

- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.
- HSA funding assumes $500 per individual and $1,000 per family.
- Level Funded Arrangement offers 50% surplus share.
- Cigna Fully Insured rates are estimated based on 3% reduction to the Level-Funded rates.
- Cigna has agreed to pay for Single Billing Services.
- Elective abortions are not covered for both the Cigna Fully Insured and Cigna Level-Funded plans.

Prepared by:
Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 2

Cedar Park 000083

# HRA Administration
## *Cost Comparison and Utilization*

| Administration Costs | | Current NMR | Renewal NMR |
|---|---|---|---|
| Submission Fee (Per Employee) | 22 | $40.00 | $40.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $225.00 |
| **Total Annual Administration Cost** | | **$1,105** | **$1,105** |

| Reimbursement Limits | | Current/Renewal NMR |
|---|---|---|
| **PPO Plan Deductible** | | $4,500/$9,000 |
| Employee | 48 | $3,150 |
| Employee & Family | 21 | $6,300 |
| **HMO Plan Deductible** | | $4,500/$9,000 |
| Employee | 37 | $3,150 |
| Employee & Family | 9 | $6,300 |
| **Annual Maximum Liability** | | **$456,750** |

| HRA Utilization Costs and Projections | 2018 Reimbursements | 1/1/2019 - 5/31/2019 Reimbursements | Current Year Completion Projection | Renewal Year Projection |
|---|---|---|---|---|
| **Combined Plan Utilization** | $65,134 | $17,971 | $69,432 | $74,015 |
| **% of Max Utilization** | **14.3%** | **3.9%** | **15.2%** | **16.2%** |

| Total Costs Projection | Current Projected | Renewal Projected |
|---|---|---|
| **Total Administration Cost** | $1,105 | $1,105 |
| **Utilization Projected costs** | $69,432 | $74,015 |
| **Total HRA Annual Cost Projection** | **$70,537** | **$75,120** |

 **Remember**

- HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.
- HRA projection trend: 6.6%

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 3

Cedar Park 000084

# Medical

## *Benefit Outline - PPO Plan*

| | Current/Renewal | | Alternative 1 & 2 | |
|---|---|---|---|---|
| | Kaiser Permanente | | Cigna | |
| PCY = Per Calendar Year | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Medical Plan** | Access PPO | | Open Access Plus | |
| **Annual Deductible** (Individual/Family) | $4,500/$9,000 | | $4,500/$9,000 | $9,000/$18,000 |
| **Coinsurance** | 10% (5% enhanced)* | 30% | 10% | 30% |
| **Annual Out-of-Pocket Maximum** (Individual/Family) | $6,550/$13,100 | | $6,550/$13,100 | $13,100/$26,200 |
| **Preventive Care** | Covered in full | | Covered in full | Not covered |
| **Outpatient Services** | | | | |
| • Office Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Specialist Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Surgery | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Rehabilitation | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | | | Up to 60 visits PCY | |
| **Other Services** | | | | |
| • Chiropractic Care | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 8 visits PCY | | Up to 12 visits PCY | |
| • Acupuncture | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 12 visits PCY | | Up to 12 visits PCY | |
| **Urgent Care** | 10% after deductible | 30% after deductible | Covered in full after deductible | 30% after deductible |
| **Emergency Room** (copay waived if admitted) | 10% after deductible | | 10% after deductible | |
| **Inpatient Hospitalization** | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| **Prescription Drug Plan** | At Preferred Pharmacies | | At Preferred Pharmacies | |
| **Annual Deductible** (Individual/Family) | Shared with medical | | Shared with medical | |
| **Annual Out-of-Pocket Maximum** (Individual/Family) | Shared with medical | | Shared with medical | |
| **Retail Pharmacy** (30-day supply) | After deductible… | | After deductible… | |
| • Generic | $10 | | $10 | |
| • Preferred Brand | $35 ($30*) | | $35 | |
| • Non-Preferred Brand | $70 ($65*) | | $70 | |
| • Specialty | Above cost shares apply | | Above cost shares apply | |
| **Mail Order** (90-day supply) | 3 x enhanced retail cost share* | | 2 x retail cost share | |
| **Part D Creditable/Non-Creditable** | Creditable | | Creditable | |
| **Formulary** | KPWA Formulary | | Cigna Advantage | |



ⓘ **Remember**

• For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

• *Enhanced benefit applies when outpatient services are provided at a Kaiser Permanente facility.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 4

Cedar Park 000085

# Medical
## *Benefit Outline - HMO Plan*



| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente<br>*In-Network Only* | Alternative 1 & 2<br>Cigna<br>*In-Network Only* |
|---|---|---|
| *Medical Plan* | *Core HMO* | *Open Access Plus* |
| **Annual Deductible**<br>(Individual/Family) | $4,500/$9,000 | $4,500/$9,000 |
| **Coinsurance** | 10% | 10% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,650/$13,300 | $6,650/$13,300 |
| **Preventive Care** | Covered in full | Covered in full |
| **Outpatient Services** | | |
| • Office Visit | 10% after deductible | 10% after deductible |
| • Specialist Visit | 10% after deductible | 10% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 10% after deductible |
| • Surgery | 10% after deductible | 10% after deductible |
| • Rehabilitation | 10% after deductible<br>Up to 60 visits PCY | 10% after deductible<br>Up to 60 visits PCY |
| **Other Services** | | |
| • Chiropractic Care | 10% after deductible<br>Up to 10 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| • Acupuncture | 10% after deductible<br>Up to 12 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| **Urgent Care** | 10% after deductible | Covered in full after deductible |
| **Emergency Room**<br>(copay waived if admitted) | 10% after deductible | 10% after deductible |
| **Inpatient Hospitalization** | 10% after deductible | 10% after deductible |
| *Prescription Drug Plan* | *At Preferred Pharmacies* | *At Preferred Pharmacies* |
| **Annual Deductible**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Retail Pharmacy** (30-day supply) | *After deductible…* | *After deductible…* |
| • Generic | $20 | $10 |
| • Preferred Brand | $40 | $40 |
| • Non-Preferred Brand | $60 | $60 |
| • Specialty | Above cost shares apply | Above cost shares apply |
| **Mail Order** (90-day supply) | 3 x retail cost share | 2 x retail cost share |
| **Part D Creditable/Non-Creditable** | Creditable | Creditable |
| **Formulary** | KPWA Formulary | Cigna Advantage |

ⓘ **Remember**
- For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

# Self-Funded Medical
## *Fixed Cost Comparison*

|  |  | Proposed |
|---|---|---|
| *Administration* |  |  |
| **TPA** |  | HMA |
| **PBM** |  | CVS Caremark |
| **Network Option** |  | Regence BlueShield |
| **Administrative Fees** | 115 |  |
| • Set-Up |  | $3,500.00 |
| • Plan Administration |  | $28.60 |
| • Network |  | $5.50 |
| • Care Management |  | $3.75 |
| • Fiduciary |  | $2.00 |
| • 24-Hour Nurse Line |  | $0.65 |
| • MD Live Telehealth w/ Behavioral |  | $1.30 |
| • Care Navigator |  | $1.50 |
| • Disease Management |  | $3.00 |
| • Cost Transparency Tool |  | $1.50 |
| • Maternity Management |  | $350 per case |
| • Creditable Coverage Determination | 2 | $385.00 |
| **Rate Guarantee** |  | 12 months |
| **Annual Administration Cost** |  | **$70,234** |

 Remember

- Determination of employer prescription drug coverage meeting Medicare's Creditable Coverage Requirements - $385 (fee is per Plan tested).

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 6

Cedar Park 000087

Crisalli Decl., p.0231

# Self-Funded Medical

## *Stop Loss Comparison - Financial Analysis*

| | Proposed |
|---|---|
| **Administration** | |
| **TPA** | HMA |
| **Stop Loss** | |
| **Reinsurer** | Symetra |
| **Quote Status** | Preliminary |
| **Individual Stop Loss** (ISL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Deductible | $100,000 |
| • Accumulation Basis | Per member |
| • Annual Maximum | Unlimited |
| • Lifetime Maximum | Unlimited |
| • Run-In Limitation | N/A |
| **Aggregate Stop Loss** (ASL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Corridor | 125% |
| • Annual Maximum | $1,000,000 |
| • Run-In Limitation | N/A |
| **Additional Provisions** | |
| • Aggregating Specific Deductible | None |
| • Specific Advanced Funding | Not Included |
| • Aggregate Accommodation | Not Included |
| • Retiree Coverage | Not covered |
| • Actively at Work | Waived w/ Disclosure |
| • No New Laser/Rate Cap | Not Included |
| **Laser Liability** | None |
| **Rates Subject to Change** | Lock w/ data through May |
| **ISL Composite Rate** 115 | $186.40 |
| **ASL Composite Rate** 115 | $21.42 |
| **Annual Stop Loss Premium** | **$286,792** |

ⓘ **Remember**

• Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 7

Cedar Park 000088

# Self-Funded Medical
### *Expected & Maximum Claims Factor Comparison*

| | Proposed |
|---|---|
| **Stop Loss** | |
| **Reinsurer** | Symetra |
| **Quote Status** | Preliminary |
| **Individual Stop Loss** (ISL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Deductible | $100,000 |
| • Annual Maximum | Unlimited |
| **Aggregate Stop Loss** (ASL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Corridor | 125% |
| • Annual Maximum | $1,000,000 |
| **Laser Liability** | None |
| **Gallagher Projection** | |
| **Underwriting Assumptions** | |
| • Experience Period | May 2017 - April 2019 |
| • Experience Weight (Prior/Current) | 33%/67% |
| • Medical/Rx Trend | 5.7% |
| • Margin | 2.0% |
| **Expected Claims Factor (PEPM)** 115 | $452.51 |
| **Gallagher Annual Expected Claims** | **$624,464** |
| **Maximum Liability** | |
| **Maximum Claims Factors** (for ASL) **115** | $619.57 |
| **Maximum Annual Claims Liability** | **$855,007** |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

# Funding Development

| | Expected Renewal<br>*Based on Gallagher Projection*<br>*Proposed* |
|---|---|
| | *Medical, Rx* |
| TPA | HMA |
| Stop Loss | Symetra |
| ISL | $100,000 |
| **Cost Components** | |
| • Projected Paid Claims | $624,464 |
| • Projected Fixed Cost | $357,026 |
| • Estimated Rx Rebates | ($35,000) |
| **Total Needed Funding** | **$946,489** |
| **Present Funding** | $708,914 |
| **Needed Change to Present Rates** | **33.5%** |

 **Remember**

- Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.
- Needed and Present Funding do not include HSA or HRA funding.
- Needed Funding includes 5.3% commission for Stop Loss only.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 9

Cedar Park 000090

Crisalli Decl., p.0234

# Self-Funded Medical

*Stop Loss Comparison - Coverage Analysis*

| Reinsurer Statement | |
|---|---|
| *Coverage Analysis Statement* | |
| **Proposed - Symetra**<br>• Stop Loss Reinsurer: Symetra<br>• Administration TPA: HMA | Symetra agrees their stop loss policy will cover agreed upon benefits. Any claims including fiduciary override such as extra contractual payment or claims that are covered or eligible for coverage by Worker's Compensation will not be covered under the stop loss policy. Also, coverage for prescription drugs is required to be in included in the experience provided to the underwriter and the stop loss coverage is subject to the terms outlined on the Symetra stop loss policy schedule of benefits. |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 10

Cedar Park 000091

Crisalli Decl., p.0235

# Dental
## *Benefit & Cost Outline*



| | Current/Renewal<br>Delta Dental of WA | | Alternative 1<br>Delta Dental of WA | |
|---|---|---|---|---|
| | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* |
| **Dental Plan** | MAC | | MAC | |
| **Annual Deductible** | $0 per person | $50 per person | $25 per person | |
| (waived for Preventive & Diagnostic) | $0 per family | $150 per family | $75 per family | |
| **Annual Benefit Maximum** | $1,500 per person | | $2,000 per person | |
| **Waiting Period** | 12 months for Major services | | None | |
| **Services** | | | | |
| • Preventive & Diagnostic | No charge | No charge | No charge | No charge |
| • Basic | 20% | 20% after deductible | 10% after deductible | 10% after deductible |
| • Major | 50% | 50% after deductible | 40% after deductible | 40% after deductible |
| **Periodontics** | Covered under Basic | | Covered under Basic | |
| **Endodontics** | Covered under Basic | | Covered under Basic | |
| **Implants** | Covered under Major | | Covered under Major | |
| **Orthodontia** | | | Children only | |
| • Services | Not covered | | 50% | 50% |
| • Lifetime Benefit Maximum | | | $2,000 per person | |
| **Late Entrant Penalty** | Open Enrollment | | None | |
| **Monthly Rates** | *Current* | *Renewal* | | |
| Employee Only | 94 | $48.95 | $48.95 | $56.49 |
| Employee + Spouse | 16 | $95.79 | $95.79 | $110.54 |
| Employee + Child(ren) | 11 | $105.56 | $105.56 | $136.82 |
| Employee + Family | 14 | $152.41 | $152.41 | $190.88 |
| **Rate Guarantee** | | 12 months | 12 months | |
| **Total Annual Cost** 135 | $113,146 | $113,146 | $135,072 | |
| *% Change* | | *0.0%* | *19.4%* | |
| *$ Change* | | *$0* | *$21,926* | |

ⓘ **Remember**

• Actual claims paid are subject to maximum allowable charge, frequencies, age limitations, and terms and conditions of the contract.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 11

Cedar Park 000092

## Contribution Outline

| | | Current | | | Negotiated | | | Alternative 1 | | | Alternative 2 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Cost | ER Cost | EE Cost* | Total Cost | ER Cost | EE Cost* | Total Cost | ER Cost | EE Cost* | Total Cost | ER Cost | EE Cost* |
| **PPO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 48 | $396.85 | $281.85 | $115.00 | $431.99 | $306.81 | $125.18 | $399.41 | $283.65 | $115.75 | $411.76 | $292.43 | $119.33 |
| Employee + Spouse | 5 | $876.79 | $308.97 | $567.82 | $954.44 | $336.34 | $618.10 | $882.26 | $310.95 | $571.31 | $909.55 | $320.57 | $588.98 |
| Employee + Child(ren) | 7 | $740.31 | $303.71 | $436.60 | $805.87 | $330.61 | $475.26 | $744.87 | $305.65 | $439.22 | $767.91 | $315.11 | $452.80 |
| Employee + Family | 9 | $1,220.25 | $322.24 | $898.01 | $1,328.31 | $350.77 | $977.54 | $1,228.16 | $324.30 | $903.86 | $1,266.14 | $334.33 | $931.81 |
| **HMO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 37 | $345.53 | $270.53 | $75.00 | $371.70 | $291.02 | $80.68 | $391.13 | $306.22 | $84.91 | $403.23 | $315.69 | $87.54 |
| Employee + Spouse | 4 | $763.40 | $269.02 | $494.38 | $821.22 | $289.39 | $531.83 | $864.03 | $304.51 | $559.52 | $890.75 | $313.93 | $576.82 |
| Employee + Child(ren) | 4 | $644.58 | $264.44 | $380.14 | $693.39 | $284.46 | $408.93 | $729.47 | $299.32 | $430.15 | $752.03 | $308.58 | $443.45 |
| Employee + Family | 1 | $1,062.45 | $280.56 | $781.89 | $1,142.91 | $301.81 | $841.10 | $1,202.73 | $317.58 | $885.16 | $1,239.93 | $327.40 | $912.53 |
| **Medical Annual Cost** | | $708,914 | $390,285 | $318,629 | $768,694 | $422,935 | $345,759 | $742,788 | $411,495 | $331,293 | $765,761 | $424,222 | $341,539 |
| **Additional Employer Contributions** | | | | | | | | | | | | | |
| Annual HSA Contribution | | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 |
| Annual HRA Contribution | | $70,537 | $70,537 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 |
| **Medical Total Annual Cost** | | $851,951 | $533,323 | $318,629 | $916,314 | $570,555 | $345,759 | $890,408 | $559,115 | $331,293 | $913,381 | $571,842 | $341,539 |
| **Dental Plan** | | DDWA | | | DDWA | | | DDWA | | | DDWA | | |
| Employee | 94 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 |
| Employee + Spouse | 16 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 |
| Employee + Child(ren) | 11 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 |
| Employee + Family | 14 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 |
| **Dental Total Annual Cost** | | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 |
| | | | | | | | | | | | | | |
| **Total Annual Cost** | | $965,097 | $587,669 | $377,429 | $1,029,460 | $624,901 | $404,559 | $1,003,554 | $613,461 | $390,093 | $1,026,527 | $626,188 | $400,339 |
| *% Change* | | | | | 6.7% | 6.3% | 7.2% | 4.0% | 4.4% | 3.4% | 6.4% | 6.6% | 6.1% |
| *$ Change* | | | | | $64,363 | $37,233 | $27,130 | $38,457 | $25,793 | $12,664 | $61,430 | $38,519 | $22,911 |

\* Under the Affordable Care Act (ACA), coverage is affordable for an employee if the employee's contribution toward the lowest-cost, self-only, minimum value coverage does not exceed a specified percentage of the employee's household income (9.56% for plan years beginning in 2018; 9.86% for plan years beginning in 2019; and 9.86% for plan years beginning in 2020). There are three safe harbors including the Federal Poverty Line safe harbor. To meet the Federal Poverty Line safe harbor for affordability for plan years starting on July 1, 2019 or prior to July 1, 2020, employee contribution for employee-only coverage cannot exceed 9.86% of the Federal Poverty Line which is equal to $102.63 per month for the 48 contiguous states, $128.16 for Alaska and $118.15 for Hawaii. Note: The affordability percentage rate, and therefore the dollar amount, may change annually. Employers may use the poverty guidelines in effect within six months prior to the first day of the plan year. There are two additional safe harbor options that may be used: the Form W-2 Safe Harbor or the Rate of Pay Safe Harbor. Guidance addresses how HRAs, wellness program rewards, flex credits, defined contributions, opt-out payments, and fringe benefit payments required under the Davis-Bacon Act or the Service Contract Act affect the affordability of employer coverage. See Healthcare Reform Guidelines for details.

Prepared by:
 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 12
Cedar Park 000093

Crisalli Decl., p.0237

# Voluntary Vision
## *Benefit & Cost Outline*



| Employee Share of Eligible Expenses | | | Current/Renewal vChoice (Underwritten by VSP) Base Plan | | Current/Renewal vChoice (Underwritten by VSP) Buy-Up Plan | |
|---|---|---|---|---|---|---|
| | | | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Vision Plan** | | | *Signature Plan* | | *Signature Plan* | |
| **Routine Exam Copay** | | | $10 | $10 | $10 | $10 |
| **Routine Exam** | | | Covered in full* | Reimbursed up to $50* | Covered in full* | Reimbursed up to $50* |
| **Materials Copay** | | | $25 | $25 | $25 | $25 |
| **Lenses** (per pair) | | | | Reimbursed up to… | | Reimbursed up to… |
| • Single Vision | | | No charge* | $50* | No charge* | $50* |
| • Lined Bifocals | | | No charge* | $75* | No charge* | $75* |
| • Lined Trifocals | | | No charge* | $100* | No charge* | $100* |
| **Frames** | | | $130 allowance then 20% discount* | Reimbursed up to $70* | $130 allowance then 20% discount* | Reimbursed up to $70* |
| **Contact Lenses** (in lieu of eyeglasses) | | | | | | |
| • Fitting and Evaluation | | | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials |
| • Elective Contacts | | | $130 allowance | | $130 allowance | |
| **Frequency** (Exam/Lenses/Frames/Contacts) | | | 12/12/24/12 Months | | 12/12/12/12 Months | |
| **Monthly Rates** | Base | Buy-Up | Current | Renewal | | |
| Employee Only | 32 | 6 | $7.86 | $7.86 | $9.81 | $9.81 |
| Employee + Spouse | 6 | 7 | $12.58 | $12.58 | $15.70 | $15.70 |
| Employee + Child(ren) | 2 | 3 | $12.84 | $12.84 | $16.02 | $16.02 |
| Employee + Family | 5 | 0 | $20.71 | $20.71 | $25.83 | $25.83 |
| **Rate Guarantee** | | | | 12 more months | | 12 more months |
| **Total Annual Cost** | 45 | 16 | $5,475 | $5,475 | $2,602 | $2,602 |
| *% Change* | | | | 0.0% | | 0.0% |
| *$ Change* | | | | $0 | | $0 |

*Less any applicable copay.

ⓘ **Remember**

- Out-of-Network benefits reflect the maximum reimbursement for specific services.
- Members may receive additional discount off of non-covered lens options when services are received from a VSP network provider.
- Frequency applies on a beginning with the first date of service.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 13

Cedar Park 000094

# Life/AD&D
## *Benefit & Cost Outline*



| | Current/Renewal<br>Lincoln Financial Group | | |
|---|---|---|---|
| **Life and AD&D Plan** | | | |
| **Benefit Amount** | $10,000 | | |
| **Guarantee Issue** | $10,000 | | |
| **Additional Features** | | | |
| • Accelerated Benefit | Up to 75% | | |
| • Conversion | Included | | |
| • Portability | Included | | |
| • Waiver of Premium | Included | | |
| **Benefit begins to reduce at age** | 65 | | |
| **Monthly Rates** | *Volume* | *Current* | *Renewal* |
| **Life** (per $1,000 of benefit) | $1,714,500 | $0.160 | $0.160 |
| **AD&D** (per $1,000 of benefit) | $1,714,500 | $0.020 | $0.020 |
| **Rate Guarantee** | | | 12 more months |
| **Total Annual Cost** | Lives: 179 | **$3,703** | **$3,703** |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 14

Cedar Park 000095

# Long-Term Disability
## *Benefit & Cost Outline*

| | Current/Renewal<br>Lincoln Financial Group |
|---|---|
| **Long-Term Disability (LTD)** | |
| **Elimination Period** | 90 days |
| **Covered Monthly Earnings** | 60% |
| **Benefit Maximum** | $5,000 |
| **Benefit Minimum** | Greater of 10% or $100 |
| **Definition of Earnings** | Basic Monthly Earnings |
| **Definition of Disability** | 24 months own occupation |
| **Maximum Duration** | SSNRA |
| **Tax Free Benefit (Gross Up)** | No |
| **Benefit Limitations** | |
| • Pre-Existing Condition | 3/12 |
| • Mental Health & Chemical Dependency | 24 months |
| • Self-Reported | 24 months |
| **Additional Features** | |
| • Conversion | Included |
| • W2 Prep | Included |
| • FICA Matching | Included |
| • Employee Assistance Program | Included with up to 4 face-to-face visits PCY |

| **Monthly Rates** | Volume | Current | Renewal |
|---|---|---|---|
| **LTD** (per $100 of covered monthly payroll) | $618,198 | $0.180 | $0.180 |
| **Rate Guarantee** | | | 12 more months |
| **Total Annual Cost** | Lives: 179 | **$13,353** | **$13,353** |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures**
**and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 15

Cedar Park 000096

Crisalli Decl., p.0240

# Voluntary Life
## Benefit & Cost Outline



| Voluntary Life Monthly Rates | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Employee and Spouse** (per $1,000) | |
| < 25 | $0.057 |
| 25 - 29 | $0.069 |
| 30 - 34 | $0.092 |
| 35 - 39 | $0.103 |
| 40 - 44 | $0.115 |
| 45 - 49 | $0.172 |
| 50 - 54 | $0.264 |
| 55 - 59 | $0.493 |
| 60 - 64 | $0.756 |
| 65 - 69 | $1.456 |
| 70 + | $2.361 |
| **Child(ren)** (per unit) - Birth to Age 26 | $2.500 |

| Voluntary Life Plan | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Benefit Options** | |
| • Employee | 1-5 x earning rounded to $10,000 |
| • Spouse | .5-2.5 x earnings rounded to $5,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 5 x earnings or $500,000 |
| • Spouse | 50% of employees amount or $250,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Guarantee Issue** | |
| • Employee | $210,000 |
| • Spouse | $105,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Accelerated Benefit | 75% to $500,000 |
| • Conversion | Included |
| • Portability | Included |
| • Waiver of Premium | Included |
| **Benefit begins to reduce at age** | 70 |
| **Participation Requirement** | 10 |

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 16

Cedar Park 000097

Crisalli Decl., p.0241

# Voluntary AD&D
### *Benefit & Cost Outline*

| | Current/Renewal<br>vChoice (Underwritten by Standard) |
|---|---|
| **Voluntary AD&D Plan** | |
| **Benefit Options** | |
| • Employee | $100,000 increments |
| • Spouse | 50% of employee amount |
| • Children (newborn to 26 years) | $10,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 10 x earnings or $500,000 |
| • Spouse | 50% of employee amount or $250,000 |
| • Children (newborn to 26 years) | $10,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Portability | Included |
| • Waiver of Premium | Not included |
| **Participation Requirement** | 10 |
| **Voluntary AD&D Monthly Rates** | |
| **Employee** (per $1,000) | $0.047 |
| **Spouse** (per $1,000) | $0.047 |
| **Child(ren)** (per $1,000) | $0.047 |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 17

Cedar Park 000098

Crisalli Decl., p.0242

# Administration Services
## *Cost Outline*

### *Single Billing Services*

| | Current/Renewal<br>GBS Administrators |
|---|---|
| **Total Annual Fees** | **Your fee structure is 2% of monthly medical costs, included in Kaiser's medical premium.** |

- SBS regeneration fee not paying as billed - $50
- Cigna will cover the cost of SBS if medical carriers move

### *Benefit Advocate Center*

| | Current/Renewal<br>GBS |
|---|---|
| **PEPM Administration Fee** | Included |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 18

Cedar Park 000099

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $708,914 | $390,285 | $318,629 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Negotiated

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $768,694 | $422,935 | $345,759 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $1,046,517 | $641,958 | $404,559 |
| % Change | | | 6.6% | 6.2% | 7.2% |
| $ Change | | | $64,363 | $37,233 | $27,130 |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 19

Cedar Park 000100

Crisalli Decl., p.0244

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $708,914 | $390,285 | $318,629 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Alternative 1

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Fully Insured) | *Dual Option PPO/HMO $4,500 Ded.* | $742,788 | $411,495 | $331,293 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| Total Annual Cost | | | $1,020,611 | $630,518 | $390,093 |
| *% Change* | | | *3.9%* | *4.3%* | *3.4%* |
| *$ Change* | | | *$38,457* | *$25,793* | *$12,664* |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 20

Cedar Park 000101

Crisalli Decl., p.0245

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $708,914 | $390,285 | $318,629 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$982,154** | **$604,725** | **$377,429** |

## Alternative 2

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Level-Funded) | *Dual Option PPO/HMO $4,500 Ded.* | $765,761 | $424,222 | $341,539 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$1,043,584** | **$643,244** | **$400,339** |
| *% Change* | | | *6.3%* | *6.4%* | *6.1%* |
| *$ Change* | | | *$61,430* | *$38,519* | *$22,911* |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 21

Cedar Park 000102

# Carriers Invited To Bid

| Self-Insured Plan Administration (TPA) | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HMA | Shown in Proposal | Net of commission | $0.00 to $40.00 PEPY |
| First Choice | Not shown - Base PEPM Admin Fee 53.8% over HMA | N/A | Not Applicable |

| Stop Loss | AM Best Rating | Response | RFI Available | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|---|
| Symetra | A | Shown in Proposal | Yes | 5.3% | 2.5% of Premium |
| HM | A | DTQ - 37% over current (expected) / 59% over (maximum) | Yes | N/A | 3.0% of Premium |

| Fully-Insured Medical Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Kaiser Permanente WA | Current Carrier - Shown in Proposal | 5.3% | Not Applicable |
| Cigna | Shown in Proposal | $29.41 PEPM | $0.00 to $28.00 PEPY |
| Regence BlueShield | Not shown - 22.9% over current and 6.6% over renewal | N/A | $0.00 to $40.00 PEPY |
| Premera Blue Cross | Not shown - 32.9% over current and 15.5% over renewal | N/A | 0.0% to 0.8% of medical premium |
| Business Health Trust | Not shown - 30.4% over current and 13.3% over renewal | N/A | Not Applicable |
| United Healthcare | DTQ - Per UHC: "We have conducted a review of your request and have determined that our rates our uncompetetive and we coming in over the 2019 renewal" | N/A | Not Applicable |
| Aetna | DTQ - Per Aetna: "We have evaluated all aspects of this group and we have determined we will not be competetive" | N/A | $0.00 to $30.00 PMPY |
| Christian Brothers | DTQ - Group must be part of the Catholic Church to participate | N/A | Not Applicable |

| Gallagher vChoice Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Vision - Vision Service Plan | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Fully-Insured Dental Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Delta Dental of Washington | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Miscellaneous Benefit Lines | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HRA Administration - NMR | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Benefit Advocate Center - GBS | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Single Billing Services - GBSA | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 22

Cedar Park 000103

Crisalli Decl., p.0247

# Carriers Invited To Bid

| Life/AD&D and Disability Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Lincoln Financial Group | A+ | Current Carrier - Shown in Proposal | Life: 20% LTD: 10% | 1.0% to 4.5% of Premium |

| Gallagher vChoice Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Life - Unum | A | Current Carrier - Shown in Proposal | 20.0% | 1.25% of Premium |
| AD&D - Standard | A | Current Carrier - Shown in Proposal | 25.0% | 1.5% to 2.25% of Premium |
| Pet Insurance - PetsBest | N/A | Current Carrier - Not Shown | 7.5% | Not Applicable |
| Additional Administrative Fee | N/A | Current Carrier - Shown in Proposal | $1.25 PEPM | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

While GBS does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier or HMO.  There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com).  Generally, agencies that provide ratings of U.S. Health Insurers, including traditional insurance companies and other managed care (e.g., HMO) organizations, reflects their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.

## A.M. Best's Rating Scale

| Level | Category | Level | Category | Level | Category |
|---|---|---|---|---|---|
| A++, A+ | Superior | B, B- | Fair | D | Poor |
| A, A- | Excellent | C++, C+ | Marginal | E | Under Regulatory Supervision |
| B++, B+ | Very Good | C, C- | Weak | F | In Liquidation |
| | | | | S | Rating Suspended |

### Financial Size Categories

| | | | |
|---|---|---|---|
| FSC I | Up to $1,000 | FSC IX | $250,000 to $500,000 |
| FSC II | $1,000 to $2,000 | FSC X | $500,000 to $750,000 |
| FSC III | $2,000 to $5,000 | FSC XI | $750,000 to $1,000,000 |
| FSC IV | $5,000 to $10,000 | FSC XII | $1,000,000 to $1,250,000 |
| FSC V | $10,000 to $25,000 | FSC XIII | $1,250,000 to $1,500,000 |
| FSC VI | $25,000 to $50,000 | FSC XIV | $1,500,000 to $2,000,000 |
| FSC VII | $50,000 to $100,000 | FSC XV | $2,000,000 Or More |
| FSC VIII | $100,000 to $250,000 | (In $000 of Reported Policyholders' Surplus Plus Conditional Reserve Funds) | |

Best's Insurance Reports, published annually by A.M. Best Company, Inc., presents comprehensive reports on the financial position, history and transactions of insurance companies operating in the United States and Canada.  Companies licensed to do business in the United States are assigned a Best's Rating which attempts to measure the comparative position of the company or association against industry averages.

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 23

Cedar Park 000104

Crisalli Decl., p.0248

# Non-Grandfathered Status

You had a health policy in effect prior to March 23, 2010, and because you have made significant enough plan changes to have lost your grandfathered status, you must comply with the additional requirements under the Affordable Health Care Act (ACA).

**Examples of plan changes that could have caused you to lose grandfathered status include, but may not be limited to:**

- Significantly cut or reduce benefits; or
- Add or reduce annual dollar limits; or
- Raise coinsurance percentages; or
- Increase deductibles or out-of-pocket maximums by more than the amounts allowed based on medical inflation*; or
- Increase employee contribution percentage by more than 5% of the contribution rate on March 23, 2010 (determined contribution rate based on COBRA valuation for self-insured plans).

*Medical inflation is the increase since March 2010 in the overall medical care component of the Consumer Price Index for All Urban Consumers (CPI-U) (unadjusted) published by the Department of Labor.

Your plan must comply with the provisions that apply to grandfathered plans in addition to the provisions that apply to non-grandfathered plans. The additional requirements that apply to non-grandfathered plans include, but are not limited to:

- Provide coverage to children to age 26 regardless of whether they are eligible for their own employment-based coverage; and
- Provide coverage of recommended preventive services with no cost sharing; and
- Include patient protections such as guaranteed access to emergency room services and OB-GYNs and pediatricians; and
- Include new claims appeal rules including both internal and external review; and
- Comply with nondiscrimination rules for fully insured health plans under Code §105(h) which prohibit discrimination in favor of highly compensated individuals as to benefits and eligibility requirements (pending release of final regulations).

**For plan years starting on or after January 1, 2014**, plans that have lost grandfathered status will also have to comply with the following:

- No discrimination against individuals participating in clinical trials (insured plans only); and
- No discrimination based on health status; and
- Provide essential benefits (insured plans only) and prohibit cost sharing in excess of the limits for qualified high deductible health plans; and
- No discrimination against healthcare providers acting within the scope of their professional license and applicable State law; and
- Prohibit out-of-pocket limits in excess of applicable out of pocket limits as determined by HHS for plan years starting on or after January 1, 2015.

*NOTE: This is only a brief summary of ACA guidance, intended to highlight points with the most universal impact. It is not intended to be a complete summary of requirements, changes, or regulations.  Further guidance and probable changes are expected to continue.*

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 24

Cedar Park 000105

Crisalli Decl., p.0249

# Employer Shared Responsibility Mandate/ACA Compliance

| | | |
|---|---|---|
| **Employer Shared Responsibility Mandate (ESRM)**<br>Applicable Large Employer | 50+ full-time equivalent employees | An employer that employed at least 50 full time equivalent employees (FTE) in the preceding calendar year is required to offer affordable, minimum value health coverage to substantially all FTEs and dependent children or pay a penalty. |
| **Member of Controlled Group?** | Subject to Employer Determination | If the total of FTEs for all employers in the controlled group is at least 50, each separate company is and applicable large employer and is subject to the employer mandate. Penalties are then imposed based on the offer of coverage provided by each separate company. |
| **Medical Plan(s) meet Minimum Essential Coverage?** | Yes | A plan must meet the minimum essential coverage requirement for an applicable large employer to meet employer mandate requirement.<br>The Summary of Benefits & Coverage is required to reflect if the plan is minimum essential coverage. |
| **Offering to 95% of full-time employees?** | Subject to Employer Determination | An applicable large employer is required to offer minimum essential coverage to at least 95% of full-time employees or be subject to a penalty. |
| **Medical Plan(s) meet Minimum Value?*** | Yes | If the plan is not of a minimum value, then an employee will be eligible to seek premium assistance from the Marketplace (Exchange). If the employee receives premium assistance through the Marketplace, the employer will be subject to a penalty. The SBC is required to reflect whether the plan is of a minimum value. |
| **Affordable Coverage?*** | Subject to Employer Determination | If the cost of health coverage for the employee is unaffordable, then an employee will be eligible to seek premium assistance to purchase a plan from the Marketplace. If the employee receives premium assistance to purchase health coverage, then the employer would be subject to a penalty. |

*ACA requires employers covered by the Fair Labor Standards Act to notify employees about the availability of health insurance options for the public marketplaces/exchanges.  The Marketplace Notice you provide to new employees may need to be updated if the minimum value and/or affordable coverage status of your plan changes.

*NOTE: The answers outlined here are based on the recommendations of this proposal.  If these options are not chosen, are modified or final contributions differ, you may be subject to fees and penalties.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 25

Cedar Park 000106

Crisalli Decl., p.0250

# Proposal Assumptions

**General Assumptions**

- Carriers reserve the right to revise rates should any federal, state or local authority mandate a change in benefits or impose or change a tax on plan revenue during the contract period.
- A group health plan may not reduce its coverage of the costs of pediatric vaccines (as defined under section 1928(h)(6) of the Social Security Act as amended by section 13830 of the Omnibus Budget Reconciliation Act of 1993) below the coverage it provided as of May 1, 1993. If the preventive care benefit which includes immunizations is currently in or is added to your medical plan it cannot in the future be deleted.
- Generally all lines of coverage within a carrier must be packaged and have common eligibility.
- Retirees are not eligible for coverage unless they qualify for a COBRA extension.
- Final rates will be based on actual enrollment, participation, employer contribution and other underwriting guidelines.
- Effective date of September 1, 2019. Unless otherwise indicated, rates will be guaranteed for 12 months.
- For plan years ending on or after October 1, 2017, group health plans will be assessed a $2.39 per life per year Patient-Centered Outcomes Research Institute Fee (PCORI).
  For plan years ending on or after 10/1/18 but before 10/1/19, the fee will be $2.45 per life per year. Fees will be based on the average number of lives covered under the plan during that year. The fee will be paid by the insurer for insured plans and by the plan sponsor for self-insured health plans. For any renewal effective on or after 10/2/18 PCORI does not apply (unless there is a short plan year). If plan year ends on 9/30/19, PCORI does apply.
- **Employer Contribution:** Please refer to contribution page.
- **Eligible Employees:** Employees must work 30 hours per week to be eligible.
- **Probationary Period:** First of month following date of hire.

**Kaiser Permanente**

- Rates are guaranteed for 12 months until September 1, 2020.
- The employer must contribute at least 50% of the employee-only monthly premium, and the contributions may not be made in a discriminatory manner.
- The proposed rates and benefits assume that 75% of all eligible employees are enrolled in a company-sponsored plan, excluding those who have documented other qualified coverage.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 26

Cedar Park 000107

# Proposal Assumptions

## Cigna

- Rates are guaranteed for 12 months until September 1, 2020.
- The proposed rates and benefits assume that enrollment in the Cigna HealthCare administered plan is at least 50% of the total eligible population identified as 183.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

**Level Funded Arrangement**

- Current Specific Stop Loss Deductible is $50,000.
- Aggregate Corridor is 120%.
- Includes Rx claims for the Individual Stop Loss (ISL) coverage.
- Includes Rx claims for the Aggregate Stop Loss (ASL) coverage.
- Stop Loss contract covers claims incurred since policy inception and are paid during the current policy year. The paid period will be extended in the year of termination to include the 15 months immediately following.
- **Stop Loss Rates:**

| OAP Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $159.67 | $15.40 |
| Emp + Spouse | $352.71 | $34.00 |
| Emp + Child(ren) | $297.78 | $28.71 |
| Emp + Family | $490.98 | $47.34 |

| OAP (IN) Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $145.59 | $15.92 |
| Emp + Spouse | $321.61 | $35.16 |
| Emp + Child(ren) | $271.53 | $29.69 |
| Emp + Family | $447.69 | $48.95 |

## HMA

- Rates are guaranteed for 12 months until September 1, 2020.
- HMA requires that their clients partners  with one our their Preferred Stop Loss Partners. These include SunLife, Symetra, HM, HCC Tokio Marine, Optum Health, QBE, Physicians, Voya, Munich Re, SwissRe, ISU, Commencement Bay Risk Management and Reliance Standard.
- As stated in "General Assumptions."

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 27

Cedar Park 000108

# Proposal Assumptions

**Symetra**
- Rates are guaranteed for 12 months until September 1, 2020.
- Plan sponsor's Plan Document or Plan Document Amendment is due no later than 90 days after the proposed effective/renewal date of Excess Loss Insurance coverage.
- Please provide details on any individual who has been hospital confined for 30 days or more in the most recent 12 months or is currently on an organ transplant list.
- Any unfunded or pended claims balance must be disclosed, otherwise such claims will not be considered eligible under the Excess Loss Policy.
- This proposal is based upon the following network(s): Blues ASO
- Network Fees are ineligible expenses.
- Retirees are excluded from coverage under the Stop Loss Policy.
- Completed Symetra Disclosure Statement including: diagnosis, treatment received, current status, expected treatment and amount paid during the experience period as of the effective date of cover
- Terms are subject to change if final enrollment varies by more than 10% from proposal assumptions. Current census must be received at least 14 days prior to the effective date.
- Updated Large Claims data as well as Monthly Paid Claims and Enrollments as of 90 days prior to the effective date

**Delta Dental of WA**
- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**Lincoln Financial**
- Rates are guaranteed for 12 more months until September 1, 2020.
- All employees must be actively at work on their effective date in order to be covered.
- As stated in "General Assumptions."
- Your Plan is potentially discriminatory if it provides a better life insurance benefit to key employees; either on the basis of eligibility, difference in flat amount of
  benefit, or difference in multiplier. There are nondiscrimination tests that should be reviewed.  If your Plan is discriminatory,
  you would have to tax your key employees on the value of the total amount of employer-paid life insurance.

**NMR**
- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**GBS Administrators**
- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park 000109

# Proposal Assumptions

**Gallagher vChoice (Voluntary Vision - Underwritten by VSP)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Life - Underwritten by Unum)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary AD&D - Underwritten by Standard)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Pet Insurance - Underwritten by PetsBest)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 29

Cedar Park 000110

Crisalli Decl., p.0254

# Gallagher Benefit Services Disclaimers

**Coverage**

This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company.  It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language.  See the policies and contracts for actual language.  This proposal (analyses, report, etc.) is not a contract and offers no contractual obligation on behalf of GBS.

**Renewal/Financial**

This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.

**Legal**

The intent of this analysis [report, letter, etc.] is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment.  It should not be construed as, nor is it intended to provide, legal advice.  Laws may be complex and subject to change.  This information is based on current interpretation of the law and is not guaranteed.  Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures**
**and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 30

Cedar Park 000111

# Gallagher Benefit Services Privacy Policy Disclosure

6/10/2019

Cedar Park Assembly of God
Steve Orcutt
16300 112 Ave NE
Bothell, WA - 98011

RE: Privacy Policy Disclosure

Dear Steve Orcutt,

Gallagher Benefit Services, Inc. (Gallagher) treats your personal privacy with care and respect. Because we value our client relationships, we do not disclose our clients' nonpublic personal, financial or health information with third parties, except for the specific purposes listed in the enclosed Privacy Policy Summary or as otherwise permitted by law.  Personal information is any information that can be used to identify, locate or contact you or your employees.   Personal information does not include publicly available information or individually identifiable business contact information of employees such as name, title, business address, business telephone number or business email address.

Applicable law requires Gallagher to provide our clients with notice of our Privacy Policy, a summary of which is enclosed here (the full text of the Gallagher Privacy Policy can be retrieved at the following URL: http://www.ajg.com/privacy-policy/).  This policy does not apply to our efforts to market our products and services to you, so you may receive information from us regarding products that may suit your needs.

Gallagher has always been mindful of our clients' privacy.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Thank you for choosing Gallagher Benefit Services, Inc. We appreciate your business and value our relationship.

Enclosure: Privacy Policy Summary

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 31

Cedar Park 000112

# Gallagher Benefit Services Privacy Policy Disclosure

This Privacy Policy Disclosure outlines and summarizes our information sharing practices to help you understand how we protect your privacy and that of your employees when we collect and use information about you and your employees, and the measures we take to safeguard that information.

**Information We May Collect.** We may collect the following nonpublic personal, financial or health information about you or your employees including:

- Information we receive from you and your employees on applications or-questionnaires, such as occupation, current employer and social security number;
- Information about your transactions with us, our affiliates or previous insurers; such as your policy coverage, claim information, premiums and payment history;
- Information we receive from consumer-reporting agencies such as Equifax-that is obtained for the purpose of ascertaining credit histories. These reports are obtained as underwriting tools to determine bill paying habits and credit worthiness for certain individual, personal insurance products. These reports are not subject to race, gender or income.
- Information that allows us to communicate with you or your employees, such as name, user name, password, age, marital status, occupation, mailing address, telephone numbers, email address, or other addresses that allow us to send a message;
- Information that assists us to conduct business with you or your employees, such as types of products or services that may be of interest, employee financial information, or information on your company's size, revenue, type, industry codes, demographics, locations, and financial information;
- Information about your transactions with us, our affiliates, or your previous providers;

**Information We Disclose.** We do not disclose any nonpublic personal, financial or health information about our clients, former clients or their employees to anyone, except for the purposes of placing your insurance coverage(s), fulfilling your requests for products or services and related activities, responding to your requests for a call or email, processing transactions you request, telling you about products or services we offer and as otherwise permitted by law.

**Information Security.** We restrict access to nonpublic personal, financial or health information about you and your employees to those employees and subcontractors who have a need to know that information to provide products or services to you or your employees. We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 32

Cedar Park 000113

Crisalli Decl., p.0257

# Exhibit L



Insurance | Risk Management | Consulting

 
 

# 2020/2021 Employee Benefit Analysis and Recommendations

Proposed Effective Date: September 1, 2020
Jami Hansen, Area-Vice President/Client Consultant
*Melinda Hansen, Client Manager*
*James Stanek, Benefit Analyst*
Date Presented: July 9, 2020

**IMPORTANT:** This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc. This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts. See your policy or contact us for specific information or further details in this regard.



Cedar Park 000439

# Medical
## Cost Outline
### PPO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Renewal<br>Kaiser Permanente | Negotiated*<br>Kaiser Permanente | Alternative<br>Cigna (Level-Funded)<br>Single Plan Option (PPO) |
|---|---|---|---|---|---|
| Employee Only | 49 | $431.99 | $498.22 | $470.87 | $466.86 |
| Employee + Spouse | 6 | $954.44 | $1,100.76 | $1,040.34 | $1,027.10 |
| Employee + Child(ren) | 9 | $805.87 | $929.41 | $878.40 | $870.69 |
| Employee + Family | 9 | $1,328.31 | $1,531.95 | $1,447.86 | $1,435.60 |
| **PPO Plan Annual Cost** | **73** | **$553,221** | **$638,035** | **$603,011** | **$597,544** |
| % Change | | | 15.3% | 9.0% | 8.0% |
| $ Change | | | $84,814 | $49,790 | $44,323 |

### HMO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Renewal<br>Kaiser Permanente | Negotiated*<br>Kaiser Permanente | Alternative<br>Cigna (Level-Funded)<br>Single Plan Option (PPO) |
|---|---|---|---|---|---|
| Employee Only | 42 | $371.70 | $425.00 | $405.15 | $466.86 |
| Employee + Spouse | 3 | $821.22 | $938.99 | $895.13 | $1,027.10 |
| Employee + Child(ren) | 5 | $693.39 | $792.83 | $755.80 | $870.69 |
| Employee + Family | 2 | $1,142.91 | $1,306.81 | $1,245.77 | $1,435.60 |
| **HMO Plan Annual Cost** | **52** | **$285,934** | **$326,937** | **$311,668** | **$358,969** |
| % Change | | | 14.3% | 9.0% | 25.5% |
| $ Change | | | $41,003 | $25,734 | $73,035 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Annual Cost** | **125** | **$839,155** | **$964,972** | **$914,679** | **$956,513** |
| % Change | | | 15.0% | 9.0% | 14.0% |
| $ Change | | | $125,817 | $75,524 | $117,358 |

| | Current | Renewal | Negotiated* | Alternative |
|---|---|---|---|---|
| **HSA Annual Contribution** | $79,500 | $79,500 | $79,500 | $79,500 |
| **HRA Annual Contribution** | $98,956 | $104,912 | $104,912 | $104,912 |
| **Combined Medical/HSA/HRA Annual Cost** | **$1,017,611** | **$1,149,384** | **$1,099,092** | **$1,140,925** |
| % Change | | 12.9% | 8.0% | 12.1% |
| $ Change | | $131,773 | $81,481 | $123,315 |

ⓘ **Remember**

- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.
- Kaiser negotiated rates shown are estimated at 9% above renewal. Actual rates have not yet been released
- HSA funding assumes $500 per individual and $1,000 per family.
- Cigna Level Funded Arrangement offers 50% surplus share.
- Cigna has agreed to pay for Single Billing Services.
- Cigna quote excludes coverage for elective abortions and Aborta Facet Drugs (for both Level-Funded and Fully-Insured plans).
- Cigna is also offering a one-time Transitional Relief Credit, worth 2% overall, or approximately $19,100 – applied upfront, towards fixed costs on their Level Funding quote.
- Cigna Fully-Insured rates would be 1% under the Level-Funded rates illustrated.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 2
Cedar Park 000440

# Level-Funded Medical

## *Cost Outline*



|  |  | Proposed Cigna |
|---|---|---|
| ***Monthly Rates*** |  |  |
| Employee Only | 91 | $466.86 |
| Employee + Spouse | 9 | $1,027.10 |
| Employee + Child(ren) | 14 | $870.69 |
| Employee + Family | 11 | $1,435.60 |
| **Annual Cost** | **125** | **$956,513** |
| *% Change* |  |  |
| *$ Change* |  |  |

## *Level Funding*

|  | Proposed Cigna |
|---|---|
| ***Administration Fees (Includes Commissions)*** |  |
| Employee Only | $26.54 |
| Employee + Spouse | $58.40 |
| Employee + Child(ren) | $49.50 |
| Employee + Family | $81.62 |
| ***Individual & Aggregate Stop Loss*** |  |
| Employee Only | $155.70 |
| Employee + Spouse | $342.54 |
| Employee + Child(ren) | $290.38 |
| Employee + Family | $478.77 |
| ***Claims Funding*** |  |
| Employee Only | $284.62 |
| Employee + Spouse | $626.16 |
| Employee + Child(ren) | $530.81 |
| Employee + Family | $875.21 |

ⓘ **Remember**

- $50,000 ISL, 120% Corridor
- 50/50 Surplus Split: 1/2 Retained by Cigna, 1/2 Returned to Employer.
- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 3

Cedar Park 000441

# HRA Administration

## *Cost Comparison and Utilization - Deductible Only HRA*

| Administration Costs | | Current NMR | Renewal NMR |
|---|---|---|---|
| Submission Fee (Per Employee) | 27 | $40.00 | $40.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $225.00 |
| **Total Annual Administration Cost** | | **$1,305** | **$1,305** |

| Reimbursement Limits | | Current/Renewal NMR |
|---|---|---|
| **PPO Plan Deductible** | | $4,500/$9,000 |
| Employee | 49 | $3,150 |
| Employee & Family | 24 | $6,300 |
| **HMO Plan Deductible** | | $4,500/$9,000 |
| Employee | 42 | $3,150 |
| Employee & Family | 10 | $6,300 |
| **Annual Maximum Liability** | | **$500,850** |

| HRA Utilization Costs and Projections | 2019 Reimbursements | Year to Date 1/1/2020 - 5/31/2020 | Current Completion Projection | Renewal Projection |
|---|---|---|---|---|
| **Combined Plan Utilization** | $92,036 | $23,032 | $97,651 | $103,607 |
| **% of Max Utilization** | **18.4%** | **4.6%** | **19.5%** | **20.7%** |

| Total Costs Projection | Current Projected | Renewal Projected |
|---|---|---|
| **Administration Cost** | $1,305 | $1,305 |
| **Projected Utilization** | $97,651 | $103,607 |
| **Total HRA Annual Cost Projection** | **$98,956** | **$104,912** |

 **Remember**

- HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.
- HRA Projection Trend: 6.1%

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 4

Cedar Park 000442

# HRA Administration

*Benefit Outline - Deductible Only HRA*

| | Current/Renewal |
|---|---|
| | NMR |
| **PPO Plan** | |
| **Member Responsibility Before HRA** | |
| Employee | $1,350 |
| Employee & Family | $2,700 |
| **HRA Reimbursement Toward Deductible** | |
| Employee | $3,150 |
| Employee & Family | $6,300 |
| **Total Deductible** | |
| Employee | $4,500 |
| Employee & Family | $9,000 |

| | Current/Renewal |
|---|---|
| | NMR |
| **HMO Plan** | |
| **Member Responsibility Before HRA** | |
| Employee | $1,350 |
| Employee & Family | $2,700 |
| **HRA Reimbursement Toward Deductible** | |
| Employee | $3,150 |
| Employee & Family | $6,300 |
| **Total Deductible** | |
| Employee | $4,500 |
| Employee & Family | $9,000 |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 5

Cedar Park 000443

Crisalli Decl., p.0263

# Medical
## *Benefit Outline*



| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente<br>*In-Network Only* | Current/Renewal<br>Kaiser Permanente<br>*In-Network* | *Out-of-Network* | Alternative<br>Cigna<br>*In-Network* | *Out-of-Network* |
|---|---|---|---|---|---|
| *Medical Plan* | *Core HMO* | *Access PPO* | | *Cigna OAP* | |
| **Annual Deductible**<br>(Individual/Family) | $4,500/$9,000 | $4,500/$9,000 | | $4,500/$9,000 | |
| **Coinsurance** | 10% | 10% (5%*) | 30% | 10% | 30% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,650/$13,300 | $6,550/$13,100 | | $6,550/$13,100 | |
| **Preventive Care** | Covered in full | Covered in full | 30% after deductible | Covered in full | Not covered |
| **Outpatient Services** | | | | | |
| • Office Visit | 10% after deductible | 10%* after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Surgery | 10% after deductible | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Rehabilitation | 10% after deductible<br>Up to 60 visits PCY | 10% after deductible<br>Up to 60 visits PCY | 30% after deductible | 10% after deductible<br>Up to 60 visits PCY | 30% after deductible |
| **Other Services** | | | | | |
| • Chiropractic Care | 10% after deductible<br>Up to 10 visits PCY | 10% after deductible<br>Up to 8 visits PCY | 30% after deductible | 10% after deductible<br>Up to 12 visits PCY | 30% after deductible |
| • Acupuncture | 10% after deductible<br>Up to 12 visits PCY | 10% after deductible<br>Up to 12 visits PCY | 30% after deductible | 10% after deductible<br>Up to 12 visits PCY | 30% after deductible |
| **Urgent Care** | 10% after deductible | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| **Emergency Room** | 10% after deductible | 10% after deductible | | 10% after deductible | |
| **Inpatient Hospitalization** | 10% after deductible | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| *Prescription Drug Plan* | *At Preferred Pharmacies* | *At Preferred Pharmacies* | | *At Preferred Pharmacies* | |
| **Retail Pharmacy** (30-day supply) | *Medical Deductible Applies* | *Medical Deductible Applies* | | *Medical Deductible Applies* | |
| • Preferred Generic | $20 after deductible | $10 ($10*) after deductible | | 10% after deductible | |
| • Preferred Brand | $40 after deductible | $35 ($30*) after deductible | | 10% after deductible | |
| • Non-Preferred Generic and Brand | $60 after deductible | $70 ($65*) after deductible | | 10% after deductible | |
| **Mail Order** (90-day supply) | 3 X retail copay | 3 X enhanced* retail cost share | | 10% after deductible | |
| **Part D Creditable/Non-Creditable** | Creditable | Creditable | | Creditable | |
| **Formulary** | KPWA Formulary | KPWA Formulary | | Cigna Advantage Prescription Drug List | |

ⓘ **Remember**

• For plan years beginning in 2020, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible
  or out-of-pocket maximum is over $8,150.

• For plan years beginning in 2020, non-grandfathered QHDHP health plans must have a minimum individual deductible of $1,400 for an aggregate deductible and $2,800 for an embedded deductible.

• **\*Kaiser PPO**: Enhanced cost share applies when members utilize a Kaiser facility or pharmacy.

• Cigna benefits in red reflect changes from Kaiser PPO plan.

• Cigna benefits exclude coverage for elective abortions and Aborta Facet Drugs

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 6

Cedar Park 000444

# Dental
## *Benefit & Cost Outline*

| | Current/Renewal/Alternative | | |
|---|---|---|---|
| | Delta Dental of WA | | |
| | *In-Network* | | *Out-of-Network* |
| *Dental Plan* | | | *MAC* |
| **Annual Deductible** | $0 per person | | $50 per person |
| (waived for Preventive & Diagnostic) | $0 per family | | $150 per family |
| **Annual Benefit Maximum** | $1,500 per person | | |
| **Waiting Period** | 12 months for Major services | | |
| **Services** | | | |
| • Preventive & Diagnostic | No charge | | No charge |
| • Basic | 20% | | 20% after deductible |
| • Major | 50% | | 50% after deductible |
| **Periodontics** | Covered under Basic | | |
| **Endodontics** | Covered under Basic | | |
| **Implants** | Covered under Major | | |
| **Orthodontia** | Not covered | | |
| **Late Entrant Penalty** | None | | |
| *Monthly Rates* | *Current* | *Renewal* | *Posterior Composites* |
| Employee Only | 98 | $48.95 | $48.95 | $50.82 |
| Employee + Spouse | 17 | $95.79 | $95.79 | $99.46 |
| Employee + Child(ren) | 12 | $105.56 | $105.56 | $109.60 |
| Employee + Family | 16 | $152.41 | $152.41 | $158.25 |
| **Rate Guarantee** | | 12 months | 12 months |
| **Total Annual Cost** | 143 | **$121,570** | **$121,570** | **$126,221** |
| *% Change* | | *0.0%* | *3.8%* |
| *$ Change* | | *$0* | *$4,651* |

 **Remember**

• Actual claims paid are subject to maximum allowable charge, frequencies, age limitations, and terms and conditions of the contract.
• Alternative plan design is the same as current but with the addition of posterior composites covered.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 7

Cedar Park 000445

# Contribution Outline

| | | Current | | | Negotiated Renewal | | | | Alternative | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total Cost | ER Cost | EE Cost* | Total Cost | ER Cost | EE Cost* | | Total Cost | ER Cost | EE Cost* |
| **PPO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | | Cigna Level-Funded (Single Plan Option) | | |
| Employee | 49 | $431.99 | $304.99 | $127.00 | $470.87 | $332.44 | $138.43 | 91 | $466.86 | $329.61 | $137.25 |
| Employee + Spouse | 6 | $954.44 | $327.44 | $627.00 | $1,040.34 | $356.91 | $683.43 | 9 | $1,027.10 | $352.37 | $674.73 |
| Employee + Child(ren) | 9 | $805.87 | $323.87 | $482.00 | $878.40 | $353.02 | $525.38 | 14 | $870.69 | $349.92 | $520.77 |
| Employee + Family | 9 | $1,328.31 | $336.31 | $992.00 | $1,447.86 | $366.58 | $1,081.28 | 11 | $1,435.60 | $363.47 | $1,072.13 |
| **HMO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | | | | |
| Employee | 42 | $371.70 | $289.70 | $82.00 | $405.15 | $315.77 | $89.38 | | | | |
| Employee + Spouse | 3 | $821.22 | $281.22 | $540.00 | $895.13 | $306.53 | $588.60 | | | | |
| Employee + Child(ren) | 5 | $693.39 | $278.39 | $415.00 | $755.80 | $303.45 | $452.35 | | | | |
| Employee + Family | 2 | $1,142.91 | $289.91 | $853.00 | $1,245.77 | $316.00 | $929.77 | | | | |
| **Medical Annual Cost** | | $839,155 | $454,003 | $385,152 | $914,679 | $494,863 | $419,816 | | $956,513 | $504,755 | $451,758 |
| **Additional Employer Contributions** | | | | | | | | | | | |
| Annual HSA Contribution | | $79,500 | $79,500 | $0 | $79,500 | $79,500 | $0 | | $79,500 | $79,500 | $0 |
| Annual HRA Contribution | | $98,956 | $98,956 | $0 | $104,912 | $104,912 | $0 | | $104,912 | $104,912 | $0 |
| **Medical Total Annual Cost** | | $1,017,611 | $632,459 | $385,152 | $1,099,092 | $679,276 | $419,816 | | $1,140,925 | $689,167 | $451,758 |
| **Dental Plan** | | | | | | | | | | | |
| Employee | 98 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | 98 | $48.95 | $28.95 | $20.00 |
| Employee + Spouse | 17 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | 17 | $95.79 | $35.79 | $60.00 |
| Employee + Child(ren) | 12 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | 12 | $105.56 | $45.56 | $60.00 |
| Employee + Family | 16 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | 16 | $152.41 | $52.41 | $100.00 |
| **Dental Total Annual Cost** | | $121,570 | $57,970 | $63,600 | $121,570 | $57,970 | $63,600 | | $121,570 | $57,970 | $63,600 |
| **Total Annual Cost** | | $1,139,181 | $690,429 | $448,752 | $1,220,661 | $737,245 | $483,416 | | $1,262,495 | $747,137 | $515,358 |
| *% Change* | | | | | *7.2%* | *6.8%* | *7.7%* | | *10.8%* | *8.2%* | *14.8%* |
| *$ Change* | | | | | *$81,481* | *$46,817* | *$34,664* | | *$123,315* | *$56,708* | *$66,606* |

Negotiated Renewal Rates are estimated at +9% above current rates. Actual rates are still pending.

\* Under the Affordable Care Act (ACA), coverage is affordable for an employee if the employee's contribution toward the lowest-cost, self-only, minimum value coverage does not exceed a specified percentage of the employee's household income (9.86% for plan years beginning in 2019; and 9.78% for plan years beginning in 2020). There are three safe harbors including the Federal Poverty Line (FPL) safe harbor. To meet the FPL safe harbor for affordability for plan years beginning July 1, 2020 through December 31, 2020, employers must use the 2020 Federal Poverty Line (FPL) multiplied by the 2020 affordability safe harbor rate of 9.78% in order to get the maximum annual affordable contribution. Using that calculation, the maximum affordable contribution for a month is equal to $103.99 per month for the 48 contiguous states, $129.99 for Alaska and $119.64 for Hawaii.

Note: the affordability percentage rate, and therefore the dollar amount, may change annually. Employers may use the poverty guidelines in effect within six months before the beginning of the plan year. There are two additional safe harbor options that may be used: the Form W-2 Safe Harbor or the Rate of Pay Safe Harbor. Guidance also addresses how HRA contributions, wellness program rewards, employer flex credits, defined contribution arrangements, opt-out payments, and fringe benefit payments required under the Davis-Bacon and the Service Contract Act affect the affordability of employer coverage. See our ACA Affordability Safe Harbors Chart for details.

Prepared by:

Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 8
Cedar Park 000446

# Voluntary Vision
## *Benefit & Cost Outline*



| | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Base Plan | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Buy-Up Plan | |
|---|---|---|---|---|---|
| *Employee Share of Eligible Expenses* | | *In-Network* | *Out-of-Network* | *In-Network* | *Out-of-Network* |
| **Vision Plan** | | *Signature Plan* | | *Signature Plan* | |
| **Routine Exam Copay** | | $10 | $10 | $10 | $10 |
| **Routine Exam** | | Covered in full* | Reimbursed up to $50* | Covered in full* | Reimbursed up to $50* |
| **Materials Copay** | | $25 | $25 | $25 | $25 |
| **Lenses** (per pair) | | | Reimbursed up to… | | Reimbursed up to… |
| • Single Vision | | No charge* | $50* | No charge* | $50* |
| • Lined Bifocals | | No charge* | $75* | No charge* | $75* |
| • Lined Trifocals | | No charge* | $100* | No charge* | $100* |
| **Frames** | | $130 allowance then 20% discount* | Reimbursed up to $70* | $130 allowance then 20% discount* | Reimbursed up to $70* |
| **Contact Lenses** (in lieu of eyeglasses) | | | | | |
| • Fitting and Evaluation | | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials |
| • Elective Contacts | | $130 allowance | | $130 allowance | |
| **Frequency** (Exam/Lenses/Frames/Contacts) | | 12/12/24/12 Months | | 12/12/12/12 Months | |

| *Monthly Rates* | Base | Buy-Up | *Current* | *Renewal* | *Current* | *Renewal* |
|---|---|---|---|---|---|---|
| Employee Only | 36 | 9 | $7.86 | $7.86 | $9.81 | $9.81 |
| Employee + Spouse | 4 | 9 | $12.58 | $12.58 | $15.70 | $15.70 |
| Employee + Child(ren) | 3 | 3 | $12.84 | $12.84 | $16.02 | $16.02 |
| Employee + Family | 6 | 3 | $20.71 | $20.71 | $25.83 | $25.83 |
| **Rate Guarantee** | | | | 12 months | | 12 months |
| **Total Annual Cost** | **49** | **24** | **$5,953** | **$5,953** | **$4,262** | **$4,262** |
| *% Change* | | | | *0.0%* | | *0.0%* |
| *$ Change* | | | | *$0* | | *$0* |

*Less any applicable copay.

ⓘ **Remember**

• Out-of-Network benefits reflect the maximum reimbursement for specific services.

• Members may receive additional discount off of non-covered lens options when services are received from a VSP network provider.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 9

Cedar Park 000447

# Life/AD&D
## *Benefit & Cost Outline*



| | Current/Renewal<br>Lincoln Financial Group | | |
|---|---|---|---|
| **Life and AD&D Plan** | | | |
| **Benefit Amount** | $10,000 | | |
| **Guarantee Issue** | $10,000 | | |
| **Additional Features** | | | |
| • Accelerated Benefit | Up to 75% | | |
| • Conversion | Included | | |
| • Portability | Included | | |
| • Waiver of Premium | Included | | |
| **Benefit begins to reduce at age** | 65 | | |
| **Monthly Rates** | *Volume* | *Current* | *Renewal* |
| **Life** (per $1,000 of benefit) | $1,796,500 | $0.160 | $0.190 |
| **AD&D** (per $1,000 of benefit) | $1,796,500 | $0.020 | $0.020 |
| **Rate Guarantee** | | | 12 months |
| **Total Annual Cost** | Lives: 189 | **$3,880** | **$4,527** |
| *% Change* | | | *16.7%* |
| *$ Change* | | | *$647* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 10

Cedar Park 000448

# Long-Term Disability
## *Benefit & Cost Outline*



| | Current/Renewal |
|---|---|
| | Lincoln Financial Group |
| **Long-Term Disability (LTD)** | |
| Elimination Period | 90 days |
| Covered Monthly Earnings | 60% |
| Benefit Maximum | $5,000 |
| Benefit Minimum | Greater of 10% or $100 |
| Definition of Earnings | Base monthly earnings |
| Definition of Disability | 24 months own occupation |
| Maximum Duration | SSNRA |
| Tax Free Benefit (Gross Up) | No |
| **Benefit Limitations** | |
| • Pre-Existing Condition | 3/12 |
| • Mental Health & Chemical Dependency | 24 months |
| • Self-Reported | 24 months |
| **Additional Features** | |
| • Conversion | Included |
| • W2 Prep | Included |
| • FICA Matching | Included |
| • Employee Assistance Program | Included with up to 4 face-to-face visits |

| *Monthly Rates* | *Volume* | | |
|---|---|---|---|
| **LTD** (per $100 of covered monthly payroll) | $693,529 | $0.180 | $0.217 |
| Rate Guarantee | | | 12 months |
| **Total Annual Cost** | Lives: 189 | **$14,980** | **$18,059** |
| *% Change* | | | *20.6%* |
| *$ Change* | | | *$3,079* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 11

Cedar Park 000449

# Voluntary Life
## *Benefit & Cost Outline*

| Voluntary Life Monthly Rates | Current/Renewal<br>vChoice (Underwritten by Unum) |
|---|---|
| **Employee and Spouse** (per $1,000) | |
| < 25 | $0.057 |
| 25 - 29 | $0.069 |
| 30 - 34 | $0.092 |
| 35 - 39 | $0.103 |
| 40 - 44 | $0.115 |
| 45 - 49 | $0.172 |
| 50 - 54 | $0.264 |
| 55 - 59 | $0.493 |
| 60 - 64 | $0.756 |
| 65 - 69 | $1.456 |
| 70 + | $2.361 |
| **Child(ren)** (per unit) - Birth to Age 26 | $2.50 |
| **Rate Guarantee** | 12 months |

| Voluntary Life Plan | Current/Renewal<br>vChoice (Underwritten by Unum) |
|---|---|
| **Benefit Options** | |
| • Employee | 1-5 x earning rounded to $10,000 |
| • Spouse | .5-2.5 x earnings rounded to $5,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 5 x earnings or $500,000 |
| • Spouse | 50% of employees amount or $250,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Guarantee Issue** | |
| • Employee | $210,000 |
| • Spouse | $105,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Accelerated Benefit | 75% to $500,000 |
| • Conversion | Included |
| • Portability | Included |
| • Waiver of Premium | Included |
| **Benefit begins to reduce at age** | 70 |
| **Participation Requirement** | 10 |



ⓘ Remember

• Current Enrollment: 34 Employees, 14 Spouses, and 7 Children.

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 12

Cedar Park 000450

# Voluntary AD&D
## *Benefit & Cost Outline*

|  | Current/Renewal<br>vChoice (Underwritten by Standard) |
|---|---|
| **Voluntary AD&D Plan** | |
| **Benefit Options** | |
| • Employee | $100,000 increments |
| • Spouse | 50% of employee amount |
| • Children (newborn to 26 years) | $10,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 10 x earnings or $500,000 |
| • Spouse | 50% of employee amount or $250,000 |
| • Children (newborn to 26 years) | $10,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Portability | Included |
| • Waiver of Premium | Not included |
| **Participation Requirement** | 10 |
| **Voluntary AD&D Monthly Rates** | |
| **Employee** (per $1,000) | $0.047 |
| **Spouse** (per $1,000) | $0.047 |
| **Child(ren)** (per $1,000) | $0.047 |
| **Rate Guarantee** | 12 months |

 **Remember**

• Current Enrollment: 38 Employees.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 13

Cedar Park 000451

# Administration Services

## *Cost Outline*

*Single Billing Services*

| | Current/Renewal<br>GBS Administrators |
|---|---|
| **Total Annual Fees** | **Your fee structure is 2% of the monthly medical premium** |
| **Benefit Advocate** | Included |

- SBS regeneration fee not paying as billed - $50
- Cigna will cover the cost of SBS if medical carriers move

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 14

Cedar Park 000452

Crisalli Decl., p.0272

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|----------|---------|---------------------|-----------|---------|---------|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $839,155 | $454,003 | $385,152 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $79,500 | $79,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $98,956 | $98,956 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $121,570 | $57,970 | $63,600 |
| Voluntary Vision | VSP | *Voluntary* | $10,214 | $0 | $10,214 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,880 | $3,880 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $14,980 | $14,980 | $0 |
| Single Billing Services | GBS Administrators | *2% of medical premium* | Included in Medical | | |
| **Total Annual Cost** | | | **$1,168,256** | **$709,289** | **$458,966** |

## Negotiated Renewal

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|----------|---------|---------------------|-----------|---------|---------|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $914,679 | $494,863 | $419,816 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $79,500 | $79,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $104,912 | $104,912 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $121,570 | $57,970 | $63,600 |
| Voluntary Vision | VSP | *Voluntary* | $10,214 | $0 | $10,214 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $4,527 | $4,527 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $18,059 | $18,059 | $0 |
| Single Billing Services | GBS Administrators | *2% of medical premium* | Included in Medical | | |
| **Total Annual Cost** | | | **$1,253,462** | **$759,832** | **$493,630** |
| *% Change* | | | *7.3%* | *7.1%* | *7.6%* |
| *$ Change* | | | *$85,207* | *$50,543* | *$34,664* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 15

Cedar Park 000453

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $839,155 | $454,003 | $385,152 |
| HSA Funding | | $500 per individual/$1,000 per family | $79,500 | $79,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $98,956 | $98,956 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $121,570 | $57,970 | $63,600 |
| Voluntary Vision | VSP | Voluntary | $10,214 | $0 | $10,214 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,880 | $3,880 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $14,980 | $14,980 | $0 |
| Single Billing Services | GBS Administrators | 2% of medical premium | | Included in Medical | |
| Total Annual Cost | | | $1,168,256 | $709,289 | $458,966 |

## Alternative

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Level-Funded) | Single Plan Option (PPO) | $956,513 | $504,755 | $451,758 |
| Transitional Releif Credit | Cigna (Level-Funded) | One-time 2% credit (approx. $19,100) | ($19,100) | ($19,100) | $0 |
| HSA Funding | | $500 per individual/$1,000 per family | $79,500 | $79,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $104,912 | $104,912 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $121,570 | $57,970 | $63,600 |
| Voluntary Vision | VSP | Voluntary | $10,214 | $0 | $10,214 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $4,527 | $4,527 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $18,059 | $18,059 | $0 |
| Single Billing Services | GBS Administrators | 2% of medical premium | | Paid for by Cigna | |
| Total Annual Cost | | | $1,276,196 | $750,623 | $525,573 |
| % Change | | | 9.2% | 5.8% | 14.5% |
| $ Change | | | $107,941 | $41,334 | $66,606 |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 16

Cedar Park 000454

# Carriers Invited To Bid

| Self-Insured Plan Administration (TPA) | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Cigna (Level-Funded) | Shown in Proposal | $29.57 PEPM | Not Applicable |
| Providence | Not shown - Uncompetitive (+40% to current fully-insured funding) | N/A | Not Applicable |

| Stop Loss | AM Best Rating | Response | RFI Available | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|---|
| Cigna (Level-Funded) | A | Shown in Proposal | Yes | Net of Commission | $0.00 to $28.00 PEPY |

| Fully-Insured Medical Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Kaiser Permanente WA | Current Carrier - Shown in Proposal | 5.3% | Not Applicable |
| Regence BlueShield | Not Shown - DTQ - Uncompetitive | N/A | Not Applicable |
| Premera Blue Cross | Not Shown - DTQ - Uncompetitive and not able to remove the benefits for abortions and aborta Facet Drugs | N/A | Not Applicable |
| UnitedHealthcare | Not Shown - Uncompetitive | N/A | Not Applicable |
| Aetna | Not Shown - DTQ - Uncompetitive | N/A | Not Applicable |

| Gallagher vChoice Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Vision - Vision Service Plan | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Fully-Insured Dental Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Delta Dental of Washington | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Miscellaneous Benefit Lines | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HRA Administration - NMR | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |
| Benefit Advocate Center - GBS | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |
| Single Billing Services - GBSA | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 17

Cedar Park 000455

# Carriers Invited To Bid

| Life/AD&D and Disability Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Lincoln Financial Group | A+ | Current Carrier - Shown in Proposal | Life: 20% LTD: 10% | 1.5% of Premium |

| Gallagher vChoice Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Life - Unum | A | Current Carrier - Shown in Proposal | 20.0% | 1.25% of Premium |
| AD&D - Standard | A | Current Carrier - Shown in Proposal | 25.0% | 1.5% to 2.25% of Premium |
| Pet Insurance - PetsBest | N/A | Current Carrier - Not shown | 7.5% | $0.00 to $32.40 PMPY |
| Additional Administrative Fee | N/A | Current Carrier - Shown in Proposal | $1.00 PPPM | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

While GBS does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier or HMO.  There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com).  Generally, agencies that provide ratings of U.S. Health Insurers, including traditional insurance companies and other managed care (e.g., HMO) organizations, reflects their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.

## A.M. Best's Rating Scale

| Level | Category | Level | Category | Level | Category |
|---|---|---|---|---|---|
| A++, A+ | Superior | B, B- | Fair | D | Poor |
| A, A- | Excellent | C++, C+ | Marginal | E | Under Regulatory Supervision |
| B++, B+ | Very Good | C, C- | Weak | F | In Liquidation |
| | | | | S | Rating Suspended |

### Financial Size Categories

| | | | |
|---|---|---|---|
| FSC I | Up to $1,000 | FSC IX | $250,000 to $500,000 |
| FSC II | $1,000 to $2,000 | FSC X | $500,000 to $750,000 |
| FSC III | $2,000 to $5,000 | FSC XI | $750,000 to $1,000,000 |
| FSC IV | $5,000 to $10,000 | FSC XII | $1,000,000 to $1,250,000 |
| FSC V | $10,000 to $25,000 | FSC XIII | $1,250,000 to $1,500,000 |
| FSC VI | $25,000 to $50,000 | FSC XIV | $1,500,000 to $2,000,000 |
| FSC VII | $50,000 to $100,000 | FSC XV | $2,000,000 Or More |
| FSC VIII | $100,000 to $250,000 | (In $000 of Reported Policyholders' Surplus Plus Conditional Reserve Funds) | |

Best's Insurance Reports, published annually by A.M. Best Company, Inc., presents comprehensive reports on the financial position, history and transactions of insurance companies operating in the United States and Canada.  Companies licensed to do business in the United States are assigned a Best's Rating which attempts to measure the comparative position of the company or association against industry averages.

Prepared by:

Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 18

Cedar Park 000456

Crisalli Decl., p.0276

# Non-Grandfathered Status

You had a health policy in effect prior to March 23, 2010, and because you have made significant enough plan changes to have lost your grandfathered status, you must comply with the additional requirements under the Affordable Health Care Act (ACA).

**Examples of plan changes that could have caused you to lose grandfathered status include, but may not be limited to:**

- Significantly cut or reduce benefits; or
- Add or reduce annual dollar limits; or
- Raise coinsurance percentages; or
- Increase deductibles or out-of-pocket maximums by more than the amounts allowed based on medical inflation*; or
- Increase employee contribution percentage by more than 5% of the contribution rate on March 23, 2010 (determined contribution rate based on COBRA valuation for self-insured plans).

*Medical inflation is the increase since March 2010 in the overall medical care component of the Consumer Price Index for All Urban Consumers (CPI-U) (unadjusted) published by the Department of Labor.

Your plan must comply with the provisions that apply to grandfathered plans in addition to the provisions that apply to non-grandfathered plans. The additional requirements that apply to non-grandfathered plans include, but are not limited to:

- Provide coverage to children to age 26 regardless of whether they are eligible for their own employment-based coverage; and
- Provide coverage of recommended preventive services with no cost sharing; and
- Include patient protections such as guaranteed access to emergency room services and OB-GYNs and pediatricians; and
- Include new claims appeal rules including both internal and external review; and
- Comply with nondiscrimination rules for fully insured health plans under Code §105(h) which prohibit discrimination in favor of highly compensated individuals as to benefits and eligibility requirements (pending release of final regulations).

**For plan years starting on or after January 1, 2014**, plans that have lost grandfathered status will also have to comply with the following:

- No discrimination against individuals participating in clinical trials (insured plans only); and
- No discrimination based on health status; and
- Provide essential benefits (insured plans only) and prohibit cost sharing in excess of the limits for qualified high deductible health plans; and
- No discrimination against healthcare providers acting within the scope of their professional license and applicable State law; and
- Prohibit out-of-pocket limits in excess of applicable out of pocket limits as determined by HHS for plan years starting on or after January 1, 2015.

*NOTE: This is only a brief summary of ACA guidance, intended to highlight points with the most universal impact. It is not intended to be a complete summary of requirements, changes, or regulations.  Further guidance and probable changes are expected to continue.*

Prepared by:
 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 19

Cedar Park 000457

Crisalli Decl., p.0277

# Employer Shared Responsibility Mandate/ACA Compliance

| | | |
|---|---|---|
| **Employer Shared Responsibility Mandate (ESRM)**<br>Applicable Large Employer | 50+ full-time equivalent employees | An employer that employed at least 50 full time equivalent employees (FTE) in the preceding calendar year is required to offer affordable, minimum value health coverage to substantially all FTEs and dependent children or pay a penalty. There are separate requirements for 6055 (minimum essential coverage) reporting and 6056 (applicable large employer reporting). Refer to GBS Sections 6055 & 6056 Reporting Requirements toolkit. |
| **Member of Controlled Group?** | Subject to Employer Determination | If the total of FTEs for all employers in the controlled group is at least 50, each separate company is and applicable large employer and is subject to the employer mandate. Penalties are then imposed based on the offer of coverage provided by each separate company. |
| **Medical Plan(s) meet Minimum Essential Coverage?** | Yes | A plan must meet the minimum essential coverage requirement for an applicable large employer to meet employer mandate requirement. The Summary of Benefits & Coverage is required to reflect if the plan is minimum essential coverage. |
| **Offering to 95% of full-time employees?** | Subject to Employer Determination | An applicable large employer is required to offer minimum essential coverage to at least 95% of full-time employees or be subject to a penalty. |
| **Medical Plan(s) meet Minimum Value?*** | Yes | If the plan is not of a minimum value, then an employee will be eligible to seek premium assistance from the Marketplace (Exchange). If the employee receives premium assistance through the Marketplace, the employer will be subject to a penalty. The SBC is required to reflect whether the plan is of a minimum value. |
| **Affordable Coverage?*** | Subject to Employer Determination | If the cost of health coverage for the employee is unaffordable, then an employee will be eligible to seek premium assistance to purchase a plan from the Marketplace. If the employee receives premium assistance to purchase health coverage, then the employer would be subject to a penalty. |

*ACA requires employers covered by the Fair Labor Standards Act to notify employees about the availability of health insurance options for the public marketplaces/exchanges.  The Marketplace Notice you provide to new employees may need to be updated if the minimum value and/or affordable coverage status of your plan changes.

*NOTE: The answers outlined here are based on the recommendations of this proposal.  If these options are not chosen, are modified or final contributions differ, you may be subject to fees and penalties.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 20

Cedar Park 000458

Crisalli Decl., p.0278

# Proposal Assumptions

**General Assumptions**

- Carriers reserve the right to revise rates should any federal, state or local authority mandate a change in benefits or impose or change a tax on plan revenue during the contract period.
- A group health plan may not reduce its coverage of the costs of pediatric vaccines (as defined under section 1928(h)(6) of the Social Security Act as amended by section 13830 of the Omnibus Budget Reconciliation Act of 1993) below the coverage it provided as of May 1, 1993. If the preventive care benefit which includes immunizations is currently in or is added to your medical plan it cannot in the future be deleted.
- Generally all lines of coverage within a carrier must be packaged and have common eligibility.
- Retirees are not eligible for coverage unless they qualify for a COBRA extension.
- Final rates will be based on actual enrollment, participation, employer contribution and other underwriting guidelines.
- Effective date of September 1, 2020. Unless otherwise indicated, rates will be guaranteed for 12 months.
- The PCORI (Patient-Centered Outcomes Research Institute) Fee has been extended through September 30, 2029. The fee will be paid by the insurer for insured plans and by the plan sponsor for self-insured health plans. For plan years that end on or after October 1, 2019, and before October 1, 2020, the fee is $2.54 per covered life. For plan years that end on or after October 1, 2018, and before October 1, 2019, the fee is $2.45 per covered life.
- **Employer Contribution:** Please refer to contribution page.
- **Eligible Employees:** Employees must work 30 hours per week to be eligible.
- **Probationary Period:** First of month following date of hire.

**Kaiser Permanente**

- Rates are guaranteed for 12 months until September 1, 2021.
- The employer must contribute at least 50% of the employee-only monthly premium, and the contributions may not be made in a discriminatory manner.
- The proposed rates and benefits assume that 75% of all eligible employees are enrolled in a company-sponsored plan, excluding those who have documented other qualified coverage.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

**CIGNA (Level-Funded)**

- Rates are guaranteed for 12 months until September 1, 2021.
- Specific Stop Loss Deductible is $50,000. Rx claims are included toward the fulfillment of the Specific Stop Loss Deductible.
- Aggregate Corridor is 120%.
- The proposed rates and benefits assume that 50% of total eligible population identified as 196.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- As stated in "General Assumptions."

**Delta Dental of WA**

- Rates are guaranteed for 12 months until September 1, 2021.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 21

Cedar Park 000459

# Proposal Assumptions

**Lincoln Financial Group**

- Rates are guaranteed for 12 months until September 1, 2021.
- All employees must be actively at work on their effective date in order to be covered.
- As stated in "General Assumptions."
- Employers who pay for employees' group term life insurance must tax them on the cost of insurance for amounts exceeding $50,000.
  Internal Revenue Code Section 79 requires the taxable amount to be calculated using "uniform premium" rates commonly referred to as "Table I Rates".
- Your Plan is potentially discriminatory if it provides a better life insurance benefit to key employees; either on the basis of eligibility, difference in flat amount of
  benefit, or difference in multiplier. There are nondiscrimination tests that should be reviewed.  If your Plan is discriminatory,
  you would have to tax your key employees on the value of the total amount of employer-paid life insurance.

| Table I Rates: | |
| --- | --- |
| Under age 25 | $0.05 |
| Ages 25 - 29 | $0.06 |
| Ages 30 – 34 | $0.08 |
| Ages 35 – 39 | $0.09 |
| Ages 40 – 44 | $0.10 |
| Ages 45 – 49 | $0.15 |
| Ages 50 – 54 | $0.23 |
| Ages 55 – 59 | $0.43 |
| Ages 60 – 64 | $0.66 |
| Ages 65 – 69 | $1.27 |
| Ages 70 + | $2.06 |

**Northwest Marketing Resources (NMR)**

- Rates are guaranteed for 12 months until September 1, 2021.
- As stated in "General Assumptions."

**GBS Administrators**

- Rates are guaranteed for 12 months until September 1, 2021.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Vision - Underwritten by VSP)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Life - Underwritten by Unum)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary AD&D - Underwritten by Standard)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Pet Insurance - Underwritten by PetsBest)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 22

Cedar Park 000460

Crisalli Decl., p.0280

# Gallagher Benefit Services Disclaimers

**Coverage**

This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company.  It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language.  See the policies and contracts for actual language.  This proposal (analyses, report, etc.) is not a contract and offers no contractual obligation on behalf of GBS.

**Renewal/Financial**

This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.

**Legal**

The intent of this analysis [report, letter, etc.] is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment.  It should not be construed as, nor is it intended to provide, legal advice.  Laws may be complex and subject to change.  This information is based on current interpretation of the law and is not guaranteed.  Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 23

Cedar Park 000461

Crisalli Decl., p.0281

# Gallagher Benefit Services Privacy Policy Disclosure

7/9/2020

Cedar Park Assembly of God
Steve Orcutt
16300 112 Ave NE
Bothell, WA - 98011

RE: Privacy Policy Disclosure

Dear Steve,

Gallagher Benefit Services, Inc. (Gallagher) treats your personal privacy with care and respect. Because we value our client relationships, we do not disclose our clients' nonpublic personal, financial or health information with third parties, except for the specific purposes listed in the enclosed Privacy Policy Summary or as otherwise permitted by law.  Personal information is any information that can be used to identify, locate or contact you or your employees.  Personal information does not include publicly available information or individually identifiable business contact information of employees such as name, title, business address, business telephone number or business email address.

Applicable law requires Gallagher to provide our clients with notice of our Privacy Policy, a summary of which is enclosed here (the full text of the Gallagher Privacy Policy can be retrieved at the following URL: http://www.ajg.com/privacy-policy/).  This policy does not apply to our efforts to market our products and services to you, so you may receive information from us regarding products that may suit your needs.

Gallagher has always been mindful of our clients' privacy.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Thank you for choosing Gallagher Benefit Services, Inc. We appreciate your business and value our relationship.

Enclosure: Privacy Policy Summary

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 24

Cedar Park 000462

# Gallagher Benefit Services Privacy Policy Disclosure

This Privacy Policy Disclosure outlines and summarizes our information sharing practices to help you understand how we protect your privacy and that of your employees when we collect and use information about you and your employees, and the measures we take to safeguard that information.

**Information We May Collect.** We may collect the following nonpublic personal, financial or health information about you or your employees including:

- Information we receive from you and your employees on applications or questionnaires, such as occupation, current employer and social security number;
- Information about your transactions with us, our affiliates or previous insurers; such as your policy coverage, claim information, premiums and payment history;
- Information we receive from consumer-reporting agencies such as Equifax that is obtained for the purpose of ascertaining credit histories. These reports are obtained as underwriting tools to determine bill paying habits and credit worthiness for certain individual, personal insurance products. These reports are not subject to race, gender or income.
- Information that allows us to communicate with you or your employees, such as name, user name, password, age, marital status, occupation, mailing address, telephone numbers, email address, or other addresses that allow us to send a message;
- Information that assists us to conduct business with you or your employees, such as types of products or services that may be of interest, employee financial information, or information on your company's size, revenue, type, industry codes, demographics, locations, and financial information;
- Information about your transactions with us, our affiliates, or your previous providers;

**Information We Disclose.** We do not disclose any nonpublic personal, financial or health information about our clients, former clients or their employees to anyone, except for the purposes of placing your insurance coverage(s), fulfilling your requests for products or services and related activities, responding to your requests for a call or email, processing transactions you request, telling you about products or services we offer and as otherwise permitted by law.

**Information Security.** We restrict access to nonpublic personal, financial or health information about you and your employees to those employees and subcontractors who have a need to know that information to provide products or services to you or your employees. We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2020 - Page 25

Cedar Park 000463



## Cedar Park Assembly of God
### Fully-Insured Medical and Prescription Drug Plan
### Kaiser Permanente
### April 1, 2019 through March 31, 2020

*Rolling Twelve Months*

Legend: ■ In Network Paid Claims   ■ Out-of-Network Paid Claims   ◆ Estimated Net Premium

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| Month | Employees | Members | Earned Premium | Estimated Administrative Charges* | Estimated Net Premium (C - D) | In Network Paid Claims | Out-of-Network Paid Claims | Total Paid Claims (F + G) | Estimated Net Gain/(Loss) (E - H) | Estimated Net Loss Ratio (H / E) |
| April 2019 | 114 | 178 | $57,918 | $12,487 | $45,431 | $42,660 | $0 | $42,660 | $2,771 | 93.9% |
| May | 115 | 182 | $59,062 | $12,751 | $46,312 | $29,288 | $0 | $29,288 | $17,024 | 63.2% |
| June | 116 | 188 | $59,816 | $13,049 | $46,767 | $38,259 | $0 | $38,259 | $8,508 | 81.8% |
| July | 111 | 177 | $57,058 | $12,397 | $44,662 | $79,050 | $0 | $79,050 | ($34,389) | 177.0% |
| August | 111 | 177 | $57,592 | $12,457 | $45,134 | $116,409 | $0 | $116,409 | ($71,274) | 257.9% |
| September | 120 | 195 | $67,669 | $13,025 | $54,644 | $50,304 | $0 | $50,304 | $4,340 | 92.1% |
| October | 123 | 199 | $69,824 | $13,362 | $56,462 | $44,119 | $0 | $44,119 | $12,343 | 78.1% |
| November | 123 | 199 | $70,346 | $13,409 | $56,937 | $61,434 | $0 | $61,434 | ($4,496) | 107.9% |
| December | 123 | 199 | $70,311 | $13,406 | $56,905 | $86,409 | $0 | $86,409 | ($29,503) | 151.8% |
| January 2020 | 122 | 207 | $70,432 | $13,703 | $56,729 | $78,684 | $0 | $78,684 | ($21,954) | 138.7% |
| February | 124 | 210 | $70,947 | $13,859 | $57,087 | $102,842 | $0 | $102,842 | ($45,754) | 180.1% |
| March | 125 | 209 | $70,974 | $13,829 | $57,146 | $196,360 | $0 | $196,360 | ($139,214) | 343.6% |
| **Total Year to Date** | **1,427** | **2,320** | **$781,951** | **$157,733** | **$624,218** | **$925,816** | **$0** | **$925,816** | **($301,598)** | **148.3%** |
| *Less Estimated Pooled Claims:* | | | | | | ($215,149) | | ($215,149) | $215,149 | |
| **NET Year to Date** | **1,427** | **2,320** | **$781,951** | **$157,733** | **$624,218** | **$710,666** | **$0** | **$710,666** | **($86,449)** | **113.8%** |
| | | | | | *Percent of Total Paid Claims:* | 100.0% | 0.0% | | | |
| Current PEPM | 119 | 193 | $547.97 | $110.53 | $437.43 | $498.01 | $0.00 | $498.01 | ($60.58) | 113.8% |
| 2018 Plan Year | 115 | 180 | $507.87 | $110.07 | $397.81 | $454.95 | $0.00 | $454.95 | ($57.14) | 114.4% |
| 2017 Plan Year | 120 | 185 | $476.01 | $100.38 | $375.63 | $420.05 | $0.00 | $420.05 | ($44.42) | 111.8% |
| 2016 Plan Year | 113 | 177 | $459.46 | $113.38 | $346.08 | $349.07 | $0.00 | $349.07 | ($2.99) | 100.9% |

*\* Includes administration, premium tax, margin, and commission.*

*Please Note: At renewal, other factors such as incurred but unpaid claims and overall cost trends may influence rate adjustments.*

*This report has been prepared by Gallagher Benefit Services based on data provided by the insurance carrier, which is solely responsible for its completeness and accuracy.*



### Cedar Park Assembly of God

**Fully-Insured Medical and Prescription Drug Plan**
**Kaiser Permanente**
**April 1, 2019 through March 31, 2020**

**Individuals with Total Claims in Excess of $50,000 ($100,000 Estimated Pooling Level)**

| Relationship | Major Diagnostic Category | Enrollee Status | Total Paid Expense | Percent of Total Claims | Estimated Pooling Level | Percent of Pooling Level | Estimated Pooled Claims |
|---|---|---|---|---|---|---|---|
| Person 1 | Neoplasms | Inactive | $240,006 | 25.9% | $100,000 | 240.0% | $140,006 |
| Person 2 | Neoplasms | Active | $175,143 | 18.9% | $100,000 | 175.1% | $75,143 |
| Person 3 | Pharmacy | Active | $52,794 | 5.7% | $100,000 | 52.8% | $0 |
| **Total** | | | **$467,943** | **50.5%** | | | **$215,149** |



*This report has been prepared by Gallagher Benefit Services based on data provided by the insurance carrier, which is solely responsible for its completeness and accuracy.*

*4/27/2020*   Page 27

Cedar Park 000465

## Cedar Park Assembly of God

### Fully-Insured Dental Benefits Plan
### Delta Dental of Washington
### September 1, 2019 through August 31, 2020



| Month | A Employees | B Earned Premium | C Estimated Administrative Charges* | D Estimated Net Premium (B - C) | E Paid Claims | F Estimated Net Gain/(Loss) (D - E) | G Estimated Net Loss Ratio (E / D) |
|---|---|---|---|---|---|---|---|
| September 2019 | 125 | $9,018 | $1,749 | $7,268 | $5,404 | $1,864 | 74.3% |
| October | 154 | $11,140 | $2,161 | $8,979 | $7,997 | $981 | 89.1% |
| November | 143 | $9,614 | $1,865 | $7,749 | $5,505 | $2,243 | 71.0% |
| December | 140 | $9,994 | $1,939 | $8,055 | $7,921 | $134 | 98.3% |
| January 2020 | 138 | $9,896 | $1,920 | $7,976 | $9,645 | ($1,669) | 120.9% |
| February | 142 | $10,205 | $1,980 | $8,225 | $9,936 | ($1,711) | 120.8% |
| March | 144 | $10,340 | $2,006 | $8,334 | $5,831 | $2,503 | 70.0% |
| April | 148 | $10,489 | $2,035 | $8,454 | $3,533 | $4,921 | 41.8% |
| May | 143 | $10,244 | $1,987 | $8,257 | $2,254 | $6,003 | 27.3% |
| June | | | | | | | |
| July | | | | | | | |
| August | | | | | | | |
| **Total Year to Date** | **1,277** | **$90,938** | **$17,642** | **$73,296** | **$58,025** | **$15,271** | **79.2%** |
| | | | | | | | |
| Current PEPM | 142 | $71.21 | $13.82 | $57.40 | $45.44 | $11.96 | 79.2% |
| 2018 Plan Year | 133 | $69.00 | $13.39 | $55.61 | $53.63 | $1.98 | 96.4% |
| 2017 Plan Year | 134 | $69.54 | $12.94 | $56.61 | $51.22 | $5.38 | 90.5% |
| 2016 Plan Year | 128 | $77.48 | $13.33 | $64.16 | $55.61 | $8.55 | 86.7% |



*Administrative Charges are currently estimated at 19.4%.*

*Please Note: At renewal, other factors such as incurred but unpaid claims and overall cost trends may influence rate adjustments.*

*This report has been prepared by Gallagher Benefit Services based on data provided by the insurance carrier, which is solely responsible for its completeness and accuracy.*

7/2/2020    Page 28

Cedar Park 000466

# Exhibit M

 **Gmail**

**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Cigna Confirmation
1 message

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                          Tue, Jul 14, 2020 at 3:06 PM
To: Steve Orcutt <steve.o@cedarpark.org>, Melissa Knauss <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Here is the written response from Cigna's Compliance Team:

<u>For an insured plan sitused in WA:</u>

·        Policies must cover maternity care and this includes coverage for abortions;

·        Policies must cover contraceptives;

·        An employer with a religious or moral tenet opposed to a specific service is not required to purchase coverage for that service if they object for reason of religion or conscience. In other words, an employer may exclude coverage for contraceptives and abortion if that employer objects to providing that coverage due to religious or other beliefs.

·        Enrollees shall not be denied coverage to any service excluded from their benefit package as a result of the employer's opposition to providing a specific service.

·        Cigna will send a letter to enrollees notifying them of their rights to access these excluded services outside of their plan.

**\*_Eligible Organizations and Optional Contraceptive Accommodation; Disclosure Requirements_**

If a fully insured client is eligible for and voluntarily elects an optional contraceptive accommodation (opt out), Cigna will pay for <u>all</u> FDA-approved contraceptive coverage for eligible employees (subscribers and dependents) under a separate contraceptive-only PPO account that is set up for these customers.  For self-insured clients, the current administrator for that client must arrange for an insurer to pay for the coverage.  In both cases, Cigna will fund the contraceptive coverage regardless of funding type. Cigna will segregate premium revenue collected from the client from the monies used to provide payment for contraceptives.

Cigna will only pay for in-network medical contraceptive procedures and generic prescription contraceptives or brand prescription contraceptives with no generic equivalent or alternative. Out of network medical services and brand prescription drugs that have a generic equivalent or alternative are not covered under these plans.

The client will be responsible for certifying that they will not be covering contraceptives due to their religious or moral beliefs and eligibility for the optional accommodation. If a client elects the accommodation, they will not have the option to pick and choose which contraceptives they will cover and exclude due to the complexity of administering a variable customized benefit for each client.  Clients must sign and return the attached self-certification or notify HHS using the attached model notice or other alternate written notification.

Cigna will notify the employees of the eligible clients of the availability of separate payments for contraceptive coverage by providing them with a custom letter substantially similar to the model notice.  The notice will be sent to subscribers (and to dependents with privacy restrictions) annually at renewal and to new hires once eligibility has been finalized on the employer's group plan.

Existing clients who are under a current accommodation arrangement may keep or revoke this accommodation. If the client chooses to revoke, Cigna will provide notice to the affected employees explaining that they will no longer have contraceptive coverage through Cigna.

Cedar Park 000468

**Visit Gallagher's Pandemic Preparedness page for information to prepare your business and your employees for pandemic outbreaks, including COVID-19.**

*Jami M. Hansen,*
*Area Vice President*

Health and Welfare Consulting



Insurance | Risk Management | Consulting

777 108th Avenue NE, Suite 200 | Bellevue, WA 98004

P: 425.974.3275 | F: 425.201.2774

www.ajg.com




*This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law.*
*Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.*

Cedar Park 000469

# Exhibit N



Insurance | Risk Management | Consulting

 
 

# 2021/2022 Employee Benefit Analysis and Recommendations

Proposed Effective Date: September 1, 2021
Jami Hansen, Area-Vice President/Client Consultant
*Melinda Hansen, Client Manager*
*James Stanek, Benefit Analyst*
Date Presented: June 28, 2021

**IMPORTANT:** This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc. This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts. See your policy or contact us for specific information or further details in this regard.



Cedar Park 000667

# Medical
## *Cost Outline*

### PPO Plan

| | | Current<br>Kaiser Permanente | Renewal<br>Kaiser Permanente | Alternative<br>Regence BlueShield |
|---|---|---|---|---|
| **Monthly Rates** | | | | **HSA Healthplan 3.0 PPO** |
| Employee Only | 43 | $419.75 | $482.71 | $493.80 |
| Employee + Spouse | 4 | $927.39 | $1,066.50 | $1,091.10 |
| Employee + Child(ren) | 8 | $783.03 | $900.50 | $921.20 |
| Employee + Family | 10 | $1,290.66 | $1,484.24 | $1,518.50 |
| **PPO Plan Annual Cost** | **65** | **$491,156** | **$564,827** | **$577,829** |
| *% Change* | | | *15.0%* | *17.6%* |
| *$ Change* | | | *$73,671* | *$86,673* |
| **HSA Annual Contribution** | | | | |
| Employee | 43 | $500 | $500 | $500 |
| Family | 22 | $1,000 | $1,000 | $1,000 |
| **PPO HSA Annual Contribution** | **65** | **$43,500** | **$43,500** | **$43,500** |

### HMO Plan

| | | Current<br>Kaiser Permanente | Renewal<br>Kaiser Permanente | Alternative<br>Regence BlueShield |
|---|---|---|---|---|
| **Monthly Rates** | | | | **HSA Healthplan 3.0 PPO** |
| Employee Only | 49 | $362.78 | $417.20 | $493.80 |
| Employee + Spouse | 3 | $801.50 | $921.71 | $1,091.10 |
| Employee + Child(ren) | 3 | $676.74 | $778.24 | $921.20 |
| Employee + Family | 3 | $1,115.47 | $1,282.80 | $1,518.50 |
| **HMO Plan Annual Cost** | **58** | **$306,688** | **$352,693** | **$417,463** |
| *% Change* | | | *15.0%* | *36.1%* |
| *$ Change* | | | *$46,004* | *$110,775* |
| **HSA Annual Contribution** | | | | |
| Employee | 49 | $500 | $500 | $500 |
| Family | 9 | $1,000 | $1,000 | $1,000 |
| **HMO HSA Annual Contribution** | **58** | **$33,500** | **$33,500** | **$33,500** |

| | Current | Renewal | Alternative |
|---|---|---|---|
| **Total Medical Plan Annual Cost** | **$797,844** | **$917,520** | **$995,292** |
| **Total HSA Annual Cost** | **$77,000** | **$77,000** | **$77,000** |
| **Total HRA Annual Cost** | **$83,739** | **$115,064** | **$115,064** |

| | Current | Renewal | Alternative |
|---|---|---|---|
| **Combined Medical/HSA/HRA Annual Cost** | **$958,583** | **$1,109,583** | **$1,187,356** |
| *% Change* | | *15.8%* | *23.9%* |
| *$ Change* | | *$151,001* | *$228,773* |



ⓘ **Remember**

- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.

Prepared by:



**The Information contained herein is subject to the disclosures**
**and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000668

# Medical Renewal & Quotes

## *Kaiser Permanente Renewal Calculation Notes*

| Key Renewal Findings Provided by Kaiser |
|---|
| • Credibility is changing from 60%/40% to 80%/20% (which is helping the renewal) |
| • There is a very large active claimant in the amount of $1,399,166.27 |
| • There are three other active large claimants |
| • MBR is 256% for 2020 and 123% for 2019 |
| • Total per member per month dollar amount has increased 109.5% |
| • Renewal called for a 19.2% increase, however actual renewal was 15% due to rate cap in place |

## *RFP Responses*

| Carriers Invited to Bid |
|---|
| **Regence Blue Shield** |
| • Regence was the only carrier that provided a quote (+25% above current rates, +8% above Kaiser renewal rates) |
| • Regence has a smaller provider system (AHN) that could replace the HMO plan, estimated at 6-8% below the PPO plan they quoted (Eastside Health Network is not currently included in their AHN but will be as of 1/1/2022) |
| • Regence is not able to accommodate the current abortion language on a fully-insured basis, but would be able to provide a level-funded quote that would allow the language |
| • Renewal called for a 19.2% increase, however actual renewal was 15% due to rate cap in place |
| **Aetna** |
| • Aetna declined to quote - Rates were coming in around +75% above the Kaiser renewal |
| **Premera Blue Cross** |
| • Premera declined to quote - Rates were coming in around +5% above the Kaiser PPO renewal and +23% above the Kaiser HMO renewal |
| **Cigna** |
| • Cigna declined to quote - Rates were coming in around +12-17% above the Kaiser renewal |
| **UnitedHealthcare** |
| • UHC declined to quote - Rates were coming in around +11% above the Kaiser renewal |
| |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000669

# HRA Administration

## *Cost Comparison and Utilization - Deductible Only HRA*

| Administration Costs | | Current<br>NMR | Renewal<br>NMR |
|---|---|---|---|
| Submission Fee (Per Employee) | 27 | $40.00 | $40.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $225.00 |
| **Total Annual Administration Cost** | | **$1,305** | **$1,305** |

| Reimbursement Limits | | Current<br>NMR | Renewal<br>NMR |
|---|---|---|---|
| **PPO Plan Deductible** | | $6,750/$13,500 | $6,750/$13,500 |
| Employee | 43 | $5,350 | $5,350 |
| Employee & Family | 22 | $10,700 | $10,700 |
| **HMO Plan Deductible** | | $6,750/$13,500 | $6,750/$13,500 |
| Employee | 49 | $5,350 | $5,350 |
| Employee & Family | 9 | $10,700 | $10,700 |
| **Annual Maximum Liability** | | **$823,900** | **$823,900** |

| HRA Utilization Costs and Projections | Current<br>Completion Projection | Renewal<br>Projection |
|---|---|---|
| **Combined Plan Utilization** | $82,434 | $113,759 |
| **% of Max Utilization** | **10.0%** | **13.8%** |

| Total Costs Projection | Current<br>Projected | Renewal<br>Projected |
|---|---|---|
| **Administration Cost** | $1,305 | $1,305 |
| **Projected Utilization** | $82,434 | $113,759 |
| **Total HRA Annual Cost Projection** | **$83,739** | **$115,064** |

 **Remember**

- HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.
- HRA Projection Trend: 6.1%

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000670

# HRA Administration

## *Benefit Outline - Deductible Only HRA*

|  | Current NMR | Renewal NMR |
|---|---|---|
| **PPO Plan** | | |
| **Member Responsibility Before HRA** | | |
| Employee | $1,400 | $1,400 |
| Employee & Family | $2,800 | $2,800 |
| **HRA Reimbursement Toward Deductible** | | |
| Employee | $5,350 | $5,350 |
| Employee & Family | $10,700 | $10,700 |
| **Total Deductible** | | |
| Employee | $6,750 | $6,750 |
| Employee & Family | $13,500 | $13,500 |

|  | Current NMR | Renewal NMR |
|---|---|---|
| **HMO Plan** | | |
| **Member Responsibility Before HRA** | | |
| Employee | $1,400 | $1,400 |
| Employee & Family | $2,800 | $2,800 |
| **HRA Reimbursement Toward Deductible** | | |
| Employee | $5,350 | $5,350 |
| Employee & Family | $10,700 | $10,700 |
| **Total Deductible** | | |
| Employee | $6,750 | $6,750 |
| Employee & Family | $13,500 | $13,500 |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000671

Crisalli Decl., p.0295

# Medical
## *Benefit Outline*

| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente<br>*In-Network* | Current/Renewal<br>Kaiser Permanente<br>*In-Network* | Current/Renewal<br>Kaiser Permanente<br>*Out-of-Network* |
|---|---|---|---|
| *Medical Plan* | *Core HMO* | *Access PPO* | |
| **Annual Deductible**<br>(Individual/Family) | $6,750/$13,500 | $6,750/$13,500 | |
| **Coinsurance** | 10% | 10% (5%*) | 30% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,900/$13,800 | $6,900/$13,800 | |
| **Preventive Care** | Covered in full | Covered in full | 30% after deductible |
| **Outpatient Services** | | | |
| • Office Visit | 10% after deductible | 10%* after deductible | 30% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 10% after deductible | 30% after deductible |
| • Surgery | 10% after deductible | 10% after deductible | 30% after deductible |
| • Rehabilitation | 10% after deductible<br>Up to 60 visits PCY | 10%* after deductible<br>Up to 60 visits PCY | 30% after deductible |
| **Other Services** | | | |
| • Chiropractic Care | 10% after deductible<br>Up to 10 visits PCY | 10% after deductible<br>Up to 8 visits PCY | 30% after deductible |
| • Acupuncture | 10% after deductible<br>Up to 12 visits PCY | 10% after deductible<br>Up to 12 visits PCY | 30% after deductible |
| **Urgent Care** | 10% after deductible | 10%* after deductible | 30% after deductible |
| **Emergency Room**<br>(copay waived if admitted) | 10% after deductible | 10% after deductible | |
| **Inpatient Hospitalization** | 10% after deductible | 10% after deductible | 30% after deductible |
| *Prescription Drug Plan* | *At Preferred Pharmacies* | *At Preferred Pharmacies* | |
| **Retail Pharmacy** (30-day supply) | *Medical Deductible Applies* | *Medical Deductible Applies* | |
| • Preferred Generic | $20 after deductible | $10 after deductible | |
| • Preferred Brand | $40 after deductible | $35 ($30*) after deductible | |
| • All Non-Preferred | $60 after deductible | $70 ($65*) after deductible | |
| • Specialty | Above copays apply | Above copays apply | |
| **Mail Order** (90-day supply) | 3 X retail copay | 3 X retail copay (enhanced only*) | |
| **Part D Creditable/Non-Creditable** | Creditable | Creditable | |
| **Formulary** | 2021 KPWA Large Group Formulary | 2021 KPWA Large Group Formulary | |

 **Remember**

- For plan years beginning in 2021, non-grandfathered QHDHP health plans must have a minimum individual deductible of $1,400 for an aggregate deductible and $2,800 for an embedded deductible.
- For plan years beginning in 2021, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $8,550.
- **\*Kaiser PPO**: Enhanced cost share applies when members utilize a Kaiser facility or pharmacy.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000672

# HIPAA Solutions

Gallagher's Compliance Solutions team has options that can help your organization face the future with increased confidence. With Gallagher's HIPAA Solution, your organization can meet its HIPAA compliance goals for your employer-sponsored health plan, including building better HIPAA policies and procedures, training workforce members, and conducting a Security Risk Analysis.

**1) Gallagher's proprietary Customized HIPAA solution is intended for employers with more than 250 employees and/or self-insured medical benefits.**

| HIPAA Customized | Price |
|---|---|
| **Policies and Procedures** | |
| Level One: Customized written HIPAA Privacy policies and procedures, 26 Privacy forms, and a Notice of Privacy Practices (if requested) | $2,500 |
| Level Two: Customized written HIPAA Security policies and procedures and 23 Security forms | $3,500 |
| Level Three: Customized written HIPAA Privacy and Security policies and procedures, 26 Privacy forms, 23 Security forms, and a Notice of Privacy Practices (if requested) | $5,000 |
| **Training** | |
| Level One: Customized recorded Privacy and Security HIPAA Workforce Member training webinar | $2,500 |
| Level Two: Customized one-time, live, on-site Privacy and Security workforce training lasting approximately 90 to 120 minutes | $3,500 |
| Level Three: Customized one-time, live, on-site Privacy and Security HIPAA Workforce Member training lasting approximately 90 to 120 minutes, and a customized recorded Privacy and Security workforce training webinar | $5,500 |
| **Risk Analysis** | |
| Completion and documentation of a current HIPAA Security Risk Analysis and documentation of compliance with the HIPAA Security Rule safeguard requirements | $12,500 |
| **Bundles** | |
| Level One: Customized written HIPAA Privacy and Security policies and procedures, 26 Privacy forms, 23 Security forms, and a Notice of Privacy Practices (if requested); customized one-time, live, on-site Privacy and Security HIPAA Workforce Member training lasting approximately 90 to 120 minutes, and a customized recorded Privacy and Security workforce training webinar | $10,000 |
| Level Two: Customized written HIPAA Privacy and Security policies and procedures, 26 Privacy forms, 23 Security forms, and a Notice of Privacy Practices (if requested); customized one-time, live, on-site Privacy and Security HIPAA Workforce Member training lasting approximately 90 to 120 minutes, and a customized recorded Privacy and Security workforce training webinar; completion and documentation of a current HIPAA Security Risk Analysis and documentation of compliance with the HIPAA Security Rule safeguard requirements | $22,000 |

**2) Gallagher's proprietary Core HIPAA solution is intended for employers with 250 or fewer employees and fully insured medical benefits, but services are also available for customized training and Security Risk Analysis facilitation.**

| HIPAA Core | Price |
|---|---|
| **Policies and Procedures** | |
| Semi-customized core HIPAA Privacy and Security policies, procedures, and forms | $750 |
| Recorded webinar training | $350 |

Prepared by:

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Gallagher

Cedar Park Assembly of God
September 2021

Cedar Park 000673

# Dental
## Benefit & Cost Outline

| | Current/Renewal/Negotiated<br>Delta Dental of WA | | | Alternative 1<br>MetLife | | Alternative 2<br>Ameritas | |
|---|---|---|---|---|---|---|---|
| | *In-Network* | | *Out-of-Network* | *In-Network* | *Out-of-Network* | *In-Network* | *Out-of-Network* |
| **Dental Plan** | | *MAC* | | *MetLife PPO* | *99th UCR* | *Freedom of Choice* | *90th UCR* |
| **Annual Deductible** | $0 per person | | $50 per person | $0 per person | $50 per person | $0 per person | $50 per person |
| (waived for Preventive & Diagnostic) | $0 per family | | $150 per family | $0 per family | $150 per family | $0 per family | $150 per family |
| **Annual Benefit Maximum** | $1,500 per person | | | $1,500 per person | | $1,500 per person | |
| **Waiting Period** | 12 months for Major Services | | | None | | None | |
| **Services** | | | | | | | |
| • Preventive & Diagnostic | No charge | | No charge | No charge | No charge | No charge | No charge |
| • Basic | 20% | | 20% after deductible | 20% | 20% after deductible | 20% | 20% after deductible |
| • Major | 50% | | 50% after deductible | 50% | 50% after deductible | 50% | 50% after deductible |
| **Periodontics** | Covered under Basic | | | Covered under Basic | | Covered under Basic | |
| **Endodontics** | Covered under Basic | | | Covered under Basic | | Covered under Basic | |
| **Implants** | Covered under Major | | | Covered under Major | | Covered under Major | |
| **Orthodontia** | Not covered | | | Not covered | | Not covered | |
| **Late Entrant Penalty** | Next Annual Open Enrollment | | | Next Annual Open Enrollment | | Next Annual Open Enrollment | |
| **Monthly Rates** | | *Current* | *Renewal* | *Negotiated* | | | |
| Employee Only | 95 | $48.95 | $52.18 | $50.42 | $44.95 | | $45.99 |
| Employee + Spouse | 18 | $95.79 | $102.10 | $98.66 | $87.97 | | $91.96 |
| Employee + Child(ren) | 9 | $105.56 | $112.52 | $108.73 | $96.94 | | $101.34 |
| Employee + Family | 19 | $152.41 | $162.46 | $156.98 | $139.97 | | $146.31 |
| **Rate Guarantee** | | 12 months | 12 months | 12 months - 5% rate cap for year 2 & 3 | | 12 months | |
| **Total Annual Cost** | 141 | $122,644 | $130,732 | $126,324 | $112,627 | | $116,595 |
| *% Change* | | | 6.6% | 3.0% | -8.2% | | -4.9% |
| *$ Change* | | | $8,088 | $3,680 | ($10,016) | | ($6,048) |

 **Remember**

- **DDWA:** Actual claims paid are subject to maximum allowable charge, frequencies, age limitations, and terms and conditions of the contract.
- **MetLife and Ameritas:** Out-of-Network benefits are paid at usual, customary and reasonable rates. Any amounts in excess will be the responsibility of the plan member.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000674

# Contribution Outline

| | | Current | | | Renewal | |
|---|---|---|---|---|---|---|
| | Total Cost | ER Cost | EE Cost* | Total Cost | ER Cost | EE Cost* |
| **PPO Medical Plan** | | | | | | |
| Employee 43 | $419.75 | $280.75 | $139.00 | $482.71 | $322.86 | $159.85 |
| Employee + Spouse 4 | $927.39 | $288.39 | $639.00 | $1,066.50 | $331.65 | $734.85 |
| Employee + Child(ren) 8 | $783.03 | $289.03 | $494.00 | $900.50 | $332.39 | $568.11 |
| Employee + Family 10 | $1,290.66 | $286.66 | $1,004.00 | $1,484.24 | $329.65 | $1,154.59 |
| **HMO Medical Plan** | | | | | | |
| Employee 49 | $362.78 | $273.78 | $89.00 | $417.20 | $314.85 | $102.35 |
| Employee + Spouse 3 | $801.50 | $254.50 | $547.00 | $921.71 | $292.67 | $629.04 |
| Employee + Child(ren) 3 | $676.74 | $254.74 | $422.00 | $778.24 | $292.95 | $485.29 |
| Employee + Family 3 | $1,115.47 | $255.47 | $860.00 | $1,282.80 | $293.79 | $989.01 |
| **Medical Total Annual Cost** | $797,844 | $409,368 | $388,476 | $917,520 | $470,773 | $446,747 |
| **Additional Employer Contributions** | | | | | | |
| Annual HSA Contribution | $77,000 | $77,000 | $0 | $77,000 | $77,000 | $0 |
| Annual HRA Contribution | $83,739 | $83,739 | $0 | $115,064 | $115,064 | $0 |
| **Medical/HRA/HSA Annual Cost** | $958,583 | $570,107 | $388,476 | $1,109,583 | $662,837 | $446,747 |
| **Dental Plan** | | | | | | |
| Employee 95 | $48.95 | $28.95 | $20.00 | $50.42 | $29.82 | $20.60 |
| Employee + Spouse 18 | $95.79 | $35.79 | $60.00 | $98.66 | $36.86 | $61.80 |
| Employee + Child(ren) 9 | $105.56 | $45.56 | $60.00 | $108.73 | $46.93 | $61.80 |
| Employee + Family 19 | $152.41 | $52.41 | $100.00 | $156.98 | $53.98 | $103.00 |
| **Dental Total Annual Cost** | $122,644 | $57,604 | $65,040 | $126,324 | $59,332 | $66,991 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total Annual Cost** | $1,081,227 | $627,711 | $453,516 | $1,235,907 | $722,169 | $513,738 |
| *% Change* | | | | 14.3% | 15.0% | 13.3% |
| *$ Change* | | | | $154,681 | $94,459 | $60,222 |

\* Under the Affordable Care Act (ACA), coverage is affordable for an employee if the employee's contribution toward the lowest-cost, self-only, minimum value coverage does not exceed a specified percentage of the employee's household income (9.78% for plan years beginning in 2020; and 9.83% for plan years beginning in 2021). There are three safe harbors including the Federal Poverty Line (FPL) safe harbor. To meet the FPL safe harbor for affordability for plan years beginning July 1, 2021 through December 1, 2021, employers must use the 2021 Federal Poverty Line (FPL) multiplied by the 2021 affordability safe harbor rate of 9.83% in order to get the maximum annual affordable contribution. Using that calculation, the maximum affordable contribution for a month is equal to $105.51 per month for the 48 contiguous states, $131.80 for Alaska and $121.40 for Hawaii.

Note: the affordability percentage rate, and therefore the dollar amount, may change annually. Employers may use the poverty guidelines in effect within six months before the beginning of the plan year There are two additional safe harbor options that may be used: the Form W-2 Safe Harbor or the Rate of Pay Safe Harbor. Guidance also addresses how HRA contributions, wellness program rewards, employer flex credits, defined contribution arrangements, opt-out payments, and fringe benefit payments required under the Davis-Bacon Act and the Service Contract Act affect the affordability of employer coverage. See our ACA Affordability Safe Harbors Chart for details.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000675

# Voluntary Vision
## *Benefit & Cost Outline*



| Employee Share of Eligible Expenses | | | Current/Renewal vChoice (Underwritten by VSP) Base Plan | | Current/Renewal vChoice (Underwritten by VSP) Buy-Up Plan | |
|---|---|---|---|---|---|---|
| | | | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Vision Plan** | | | Signature Plan | | Signature Plan | |
| **Routine Exam Copay** | | | $10 | $10 | $10 | $10 |
| **Routine Exam** | | | Covered in full* | Reimbursed up to $50* | Covered in full* | Reimbursed up to $50* |
| **Materials Copay** | | | $25 | $25 | $25 | $25 |
| **Lenses** (per pair) | | | | Reimbursed up to… | | Reimbursed up to… |
| • Single Vision | | | No charge* | $50* | No charge* | $50* |
| • Lined Bifocals | | | No charge* | $75* | No charge* | $75* |
| • Lined Trifocals | | | No charge* | $100* | No charge* | $100* |
| **Frames** | | | $130 allowance then 20% discount* | Reimbursed up to $70* | $130 allowance then 20% discount* | Reimbursed up to $70* |
| **Contact Lenses** (in lieu of eyeglasses) | | | | | | |
| • Fitting and Evaluation | | | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials |
| • Elective Contacts | | | $130 allowance | | $130 allowance | |
| **Frequency** (Exam/Lenses/Frames/Contacts) | | | 12/12/24/12 Months | | 12/12/12/12 Months | |
| **Monthly Rates** | Base | Buy-Up | Current | Renewal | Current | Renewal |
| Employee Only | 34 | 14 | $7.86 | $7.86 | $9.81 | $9.81 |
| Employee + Spouse | 5 | 8 | $12.58 | $12.58 | $15.70 | $15.70 |
| Employee + Child(ren) | 4 | 2 | $12.84 | $12.84 | $16.02 | $16.02 |
| Employee + Family | 8 | 4 | $20.71 | $20.71 | $25.83 | $25.83 |
| **Rate Guarantee** | | | | 12 months | | 12 months |
| **Total Annual Cost** | 51 | 28 | **$6,566** | **$6,566** | **$4,780** | **$4,780** |
| *% Change* | | | | 0.0% | | 0.0% |
| *$ Change* | | | | $0 | | $0 |

*Less any applicable copay.

ⓘ **Remember**

• Out-of-Network benefits reflect the maximum reimbursement for specific services.
• Members may receive additional discount off of non-covered lens options when services are received from a VSP network provider.
• Frequency applies beginning with first date of service.

Prepared by:

 **Gallagher**

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000676

# Life/AD&D
## Benefit & Cost Outline

| | Current/Renewal |  |
| --- | --- | --- |
| | Lincoln Financial Group | |
| **Life and AD&D Plan** | | |
| **Benefit Amount** | $10,000 | |
| **Guarantee Issue** | $10,000 | |
| **Additional Features** | | |
| • Accelerated Benefit | Up to 75% | |
| • Conversion | Included | |
| • Portability | Included | |
| • Waiver of Premium | Included | |
| **Benefit begins to reduce at age** | 65 | |
| **Monthly Rates** | *Volume* | |
| **Life** (per $1,000 of benefit) | $1,866,000 | $0.190 | $0.190 |
| **AD&D** (per $1,000 of benefit) | $1,866,000 | $0.020 | $0.020 |
| **Rate Guarantee** | | 24 months |
| **Total Annual Cost** | Lives: 196 | **$4,702** | **$4,702** |
| *% Change* | | *0.0%* |
| *$ Change* | | *$0* |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000677

# Long-Term Disability
*Benefit & Cost Outline*



| | Current/Renewal<br>Lincoln Financial Group | |
|---|---|---|
| **Long-Term Disability (LTD)** | | |
| **Elimination Period** | 90 days | |
| **Covered Monthly Earnings** | 60% | |
| **Benefit Maximum** | $5,000 | |
| **Benefit Minimum** | Greater of 10% or $100 | |
| **Definition of Earnings** | Base monthly earnings | |
| **Definition of Disability** | 24 months own occupation | |
| **Maximum Duration** | SSNRA | |
| **Tax Free Benefit (Gross Up)** | No | |
| **Benefit Limitations** | | |
| • Pre-Existing Condition | 3/12 | |
| • Mental Health & Chemical Dependency | 24 months | |
| • Self-Reported | 24 months | |
| **Additional Features** | | |
| • Conversion | Included | |
| • W2 Prep | Included | |
| • FICA Matching | Included | |
| • Employee Assistance Program | Included with up to 4 face-to-face visits | |

| *Monthly Rates* | *Volume* | *Current* | *Renewal* |
|---|---|---|---|
| **LTD** (per $100 of covered monthly payroll) | $728,460 | $0.217 | $0.217 |
| Rate Guarantee | | | 24 months |
| **Total Annual Cost** | Lives: 196 | **$18,969** | **$18,969** |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000678

# Voluntary Life
## *Benefit & Cost Outline*



| Voluntary Life Monthly Rates | Lives | Volume | Current/Renewal<br>vChoice (Underwritten by Unum) |
|---|---|---|---|
| **Employee and Spouse** (per $1,000) | | | |
| < 25 | 1 | $50,000 | $0.057 |
| 25 - 29 | 0 | $0 | $0.069 |
| 30 - 34 | 0 | $0 | $0.092 |
| 35 - 39 | 1 | $50,000 | $0.103 |
| 40 - 44 | 4 | $400,000 | $0.115 |
| 45 - 49 | 7 | $940,000 | $0.172 |
| 50 - 54 | 10 | $1,625,000 | $0.264 |
| 55 - 59 | 8 | $550,000 | $0.493 |
| 60 - 64 | 4 | $475,000 | $0.756 |
| 65 - 69 | 6 | $795,000 | $1.456 |
| 70 + | 0 | $0 | $2.361 |
| **Child(ren)** (per unit) - Birth to Age 26 | 5 | $50,000 | $2.50 |
| **Total Annual Cost** | | | **$30,689** |
| **Rate Guarantee** | | | 12 months |

| Voluntary Life Plan | Current/Renewal<br>vChoice (Underwritten by Unum) |
|---|---|
| **Benefit Options** | |
| • Employee | 1-5 x earnings rounded to $10,000 |
| • Spouse | .5-2.5 x earnings rounded to $5,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 5 x earnings or $500,000 |
| • Spouse | 50% of employees amount or $250,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Guarantee Issue** | |
| • Employee | $210,000 |
| • Spouse | $105,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Accelerated Benefit | 75% to $500,000 |
| • Conversion | Included |
| • Portability | Included |
| • Waiver of Premium | Included |
| **Benefit begins to reduce at age** | 65 |
| **Participation Requirement** | 10 |

 **Remember**

• Current Enrollment: 31 Employees, 10 Spouses, and 5 Children.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000679

# Voluntary AD&D
### *Benefit & Cost Outline*

| | Current/Renewal<br>vChoice (Underwritten by Standard) |
|---|---|
| **Voluntary AD&D Plan** | |
| **Benefit Options** | |
| • Employee | $100,000 increments |
| • Spouse | 50% of employee amount |
| • Children (newborn to 26 years) | $10,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 10 x earnings or $500,000 |
| • Spouse | 50% of employee amount or $250,000 |
| • Children (newborn to 26 years) | $10,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Portability | Included |
| • Waiver of Premium | Not included |
| **Participation Requirement** | 10 |
| **Voluntary AD&D Monthly Rates** *Lives Volume* | |
| **Employee** (per $1,000)    45    $7,300,000 | $0.047 |
| **Total Annual Cost** | **$4,117** |
| **Rate Guarantee** | 12 months |

 **Remember**

• Current Enrollment: 45 Employees.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000680

# Administration Services

## *Cost Outline*

*Single Billing Services*

| | Current | Renewal |
|---|---|---|
| | GBS Administrators | GBS Administrators |
| **PEPM Administration Fee** | **Your fee structure is 2% of the monthly medical premium** | |
| **Benefit Advocate** | Included | |

- Total Annual Fees shown are estimated and already included in medical premium.
- SBS regeneration fee not paying as billed - $50

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000681

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $6,750 Ded. | $797,844 | $409,368 | $388,476 |
| HSA Funding | | $500 per individual/$1,000 per family | $77,000 | $77,000 | $0 |
| Estimated HRA Utilization | NMR | $5,350 per individual/$10,700 per family | $83,739 | $83,739 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $122,644 | $57,604 | $65,040 |
| Voluntary Vision | vChoice (VSP) | Voluntary | $11,346 | $0 | $11,346 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $4,702 | $4,702 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $18,969 | $18,969 | $0 |
| Voluntary Life | vChoice (Unum) | Voluntary | $30,689 | $0 | $30,689 |
| Voluntary AD&D | vChoice (Standard) | Voluntary | $4,117 | $0 | $4,117 |
| Single Billing Services | GBS Administrators | 2% of medical premium | Included in Medical | | |
| PCORI | | Healthcare Reform ($2.54 PMPY) | $311 | $311 | $0 |
| Total Annual Cost | | | $1,151,050 | $651,382 | $499,668 |

## Renewal

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $6,750 Ded. | $917,520 | $470,773 | $446,747 |
| HSA Funding | | $500 per individual/$1,000 per family | $77,000 | $77,000 | $0 |
| Estimated HRA Utilization | NMR | $5,350 per individual/$10,700 per family | $115,064 | $115,064 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $126,324 | $59,332 | $66,991 |
| Voluntary Vision | vChoice (VSP) | Voluntary | $11,346 | $0 | $11,346 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $4,702 | $4,702 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $18,969 | $18,969 | $0 |
| Voluntary Life | vChoice (Unum) | Voluntary | $30,689 | $0 | $30,689 |
| Voluntary AD&D | vChoice (Standard) | Voluntary | $4,117 | $0 | $4,117 |
| Single Billing Services | GBS Administrators | 2% of medical premium | Included in Medical | | |
| PCORI | | Healthcare Reform ($2.66 PMPY) | $326 | $326 | $0 |
| Total Annual Cost | | | $1,305,731 | $745,841 | $559,890 |
| % Change | | | 13.4% | 14.5% | 12.1% |
| $ Change | | | $154,681 | $94,459 | $60,222 |

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000682

# Carriers Invited To Bid

| Fully-Insured Medical Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Kaiser Permanente | Current Carrier - Shown in Proposal | 5.3% | Not Applicable |
| Aetna | Declined to Quote - Not Competitive | N/A | Not Applicable |
| Cigna | Declined to Quote - Not Competitive | N/A | Not Applicable |
| Premera Blue Cross | Declined to Quote - Not Competitive | N/A | Not Applicable |
| Regence BlueShield | Shown in Proposal | N/A | Not Applicable |
| United Healthcare | Declined to Quote - Not Competitive | N/A | Not Applicable |

| Gallagher vChoice Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Vision - Vision Service Plan | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Fully-Insured Dental Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Delta Dental of Washington | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |
| Lincoln Financial | Declined to Quote - Not Competitive | N/A | 1.0% to 4.0% of Premium |
| MetLife | Shown in Proposal | 10.0% | $0.00 to $29.50 PMPY |
| Ameritas | Shown in Proposal | 10.0% | $0.00 to $29.50 PMPY |

| Miscellaneous Benefit Lines | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HRA Administration - NMR | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |
| Benefit Advocate Center - GBS | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |
| Single Billing Services - GBSA | Current Carrier - Shown in Proposal | Net of Commission | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000683

# Carriers Invited To Bid

| Life/AD&D and Disability Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Lincoln Financial Group | A | Current Carrier - Shown in Proposal | Life: 20% LTD: 10% | $0.00 to $29.50 PMPY |

| Gallagher vChoice Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Life - Unum | A | Current Carrier - Shown in Proposal | 20.0% | 0.0% to 6.0% of Premium |
| AD&D - Standard | A | Current Carrier - Shown in Proposal | 25.0% | 0.0% to 3.5% of Premium |
| Pet Insurance - PetsBest | Not Applicable | Current Carrier - Not shown | 7.5% | Not Applicable |
| Additional Administrative Fee | N/A | Current Carrier - Shown in Proposal | $1.00 PPPM | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

While GBS does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier or HMO.  There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com).  Generally, agencies that provide ratings of U.S. Health Insurers, including traditional insurance companies and other managed care (e.g., HMO) organizations, reflects their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.

## A.M. Best's Rating Scale

| Level | Category | Level | Category | Level | Category |
|---|---|---|---|---|---|
| A++, A+ | Superior | B, B- | Fair | D | Poor |
| A, A- | Excellent | C++, C+ | Marginal | E | Under Regulatory Supervision |
| B++, B+ | Very Good | C, C- | Weak | F | In Liquidation |
|  |  |  |  | S | Rating Suspended |

### Financial Size Categories

| | |
|---|---|
| FSC I ................................................ Up to $1,000 | FSC IX ........................................ $250,000 to $500,000 |
| FSC II .......................................... $1,000 to $2,000 | FSC X ......................................... $500,000 to $750,000 |
| FSC III ......................................... $2,000 to $5,000 | FSC XI ........................................ $750,000 to $1,000,000 |
| FSC IV ....................................... $5,000 to $10,000 | FSC XII ...................................... $1,000,000 to $1,250,000 |
| FSC V ...................................... $10,000 to $25,000 | FSC XIII ..................................... $1,250,000 to $1,500,000 |
| FSC VI ..................................... $25,000 to $50,000 | FSC XIV ..................................... $1,500,000 to $2,000,000 |
| FSC VII ................................... $50,000 to $100,000 | FSC XV ...................................... $2,000,000 Or More |
| FSC VIII ................................. $100,000 to $250,000 | (In $000 of Reported Policyholders' Surplus Plus Conditional Reserve Funds) |

Best's Insurance Reports, published annually by A.M. Best Company, Inc., presents comprehensive reports on the financial position, history and transactions of insurance companies operating in the United States and Canada.  Companies licensed to do business in the United States are assigned a Best's Rating which attempts to measure the comparative position of the company or association against industry averages.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000684

# Non-Grandfathered Status

You had a health policy in effect prior to March 23, 2010, and because you have made significant enough plan changes to have lost your grandfathered status, you must comply with the additional requirements under the Affordable Health Care Act (ACA).

**Examples of plan changes that could have caused you to lose grandfathered status include, but may not be limited to:**

- Significantly cut or reduce benefits; or
- Add or reduce annual dollar limits; or
- Raise coinsurance percentages; or
- Increase deductibles or out-of-pocket maximums by more than the amounts allowed based on medical inflation*; or
- Increase employee contribution percentage by more than 5% of the contribution rate on March 23, 2010 (determined contribution rate based on COBRA valuation for self-insured plans).

*Medical inflation is the increase since March 2010 in the overall medical care component of the Consumer Price Index for All Urban Consumers (CPI-U) (unadjusted) published by the Department of Labor.

Your plan must comply with the provisions that apply to grandfathered plans in addition to the provisions that apply to non-grandfathered plans. The additional requirements that apply to non-grandfathered plans include, but are not limited to:

- Provide coverage to children to age 26 regardless of whether they are eligible for their own employment-based coverage; and
- Provide coverage of recommended preventive services with no cost sharing; and
- Include patient protections such as guaranteed access to emergency room services and OB-GYNs and pediatricians; and
- Include new claims appeal rules including both internal and external review; and
- Comply with nondiscrimination rules for fully insured health plans under Code §105(h) which prohibit discrimination in favor of highly compensated individuals as to benefits and eligibility requirements (pending release of final regulations).

**For plan years starting on or after January 1, 2014**, plans that have lost grandfathered status will also have to comply with the following:

- No discrimination against individuals participating in clinical trials (insured plans only); and
- No discrimination based on health status; and
- Provide essential benefits (insured plans only) and prohibit cost sharing in excess of the limits for qualified high deductible health plans; and
- No discrimination against healthcare providers acting within the scope of their professional license and applicable State law; and
- Prohibit out-of-pocket limits in excess of applicable out of pocket limits as determined by HHS for plan years starting on or after January 1, 2015.

*NOTE: This is only a brief summary of ACA guidance, intended to highlight points with the most universal impact. It is not intended to be a complete summary of requirements, changes, or regulations. Further guidance and probable changes are expected to continue.*

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000685

Crisalli Decl., p.0309

# Employer Shared Responsibility Mandate/ACA Compliance

| | | |
|---|---|---|
| **Employer Shared Responsibility Mandate (ESRM)**<br>Applicable Large Employer | 50+ full-time equivalent employees | An employer that employed at least 50 full time equivalent employees (FTE) in the preceding calendar year is required to offer affordable, minimum value health coverage to substantially all FTEs and dependent children or pay a penalty. There are separate requirements for 6055 (minimum essential coverage) reporting and 6056 (applicable large employer reporting). Refer to GBS Sections 6055 & 6056 Reporting Requirements toolkit. |
| **Member of Controlled Group?** | Subject to Employer Determination | If the total of FTEs for all employers in the controlled group is at least 50, each separate company is an applicable large employer and is subject to the employer mandate. Penalties are then imposed based on the offer of coverage provided by each separate company. |
| **Medical Plan(s) meet Minimum Essential Coverage?** | Yes | A plan must meet the minimum essential coverage requirement for an applicable large employer to meet employer mandate requirement. The Summary of Benefits & Coverage is required to reflect if the plan is minimum essential coverage. |
| **Offering to 95% of full-time employees?** | Subject to Employer Determination | An applicable large employer is required to offer minimum essential coverage to at least 95% of full-time employees or be subject to a penalty. |
| **Medical Plan(s) meet Minimum Value?*** | Yes | If the plan is not of a minimum value, then an employee will be eligible to seek premium assistance from the Marketplace (Exchange). If the employee receives premium assistance through the Marketplace, the employer will be subject to a penalty. The SBC is required to reflect whether the plan is of a minimum value. |
| **Affordable Coverage?*** | Subject to Employer Determination | If the cost of health coverage for the employee is unaffordable, then an employee will be eligible to seek premium assistance to purchase a plan from the Marketplace. If the employee receives premium assistance to purchase health coverage, then the employer would be subject to a penalty. |

*ACA requires employers covered by the Fair Labor Standards Act to notify employees about the availability of health insurance options for the public marketplaces/exchanges.  The Marketplace Notice you provide to new employees may need to be updated if the minimum value and/or affordable coverage status of your plan changes.

*NOTE: The answers outlined here are based on the recommendations of this proposal.  If these options are not chosen, are modified or final contributions differ, you may be subject to fees and penalties.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000686

Crisalli Decl., p.0310

# Proposal Assumptions

## General Assumptions

- Carriers reserve the right to revise rates should any federal, state or local authority mandate a change in benefits or impose or change a tax on plan revenue during the contract period.
- A group health plan may not reduce its coverage of the costs of pediatric vaccines (as defined under section 1928(h)(6) of the Social Security Act as amended by section 13830 of the Omnibus Budget Reconciliation Act of 1993) below the coverage it provided as of May 1, 1993. If the preventive care benefit which includes immunizations is currently in or is added to your medical plan it cannot in the future be deleted.
- Generally all lines of coverage within a carrier must be packaged and have common eligibility.
- Retirees are not eligible for coverage unless they qualify for a COBRA extension.
- Final rates will be based on actual enrollment, participation, employer contribution and other underwriting guidelines.
- Effective date of September 1, 2021. Unless otherwise indicated, rates will be guaranteed for 12 months.
- The PCORI (Patient-Centered Outcomes Research Institute) Fee has been extended through September 30, 2029. The fee will be paid by the insurer for insured plans and by the plan sponsor for self-insured health plans. For plan years that end on or after October 1, 2020, and before October 1, 2021, the fee is $2.66 per covered life. For plan years that end on or after October 1, 2019, and before October 1, 2020, the fee is $2.54 per covered life. For plan years that end on or after October 1, 2018, and before October 1, 2019, the fee is $2.45 per covered life.
- **Employer Contribution:** Please refer to contribution page.
- Eligible Employees:  Employees must work 30 hours per week to be eligible.
- **Probationary Period:** First of month following date of hire.

## Kaiser Permanente

- Rates are guaranteed for 12 months until September 1, 2022.
- The employer must contribute at least 50% of the employee-only monthly premium, and the contributions may not be made in a discriminatory manner.
- The proposed rates and benefits assume that 75% of all eligible employees are enrolled in a company-sponsored plan, excluding those who have documented other qualified coverage.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

## Delta Dental of WA

- Rates are guaranteed for 12 months until September 1, 2022.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000687

# Proposal Assumptions

**Lincoln Financial Group**
- Rates are guaranteed for 12 months until September 1, 2022.
- All employees must be actively at work on their effective date in order to be covered.
- As stated in "General Assumptions."
- Employers who pay for employees' group term life insurance must tax them on the cost of insurance for amounts exceeding $50,000.
  Internal Revenue Code Section 79 requires the taxable amount to be calculated using "uniform premium" rates commonly referred to as "Table I Rates".
- Your Plan is potentially discriminatory if it provides a better life insurance benefit to key employees; either on the basis of eligibility, difference in flat amount of
  benefit, or difference in multiplier. There are nondiscrimination tests that should be reviewed.  If your Plan is discriminatory,
  you would have to tax your key employees on the value of the total amount of employer-paid life insurance.

| Table I Rates: | |
|---|---|
| **Under age 25** | **$0.05** |
| **Ages 25 – 29** | **$0.06** |
| **Ages 30 – 34** | **$0.08** |
| **Ages 35 – 39** | **$0.09** |
| **Ages 40 – 44** | **$0.10** |
| **Ages 45 – 49** | **$0.15** |
| **Ages 50 – 54** | **$0.23** |
| **Ages 55 – 59** | **$0.43** |
| **Ages 60 – 64** | **$0.66** |
| **Ages 65 – 69** | **$1.27** |
| **Ages 70 +** | **$2.06** |

**Northwest Marketing Resources (NMR)**
- Rates are guaranteed for 12 months until September 1, 2022.
- As stated in "General Assumptions."

**GBS Administrators**
- Rates are guaranteed for 12 months until September 1, 2022.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Vision - Underwritten by VSP)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Life - Underwritten by Unum)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary AD&D - Underwritten by Standard)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Pet Insurance - Underwritten by PetsBest)**
- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

Prepared by:

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000688

# Gallagher Benefit Services Disclaimers

**Coverage**

This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company.  It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language.  See the policies and contracts for actual language.  This proposal (analyses, report, etc.) is not a contract and offers no contractual obligation on behalf of GBS.

**Renewal/Financial**

This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.

**Legal**

The intent of this analysis [report, letter, etc.] is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment. It should not be construed as, nor is it intended to provide, legal advice.  Laws may be complex and subject to change.  This information is based on current interpretation of the law and is not guaranteed.  Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000689

# Gallagher Benefit Services Privacy Policy Disclosure

6/28/2021

Cedar Park Assembly of God
Steve Orcutt
16300 112 Ave NE
Bothell, WA - 98011

RE: Privacy Policy Disclosure

Dear Steve,

Gallagher Benefit Services, Inc. (Gallagher) treats your personal privacy with care and respect. Because we value our client relationships, we do not disclose our clients' nonpublic personal, financial or health information with third parties, except for the specific purposes listed in the enclosed Privacy Policy Summary or as otherwise permitted by law.  Personal information is any information that can be used to identify, locate or contact you or your employees.  Personal information does not include publicly available information or individually identifiable business contact information of employees such as name, title, business address, business telephone number or business email address.

Applicable law requires Gallagher to provide our clients with notice of our Privacy Policy, a summary of which is enclosed here (the full text of the Gallagher Privacy Policy can be retrieved at the following URL: http://www.ajg.com/privacy-policy/).  This policy does not apply to our efforts to market our products and services to you, so you may receive information from us regarding products that may suit your needs.

Gallagher has always been mindful of our clients' privacy.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Thank you for choosing Gallagher Benefit Services, Inc. We appreciate your business and value our relationship.

Enclosure: Privacy Policy Summary

Prepared by:
 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000690

# Gallagher Benefit Services Privacy Policy Disclosure

This Privacy Policy Disclosure outlines and summarizes our information sharing practices to help you understand how we protect your privacy and that of your employees when we collect and use information about you and your employees, and the measures we take to safeguard that information.

**Information We May Collect.** We may collect the following nonpublic personal, financial or health information about you or your employees including:

- Information we receive from you and your employees on applications or questionnaires, such as occupation, current employer and social security number;
- Information about your transactions with us, our affiliates or previous insurers; such as your policy coverage, claim information, premiums and payment history;
- Information we receive from consumer-reporting agencies such as Equifax that is obtained for the purpose of ascertaining credit histories. These reports are obtained as underwriting tools to determine bill paying habits and credit worthiness for certain individual, personal insurance products. These reports are not subject to race, gender or income.
- Information that allows us to communicate with you or your employees, such as name, user name, password, age, marital status, occupation, mailing address, telephone numbers, email address, or other addresses that allow us to send a message;
- Information that assists us to conduct business with you or your employees, such as types of products or services that may be of interest, employee financial information, or information on your company's size, revenue, type, industry codes, demographics, locations, and financial information;
- Information about your transactions with us, our affiliates, or your previous providers;

**Information We Disclose.** We do not disclose any nonpublic personal, financial or health information about our clients, former clients or their employees to anyone, except for the purposes of placing your insurance coverage(s), fulfilling your requests for products or services and related activities, responding to your requests for a call or email, processing transactions you request, telling you about products or services we offer and as otherwise permitted by law.

**Information Security.** We restrict access to nonpublic personal, financial or health information about you and your employees to those employees and subcontractors who have a need to know that information to provide products or services to you or your employees.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2021

Cedar Park 000691

# Medical
### *Benchmarking - Contributions*



| | Cedar Park Assembly of God | Cedar Park Assembly of God | 2020 Gallagher Benefits Strategy and Benchmarking Survey | | | | |
| | | | Religious Industry | K-12 Industry | Washington State | 100 to 499 FTEs | All Employers |
|---|---|---|---|---|---|---|---|
| *Medical Plan* | *HMO* | *PPO* | | | | | |
| **Monthly Employer Contribution\*** | | | | | | | |
| Employee Only Plan | 75% | 67% | Insufficient data\*\* | 89% | Insufficient data\*\* | 82% | 82% |
| Family Plan | 23% | 22% | Insufficient data\*\* | 86% | Insufficient data\*\* | 75% | 74% |
| **Factors That Determine Contributions** | | | | | | | |
| Salary | | | 13% | 9% | 5% | 8% | 9% |
| Job Grade | | | 9% | 20% | 2% | 6% | 6% |
| Wellbeing Program Participating | | | 7% | 4% | 7% | 10% | 11% |
| Completion of Health Risk Assessment | | | 4% | 7% | 4% | 6% | 7% |
| Per-Dependent Charge | | | 0% | 5% | 17% | 10% | 10% |
| Other | | | 13% | 13% | 14% | 11% | 12% |
| No Variation in Contributions | | | 61% | 56% | 60% | 61% | 59% |
| **Employee Cost-Sharing Increases Implemented at Most Recent Renewal** | | | | | | | |
| Health Plan Premiums | | | 51% | 39% | 39% | 44% | 44% |
| Out-of-Pocket Maximums | | | 13% | 11% | 14% | 12% | 14% |
| Deductibles | | | 9% | 10% | 16% | 14% | 16% |
| Brand-Name Drugs | | | 4% | 6% | 7% | 5% | 5% |
| Specialty Drugs | | | 2% | 7% | 8% | 6% | 6% |
| Generic Drugs | | | 2% | 3% | 4% | 3% | 3% |
| Did not increase EE Cost Share | | | 49% | 54% | 53% | 50% | 48% |
| **Monthly COBRA Rate\*** | | | | | | | |
| Employee Only Plan | $370 | $428 | Insufficient data\*\* | $534 | $533 | $610 | $564 |
| Family Plan | $1,138 | $1,316 | Insufficient data\*\* | $1,511 | $1,679 | $1,624 | $1,613 |
| **Employer Contribution to HRA - *Estimated*** | | | | | | | |
| Employee Only Plan | $5,350 | $5,350 | $1,025 | $915 | $1,356 | $1,025 | $939 |
| Family Plan | $10,700 | $10,700 | $1,788 | $1,340 | $1,813 | $1,731 | $1,616 |
| **Does Employer Contribute to the HSA ?** | - | - | Yes - 46% No - 54% | Yes - 73% No - 27% | Yes - 91% No - 9% | Yes - 73% No - 27% | Yes - 73% No - 27% |
| **Employer Contribution to HSA - *Estimated*** | | | | | | | |
| Employee Only Plan | $500 | $500 | $786 | $785 | $968 | $828 | $793 |
| Family Plan | $1,000 | $1,000 | $1,266 | $1,189 | $1,449 | $1,318 | $1,290 |

\*Benchmark Contribution data and COBRA rates are based on survey results for employees with HDHP plans with an HRA only.

\*\*Insufficient data indicates sample size responses too low to share results.

Cedar Park 000692

# Exhibit O

# cedarpark church

## 2022 Employee Benefits Renewal

Wednesday June 1st, 2022

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM



Cedar Park 001891

## Agenda

I.    Executive Summary

II.   Renewal and Marketing Summary

    A.  Medical – Current/Renewal/Alternative rates, benefits and contributions

    B.  Dental – Current/Renewal rates, benefits and contributions

    C.  Vision – Current/Renewal rates and benefits

    D.  Life and AD&D – Current/Renewal rates and benefits

    E.  Voluntary Life – Current/Alternative rates and benefits

    F.  Voluntary AD&D – Current rates and benefits

    G.  Long Term Disability – Current/Renewal rates and benefits

III.  Voluntary Critical Illness and Voluntary Accident

IV.   HRA

V.    Current Experience Reports

VI.   Carrier Reporting

VII.  Disclaimers and Disclosures



Cedar Park 001892

Crisalli Decl., p.0319



# Executive Summary

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 3

Cedar Park 001893

## Executive Summary

**I.**  **Medical – Kaiser Permanente:**

The renewal called for a 14.18% increase from current

➢  HDHP HMO – 7.43% increase ($22,558)

➢  HDHP PPO – 17.14% increase ($118,797)

**II.**  **Dental – Delta Dental of Washington:**

The renewal called for a 0% change from current with 1 year rate guarantee ending 08/31/2023.

**III.**  **Vision – Vision Service Plan:**

The renewal called for a 6.15% increase from current, or an increase of $698 with 2 year rate guarantee ending 08/31/2024.

➢  Base Plan – 6.18% increase ($406)

➢  Buy Up Plan – 6.12% increase ($292)

**IV.**  **Life and AD&D – Lincoln Financial Group:**

The Life and AD&D plan is under 2 year rate guarantee ending 08/31/2023.



## Executive Summary

**V.  Voluntary Life – Unum:**

The renewal called for a 0% increase.

**Lincoln Financial Group: alternative shown**

The Voluntary Life and AD&D plan is under 2 year rate guarantee ending 08/31/2024.

**VI.  Voluntary AD&D – Standard Insurance Company:**

The renewal called for a 0% increase.

**Long Term Disability – Lincoln Financial Group:**

The Long Term Disability plan is under 2 year rate guarantee ending 08/31/2023.



Cedar Park 001895

## Renewal Summary

### 2022 Plan Year

| Coverage | Carrier | Renewal Date | Rate Action |
|---|---|---|---|
| Medical | Kaiser Permanente | 09/01/2022 | 14.18% increase |
| Dental | Delta Dental of Washington | 09/01/2022 | 0% change |
| Vision | Vision Service Plan | 09/01/2022 | 6.15% increase |
| Life and AD&D | Lincoln Financial Group | 09/01/2023 | 0% change |
| Voluntary Life | Unum | 09/01/2022 | 0% change |
| Voluntary AD&D | Standard Insurance Company | 09/01/2022 | 0% change |
| Long Term Disability | Lincoln Financial Group | 09/01/2023 | 0% change |



Cedar Park 001896

Crisalli Decl., p.0323



Insurance | Risk Management | Consulting

# Medical Plans

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 7

Cedar Park 001897

# Medical Plans Current Summary – Kaiser Permanente

| | | | CURRENT | |
| --- | --- | --- | --- | --- |
| | **Carrier Name** | | Kaiser Permanente | |
| | **Plan Name** | | HDHP HMO | HDHP PPO |
| **PLAN DESIGN*** | | | | |
| **In-Network Benefits** | | | Core HMO | Access PPO |
| Deductible Type | | | Embedded | Embedded |
| Calendar Year (CY) Deductible (Individual / Family) | | | $6,750 / $13,500 | $6,750 / $13,500 |
| Out-of-Pocket Max Type | | | Embedded | Embedded |
| CY Out-of-Pocket Max (Individual / Family) | | | $6,900 / $13,800 | $6,900 / $13,800 |
| Coinsurance (member pays after deductible) | | | 10% | 10% |
| Preventive Care | | | Covered 100% | Covered 100% |
| Primary Care Visit | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Specialist Visit | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Telehealth | | | 0% after deductible | 0% after deductible |
| Urgent Care | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Emergency Room | | | 10% after deductible (Copay waived if admitted) | 10% after deductible (Copay waived if admitted) |
| Inpatient Hospital | | | 10% after deductible | 10% after deductible |
| Outpatient Surgery | | | 10% after deductible | 10% after deductible |
| Chiropractic (visit limits may apply) | | | 10% after deductible (10 Visits) | 10% after deductible (Combined 8 visits) |
| Phys/Occ/Speech Therapy (visit limits may apply) | | | 10% after deductible (Outpatient: Combined with Habilitation services 60 visits; Inpatient: 60 Days) | 10% after deductible (Enhanced benefit: 5% after deductible) (Outpatient: Combined with Habilitation services 60 visits; Inpatient: 60 Days) |
| Diagnostic Test (X-ray, blood work) | | | 10% after deductible | 10% after deductible |
| Imaging (CT/PET scan, MRI) | | | 10% after deductible | 10% after deductible |
| Prescription Drug Benefit | | | | |
| Retail | Preventive Drug | | Covered 100% | Covered 100% |
| | | | 30 Days | 30 Days |
| | Tier I / Tier II / Tier III | | $20 / $40 / $60 after deductible | $10 / $35 / $70 after deductible (Enhanced: $10 / $30 / $65 after deductible) |
| Mail Order | Specialty | | $20 / $40 / $60 after deductible | $10 / $35 / $70 after deductible |
| | | | 90 Days | 90 days |
| | Tier I / Tier II / Tier III | | $60 / $120 / $180 after deductible | $30 / $105 / $210 after deductible |
| **Out-of-Network Benefits** | | | | |
| Deductible Type | | | N/A | Embedded |
| CY Deductible (Individual / Family) | | | N/A | $6,750 / $13,500 |
| Out-of-Pocket Max Type | | | N/A | Embedded |
| CY Out-of-Pocket Max (Individual / Family) | | | N/A | $6,900 / $13,800 |
| Coinsurance (member pays after deductible) | | | N/A | 30% |

| **COST ANALYSIS** | | | | |
| --- | --- | --- | --- | --- |
| | Plan 1 | Plan 2 | HDHP HMO | HDHP PPO |
| Employee (EE) Only | 37 | 50 | $417.20 | $482.71 |
| EE + Spouse | 4 | 5 | $921.71 | $1,066.50 |
| EE + Child(ren) | 3 | 10 | $778.24 | $900.50 |
| EE + Family | 3 | 13 | $1,282.80 | $1,484.24 |
| **Total Enrollment** | **47** | **78** | | |
| Estimated Monthly Premium | | | $25,306 | $57,768 |
| Estimated Annual Premium | | | **$303,676** | **$693,217** |
| | | Dollar Difference from Current | | |
| | | Percent Change from Current | | |

| **Total Combined Annual Cost** | | |
| --- | --- | --- |
| | CURRENT | |
| Estimated Annual Premium | $996,894 | |
| Dollar Difference from Current | | |
| Percent Change from Current | | |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Cedar Park 001898

Insurance | Risk Management | Consulting

Gallagher

# Medical Plans Renewal Summary – Kaiser Permanente

| | | | RENEWAL | |
|---|---|---|---|---|
| | | Carrier Name | Kaiser Permanente | |
| | | Plan Name | HDHP HMO | HDHP PPO |
| **PLAN DESIGN\*** | | | | |
| **In-Network Benefits** | | | Core HMO | Access PPO |
| Deductible Type | | | Embedded | Embedded |
| Calendar Year (CY) Deductible (Individual / Family) | | | $6,750 / $13,500 | $6,750 / $13,500 |
| Out-of-Pocket Max Type | | | Embedded | Embedded |
| CY Out-of-Pocket Max (Individual / Family) | | | $6,900 / $13,800 | $6,900 / $13,800 |
| Coinsurance (member pays after deductible) | | | 10% | 10% |
| Preventive Care | | | Covered 100% | Covered 100% |
| Primary Care Visit | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Specialist Visit | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Telehealth | | | 0% after deductible | 0% after deductible |
| Urgent Care | | | 10% after deductible | 10% after deductible (Enhanced benefit: 5% after deductible) |
| Emergency Room | | | 10% after deductible (Copay waived if admitted) | 10% after deductible (Copay waived if admitted) |
| Inpatient Hospital | | | 10% after deductible | 10% after deductible |
| Outpatient Surgery | | | 10% after deductible | 10% after deductible |
| Chiropractic (visit limits may apply) | | | 10% after deductible (10 Visits) | 10% after deductible (Combined 8 visits) |
| Phys/Occ/Speech Therapy (visit limits may apply) | | | 10% after deductible (Outpatient: Combined with Habilitation services 60 visits; Inpatient: 60 Days) | 10% after deductible (Enhanced benefit: 5% after deductible) (Outpatient: Combined with Habilitation services 60 visits; Inpatient: 60 Days) |
| Diagnostic Test (X-ray, blood work) | | | 10% after deductible | 10% after deductible |
| Imaging (CT/PET scan, MRI) | | | 10% after deductible | 10% after deductible |
| **Prescription Drug Benefit** | | | | |
| Preventive Drug | | | Covered 100% | Covered 100% |
| Retail | | | 30 Days | 30 Days |
| Tier I / Tier II / Tier III | | | $20 / $40 / $60 after deductible | $10 / $35 / $70 after deductible (Enhanced: $10 / $30 / $65 after deductible) |
| Specialty | | | $20 / $40 / $60 after deductible | $10 / $35 / $70 after deductible |
| Mail Order | | | 90 Days | 90 days |
| Tier I / Tier II / Tier III | | | $60 / $120 / $180 after deductible | $30 / $105 / $210 after deductible |
| **Out-of-Network Benefits** | | | | |
| Deductible Type | | | N/A | Embedded |
| CY Deductible (Individual / Family) | | | N/A | $13,500 / $27,000 |
| Out-of-Pocket Max Type | | | N/A | Embedded |
| CY Out-of-Pocket Max (Individual / Family) | | | N/A | Unlimited |
| Coinsurance (member pays after deductible) | | | N/A | 30% |
| **COST ANALYSIS** | | | | |
| | Plan 1 | Plan 2 | HDHP HMO | HDHP PPO |
| Employee (EE) Only | 37 | 50 | $448.19 | $565.43 |
| EE + Spouse | 4 | 5 | $990.18 | $1,249.27 |
| EE + Child(ren) | 3 | 10 | $836.05 | $1,054.82 |
| EE + Family | 3 | 13 | $1,378.09 | $1,738.60 |
| Total Enrollment | 47 | 78 | | |
| Estimated Monthly Premium | | | $27,186 | $67,668 |
| Estimated Annual Premium | | | $326,234 | $812,014 |
| | | Dollar Difference from Current | $22,558 | $118,797 |
| | | Percent Change from Current | 7.43% | 17.14% |
| **Total Combined Annual Cost** | | | | |
| | | | RENEWAL | |
| Estimated Annual Premium | | | $1,138,248 | |
| | | Dollar Difference from Current | $141,354 | |
| | | Percent Change from Current | 14.18% | |

\*NOTE: Benefit deviations from Current are identified in red
The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.

Gallagher

Insurance | Risk Management | Consulting

Cedar Park 001899



# Non-Medical Plans

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 10

Cedar Park 001900

## Dental Plan Current/Renewal Summary – Delta Dental of Washington

| | | CURRENT | | RENEWAL | |
|---|---|---|---|---|---|
| **Carrier Name** | | Delta Dental of Washington | | Delta Dental of Washington | |
| **Plan Name** | | Dental PPO Plan | | Dental PPO Plan | |
| **PLAN DESIGN*** | | | | | |
| | **Network** | **INN [Delta Dental PPO]** | **OON** | **INN [Delta Dental PPO]** | **OON** |
| Calendar Year (CY) Deductible (Individual / Family) | | $0 / $0 | $50 / $150 | $0 / $0 | $50 / $150 |
| Annual Maximum | | $1,500 | $1,500 | $1,500 | $1,500 |
| Coinsurance** (member pays after deductible) | | | | | |
| Preventive Services | | 100% | 100% | 100% | 100% |
| Cleaning Frequency | | Twice in a benefit period | Twice in a benefit period | Twice in a benefit period | Twice in a benefit period |
| Deductible Waived? | | Yes | Yes | Yes | Yes |
| Basic | | 80% | 80% | 80% | 80% |
| Periodontics | | 80% | 80% | 80% | 80% |
| Endodontics | | 80% | 80% | 80% | 80% |
| Major | | 50% | 50% | 50% | 50% |
| Implants | | 50% | 50% | 50% | 50% |
| Orthodontics | | Not Covered | Not Covered | Not Covered | Not Covered |
| Maximum Age | | N/A | N/A | N/A | N/A |
| Deductible | | N/A | N/A | N/A | N/A |
| Lifetime Max | | N/A | N/A | N/A | N/A |
| **OON Reimbursement Level** | | MAC | | MAC | |
| **COST ANALYSIS** | | | | | |
| | Plan 1 | Dental PPO Plan | | Dental PPO Plan | |
| Employee (EE) Only | 95 | $50.42 | | $50.42 | |
| EE + Spouse | 18 | $98.66 | | $98.66 | |
| EE + Child(ren) | 9 | $108.73 | | $108.73 | |
| EE + Family | 19 | $156.98 | | $156.98 | |
| **Total Enrollment** | **141** | | | | |
| Estimated Monthly Premium | | $10,527 | | $10,527 | |
| Estimated Annual Premium | | **$126,324** | | **$126,324** | |
| **Dollar Difference from Current** | | | | **$0** | |
| **Percent Change from Current** | | | | **0.00%** | |

**\*\*Exclusions/limitations may apply**
*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001901

# Contribution Outline

| | | Current (9/1/2021 - 8/31/2022) | | | Renewal (9/1/2022 - 8/31/2023) | | |
|---|---|---|---|---|---|---|---|
| | | *Total Cost* | *ER Cost* | *EE Cost\** | *Total Cost* | *ER Cost* | *EE Cost\** |
| **PPO Medical Plan** | | | | | | | |
| Employee | 50 | $482.71 | $333.71 | $149.00 | $565.43 | $390.90 | $174.53 |
| Employee + Spouse | 5 | $1,066.50 | $397.50 | $669.00 | $1,249.27 | $465.62 | $783.65 |
| Employee + Child(ren) | 10 | $900.50 | $386.50 | $514.00 | $1,054.82 | $452.74 | $602.08 |
| Employee + Family | 13 | $1,484.24 | $430.24 | $1,054.00 | $1,738.60 | $503.97 | $1,234.63 |
| **HMO Medical Plan** | | | | | | | |
| Employee | 37 | $417.20 | $318.20 | $99.00 | $448.19 | $341.84 | $106.35 |
| Employee + Spouse | 4 | $921.71 | $344.71 | $577.00 | $990.18 | $370.32 | $619.86 |
| Employee + Child(ren) | 3 | $778.24 | $336.24 | $442.00 | $836.05 | $361.22 | $474.83 |
| Employee + Family | 3 | $1,282.80 | $372.80 | $910.00 | $1,378.09 | $400.49 | $977.60 |
| **Medical Total Annual Cost** | | **$996,894** | **$520,926** | **$475,968** | **$1,138,248** | **$592,399** | **$545,849** |
| *% Change* | | | | | *14.2%* | *13.7%* | *14.7%* |
| *$ Change* | | | | | *$141,354* | *$71,473* | *$69,881* |
| | | | | | | | |
| **Annual HSA Contribution** | | | | | | | |
| Employee Only | 87 | $500 | $500 | $0 | $500 | $500 | $0 |
| Employee + Dependents | 38 | $1,000 | $1,000 | $0 | $1,000 | $1,000 | $0 |
| **HSA Contribution Total Annual Cost** | | **$81,500** | **$81,500** | **$0** | **$81,500** | **$81,500** | **$0** |
| *% Change* | | | | | *0.0%* | *0.0%* | *0.0%* |
| *$ Change* | | | | | *$0* | *$0* | *$0* |
| | | | | | | | |
| **Dental Plan** | | | | | | | |
| Employee | 95 | $50.42 | $28.42 | $22.00 | $50.42 | $28.42 | $22.00 |
| Employee + Spouse | 18 | $98.66 | $35.66 | $63.00 | $98.66 | $35.66 | $63.00 |
| Employee + Child(ren) | 9 | $108.73 | $45.73 | $63.00 | $108.73 | $45.73 | $63.00 |
| Employee + Family | 19 | $156.98 | $51.98 | $105.00 | $156.98 | $51.98 | $105.00 |
| **Dental Total Annual Cost** | | **$126,324** | **$56,892** | **$69,432** | **$126,324** | **$56,892** | **$69,432** |
| *% Change* | | | | | *0.0%* | *0.0%* | *0.0%* |
| *$ Change* | | | | | *$0* | *$0* | *$0* |
| | | | | | | | |
| **Total Annual Cost** | | **$1,204,717** | **$659,317** | **$545,400** | **$1,346,072** | **$730,791** | **$615,281** |
| *% Change* | | | | | *11.7%* | *10.8%* | *12.8%* |
| *$ Change* | | | | | *$141,354* | *$71,473* | *$69,881* |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 12

**Gallagher**

Insurance | Risk Management | Consulting

Cedar Park 001902

# Vision Plans Current Summary – Vision Service Plan (Voluntary)

| | | CURRENT | | | |
|---|---|---|---|---|---|
| **Carrier Name** | | Vision Service Plan | | | |
| **Plan Name** | | **Base Plan** | | **Buy Up Plan** | |
| **PLAN DESIGN\*** | | | | | |
| **Network Name** | | **VSP** | **Out of network** | **VSP** | **Out of network** |
| Exam (including eyewear exam) | | | | | |
| Frequency | | 12 Months | 12 Months | 12 Months | 12 Months |
| Benefit | | $10 Copay | Reimburse up to $50 | $10 Copay | Reimburse up to $50 |
| Lenses | | | | | |
| Materials Copay | | $25 Copay | | $25 Copay | |
| Frequency | | 12 Months | 12 Months | 12 Months | 12 Months |
| Single | | $25 Copay | Reimburse up to $50 | $25 Copay | Reimburse up to $50 |
| Bifocal | | $25 Copay | Reimburse up to $75 | $25 Copay | Reimburse up to $75 |
| Trifocal | | $25 Copay | Reimburse up to $100 | $25 Copay | Reimburse up to $100 |
| Frames | | | | | |
| Frequency | | 24 Months | 24 Months | 12 Months | 12 Months |
| Allowance | | Up to $130 plus 20% off | Reimburse up to $70 | Up to $130 plus 20% off | Reimburse up to $70 |
| Contact Lenses | | | | | |
| Frequency | | 12 Months | 12 Months | 12 Months | 12 Months |
| Allowance | | Up to $130 | Reimburse up to $105 | Up to $130 | Reimburse up to $105 |
| Medically Necessary | | Covered in full | Reimburse up to $210 | Covered in full | Reimburse up to $210 |
| Separate Fitting Allowance | | Up to $60 copay after 15% discount | Reimburse up to $105 | Up to $60 copay after 15% discount | Reimburse up to $105 |
| **COST ANALYSIS** | | | | | |
| | Plan 1 | Plan 2 | Base Plan | | Buy Up Plan |
| **Employee (EE) Only** | 34 | 14 | $7.86 | | $9.81 |
| **EE + Spouse** | 5 | 8 | $12.58 | | $15.70 |
| **EE + Child(ren)** | 4 | 2 | $12.84 | | $16.02 |
| **EE + Family** | 8 | 4 | $20.71 | | $25.83 |
| **Total Enrollment** | 51 | 28 | | | |
| **Estimated Monthly Premium** | | | $547 | | $398 |
| **Estimated Annual Premium** | | | **$6,566** | | **$4,780** |
| **Dollar Difference from Current** | | | | | |
| **Percent Change from Current** | | | | | |
| **Total Combined Annual Cost** | | | | | |
| **Estimated Annual Premium** | | | $11,346 | | |
| **Dollar Difference from Current** | | | | | |
| **Percent Change from Current** | | | | | |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Gallagher

Cedar Park 001903

# Vision Plans Renewal Summary – Vision Service Plan (Voluntary)

| | RENEWAL | | | |
|---|---|---|---|---|
| Carrier Name | Vision Service Plan | | | |
| Plan Name | Base Plan | | Buy Up Plan | |

| **PLAN DESIGN\*** | | | | |
|---|---|---|---|---|
| Network Name | **VSP** | **Out of network** | **VSP** | **Out of network** |
| **Exam (including eyewear exam)** | | | | |
| Frequency | 12 Months | 12 Months | 12 Months | 12 Months |
| Benefit | $10 Copay | Reimburse up to $50 | $10 Copay | Reimburse up to $50 |
| **Lenses** | | | | |
| Materials Copay | $25 Copay | | $25 Copay | |
| Frequency | 12 Months | 12 Months | 12 Months | 12 Months |
| Single | $25 Copay | Reimburse up to $50 | $25 Copay | Reimburse up to $50 |
| Bifocal | $25 Copay | Reimburse up to $75 | $25 Copay | Reimburse up to $75 |
| Trifocal | $25 Copay | Reimburse up to $100 | $25 Copay | Reimburse up to $100 |
| **Frames** | | | | |
| Frequency | 24 Months | 24 Months | 12 Months | 12 Months |
| Allowance | Up to $130 plus 20% off | Reimburse up to $70 | Up to $130 plus 20% off | Reimburse up to $70 |
| **Contact Lenses** | | | | |
| Frequency | 12 Months | 12 Months | 12 Months | 12 Months |
| Allowance | Up to $130 | Reimburse up to $105 | Up to $130 | Reimburse up to $105 |
| Medically Necessary | Covered in full | Reimburse up to $210 | Covered in full | Reimburse up to $210 |
| Separate Fitting Allowance | Up to $60 copay after 15% discount | Reimburse up to $105 | Up to $60 copay after 15% discount | Reimburse up to $105 |

| **COST ANALYSIS** | | | | |
|---|---|---|---|---|
| | Plan 1 | Plan 2 | Base Plan | Buy Up Plan |
| **Employee (EE) Only** | 34 | 14 | $8.35 | $10.41 |
| **EE + Spouse** | 5 | 8 | $13.35 | $16.66 |
| **EE + Child(ren)** | 4 | 2 | $13.63 | $17.00 |
| **EE + Family** | 8 | 4 | $21.98 | $27.41 |
| **Total Enrollment** | **51** | **28** | | |
| **Estimated Monthly Premium** | | | $581 | $423 |
| **Estimated Annual Premium** | | | **$6,972** | **$5,072** |
| Dollar Difference from Current | | | **$406** | **$292** |
| Percent Change from Current | | | **6.18%** | **6.12%** |
| **Total Combined Annual Cost** | | | | |
| **Estimated Annual Premium** | | | $12,044 | |
| Dollar Difference from Current | | | $698 | |
| Percent Change from Current | | | 6.15% | |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 14

Gallagher

Insurance | Risk Management | Consulting

Cedar Park 001904

## Life and AD&D Plan Current/Renewal Summary – Lincoln Financial Group

| | | | CURRENT / RENEWAL |
|---|---|---|---|
| | | Carrier Name | **Lincoln Financial Group** |
| **PLAN DESIGN\*** | | | |
| **Employee** | | | |
| **Life Benefit** | | | $10,000 |
| **AD&D Benefit** | | | Same as Life amount |
| **Benefit Reduction Schedule** (% benefit reduces by at age) | | | 35% at age 65; 50% at age 70 |
| **Waiver of Premium** | | | Included |
| **Accelerated Benefit Amount** | | | 75% to max $250,000 |
| **Convertible/Portable** | | | Included |
| **COST ANALYSIS** | | | |
| **Rates** | **Volume/Unit(s)** | **Covered Lives** | CURRENT / RENEWAL |
| **Life Rate Per $1,000 Vol** | $1,866,000 | 196 | $0.190 |
| **AD&D Rate Per $1,000 Vol** | $1,866,000 | 196 | $0.020 |
| **Estimated Monthly Premium** | | | $392 |
| **Estimated Annual Premium** | | | **$4,702** |
| | | **Dollar Difference from Current** | **$0** |
| | | **Percent Change from Current** | **0.00%** |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Cedar Park 001905

Gallagher

Crisalli Decl., p.0332

# Voluntary Life Plan Current Summary – Unum

| | CURRENT |
|---|---|
| **Carrier Name** | **Unum** |
| **PLAN DESIGN\*** | |
| **Employee Benefit** | |
| **Benefit Maximum** | 1-5x annual earnings to max $500,000 |
| **Guarantee Issue** | $210,000 |
| **Benefit Reduction Schedule** | |
| **(% benefit reduces by at age)** | 35% at age 70; 50% at age 75 |
| **Spouse Benefit** | |
| **Benefit Maximum** | 0.5-2.5x annual earnings or $250,000 not to exceed 50% of EE's amount |
| **Guarantee Issue** | $105,000 |
| **Benefit Reduction Schedule** | |
| **(% benefit reduces by at age)** | 35% at age 70; 50% at age 75 |
| **Child Benefit (Life)** | Live birth to 14 days: $1,000; 14 days to 6 months: $1,000; 6 months to age 26: $10,000 not to exceed 50% of EE's amount |
| **Definition of Earnings** | Base salary + commissions |
| **Waiver of Premium** | Included |
| **Accelerated Benefit** | 75% to max $500,000 |
| **Conversion/Portability** | Included |
| **Continuity of Coverage** | Included |
| **COST ANALYSIS** | |

| **Voluntary Rates per $1,000** | **Covered Lives** | **Employee** | **Spouse** |
|---|---|---|---|
| **Age Range (spouse based on EE's age)** | | | |
| 0 - 19 | | $0.057 | $0.057 |
| 20 - 24 | | $0.057 | $0.057 |
| 25 - 29 | | $0.069 | $0.069 |
| 30 - 34 | | $0.092 | $0.092 |
| 35 - 39 | | $0.103 | $0.103 |
| 40 - 44 | EE: 34; | $0.115 | $0.115 |
| 45 - 49 | Spouse: 14; | $0.172 | $0.172 |
| 50 - 54 | Children: 7 | $0.264 | $0.264 |
| 55 - 59 | | $0.493 | $0.493 |
| 60 - 64 | | $0.756 | $0.756 |
| 65 - 69 | | $1.456 | $1.456 |
| 70 - 74 | | $2.361 | $2.361 |
| 75 - 79 | | $2.361 | $2.361 |
| 80+ | | $2.361 | $2.361 |
| **Child Rate** | | $2.500 | |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

**Gallagher**
Insurance | Risk Management | Consulting

Cedar Park 001906

## Voluntary AD&D Plan Current Summary – Standard Insurance Company

| | | CURRENT |
|---|---|---|
| | Carrier Name | Standard Insurance Company |
| **PLAN DESIGN*** | | |
| **Employee Benefit** | | |
|   Increments | | $100,000 |
|   Guarantee Issue | | $500,000 |
|   **AD&D Benefit** | | Lesser of 10x annual earnings or $500,000 |
| **Benefit Reduction Schedule**<br>  (% benefit reduces by at age) | | No age reduction |
| **Spouse Benefit** | | |
|   Guarantee Issue | | $250,000 |
|   **AD&D Benefit** | | Lesser of $250,000 or 50% of EE's amount |
| **Benefit Reduction Schedule**<br>  (% benefit reduces by at age) | | No age reduction |
| **Child Benefit (Life/AD&D)** | | $10,000 not to exceed 100% of EE's amount |
| **Definition of Earnings** | | Base salary + commissions |
| **Waiver of Premium** | | Not-Included |
| **Conversion/Portability** | | Not-Included / Included |
| **Continuity of Coverage** | | Included |
| **Suicide Exclusion** | | Included |
| **COST ANALYSIS** | | |
| **AD&D Rate (Employee / Spouse / Child)** | **Covered Lives**<br>**EE: 38** | $0.047 / $0.047 / $0.047 |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 17

Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001907

# Voluntary Life Alternative– Lincoln Financial Group

| | Alternative Plan |
|---|---|
| Carrier Name | Lincoln Financial Group |
| **PLAN DESIGN*** | |
| **Employee Benefit** | |
| Increments | $10,000 |
| Benefit Maximum | 5x annual salary to max $500,000;<br>Age 70 & over: $50,000 |
| Guarantee Issue | $200,000 |
| Benefit Reduction Schedule<br>(% benefit reduces by at age) | 35% at age 65; 60% at age 70; 75% at age 75 |
| **Spouse Benefit** | |
| Increments | $5,000 |
| Benefit Maximum | $250,000 not to exceed 50% of EE's amount |
| Guarantee Issue | $30,000 |
| Benefit Reduction Schedule<br>(% benefit reduces by at age) | 35% at age 65; Terminates at age 70 |
| Child Benefit (Life/AD&D) | Day 1 to age 14 days: No Benefit;<br>14 days but less than 6 months: $250;<br>6 Months but less than 19 years (or 25 years if unmarried, & a full-time student): $10,000 |
| Definition of Earnings | Basic Annual Including Commissions |
| Waiver of Premium | Included |
| Accelerated Benefit | 75% to max $250,000 |
| Conversion/Portability | Included |
| Continuity of Coverage | Included |

| **COST ANALYSIS** | | | |
|---|---|---|---|
| Voluntary Rates per $1,000 | Covered Lives | Employee | Spouse |
| **Age Range (spouse based on EE's age)** | | | |
| 0 - 19 | | $0.040 | $0.040 |
| 20 - 24 | | $0.040 | $0.040 |
| 25 - 29 | | $0.050 | $0.050 |
| 30 - 34 | | $0.060 | $0.060 |
| 35 - 39 | | $0.070 | $0.070 |
| 40 - 44 | EE: 34; | $0.080 | $0.080 |
| 45 - 49 | Spouse: 14; | $0.120 | $0.120 |
| 50 - 54 | Children: 7 | $0.180 | $0.180 |
| 55 - 59 | | $0.340 | $0.340 |
| 60 - 64 | | $0.510 | $0.510 |
| 65 - 69 | | $0.990 | $0.990 |
| 70 - 74 | | $1.610 | $1.610 |
| 75 - 79 | | $1.610 | $1.610 |
| 80+ | | $1.610 | $1.610 |
| Child Rate | | $0.200 | |

*NOTE: Benefit deviations from Current are identified in blue*
*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 18

Gallagher
Insurance | Risk Management | Consulting

Cedar Park-001908

## Voluntary AD&D Alternative – Lincoln Financial Group

| | | Alternative Plan |
|---|---|---|
| | Carrier Name | Lincoln Financial Group |
| **PLAN DESIGN*** | | |
| **Employee Benefit** | | |
|   Increments | | $10,000 |
|   Guarantee Issue | | $200,000 |
| **Benefit Reduction Schedule** (% benefit reduces by at age) | | 35% at age 65; 60% at age 70; 75% at age 75 |
| **Spouse Benefit** | | |
|   Guarantee Issue | | $30,000 |
| **Benefit Reduction Schedule** (% benefit reduces by at age) | | 35% at age 65; Terminates at age 70 |
| **Child Benefit (Life/AD&D)** | | Day 1 to age 14 days: No Benefit; 14 days but less than 6 months: $250; 6 Months but less than 19 years (or 25 years if unmarried, & a full-time student): $10,000 |
| **Definition of Earnings** | | Basic Annual Including Commissions |
| **Waiver of Premium** | | Included |
| **Conversion/Portability** | | Included |
| **Continuity of Coverage** | | Included |
| **COST ANALYSIS** | | |
| **AD&D Rate (Employee / Spouse / Child)** | **Covered Lives** EE: 34; Spouse: 14; Children: 7 | EE: $0.030 / SP: $0.030 / CH $0.200 |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

**Gallagher**
Insurance | Risk Management | Consulting

Cedar Park 001909

## Long Term Disability Plan Current/Renewal Summary – Lincoln Financial Group

| | CURRENT / RENEWAL |
|---|---|
| **Carrier Name** | **Lincoln Financial Group** |
| **PLAN DESIGN\*** | |
| Benefit | 60% to max $5,000 |
| Elimination Period | 90 Days |
| Duration of Benefits | SSNRA or To age 65 |
| Own Occupation Continuation | 24 Months |
| Features and Limitations | |
| Definition of Earnings | Basic Monthly Earnings |
| Definition of Disability | 24 months own occupation |
| Total and Partial Disability | Included |
| Return to Work | 12 Months |
| Workplace Modification Benefit | Up to $5,000 |
| Rehabilitation Benefit | Included |
| Minimum Benefit | $100 or 10% of benefit whichever is greater |
| Pre-Existing Condition Limitation | 3/12 |
| Earnings Test | Own occupation |
| Disability Limitations | |
| Mental Health | 24 Months |
| Substance Abuse | 24 Months |
| Self-Reported | 24 Months |
| Recurrent Disability | 6 Months |
| Waiver of Premium | Included |
| Continuity of Coverage | Included |
| W-2 Preparation FICA Match | Included |
| EAP Offered? | Included with up to 5 face-to-face visits |
| **COST ANALYSIS** | |

| Rates | Covered Payroll | Covered Lives | CURRENT / RENEWAL |
|---|---|---|---|
| Per $100 of Covered Payroll | $728,460 | 196 | $0.217 |
| Estimated Monthly Premium | | | $1,581 |
| Estimated Annual Premium | | | **$18,969** |
| | | Dollar Difference from Current | **$0** |
| | | Percent Change from Current | **0.00%** |

**Definition of Disability Language**

**And Definition of Disability -** During the Own Occ period (first 24 months), the insured is disabled when Unum determines that: the insured is limited from performing the material and substantial duties of his/her regular occupation due to sickness or injury; AND the insured has a 20% or more loss of indexed monthly earnings due to the same injury or illness

**Or Definition of Disability -** During the Own Occ period (first 24 months), the employee is disabled when the Unum determines that due to his or her sickness or injury: * the employee is unable to perform the material and substantial duties of his or her regular occupation and is not working in his or her regular occupation or any other occupation; or * the employee is unable to perform one or more of the material and substantial duties of his or her regular occupation, and the employee has a 20% or more loss in his or her indexed monthly earning while working in his or her regular occupation or in any occupation.

**Duties Only Definition -** No earnings loss required
*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 20

Cedar Park 001910

Gallagher
Insurance | Risk Management | Consulting



Insurance | Risk Management | Consulting

# Voluntary Critical Illness and Voluntary Accident

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 21

Cedar Park 001911

# Voluntary Critical Illness

|  |  | PROPOSED | |
|---|---|---|---|
|  | **Carrier Name** | **Lincoln Financial** | |
| **COST ANALYSIS** | | | |
| **Voluntary Rates per $1,000** | | **Employee** | **Spouse** |
| **Age Range (spouse based on EE's age)** | | | |
| **0 - 19** | | $0.213 | $0.213 |
| **20 - 24** | | $0.213 | $0.213 |
| **25 - 29** | | $0.354 | $0.354 |
| **30 - 34** | | $0.497 | $0.497 |
| **35 - 39** | | $0.668 | $0.668 |
| **40 - 44** | | $0.964 | $0.964 |
| **45 - 49** | | $1.327 | $1.327 |
| **50 - 54** | | $1.893 | $1.893 |
| **55 - 59** | | $2.558 | $2.558 |
| **60 - 64** | | $3.640 | $3.640 |
| **65 - 69** | | $5.054 | $5.054 |
| **70 +** | | $8.720 | $8.720 |
| **Children (Birth to age 26)** | | per $1,000 - $0.340 | |
| **PLAN PROVISIONS** | | | |
| **Rate Guarantee** | | 24 months | |
| **Required Participation** | | 15% | |
| **Eligibility** | | FTE 20HRS/WK | |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Cedar Park 001012

**Gallagher**
Insurance | Risk Management | Consulting

## Voluntary Accident

| | PROPOSED |
|---|---|
| **Carrier Name** | **Lincoln Financial** |
| **COST ANALYSIS** | |
| **PEPM Rates** | PROPOSED |
| **Employee (EE) Only** | $13.74 |
| **EE + Spouse** | $21.56 |
| **EE + Child(ren)** | $22.64 |
| **EE + Family** | $34.67 |
| **PLAN PROVISIONS** | |
| **Rate Guarantee** | 24 months |
| **Required Participation** | 15% |
| **Eligibility** | FTE 20HRS/WK |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Gallagher

Cedar Park 001913



Insurance | Risk Management | Consulting

# HRA Administration

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 24

Cedar Park 001914

## HRA Administration

| | Est Participation | CURRENT | PROPOSED #1 | PROPOSED #2 | PROPOSED #3 |
|---|---|---|---|---|---|
| Carrier Name | | NMR | TPSC | Navia | WEX |
| **COST ANALYSIS** | | | | | |
| Per Participant Per Month | 125 | N/A | $4.50 | $4.20 | $4.05 |
| Submission Fee (Per Employee) | 27 | $40.00 | N/A | N/A | N/A |
| Monthly Minimum Fee | | N/A | N/A | $100 | $50.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $250.00 | Waived | Waived |
| Monthly Cost | | $1,080 | $563 | $525 | $506 |
| Annual Cost | | $1,305 | $7,000 | $6,300 | $6,075 |

| | | CURRENT/RENEWAL |
|---|---|---|
| **REIMBURSMENT LIMITS** | | |
| PPO Plan Deductible | | $6,750/$13,500 |
| Employee | 50 | $5,350 |
| Employee & Family | 28 | $10,700 |
| HMO Plan Deductible | | $6,750/$13,500 |
| Employee | 37 | $5,350 |
| Employee & Family | 10 | $10,700 |
| Annual Maximum Liability | | $872,050 |

| HRA UTLIZATION AND COST PROJECTIONS | CURRENT | RENEWAL |
|---|---|---|
| | *2021 Paid Claims 9/1/2021 – 4/12/2022* | *2022 Projection 9/1/2022 - 8/30/2023* |
| Combined Plan Utilization | $89,152 | $94,144 |
| % of Max Utilization | 10.2% | 10.8% |

| TOTAL COSTS PROJECTION | CURRENT | PROPOSED #1 | PROPOSED #2 | PROPOSED #3 |
|---|---|---|---|---|
| | | *Projected* | *Projected* | *Projected* |
| Administration Cost | $1,305 | $7,000 | $6,300 | $6,075 |
| Projected Utilization | $89,152 | $94,144 | $94,144 | $94,144 |
| Total HRA Annual Cost Projection | $90,457 | $101,144 | $100,444 | $100,219 |

HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001945

## HRA Administration 2

| | CURRENT/RENEWAL |
|---|---|
| *PPO Plan* | |
| **Member Responsibility Before HRA** | |
| Employee | **$1,400** |
| Employee & Family | **$2,800** |
| **HRA Reimbursement Toward Deductible** | |
| Employee | **$5,350** |
| Employee & Family | **$10,700** |
| **Total Deductible** | |
| Employee | **$6,750** |
| Employee & Family | **$13,500** |

| | CURRENT/RENEWAL |
|---|---|
| *HMO Plan* | |
| **Member Responsibility Before HRA** | |
| Employee | **$1,400** |
| Employee & Family | **$2,800** |
| **HRA Reimbursement Toward Deductible** | |
| Employee | **$5,350** |
| Employee & Family | **$10,700** |
| **Total Deductible** | |
| Employee | **$6,750** |
| Employee & Family | **$13,500** |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

Gallagher

Insurance | Risk Management | Consulting

Cedar Park 001916



Insurance | Risk Management | Consulting

# Current Experience Reports

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 27

Cedar Park 001917

*Rolling 12 months -Paid Claims Vs. Earned Premium*

### Cedar Park Assembly of God
**Fully-Insured Medical and Prescription Drug Plan**
Kaiser Permanente
**March 1, 2021 through February 28, 2022**



| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| Month | Employees | Members | Earned Premium | Estimated Administrative Charges* | Estimated Net Premium | Medical Claims | Rx Claims | Total Claims | Estimated Net Gain/ (Loss) | Estimated Net Loss Ratio |
| | | | | | (C - D) | | | (F + G) | (E - H) | (H / E) |
| March 2021 | 124 | 206 | $67,778 | $12,200 | $55,578 | $55,035 | $83,160 | $138,195 | ($82,617) | 248.7% |
| April | 123 | 201 | $66,487 | $11,968 | $54,519 | $29,506 | $75,912 | $105,418 | ($50,898) | 193.4% |
| May | 123 | 201 | $66,487 | $11,968 | $54,519 | $43,460 | $30,806 | $74,266 | ($19,747) | 136.2% |
| June | 123 | 201 | $66,487 | $11,968 | $54,519 | $118,645 | $29,037 | $147,682 | ($93,163) | 270.9% |
| July | 122 | 200 | $66,067 | $11,892 | $54,175 | $105,280 | $29,718 | $134,999 | ($80,823) | 249.2% |
| August | 121 | 200 | $66,506 | $11,971 | $54,535 | $26,696 | $32,015 | $58,711 | ($4,176) | 107.7% |
| September | 132 | 222 | $85,289 | $15,352 | $69,937 | $56,032 | $32,132 | $88,164 | ($18,227) | 126.1% |
| October | 133 | 223 | $85,850 | $15,453 | $70,397 | $118,978 | $30,028 | $149,006 | ($78,609) | 211.7% |
| November | 134 | 226 | $86,816 | $15,627 | $71,189 | $93,600 | $30,188 | $123,788 | ($52,599) | 173.9% |
| December | 134 | 226 | $86,881 | $15,639 | $71,242 | $132,482 | $31,942 | $164,424 | ($93,182) | 230.8% |
| January 2022 | 132 | 227 | $87,114 | $15,680 | $71,433 | $143,024 | $22,072 | $165,096 | ($93,663) | 231.1% |
| February | 131 | 223 | $86,279 | $15,530 | $70,749 | $37,486 | $35,554 | $73,039 | ($2,291) | 103.2% |
| **Total Year to Date** | **1,532** | **2,556** | **$918,040** | **$165,247** | **$752,792** | **$960,225** | **$462,564** | **$1,422,789** | **($669,996)** | **189.0%** |
| *Less Estimated Pooled Claims:* | | | | | | | | ($624,547) | $624,547 | |
| **NET Year to Date** | **1,532** | **2,556** | **$918,040** | **$165,247** | **$752,792** | **$960,225** | **$462,564** | **$798,241** | **($45,449)** | **106.0%** |
| Current Net PEPM | 128 | 213 | $599.24 | $107.86 | $491.38 | $626.78 | $301.93 | $521.05 | ($29.67) | 106.0% |
| 2020 Net Plan Year | 115 | 180 | $507.87 | $110.07 | $397.81 | - | - | $454.95 | ($57.14) | 114.4% |
| 2019 Net Plan Year | 120 | 185 | $476.01 | $100.38 | $375.63 | - | - | $420.05 | ($44.42) | 111.8% |

\* Includes administration, premium tax, margin, and commission.

\*\* Data includes run-out paid claims and fixed costs from Premera Blue Cross.

Please Note: At renewal, other factors such as incurred but unpaid claims and overall cost trends may influence rate adjustments.

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 28

**Gallagher**
Insurance | Risk Management | Consulting

Cedar Park 001918

*Large Claimants*

## Cedar Park Assembly of God

**Fully-Insured Medical and Prescription Drug Plan**

**Kaiser Permanente**

**March 1, 2021 through February 28, 2022**

*Individuals with Total Claims in Excess of $50,000 ($100,000 Estimated Pooling Level)*

| Encrypted ID | Enrollee Status | Total Paid Expense | Percent of Total Claims | Estimated Pooling Level | Percent of Pooling Level | Estimated Pooled Claims |
|---|---|---|---|---|---|---|
| 001 | Active | $709,034 | 49.8% | $100,000 | 709.0% | $609,034 |
| 002 | Active | $114,039 | 8.0% | $100,000 | 114.0% | $14,039 |
| 003 | Active | $101,474 | 7.1% | $100,000 | 101.5% | $1,474 |
| 004 | Active | $59,688 | 4.2% | $100,000 | 59.7% | $0 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | | **$984,236** | **69.2%** | | | **$624,547** |

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 29

**Gallagher**

Insurance | Risk Management | Consulting

Cedar Park 001919

### Cedar Park Assembly of God
**Fully-Insured Dental Benefits Plan**
**Delta Dental of Washington**
**September 1, 2021 through August 31, 2022**



| Month | A Employees | B Earned Premium | C Estimated Administrative Charges* | D Estimated Net Premium (B - C) | E Paid Claims | F Estimated Net Gain/(Loss) (D - E) | G Estimated Net Loss Ratio (E / D) |
|---|---|---|---|---|---|---|---|
| September 2021 | 144 | $10,672 | $2,145 | $8,527 | $10,061 | ($1,534) | 118.0% |
| October | 172 | $13,286 | $2,671 | $10,616 | $9,080 | $1,536 | 85.5% |
| November | 168 | $13,041 | $2,621 | $10,419 | $4,542 | $5,878 | 43.6% |
| December | 162 | $12,768 | $2,566 | $10,202 | $8,969 | $1,233 | 87.9% |
| January 2022 | 160 | $12,406 | $2,494 | $9,912 | $8,277 | $1,635 | 83.5% |
| February | 154 | $11,938 | $2,400 | $9,539 | $10,507 | ($968) | 110.2% |
| March | 154 | $12,093 | $2,431 | $9,662 | $10,909 | ($1,247) | 112.9% |
| April | | | | | | | |
| May | | | | | | | |
| June | | | | | | | |
| July | | | | | | | |
| August | | | | | | | |
| **Total Year to Date** | **1,114** | **$86,205** | **$17,327** | **$68,878** | **$62,344** | **$6,533** | **90.5%** |
| | | | | | | | |
| Current PEPM | 159 | $77.38 | $15.55 | $61.83 | $55.96 | $5.86 | 90.5% |
| 2020 Plan Year | 144 | $70.24 | $14.12 | $56.12 | $56.45 | ($0.32) | 100.6% |
| 2019 Plan Year | 142 | $67.88 | $13.17 | $54.71 | $49.65 | $5.06 | 90.7% |
| 2018 Plan Year | 133 | $69.00 | $13.39 | $55.61 | $53.63 | $1.98 | 96.4% |

*Administrative Charges are currently estimated at 20.1%.*

*Please Note: At renewal, other factors such as incurred but unpaid claims and overall cost trends may influence rate adjustments.*

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 30

Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001920



Insurance | Risk Management | Consulting

# Carrier Reporting

Cedar Park 001921

# HRA Claims Report

**Cedar Park Assembly of God**
**HRA Claims Report**
**2021 - Current Year to Date**

| Date | Single or Family | EOB Date | Year of Ded | Deductible YTD | OOP YTD | Reimbursable | YTD |
|------|------------------|----------|-------------|----------------|---------|--------------|-----|
| **2021** | | | | | | | |
| 2/10/2022 | Single | 1/15/2022 | 2021 | $2,256.26 | $2,256.26 | $856.26 | |
| 3/24/2022 | Single | 1/31/2022 | 2021 | $2,256.26 | $2,256.26 | $0.00 | $856.26 |
| 10/28/2021 | Single | 10/13/2021 | 2021 | $5,935.38 | $5,935.38 | $4,535.38 | |
| 3/31/2022 | Single | 3/25/2022 | 2021 | $6,477.93 | $6,477.93 | $542.55 | $5,077.93 |
| 4/13/2021 | Single | 3/31/2021 | 2021 | $6,131.68 | $6,131.68 | $4,731.68 | $4,731.68 |
| 10/28/2021 | Family | 10/9/2021 | 2021 | $6,842.93 | $6,992.93 | $4,042.93 | $4,042.93 |
| 1/28/2022 | Single | 1/15/2022 | 2021 | $2,994.31 | $2,994.31 | $1,594.31 | $1,594.31 |
| 4/27/2021 | Family | 4/22/2021 | 2021 | $7,898.57 | $7,898.57 | $5,098.57 | $5,098.57 |
| 9/29/2021 | Family | 9/27/2021 | 2021 | $3,773.02 | $3,773.02 | $973.02 | $973.02 |
| 1/10/2022 | Family | 1/4/2022 | 2021 | $4,836.22 | $2,036.22 | $2,036.22 | $2,036.22 |
| 1/10/2022 | Family | 11/6/2021 | 2021 | $4,692.87 | $1,892.87 | $1,892.87 | |
| 3/3/2022 | Family | 12/31/2021 | 2021 | $8,179.16 | $8,179.16 | $3,486.29 | $5,379.16 |
| 4/9/2021 | Single | 3/27/2021 | 2021 | $4,352.23 | $4,352.23 | $2,952.23 | |
| 8/9/2021 | Single | 7/17/2021 | 2021 | $6,750.00 | $6,838.56 | $2,397.77 | $5,350.00 |
| 1/10/2022 | Single | 12/31/2021 | 2021 | $6,750.00 | $6,900.00 | $5,350.00 | $5,350.00 |
| 9/21/2021 | Single | 9/20/2021 | 2021 | $3,314.70 | $3,314.70 | $1,914.70 | |
| 3/8/2022 | Single | 3/7/2022 | 2021 | $4,571.91 | $4,571.91 | $1,257.21 | $3,171.91 |
| 8/25/2021 | Family | 8/7/2021 | 2021 | $4,337.40 | $4,337.40 | $1,537.40 | |
| 9/21/2021 | Family | 9/4/2021 | 2021 | $4,533.70 | $4,533.70 | $196.30 | |
| 11/9/2021 | Family | 10/31/2021 | 2021 | $4,695.24 | $4,695.24 | $0.00 | $1,733.70 |
| 12/6/2021 | Family | 11/29/2021 | 2021 | $7,334.00 | $7,334.00 | $4,534.00 | $4,534.00 |
| 11/9/2021 | Single | 9/9/2021 | 2021 | $936.00 | $0.00 | $0.00 | $0.00 |
| 3/3/2022 | Single | 2/22/2022 | 2021 | $4,058.07 | $4,058.07 | $2,658.07 | $2,658.07 |
| 7/23/2021 | Family | 7/23/2021 | 2021 | $5,990.10 | $5,990.10 | $3,190.10 | |
| 10/28/2021 | Family | 10/18/2021 | 2021 | $9,620.93 | $9,620.93 | $3,630.83 | |
| 3/8/2022 | Family | 3/7/2022 | 2021 | $9,918.05 | $9,918.05 | $297.12 | $7,118.05 |
| 3/10/2022 | Single | 9/30/2021 | 2021 | $6,750.00 | $6,900.00 | $5,350.00 | $5,350.00 |
| 7/23/2021 | Single | 7/15/2021 | 2021 | $6,750.00 | $6,750.00 | $5,350.00 | $5,350.00 |
| 1/14/2022 | Single | 1/12/2022 | 2021 | $6,750.00 | $6,750.00 | $5,350.00 | $5,350.00 |
| 5/11/2021 | Family | 4/30/2021 | 2021 | $8,012.78 | $8,162.78 | $5,212.78 | $5,212.78 |
| 10/28/2021 | Single | 10/20/2021 | 2021 | $3,247.19 | $3,247.19 | $1,847.19 | $1,847.19 |
| 5/26/2021 | Family | 5/21/2021 | 2021 | $10,102.45 | $10,102.45 | $7,302.45 | $7,302.45 |
| 6/7/2021 | Single | 5/22/2021 | 2021 | $1,726.47 | $1,726.47 | $326.47 | |
| 8/9/2021 | Single | 7/17/2021 | 2021 | $4,790.72 | $4,790.72 | $3,064.25 | |
| 2/10/2022 | Single | 12/31/2021 | 2021 | $6,367.86 | | $1,577.14 | $4,967.86 |
| | | | | **2021 Claims Paid** | | **$89,151.90** | **$89,151.90** |
| | | | | | | | |
| **2022** | | | | | | | |
| 3/31/2022 | Single | 3/25/2022 | 2022 | $1,637.88 | $1,637.88 | $237.88 | $237.88 |
| | | | | **2022 Claims Paid YTD** | | | |

Colored blocks represent one employees transactions.
Names have been removed to protect privacy.

As of 4/12/2022

*The information contained herein is subject to the disclosures and disclaimers on the Disclaimers page of this presentation.*

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 32

Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001922

# Disclaimers and Disclosures

Consulting and insurance brokerage services to be provided by Gallagher Benefit Services, Inc. and/or its affiliate Gallagher Benefit Services (Canada) Group Inc. Gallagher Benefit Services, Inc., a non-investment firm and subsidiary of Arthur J. Gallagher & Co., is a licensed insurance agency that does business in California as "Gallagher Benefit Services of California Insurance Services" and in Massachusetts as "Gallagher Benefit Insurance Services." Investment advisory services and corresponding named fiduciary services may be offered through Gallagher Fiduciary Advisors, LLC, a Registered Investment Adviser. Gallagher Fiduciary Advisors, LLC is a single-member, limited-liability company, with Gallagher Benefit Services, Inc. as its single member. Certain appropriately licensed individuals of Arthur J. Gallagher & Co. subsidiaries or affiliates, excluding Gallagher Fiduciary Advisors, LLC, offer securities through Kestra Investment Services (Kestra IS), member FINRA/SIPC and or investment advisory services through Kestra Advisory Services (Kestra AS), an affiliate of Kestra IS. Neither Kestra IS nor Kestra AS is affiliated with Arthur J. Gallagher & Co., Gallagher Benefit Services, Inc. or Gallagher Fiduciary Advisors, LLC. Neither Kestra AS, Kestra IS, Arthur J. Gallagher & Co., nor their affiliates provide accounting, legal, or tax advice.

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | **Page 33**



Insurance | Risk Management | Consulting

Cedar Park 001923

# General Disclaimers

### Coverage Disclaimer

*This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. Policy forms for your reference will be made available upon request.*

### Renewal / Financial Disclaimer

*This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.*

### Legal

*The intent of this analysis is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment. It should not be construed as, nor is it intended to provide, legal advice. Laws may be complex and subject to change. This information is based on current interpretation of the law and is not guaranteed. Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.*



Cedar Park 001924

## Marketing Summary (Medical)

| Line of Coverage | Carrier Name | Response | Rate Guarantee | Commission |
|---|---|---|---|---|
| **Medical** | **Kaiser Permanente** | **Current** | **1 Year** | **5.30%** |
| Medical | Kaiser Permanente | Renewal | 1 Year | 5.30% |
| Medical | Kaiser Permanente | Renewal Option | 1 Year | 3% |
| | | | | |

*While Gallagher does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier. There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com). Generally, agencies that provide ratings of Health Insurers, including traditional insurance companies and other managed care organizations, reflect their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile. However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.*

### Supplemental Compensation

*Gallagher may receive supplemental compensation from insurance carriers and vendors, normally calculated at the end of each calendar year, that are contingent on a number of factors including the overall number of employer plans represented, plan retention rates, and overall premium growth. Historically, supplemental compensation has ranged, on average, between 0-3% based on specific carrier programs. These plans have no effect on premiums. Further, Gallagher may receive non-cash compensation from plan vendors or service providers that are not in connection with any particular client. If you have any questions regarding direct or indirect compensation received by Gallagher, please contact your dedicated Gallagher advisor or refer to the Gallagher Global Standards of Business Conduct (https://www.ajg.com/us/about-us/global-standards).*



Cedar Park 001925

# Marketing Summary (Non-Medical)

| Health Lines of Coverage: Including Medical, Dental, Vision and EAPs | | | | |
|---|---|---|---|---|
| **Line of Coverage** | **Carrier Name** | **Response** | **Rate Guarantee** | **Commission** |
| **Dental** | **Delta Dental of Washington** | **Current** | **1 Year** | **10%** |
| Dental | Delta Dental of Washington | Renewal | 1 Year | 10% |
| **Vision** | **Vision Service Plan** | **Current** | **1 Year** | **10%** |
| Vision | Vision Service Plan | Renewal | 2 Year | 10% |

*While Gallagher does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier. There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com). Generally, agencies that provide ratings of Health Insurers, including traditional insurance companies and other managed care organizations, reflect their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.*

| Non-Health Lines of Coverage | | | | | |
|---|---|---|---|---|---|
| **Line of Coverage** | **Carrier Name** | **Response** | **\*\*AM Best Rating** | **Rate Guarantee** | **Commission** |
| **Basic Life AD&D** | **Lincoln Financial Group** | **Current** / Renewal | **A+ / XV** | **2 Year** | **20%** |
| **Voluntary Life** | **Unum** | **Current** | **A / XV** | **1 Year** | **20%** |
| **Voluntary AD&D** | **Standard Insurance Company** | **Current** | **A / XIV** | **1 Year** | **25%** |
| **Voluntary Life AD&D** | **Lincoln Financial Group** | **Quote** | **A+ / XV** | **2 Year** | **15%** |
| **LTD** | **Lincoln Financial Group** | **Current** / Renewal | **A+ / XV** | **2 Year** | **10%** |
| **Voluntary Critical Illness** | **Lincoln Financial Group** | **Quote** | **A+ / XV** | **2 Year** | |
| **Voluntary Accident** | **Lincoln Financial Group** | **Quote** | **A+ / XV** | **2 Year** | |
| **HRA** | **NMR** | **Current** | **N/A** | **1 Year** | **Net** |
| HRA | TPSC | Quote | N/A | 1 Year | Net |
| HRA | Navia | Quote | N/A | 1 Year | Net |
| HRA | WEX | Quote | N/A | 1 Year | Net |
| COBRA | Navia | Quote | N/A | 1 Year | Net |
| COBRA | WEX | Quote | N/A | 1 Year | Net |
| **Single Billing** | **GBSA** | **Current** / Renewal | **N/A** | **1 Year** | **Net** |
| Supplemental Compensation | | | | | |

*Gallagher may receive supplemental compensation from insurance carriers and vendors, normally calculated at the end of each calendar year, that are contingent on a number of factors including the overall number of employer plans represented, plan retention rates, and overall premium growth. Historically, supplemental compensation has ranged, on average, between 0-3% based on specific carrier programs.  These plans have no effect on premiums. Further, Gallagher may receive non-cash compensation from plan vendors or service providers that are not in connection with any particular client. If you have any questions regarding direct or indirect compensation received by Gallagher, please contact your dedicated Gallagher advisor or refer to the Gallagher Global Standards of Business Conduct (https://www.ajg.com/us/about-us/global-standards).*



Gallagher
Insurance | Risk Management | Consulting

Cedar Park 001926

## A.M. Best Rating

| **A.M. Best Rating**<br>**Required Standards for Gallagher Benefit Services** | | **Financial Size Category** | |
|---|---|---|---|
| Group 1  A -  to A++ | | | |
| Group 2  B + to B ++ and/or financial rating under "VI", or any of Best's "NR" group.This would apply to Best's "A- or higher" rated companies with a financial size under "VI". | **Recommended**<br>Acceptable with signed client acknowledgement letter | Class | Adjusted Policyholders' Surplus |
| **Financial Strength Ratings** | | I | Less than $1 Million |
| Secure | Vulnerable | II | $1 to $2 Million |
| A++, A+ (Superior) | B, B - (Fair) | III | $2 to $5 Million |
| A, A -, A U (Excellent) | C++, C+ (Marginal) | IV | $5 to $10 Million |
| B++, B+ (Very Good) | C, C - (Weak) | V | $10 to $25 Million |
| | | VI | $25 to $50 Million |
| | | VII | $50 to $100 Million |
| | | VIII | $100 to $250 Million |
| | | IX | $250 to $500 Million |
| | | X | $500 to $750 Million |
| | | XI | $750 to $1,000 Billion |
| | | XII | $1,000 to $1,250 Billion |
| | | XIII | $1,250 to $1,500 Billion |
| | | XIV | $1,500 to $2,000 Billion |
| | | XV | $2,000 or greater Billion |
| | | NR | Not Rated |



Cedar Park 001927

Insurance | Risk Management | Consulting

Crisalli Decl., p.0354

Thank you!

Jami Hansen  |  Area Vice President, Client Consultant
+1 425 974 3275
Jami_Hansen@AJG.com

777 108th Avenue NE, Suite 200, Bellevue,
WA 98004

©2022 ARTHUR J. GALLAGHER & CO. | AJG.COM | Page 38



Cedar Park 001928

Exhibit P



**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Urgent Final Verification . . . Again!
3 messages

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Tue, Mar 5, 2019 at 5:37 PM
To: Melissa Knauss <melissa.k@cedarpark.org>, Jami_Hansen <Jami_Hansen@ajg.com>

For the umteenth time . . . I need to be 100% certain that what you finalized for me while I was stuck in NYC in early February is accurate:

1.  That Gallagher has confirmed to CP that it would have cost **$243,125** in additional costs to become self-insured last year.

2.  And that with our current employee experience and the potential of a kidney transplant, that future _additional costs_ to self-insure would surely increase and that number is expected to double within the next several years due to increased plan use.

Please let me know tomorrow before 9:00 if possible.  Thanks!  Steve.

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                    Tue, Mar 5, 2019 at 6:50 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Hi Steve!

Yes, that number is correct and we will do the same exercise at your upcoming renewal.  As far as your current experience, you are also correct.  We can bid self insurance however the carriers/TPA's will probably attach a laser to that claim which means they won't cover it.  Again, we will look at how self insurance looks at renewal time and you can determine if it makes sense.

Does that help?

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

[Quoted text hidden]

---

**Steve Orcutt** <steve.o@cedarpark.org>                                    Tue, Mar 5, 2019 at 9:01 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Absolutely, thanks!  Steve.
[Quoted text hidden]

11.21.2022
30(b)(6) Smith

**29**

Buell Realtime Reporting

Cedar Park 000052

# Exhibit Q



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  12/01/2022

**TO:**  Kevin H. Theriot

**CASE NAME:**  Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**WITNESS:**  30(b)(6) Steven Orcutt

**DATE TAKEN:**  11/21/2022

The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date. Otherwise, signature will be deemed waived for all purposes. Please contact the witness and arrange a convenient time and place for reading and signing. Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:
Paul M. Crisalli

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com

Crisalli Decl., p.0359

## ERRATA

**CASE NAME**: Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN**: 11/21/2022

**WITNESS**: 30(b)(6) Steven Orcutt

## CORRECTIONS

| Page | Line | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 17 | 22-23 | "We provide a Christian counseling network and a Christian club sports program." | "We have over a dozen different ministries including a Christian counseling network and a Christian club sports program." | Misspoke. |
| 22 | 18-19 | "I believe for 13 of the last years I've been here." | "I believe for 13 of the last 14 & 1/2 years I've been here." | Misspoke or transcription error. |
| 32 | 17-18 | "No. We—we have an annual audit by an audit firm but not an accounting firm." | "Yes." | Misspoke or misunderstood question. |
| 69 | 13-14 | "Yes. Because that is a level-funded plan, we could exclude specific procedures." | "Yes it would have excluded abortion and contraceptive services. Because that is a level-funded plan, we could have excluded specific procedures." | Clarify answer to compound question and clarify record to be consistent with previous testimony. |
| 74 | 10-12 | "Yes. Along with all of the other considerations of a level-funded versus a fully-insured plan, which Cigna chose not to bid that year." | "Yes there was an assumption of an exemption for abortion services and certain contraceptives. Along with all of the other considerations of a level-funded versus a fully-insured plan, which Cigna chose not to bid that year." | Clarify answer to compound question and clarify record to be consistent with previous testimony. |

Signature of Deponent



# D E C L A R A T I O N

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**   30(b)(6) Steven Orcutt

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

30(b)(6) Steven Orcutt

Signed on the ___29___ day of ___DECEMBER___, 202_2_

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  12/01/2022

**TO:**   Kevin H. Theriot

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**WITNESS:**  30(b)(6) Jason Smith

**DATE TAKEN:**  11/21/2022

The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date.  Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:

Paul M. Crisalli



# E R R A T A

**CASE NAME:**  Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**   30(b)(6) Jason Smith

## CORRECTIONS*

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 102 | 4 | "reach" | "outreach" |
| 107 | 8 | "the ending of a fertilized embryo" | "the ending of the life of a fertilized embryo" |
| 107 | 10 | "is the definition of life" | "meets the definition of life..." |

**\*Reason for corrections: transcription error or misspoke.**

_____
                              Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**      30(b)(6) Jason Smith

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
30(b)(6) Jason Smith

Signed on the ____29____ day of _____December_____, 202__2__.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com