# Exhibit A

1

Honorable Benjamin H. Settle

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

Civil Action No. 3:19-cv-05181

CEDAR PARK ASSEMBLY OF GOD OF
KIRLAND, WASHINGTON,

      Plaintiff,

vs.

MYRON "MIKE" KREIDLER, in his official
capacity as Insurance Commissioner for
the State of Washington; JAY INSLEE, in his
official capacity as Governor of the State
of Washington,

      Defendants.
_____

VIDEOCONFERENCE and 30(b)(6) DEPOSITION of DEFENDANTS

MYRON "MIKE" KREIDLER and GOVERNOR JAY INSLEE

REPRESENTATIVE KIM TOCCO

_____

PURSUANT TO NOTICE, the above-entitled

deposition was taken on behalf of the Plaintiff on

Wednesday, November 16, 2022, at 10:02 a.m. PST, before

Jana Mackelprang, Certified Realtime Reporter,

Registered Professional Reporter, and Notary Public.

Electronically signed by Jana Mackelprang (001-409-517-3774)    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

2

```
 1   APPEARANCES:

 2   For the Plaintiff:
              Kevin H. Theriot, Esq.
 3            Alliance Defending Freedom
              15100 N. 90th Street
 4            Scottsdale, Arizona 85260
              480.444-0020
 5            ktheriot@adflegal.org

 6   For the Defendant:
              Paul M. Crisalli
 7            Jeffrey Todd Sprung
              Attorney General's Office
 8            800 5th Avenue, Suite 2000
              Seattle, Washington 98104
 9            paul.crisalli@atg.wa.gov

10            Marta U. DeLeon
              Attorney General's Office
11            PO Box 40100
              Olympia, Washington 98504
12            marta.deleon@atg.wa.gov

13
     Also Present:
14            Daniel Bagley

15

16

17

18

19

20

21

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

3

```
1                        EXAMINATION INDEX

2   By Mr. Theriot                              Page 5

3

4


5                         EXHIBIT INDEX
    FOR IDENTIFICATION                          INITIAL
6                                               REFERENCE

7   Exhibit 1  Plaintiff's Notice of Rule 30(b)(6)    9
               Deposition
8
    Exhibit 2  WA ST 48.43.005 - Definitions          32
9
    Exhibit 3  Substitute Senate Bill 6219            35
10
    Exhibit 4  WA ST 48.43.065                        66
11
    Exhibit 5  WA ST 48.43.725                        91
12
    Exhibit 6  WAC 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                       113
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

4

```
 1                P R O C E E D I N G S
 2           WHEREUPON, the following proceedings were
 3  taken pursuant to the Federal Rules of Civil
 4  Procedure.
 5                *     *     *     *     *
 6           THE COURT REPORTER:  Will counsel please
 7  stipulate that the court reporter is authorized to
 8  administer the oath remotely; that no objection to
 9  admissibility of the deposition will be made based on
10  validity of the oath; and that Ms. Tocco is who she
11  says she is so that I may swear her in remotely?
12           MR. THERIOT:  The Plaintiff stipulates.
13           MR. CRISALLI:  Defendants stipulate.
14                     KIM TOCCO,
15  having been first duly sworn to state the whole
16  truth, testified as follows:
17           MR. CRISALLI:  Before we begin and turn
18  it over to Mr. Theriot, Defendants want to note for the
19  record first that while this is being recorded for
20  Zoom, we all agree that this is not a videotape
21  deposition under the Federal Rules of Civil Procedure.
22  We did not receive notice of that and that was not the
23  intent of the Plaintiff in this matter.
24           Second, we received notice that a Topic 6
25  was changed to cover RCW 48.43.005, subsection (31).
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

 1   We have prepared a witness to testify regarding that
 2   statute as relevant, and we'll reserve any objections
 3   to specific questions.
 4              Last, I would note a general objection to
 5   the definition of "employee" within the notice, as
 6   can't make heads or tails of why California -- I'll use
 7   the language -- why California Department of Managed
 8   Health Care is relevant to this case, but we
 9   understand -- that term is not used in the topics, so
10   we prepared our witnesses as needed.
11              MR. THERIOT:  Okay.  So there may be --
12   are you saying that the notice actually refers to the
13   California Department of Health Care?
14              MR. CRISALLI:  Yes.
15              MR. THERIOT:  Well, that is a problem,
16   and that's my fault.  It should not.  I appreciate you
17   mentioning that.  All right.
18                      EXAMINATION
19   BY MR. THERIOT:
20       Q.    Ms. Tocco, my name is Kevin Theriot.  I'm
21   counsel for Cedar Park, and we are here to take your
22   deposition today.
23              We've got a couple preliminaries to go
24   through, but I think it really just starts off with:
25   Have you ever given a deposition before?

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

6

1          A.     No.

2          **Q.     Have you ever testified in court before?**

3          A.     No.

4          **Q.     What is your current position?**

5          A.     I'm currently employed as the health

6     forms program manager at the Washington State Office of

7     the Insurance Commissioner.

8          **Q.     How long have you been in that position?**

9          A.     I have been in this position since

10    April 1 of 2020.

11         **Q.     What was your occupation before that?**

12         A.     Prior to that, I was also with the Office

13    of the Insurance Commissioner.  I started with the

14    Agency in December of 2018, and I was working as an

15    insurance enforcement specialist.

16         **Q.     So before 2018, what was your occupation?**

17         A.     I was a regulatory compliance consultant

18    for a health plan.

19         **Q.     Okay.  Which health plan was that?**

20         A.     It was Providence Health Plan in

21    Portland, Oregon.

22         **Q.     Have you ever been charged with any kind**

23    **of -- well, let me rephrase that.**

24         **Have you ever been charged with any sort**

25    **of criminal charge other than a traffic violation?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

7

```
 1        A.     No.
 2        Q.     Okay.  So I know that you have spoken
 3   with your attorneys and they gave you some
 4   instructions.  I'm certainly not going to ask you about
 5   those instructions.
 6               I'm not going to go over all the rules,
 7   but just to reiterate things, because this is sort of
 8   an unnatural thing, especially since you haven't been
 9   deposed before, but you understand you're under oath
10   today and this would be just as if you were testifying
11   in a courtroom?
12        A.     Yes.
13        Q.     Okay.  And that was going to be my next
14   thing, that one of the awkward things is you actually
15   have to answer the question and say "yes" or "no,"
16   instead of nod your head or say "uh-huh" or "huh-uh."
17   I will probably make the same mistake.  I'll try to
18   remind you when you're doing that.
19               Is there anything that would prevent you
20   from thinking clearly or testifying truthfully today?
21        A.     No.
22        Q.     Are you on any medications that affect
23   your memory or your cognitive ability?
24        A.     No.
25        Q.     I think the other thing that is
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1    especially true in a video deposition is waiting for me
2    to finish my question before you answer, which I'm sure
3    your attorney spoke with you about; but also that goes
4    both ways, I need to wait until you finish your answer
5    before I ask another question.  I'll do my best to do
6    that.
7              Of course, the biggest thing is that we
8    enunciate clearly and we give verbal responses and
9    verbal interactions so that the court reporter can take
10   those down.
11             Of course, we can take a break when
12   you're ready.
13             MR. THERIOT:  I believe, Paul, you
14   mentioned that you want to break at noon Pacific
15   Standard Time.  So that's in a couple hours.
16             MR. CRISALLI:  Yes, please.  Thank you.
17             MR. THERIOT:  We can definitely do that,
18   not to say that we can't take a break before then, but
19   we can definitely do that.  Do you know about how long
20   that will take?
21             MR. CRISALLI:  I was thinking of trying
22   to shoot for half an hour, make it the lunch hour for
23   us, if that works for you.
24             MR. THERIOT:  Yes, that's fine.
25             MR. CRISALLI:  It may be longer depending

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

9

```
 1   on how we want to do lunch.
 2              MR. THERIOT:  Right.
 3       Q.    (By Mr. Theriot) I'm going to be bringing
 4   some exhibits up when I share my screen.  You should be
 5   able to see them.  And, of course, if you can't see
 6   them, let me know, but let's start with what I'm going
 7   to mark as Exhibit 1.  It's the Plaintiff's Notice of
 8   Rule 30(b)(6) Deposition.  Let's see if I can do this
 9   in a way that makes sense.
10              Okay.  Can you see that on your screen?
11       A.    I can.
12       Q.    Okay.  So have you seen this -- this is
13   Plaintiff's Notice of Rule 30(b)(6) Deposition -- have
14   you seen this before?
15       A.    Yes.
16       Q.    Okay.  We're going to designate this as
17   Exhibit 1.  This is our notice, Plaintiff's Notice of
18   Rule 30(b)(6) Deposition.
19              (Exhibit 1 was remotely introduced and
20   provided electronically to the reporter.)
21       Q.    (By Mr. Theriot) And you understand,
22   Ms. Tocco, that you've been designated by the
23   Defendants to testify on their behalf for some of the
24   topics listed in this deposition notice?
25       A.    Yes, I do.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

10

1          Q.     Based upon the email from your counsel,

2    it's my understanding that you're going to testify as

3    to the following topics.  And I'm going to scroll down

4    here so you can see them, and I just want you to

5    confirm that that's correct.  Let me try to get this

6    right.  All right.

7               So my understanding is that you are

8    prepared to testify today regarding Topics 1, 2, and 3.

9    Those are on the page I'm showing you now.

10              Is that correct?

11         A.     Yes, that's correct.

12         Q.     Thank you.  I'm going to scroll down to

13   6, 7, and 8 here, actually, and 9.

14              And you're also prepared to testify as to

15   Topics 6, 7, 8, and 9; is that correct?

16         A.     Yes, that's correct.

17         Q.     And then lastly, Topics 11 and 12 in

18   Exhibit 1?

19         A.     Yes, correct.

20         Q.     All right.

21              MR. CRISALLI:  Kevin, can I interject a

22   quick question or request?  Not necessarily for this

23   exhibit or subsequent exhibits, to have them be

24   downloadable for the witness and myself.  This one is

25   fine because she's viewed it and I have it with me, but

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

11

```
 1   just that way we have the ability for the witness to
 2   review the whole document.
 3                MR. THERIOT:  You certainly can make that
 4   request, but I'm not sure that I know how to do that.
 5                Jana, what's the --
 6                MR. CRISALLI:  Should we go off the
 7   record?
 8                MR. THERIOT:  Yes, let's go off the
 9   record.
10                (There was a brief discussion off the
11   record.)
12        Q.     (By Mr. Theriot) Ms. Tocco, we're back on
13   the record.
14                What did you do to prepare for today's
15   deposition?
16        A.     I met for a couple hours with my
17   attorneys.  I reviewed the deposition notice.  I
18   reviewed our responses to interrogatories, and I
19   briefly reviewed some of the statutes at issue.
20        Q.     Okay.  Do you remember which statutes you
21   reviewed?
22        A.     Yes, I do.
23        Q.     Which ones were they?
24        A.     I reviewed the session law 6219.  I
25   reviewed RCW 48.43, and I don't recall which specific
```

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

12

1  sections of 48.43.

2       Q.     Okay.  How much time did you spend

3  preparing for today's deposition?

4       A.     Total, approximately -- approximately

5  four hours.

6       Q.     So remind me of your job title again.

7       A.     Health forms program manager.

8       Q.     As health forms program manager, what is

9  your job description?

10      A.     I oversee a team of analysts who are

11 responsible for reviewing certain health form filings

12 for compliance, for legal compliance with laws and

13 regulations.

14      Q.     What Is your education?

15      A.     I received my JD in 2019.  So I have an

16 active bar license.  I also have a master's degree in

17 social work and an undergraduate degree in psychology.

18      Q.     All right.  Prior to coming to work for

19 the Office of the Insurance Commissioner, you worked

20 for Providence; is that right's?

21      A.     I did.

22      Q.     And what was your position there?

23      A.     I worked as a regulatory compliance

24 consultant.

25      Q.     Okay.  Have you ever practiced law with a

Calderwood-Mackelprang, Inc.  303.477.3500

1  firm or anything like that?

2      A.    No.

3      Q.    Approximately how long did you work with

4  Providence?

5      A.    Approximately four and a half years.

6      Q.    Okay.  And prior to that, where did you

7  work?

8      A.    Prior to that, I held a variety of

9  contract positions, but I was working for the State of

10  Oregon, Department of Justice, most recently before

11  Providence.

12      Q.    And what did you do for the State of

13  Oregon, Department of Justice?

14      A.    I was doing complex document review.

15      Q.    And that complex document review, is that

16  within the insurance industry?

17      A.    No, it wasn't.

18      Q.    What kinds of documents did you review?

19      A.    It was related to the nationwide tobacco

20  litigation.

21      Q.    Okay.  I'd like to move to the first

22  topic in the notice that says, "The State of

23  Washington's policies, procedures, and practices

24  related to review and approval of health care plans."

25  Assuming that I got your -- the questions I have for

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

14

1  you right, that's one of the ones you're going to

2  testify to.

3              So what agency regulates health plans in

4  Washington?

5              MR. CRISALLI:  Object to the extent it

6  goes beyond the scope of the notice.

7              MR. THERIOT:  Okay.  Are you instructing

8  her not to answer?

9              MR. CRISALLI:  No.

10      Q.    (By Mr. Theriot) Go ahead.

11      A.    Can you repeat the question, please?

12      Q.    What agency regulates health plans in

13  Washington?

14      A.    The Washington State Office of the

15  Insurance Commissioner reviews commercial health plans.

16      Q.    Are there any -- does the Office of the

17  Insurance Commissioner, does it regulate all forms of

18  insurance in Washington?

19      A.    I don't know.

20      Q.    But it does regulate health plans, right?

21      A.    Fully insured commercial health plans,

22  yes.

23      Q.    Okay.  What's an example of a health plan

24  that is not a fully insured commercial health plan that

25  it does not regulate?

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1        A.     The Medicaid plan.
 2        Q.     Okay.  Are there any others that fall
 3   into that category?
 4        A.     In what category is that?
 5        Q.     Into the category that the Office of the
 6   Insurance Commissioner does not regulate?
 7        A.     Yes, there are.
 8        Q.     Can you give me a couple more examples
 9   besides the Medicaid plan?
10             MR. CRISALLI:  I'm going to object to the
11   extent it goes beyond the scope.
12             THE DEPONENT:  Another example would be
13   the Medicare coverage.
14        Q.     (By Mr. Theriot) So within the area where
15   the Office of the Insurance Commissioner does regulate,
16   are there different types of health plans that it
17   regulates?
18        A.     What do you mean by "types"?  Can you
19   clarify, please?
20        Q.     So the phrase you used to describe the
21   types of plans it regulates, can you repeat that for
22   me?  Commercial ...
23        A.     Commercial fully insured.
24        Q.     Commercial fully insured.  So what are
25   some plans that, for instance, are -- that fall into
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

1  that category?  Are there different types of plans that

2  fall into commercial fully insured plans?

3          A.     Yes.

4          Q.     Okay.  So give me some examples of those,

5  please.

6          A.     There could be an individual health plan.

7  There can be a group health plan, whether or not there

8  can be a small group health plan or a large group

9  health plan.  And those refer to employer groups.

10         Q.     But all of those are regulated by the

11  Office of the Insurance Commissioner, right?

12         A.     Yes.

13         Q.     Are there basic coverage requirements for

14  each type of health plan that is regulated by the OIC?

15         A.     Yes, there are requirements for each type

16  of health plan.

17         Q.     Where are those requirements found?

18         A.     They are found in the Washington code,

19  RCW, and also the Washington administrative code.

20         Q.     And how would you refer to those?  Are

21  those minimum requirements that must be covered, or how

22  are those referenced?

23         A.     It would depend on the specific citation

24  we were talking about.

25         Q.     Okay.  Could you describe the general

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   **process by which the Office of the Insurance**
2   **Commissioner reviews a health plan submitted for**
3   **approval?**
4        A.    Yes, I can speak to how the health plan
5   forms are reviewed for approval.
6        **Q.    Okay.  How does that process work?**
7        A.    It would start with us, the Agency,
8   receiving a filing from a carrier.
9        **Q.    And then what's the next step?**
10       A.    That filing would come to our intake
11  team.  And then if it is -- each filing has a
12  designation as far as the type of insurance.  And if it
13  is a health plan, it would be assigned to my team.
14       **Q.    Okay.  What materials must be submitted**
15  **as part of that application?**
16       A.    We require that all forms that comprise
17  the insurance contract be filed with us.
18       **Q.    So those forms that comprise the**
19  **insurance contract would be the forms that the carrier**
20  **would provide to whoever is purchasing -- who would**
21  **purchase the plan?**
22       A.    Yes.
23       **Q.    And you said your team is responsible for**
24  **reviewing those materials?**
25       A.    Yes.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          Q.     How does your team communicate with the
2    carrier throughout that process?
3          A.     We use a system called the system for
4    Electronic Rate and Forms Filing, referred to as SERFF.
5          Q.     So it's all online?
6          A.     It is an electronic system, yes.
7          Q.     Electronic system.  Are all
8    communications in writing?
9          A.     It varies.
10         Q.     So there could be some phone calls?
11         A.     There could be some phone calls of a
12   nonsubstantive nature.
13         Q.     Okay.  And how is approval of that plan
14   communicated to you?
15         A.     Ultimately, we would complete a
16   disposition on the filing, and that would be -- that
17   would be a formal approval.
18         Q.     Okay.  And that formal approval is
19   communicated to the carrier through the system, or is
20   there some other way that that's done?
21         A.     Correct, the status would change in the
22   SERFF system --
23         Q.     I see.
24         A.     -- once the --
25         Q.     Sorry, I interrupted you.  Would you

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   repeat that?

2          A.     Sure.  I just said the status would

3   change in SERFF once our review was complete.

4          Q.     And how does the OIC keep track of the

5   plans that it approves or objects to?

6          A.     Approving and objecting aren't mutually

7   exclusive for us.

8          Q.     Okay.  So maybe I should ask it this way:

9   How does OIC keep track of health plans that it

10  approves?

11         A.     Those are all maintained as a public

12  record.

13         Q.     I see.  And are those -- how are those

14  organized as a public record?  By the organization, or

15  how are you able to -- well, how are they organized,

16  let's just say?

17         A.     They are accessible in SERFF and they are

18  accessible from our public-facing website with a search

19  function.

20         Q.     Okay.  And you can search by type of

21  plan?

22         A.     I don't know.

23         Q.     You can search by carrier?

24         A.     Yes.

25                MR. CRISALLI:  I'm going to put in an

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

1    objection there.  Because she referenced there were two

2    different ways, SERFF and the public-facing program,

3    it's unclear to me which one we're talking about with

4    those two questions.

5              MR. THERIOT:  Well, I think I was first

6    of all talking about if the ones that are searchable as

7    a public-facing -- as a public-facing program.  That's

8    which one I was referring to.

9         Q.    (By Mr. Theriot) Is that the way you

10   understood it, Ms. Tocco?

11        A.    Yes, I was speaking to that.

12        Q.    Okay.  All right.  Are there currently

13   approved health plans that do not cover abortion in

14   Washington?

15        A.    Yes.

16        Q.    Are those health plans offered by

17   religious organizations?

18             MR. CRISALLI:  Object to form.  Vague.

19             THE DEPONENT:  I can't search by a given

20   employer group.  So I wouldn't know which employer

21   group of any kind purchased a health plan.

22        Q.    (By Mr. Theriot) Okay.  So do you know

23   approximately how many health plans, approved health

24   plans, in Washington don't cover abortion?

25        A.    I don't know for sure.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          Q.      Is it more than five?  Less than five?

2          A.      More than five.

3          Q.      More than five.  Who would know the

4    identity of those health plans that don't cover

5    abortion?

6                  MR. CRISALLI:  Let me get an objection in

7    there.  That's vague.  Are you talking as to OIC?

8                  MR. THERIOT:  Yes, as to OIC.

9                  THE DEPONENT:  I don't know who would

10   know off the top of their head.  It's information that

11   can be accessed in our SERFF system.

12         Q.      (By Mr. Theriot) And how -- and that

13   information could be accessed by the public?

14         A.      All of our approved, filed and approved,

15   health plans would be accessible to the public to

16   search.

17         Q.      Can you search those plans that are

18   accessible to the public based upon whether or not they

19   cover abortion?

20                 MR. CRISALLI:  Object to form.  Vague.

21                 THE DEPONENT:  No.

22         Q.      (By Mr. Theriot) Do you know if any of

23   those plans are available in King County?

24         A.      Yes, I do.

25         Q.      And are there any that are available in

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

22

1    King County?

2         A.     I am aware of -- yes.

3         Q.     Which plan is that?

4         A.     I am aware of a small group health plan

5    offered by Premera.

6         Q.     When you say "a small group health plan,"

7    how is that defined?

8         A.     A small group would be a plan offered for

9    sale to an employer having 50 or fewer employees.

10        Q.     Did you say 50 or fewer?

11        A.     5-0, yes.

12        Q.     Okay.  Are you aware of any others

13   except -- or besides, excuse me, Premera that offer a

14   health plan that excludes abortion in King County?

15        A.     Do you mean -- can you clarify?  Do you

16   mean for a larger employer?

17        Q.     Well, I was just asking for any other

18   employer, not necessarily a larger employer, but -- I'm

19   sorry, for any employer.  I'll ask the question again.

20   Let me just clarify:  I'm not necessarily asking for a

21   larger employer.

22             So are there any health care plans that

23   exclude abortion available in King County other than

24   the Premera plan that we just discussed?

25                  MR. CRISALLI:  Object to form.  Vague.

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

23

1            THE DEPONENT:  There may be.  In terms of

2   a larger employer, they have the ability to negotiate

3   certain terms.

4        **Q.    (By Mr. Theriot) Okay.  So you're saying**

5   **there may be, but you're not aware of any as you sit**

6   **here today?**

7            MR. CRISALLI:  Object to form.  Vague.

8            THE DEPONENT:  Sorry.  Correct, I can't

9   search by an employer group.

10       **Q.    (By Mr. Theriot) But you are -- I**

11  **understand your testimony to be, though, that if a**

12  **larger group wanted to attempt to negotiate a plan,**

13  **they could try?**

14       A.    Correct.

15       **Q.    And how would they go about doing that?**

16           MR. CRISALLI:  Object to form.  Beyond

17  the scope.

18           THE DEPONENT:  I don't know.  That would

19  be between the employer and the carrier.

20       **Q.    (By Mr. Theriot) Okay.  How do you know**

21  **that they could attempt to negotiate a plan from a**

22  **carrier as a larger group?**

23       A.    My understanding is that an employer who

24  wishes to purchase a health plan to cover its employees

25  can contact carriers to make that purchase.

Electronically signed by Jana Mackelprang (001-409-517-3774)                          fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1          Q.     Are you aware --
 2          A.     And --
 3          Q.     I'm sorry.  Go ahead.  I interrupted you.
 4          A.     And the nature of a large group product
 5  is that there are terms that they can negotiate.
 6          Q.     But you're not aware of a large -- well,
 7  strike that.
 8                 Are you aware of a large employer, more
 9  than 50 employees, that has negotiated such a plan in
10  King County?
11          A.     Can you clarify your time frame?
12          Q.     Well, let's start with currently.
13          A.     Currently I am not aware of any
14  negotiated large group plan.
15          Q.     Are you aware of any since 2018?
16          A.     Are we still in King County?
17          Q.     Yes.
18          A.     No, I'm not aware of any.
19          Q.     Are you aware of any outside of King
20  County?
21          A.     Yes.
22          Q.     Which plan is that?
23          A.     I don't have the plan name.  I know that
24  there is a product, a health plan, approved for sale by
25  Kaiser Foundation of the Northwest.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

25

```
 1         Q.     Do you know which county that is -- I'm
 2    sorry -- do you know which county that is offered in?
 3         A.     I would have to look at the plan
 4    documents to identify the service area.
 5         Q.     And that plan is currently available in
 6    those counties, as far as you know?
 7         A.     It is currently available in some
 8    counties.  I don't know which counties.
 9         Q.     Are you aware of any plans that exclude
10    abortion in Snohomish County?  Am I pronouncing that
11    right?
12         A.     I don't know by county.
13         Q.     Okay.
14         A.     I wasn't done identifying the other
15    plans, though.
16         Q.     Oh, I'm sorry.  Go right ahead.
17         A.     I was just going to state that I know, as
18    a carrier, Providence Health Plan also offers
19    individual and large group plans in the state of
20    Washington.
21         Q.     Do you know if Providence offers those in
22    King or Snohomish County?
23         A.     No, I would have to look at the plan
24    documents.
25         Q.     What are the reasons why a carrier may
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                              fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

```
 1   offer a plan in certain counties and not others?
 2              MR. CRISALLI:  Object.  Speculation.
 3              THE DEPONENT:  That would be a business
 4   decision.
 5       Q.    (By Mr. Theriot) There's no -- is there
 6   any rule or law that would make some -- offering plans
 7   in some counties more so than others?
 8       A.    Sir, can you repeat that?
 9       Q.    Is there any Washington rule or law that
10   would make a carrier think that offering a health plan
11   in some counties is more desirable than others?
12              MR. CRISALLI:  Object.  Speculation.
13   Vague.
14              THE DEPONENT:  I don't know what a
15   carrier would think.
16       Q.    (By Mr. Theriot) Are there any Washington
17   laws or regulations that limit or apply to health care
18   plans that only apply in certain counties in
19   Washington?
20       A.    Could you repeat that?
21       Q.    Sure.  Are you aware of any Washington
22   law or regulation that regulates health care plans only
23   in certain counties?
24              MR. CRISALLI:  Object.  Beyond the scope
25   and vague.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1               THE DEPONENT:  No, I'm not aware of any.

2       **Q.    (By Mr. Theriot) Are you familiar with**

3  **Providence's plan that it offers?**

4       A.    Generally familiar with Providence's

5  health plan, yes.

6       **Q.    Does it cover drugs that are -- strike**

7  **that.**

8               **Does it cover all forms of birth control?**

9               MR. CRISALLI:  I'm going to object to

10  form as well as potentially beyond the scope.

11              THE DEPONENT:  I would have to review

12  plan documents.  In general, it does cover

13  contraception.

14       **Q.    (By Mr. Theriot) Are you aware of any**

15  **plans offered by carriers in King and Snohomish**

16  **Counties that do not cover all contraception?**

17       A.    I'm not aware of any.

18       **Q.    Are you aware of any other currently**

19  **approved health plans that don't cover abortion in all**

20  **contraception?**

21              MR. CRISALLI:  Object to form.

22              THE DEPONENT:  Can you repeat?  Are you

23  asking about two types of coverage?

24       **Q.    (By Mr. Theriot) Well, I can split it up.**

25              **Are you aware of any other health plans**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   that are currently offered that don't cover abortion?

2                    MR. CRISALLI:  Object to form.

3                    THE DEPONENT:  Other than the ones I've

4   stated, no.

5        Q.    (By Mr. Theriot) Are you aware of any

6   health plans, currently approved health plans, that

7   don't cover contraception?

8                    MR. CRISALLI:  Object to form.

9                    THE DEPONENT:  I am not.

10       Q.    (By Mr. Theriot) Is there any state law

11   or rule that requires employers to offer health plans?

12       A.    Can you repeat that?

13       Q.    Yes.  Is there any state law or rule that

14   requires employers to offer health plans to their

15   employees?

16       A.    Well, the Office of the Insurance

17   Commissioner would not regulate employers.

18       Q.    I'm sorry, can you repeat that answer

19   again?

20       A.    I said the Office of the Insurance

21   Commissioner would not be regulating an employer.

22       Q.    I understand that, but is there a state

23   law or rule that actually requires employers to offer

24   insurance that you're aware of?

25       A.    Within the entire Washington code, not

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

29

 1  that I'm aware of.

 2      Q.    I understand that you came to work for

 3  the Office of the Insurance Commissioner about the time

 4  that SB 6219 was enacted, but I'm going to ask this

 5  question anyway.

 6      A.    Okay.

 7      Q.    So before SB 6219 was enacted, had the

 8  Office of the Insurance Commissioner approved health

 9  plans that limited or excluded coverage for abortion?

10      A.    I don't know.

11      Q.    Before SB 6219, had the Office of the

12  Insurance Commissioner approved health plans that

13  limited or excluded coverage for contraception?

14           MR. CRISALLI:  Object to form.

15           THE DEPONENT:  Actually, I have a

16  clarifying -- I have a clarifying on the prior

17  question.

18           Can you repeat the prior question?

19      Q.    (By Mr. Theriot) I'm going to try.  If I

20  get it wrong, let me know.

21           Prior to Senate Bill 6219 being enacted,

22  did the Office of the Insurance Commissioner approve

23  health plans that limited or excluded coverage for

24  abortion?

25      A.    Yes, I would know that only from my

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  capacity working with Providence Health Plan.

2       Q.    I see.  So after -- so prior to the

3  enactment of 6219, Providence offered a plan that

4  covered abortion -- excuse me, that excluded abortion,

5  correct?

6       A.    Providence offered products in the large

7  group market that excluded abortion, yes.

8       Q.    And after SB 6219 was enacted, how did

9  that affect that plan?

10          MR. CRISALLI:  Object to form.

11      Q.    (By Mr. Theriot) Or those plans?

12      A.    Well, currently, Providence continues to

13  offer products in the large group market that exclude

14  abortion.  They've also moved into the individual

15  market in the last couple years.

16      Q.    Prior to -- and we've already -- just

17  strike that -- we've already discussed where Providence

18  offers those plans currently.

19          Do you know whether it offered those

20  plans statewide prior to SB 6219 being enacted?

21          MR. CRISALLI:  Object to the extent this

22  is beyond the scope and form.

23          THE DEPONENT:  I don't recall their

24  service areas.

25      Q.    (By Mr. Theriot) Before SB 6219 was

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

1    enacted, did the Office of the Insurance Commissioner

2    approve health care plans that limited or excluded

3    coverage for contraception?

4          A.    I don't know.

5          Q.    Okay.  How you doing?

6          A.    I'm good.

7          Q.    I'm moving to another topic, so that's

8    why I asked.

9          A.    Okay.

10         Q.    Are there approved health plans that

11   don't cover maternity?

12               MR. CRISALLI:  Object to form.

13               THE DEPONENT:  Not that I'm aware of.

14         Q.    (By Mr. Theriot) Are there approved,

15   currently approved, health plans that don't cover

16   contraception?

17               MR. CRISALLI:  Object to form.

18               THE DEPONENT:  Not that I'm --

19         Q.    (By Mr. Theriot) I'm sorry, can you

20   repeat that?

21         A.    Sure.  Not that I'm aware of.

22         Q.    As used in Senate Bill 6219, the term or

23   the phrase "health plan" is defined by 48.43.005, 31;

24   is that correct?

25               And I will -- that's the question

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

32

1    **pending.  You don't have to answer yet.  I'm going to**

2    **show you that statute.  And I will -- and I will put it**

3    **into chat, if I can.**

4              MR. CRISALLI:  I'm going to object.  This

5    calls for a legal conclusion and the law speaks for

6    itself.

7              MR. THERIOT:  All right, let me see if I

8    can do this here.

9         Q.   **(By Mr. Theriot) I actually scrolled**

10   **down.  Let me scroll up so you can see it, and then I'm**

11   **going to try to put it into chat here.**

12             **So that's what we're looking at.**

13        A.   Okay.

14        Q.   **Okay.  Let's see here.  All right.  Bear**

15   **with me for a moment.  All my options went away.**

16             MR. CRISALLI:  If you minimize, I think

17   those will appear, not full screen.

18             MR. THERIOT:  Yeah, I'm just -- chat,

19   there we are, but that was only to Daniel.  Can you all

20   see that in the chat?

21             MR. CRISALLI:  We can, thank you.

22             MR. THERIOT:  You're welcome.

23             (Exhibit 2 was remotely introduced and

24   provided electronically to the reporter.)

25        Q.   **(By Mr. Theriot) Do you want me to repeat**

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

33

1    the question, Ms. Tocco?

2         A.    I actually can't open it.  When I click

3    on it, I get a series of windows.

4         Q.    Well, that's weird.  You get a series of

5    windows instead of a document?

6         A.    I do.  I get a "save as" option.

7         Q.    Let me try it one more time.

8               So you can see the definitions PDF, but

9    when you click on it, it doesn't load?

10        A.    Correct.

11        Q.    What if I were to email that to you?

12   That I know how to do.  Do you have access to a

13   computer?

14        A.    I do.

15             MR. THERIOT:  So I'm going to send it to

16   you, Paul, and to Jeff.

17        Q.    (By Mr. Theriot) What's the best email

18   for you, Ms. Tocco?

19        A.    It's Kim, K-I-M, dot, Tocco, T-O-C-C-O,

20   at OIC.wa.gov.

21        Q.    Kim.tocco@oic.wa.gov?

22        A.    Yes.

23             MR. THERIOT:  Ms. DeLeon, would you like

24   me to send it to you as well?

25             MS. DeLEON:  That would be great.

Calderwood-Mackelprang, Inc.  303.477.3500

```
 1              (There was a brief discussion off the
 2     record.)
 3         Q.     (By Mr. Theriot) So as used in SB 6219,
 4     "health plan" is defined by 48.43.005, subsection (31),
 5     correct?
 6              MR. CRISALLI:  Object to calling for a
 7     legal conclusion.
 8              THE DEPONENT:  I would have to see the
 9     text of 6219.
10         Q.     (By Mr. Theriot) Okay, I can show you
11     that.
12              MR. THERIOT:  So let's call this
13     Exhibit 2, by the way.
14              MR. CRISALLI:  I think it would be 3
15     because Exhibit 1 is the notice.
16              MR. THERIOT:  What was Exhibit 2?
17              MR. CRISALLI:  Exhibit 2 is the
18     definitions you just put up, and Exhibit 3 will be
19     6219.
20              MR. THERIOT:  Oh, I'm sorry, I was
21     referring to the definitions.  I should have been more
22     clear.
23              MR. CRISALLI:  No problem.
24              MR. THERIOT:  So we're going to make
25     Exhibit 2 the definitions.  I just want to make sure I
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

1   got my records correct here, so whether we come back

2   later, we know what we're talking about.

3                (Exhibit 3 was remotely introduced and

4   provided electronically to the reporter.)

5        Q.    (By Mr. Theriot) I'll stop sharing that

6   and get you 6219, which will be Exhibit 3.  I'm just

7   going to send it to you.

8                Did you get that email, Kim, that I sent

9   you, or did you just pull it up?

10       A.    My Outlook is spinning right now.  I will

11  tell you when it loads.

12       Q.    So you must have just pulled it off the

13  chat, then.  No?

14       A.    I have pulled the definitions off the

15  chat, and my Outlook is not opening at the moment.

16       Q.    I sent it to the wrong address.  I'll put

17  in the chat again, or I'll try.

18                Can you see that in the chat?

19       A.    Yes, I can.

20       Q.    And I'm going to share my screen with you

21  too, so you can see that.

22       A.    Okay.

23       Q.    So I'm referring, in SB 6219, which we're

24  going to call Exhibit 3, to New Section, Section 2.  It

25  says, A new section is added to chapter 48.43 RCW and

Calderwood-Mackelprang, Inc.  303.477.3500

1  reads as follows:  A health plan issued or renewed on

2  or after January 1, 2019.

3              And the question is:  Is that term

4  defined by 48.43.005, 31?

5              MR. CRISALLI:  Objection.  Calls for a

6  legal conclusion.  The law speaks for itself.

7              THE DEPONENT:  So, yes, that definition

8  would be in 48.43.005.

9        Q.    (By Mr. Theriot) Okay.  Subsection (31)?

10       A.    Correct.

11       Q.    All right.

12              MR. CRISALLI:  The same objection.

13       Q.    (By Mr. Theriot) So I will give you a

14  moment to look at the subsections under 31, but

15  subsection (31) says, "'Health plan' or 'health benefit

16  plan' means any policy, contract, or agreement offered

17  by a health carrier to provide, arrange, reimburse, or

18  pay for health care services except the following."

19              So I'd like to spend some time talking

20  about those exceptions.  Would you like a moment to

21  review those?  There are multiple ones.

22       A.    Yes.

23       Q.    Okay.

24       A.    Okay.

25       Q.    Is there an overarching reason that

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  **you're aware of that these plans are excluded from the**

2  **definition of "health plan" or "health benefit plan"?**

3           MR. CRISALLI:  Objection.  Beyond the

4  scope and asks for a legal conclusion.

5           THE DEPONENT:  I don't know why the

6  legislature would except those, would list those out as

7  the exceptions.

8       **Q.    (By Mr. Theriot) Do these plans cover**

9  **health care?**

10           MR. CRISALLI:  Object to form.  The same

11  objection as before.

12       **Q.    (By Mr. Theriot) Do the plans in**

13  **subsection (31), listed as exceptions, do those cover**

14  **health care?**

15           MR. CRISALLI:  Calls for a legal

16  conclusion.  Object to form.

17           And beyond the scope.  Sorry.

18           THE DEPONENT:  I think it may depend on

19  which subsection, which of the sub letters you're

20  looking at.

21       **Q.    (By Mr. Theriot) Okay.  Why don't we just**

22  **go through them, and then I can ask my questions about**

23  **each.  That will probably be the easiest way.**

24           **In Exhibit 2, which is RCW 48.43.005,**

25  **subsection (31)(a) refers to "Long-term care insurance**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

38

 1   governed by chapter 48.84 or 48.83 RCW."

 2                   What kinds of -- what kinds of things do

 3   these plans cover?

 4                   MR. CRISALLI:  Object to form.  Calls for

 5   a legal conclusion.  Also beyond the scope.

 6                   THE DEPONENT:  I don't know.

 7        Q.    (By Mr. Theriot) You don't know.  Do you

 8   know if long-term care insurance governed by chapter

 9   48.84 could cover maternity?

10                   MR. CRISALLI:  Object to form.  Calls for

11   a legal conclusion.  Beyond the scope.

12                   THE DEPONENT:  I don't know.

13        Q.    (By Mr. Theriot) Who would know?

14                   MR. CRISALLI:  Object.  Beyond the scope.

15                   THE DEPONENT:  Are you asking who would

16   know if a long-term care insurance, under those

17   chapters, could -- would be permitted to provide

18   maternity coverage?

19        Q.    (By Mr. Theriot) Yes.

20                   MR. CRISALLI:  Object to form.  Beyond

21   the scope and speculation.

22                   THE DEPONENT:  I'm not familiar with

23   chapter 48.84 or 48.83.  Those are outside of the

24   insurance code.

25        Q.    (By Mr. Theriot) So maybe a different

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  question is:  Does the Office of the Insurance

2  Commissioner, does it oversee long-term care insurance

3  governed by chapter 48.84 or 48.83?

4       A.    I would have to look at those chapters.

5            MR. CRISALLI:  The same objection.

6       Q.    (By Mr. Theriot) Okay.  We can come back

7  to that one.  Let's go down through the rest of them

8  and see if you know about any of the rest of them.

9            Let's go to subsection (b) of Exhibit 2,

10 subsection (31)(b), "Medicare health supplemental

11 insurance governed by chapter 48.66 RCW."

12           Are you familiar with what those types of

13 plans cover?

14           MR. CRISALLI:  Object to form.  Calls for

15 a legal conclusion.  Beyond the scope.

16           THE DEPONENT:  No, neither me nor my team

17 review Medicare supplements.

18      Q.    (By Mr. Theriot) Do you know whether

19 those are covered by -- are governed by or regulated

20 by -- strike that.  Let me start over.

21           Do you know whether the Medicare

22 supplemental insurance governed by chapter 48.66 is

23 governed by the Office of the Insurance Commissioner?

24           MR. CRISALLI:  It calls for a legal

25 conclusion.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1              THE DEPONENT:  I don't know with
2    certainty.
3         Q.    (By Mr. Theriot) It may; is that what
4    you're saying?
5              MR. CRISALLI:  It's your testimony and
6    legal conclusion.  Sorry.
7         Q.    (By Mr. Theriot) Might it be regulated by
8    the Office of the Insurance Commissioner?
9              MR. CRISALLI:  The same objection.
10             THE DEPONENT:  Medicare is a federal
11   program.  Some aspects of those products may be
12   regulated by the OIC, but I don't know for sure.
13        Q.    (By Mr. Theriot) It looks like
14   subsection (b) refers to supplemental Medicare
15   insurance.  So are you familiar with whether the Office
16   of the Insurance Commissioner regulates supplemental
17   Medicare health insurance?
18             MR. CRISALLI:  The same objection.
19             THE DEPONENT:  My answer is the same.
20   The OIC may regulate some aspects, but I don't know
21   which for sure.
22        Q.    (By Mr. Theriot) Okay.  And who would
23   know whether the Office of the Insurance Commissioner
24   regulates Medicare supplemental health insurance?
25             MR. CRISALLI:  Object to form.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1              THE DEPONENT:  I don't know without
2    seeing the 48.66.  I don't know what the statute
3    states.
4         Q.    (By Mr. Theriot) Okay.
5         A.    Or that chapter.
6         **Q.    All right.  Let's go to subsection (c) of**
7    **Exhibit 2, (31)(c).  "Coverage supplemental to the**
8    **coverage provided under chapter 55, Title 10," of the**
9    **United States Code.**
10             **Are you familiar with what those plans**
11   **cover?**
12        A.    Again, not without looking up chapter 55,
13   title 10, of the US Code.
14        **Q.    All right.  Let's go to subsection 31(d)**
15   **of Exhibit 2, "Limited health care services offered by**
16   **limited health care service contractors in accordance**
17   **with RCW 48.44.035."**
18             **Are you familiar with those plans?**
19        A.    Very generally.
20        **Q.    What do those types of plans cover?**
21             MR. CRISALLI:  Objection.  Calls for a
22   legal conclusion.  Speculation.
23             THE DEPONENT:  I believe it varies
24   depending on the product that's offered.
25        Q.    (By Mr. Theriot) Is there -- may the

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1  plans referred to in subsection (d), 31(d), of
 2  Exhibit 2, could those cover contraception?
 3              MR. CRISALLI:  Objection.  Calls for a
 4  legal conclusion.  Speculation.
 5              THE DEPONENT:  I don't know.
 6       Q.    (By Mr. Theriot) Could the plans governed
 7  by -- or, excuse me, could the plans, "limited health
 8  care services offered by limited health care service
 9  contractors in accordance with RCW 48.44.035," could
10  those cover abortion?
11              MR. CRISALLI:  Objection.  Calls for a
12  legal conclusion.  Speculation.
13              THE DEPONENT:  Again, I don't know
14  without looking at those titles and section.
15       Q.    (By Mr. Theriot) Are you aware of
16  anything that would prohibit that plan listed in
17  subsection (31)(d) of Exhibit 2 from covering
18  contraception or abortion?
19              MR. CRISALLI:  Object to form.  Beyond
20  the scope and a legal conclusion.
21              THE DEPONENT:  I don't know without
22  further research.
23       Q.    (By Mr. Theriot) So I'm referring now to
24  subsection (31)(d) of Exhibit 2, "disability income."
25              Do you know if there is any specific
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1   statute that governs these types of plans.
 2                 MR. CRISALLI:  Object to form.  Beyond
 3   the scope.
 4                 THE DEPONENT:  Yes, I do know.
 5        Q.    (By Mr. Theriot) Okay.  And which statute
 6   is that?
 7        A.    Again, I would have to look in my statute
 8   book for disability income beyond title 48.
 9        Q.    Is it governed by title 48.20?
10                 MR. CRISALLI:  Object to form.  Calls for
11   a legal conclusion.
12                 THE DEPONENT:  I would need to look at
13   48.20.  I would look at the text of 48.20 to see what
14   it refers to.
15        Q.    (By Mr. Theriot) Let's look -- we'll move
16   down to "coverage incidental to a property" in (31)(f),
17   subsection (31)(f) of Exhibit 2.  "Coverage incidental
18   to a property/casualty liability insurance policy such
19   as automobile personal injury protection coverage and
20   homeowner guest medical."
21                 Are you familiar with the types of things
22   that those plans cover?
23                 MR. CRISALLI:  Object to form.
24                 THE DEPONENT:  Generally, yes.
25        Q.    (By Mr. Theriot) Could those plans cover
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                              fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

44

1   **health insurance?**

2              MR. CRISALLI:  Object to form.  Vague.

3              THE DEPONENT:  Are you asking whether a

4   property insurance policy can cover a health insurance

5   policy?

6         **Q.     (By Mr. Theriot) No.  That was a poor**

7   **question.**

8              **Could the policy listed in subsection**

9   **(31)(f) of Exhibit 2 cover health needs --**

10             MR. CRISALLI:  Object to form.  Vague.

11        **Q.     (By Mr. Theriot) -- services?**

12             MR. CRISALLI:  The same objection.  Calls

13  for a legal conclusion.

14             THE DEPONENT:  I don't know for sure.  My

15  unit doesn't review those products.

16        **Q.     (By Mr. Theriot) Who would know the**

17  **answer to that question?**

18             MR. CRISALLI:  Object to form.  Beyond

19  the scope.

20             THE DEPONENT:  I would have to find out

21  who our subject matter expert would be with regard to

22  property and casualty insurance, P&C.

23        **Q.     (By Mr. Theriot) Are you aware of any**

24  **laws or regulations that would prohibit the coverage**

25  **listed in Exhibit 2, subsection (31)(f)), from covering**

Calderwood-Mackelprang, Inc.  303.477.3500

1  **abortion --**

2           MR. CRISALLI:  Objection.

3      **Q.    (By Mr. Theriot) -- or contraception?**

4           MR. CRISALLI:  My apologies.

5           Calls for a legal conclusion.  Beyond the

6  scope.

7           THE DEPONENT:  I am not familiar with the

8  regulations that apply to those types of policies.

9      **Q.    (By Mr. Theriot) All right.  Let's move**

10 **to subsection (g), 31(g) of Exhibit 2, "Workers'**

11 **compensation coverage."  Are you familiar with the**

12 **coverage that those policies -- excuse me, strike that.**

13          **Are you familiar with the coverage in**

14 **those policies listed that could be called workers'**

15 **compensation coverage?**

16          MR. CRISALLI:  Objection.  Vague.  Beyond

17 the scope.  Legal conclusion.

18          THE DEPONENT:  Generally I know what

19 workers' compensation coverage is.

20     **Q.    (By Mr. Theriot) What do those plans**

21 **usually cover?**

22          MR. CRISALLI:  Object to form.  Calls for

23 a legal conclusion.  Misstates Washington law.

24          THE DEPONENT:  I understand they're

25 designed to compensate for workplace injuries.

Electronically signed by Jana Mackelprang (001-409-517-3774)                          fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1        Q.     (By Mr. Theriot) Do you know what
 2   statutes govern workers' compensation coverage?
 3              MR. CRISALLI:  Object to form.  Beyond
 4   the scope.  Calls for a legal conclusion.
 5              THE DEPONENT:  I do not without looking
 6   at the statutes.
 7        Q.     (By Mr. Theriot) Is there any Washington
 8   law or regulation that would prohibit workers'
 9   compensation coverage from including coverage for
10   abortion or contraception?
11              MR. CRISALLI:  Objection.  Beyond the
12   scope.  Calls for a legal conclusion.  Vague.
13              THE DEPONENT:  I don't know.
14        Q.     (By Mr. Theriot) Who would know the
15   answer to that question?
16              MR. CRISALLI:  Objection.  Beyond the
17   scope.  Calls for a legal conclusion.
18              THE DEPONENT:  Can you repeat the
19   question?
20        Q.     (By Mr. Theriot) Yes.  Who would know the
21   answer -- who would know whether workers' compensation
22   coverage could cover abortion or contraception?
23              MR. CRISALLI:  The same objections.
24              THE DEPONENT:  I believe that would be
25   the authority that regulates workers comp in
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

 1  Washington.

 2       Q.     (By Mr. Theriot) What authority is that?

 3              MR. CRISALLI:  Objection.  Beyond the

 4  scope.  Calls for a legal conclusion.

 5              THE DEPONENT:  I believe that's the

 6  Department of Labor, L&I.

 7       Q.     (By Mr. Theriot) What was the last thing

 8  you said?  The Department of Labor -- what?

 9       A.     Oh, it's the labor and industries, L&I.

10       Q.     Referring again to Exhibit 2, subsection

11  (31)(h), "accident only coverage," what types of --

12  what does "accident only coverage" cover?

13              MR. CRISALLI:  Objection.  Calls for a

14  legal conclusion.  Beyond the scope.

15              THE DEPONENT:  I don't know without

16  further research.

17       Q.     (By Mr. Theriot) Are you aware of any

18  Washington law or regulation that would prohibit

19  accident only coverage from covering abortion and

20  maternity -- I'm sorry, I'm sorry, from covering

21  contraception or abortion?

22              MR. CRISALLI:  Objection.  Beyond the

23  scope.  Calls for a legal conclusion.

24              THE DEPONENT:  I'm not familiar with any

25  legal requirements in general related to that type of

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

48

1  coverage.

2      Q.    (By Mr. Theriot) All right.  Let me ask

3  this a different way, instead of going through this.

4  Are there any of the plans listed in 48.43.005, 31,

5  subsection (31), that may cover maternity?

6            MR. CRISALLI:  Objection.  Calls for

7  speculation and a legal conclusion.  Also beyond the

8  scope.

9            THE DEPONENT:  I don't know.

10     Q.    (By Mr. Theriot) Who would know the

11  answer to that question?

12            MR. CRISALLI:  The same objection.

13            THE DEPONENT:  I would see that as eight

14  different questions.  So I would say depending on the

15  regulatory authority for each of those types of

16  products.

17     Q.    (By Mr. Theriot) Okay.  Does the Office

18  of the Insurance Commissioner regulate any of the

19  products listed in 48.43.005, subsection (31)?

20            MR. CRISALLI:  Objection.  Calls for a

21  legal conclusion.

22            THE DEPONENT:  Does the OIC regulate

23  anything from A through ...

24     Q.    (By Mr. Theriot) A through N of

25  subsection (31).

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

49

```
 1        A.     Yes.
 2        Q.     Which ones does it regulate?
 3               MR. CRISALLI:  Calls for a legal
 4   conclusion.
 5               THE DEPONENT:  I'm looking through them
 6   now.
 7        Q.     (By Mr. Theriot) Okay.
 8        A.     The OIC might regulate some aspects of B.
 9        Q.     Did you say B, as in bravo?
10        A.     I did.
11               C, I don't know unless I were to look up
12   that section of the federal code.
13               D would be the Office of the Insurance
14   Commissioner.
15        Q.     I'm sorry, did you say D --
16        A.     D, as in David, yes.
17        Q.     David.  So B and D.
18        A.     E, as in elephant, would be under the
19   OIC's authority.
20        Q.     Disability income?
21        A.     Yes.  F.
22        Q.     F, as in "coverage incidental to a
23   property/casualty liability insurance policy"?
24        A.     Correct.
25        Q.     Okay.
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1      A.     H, accident only.

2      Q.     Okay.

3      A.     I, specified disease.

4             K, dental only and vision only.

5             L.

6      Q.     Okay.  And possibly some aspects of N, as

7  in Nancy.

8             What aspects of N, as in Nancy, might the

9  Office of the Insurance Commissioner regulate?

10     A.     I would need to look up the cite in CFR,

11 but, in general, we may do some review of what's

12 considered a wrap plan.  It's prescription drug

13 coverage that wraps around a Medicare part D policy.

14            MR. CRISALLI:  If I could interject.

15 I've let you go quite a bit on the subject of these

16 exemptions, but this is an argument that the District

17 Court has rejected from Cedar Park and the Ninth

18 Circuit did not touch that aspect of its ruling.

19            So I've given you some leeway on this and

20 tried to prepare someone to testify to this, but our

21 position is this is irrelevant, and going too much

22 further is improper considering the District Court and

23 Ninth Circuit's rulings.

24            MR. THERIOT:  Well, I disagree with you

25 because it goes to our free exercise, what exceptions.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

1  And we still have a valid, free exercise agreement, and

2  that's clear.

3            So I can ask about this.  And not only

4  that, but I'm going to, unless you have somebody

5  prepared to testify as to what we've asked about in the

6  30(b)(6) notice, then we're going to have to do this

7  again.

8            MR. CRISALLI:  We have additional

9  witnesses that may touch on some of this, but I'm just

10 saying, this argument has been rejected -- this aspect

11 of this argument has been rejected by the District

12 Court, and the Ninth Court did not change.  We have the

13 ruling from the District Court that focuses on the free

14 exercise claim that resulted from that.

15            I've given a little bit of leeway because

16 I understand where your argument is on this, but I

17 think, you know, wasting all this time on other

18 agencies that are not parties to this case, that's why

19 I've been objecting as beyond the scope and why I think

20 it's inappropriate, in addition to being that I think

21 this argument has already been rejected.

22            MR. THERIOT:  When you say "other

23 agencies," Ms. Tocco just listed 10 of these plans that

24 are regulated by the Office of the Insurance

25 Commissioner.  So what do you mean by "other agencies"?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

52

```
 1              MR. CRISALLI:  Well, you went at length
 2  about labor and industries.  There's some aspects of
 3  this to the extent --
 4              MR. THERIOT:  All right.
 5              MR. CRISALLI:  -- as well as others.
 6              MR. THERIOT:  But not all of them, but
 7  some of them.
 8              MR. CRISALLI:  Not all of them, but I
 9  still disagree with the parts that are some of them
10  because it's not based on any kind of religion basis,
11  which is the ruling of the Ninth Circuit and the
12  District Court.
13              I mean, I understand it's your
14  deposition.  I'm not trying to -- I just want to say
15  I'm voicing my objection.  If it goes too far, I'm
16  going to make an issue of it later.
17              MR. THERIOT:  Okay.  I think I'm entitled
18  to the answers to these questions.  I understand that
19  Ms. Tocco may not know the answer to those questions,
20  although, you did indicate that she would be able to
21  answer the questions on the topic of 6, and this is
22  clearly within that topic.
23              So if we can't get answers to them, then,
24  as I said, by Ms. Tocco or someone else, then we'll
25  have to find somebody who will give us answers to them,
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

53

1   and we can talk about that off the record.

2             MR. CRISALLI:  Okay.

3        Q.    (By Mr. Theriot) So we've got about 30

4   minutes before lunchtime, but I think -- if I can just

5   ask some general questions to make sure I understand

6   your testimony, Ms. Tocco, about Exhibit 2, subsection

7   (31), and the subsections within that.

8             And it's my understanding that with

9   regard to those types of policies listed in there,

10  you're not familiar with each of those -- I'm sorry,

11  let me say this:  Is it true that you don't know

12  whether any of those listed in Exhibit 2, subsection

13  (31), cover maternity?

14            MR. CRISALLI:  Objection.  Beyond the

15  scope, calls for speculation, and a legal conclusion.

16            THE DEPONENT:  I can only speak to the

17  ones that I and my team have oversight for, that we'd

18  actually review.

19       Q.    (By Mr. Theriot) So which ones do you and

20  your team have oversight for?

21       A.    Certainly health plans, which is

22  everything but what's in here.

23       Q.    Okay.

24       A.    So these are the exceptions to what I do

25  review.  The one caveat is my team reviews dental only

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

54

1   and vision only coverage as well.  I oversee health

2   plan and I oversee dental-only and vision-only reviews.

3          Q.      So dental only and vision only is

4   subsection (k); is that right?

5          A.      Correct.

6          Q.      And let me then ask some specific

7   questions about that.

8                  All right.  What do dental only and

9   vision only -- yeah, dental-only and vision-only

10  coverage, what types of things do those plans usually

11  cover?

12                 MR. CRISALLI:  Objection.  Calls for a

13  legal conclusion.  Beyond the scope.

14                 THE DEPONENT:  Dental only is going to

15  provide coverage for things like basic dental exams,

16  cleaning, fillings, crowns, possibly TMJ.

17                 Vision only is going to cover basic

18  vision services, exams, hardware, contacts.

19         Q.      (By Mr. Theriot) Could any of the dental

20  only or vision only plans cover maternity?

21                 MR. CRISALLI:  Objection.  Calls for a

22  legal conclusion.  Are you arguing that vision plans

23  should include maternity care services?

24                 MR. THERIOT:  I'm not arguing.  I'm

25  asking Ms. Tocco, could they?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1            MR. CRISALLI:  The same objections.

2            THE DEPONENT:  Could a dental only

3  carrier offer maternity care in addition to dental

4  services?

5       Q.    (By Mr. Theriot) Yes.  I'm sorry.  Could

6  **a dental-only carrier include maternity care in one of**

7  **its policies?**

8            MR. CRISALLI:  Objection.  Calls for a

9  legal conclusion.  Outside the scope.

10            THE DEPONENT:  We ...

11            MR. CRISALLI:  And vague.

12            THE DEPONENT:  I don't know that we could

13  accept a filing for review that was a dental/maternity

14  plan.  We would probably require that to be filed

15  differently or rejected.

16       Q.    **(By Mr. Theriot) Could a vision-only plan**

17  **that's governed by (31), subsection (k), include**

18  **coverage for maternity?**

19            MR. CRISALLI:  The same objection.

20            THE DEPONENT:  The same answer.

21       Q.    **(By Mr. Theriot) Okay.**

22       A.    I would say I don't believe the providers

23  that would be required to access -- they would have to

24  be licensed to practice within the scope of their

25  license.  So that would likely be outside the scope of

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

 1   the Division currently.
 2        Q.    Could a dental-only plan cover
 3   contraception?
 4               MR. CRISALLI:  The same objections.
 5               THE DEPONENT:  My answer would be the
 6   same.
 7        Q.    (By Mr. Theriot) Could a vision-only plan
 8   cover contraception?
 9               MR. CRISALLI:  The same objection.
10               THE DEPONENT:  The same answer.
11        Q.    (By Mr. Theriot) And the same answer
12   is ...
13        A.    I don't know what a product would look
14   like that was a bundle of vision and maternity.  It
15   would not only have to meet form requirements, but it
16   would have to meet network and rating requirements.  So
17   I'm not sure that's even a reviewable product within
18   Washington.  But a vision/maternity plan, I've never
19   heard of those.
20        Q.    Are there any rules or regulations that
21   would prohibit dental only and vision only coverage
22   from covering maternity?
23               MR. CRISALLI:  Objection.  Calls for a
24   legal conclusion.  Vague.
25               THE DEPONENT:  Well, for --

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

57

1              MR. CRISALLI:  And I think misstates the

2  testimony.

3              MR. THERIOT:  I didn't state the

4  testimony.  I'm just asking --

5              MR. CRISALLI:  Well, the testimony is

6  that it's vision only.  So how can it have anything

7  aside from vision?

8              MR. THERIOT:  That's not the question.

9       **Q.    (By Mr. Theriot) The question is:  Are**

10  **there any rules that prohibit dental only and vision**

11  **only plans from covering maternity?**

12              MR. CRISALLI:  The same objection.

13              THE DEPONENT:  I don't know how such a

14  product would even be able to be submitted to us

15  because it's submitted based on a type of insurance.

16       **Q.    (By Mr. Theriot) I understand that.**

17  **That's not the question.  The question is:  Are there**

18  **any rules that prohibit a product from being submitted**

19  **and covering -- the dental only and vision only from**

20  **covering maternity?**

21              MR. CRISALLI:  Asked and answered.  The

22  same objections.

23              MR. THERIOT:  And I'm going to object to

24  you coaching the witness.  She's basically taking what

25  you just said and using it in her answer.

Calderwood-Mackelprang, Inc.  303.477.3500

1              MR. CRISALLI:  Counsel, I've said
2    objection to form, beyond the scope, legal conclusion.
3    I've said the same objection.
4              MR. THERIOT:  Yes, but before you said
5    the objection was -- I can't even think -- it misstates
6    the testimony and I can't think of a plan that would
7    allow that.  And again that's what she basically said.
8    So I object to your coaching the witness.
9         **Q.    (By Mr. Theriot) Now, I'm going to ask**
10   **one more time:  Are there any rules or regulations that**
11   **prohibit dental only or vision only coverage from**
12   **including maternity?**
13             MR. CRISALLI:  Objection.  Asked and
14   answered.  The same objection as before.
15             THE DEPONENT:  We have -- we have general
16   filing instructions that all carriers must follow, and
17   they are requirements for how forms and rates and
18   network filings can be submitted for our review.  So
19   based on those filing instructions, which are grounded
20   in our administrative code and/or statutes, that type
21   of product wouldn't be able to get in the door for our
22   review because it wouldn't meet the basic filing
23   requirements to even get to a team for review.
24        **Q.    (By Mr. Theriot) Okay.  All right.  Are**
25   **there any other products or types of plans listed in**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  subsection (31) of Exhibit 2 that your office has --
2  that your office has authority over?  Is that the right
3  word.  I'm going to object to my own question.
4            MR. CRISALLI:  Object to form.
5            THE DEPONENT:  So I think I've
6  distinguished between which ones the Agency has
7  authority for and then which types I oversee.
8       Q.    (By Mr. Theriot) Right.
9       A.    So can you repeat your question, then?
10      Q.    Yes.  Are there any other plans listed in
11 subsection (31) of Exhibit 2 that your department has
12 authority over?
13      A.    My department has authority for health
14 plans, and the only exception is dental only and vision
15 only.
16      Q.    Okay.
17      A.    "My department" as in my health forms
18 unit.
19      Q.    Okay.  And then as far as the other types
20 of plans listed in subsection (31), you wouldn't know
21 anything about what they cover except by what's listed
22 in the statutes that's referenced in some of them; is
23 that right?
24            MR. CRISALLI:  Objection.  Misstates the
25 testimony, beyond the scope, and calls for a legal

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

1  conclusion.

2              THE DEPONENT:  I wouldn't know in my

3  capacity as a representative of the OIC, no.

4       Q.    (By Mr. Theriot) Would you know in some

5  other capacity?

6       A.    I'm familiar with --

7              MR. CRISALLI:  Objection.  Beyond the

8  scope.

9              MR. THERIOT:  Do you want to state your

10 objection more fully?

11             MR. CRISALLI:  Yeah, beyond the scope.

12      Q.    (By Mr. Theriot) Go ahead.

13      A.    I would be generally familiar with, for

14 example, an auto insurance policy, but that's by the

15 nature of being a policyholder.

16      Q.    If we go another 15 minutes, that would

17 probably be better than taking a break now.

18      A.    Sure.

19      Q.    When your department reviews a plan and

20 responds to it with a general objection, can you

21 describe for me what that is?  What's a general

22 objection?

23      A.    Well, in our process, we have -- we use

24 what we call an analyst's checklist.  And it's a

25 compliance tool that analyzes all the requirements that

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   a given plan that's submitted to us has to meet.  So an

2   objection from us would mean, in our review of that

3   filing, there is -- there is an item that's deficient.

4   So that's going to be a citation to RCWs or RACs.

5   That's our objection process.

6           Q.      Okay.  As far as the OIC is aware, have

7   **all health plans currently approved in Washington**

8   **complied with SB 6219?**

9                   MR. CRISALLI:  Objection.  Calls for a

10  legal conclusion.

11                  We'll see if this is the witness.  We

12  have a compliance person.  If she can answer it, that's

13  fine by me.  I don't mean to stop the answer, but,

14  also, since she's not on the compliance side, I just

15  want to draw that distinction.

16                  MR. THERIOT:  I understand.  It was a

17  little unclear whether she could answer that question.

18          Q.      **(By Mr. Theriot) If you can, go ahead and**

19  **answer it.**

20          A.      Could you repeat that question?

21          Q.      **As far as the Office of the Insurance**

22  **Commissioner is aware, have all health plans approved**

23  **in Washington complied with the requirements set forth**

24  **in SB 6219?**

25                  MR. CRISALLI:  Objection.  Calls for a

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  legal conclusion.

2            You may answer if you know.

3            THE DEPONENT:  Sure.  I think there's two

4  aspects to the process.  Myself and my team, we review

5  these filings typically prior to being sold, at least

6  in the individual and small group market.  So what

7  occurs during the administration of a plan, after it's

8  purchased, after a consumer is actively using their

9  plan, that wouldn't come to my team.

10       Q.    (By Mr. Theriot) And just to make sure I

11  understand your answer, does your team -- does your

12  team review large group policies or just small group

13  policies?

14       A.    Individual, small group, and large group.

15       Q.    So, as I understand it, what you're

16  saying is you're not aware of any plan that's currently

17  approved that doesn't comply with SB 6219?

18       A.    That's correct.

19       Q.    Are you aware of the -- do you know the

20  consequences of noncompliance, or is that a different

21  witness?

22       A.    Sorry, can you repeat that?  I just

23  didn't hear the end.

24       Q.    Do you know the consequences of

25  noncompliance with SB 6219?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1              MR. CRISALLI:  I object to the extent

2    it's beyond the scope of this witness.

3              MR. THERIOT:  Of this witness.  Okay.

4              MR. CRISALLI:  If she knows, I don't want

5    to step on her, if she has an answer for you.  We do

6    have compliance -- although I'm not sure that's

7    identified as one of your topics.  We have prepared for

8    14, which I think you're trying to get at the

9    consequences; but it's also a legal conclusion.

10             I don't believe I saw one that addressed

11   what is a consequence of the failure to comply with

12   6219 or any --

13             MR. THERIOT:  Well, I think that falls

14   within Washington's knowledge of insurance compliance

15   requirements.  But we can bicker about that later.

16        Q.    (By Mr. Theriot) The question is:  Do you

17   know?

18        A.    And can you repeat the question.

19        Q.    Do you know the consequences of

20   noncompliance with SB 6219?

21             MR. CRISALLI:  And calls for a legal

22   conclusion as well as speculation.

23             THE DEPONENT:  Generally, yes, I do.

24        Q.    (By Mr. Theriot) Okay.  What are those

25   consequences?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1        A.        In my position, it would depend on when

2    we see that noncompliance.  For example, if we identify

3    a deficiency in the form based on noncompliance, we

4    would address that in the objection process.  So that

5    would be the consequence while it's under our review.

6        **Q.        Okay.  So one of the consequences would**

7    **be that the plan just wouldn't get approved?**

8        A.        Ultimately, yes.  We typically work

9    through several rounds of objections to get to

10   approval; but if a carrier refuses to comply, we would

11   not be able to approve the plan.

12       **Q.        I see.  So your team would not be**

13   **involved in assessing fines or taking any other action**

14   **besides not approving the plan?**

15       A.        Correct.  Noncompliance after it is in

16   the market would be within our enforcement division.

17       **Q.        What contraception is required by SB**

18   **6219?**

19              MR. CRISALLI:  Objection.  Calls for a

20   legal conclusion and beyond the scope.

21              THE DEPONENT:  Is that with -- am I able

22   to reference the statute?

23       **Q.        (By Mr. Theriot) Yes.**

24       A.        Okay.  So 6219, you're asking?

25       **Q.        Yes.  So what drugs are required by**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  SB 6219?

2                    MR. CRISALLI:  The same objection.

3                    THE DEPONENT:  I don't have knowledge of

4  specific drug names.

5        Q.     (By Mr. Theriot) Okay.

6        A.     If that's your question.

7        Q.     Yes, that was my question.

8               Do you have general knowledge that all

9  FDA approved contraception is required by SB 6219?

10       A.     Yes.

11                   MR. CRISALLI:  I'm going to object as

12  beyond the scope with respect to this witness.

13       Q.     (By Mr. Theriot) Did you say yes?

14       A.     I said yes.

15       Q.     Okay.  All right.

16                   MR. THERIOT:  I know this isn't a great

17  place to take a break, but it makes sense because I'd

18  be switching topics.  Let me just double-check here.

19                   Yeah, I think it would be better just to

20  wait and then come back on the next one.

21                   (The luncheon recess was taken from 11:52

22  p.m. to 12:34 p.m. PST.)

23                   MR. THERIOT:  We're back on the record.

24       Q.     (By Mr. Theriot) Ms. Tocco, you

25  understand you're still under oath?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

66

```
 1        A.    Yes, I do.
 2        Q.    All right.  I put in the chat -- well,
 3   actually, before we get there -- yeah, so we're going
 4   to mark as -- I believe we are on Exhibit 4.
 5              MR. THERIOT:  Is that right, Jana?
 6              THE REPORTER:  Yes.
 7              (Exhibit 4 was remotely introduced and
 8   provided electronically to the reporter.)
 9        Q.    (By Mr. Theriot) This is Statute RCW
10   48.43.065, and I put that in the chat.  And would
11   you -- do you want me to share my screen too,
12   Ms. Tocco, or do you care?
13        A.    I don't mind looking at it on my screen,
14   if it's clear what you're looking at.
15        Q.    Okay, let's just do that, because
16   actually when I share my screen, everybody gets
17   smaller, and so it's easier for me if we don't do that.
18              I am looking at what's been marked as
19   Exhibit Number 4, RCWA 48.43.065.  Do you see that,
20   Ms. Tocco?
21        A.    Yes, I do.
22        Q.    In subsection (2)(a) of that statute, it
23   says, "No individual health care provider."  It begins
24   with.
25        A.    Uh-huh.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          Q.     Are you -- is "health care provider"

2    defined by what we've previously marked as Exhibit 2,

3    RCW 48.43.005?  And I can direct you specifically to

4    subsection (27).

5                    MR. CRISALLI:  Objection to the extent it

6    calls for a legal conclusion.

7                    THE DEPONENT:  What is the question?

8          Q.     (By Mr. Theriot) The question is:  For

9    purposes of Exhibit 4, 48.43.065, is the definition for

10   "health care provider," as it's used in that statute,

11   found in 48.43.005, subsection (27)?

12                   MR. CRISALLI:  Objection.  Legal

13   conclusion.

14                   THE DEPONENT:  Oh, sorry.

15                   MR. CRISALLI:  And I think misstates -- I

16   think you're focusing on subsection (28).

17                   MR. THERIOT:  I'm sorry about that, if I

18   misstated it.

19                   THE DEPONENT:  I have health care

20   provider at sub (28).

21         Q.     (By Mr. Theriot) Yes.  And I meant to ask

22   you about health care facility.  So if I misstated the

23   question, then let's go with health care provider.

24                   So is health care provider, as that's

25   used in 48.43.065, is that defined in subsection (28)

Electronically signed by Jana Mackelprang (001-409-517-3774)                        fe265592-9478-4d73-bcd5-ebcc840c6c96

1  of Exhibit 2?

2              MR. CRISALLI:  The same objection to a

3  legal conclusion.

4              THE DEPONENT:  Yes, it is.

5      Q.    (By Mr. Theriot) And if you look at,

6  again, at Exhibit 4, it uses the term "health care

7  facility."  Is that term defined in 48.43.005,

8  subsection (27)?

9              MR. CRISALLI:  The same --

10              THE DEPONENT:  Yes, it is.

11              MR. CRISALLI:  -- objection.

12              THE DEPONENT:  Oh, sorry.  Yes, it is.

13      Q.    (By Mr. Theriot) It's a lot easier to do

14  this when you're live.  The objection seems to work

15  better.  But this is much more convenient.

16              So looking at that, is it your

17  understanding that "health care facility," as that term

18  is used in 48.43.065, includes religious hospitals?

19              MR. CRISALLI:  The same objection.

20              THE DEPONENT:  My understanding is that

21  the hospital license is not -- does not specify secular

22  versus religious.

23      Q.    (By Mr. Theriot) Okay.

24      A.    So a health care facility would be a

25  hospital.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          Q.    Okay.  So it would include hospitals?

2          A.    It would include a hospital, yes.

3          Q.    And health care provider, does that

4   include a sole practitioner?

5               MR. CRISALLI:  The same objection.

6               I usually hate to do standing objections,

7   but as we're asking what the statutes say, can I have a

8   standing objection that that's asking for a legal

9   conclusion?

10              MR. THERIOT:  Yes.

11              MR. CRISALLI:  I'll pipe in when it

12  changes subjects, but I didn't want to interrupt your

13  flow.

14              MR. THERIOT:  Okay.

15              THE DEPONENT:  Can you repeat that

16  question, please?

17         Q.    (By Mr. Theriot) Yes.  The definition

18  for -- health care provider, as that term is used in

19  Exhibit 4, 48.43.065, does that include a sole

20  practitioner?

21              MR. CRISALLI:  Vague.

22              THE DEPONENT:  I don't believe "sole

23  practitioner" is a category of license under Title 18.

24         Q.    (By Mr. Theriot) All right.  What would

25  it include?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

70

1            MR. CRISALLI:  Objection.  Vague.

2        **Q.    (By Mr. Theriot) What does "health care**

3   **provider" mean, as that term is used in 065 and as it's**

4   **defined in 005?**

5        A.    It's going to be any person regulated

6   under Title 18 or under that other chapter of 70.127.

7   So those are going to be all your licensed persons

8   under the Department of Health's licensing section.

9        **Q.    Okay.  So that would include medical**

10  **doctors?**

11       A.    It would.

12       **Q.    And it would include their employees?**

13            MR. CRISALLI:  Objection.  Beyond the

14  scope and vague.

15            THE DEPONENT:  It would include employees

16  or agents by statute, by 28(b).

17       **Q.    (By Mr. Theriot) All right.  Let's look**

18  **at Exhibit 4, 48.43.065.  Just so -- I want to make**

19  **sure we're not wasting our time here -- so are you, in**

20  **your duties in the Office of the Insurance**

21  **Commissioner, are you responsible for understanding**

22  **what this statute means and how it applies in**

23  **particular situations?**

24       A.    Yes, this is one that we would apply.

25       **Q.    Okay.  So I'm looking at**

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

71

1    subsection (2)(a) of Exhibit 4.  And it applies to --
2    well, let me just ask you:  How does that part of the
3    statute work with regard to health care providers and
4    health care facilities?  I want to talk about carriers
5    first.
6                 MR. CRISALLI:  Object to form.  Vague.
7                 THE DEPONENT:  The OIC does not regulate
8    individual providers or the individual facilities.  So
9    I wouldn't be applying it in the context of a provider
10   or a facility.
11        Q.    (By Mr. Theriot) Okay.  So if a -- but
12   you would apply it in the context of a health insurance
13   policy purchased by an individual health care provider
14   or a health care facility?
15                MR. CRISALLI:  Object to form.
16                THE DEPONENT:  No, that is not my
17   understanding.
18        Q.    (By Mr. Theriot) Okay.  So in what
19   context do you apply 48.43.065?
20        A.    We would apply it, my unit would apply it
21   as it relates to a religiously sponsored health carrier
22   that is submitting health forms for our approval.
23        Q.    Okay.  So do you have any knowledge about
24   how subsection (2)(a) applies to health care providers
25   and health care facilities?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

72

1            MR. CRISALLI:  Object to form.  Beyond
2  the scope.
3            THE DEPONENT:  Can you repeat the
4  question?
5       Q.     (By Mr. Theriot) **Do you have any**
6  **knowledge about how subsection (2)(a) of 065 applies to**
7  **health care providers and health care facilities?**
8            MR. CRISALLI:  The same objection.
9            THE DEPONENT:  I do have knowledge.  I
10 just wouldn't be applying it to those entities.
11      Q.     (By Mr. Theriot) **Okay.  So what's your**
12 **understanding of how subsection (2)(a) applies to**
13 **health care providers and health care facilities?**
14            MR. CRISALLI:  The same objection.
15            THE DEPONENT:  To my understanding, an
16 individual health care provider would be an individual
17 health care provider who has a conscience or a
18 religious-based objection to providing a certain
19 service in the patient setting, that they are not
20 required by law to do that.
21      Q.     (By Mr. Theriot) **So --**
22      A.     And then --
23      Q.     **Go ahead.  I interrupted you.**
24      A.     And to the extent a carrier wants to
25 contract with a particular provider to provide services

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  to their enrollees, if the provider objects to that

2  inclusion, they can't be forced to contract.

3       **Q.    They can't be forced to contract with the**

4  **carrier?**

5       A.    To contract as a participating provider

6  in a network.  It's in a network.  It may be a

7  carrier's network; it may be a different network.

8       **Q.    I see.  So if a carrier -- I'm sorry, an**

9  **individual health care provider could still be part of**

10 **a carrier's health care network even though they don't**

11 **participate in abortion?**

12            MR. CRISALLI:  Object to form.  Vague.

13            THE DEPONENT:  Sorry, can you repeat

14 that?

15      **Q.    (By Mr. Theriot) I'm just making sure I**

16 **understand your testimony, that this provision protects**

17 **a health care provider who is part of a network of**

18 **carriers from being forced to provide abortion?**

19            MR. CRISALLI:  Object to form.

20            THE DEPONENT:  Correct.  My understanding

21 is they cannot be compelled to provide that given

22 service to an enrollee if they object by reason of

23 conscience.

24      **Q.    (By Mr. Theriot) And that same thing**

25 **would apply to contraception, right?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

74

1            MR. CRISALLI:  The same objection.

2            THE DEPONENT:  It applies -- it applies

3  to any service, any specific service to which they may

4  have an objection, a religious or conscience objection.

5        Q.    (By Mr. Theriot) So if you'll look in the

6  middle of that subsection, it says that "to participate

7  in the provision of or payment for a specific service."

8        A.    Okay.

9        Q.    So what does the "payment for" refer to?

10           MR. CRISALLI:  Object to form.

11           THE DEPONENT:  Well, that -- payment for

12  a specific service applies to the carrier who would not

13  be required to pay for an objectionable service that

14  the carrier objects to providing by reason of

15  conscience.

16        Q.    (By Mr. Theriot) Is there anything in

17  that provision that indicates that that payment is

18  limited to carriers?

19           MR. CRISALLI:  Object to form.  Possible

20  legal conclusion.

21           THE DEPONENT:  The text of that provision

22  does not include a limitation.

23        Q.    (By Mr. Theriot) The text of the

24  provision, it could apply to providers and health care

25  providers, the protection of having to pay for a

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

1   **specific service, right?**

2                   MR. CRISALLI:  The same objection.

3                   THE DEPONENT:  If an individual health

4   care provider or a health care facility were payers, if

5   they were paying for a given service, then that's

6   correct, they could not be compelled to be.  Typically,

7   your individual provider or your facility are not the

8   payers for care.

9        **Q.    (By Mr. Theriot) But an individual**

10  **provider or a facility could pay for health care**

11  **insurance, though, right?**

12                  MR. CRISALLI:  Object to form.  Vague.

13  Calls for a legal conclusion.

14                  THE DEPONENT:  Are you asking if a health

15  care facility would buy health care insurance?

16       **Q.    (By Mr. Theriot) I'm asking -- yes, let's**

17  **start there.  The health care facilities and health**

18  **care providers could purchase insurance, correct?**

19                  MR. CRISALLI:  The same objection.

20                  THE DEPONENT:  A given health care

21  facility, in its context, if a health care facility

22  were also in the capacity of an employer, then

23  certainly any employer group could purchase insurance

24  for its employees.

25       **Q.    (By Mr. Theriot) Right.  And does -- and**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

76

1   **this provision in subsection (2)(a) protects them from**

2   **having to pay for abortion as part of that health care**

3   **insurance?**

4               MR. CRISALLI:  Object to form.

5       **Q.    (By Mr. Theriot) Or any objectionable**

6   **service?**

7               MR. CRISALLI:  Object to form.  Calls for

8   a legal conclusion.

9               THE DEPONENT:  That is not how -- that's

10  not how that is applied.

11      **Q.    (By Mr. Theriot) Okay.  Is there anything**

12  **other than the statute that you are referring to that**

13  **says that's not how that's applied?**

14              MR. CRISALLI:  The same objection.

15              THE DEPONENT:  There is -- no employer of

16  any kind can be compelled to purchase a policy to which

17  that -- again, "employer" is broader than "health care

18  facility."

19      **Q.    (By Mr. Theriot) I understand that.  What**

20  **I'm driving at is, what I'm asking you is:  This**

21  **subsection (2)(a) doesn't apply to just any employer;**

22  **it applies to health care providers and health care**

23  **facilities as well as carriers, but we're just talking**

24  **about health care providers and facilities right now.**

25  **So it protects them specifically, correct?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

77

```
 1              MR. CRISALLI:  Object to form.  Calls for
 2   a legal conclusion.
 3              THE DEPONENT:  I don't agree with that
 4   characterization.
 5        Q.    (By Mr. Theriot) Okay.  So what do you
 6   disagree with about that characterization?
 7              MR. CRISALLI:  The same objection.
 8              THE DEPONENT:  So no individual health
 9   care provider or facility -- I'm leaving out the
10   carrier for now -- could be required to provide a given
11   service, whether that's rendering a certain service to
12   a patient, whether that is allowing certain services to
13   occur within their facility --
14        Q.    (By Mr. Theriot) So it's your -- I'm
15   sorry.
16        A.    But this is not -- I guess I'm still not
17   familiar with how a provider or a health care facility
18   would be functioning as a payer.  And what I mean is
19   paying for the provision of services.  You're providing
20   the services, but you wouldn't be paying for them, if
21   you were, let's say, an individual physician.
22        Q.    But I believe you testified that they
23   wouldn't pay for health insurance for their employees,
24   correct?
25              MR. CRISALLI:  Object to form.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1              THE DEPONENT:  Not in the capacity of a
2    health care facility.  It would be in their capacity as
3    a private employer.
4         **Q.    (By Mr. Theriot) And do you have any**
5    **authority for that distinction?  What are you basing**
6    **that distinction on?**
7              MR. CRISALLI:  The same objection.
8              THE DEPONENT:  I base that on the text of
9    the provision.
10        **Q.    (By Mr. Theriot) All right.  Let's talk**
11   **about the carriers in subsection (2)(a).**
12        A.    Okay.
13        **Q.    So how does this provision protect**
14   **carriers that have objections to certain health care**
15   **services?**
16             MR. CRISALLI:  Object to form.
17             THE DEPONENT:  A carrier that has an
18   objection to covering, paying for, a particular service
19   by reason of conscience or religion would not have to
20   include those services as part of its package of
21   benefits.
22        **Q.    (By Mr. Theriot) So how do the provisions**
23   **in subsection (b) work with regard to health care?**
24   **They only apply to health care, right?   In**
25   **subsection (b), (2)(b)?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1      A.     (2)(b) is specific to the health carrier,

2  yes.

3      **Q.     And walk me through what the health**

4  **carrier is required to do if they object to covering a**

5  **certain service like abortion or contraception.**

6              MR. CRISALLI:  Object to form.

7              THE DEPONENT:  So provision -- well, with

8  (2)(a) and (2)(b), basically a carrier -- a carrier is

9  not required to provide or pay for those services.  At

10  the same time, (b) states that an enrollee, someone

11  who's purchased that coverage, cannot be denied access

12  to whatever services the carrier has objected to.

13              So what the carrier would be required to

14  do, if the carrier has an objection for reasons of

15  conscience or religion, they are required to include

16  certain information to the enrollees.

17              So just based on (b)(i), there has to be

18  notice provided telling the enrollees -- and

19  "enrollees" meaning these are people who have already

20  purchased the plan -- there must be notice provided to

21  the enrollees advising them of what services this

22  carrier does not cover and therefore this plan does not

23  provide by reason of conscience.

24              So that would be -- we, in our forms

25  review, would be looking for that notice.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1        Q.     (By Mr. Theriot) Okay.  So
 2   subsection (2)(b)(iii) says, "Ensure that enrollees
 3   refused services under this section have prompt access
 4   to the information."
 5              And does that mean they just have to send
 6   it to them?  How do you ensure that they have prompt
 7   access?
 8              MR. CRISALLI:  The same objection.
 9              THE DEPONENT:  First, I guess I would go
10   back and just provide -- I would state the other
11   requirement in (ii), which is -- so in addition to (i),
12   where you've told the enrollees what the plan does not
13   cover, you then also have to provide written
14   information as to how that enrollee may still access
15   those services.
16        Q.     (By Mr. Theriot) So when you're looking
17   for that in there, in a plan, how does a carrier comply
18   with that requirement in (ii)?
19        A.     In (ii), we're going to -- are we
20   in (2)(b)(ii)?
21        Q.     Yeah, yeah.  So (2)(b)(ii), the one that
22   reads "Provide written information describing how an
23   enrollee may directly access services in an expeditious
24   manner."
25              MR. THERIOT:  I'm sorry, I was a little
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

81

1  fast on that, Jana.

2          THE DEPONENT:  So compliance with

3  specifically (ii), the "written information describing

4  how an enrollee may directly access services," we are

5  going to look for that language in the plan, in the

6  plan language, in the forms that we're reviewing.

7  **Q.    (By Mr. Theriot) What's an example of**

8  **some language that would meet that requirement?**

9          MR. CRISALLI:  Object to form.

10         THE DEPONENT:  So I would -- again,

11 typically, we're going to see the information required

12 by (b)(i) and (b)(ii), little Is.  We're going to see

13 that together.

14         So an example could be -- again, this

15 would just be -- typically in the plan booklet that the

16 enrollee has, there would be a statement that -- again,

17 this is just as an example -- but for reasons of

18 conscience or religion, your carrier does not cover A,

19 B, and C services.  In order to access these services,

20 you may do A, B, and C in order to receive them.

21 **Q.    (By Mr. Theriot) All right.  And you may**

22 **do A, B, and C in order to receive them.  What would**

23 **that be?  What would satisfy that requirement?**

24         A.    We're going to be looking at it from an

25 enrollee's perspective.  So an enrollee who, let's say,

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

82

1   is seeking abortion services, they happen to have a

2   plan sponsored by a religious carrier who doesn't

3   provide that, we're going to be looking from the

4   enrollee's standpoint, is, A, how would they know

5   what's not covered?  So that's where we would look to

6   the listing of services or the statement of what's not

7   covered.

8              And then we're also going to be looking,

9   again as an enrollee, how can I -- how can I access

10  those?  So is that a -- I've seen some carriers have a

11  specific contact phone number to reach out for more

12  information on how to receive those calls.

13             In the case of -- I've also seen, as an

14  example, referrals to the Washington Department of

15  Health, who can then -- who has arranged to provide

16  those services in some cases.  And I'm speaking

17  specific to Providence Health Plan.

18      Q.    Okay.  So how does -- how does that

19  objected-to service get paid?  Who pays for it?

20             MR. CRISALLI:  Object to form.  Beyond

21  the scope.

22             THE DEPONENT:  It is going to depend on

23  the process that the carrier has put in place in order

24  for the order -- in order for the enrollee to get that

25  service.

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

```
1         Q.    (By Mr. Theriot) So if they put in place
2  the one you mentioned about Providence, where they call
3  the Department of Health in order to get an abortion,
4  who pays for that?
5              MR. CRISALLI:  Object to form.  Beyond
6  the scope.
7              THE DEPONENT:  My understanding is -- my
8  understanding of the arrangement is that is paid with
9  funds through the Department of Health.
10        Q.    (By Mr. Theriot) Okay.  Are you aware
11  of -- or do you know if there's any document that
12  describes that arrangement with the Department of
13  Health?
14              MR. CRISALLI:  Object to form.  Beyond
15  the scope.
16              THE DEPONENT:  I don't know.
17        Q.    (By Mr. Theriot) And then if we're
18  looking at, once again, subsection (2)(c), it says,
19  "The insurance commissioner shall establish by rule of
20  mechanism or mechanisms to recognize the right to
21  exercise conscience while ensuring enrollee's timely
22  access to services and to assure prompt payment to
23  service providers."
24              Has the Commissioner promulgated such a
25  rule?
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

1          MR. CRISALLI:  It may be another witness

2    who has worked on rule-making who can better answer

3    that question, but to the extent that this designee

4    knows, please feel free to answer.

5          THE DEPONENT:  Rule-making specific to

6    48.43.065, I would have to take -- I would have to

7    review the WACs.

8      **Q.    (By Mr. Theriot) Okay.  So when you are**

9    **looking and making sure that 48.43.065 is followed and**

10   **complied with, there's not a rule that you're looking**

11   **at outside of the statute?**

12     A.     In our review of the plan documents, no.

13   We're using (2)(b)(i) and (ii).

14          When you get down to, let's say, (iii)

15   and then (c), in terms of timely access and payment,

16   those -- that's going to occur after -- that's not

17   going to occur within my unit.  That's after the plan

18   is being administered, being used by the enrollees.

19          So I wouldn't receive any information

20   about how timely an enrollee was accessing something or

21   how timely or promptly a payment occurred.  So that's

22   outside of my unit.

23     **Q.     With regard to carriers who have a**

24   **religious exemption that are protected by**

25   **subsection (2)(a), how does that protection apply to**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  that carrier's health plan for its own employees?

2              MR. CRISALLI:  Object to form.  Calls for

3  a legal conclusion.  Misstates the law.

4              THE DEPONENT:  Sorry, can you repeat

5  that?

6       Q.    (By Mr. Theriot) Yes.  How does the

7  protection in subsection (2)(a) apply to an objecting

8  carrier, like Providence, how does it apply to the

9  health care benefits for its own employees?

10             MR. CRISALLI:  The same objection.

11             THE DEPONENT:  I wouldn't know.  The

12 carrier, as an employer, makes use to self-fund, for

13 example.  And that would be something not regulated by

14 the OIC.

15      Q.    (By Mr. Theriot) Right, I understand

16 that, but what if they had a group health insurance

17 policy for their own employees that is governed by the

18 OIC?

19             MR. CRISALLI:  The same objection.  Also

20 speculation.

21             THE DEPONENT:  Can you repeat the rest of

22 the question, then?

23      Q.    (By Mr. Theriot) Yes.  So if a provider

24 like Providence has a health care plan for its own

25 employees, and that health care plan -- and they object

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   to providing services like abortion or contraception to

2   those employees, then how does subsection (2)(a) of

3   48.43.065 protect them?

4            MR. CRISALLI:  The same objections.

5            THE DEPONENT:  I don't know based on the

6   premise of that question.

7       Q.    (By Mr. Theriot) So are you saying that

8   they would have to cover abortion in their employee

9   benefit plan for their own employees?

10           MR. CRISALLI:  Objection.  Misstates the

11  testimony.  The same objections as before.

12           THE DEPONENT:  I think what's being

13  conflated here for me is the protections that apply to

14  the carrier and what's generally available for a large

15  group employer -- in this case, I assume it's a larger

16  group -- what's available to a large group employer in

17  the market, in general, despite -- I don't read this as

18  religiously sponsored employer.  I read this as a

19  religiously sponsored health carrier.  So, to me, those

20  are getting conflated.

21      Q.    (By Mr. Theriot) Is there anything you

22  rely upon for that reading outside of the statute?

23           MR. CRISALLI:  The same objection.

24           THE DEPONENT:  I rely on the text that

25  states "religiously sponsored health carrier."

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          Q.     (By Mr. Theriot) Okay.  So if Providence

2    doesn't want to pay for abortions for its own

3    employees, what does it need to do?

4                 MR. CRISALLI:  Objection.  Calls for

5    speculation.  Legal conclusion.  Beyond the scope.

6                 THE DEPONENT:  Again, I can speak to the

7    context of any large group employer, any large group

8    employer that would not wish to provide a certain

9    service.

10         Q.     (By Mr. Theriot) So it would be in the

11   same boat or be regulated the same way as the

12   organizations in subsection (3)?

13         A.     Well, I think there's other -- for us,

14   065 isn't in isolation.  That applies as does -- as

15   does 6219 and the statutes enacted pursuant to that.

16         Q.     What other statutes -- I'm sorry, go

17   ahead.

18         A.     So when we are -- again, we're reviewing

19   a plan and we're considering, let's say we're

20   considering general, we're looking in general at

21   contraceptive coverage.  So we are going to consider --

22   we call it a conscience clause in the case of a

23   religiously sponsored health carrier.

24                 If we're reviewing, let's say, any large

25   group plan, they -- I'm trying to say -- a large group

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1    plan purchasing from the carrier, the carrier is still

2    going to be bound by -- I'd like to look at 48.43 -- I

3    don't want to guess -- I think 072 and 073, the

4    enactment of the codification of 6219.  And I would

5    confirm it in the RCW.

6         Q.    Okay.  So what if -- so let's assume for

7    **a second that Providence has a health care plan -- and**

8    **I think you've testified previously that they do, but**

9    **it doesn't cover abortion, and --**

10        A.    Providence as a health carrier?  I'm

11   sorry.

12        Q.    **Yes, Providence as a health carrier.  It**

13   **doesn't cover abortion.  It does not want to provide --**

14   **its religious convictions prohibit it from providing**

15   **the notice that's required in subsection (2)(b).  Then**

16   **is it still protected?  Can it still offer the plan?**

17             MR. CRISALLI:  Objection.  Calls for

18   speculation and a legal conclusion.

19             Also, I'm a little concerned with this

20   line of questioning just in that they've only -- it's

21   unclear to me whether this particular type of request

22   has ever come before the Insurance Commissioner for

23   evaluation.  And going into what it would approve

24   versus not, I think can be inappropriate as far as it's

25   in this vacuum and going down hypotheticals and

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   speculation, when that is their specific job.

2              I understand why you want to get into

3   this.  I'm trying to give you a little space on this,

4   but I also want to make sure that we don't have

5   something where the Office of the Insurance

6   Commissioner is out there saying, "I will approve this

7   plan," when that plan has not been presented before

8   them.  We don't have the specifics of the plan before

9   them, and I don't want something under oath out there

10  saying that this is the type of plan that would be

11  accepted.

12       **Q.     (By Mr. Theriot) So Providence, as you**

13  **understand the plan now, provides the notice required**

14  **in (2)(b); is that correct?**

15       A.    As I understand now, Providence, as a

16  carrier, includes the required notices in the health

17  plan products that have been approved by our office.

18       **Q.     And have you had an occasion to address a**

19  **plan where a carrier who has a plan doesn't want to**

20  **cover abortion and also doesn't want to provide the**

21  **notice?**

22       A.    We have not seen a religiously sponsored

23  carrier object to providing the required notice.

24       **Q.     And if you had one, you're unsure as to**

25  **how you would handle that; is that what your testimony**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1  **is?**

2              MR. CRISALLI:  Object to speculation.

3  Beyond the scope.

4              THE DEPONENT:  My factual understanding

5  is that Providence is the only religiously sponsored

6  health care currently offering products in Washington.

7  So I can only speak to how we've addressed it with

8  them.

9      **Q.    (By Mr. Theriot) I think I might have**

10 **misunderstood your answer.  Why don't you restate it to**

11 **make sure because I think you might have forgotten a**

12 **word.  Can you say that answer again?**

13     A.    Sure.  Can you restate the question?

14     **Q.    Yeah, sure.  The question is:  Have you**

15 **had another -- any carrier who objects to providing**

16 **abortion or contraception that also objects to**

17 **providing notice?**

18     A.    I have not, no.

19     **Q.    And is it true that Providence is the**

20 **only carrier that you're aware of that has a plan that**

21 **does not cover abortion at this time?**

22              MR. CRISALLI:  Objection.  Misstates the

23  record.

24              THE DEPONENT:  No.  My testimony is that

25  Providence is the only religiously sponsored health

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

91

1   carrier that offers plans that do not include abortion.

2        Q.     (By Mr. Theriot) Okay, great.  Are there

3   other plans that aren't religiously sponsored that

4   don't cover abortion?

5        A.     Sorry, can you repeat that?

6        Q.     Are there other carriers who offer plans

7   that do not cover abortion besides Providence?

8        A.     Yes.  Those would be the ones I mentioned

9   earlier.

10        Q.     Okay.  All right.

11               I've put in the chat Statute 48.43.725.

12   And we're going to mark that as Exhibit 5.

13               (Exhibit 5 was remotely introduced and

14   provided electronically to the reporter.)

15        Q.     (By Mr. Theriot) Would you open that up

16   and take a moment to familiarize yourself with it,

17   please.

18        A.     Okay.

19        Q.     Let me get my exhibit number right here

20   so I can ask you a question about it and so I don't

21   confuse myself.

22               So Exhibit 5 is RCW 48.43.725.  Does your

23   office interpret and apply this statute?

24        A.     Does our office?  Yes.

25        Q.     Okay.  So can you explain to me what this

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

92

1  statute does and what it requires?

2       A.    Sure.  Well, there's a few parts to it

3  and some I apply in our unit more than other parts of

4  it, but sure.

5       Q.    **Just with regard to the ones that you're**

6  **knowledgeable on.**

7       A.    Okay.  So subsection (1), and that is

8  going to apply to a health carrier who is offering a

9  health plan or a student health plan.

10            Sub (i) and its parts, they include a

11  notice requirement.  So that, again, is going to be

12  language that we are looking for in the plan during our

13  review process.

14       Q.    **Okay.**

15       A.    And so, again, that's going to be a

16  written notice of benefits that are not covered --

17  mandated benefits, I should say, that are not covered

18  and alternate ways that enrollee could access those

19  services.

20       Q.    **Okay.  So this appears to be similar or**

21  **maybe even the same as the notice requirements in**

22  **48.43.065?**

23       A.    Similar notice requirements, yes.

24       Q.    **What are the differences?**

25       A.    What are the differences between .725 and

Electronically signed by Jana Mackelprang (001-409-517-3774)        fe265592-9478-4d73-bcd5-ebcc840c6c96

1    .065?

2         **Q.     Yeah, the difference in the notice**

3    **requirements.**

4         A.     Can I look at them both on screen?

5         **Q.     Oh, sure.**

6         A.     Okay.

7              MR. CRISALLI:  I'm going to object as it

8    calls for a legal conclusion.

9              THE DEPONENT:  Well, in terms of the

10   notice requirement, 065 again is going to be required

11   by a carrier, and it will be the carrier's statement

12   that we, as a carrier, have a religious objection to

13   providing A, B, and C services.

14              In the 725, it's not -- it's not specific

15   to a religious carrier.  Any health carrier that

16   excludes benefits is going to provide -- is going to,

17   again, state that this plan does not provide A, B, C.

18         **Q.     (By Mr. Theriot) Okay.  Do you apply any**

19   **of the other aspects of 285 -- I'm sorry, 725?**

20         A.     The (1)(c) addresses marketing materials,

21   and that is outside the scope of our unit.

22         **Q.     Okay.  What about subsection(2)?**

23         A.     The fee assessment is not specific to our

24   unit.

25         **Q.     Who assesses that fee?**

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

94

1       A.      Those are -- information is reviewed

2   by -- my understanding is that the carrier will submit

3   information in its rate filing sufficient for the

4   actuaries to determine that fee.  And then a payment

5   would be made, I believe, through our fiscal office.

6       Q.      **All right.  So does -- can this fee be**

7   **assessed against a religious health care provider?**

8               MR. CRISALLI:  Object to form.

9               THE DEPONENT:  Well, by statute, this fee

10  is assessed on a health carrier, not on a provider.

11      Q.      **(By Mr. Theriot) I'm sorry, that was a**

12  **poor question.**

13              **Is this fee paid by the health carrier?**

14              MR. CRISALLI:  Is that your question?

15              MR. THERIOT:  Yes.

16              MR. CRISALLI:  Objection.  Vague.

17  Speculation.  Calls for a legal conclusion.  I think

18  you might be missing a word.

19              MR. THERIOT:  Oh.

20      Q.      **(By Mr. Theriot) Does this fee in**

21  **subsection (2) have to be paid by a health insurance**

22  **carrier?**

23              MR. CRISALLI:  Object to form.

24  Speculation.  Calls for a legal conclusion.

25              THE DEPONENT:  Just by statutory text,

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   (c), that fee -- the fee must be assessed, but (c)

2   allows for waiver by the Commissioner.

3         Q.     (By Mr. Theriot) Are you involved in that

4   process at all?

5         A.     No, I'm not.

6         Q.     Do you know how it works?

7         A.     No, I don't.

8         Q.     Do you know if it applies to religious

9   health care insurance carriers?

10              MR. CRISALLI:  Object to form.  Vague.

11              THE DEPONENT:  I don't know what a health

12  care insurance carrier is.  This applies to a health

13  carrier.  And then I would go back to 48.43.005 to look

14  back to the definition of health carrier.

15        Q.     (By Mr. Theriot) Okay.  So there's no

16  exemption -- it applies to those who are protected

17  by 065?

18              MR. CRISALLI:  Object to form.  Calls for

19  a legal conclusion.

20              THE DEPONENT:  This applies -- the term

21  "health carrier" would include religiously sponsored

22  health carriers that are subject to 065.

23        Q.     (By Mr. Theriot) Okay.  Let's go back

24  to 065, which is Exhibit 4.  Is your office responsible

25  for ensuring that this statute, this part of the

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   statute is applied properly?

2              MR. CRISALLI:  Object to form.

3              THE DEPONENT:  Is our office?  Yes, the

4   OIC.

5        Q.    (By Mr. Theriot) The OIC, okay.  And what

6   about your team that you supervise, is it responsible

7   for making sure this provision is complied with?

8        A.    We are -- we would be responsible for the

9   written notice requirements.  And so we would be

10  responsible to ensure that the plan documents, the plan

11  language would include the required information.  To

12  the extent there may be issues later about timely

13  access or prompt payment, that is outside of the scope

14  of the health forms unit.

15       Q.    Okay.  So your -- so what exactly are you

16  looking for in a plan to make sure that

17  subsection (3)(a) is properly complied with?

18       A.    Can you repeat that again, please?

19       Q.    Yeah.  What are you looking for in a

20  proposed plan that helps you ensure that (3)(a) is

21  complied with?

22       A.    I wouldn't be reviewing anything on

23  behalf of an individual or an organization.

24       Q.    Okay.  So if a religious organization,

25  like Cedar Park, for instance, wants to take advantage

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

97

1   of subsection (3)(a) of 065, what do they need to do?

2                MR. CRISALLI:  Object to form.

3   Speculation.

4                THE DEPONENT:  This protection extends

5   to -- an individual or organization who has a moral

6   objection can't be required to purchase a policy that

7   has it.

8        Q.    (By Mr. Theriot) Okay.

9        A.    Again, I wouldn't be -- I'm not reviewing

10  an individual or the organization.  I don't receive

11  anything from either entity.

12       Q.    So looking at subsection (b), it says "an

13  enrollee being denied coverage of, and timely access

14  to, any service or services excluded from their

15  benefits package as a result of their employer's or

16  another individual's exercise of the conscience clause

17  in (a) of this subsection."

18                So what are the options for a health care

19  plan to exclude coverages that are objected to pursuant

20  to (3)(a) to make sure that the enrollee is not denied

21  coverage?

22                MR. CRISALLI:  Object to form.  Compound.

23                THE DEPONENT:  Can you repeat your

24  question?

25       Q.    (By Mr. Theriot) How does a health care

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

98

1  **plan comply with the requirements of (3)(a)**

2  **and (3)(b) --**

3              MR. CRISALLI:  Object to form.

4  Speculation.

5       **Q.    (By Mr. Theriot) -- in the context of a**

6  **church like Cedar Park who doesn't want to cover**

7  **abortion or certain types of contraception?**

8              MR. CRISALLI:  Object to form.  I would

9  also advise the witness not to provide legal advice to

10  the extent that such answer would do so.

11              THE DEPONENT:  The compliance obligation

12  in 065 is on the health carrier under (2)(b) and the

13  subsections.  3(a) is not a compliance requirement.  It

14  doesn't -- it addresses an individual and an

15  organization to the extent that they are required to do

16  anything to which -- they aren't required to make a

17  purchase to which they object.

18              So I'm not reviewing an individual and an

19  organization for compliance with this statute.

20       **Q.    (By Mr. Theriot) So is it -- so it's up**

21  **to the church or other religious organization to find a**

22  **plan that would exclude abortion or contraception, and**

23  **the insurance -- the OIC doesn't have anything to do**

24  **with that; is that what you're saying?**

25              MR. CRISALLI:  Object to form.

Calderwood-Mackelprang, Inc.  303.477.3500

1          THE DEPONENT:  The OIC would not -- does

2   not have involvement in a given employer's decision to

3   purchase health insurance for its employees.

4          Q.    (By Mr. Theriot) So one of the ways -- is

5   one of the ways -- well, strike that.

6              There's a rule in (3)(c) of 065.  It

7   says, "the insurance commissioner shall define by rule

8   the process through which health carriers may offer the

9   basic health plan services to individuals and

10  organizations identified in (a) and (b) of this

11  subsection."

12             Is there a rule that defines the process.

13             MR. CRISALLI:  And I'm going to object

14  because it asks for a legal conclusion as well as does

15  not state the complete law.

16             THE DEPONENT:  Again, I would -- I would

17  need to look at the administrative code to see if

18  rule-making was undertaken specifically for 065.

19             MR. CRISALLI:  And I'll represent we do

20  have a designee slated to cover that aspect of this

21  topic.  So I don't want to necessarily be held -- this

22  witness might know some things.  I wasn't trying to

23  hold you back from asking this witness, but we do have

24  other witnesses that can address the rule-making.

25          Q.    (By Mr. Theriot) But as far as when you

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

100

1  **are applying 065, there's not a rule that you look to**

2  **that would explain that process that's described**

3  **in 065, subsection (3)(c)?**

4          A.    No, not beyond the notice requirements

5   that are set forth in the statute above.

6          Q.    **Do you have any knowledge of how -- of**

7   **which plans might properly comply with subsection (b)?**

8                MR. CRISALLI:  Object to form.

9                THE DEPONENT:  Can you repeat that,

10  please?

11         Q.    **(By Mr. Theriot) Do you have any**

12  **knowledge of how health care plans might comply with**

13  **subsection (b), (3)(b) of 065?**

14                MR. CRISALLI:  Object to speculation.

15  Again, I think it should be limited more to what she's

16  seeing, not to speculate what might come before her in

17  the evaluation process.

18                THE DEPONENT:  I'm sorry, can you repeat

19  that?

20         Q.    **(By Mr. Theriot) Do you have -- strike**

21  **that.**

22                **When you're reviewing a plan that**

23  **excludes an objectionable service, are there specific**

24  **ways that you've seen that the plan can comply with**

25  **subsection (3)(b)?**

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

1              MR. CRISALLI:  Object to form.

2              THE DEPONENT:  So those -- again, (3)(b)

3   is designed to ensure that even if a given benefit

4   isn't included in their benefits package, they can

5   still have access to it.  So even if their employer may

6   object to it and doesn't want it as part of the

7   package, the enrollee still has access to it.  And

8   that's by means of the examples I provided earlier.

9        Q.    (By Mr. Theriot) All right.  And you're

10  talking about the examples you provided earlier with

11  regard to Providence's plan.

12            Are you aware of any other -- I'm sorry,

13  that's two questions -- are you talking about the

14  examples you provided earlier about Providence's plan?

15       A.    Yeah, I'm talking about the context of a

16  religious carrier and the notice that they have to

17  provide and the information that they have to disclose

18  to an enrollee as to how to access those services.

19       Q.    What about with regard to a nonreligious

20  carrier?

21       A.    So -- can you ask the question again,

22  please?

23       Q.    Yes.  With regard to a nonreligious

24  carrier, how do you ensure that subsection -- if they

25  have a plan that excludes abortion for a purchaser of

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

102

1  **the plan, an employer, how do they comply with**

2  **subsection (3)(b)?**

3                MR. CRISALLI:  Object to form.

4                THE DEPONENT:  So in the example that you

5  provided, the employer group has an objection and not

6  the carrier.  And what we would expect to see is

7  notification to an enrollee that -- this is an

8  example -- your employer has chosen not to provide such

9  and such a benefit.  You still have a right to access

10  this benefit, and here's how you go about doing that.

11        **Q.    (By Mr. Theriot) Okay.  And how -- for**

12  **instance, in the plan that you're aware of, by a**

13  **nonreligious carrier, how do tell the employee they can**

14  **access the benefit that's not covered?**

15                MR. CRISALLI:  Form.  Vague.

16                THE DEPONENT:  They provide -- they

17  provide written notice in the plan documents, stating

18  what services are not covered.  They provide usually a

19  direct contact number to get information about how to

20  access them.  And they will also provide -- they may

21  also provide the associated cost shares.  So this is

22  how an enrollee can access these services, and this is

23  what the services will cost, even though their employer

24  may object to providing --

25        **Q.    (By Mr. Theriot) I'm sorry, what was the**

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

103

1  last thing you said?

2        A.      Even though -- as an enrollee, even

3  though their employer may object to providing it, the

4  carrier will make that service available.

5        Q.      And you said it will also tell them how

6  it's paid for?

7        A.      It's --

8              MR. CRISALLI:  Object to form.

9              THE DEPONENT:  It may.  That is an

10  example of one that I've seen.

11        Q.      (By Mr. Theriot) And who pays for that

12  service that's objected to?

13              MR. CRISALLI:  Object to form.

14              You're speaking about this specific

15  instance, right?

16              MR. THERIOT:  Yes.

17              THE DEPONENT:  I don't know the payment

18  mechanism.

19        Q.      (By Mr. Theriot) You just know that it's

20  not the employer who purchased the plan?

21        A.      Correct.

22              MR. CRISALLI:  Would now be a good time

23  for a brief break?

24              MR. THERIOT:  Yeah, we can take a brief

25  break.  Let me just see how much longer I have left.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1          MR. CRISALLI:  Off the record.
2          (A recess was taken from 1:49 p.m. to
3   2:04 p.m. PST)
4          MR. CRISALLI:  I think the witness has
5   something to clarify before we get to the next line of
6   questions.
7          MR. THERIOT:  Okay.
8          THE DEPONENT:  I want to do it on the
9   record.
10         I realize that I may have suggested that,
11  in our review of compliance with the conscience
12  statute, that we don't use WACs.  Excuse me.  And
13  that's because the specific cite escaped me, but there
14  is a WAC that requires the information to actually be
15  filed with us.
16         So we're looking at that information in
17  the context of a filing, but there is a separate WAC
18  that says it must be filed, and that's the notice
19  information.
20     Q.    (By Mr. Theriot) And which WAC is that?
21     A.    284.43.5020.  And just kind of the nature
22  of our reviews -- I think I mentioned this -- that
23  there's a master checklist, compliance checklist, and
24  it's topical.  So by each topic, we're going to have a
25  combination of RCWs and WACs.

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

1          But I didn't have that specific cite in
2   front of me.  Sorry about that.
3          Q.    That's all right.  That's the last thing
4   I want to talk to you about.  So I'll put that statute
5   up in front of you here in a little bit.
6          A.    Okay.
7          Q.    I have a few more questions about 065,
8   though.
9          A.    Okay.
10         Q.    So we were talking about a nonreligious
11  carrier's coverage of offering a health plan that
12  doesn't cover abortion or some other objection for
13  service.  And I think we were specifically talking
14  about Kaiser's that you referenced before; is that
15  right?
16         A.    Kaiser as an example of a health carrier
17  that offers a plan that doesn't cover abortion?
18         Q.    Correct.
19         A.    Correct.
20         Q.    That's not religious?
21         A.    That is not religious, right.
22         Q.    And --
23         A.    Or I should say whose employer doesn't
24  cover.  The plan actually provides for access.
25         Q.    Okay, good.  So the plan -- so let's talk

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

106

1    about how that's done.  In that particular context of

2    that plan that you're referring to, the employer

3    provides the objectionable -- I'm sorry, excuse me.

4              In that particular plan that you're

5    referring to, the carrier provides the objectionable

6    coverage?

7         A.    Yes.  So in that particular plan, I'm

8    seeing the product before it's offered for sale.

9         Q.    Right.

10        A.    And so I'm looking at a product where

11   there is language in the plan that says:  Your employer

12   does not provide these services; however, you can still

13   access them through us, your carrier, and here's how.

14        Q.    And that "here's how," what is the

15   "here's how"?  What do they say as to how to do it?

16        A.    Typically -- and, again, I'm thinking of

17   the Kaiser one we're talking about -- for them, for

18   enrolling, there's actually a number to call to find

19   out how to access that care.

20              But I would caveat that when we're

21   talking about Kaiser, they're an HMO.  So they're kind

22   of a closed system.  So that health plan has its own

23   providers.  So it's a distinction that may make a

24   difference.  Not every carrier will do it that way;

25   that's what I'm saying.  They happen to be an HMO, and

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1   their mechanism may be different than others.

2          Q.     So, as I understand it, the enrollee can

3   call the number, find out how to access the

4   objectionable service; but you're not sure what they

5   tell them, what Kaiser tells the enrollee?

6          A.     I'm not involved in anything after the

7   plan is in effect, so to speak.  So I don't know the

8   information that they get from their carrier.

9          Q.     Okay.  In that plan that we're talking

10  about, does Kaiser pay for the objectionable coverage?

11               MR. CRISALLI:  Object to form.

12               THE DEPONENT:  It doesn't state that in

13  the documents.  My understanding is that's how it

14  happens, but I don't know the payment mechanism.

15  Again, Kaiser is unique, that entity is unique as an

16  HMO.

17         Q.     (By Mr. Theriot) Okay.  As I recall, that

18  entity and the product that we're talking about that's

19  offered by that Kaiser entity is a small --

20         A.     Small group employer.

21         Q.     A small group employer.  So that's

22  employers of 50 and less.

23         A.     Correct.

24         Q.     Could one of the ways that the

25  objectionable coverage gets paid for, could that be --

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

108

 1 | **strike that.**
 2 | **          Could Kaiser use the method of payment**
 3 | **for the objectionable coverage that Providence uses in**
 4 | **their plan, which is referring them to the Department**
 5 | **of Health?**
 6 |           MR. CRISALLI:  Object to form.
 7 | Speculation.
 8 |           THE DEPONENT:  The referral process that
 9 | Kaiser uses is a means of access.  It's not the means
10 | of payment.
11 |           So we're ensuring that an enrollee whose
12 | employer might otherwise or does otherwise object can
13 | still access that care.  And our division, our unit, is
14 | not overseeing the payment mechanism for it.
15 |     **Q.    (By Mr. Theriot) And you don't oversee**
16 | **how they access that care?**
17 |     A.    Not beyond -- not beyond the
18 | information -- not beyond the notice requirement that
19 | we look for in the forms.  We can certainly follow up
20 | via objection if we have concerns.
21 |     **Q.    Okay.  And is there -- what are the**
22 | **options that a carrier has to provide the objectionable**
23 | **coverage?**
24 |           MR. CRISALLI:  Objection.  Speculation.
25 | Calls for a legal conclusion.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

109

```
 1              THE DEPONENT:  Sorry, can you clarify
 2  that?
 3       Q.    (By Mr. Theriot) What are the options a
 4  carrier has to provide the objectionable coverage in a
 5  plan like we've been talking about that's the Kaiser
 6  entity?
 7       A.    Well, any entity, any carrier, as part of
 8  its business model, can certainly choose to design
 9  products.  It can choose to offer a product tailored
10  towards employers that may object to certain services.
11       Q.    Are there any other ways besides Kaiser's
12  use of its HMO network to provide the objectionable
13  service or Providence's referral to the Department of
14  Health that a carrier can comply with the requirements
15  of 48.43.065 (3)(b)?
16              MR. CRISALLI:  Objection.  Speculation,
17  compound, and a legal conclusion.
18              THE DEPONENT:  Again, (3)(a) and (b) are
19  not regulating the -- they're not as applied to the
20  carrier.
21       Q.    (By Mr. Theriot) So what does apply to
22  the carrier is (2)(c)?
23       A.    Not if we're still talking about
24  nonreligious carriers.
25       Q.    Oh, okay.  So we're not -- so what are
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

110

1  the nonreligious carriers governed by when they are

2  trying to offer a plan that complies with 065 (3)?

3            MR. CRISALLI:  Object to form.

4  Speculation.

5            THE DEPONENT:  The carrier is -- a

6  nonreligious carrier is not attempting to comply

7  with 065.

8       Q.    (By Mr. Theriot) Who does attempt to

9  comply with 065?

10       A.    A religiously sponsored --

11            MR. CRISALLI:  Objection.  Vague.

12            065 in general or are we talking about --

13            MR. THERIOT:  I'm sorry.  065 (3)(a).

14            THE DEPONENT:  So 065 (3)(a) is not -- is

15  not a compliance requirement on the carrier.  It

16  protects -- it protects an individual or an employer

17  group from having to purchase coverage that they object

18  to.

19       Q.    (By Mr. Theriot) How does a nonreligious

20  carrier offer coverage that complies -- that allows the

21  employer to take advantage of (3)(a) and (b)?

22            MR. CRISALLI:  Object to form.

23  Speculation.  Legal conclusion.

24            THE DEPONENT:  A nonreligious carrier is

25  complying with many, many requirements beyond 065.  So

Electronically signed by Jana Mackelprang (001-409-517-3774)                                        fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

1  a health carrier is bound by 6219, which is going to

2  mandate coverage for contraception and abortion.  So a

3  nonreligious carrier, a health carrier is required, if

4  they offer maternity coverage, to offer, for example,

5  the abortion coverage; but they are recognizing that

6  some employers may have an objection and may wish to

7  purchase a plan in which they, the employer, aren't

8  paying for the services.

9        Q.    (By Mr. Theriot) Okay.  And then how does

10  subsection (4) of 065 apply to those types of plans?

11            MR. CRISALLI:  Object to form.  Legal

12  conclusion.  Speculation.

13            THE DEPONENT:  And can you repeat the

14  question?

15        Q.    (By Mr. Theriot) How does subsection (4)

16  of 065 apply to those types of plans that a

17  nonreligious carrier offers to employers who are taking

18  advantage of 3, of subsection (3)?

19            MR. CRISALLI:  The same objection.

20            THE DEPONENT:  Nothing in this section --

21  I'm going back up to this section -- nothing -- health

22  carriers are not required to -- they may still charge a

23  premium.  So there's nothing about these conscience

24  clauses or accommodations that prevents the carrier

25  from still charging for the service.

Calderwood-Mackelprang, Inc.  303.477.3500

112

1     Q.     (By Mr. Theriot) And is there any entity
2 other than the employer that they could charge for the
3 service?
4          MR. CRISALLI:  Object to form.  Beyond
5 the scope and a legal conclusion.
6          THE DEPONENT:  Can you repeat that?
7     Q.     (By Mr. Theriot) Is there any entity
8 other than the employer that the carrier could charge
9 for the services as described in subsection (4) of 065?
10          MR. CRISALLI:  The same objections.
11          THE DEPONENT:  I don't know.
12     Q.     (By Mr. Theriot) So the State doesn't
13 have a program for paying for the premium for the
14 objectionable services that you're aware of?
15          MR. CRISALLI:  Object to form.  Beyond
16 the scope.
17          THE DEPONENT:  The only program I'm aware
18 of is in the context of a religiously sponsored health
19 carrier, being Providence, and the arrangement that's
20 in place with the Washington Department of Health.
21     Q.     (By Mr. Theriot) All right.  Let's look
22 at the WAC you were referring to earlier, 284.43.5020.
23 I'll get that up in the chat.
24          MR. THERIOT:  We're on Exhibit 6, Jana?
25          THE REPORTER:  Yes.

Electronically signed by Jana Mackelprang (001-409-517-3774)          fe265592-9478-4d73-bcd5-ebcc840c6c96

113

```
 1                  (Exhibit 6 was remotely introduced and
 2   provided electronically to the reporter.)
 3                  THE DEPONENT:  I don't see it yet, if
 4   it's there.
 5        Q.     (By Mr. Theriot) I didn't stick it in
 6   there yet.  I tried to do something and it wouldn't let
 7   me do it.
 8                  There we go.  I was trying to do a
 9   shortcut.  There we go.  I apologize.
10                  I'm going to go back to 065 really quick,
11   a question that I forgot to ask regarding (4)(c) again.
12                  (4)(c) says that a carrier can't be
13   required to pay for services without the payment of a
14   premium or fee.  Can the carrier include the cost of
15   the premium or fee in the actuarial analysis of
16   assessing rates?
17                  MR. CRISALLI:  Object to form and
18   speculation.  Calls for a legal conclusion.
19                  THE DEPONENT:  I don't know.  That's
20   outside of my scope.  That would be with our rates and
21   actuaries.
22        Q.     (By Mr. Theriot) Okay.  So let's go back
23   to Exhibit 6 now.  All right.
24                  So we've talked about -- Exhibit 6 is
25   Washington Administrative Code 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.  I get to
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

114

1  say my dashes now.

2            We talked about this a little bit

3  earlier.  Can you just describe what this regulation

4  does and how you apply it when you are doing your job?

5       A.    Give me a moment.

6            MR. CRISALLI:  Object to the extent it

7  calls for a legal conclusion.

8            THE DEPONENT:  Can you repeat the

9  question now, please?

10      Q.    (By Mr. Theriot) Yes.  Can you describe

11 for me how you apply WAC 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 in your job of

12 reviewing health care plans?

13           MR. CRISALLI:  The same objection.

14           THE DEPONENT:  I can.  There are, I would

15 say, a two-part, two parts to my response.  One is that

16 the WAC, this WAC refers to something called the model

17 plan or basic health plan services, which I'm not

18 knowledgeable about those.

19           My understanding is that was a plan that

20 predated the ACA.  So there may be some remaining text

21 here that is sort of a carryover from pre-ACA times.

22           But in terms of how -- how we're applying

23 this currently to our reviews, what we're doing is,

24 again, it specifically goes to the -- well, I should

25 back up and say:  As I mentioned before, all forms that

Calderwood-Mackelprang, Inc.  303.477.3500

1   comprise the policy contract have to be filed with us.

2   And so as part of that filing, we would expect to

3   see -- again, this would be from a religiously

4   sponsored carrier -- and if they have opted not to

5   provide certain services, they may still offer those

6   plans as long as they ensure that enrollees will have

7   access to whatever those objectionable services are.

8             And I'm going back to the last sentence

9   of (1) there, which is:  "This process may not affect a

10  nonobjecting enrollee's access to coverage."

11            So, again, our role in this is, with

12  other requirements that we're looking for in a plan,

13  we're going to assure that the proper notice has been

14  provided to the enrollee.  So it's specifically the

15  notification and the explanation of what's not covered.

16       **Q.    (By Mr. Theriot) Okay.  So does this**

17  **regulation only apply to religiously sponsored**

18  **carriers, or does it also apply to plans like Kaiser,**

19  **who are offering a plan that respects an organization**

20  **or individual's conscience?**

21            MR. CRISALLI:  Object to form.

22            THE DEPONENT:  All carriers have to file

23  their forms with us, but the specific notice, the

24  notice requirement here is referring to a religiously

25  sponsored carrier.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

116

1        Q.    (By Mr. Theriot) Okay.  So in the first
2   couple lines of subsection (1) of Exhibit 6, it says
3   that "all carriers required pursuant to law to offer
4   and file with the commissioner a plan."
5             Which carriers are required pursuant to
6   the law to offer and file with the Commissioner a plan
7   providing benefits identical to the basic health
8   services model?
9             MR. CRISALLI:  Object to form.
10            THE DEPONENT:  I don't know based upon
11  the reference to -- the reference to the model plan
12  that may have predated the ACA.  I don't know the
13  statutory history.
14       Q.    (By Mr. Theriot) So that language may be
15  outdated?
16       A.    It's possible.  I don't know either way.
17       Q.    Okay.  But as far as in your day-to-day
18  work, you use this only with regard to religiously
19  sponsored carriers?
20       A.    I would cite, if I were going to cite
21  this statute, this citation 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, (2), would be
22  an objection to a religiously sponsored carrier.
23       Q.    So are you -- the last line of
24  subsection (1) in Exhibit 6 says, "This process may not
25  affect a nonobjecting enrollee's access to coverage for

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

117

1   those services."

2            Are you aware of any other processes

3   other than what we've talked about with regard to the

4   Kaiser plan and Providence plan that could be used by a

5   carrier so as not to affect a nonobjecting enrollee's

6   access to coverage?

7            MR. CRISALLI:  Object to form.  Calls for

8   speculation.

9            THE DEPONENT:  Can you repeat the

10  question?

11       Q.    (By Mr. Theriot) Are you aware of any

12  other processes other than what we've talked about with

13  regard to the Kaiser plan and Providence plan that

14  could be used so as not to affect a nonobjecting

15  enrollee's access to coverage for these services?

16           MR. CRISALLI:  Form.  Calls for

17  speculation.

18           THE DEPONENT:  I know generally, based on

19  the other plan, again, mentioned this morning -- and

20  this would be a nonreligious carrier, and this was the

21  Premera plan that I mentioned.  So they would also have

22  a process in place for enrollees to access services.

23       Q.    (By Mr. Theriot) Do you know what process

24  Premera uses?

25       A.    I don't know the details without looking.

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

118

1  And, again, we would be looking for the required notice

2  to enrollees of how they can get there, how they can

3  get those services.

4       **Q.     You wouldn't be looking exactly as to**

5  **what the process is?**

6       A.     Not in our unit, no.

7       **Q.     Which unit looks at that?**

8       A.     Generally speaking, for issues or

9  questions that come up during the administration of a

10 plan, while enrollees are actively using the plan,

11 those types of questions or issues are going to come to

12 our consumer department.  I think it's consumer

13 protection.

14           MR. CRISALLI:  And I'll represent -- have

15 you finished your answer?

16           THE DEPONENT:  Oh, I was just going to

17 say, possibly, possibly our market conduct oversight.

18 They work fairly closely together.

19           MR. CRISALLI:  And I will represent that

20 we have a designee who deals with compliance who is

21 prepared to testify about aspects of the questions that

22 you're getting at.

23           MR. THERIOT:  Okay.

24       **Q.     (By Mr. Theriot) So I was going to ask**

25 **you about -- maybe I shouldn't -- subsection (3)(a),**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

119

1    **"The commissioner will not disapprove processes that**

2    **meet the following criteria:  Enrollee access to all**

3    **basic health plan services is not impaired in any way."**

4                        **You don't assess for that; am I correct?**

5                    MR. CRISALLI:  Object to form.

6                    THE DEPONENT:  We would assess for,

7    again, based on the plan language, whether -- if there

8    are any obvious impairments, anything that, you know,

9    might limit access, we might see that in the plan

10   documents.  But, typically, issues of access are going

11   to come up later as enrollees are using their plan.

12        **Q.    (By Mr. Theriot) So when you're looking**

13   **to see if there is an impairment, what kinds of things**

14   **might impair an enrollee's access that you would see**

15   **and object to?**

16                   MR. CRISALLI:  Object to the extent it

17   calls for speculation.

18                   THE DEPONENT:  I don't have anything that

19   comes to mind based on what we see.

20        **Q.    (By Mr. Theriot) Have you ever objected**

21   **to a plan that is governed by Exhibit 6 because you**

22   **suspected that the enrollee's access might be impaired**

23   **in some way?**

24        A.    I don't recall at that level of

25   specificity.

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

1              MR. THERIOT:  Okay.  Why don't we -- give

2   me five minutes and let me look.  I may be done.

3              MR. CRISALLI:  Sounds good.

4              (A recess was taken from 2:38 p.m. to

5   2:44 p.m. PST.)

6              MR. THERIOT:  Back on the record for me

7   just to say I don't have any other questions, but I

8   reserve the right to recall the witness after Paul and

9   I have some discussion, and maybe even have some Court

10  intervention, but we'll see.  I don't have any further

11  questions.

12             MR. CRISALLI:  No questions for me at

13  this time.  Thanks.

14             Can she go?

15             MR. THERIOT:  Yes, thank you, you can go.

16  I appreciate your time.  I know it's not a fun process,

17  but you did a good job.

18             THE REPORTER:  Paul, do you want to order

19  a copy?

20             MR. CRISALLI:  If they order, we'll order

21  as well.

22             MR. THERIOT:  Yes, we're ordering.  The

23  question is whether I need an expedited.  We both have

24  to order.

25             Jana, let's hold off on the expedited for

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

121

```
1  now.
2                    (WHEREUPON, the deposition was concluded
3  at 2:45 p.m. PST.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Kim Tocco

122

```
1              I have read the foregoing transcript
2  of my testimony and have indicated the same by my
3  signature.
4
5
6                    _____
                                    KIM TOCCO
7
8  STATE OF _____
9  CITY OF _____ AND COUNTY OF _____
10             Subscribed and sworn to before me by KIM
11 TOCCO, on this _____, 2022.
12             My commission expires:_____.
13
14
15
16                    _____
                                 Notary Public
17
18                    _____
                                    Address
19
20
21 Reporter:  JM
   Trial/hearing date:  None
22
23
24
25
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

123

```
 1                        CERTIFICATE

 2   STATE OF COLORADO          )
                                )ss.
 3   CITY AND COUNTY OF DENVER  )

 4              I, Jana Mackelprang, Certified Realtime
     Reporter, Registered Professional Reporter, and Notary
 5   Public for the State of Colorado, do hereby certify
     that previous to the commencement of the examination,
 6   the said KIM TOCCO was duly sworn by me to testify the
     truth in relation to the matters in controversy between
 7   the said parties.
               I further certify that said deposition was
 8   taken in shorthand by me and was reduced to typewritten
     form by computer-aided transcription, that the
 9   foregoing is a true transcript of the questions asked,
     testimony given, and proceedings had.
10             I further certify that I am not an
     attorney nor counsel nor in any way connected with any
11   attorney or counsel for any of the parties to said
     action or otherwise interested in its event.
12             I further certify that, pursuant to
     Rule 30(e)(1), review of the transcript was requested.
13             IN WITNESS WHEREOF, I hereunto affix my
     hand and notarial seal this 29th day of November, 2022.
14   My commission expires January 24, 2024.

15

16

17                                  _____
                                    Jana Mackelprang
18                                  CRR, RPR, Notary Public
                                    Calderwood-Mackelprang, Inc.
19

20

21

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                    fe265592-9478-4d73-bcd5-ebcc840c6c96

30(b)(6) Deposition of Kim Tocco

124

```
 1   CALDERWOOD-MACKELPRANG, INC.
     9745 East Hampden Avenue, Suite 220
 2   Denver, Colorado  80231
     (303) 477-3500
 3
     November 29, 2022
 4
     Paul M. Crisalli
 5   Jeffrey Todd Sprung
     Attorney General's Office
 6   800 5th Avenue, Suite 2000
     Seattle, Washington 98104
 7
     Re: Cedar Park Assembly of God of Kirkland, WA v.
 8   Kreidler and Inslee

 9   Deposition of: KIM TOCCO

10   The deposition in the above-entitled matter is ready
     for reading and signing.  Please attend to this matter
11   by complying with ALL blanks checked below:

12   _____   arranging with us at the number listed below
               to read and sign the deposition in our
13             office.

14     XXX     having deponent read your copy and sign
               amendment sheets, if any (original signature
15             page enclosed.)

16   _____   reading enclosed deposition, signing
               signature page and correction sheets, if any.
17

18     XXX     within 30 days of the date of this letter.

19
     _____   by_____due to trial/hearing date of
20             _____.

21   Please be sure that the signature page and amendment
     sheets, if any, are signed before a notary public and
22   returned to our office.  If this matter has not been
     taken care of within said period of time, the
23   deposition will be filed unsigned pursuant to the Rules
     of Civil Procedure.
24
     JANA MACKELPRANG, CRR, CSR, RPR
25   cc:  Counsel of Record
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                          fe265592-9478-4d73-bcd5-ebcc840c6c96

```
 1  CALDERWOOD-MACKELPRANG, INC.
    9745 East Hampden Avenue, Suite 220
 2  Denver, Colorado  80231
    (303) 477-3500
 3

 4  Kevin H. Theriot, Esq.
    Alliance Defending Freedom
 5  15100 N. 90th Street
    Scottsdale, Arizona 85260
 6
    Re: Cedar Park Assembly of God of Kirkland, WA v.
 7  Kreidler and Inslee

 8  Dear Mr. Theriot:

 9  Enclosed is the deposition of:  KIM TOCCO

10  _____ Previously filed.  Forwarding signature page

11          and amendment sheets.

12  _____ Signed, no changes.

13  _____ Signed, with changes, copy enclosed.

14  _____ Unsigned, notice duly given _____,
            pursuant to the Rules of Civil Procedure.
15
    _____ Not signed, notice duly given _____,
16          since trial is set for _____.

17  _____ No signature required.

18  _____ Signature waived.

19  _____ To be signed in court.

20  _____ Signature pages/amendment sheets to be
            returned to court on date of trial.
21
    _____ Mailed by Priority Mail on _____.
22
    _____ Hand-delivered on approximately _____.
23

24  JANA MACKELPRANG, CRR, CSR, RPR

25  cc:  Counsel of Record
```

Calderwood-Mackelprang, Inc.  303.477.3500

Electronically signed by Jana Mackelprang (001-409-517-3774)                fe265592-9478-4d73-bcd5-ebcc840c6c96

# Exhibit B

1

                    Honorable Benjamin H. Settle


        IN THE UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
                    AT TACOMA

Civil Action No. 3:19-cv-05181

CEDAR PARK ASSEMBLY OF GOD OF
KIRLAND, WASHINGTON,

        Plaintiff,

vs.

MYRON "MIKE" KREIDLER, in his official
capacity as Insurance Commissioner for
the State of Washington; JAY INSLEE, in his
official capacity as Governor of the State
of Washington,

        Defendants.
_____

 VIDEOCONFERENCE and 30(b)(6) DEPOSITION of DEFENDANTS

    MYRON "MIKE" KREIDLER and GOVERNOR JAY INSLEE

            REPRESENTATIVE MOLLY NOLLETTE


_____


        PURSUANT TO NOTICE, the above-entitled

videoconference deposition was taken on behalf of the

Plaintiff on Thursday, November 17, 2022, at 10:01 a.m.

PST, before Jana Mackelprang, Certified Realtime

Reporter, Registered Professional Reporter, and Notary

Public.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

2

1  APPEARANCES:

2  For the Plaintiff:
           Kevin H. Theriot, Esq.
3          Julia Payne, Esq.
           Alliance Defending Freedom
4          15100 N. 90th Street
           Scottsdale, Arizona 85260
5          480.444-0020
           ktheriot@adflegal.org
6
   For the Defendants:
7          Paul M. Crisalli
           Attorney General's Office
8          800 5th Avenue, Suite 2000
           Seattle, Washington 98104
9          paul.crisalli@atg.wa.gov

10         Marta U. DeLeon
           Attorney General's Office
11         PO Box 40100
           Olympia, Washington 98504
12         marta.deleon@atg.wa.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Molly Nollette

3

```
 1                    EXAMINATION INDEX

 2   By Mr. Theriot                           Page 4

 3

 4

 5                     EXHIBIT INDEX
     FOR IDENTIFICATION                        INITIAL
 6                                             REFERENCE

 7   Exhibit 8   10/19/2018 Memorandum from Philhower    21
                 to Nollette, "Forms review standard
 8               for a carrier with a religious
                 objection to providing contraception
 9               and abortion

10   Exhibit 9   RCWA 48.44.035                49

11   Exhibit 10  9/19/2019 Providence Health Plan        65
                 Press Release
12

13

14            PREVIOUSLY MARKED EXHIBIT INDEX
     FOR IDENTIFICATION                        INITIAL
15                                             REFERENCE

16   Exhibit 1                                  7

17   Exhibit 2                                 39

18   Exhibit 3                                 73

19   Exhibit 4                                 27

20   Exhibit 5                                 69

21   Exhibit 6                                 37

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

30(b)(6) Deposition of Molly Nollette

4

```
 1              P R O C E E D I N G S
 2          WHEREUPON, the following proceedings were
 3  taken pursuant to the Federal Rules of Civil
 4  Procedure.
 5              *     *     *     *     *
 6              THE COURT REPORTER:  Will counsel please
 7  stipulate that the court reporter is authorized to
 8  administer the oath remotely; that no objection to
 9  admissibility of the deposition will be made based on
10  validity of the oath; and that Ms. Nollette is who she
11  says she is so that I may swear her in remotely?
12              MR. THERIOT:  Counsel for Plaintiff
13  stipulates.
14              MR. CRISALLI:  The same for Defendants.
15                  MOLLY NOLLETTE,
16  having been first duly sworn to state the whole
17  truth, testified as follows:
18                  EXAMINATION
19  BY MR. THERIOT:
20      Q.    Good morning, Ms. Nollette.  My name is
21  Kevin Theriot.  I'm counsel for Cedar Park in the Cedar
22  Park versus Kreidler case.
23              Could you please state your full name for
24  the record?
25      A.    My full name is Molly Sevcik Foges
```

1   Nollette.

2                  MR. THERIOT:  Do you need a spelling for

3   that, Jana?

4                  THE REPORTER:  Yes, please.

5                  THE DEPONENT:  M-O-L-L-Y, S-E-V-C-I-K,

6   F-O-G-E-S, N-O-L-L-E-T-T-E.

7                  THE REPORTER:  Thank you.

8        Q.     (By Mr. Theriot) Have you been deposed

9   before, Ms. Nollette?

10       A.     Yes, I have.

11       Q.     How many times?

12       A.     Three times.

13       Q.     Can you tell me what kinds of cases those

14   cases were with those two depositions?

15       A.     I was deposed on behalf of a former

16   employer regarding retail sale tips.

17       Q.     Okay.

18       A.     I was deposed in my current position for

19   a case involving network access requirements for health

20   care services.

21       Q.     Do you remember the name of the case

22   involving network access requirements?

23       A.     I think it was Seattle Children's

24   Hospital.  I don't remember the formal name.

25       Q.     Okay.  And that case was filed against

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    the Office of -- Office of the Insurance Commissioner?

2         A.    Yes.

3         Q.    Did you -- other than through a

4    deposition, did you testify in court in either of those

5    cases?

6         A.    No.

7         Q.    Have you testified in court before?

8         A.    Yes.

9         Q.    When did you testify in court?

10        A.    In the early '90s, I testified in a

11   landlord-tenant case in the state of Louisiana.

12        Q.    What was the subject of your testimony in

13   that case, just briefly?

14        A.    It was whether the property that was

15   being rented by myself and another person had in fact

16   been abandoned.

17        Q.    Okay.  Was your testimony in either of

18   those depositions or before that court ever challenged

19   as being incorrect?

20        A.    No.

21        Q.    Have you ever been charged with anything

22   other than a traffic violation?

23        A.    No.

24        Q.    And you understand today that, like in

25   your previous depositions, you're under oath and this

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    could be used in a court of law just as if you were

2    testifying live?  Do you understand that?

3          A.     Yes.

4          Q.     Is there anything that would prohibit you

5    from thinking clearly or testifying truthfully today?

6          A.     No.

7          Q.     Are you on any kind of medication that

8    would limit your ability to recall?

9          A.     No.

10         Q.     So I'm not going to do anything other

11   than probably remind you of what you remember for your

12   past depositions, except in a video deposition it's a

13   little bit more necessary that we don't talk over each

14   other.  So if you would wait until I finish my question

15   to answer, that would be great, and I will do my best

16   to let you finish your answer before I ask a question.

17                Of course, all responses need to be

18   verbal and not a shaking of the head, and try to avoid

19   "uh-huh" and "huh-uh."

20                Of course, we can take a break at any

21   time, as long as a question isn't pending.

22                So we're going to start with what we

23   previously marked as Exhibit 1.  And I'm going to put

24   that in the chat so that you can see it, but this is

25   the notice of deposition.  Do you see that?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1          A.     Yes.

2          Q.     So I think if you click on it, I think

3     actually on your computer, you may have to download it

4     in order to see it.

5          A.     Yes.

6          Q.     Can you take a look at that?  And then I

7     have a couple questions for you about it.

8          A.     I'm working on downloading it.

9          Q.     Okay.

10          A.     All right, it is open.

11          Q.     Okay.  Do you recognize that document?

12          A.     Yes.

13          Q.     Do you understand that you've been

14     designated by the Defendants to testify on their behalf

15     for some of the topics listed in this deposition

16     notice?

17          A.     Yes.

18          Q.     And based upon my understanding in

19     speaking with your counsel, you are prepared today to

20     testify as to Topic 1 -- I'll go slow here so you can

21     kind of look at them -- is that correct?

22          A.     Yes.

23          Q.     Topic 2; is that correct?

24          A.     Yes.

25          Q.     Topic 3; is that correct?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

9

```
 1        A.    Yes.
 2        Q.    Topic 6; is that correct?
 3        A.    Yes.
 4        Q.    Topic 7; is that correct?
 5        A.    Yes.
 6        Q.    Topic 8; is that correct?
 7        A.    Yes.
 8        Q.    Topic 12; is that correct?
 9        A.    Yes.
10        Q.    Topic 13; is that correct?
11        A.    Yes.
12        Q.    And Topic 14; is that correct?
13        A.    Yes.
14        Q.    What did you do to prepare for today's
15 deposition?
16        A.    I reviewed the statutes or rules that
17 were listed.
18        Q.    Okay.  Which statutes and rules did you
19 review?
20        A.    I reviewed the conscience clause statute.
21        Q.    That's the 065 statute?
22        A.    I believe so.  I do not memorize statute
23 or RCW numbers very well.
24        Q.    Well, good for you.  It's better to go by
25 what they actually do.
```

Calderwood-Mackelprang, Inc.  303.477.3500

10

1              So the conscience clause statute.  What
2  else?
3       A.    The equity fee statute.
4       Q.    Equity fee statute.  Okay.
5       A.    I reviewed the definitions in 48.43.005
6  related to items that are not considered health plans.
7       Q.    Okay.
8       A.    I reviewed a rule that was about
9  implementing the equity fee statute.
10      Q.    Okay.
11      A.    I reviewed Senate Bill 6219.
12      Q.    All right.  So the rule implementing the
13 equity fee statute, was that a Washington
14 Administrative Code rule?
15      A.    Yes.
16      Q.    Do you happen to remember the number of
17 that rule?
18      A.    No.
19      Q.    Was it 284.43.5020?
20      A.    I do not know.
21      Q.    Okay.  We can come back to that.  All
22 right.
23              Any other statutes or rules you reviewed
24 in preparation for this deposition?
25      A.    I reviewed a statute about large group

Electronically signed by Jana Mackelprang (001-409-517-3774)                5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

11

```
 1  rate negotiations.
 2        Q.    Do you remember what the number of that
 3  statute is?
 4        A.    No.  I don't want to make a guess.
 5        Q.    Okay.  Did you speak with anyone else
 6  besides your attorney about the subject matter of your
 7  deposition today?
 8        A.    Yes, I did.
 9        Q.    Was your attorney present when you spoke
10  to them?
11        A.    No.
12        Q.    How many people did you speak to about
13  the subject of your deposition today?
14        A.    Three people.
15        Q.    And what are their names?
16        A.    Kim Tocco, Lichiou Lee.
17        Q.    Could you spell that one?
18        A.    L-I-C-H-I-O-U, Lee, L-E-E.
19        Q.    And who else?
20        A.    Ned Gaines.
21        Q.    What was -- and the conversation with Kim
22  Tocco, when did that occur?
23        A.    Within the last couple of weeks.
24        Q.    What did you say to her and what did she
25  say to you in that conversation?
```

Electronically signed by Jana Mackelprang (001-409-517-3774)          5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

12

1        A.     We discussed that we were both identified
2    as people who were going to be deposed.
3        Q.     **All right.  Did you talk about any of the**
4    **topics that you were going to be deposed about today?**
5        A.     Not in any detail.
6        Q.     **Which ones did you talk about in general?**
7        A.     We talked about the general process for
8    filings, and we talked about benefits.
9        Q.     **The general process for filings, was that**
10   **regarding filings of health care plans?**
11       A.     Health care plans and other insurance
12   products.
13       Q.     **Besides health care plans, what other**
14   **insurance products did you talk about in the process**
15   **for filing?**
16       A.     Standalone dental plans, standalone
17   vision plans.  Let's see.  Short-term, limited duration
18   plans.
19       Q.     **And with regard to benefits, what did you**
20   **speak about regarding your conversation with Kim Tocco**
21   **on benefits?**
22       A.     Required benefits.
23       Q.     **Required benefits for which insurance**
24   **products?**
25       A.     For health plans and required benefits

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

13

1    for short-term, limited duration plans.

2         Q.    Okay.  So what did you say to Kim Tocco

3    about required benefits for health plans?

4         A.    I think we just discussed that there are

5    required benefits for health plans that are not

6    required for nonhealth plans.  That was the focus of

7    that discussion.

8         Q.    And what did you discuss with -- what did

9    you say to Kim Tocco and what did she say to you about

10   short-term, limited duration plans?

11        A.    We discussed that short-term, limited

12   duration plans were not health plans, and therefore

13   were not subject to the requirements of health plans.

14   They have a different set of requirements.

15        Q.    What are the requirements that apply to

16   short-term, limited duration health plans?

17        A.    I would have to review the specific

18   statute and WAC to go over those requirements.

19        Q.    So there's a statute that applies?

20        A.    I believe it's a statute.  It might just

21   be a rule.

22        Q.    And there's a Washington Administrative

23   Code rule that may apply also?

24        A.    I believe it is in a rule and not in a

25   statute that defines what's required for a short-term,

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   limited duration health plan, for coverage and

2   administration of the plan.

3          Q.     And because that's not a health plan,

4   it's not subject to SB 6219?

5          A.     That is correct.

6          Q.     Did you just have one conversation with

7   Kim Tocco about the subject matter of your testimony

8   today?

9          A.     No, I think it was multiple conversations

10  over weeks.

11         Q.     I'm sorry.

12                Have we spoken about the subject matter

13  of all of those conversations that you've had with Kim

14  Tocco?

15         A.     Yes.

16         Q.     So there's nothing else about the subject

17  matter of this deposition that you discussed with Kim

18  Tocco in the last couple weeks?

19         A.     No.

20         Q.     All right.  Lichiou Lee, when did you

21  speak with her?

22         A.     This week.

23         Q.     How many times?

24         A.     About the subject of the deposition?

25         Q.     Yes.  I'm sorry.  Yes.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1      A.      Once.

2      Q.      Is Lichiou Lee employed by the Office of

3  the Insurance Commissioner?

4      A.      Yes.

5      Q.      What is her position?

6      A.      Chief actuary.

7      Q.      What topics did you discuss with Lichiou

8  Lee this week about the subject matter of your

9  deposition today?

10     A.      I asked her if she knew the WAC number

11 for the rule-making that was done to implement the

12 equity fee statute.

13     Q.      And did she know that number?

14     A.      Not immediately.  It took her five

15 minutes to get back to me with it.

16     Q.      Did you speak to her about the substance

17 of that WAC?

18     A.      No.

19     Q.      Okay.  Did you speak with her -- other

20 than asking for the number of that WAC, did you talk to

21 her about anything else regarding the subject matter of

22 this deposition?

23     A.      No.

24     Q.      I'm having a little trouble reading my

25 writing.  Ned Gaines, was that the third person?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1          A.    Yes.
 2          Q.    When did you speak with Ned Gaines?
 3          A.    Yesterday.
 4          Q.    And that was about the subject matter of
 5   this deposition?
 6          A.    Yes.
 7          Q.    What topics did you discuss yesterday
 8   with Ned Gaines about this deposition?
 9          A.    I asked Ned for information regarding
10   some of the excepted benefit plans, the nonhealth
11   plans.
12          Q.    All right.  And how did Ned respond to
13   that request?
14          A.    He gave me additional information about
15   the nature of those products, the ones that I asked him
16   about.
17          Q.    All right.  So we can -- I'm going to ask
18   you about that in some detail later, but there's no
19   sense getting into that just yet.
20                Was there anything else besides the
21   products and the nature of the nonhealth care plans
22   that you discussed with Ned Gaines that relate to this
23   deposition?
24          A.    No.
25          Q.    And that was the only conversation you
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   had with Ned Gaines about this deposition?

2        A.    Yes.

3        Q.    Okay.  How much time did you spend

4   preparing for today's deposition?

5        A.    Over the last couple of weeks, about four

6   hours.

7        Q.    Let me make a real quick note here before

8   I forget.

9              What's your position with the OIC?

10       A.    I am a deputy insurance commissioner.

11       Q.    What are your responsibilities as a

12  deputy insurance commissioner?

13       A.    I'm responsible for managing and

14  supervising a division, the division of rates, forms,

15  and provider networks.

16       Q.    And can you just give me a brief

17  description of what kinds of subject matters the rates,

18  forms, and provider networks involves?

19       A.    The work is the review and approval of

20  all fully insured insurance products that are required

21  to be filed with the Office of the Insurance

22  Commissioner.  And for insurance products that include

23  a provider network, the review of the provider network.

24       Q.    How do you -- I'm sorry, I interrupted

25  you.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1        A.      An insurance product can include a form
2   that is about the benefits and administration of it; a
3   rate, which is about the premium paid; and then the
4   provider network, which is the grouping of health care
5   providers.
6        **Q.      Okay.  How do you define all fully**
7   **insured insurance products?**
8        A.      By looking at Title 48 of the insurance
9   code of Washington State.
10       **Q.      Okay.  How long have you been a deputy**
11  **insurance commissioner?**
12       A.      Since June of 2013.
13       **Q.      What was your job before that?**
14       A.      I was a Management Analyst 5 with the
15  office.
16       **Q.      How long were you a Management Analyst 5**
17  **with the OIC?**
18       A.      I started in December of 2010.
19       **Q.      And what was your job before December of**
20  **2010?**
21       A.      I worked for Starbucks Coffee Company.
22       **Q.      What position did you hold at Starbucks**
23  **Coffee Company?**
24       A.      When I left the company, I was a senior
25  manager.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1          Q.     I heard there are a lot of great perks to
2    that kind of job.
3          A.     A lot of coffee.
4          Q.     I'm not a coffee drinker, but the people
5    I know who are envy workers who work at Starbucks.
6                 What's your education?
7          A.     I have a bachelor's degree, and I have a
8    juris doctor.
9          Q.     What's your bachelor's degree in?
10         A.     English.
11         Q.     Are you familiar with the insurance
12   products offered by Providence?
13                MR. CRISALLI:  Object to form.  You may
14   answer.
15         Q.     (By Mr. Theriot) You may answer.  He's
16   preserving his objections so he can -- if he has a
17   concern about the question, he can bring that up later
18   with the judge; but unless he instructs you not to
19   answer, generally speaking, you should answer after he
20   objects.
21         A.     Providence Health Plans, yes.
22         Q.     Okay.  Are you familiar with the counties
23   in which Providence Health Plans offers its services?
24         A.     I do not have that information at hand.
25   I would look it up, if asked.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1          Q.     Okay.  Is there any law or regulation

2    that influences whether a carrier offers health plans

3    in certain counties or statewide?

4                 MR. CRISALLI:  Object to the extent it

5    calls for a legal conclusion and speculation.

6                 THE DEPONENT:  There are network access

7    requirements for health plans that a carrier must meet

8    to offer a health plan in a county.

9          Q.     (By Mr. Theriot) Okay.  So by "network

10   requirements," you mean they have to have a certain

11   number of providers that can serve the clientele in

12   that county in order to be able to offer the plan?

13                MR. CRISALLI:  The same objection.

14                THE DEPONENT:  Yes.

15         Q.     (By Mr. Theriot) Do you know whether

16   Providence offers a plan that does not cover all forms

17   of birth control?

18         A.     Yes, Providence Health Plans offers --

19   well -- birth control.  I think it covers all forms of

20   birth control.

21         Q.     Okay.  But it also offers a plan that

22   does not cover abortion?

23         A.     Yes.

24         Q.     Okay.  I am going to put -- I'm going to

25   put a document that we're going to call Exhibit 8 in

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   the chat that I'd like to discuss with you.

2               (Exhibit 8 was remotely introduced and

3   provided electronically to the reporter.)

4       Q.      (By Mr. Theriot) Let me make sure I've

5   got it right before I do that.

6               I've placed in the chat, which I've

7   marked as Exhibit 8, Jana.  We're going to continue our

8   numbering from yesterday.

9               If you would, take a moment to open that

10  up, Ms. Nollette, and familiarize yourself with that,

11  and then I have some questions about that when you're

12  ready.

13      A.      Okay.  I have general familiarity with

14  it, yeah.

15      Q.      All right.  What is this document?

16      A.      This is a document that was drafted by a

17  former OIC employee on how to review health care forms,

18  which are the documents that include the benefits, if a

19  carrier had a religious objection to providing

20  contraceptive or abortion benefits in a health plan.

21      Q.      So Ms. Philhower is no longer with OIC?

22      A.      That's correct.

23      Q.      What were her job responsibilities when

24  she was there?

25      A.      She was the manager of the health forms

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

22

```
 1  compliance unit.
 2       Q.    Did she report to you?
 3       A.    She did.
 4       Q.    Did you ask her to prepare this
 5  memorandum?
 6       A.    I did.
 7       Q.    What prompted you to ask her to prepare
 8  this memorandum?
 9       A.    Providence Health Plans was indicating
10  they were going to come into the market, and we wanted
11  to be prepared to review a health plan, if they
12  submitted one.
13       Q.    I'm not going to rush you here.  I would
14  like you to take the time to read it.  I know it's
15  extensive.  And my question is going to be:  Is there
16  anything in this memorandum that you either disagree
17  with or is not accurate?  And I want you to take your
18  time.  I'm not rushing you at all.
19       A.    Okay.
20            MR. CRISALLI:  When she's done reading,
21  would you mind repeating the question for the record?
22            MR. THERIOT:  Oh, sure.  I may get Jana
23  to do it.  I don't know if I can do it.
24            THE DEPONENT:  Okay.
25            MR. THERIOT:  Okay, Jana, could you
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                   5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  repeat that question for me?

2                (Whereupon, the record was read back by

3  the court reporter.)

4                MR. CRISALLI:  Object.  Vague as to time,

5  also to the extent it calls for a legal conclusion.

6                THE DEPONENT:  I think the memo is

7  accurate as of the time it was written.

8       **Q.    (By Mr. Theriot) Since the time it was**

9  **written, has anything changed so that there are**

10 **portions that are not accurate?**

11               MR. CRISALLI:  Objection.  Vague.

12               THE DEPONENT:  I'm looking for one

13 sentence that says that no carrier has asked for it,

14 which was true at the time when the memo was written,

15 but it's no longer true because Providence asked to not

16 cover abortion.  I'm looking for that sentence.

17      **Q.    (By Mr. Theriot) Let me see if I can help**

18 **you find it.**

19      A.    On page 4, the third paragraph, the last

20 sentence, we have not seen this situation.

21      **Q.    Okay.  So you have not seen this**

22 **situation where the carrier asserting a religious**

23 **objection to providing contraceptive benefits is barred**

24 **from selling plans without contraceptive benefits?**

25               **At that time, you had not seen one of**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1   those, but you have since?
 2                MR. CRISALLI:  Objection.  Vague and
 3   compound.
 4                THE DEPONENT:  Could I ask you to
 5   rephrase the question?
 6        Q.    (By Mr. Theriot) Sure.  Sure.  "We have
 7   not yet seen this situation," what situation is that
 8   referring to?
 9        A.    A situation where a plan was filed
10   without contraceptive benefits, where the health forms
11   analyst then sent an objection to the carrier asking
12   how they would ensure employees in the plan had
13   received the required notice and unimpaired access to
14   contraceptive services -- well, that's just
15   contraceptive services.  So we haven't seen that yet.
16   Contraceptive services, we haven't.
17        Q.    So I just wanted to be clear about that.
18   And it sounds like to me that you may have been
19   mistaken because you have received a plan that's asking
20   for an exception to abortion services since this?
21        A.    Yes.
22        Q.    And you may have actually received one at
23   this time, or at least you heard there was one coming,
24   right?
25                MR. CRISALLI:  Object to form.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1           THE DEPONENT:  I'm sorry, I didn't
2    realize that was a question.
3       Q.    (By Mr. Theriot) Well, I should have
4    ended it more with a question tone of voice.
5           At the time this memo was written, had
6    you received a request from a religious carrier to not
7    include abortion?
8       A.    I don't know if we had received a request
9    from it.  A carrier had contacted us, as carriers do,
10   to say that they were going to enter the market.
11      Q.    And that carrier was Providence?
12      A.    Providence Health Plans.
13      Q.    All right.  And as I understand it,
14   that's the only concern that you had with this memo;
15   and actually that concern turned out not to be
16   accurate, correct?
17           MR. CRISALLI:  Object to form.  Misstates
18   the testimony.
19           THE DEPONENT:  I don't remember the exact
20   year, but Providence Health Plan did enter the market.
21      Q.    (By Mr. Theriot) Okay.
22      A.    And did not include abortion coverage in
23   their health plans.
24      Q.    Okay.  Besides that sentence that we just
25   spoke about on page 4 that says, "We have not yet seen

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    this situation," is there anything else that is no

2    longer accurate about this memo that is marked as

3    Exhibit 8?

4              MR. CRISALLI:  Object to the extent it

5    calls for a legal conclusion.

6              THE DEPONENT:  Not that I'm aware of.

7         Q.    (By Mr. Theriot) Okay.  On page 2 of the

8    memorandum, you refer to -- I'm sorry -- the memo

9    refers to three options.  Do you see that?

10   Options 1, 2, and 3.

11             "She concludes that OIC has three

12   options."

13        A.    I see that section.

14        Q.    Do these options, or did these options

15   apply to contraception?

16        A.    I'd have to look at the greater context

17   of the section to answer that.

18        Q.    So let me -- I'll give you time to do

19   that, but let me just say, my question is going to be:

20   Do these three options apply to contraception or to an

21   exception for abortion or to both?

22        A.    These sections apply to coverage of

23   abortion services.

24        Q.    Okay.  Did the Office of the Insurance

25   Commissioner choose one of these options after this

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   memorandum was written?

2               MR. CRISALLI:  Object to form.

3               THE DEPONENT:  I would want to look at

4   RCW 48.43.065 before answering that question to confirm

5   it.

6        Q.     (By Mr. Theriot) Okay.  Let me put that

7   into the chat so you can take a look at it.

8        A.     Thank you.

9        Q.     Sorry I'm so slow.

10              Okay.  Can you see what's been previously

11   marked Exhibit 4, 48.43.065, Ms. Nollette?

12       A.     Yes.

13       Q.     Okay.

14       A.     Could you repeat the original question

15   again?

16       Q.     Yes.  Of those three options listed in

17   Exhibit 8, did the Office of the Insurance Commissioner

18   choose one of those options to implement?

19       A.     Yes.

20       Q.     Which option did it choose?

21       A.     Number 3.

22       Q.     Is there anything in writing that

23   indicates that you chose Option Number 3 and that is

24   how you are reviewing health care plans?

25              MR. CRISALLI:  Object to form.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1            THE DEPONENT:   The form filing review

2    process.

3        Q.      (By Mr. Theriot) Okay.   I'm sorry, I

4    interrupted you.

5        A.      The record of the form filing review.

6        Q.      Can you explain to me what that is?

7        A.      The Office of the Insurance Commissioner

8    uses an electronic web-based platform called the System

9    for Electronic Rate and Form Filing.   Carriers submit

10   their insurance products electronically on it.

11            For a form filing, the forms team, the

12   assigned analyst would review the filing.   If they had

13   questions about it or found things that needed to be

14   addressed, they would, within that record, submit what

15   we call an objection.   That objection becomes part of

16   the formal record within SERFF.   The company then

17   responds.

18            And that is how the final, if approved,

19   product is created, including the record of all

20   objections and responses, objections from the OIC and

21   responses from the carrier.   And that is the record of

22   the implementation and approval or disapproval of a

23   filing.

24        Q.      Does the public have access to that

25   software or program that you just were speaking about?

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1              MR. CRISALLI:  Objection.  Asked and
 2   answered.  Another witness covered this.
 3              THE DEPONENT:  The record is a public
 4   document and is available on the OIC's website.
 5       Q.    (By Mr. Theriot) Okay.  On page 2 of
 6   Exhibit 8, I have a question about the Weldon
 7   Amendment.
 8              I believe at the top of the -- it's an
 9   incomplete paragraph, but it begins with "One of the
10   new laws, RCW 48.43.073, recognizes the applicability
11   of the Weldon Amendment by exempting carriers from the
12   abortion coverage mandate to the extent necessary to
13   comply with federal law."
14              How is the determination made of whether
15   the Weldon amendment would exempt a particular
16   carrier's plan.
17              MR. CRISALLI:  Objection to the extent it
18   calls for a legal conclusion, and vague.
19              THE DEPONENT:  If the office were
20   concerned about a possible Weldon Amendment issue, we
21   would contact our attorney.
22       Q.    (By Mr. Theriot) So there's not an
23   internal process within the office where you make that
24   assessment?
25              MR. CRISALLI:  Object to form.
```

1            THE DEPONENT:  No.

2       Q.    (By Mr. Theriot) Does the carrier request

3  an exemption pursuant to the Weldon Amendment, or is

4  that automatically assessed by the OIC?

5            MR. CRISALLI:  Object to form.

6  Speculation.

7            THE DEPONENT:  I don't know.

8       Q.    (By Mr. Theriot) So forgive me if I

9  already asked this question.  Is there a process other

10 than referring it to counsel that is used by the OIC

11 when assessing whether there's a Weldon Amendment

12 concern?

13           MR. CRISALLI:  Object to form.

14 Speculation.

15           THE DEPONENT:  I have not had a situation

16 like that.

17      Q.    (By Mr. Theriot) Okay.  So if you did,

18 though, that would be assessed on a case-by-case basis?

19           MR. CRISALLI:  Object to form.

20 Speculation.

21           THE DEPONENT:  At this time, yes.

22      Q.    (By Mr. Theriot) On page 5 of Exhibit 8,

23 in the first full paragraph, under the heading "Refusal

24 to Cover Abortion," the last sentence says, "Plans are

25 not required to cover abortions that would be unlawful

1   under RCW 9.02.120, multistate plans under 42 U.S.C

2   Section 18054(a)(6) are exempt."

3                  What is a multistate plan?

4        A.     Under the ACA, a federal agency -- I

5   can't remember which one right now -- was directed to

6   create a multistate plan program.  As part of that

7   program, which no longer exists, a carrier

8   participating in it was required to have one health

9   plan that did not cover abortion.

10       Q.     So there's no longer a program involving

11  multistate plans?

12       A.     The multistate plan program does not

13  exist anymore.

14       Q.     Is there still a federal requirement that

15  there be a plan that does not cover abortion?

16              MR. CRISALLI:  Object to form.  Beyond

17  the scope.

18              You have not identified any federal laws

19  for purposes of discussion in the 30(b)(6) notice.

20              THE DEPONENT:  Could you repeat --

21       Q.     (By Mr. Theriot) Are you aware of any

22  other laws besides the one referenced there on page 5

23  that we're speaking about that would require that there

24  be a plan available in a state that does not include

25  abortion?

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1          MR. CRISALLI:  The same objections.

2          THE DEPONENT:  No.

3     Q.     (By Mr. Theriot) And the next sentence

4  there on page 5 of Exhibit 8 says -- I'm sorry, the

5  next phrase there at the end of the first paragraph

6  under "Refusal to Cover Abortion," it says, "and plans

7  are exempt if the application of this section to a

8  health plan results in noncompliance with federal

9  requirements that are a prescribed condition to the

10  allocation of federal funds."

11          Is that referring to the Weldon

12  Amendment?

13          MR. CRISALLI:  Object to form.

14  Speculation as well as beyond the scope.

15          THE DEPONENT:  I'm not sure.

16     Q.     (By Mr. Theriot) Could it be referring to

17  the Weldon Amendment?

18          MR. CRISALLI:  The same objection.

19          THE DEPONENT:  Yes.

20     Q.     (By Mr. Theriot) I believe, at the bottom

21  of that page, in footnote 8 of Exhibit 8 on page 5, it

22  says, "Washington currently has no multistate plan

23  filings."

24          Do you know if Washington ever had any

25  multistate plan filings.

Electronically signed by Jana Mackelprang (001-409-517-3774)                              5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

33

1              MR. CRISALLI:  Objection.  Beyond the

2  scope.

3              THE DEPONENT:  Yes.

4        Q.    (By Mr. Theriot) And did they?

5        A.    Yes.

6        Q.    How many?

7              MR. CRISALLI:  Object to form.  Beyond

8  the scope.

9              THE DEPONENT:  One carrier participated

10 in the multistate plan program.

11       Q.    (By Mr. Theriot) When was that

12 discontinued?  Do you know the answer to that?

13             MR. CRISALLI:  The same objection.

14             THE DEPONENT:  I think it wound up in the

15 2016, 2017 range.

16       Q.    (By Mr. Theriot) Okay.  Once again, on

17 page 5 of Exhibit 8, the last full paragraph there

18 says, "The phrase 'substantially equivalent' is not

19 defined in RCW 48.43.073."

20             Was a rule adopted that eventually

21 defined "substantially equivalent"?

22       A.    I don't recall.

23             MR. CRISALLI:  Objection to the extent it

24 calls for a legal conclusion.

25       Q.    (By Mr. Theriot) Is there a rule -- are

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  you aware of a rule in existence now that defines

2  "substantially equivalent"?

3          A.     I simply cannot remember right now.

4          Q.     Okay.  So there play be?

5          A.     I would need to review the WAC on point

6  to look for that.

7          Q.     On page 7 of Exhibit 8, in footnote 10,

8  there's a reference to a memo, a companion memo to this

9  one, meaning Exhibit 8.

10             Do you know if that companion memo was

11 produced as a part of the documents produced by

12 counsel?

13             MR. CRISALLI:  Object to form.

14             THE DEPONENT:  I do not.

15             MR. THERIOT:  And let me just say,

16 Counsel, for the record, I haven't seen that form in

17 the production.  If it wasn't produced, I'm going to

18 specifically ask for it, but with the caveat that I

19 understand you've produced a lot of documents and I may

20 have missed it.  So I just want to reserve that as a

21 request, if, when I go back and look for it again, I'm

22 not able to find it.

23             MR. CRISALLI:  Okay.

24         Q.     (By Mr. Theriot) All right.  On page 8 of

25 Exhibit 8, the last full paragraph before Option 3 says

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    that "Marta mentioned the possibility that OIC might

2    create its own materials informing consumers about

3    abortion resources available to them."

4                Did the OIC ever create its own materials

5    and inform consumers about abortion resources available

6    to them?

7                MR. CRISALLI:  Object to form.

8                THE DEPONENT:  Not as part of a form

9    filing.

10        Q.    (By Mr. Theriot) What do you mean by "not

11   as part of a form filing"?

12        A.    The OIC did not create any materials as

13   described for a carrier to include in a form filing.

14        Q.    Okay.  Did you create any materials that

15   could be accessed by consumers regarding abortion

16   resources available to them?

17        A.    Outside of my division, I do not know.

18        Q.    And as I understand your testimony, your

19   division did not create those materials?

20        A.    No.

21        Q.    That was a poor question.  Let me

22   rephrase it.

23                Did your division create those materials?

24        A.    No.

25        Q.    On page 8 of Exhibit 8, there's a

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    reference in the middle to WAC 284.43-5020.  Do you see

2    that?

3         A.    Yes.

4         Q.    In subsection (1), it states, "Enrollee

5    access to all basic health plan services is not

6    impaired in any way."

7               What does "not impaired in any way" mean?

8         A.    It means that there are no barriers to

9    access those services for an enrollee.

10        Q.    Are there any factors that you consider

11   when assessing whether there are any barriers to

12   accessing those services?

13        A.    If a plan refused to cover a service,

14   that would be a barrier.

15        Q.    Are you aware of any other barriers that

16   you've seen in plans that could be -- could satisfy or

17   could be an impairment to health plan services?

18        A.    Not having a single provider available to

19   provide the service.

20        Q.    Any others that would be a barrier, as

21   that term is used, in which it would be an impairment

22   to health plan services?

23        A.    I would want to look at WAC 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

24   (3) for more information.

25        Q.    I can make that happen.

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1              Okay.  I have put Exhibit 6, Washington

2    Administrative Code 284.43.5020, in the chat.  Do you

3    see that?

4         A.    I do.  Thank you.

5         Q.    Okay.  So other than the ones we've

6    already discussed, are you aware of any other barriers

7    that would be an impairment to basic health plan

8    services as that is described in 284.43.5020?

9         A.    Not covering it, not listing that it was

10   not covered, not having a provider available to deliver

11   the service.

12        Q.    Okay.  Who makes the assessment as to

13   whether something -- as to whether a plan does not

14   impair health plan services in any way?

15              MR. CRISALLI:  Object to form.

16              THE DEPONENT:  That is made by the staff

17   in my division who review health plans.

18        Q.    (By Mr. Theriot) Okay.  And other than

19   the WAC, is there anything else that would guide them

20   in making that determination?

21              MR. CRISALLI:  Object to form.

22              MR. THERIOT:  Yes, that's a good

23   objection.

24        Q.    (By Mr. Theriot) Other than WAC

25   284.43.5020, is there anything else that would guide

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   them in making that determination?
2              MR. CRISALLI:  Object to form.  Also
3   asked and answered.  We've had a witness testify to
4   this whole process.
5              THE DEPONENT:  They would look to other
6   statutes and WACs as to all of the services required.
7        Q.    (By Mr. Theriot) Okay.  What other
8   statutes and WACs are you referring to?
9              MR. CRISALLI:  Form.  Calls for
10  speculation and a legal conclusion.  Sorry.
11             THE DEPONENT:  The essential health
12  benefits, for instance.
13       Q.    (By Mr. Theriot) And those are found in
14  statute or in the administrative code?
15       A.    Administrative code.
16       Q.    I'm at a decent stopping point.  Do you
17  want to take a break now or push through to lunch?
18       A.    A break would be nice.
19       Q.    Okay.  How long do you need,
20  Ms. Nollette?
21       A.    Five minutes.
22       Q.    Five minutes.  We'll go off the record
23  and come back -- we'll make it at 11:20 Pacific time.
24       A.    Thank you.
25  ///

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1              (A recess was taken 11:14 a.m. to 11:23
 2   a.m. PST.)
 3        Q.    (By Mr. Theriot) Ms. Nollette, you
 4   understand you're still under oath?
 5        A.    Yes.
 6        Q.    I've placed in the chat Exhibit 2,
 7   48.43.005.  Would you please open that up and review
 8   it?
 9        A.    Okay.  I'm familiar with this WAC.
10        Q.    Okay.
11              MR. CRISALLI:  Did you say WAC?
12              MR. THERIOT:  Did I say WAC?  That's not
13   what I meant.
14              THE DEPONENT:  I'm familiar with this
15   statute.
16        Q.    (By Mr. Theriot) Great.  I wasn't even
17   paying attention.  Okay.
18              I believe that you testified earlier that
19   you're responsible -- as deputy insurance commissioner,
20   you manage rates, forms, and provider networks for all
21   fully insured insurance products.  And I believe that
22   you said that fully insured insurance product is
23   defined in 48, in Article 48.  Is it defined in the
24   statute that's marked as Exhibit 2?
25        A.    I don't think so.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1      Q.     Okay.  So it would be defined in a
2   different statute?
3      A.     Title 48, in its entirety, defines what
4   the fully insured market is.
5      Q.     Okay.  I see.
6             So the definitions in Exhibit 2 that say,
7   for instance, "board," and there's a definition of the
8   board, there's no -- excuse me -- there's no definition
9   of "fully insured insurance product" in a succinct way?
10     A.     No.
11     Q.     All right.  Thank you for clarifying
12  that.  I was a little confused.
13            Do you agree that "health plan," as
14  defined in Exhibit 2, is the meaning of health plan as
15  that's used in SB 6219?
16            MR. CRISALLI:  Object.  Calls for a legal
17  conclusion.
18            THE DEPONENT:  Yes.
19     Q.     (By Mr. Theriot) And if you look at
20  subsection (31) of Exhibit 2, the 005 statute -- I'll
21  give you a second to scroll down to that.
22     A.     Okay.
23     Q.     It says that a "'health plan' or 'health
24  benefit plan' means any policy, contract, or agreement
25  offered by a health carrier to provide, arrange,

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    reimburse, or pay for health care services except the

2    following."  And it lists several types of insurance

3    after that as part of sub subparagraphs.

4              Is there any overarching reason these

5    types of plans are not included in the definition of

6    "health plan" or "health benefit plan"?

7              MR. CRISALLI:  Objection.  Calls for

8    speculation and legal conclusion.

9              THE DEPONENT:  So the products listed

10   under 31, some of which are not insurance, are listed

11   there to clarify that they are not subject to the

12   requirements of a health plan as described throughout

13   Title 48.

14       Q.    (By Mr. Theriot) Okay.  Are they related

15   in any way other than they're not considered part of

16   the definition for a health plan?

17             MR. CRISALLI:  The same objection.

18             THE DEPONENT:  Not really.

19       Q.    (By Mr. Theriot) Okay.  Could some of

20   these plans cover health care services?

21             MR. CRISALLI:  Object.  Calls for

22   speculation and a legal conclusion.  I think, also, I'm

23   a little concerned with the term "could" because I

24   think that's an improper question with respect to

25   requiring such a legal analysis.  I think the better

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  question is:  Do any of them?

2              MR. THERIOT:  Well, I think there's

3  nothing wrong with the question.  I'm glad to ask both,

4  but we can start with "do they?"  And I can rephrase my

5  question to that, but I think I'm also entitled to the

6  answer of "could they?"  And I can rephrase that

7  question, maybe make it a little easier.

8        **Q.    (By Mr. Theriot) Do some of these plans**

9  **listed in 31 that are not considered part of the**

10 **definition for "health plan" or "health benefit plan"**

11 **cover some health care services?**

12             MR. CRISALLI:  The same objection.

13 Also -- excuse me -- I note for the record that some of

14 these are outside the regulatory authority of the

15 Defendants in this matter.

16             THE DEPONENT:  Yes.

17             MR. THERIOT:  Okay.  So let's start

18 with -- well, first I'd like to object to the testimony

19 of counsel, first of all.  Secondly, let's start with

20 the plans that are within the set of those plans that

21 are regulated by the Office of the Insurance

22 Commissioner.

23       **Q.    (By Mr. Theriot) Which of the plans**

24 **listed in 31 are regulated by the Office of the**

25 **Insurance Commissioner.**

Electronically signed by Jana Mackelprang (001-409-517-3774)                                              5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1                MR. CRISALLI:   Objection.   Asked and
 2   answered.
 3                THE DEPONENT:   "(a) Long-term care
 4   insurance governed by chapter 48.84 or 48.83 RCW;
 5                "(b) Medicare supplemental health
 6   insurance governed by chapter 48.66 RCW;
 7                "Coverage supplemental to the
 8   coverage" -- "(c) Coverage supplemental to the coverage
 9   under chapter 55, Title 10, United States Code;
10                "(d) Limited health care services offered
11   by limited health care service contractors in
12   accordance with RCW 48.44.035.
13                "(e) Disability income.
14                "(f) Coverage incidental to a
15   property/casualty liability insurance policy such as
16   automobile personal injury protection coverage and
17   homeowner guest medical;
18                "(h) Accident only coverage.
19                "(i) Specified disease or
20   illness-triggered fixed payment insurance, hospital
21   confinement fixed payment insurance, or other fixed
22   payment insurance offered as an independent,
23   noncoordinated benefit;
24                "(k) Dental only and vision only
25   coverage.
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1              "(l) Plans deemed by the insurance

2      commissioner to have a short-term limited purpose or

3      duration, or to be a student-only plan that is

4      guaranteed renewable while the covered person is

5      enrolled as a regular full-time undergraduate or

6      graduate student at an accredited higher education

7      institution, after a written request for such

8      classification by the carrier and subsequent written

9      approval by the insurance commissioner.

10             "(m) Civilian health and medical program

11     for the veterans affairs administration (CHAMPVA; and

12             "(n) Stand-alone prescription drug

13     coverage that exclusively supplements Medicare part D

14     coverage provided through an employer group waiver plan

15     under Federal Social Security Act regulation 42 C.F.R.

16     Section 423.458(c)."

17         Q.    (By Mr. Theriot) Okay.  Thank you.

18             So unless my calculations are wrong, the

19     two that -- there are only two that aren't regulated by

20     the OIC, and those are (g), "workers' compensation

21     coverage"; and (j), "employer-sponsored self-funded

22     health plans"; is that correct?

23         A.    Yes.

24         Q.    Thank you.

25             Okay.  So let's start with (31)(a),

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    "Long-term care insurance governed by chapter 48.84 or

2    48.83 RCW."

3              Could or do -- so let's start with do --

4    do those plans pay for health care services?

5              MR. CRISALLI:  Object to form.

6              THE DEPONENT:  No.

7        Q.    (By Mr. Theriot) What do they pay for?

8              MR. CRISALLI:  Objection.  Beyond the

9    scope.

10             THE DEPONENT:  Long-term care insurance

11   policies pay out amounts based upon the terms of the

12   contract when the older can no longer do certain

13   activities of daily living.  So the money is based upon

14   the terms of the contract.  It could be a fixed amount,

15   a daily amount, something like that.

16       Q.    (By Mr. Theriot) So as I understand your

17   testimony, they don't reimburse specific health care

18   services?

19       A.    They do not.

20       Q.    But those moneys could be used to pay for

21   health care services?

22       A.    In some policies, yes.  In some policies,

23   the money can be used for anything.

24       Q.    Okay.  Let's move to subsection (b),

25   "Medicare supplemental health care insurance governed

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   by chapter 48.66." Do these plans or could these --

2   no, I'm sorry -- do these plans cover health care

3   services?

4               MR. CRISALLI:  Object to form.  Beyond

5   the scope.

6               THE DEPONENT:  So these are supplemental

7   plans.  The base plan is Medicare.  That's where the

8   benefits are.  So these are plans that supplement the

9   coverage, but they do not add benefits.

10      Q.    (By Mr. Theriot) So they do not add

11  benefits?

12      A.    No.

13      Q.    But they could be used to pay for health

14  care services to supplement, as a supplement to what

15  Medicare covers, correct?

16              MR. CRISALLI:  Object to form.  Beyond

17  the scope.

18              THE DEPONENT:  Yes.

19      Q.    (By Mr. Theriot) Do those supplemental

20  health insurance plans cover contraception?

21              MR. CRISALLI:  Object to form.  Beyond

22  the scope.

23              THE DEPONENT:  As a supplemental plan,

24  they cover whatever is in the base plan of Medicare.

25      Q.    (By Mr. Theriot) So if the base plan of

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  Medicare covers contraception, then it would cover

2  contraception?

3                MR. CRISALLI:  Object to form.  Beyond

4  the scope.  Calls for a legal conclusion.

5                THE DEPONENT:  Yes.

6       Q.    (By Mr. Theriot) If the Medicare base

7  plan covers maternity, then the supplemental health

8  insurance plan could cover maternity, correct?

9                MR. CRISALLI:  Object to form.  Beyond

10  the scope.

11                THE DEPONENT:  Yes.

12       Q.    (By Mr. Theriot) Let's move to 31(c),

13  "Coverage supplemental to the coverage provided under

14  chapter 55, Title 10, United States Code."  What kind

15  of health care services does this supplemental coverage

16  cover?

17                MR. CRISALLI:  Object to form.  Beyond

18  the scope.

19                THE DEPONENT:  Chapter 55, Title 10, USC,

20  refers to TRICARE, which is coverage related to the VA.

21  So this is another supplemental coverage option.  So

22  the coverage would be supplemental to the base product

23  that we don't regulate.

24       Q.    (By Mr. Theriot) Okay.  So it would be

25  supplemental to -- it would provide coverage for health

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

48

1   services -- strike that.

2              So the supplemental coverage would

3   provide health services for -- man, I'm having trouble

4   articulating that.  Let me strike that too.

5              The supplemental plan would cover any

6   health services that the TRICARE government plan

7   covers?

8              MR. CRISALLI:  Objection.  Outside the

9   scope.  Calls for a legal conclusion.

10             THE DEPONENT:  As a supplemental plan, it

11  does not expand that coverage.  It provides additional

12  financial insurance for those existing benefits.

13      Q.    (By Mr. Theriot) Okay.  And so could the

14  existing -- or do the existing TRICARE benefits include

15  contraception?

16             MR. CRISALLI:  Objection.  Beyond the

17  scope.

18             THE DEPONENT:  I do not know.

19      Q.    (By Mr. Theriot) Do the existing TRICARE

20  benefits cover maternity?

21             MR. CRISALLI:  Objection.  Beyond the

22  scope.

23             THE DEPONENT:  I do not know.

24      Q.    (By Mr. Theriot) Let's move to subsection

25  (d), "Limited health care services offered by limited

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  **health care service contractors in accordance with RCW**

2  **48.44.035."**

3              **Which types of health care services is**

4  **subsection (d) referring to?**

5              MR. CRISALLI:  Objection.  Calls for a

6  legal conclusion.

7      **Q.    (By Mr. Theriot) That's a bad question.**

8  **Let me rephrase it.**

9              **What types of health care services does**

10 **the plan in subsection 31(d) cover?**

11             MR. CRISALLI:  Objection.  Calls for a

12 legal conclusion and speculation, beyond the scope.

13             THE DEPONENT:  A dental-only plan, a

14 vision-only plan.

15             MR. THERIOT:  I am going to put -- I'm

16 going to put Statute 48.44.035 in the chat as

17 Exhibit 9.

18             (Exhibit 9 was remotely introduced and

19 provided electronically to the reporter.)

20     **Q.    (By Mr. Theriot) Do you see that,**

21 **Ms. Nollette?**

22     A.    Yes.

23     **Q.    Would you open that up and just briefly**

24 **familiarize yourself with it?**

25     A.    Okay.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

50

1      Q.      In the first paragraph, subsection (1),
2  it says, towards the end of that paragraph, "but does
3  not include hospital, medical, surgical, emergency, or
4  out-of-area services except as those services are
5  provided incidentally to the limited health services
6  set forth in this subsection."
7              What does "services are provided
8  incidentally to the limited health services" include?
9              MR. CRISALLI:  Objection.  Beyond the
10  scope.  Calls for a legal conclusion.
11              THE DEPONENT:  For a dental-only plan?
12      Q.      (By Mr. Theriot) Yes.
13      A.      I'm using that as an example.
14      Q.      Yes.  I'm sorry, I interrupted you.
15      A.      An incidental service as described in the
16  section you were reading could be a prescription for an
17  antibiotic at an out-of-network pharmacy.
18      Q.      Okay.  For a pharmaceutical service, what
19  does "incidentally to the limited health services set
20  forth" mean?
21              MR. CRISALLI:  Objection.  Beyond the
22  scope, calls for a legal conclusion, and misstates the
23  testimony.
24              THE DEPONENT:  I am not familiar with a
25  limited health care service pharmaceutical services

Calderwood-Mackelprang, Inc.  303.477.3500

1  plan having ever been requested or offered.

2      Q.     (By Mr. Theriot) Are you familiar with

3  any of the other plans listed in subsection (1) besides

4  dental care?

5      A.     Vision care.

6      Q.     Vision care.  Okay.  Any others besides

7  vision care?

8      A.     No.

9      Q.     Is there any individual that would be

10 familiar with pharmaceutical services and what plans

11 are incidental to those --

12          MR. CRISALLI:  Objection.  Misstates --

13      Q.     (By Mr. Theriot) I'm sorry.

14          Are there pharmaceutical services in

15 which services are provided incidental to those?

16          MR. CRISALLI:  Hold on.  Objection.

17 Beyond the scope.  Thank you.  Speculation.  Calls for

18 a legal conclusion.

19          She testified it doesn't exist.

20          MR. THERIOT:  I object to your

21 characterization of her testimony.  That's not what she

22 said.  She said she's never seen one.

23          THE DEPONENT:  There is not currently or

24 within the entire time that I have been deputy

25 commissioner a pharmaceutical services limited health

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

52

1  care service plan.

2      Q.    (By Mr. Theriot) Okay.  So you don't know

3  what incidentally -- what "services are provided

4  incidentally to those limited health services" might

5  be?

6      A.    That is --

7          MR. CRISALLI:  Objection.  Speculation.

8  Calls for a legal conclusion.  Beyond the scope.

9      Q.    (By Mr. Theriot) Can you repeat your

10 answer, please?

11     A.    That is correct.

12     Q.    All right.  Let's move to subsection

13 (31)(e) of Exhibit 2, "Disability Income."

14          What health care services does a

15 disability income plan -- well, strike that.

16          Do disability income plans cover any

17 health care services?

18          MR. CRISALLI:  Objection.  Calls for

19 speculation.  Legal conclusion.  Misstates the law.

20          THE DEPONENT:  Disability income

21 insurance products do not cover health care services.

22     Q.    (By Mr. Theriot) Okay.

23     A.    They are income replacement products.

24     Q.    Subsection (f) -- and I think I can get

25 through this before we break for lunch.  Is that okay

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   with everybody?  It will probably take me 10 to 15

2   minutes, if I don't lose my place.

3               Subsection (f) of Exhibit 2, subsection

4   (31)(f) of Exhibit 2 says, "Coverage incidental to a

5   property/casualty liability insurance policy such as

6   automobile personal injury protection coverage and

7   homeowner guest medical."

8               Do the plans referenced in subsection

9   (31)(f) cover health care services?

10              MR. CRISALLI:  Objection.  Beyond the

11  scope.  Calls for a legal conclusion.  Speculation.

12              THE DEPONENT:  The plans cover costs

13  associated with health care services, but not the

14  health care services themselves.

15      Q.    (By Mr. Theriot) Can you give me an

16  example of that?

17              MR. CRISALLI:  Objection.  Calls for

18  speculation and a legal conclusion.  Also beyond the

19  scope.

20              THE DEPONENT:  If I'm in a car accident

21  and my leg is broken, my personal injury protection

22  coverage will allow me to submit a claim for

23  reimbursement for costs incurred in treating the leg.

24      Q.    (By Mr. Theriot) And those costs are

25  limited to health care services that are needed as a

1  result of the accident?

2            MR. CRISALLI:  The same objection.  Also

3  vague.

4            THE DEPONENT:  It would depend on the

5  specific terms of the personal injury protection

6  language in the personal passenger auto policy.  For

7  instance, it could include time lost at work.

8        Q.    (By Mr. Theriot) Could it include

9  reimbursement for medical services resulting from the

10  birth of a child?

11            MR. CRISALLI:  Objection.  The same

12  objection as before.  I fail to see the relevance of

13  how an auto insurance policy relates to this case.

14            THE DEPONENT:  If an auto accident was

15  somehow determined to be the cause of the birth of the

16  child, I suppose those costs could be submitted for

17  reimbursement under the terms of the personal injury

18  protection language.

19        Q.    (By Mr. Theriot) Thank you.  Subsection

20  (g) -- wait, that's the one that you don't regulate,

21  right?

22        A.    That is correct.

23        Q.    All right.  So we're going to skip

24  subsection (g) and go to "accident only coverage,"

25  subsection H of Exhibit 2, so subsection 31(h).

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1          Do the policies or the types of policies

2    referenced in 31(h) cover health care services?

3          A.    No.

4               MR. CRISALLI:  Objection.  Calls for a

5    legal conclusion.  Speculation.  Beyond the scope.

6          Q.    (By Mr. Theriot) What do the policies

7    referenced in subsection 31(h) cover?

8               MR. CRISALLI:  The same objection.

9               THE DEPONENT:  Costs of accidents.

10              Let me go back to my prior answer.  An

11   accident-only coverage policy could allow somebody to

12   ask to be reimbursed for health care costs due to an

13   accident.

14         Q.    (By Mr. Theriot) Okay.  Could those

15   health care services covered by accident-only coverage

16   cover the birth of a child if the birth of a child is

17   the result of the accident?

18              MR. CRISALLI:  The same objection.

19              THE DEPONENT:  I would have to look at

20   the specific language of the insurance policy to answer

21   that accurately.

22         Q.    (By Mr. Theriot) So it would depend upon

23   the insurance policy?

24              MR. CRISALLI:  The same objection.

25              THE DEPONENT:  I would have to understand

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

56

```
 1   better how the accident -- there was causation, that
 2   the accident caused it.
 3         Q.     (By Mr. Theriot) Let's move to subsection
 4   (i), (31)(i) of Exhibit 2, "Specified disease and
 5   illness-triggered fixed payment insurance, hospital
 6   confinement fixed payment insurance, or other fixed
 7   payment insurance offered as an independent,
 8   noncoordinated benefit."
 9              Could the -- or do the policies
10   referenced in (31)(i) cover health care services?
11              MR. CRISALLI:  The same objection as
12   before.
13              THE DEPONENT:  No.
14         Q.     (By Mr. Theriot) What do the plans in
15   subsection (31)(i) cover?
16              MR. CRISALLI:  The same objections.
17              THE DEPONENT:  Any fixed payment upon
18   something happening, a specific disease, a specific
19   illness, being hospitalized for any reason.
20         Q.     (By Mr. Theriot) Okay.  So I understand,
21   there's not a reimbursement of medical expenses; it's
22   just that if you're hospitalized for a particular
23   reason, you get a certain chunk of money?  It goes
24   directly to you?
25              MR. CRISALLI:  Objection.  Compound,
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  speculation, and legal conclusion.

2          THE DEPONENT:  It's not hospitalized for

3  a reason.  It's hospitalized.

4      Q.    (By Mr. Theriot) Okay.  So can you give

5  me an example of how that would work in a particular

6  situation?

7          MR. CRISALLI:  The same objection.

8  Speculation.

9          THE DEPONENT:  Generically?

10     Q.    (By Mr. Theriot) Yes.

11     A.    The requirement of the policy could be

12 that you are admitted to the hospital and you're in the

13 hospital for 48 hours.  At 48 hours, you get $1,000.

14     Q.    That helps.  Thank you.

15          Let's move to subsection (l), (31)(l) of

16 Exhibit 2, "Plans deemed by the insurance commissioner

17 to have a short-term limited purpose or duration, or to

18 be a student-only plan that is guaranteed renewable

19 while the covered person is enrolled as a regular

20 full-time undergraduate or graduate student at an

21 accredited higher education institution, after a

22 written request for such classification by the carrier

23 and subsequent written approval by the insurance

24 commissioner."

25          Do the plans -- do the plans referenced

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  in subsection (31)(l) only apply to student-only plans?

2              MR. CRISALLI:  Object.  Speculation.

3  Calls for a legal conclusion.  Beyond the scope.

4              THE DEPONENT:  The student-only plans

5  referenced under (l) are now regulated under the

6  Affordable Care Act as individual market health plans

7  and are no longer considered excepted from the health

8  plan definition.

9        Q.    (By Mr. Theriot) Okay.  But regarding the

10  first part of that sentence, "Plans deemed by the

11  insurance commissioner to have a short-term limited

12  purpose or duration," could those types of plans that

13  aren't student-only plans, could they cover health care

14  services?

15              MR. CRISALLI:  Objection.  Speculation.

16  Calls for a legal conclusion.  Beyond the scope.

17              THE DEPONENT:  If a carrier chose to

18  offer a short-term, limited purpose or duration plan,

19  they would have to follow the requirements of the

20  Washington Administrative Code rule that provides

21  further requirements, and such a plan could include a

22  maternity benefit for the three-month duration of the

23  plan.

24        Q.    (By Mr. Theriot) Okay.  Is that plan what

25  you referred to earlier in your conversation with

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1     Ms. Tocco as a short-term, limited duration plan?

2        A.    Yes.

3        Q.    And is that sometimes referred to by the

4 acronym STLD?

5        A.    Yes.

6        Q.    Let's move to subsection (31)(m),

7 "Civilian health and medical program for the veterans

8 affairs administration," what you referred to as

9 CHAMPVA?

10        A.    Yes.

11        Q.    Do the plans referenced in subsection

12 (31)(m) cover health care services?

13             MR. CRISALLI:  Objection.  Speculation.

14 Calls for a legal conclusion.  Beyond the scope.

15             THE DEPONENT:  If we had one in the

16 state, it would have the benefits as required under the

17 Veterans Administration.  We do not regulate what those

18 benefits are, and I do not know what those benefits

19 are.

20        Q.    (By Mr. Theriot) Okay.  So what aspect of

21 CHAMPVA would you regulate if you had one of those

22 plans in the state?

23             MR. CRISALLI:  Objection.  Calls for

24 speculation.  Legal conclusion.  Beyond the scope.

25             THE DEPONENT:  There are requirements as

Electronically signed by Jana Mackelprang (001-409-517-3774)    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    to the entity that the carrier contracts with.  It's

2    not an employer group, but it's an entity that has to

3    have certain papers defining its existence, kind of

4    like documents of incorporation.  So we would review

5    those documents of incorporation and that piece of it

6    met our requirements.  And we would look to make sure

7    that it met any other requirements under CHAMPVA for

8    this civilian and health and medical program, if one

9    were to be filed with us.

10        Q.    (By Mr. Theriot) All right.  Let's go to

11   the last one, subsection (31)(n) of Exhibit 2.  It

12   says, "Stand-alone prescription drug coverage that

13   exclusively supplements Medicare part D coverage

14   provided through an employer group waiver plan under

15   Federal Social Security Act regulation 42 C.F.R.

16   Section 423.458(c)."

17           What do the medical -- what medical

18   services or, I guess, drugs are covered by the plan

19   referenced in (31)(n)?

20        A.    I do not know what is on the drug list

21   for Medicare part D.

22        Q.    But the supplemental -- the supplemental

23   plan referenced in (31)(n) would cover whatever is

24   covered in supplement -- in Medicare part D?

25           MR. CRISALLI:  The same objection as

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1   before.
 2              THE DEPONENT:  It would -- it doesn't
 3   expand the coverage at all.  It merely provides
 4   additional financial insurance protections, like all
 5   the supplemental plans.
 6       Q.    (By Mr. Theriot) Okay.  So it would be
 7   similar to the other supplemental plans that we
 8   discussed?
 9       A.    Yes.
10              MR. CRISALLI:  The same objection.
11       Q.    (By Mr. Theriot) All right.  One more
12   question before we take a break.  I apologize, I'm
13   going backwards a little bit.
14              I neglected to ask you:  In subsection
15   (31)(l) of Exhibit 2, "Plans deemed by the insurance
16   commissioner to have a short-term limited purpose or
17   duration," the coverages in those plans do include
18   contraception?
19              MR. CRISALLI:  Objection.  Calls for a
20   legal conclusion.  Speculation.  Beyond the scope.
21              THE DEPONENT:  There is not currently
22   such a plan on the market.
23              MR. THERIOT:  Okay.  I think we're ready
24   to take a break.  So this will be our lunch break.
25   Yesterday we took 30 minutes.  Let me see.  Let's talk
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                                          5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

62

1    about how much time I have.  Off the record.

2                    (The luncheon recess was taken from 12:08

3    p.m. to 12:43 p.m. PST.)

4          Q.    (By Mr. Theriot) Ms. Nollette, you

5    understand you're still under oath?

6          A.    Yes.

7          Q.    Let me make sure I know where I'm at

8    here.

9                    I've put Exhibit 4, 48.43.065, in the

10   chat.  Would you pull that up, please, Ms. Nollette.

11         A.    Okay.

12         Q.    Oh, it was already in there.

13                  So I just have a couple questions I want

14   to ask you, some follow-up to what I asked yesterday.

15                  If you'll look at subsection (2)(a) and

16   (b) of Exhibit 4, how does the exemption for religious

17   health care protect providers and facilities in

18   subsection (2)(a) and (2)(b)?  We're not talking about

19   carriers, just about medical providers and medical

20   facilities.

21                  MR. CRISALLI:  Objection.  Calls for

22   speculation.  Legal conclusion.

23                  THE DEPONENT:  The Office of the

24   Insurance Commissioner doesn't regulate health care

25   facilities or providers.  So we don't have any

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

63

1   jurisdiction in that area.

2          Q.     (By Mr. Theriot) Okay.  Does -- so you

3   don't have any opinion about how that protects --

4   whether or not that requires medical -- or exempts --

5   excuse me.  Do you have an opinion -- let me start over

6   again.

7               Do you know whether subsection (2)(a)

8   protects health care providers and health care

9   facilities from being required to purchase or pay for

10  insurance policies that cover items that they object

11  to?

12              MR. CRISALLI:  Apologies.  Objection.

13  Vague.

14              THE DEPONENT:  I apologize, could I hear

15  that again?

16         Q.     (By Mr. Theriot) Yes.  So does the

17  provision in (2)(a) protect health care providers and

18  health care -- and religiously sponsored health

19  carriers from -- I'm sorry, that's wrong.

20              Does the provision in (2)(a) protect

21  health providers and health care facilities who have

22  religious convictions against certain -- providing

23  certain services like abortion from having to pay for

24  health care coverage that covers abortion?

25              MR. CRISALLI:  Objection.  Compound,

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  vague, and calls for speculation.  The statute speaks

2  for itself.

3          THE DEPONENT:  I think that the statute

4  speaks for itself.

5          MR. THERIOT:  Well, once again, I'm going

6  to object to counsel coaching the witness.

7      **Q.    (By Mr. Theriot) What provisions of**

8  **Exhibit 4 protect religious health care providers and**

9  **religious health care facilities from having to pay for**

10 **an objectionable health care service like abortion and**

11 **contraception?**

12         MR. CRISALLI:  Objection.  Foundation

13 vague.  Calls for a legal conclusion.

14         THE DEPONENT:  I apologize, can I hear

15 the question again?

16         MR. THERIOT:  Yes.  Can you repeat that

17 question for me, Jana?

18         (Whereupon, the record was read back by

19 the court reporter.)

20         MR. CRISALLI:  The same objection.

21         THE DEPONENT:  Subsection (2) and

22 subsection (3) do.

23     **Q.    (By Mr. Theriot) If you look at**

24 **subsection (2)(c), it says, "The insurance commissioner**

25 **shall establish by rule a mechanism or mechanisms to**

1   recognize the right to exercise conscience while

2   ensuring enrollees timely access to services and to

3   assure prompt payment to service providers."

4              Has the insurance commissioner

5   established such a rule?

6        A.    I think so.  I don't know the WAC off the

7   top of my head, the number.

8        Q.    Okay.  But it's your understanding that

9   there is a Washington Administrative Code provision

10  that satisfies that?

11       A.    Yes.

12       Q.    Okay.  I'm going to -- can you -- so you

13  don't know what number of that WAC is.  Can you

14  describe it?

15       A.    Well, it's possible I'm thinking of two

16  WACs, one of them that goes a little bit further on the

17  conscience clause and one of them that is more about

18  implementing the equity fee.

19              (Exhibit 10 was remotely introduced and

20  provided electronically to the reporter.)

21       Q.    (By Mr. Theriot) I've placed in the chat

22  what's been marked as Exhibit 10, a Providence press

23  release.  Can you open that and review it, please?

24       A.    I have opened it.

25       Q.    Paragraph four says, "The Office of the

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  Insurance Commissioner is requiring Providence to

2  inform enrollees who need abortion services not covered

3  by their plan that they can access the services through

4  the Washington Department of Health Family Planning

5  Program by calling 1-800-525-0127."

6          Do you see that?

7      A.    Yes, I do.

8      Q.    Okay.  So the enrollees who call that

9  number, what information are they provided?

10          MR. CRISALLI:  Objection.  Beyond the

11  scope and calls for speculation.

12          THE DEPONENT:  They are provided with

13  information about how to access abortion services.

14      Q.    (By Mr. Theriot) And who pays for those

15  abortion services?

16          MR. CRISALLI:  The same objection.

17          THE DEPONENT:  The State of Washington.

18      Q.    (By Mr. Theriot) Are -- is there a

19  process or a policy in place that provides for that

20  ability to get the State of Washington to pay for the

21  abortion services?

22          MR. CRISALLI:  The same objection.

23          THE DEPONENT:  I'm sorry, could you

24  repeat the question?

25          MR. THERIOT:  Could you read it back

Electronically signed by Jana Mackelprang (001-409-517-3774)                          5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  please, Jana.

2                     (Whereupon, the record was read back by

3  the court reporter.)

4                     MR. CRISALLI:   The same objection.

5                     THE DEPONENT:   You're asking me to answer

6  the question as of today?

7        Q.     (By Mr. Theriot) Sure, let's start with

8  today.

9        A.      So today, a carrier offering such a plan,

10 their rate filing would have provided documentation

11 that would constitute a health equity fee that they

12 would pay through the Washington State Department of

13 Insurance that we would then put in the State General

14 Fund that would be used to fund the services.

15       Q.      And what was the status -- was that in

16 place in 2019 when this press release in Exhibit 10 was

17 released?

18                     MR. CRISALLI:   The same objection.

19                     THE DEPONENT:   No.

20       Q.      (By Mr. Theriot) When did that fee --

21 when was that fee put into place?

22       A.      I would have to look at the date when the

23 statute with the health equity fee passed.   It was

24 after this.

25       Q.      So -- I think I can ask this question

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  before we talk about that statute.  Did any carrier who

2  did not provide abortion coverage in their plan at the

3  time of this press release, were they able to refer

4  people to the Department of Health so that they could

5  obtain abortion services?

6              MR. CRISALLI:  Objection.  Vague.  Calls

7  for speculation.

8              THE DEPONENT:  I believe that some

9  carriers chose to use -- who were not -- I'm not saying

10  that the carrier was religious, but they were selling

11  to a company that didn't want to cover an abortion

12  benefit.  They used a workaround process where the

13  benefit was not a covered benefit in the plan, but

14  information was provided in the plan, and the carrier

15  provided access and paid for it.

16      Q.    (By Mr. Theriot) Okay.  And as of today,

17  can any carrier, whether it's religious or not, refer

18  enrollees to the Department of Health for provision of

19  abortion services?

20              MR. CRISALLI:  Object.  Beyond the scope.

21  Speculation.

22              THE DEPONENT:  Only a carrier who was

23  refusing to provide abortion under the conscience

24  clause.  And I'm not sure if this would be the process

25  right now, the process in this press release from

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1   several years ago.

2        Q.    (By Mr. Theriot) Okay.  So what's the

3   process now?

4              MR. CRISALLI:  Object to form.  Beyond

5   the scope.

6              THE DEPONENT:  It would be detailed in

7   the actual form filing as approved by our office.  I

8   believe there is a phone number.  There may also be a

9   website.

10        Q.    (By Mr. Theriot) All right.  Before we

11   leave 065, do you see the reference to the Commissioner

12   creating a rule in (3)(c)?

13        A.    Yes.

14        Q.    Was that rule ever created?

15        A.    I don't recall.

16        Q.    I put Exhibit 5, 48.43.725, in the chat.

17   Do you see that?

18        A.    Yes, I do.

19        Q.    Could you please open it up and

20   familiarize yourself with it, please?

21        A.    Yes.

22        Q.    So what was your understanding of the

23   reason why this statute was put into place?

24              MR. CRISALLI:  Object.  Speculation.

25   Calls for a legal conclusion.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

```
 1              THE DEPONENT:  To mitigate inequality in
 2  the health insurance market.
 3       Q.    (By Mr. Theriot) And it only applies to
 4  carriers that exclude a mandated health benefit?
 5              MR. CRISALLI:  Calls for a legal
 6  conclusion.
 7              THE DEPONENT:  Yes.
 8       Q.    (By Mr. Theriot) Do you know how much the
 9  fee is?
10       A.    I do not.
11       Q.    Is that assessed differently for each
12  carrier and each plan?
13              MR. CRISALLI:  Objection.  Calls for a
14  legal conclusion.
15              THE DEPONENT:  It's assessed at the plan
16  level.  So each plan would have a rate filing, except
17  in the small group market where there's one rate filing
18  for all the plans in the market because it is a
19  single-risk pool.  And so it is calculated at the rate
20  filing level for a carrier.
21       Q.    (By Mr. Theriot) Can you explain a bit
22  what "at the rate filing level" means?
23       A.    Yes.  So a health plan generally covers a
24  group of people that is a defined group.  That is the
25  risk pool for the plan.  And so when calculating an
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

71

1  equity fee, the carrier, as part of their rate filing,

2  must include information about the cost of the

3  administration and the provision of that benefit, if

4  they were to provide it, based upon the size of the

5  risk pool and the likelihood of that size of a risk

6  pool needing that particular benefit.

7       **Q.    So the carrier makes that calculation or**

8  **an OIC actuary does?**

9            MR. CRISALLI:  Calls for a legal

10  conclusion.  Go ahead.

11            THE DEPONENT:  The carrier is required to

12  provide it in the filing.  The OIC actuary reviews

13  what's provided to make sure it meets requirements.

14       **Q.    (By Mr. Theriot) Subsection (2)(c) of**

15  **Exhibit 5 says that "the commissioner may waive the fee**

16  **assessed under subsection (2) if he or she finds that**

17  **the carrier excluding a mandated benefit for a health**

18  **plan or student health plan provides health plan**

19  **enrollees or student health plan enrollees alternative**

20  **access to all" included "mandated benefits."**

21            **Do you see that?**

22       A.    Yes, I do.

23            MR. CRISALLI:  Objection.  Misstates the

24  statute.  I believe you said "all included," which

25  should be "all excluded benefits."

Calderwood-Mackelprang, Inc.  303.477.3500

72

1            MR. THERIOT:  Oh.

2       **Q.     (By Mr. Theriot) As it reads there in**

3  **(2)(c), have there been any requests for waivers**

4  **pursuant to this provision?**

5       A.    No, the Commissioner has not been

6  requested to waive the fee.

7       **Q.     What factors would be considered when**

8  **determining whether to waive the fee outside of what's**

9  **in (2)(c)?**

10            MR. CRISALLI:  Objection.  Calls for

11  speculation.

12            This is an area I'm a little concerned

13  about the testimony in that it basically is asking for

14  a policy that doesn't yet exist and it's under oath and

15  the testimony is the OIC.  I don't want the witness to

16  indicate what a policy will be that could later be held

17  against the OIC.

18       **Q.     (By Mr. Theriot) So is there a policy for**

19  **determining how the waiver works in (2)(c) of**

20  **Exhibit 5 -- no -- yes, Exhibit 5?**

21       A.    There is no policy beyond the plain

22  language of the statute at this time.

23       **Q.     And the person who decides whether to**

24  **grant a waiver is the Commissioner?**

25       A.    Yes.

1          Q.     Okay.  I've placed what's previously been

2    marked as Exhibit 3 into the chat.  It's SB 6219.

3    Could you open that up and look at it briefly?

4          A.     Okay.

5          Q.     I can show it to you, if you'd like, but

6    I'll represent to you that in the interrogatories that

7    you signed, you referred us to this provision, to

8    Section 1 of 6219 for the interest of the State.

9                 Are there any other interests besides

10   those listed in Section 1 of Exhibit 3 that the State

11   asserts justifies SB 6219?

12                MR. CRISALLI:  Objection to the extent it

13   calls for speculation and is beyond the scope.

14                THE DEPONENT:  All sections.

15         Q.     (By Mr. Theriot) I'm sorry?

16         A.     You asked if there were any other

17   sections besides Section 1(1).  Did you mean the

18   sub (1) or -- I'm sorry, it's got highlighting on it,

19   so it's hard --

20         Q.     I do have weird highlighting on it.

21   That's my fault.  I should have put one in there that

22   was cleaner.  Let me tell you what I'm referring to.

23                All right.  So I mean "New Section,

24   Section 1," beginning with line 4 on page 2.  Are there

25   any other interests in that section that the State

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1  relies upon to justify SB 6219?

2              MR. CRISALLI:  Objection.  Vague.  Calls

3  for speculation.

4              And I apologize because I'm a little

5  confused with the question myself.  Are you asking only

6  lines 5 and 6 at subsection (1), or are you saying all

7  of Section 1 that starts on line 4 and extends into the

8  next page?

9              MR. THERIOT:  I'm asking for all of

10  Section 1 that starts on line 4 and extends into the

11  next page.

12              MR. CRISALLI:  Thank you.

13              MR. THERIOT:  And a little bit into the

14  following page.

15              THE DEPONENT:  Now I'm going to ask for

16  the original question again.  I'm sorry.

17      Q.    (By Mr. Theriot) Other than the -- are

18  there any other interests besides those in that section

19  we just referenced that justify -- that the State

20  relies upon to justify SB 6219?

21              MR. CRISALLI:  The same objection.

22              THE DEPONENT:  Not that I recall.

23      Q.    (By Mr. Theriot) Before SB 6219 was

24  enacted, are you aware of any other efforts the OIC

25  made to further the interests listed in Section 1 of SB

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

 1  **6219?**

 2       A.     The OIC has always attempted to fully

 3  enforce all of the protections in Title 48.

 4       **Q.     Were there any specific actions taken by**

 5  **the OIC to further the interest in (4) on page -- it's**

 6  **page 2 of the exhibit, but page 1 of SB 6219?  "Neither**

 7  **a woman's income level nor her type of insurance**

 8  **prevent her from having full access to a full range of**

 9  **reproductive health care, including contraception and**

10  **abortion services."**

11            MR. CRISALLI:  Objection.  Vague.

12            THE DEPONENT:  I don't -- I don't know

13  what you're referring to.

14       **Q.     (By Mr. Theriot) I'm asking you if there**

15  **were any specific policies or actions taken by the OIC**

16  **to further the interest that's listed there in (4) of**

17  **Section 1 of Exhibit 3?**

18            MR. CRISALLI:  The same objection.

19            THE DEPONENT:  The OIC has always

20  attempted to ensure that all people have full access to

21  all covered benefits.

22       **Q.     (By Mr. Theriot) So you're not aware of**

23  **any specific program or policy that was put in place to**

24  **further that interest?**

25            MR. CRISALLI:  Object to form.

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1                THE DEPONENT:  No.

2         Q.      (By Mr. Theriot) Okay.  Are you aware of

3    any specific policy or practice that was put into place

4    by the OIC prior to SB 6219 to further the interests

5    listed in sub (5) of that section in Exhibit 3?

6                MR. CRISALLI:  Object to form.

7                THE DEPONENT:  No.

8                MR. THERIOT:  All right.  I think that's

9    all I have.

10               THE DEPONENT:  Thank you.

11               MR. CRISALLI:  I have nothing at this

12   time.  We'll reserve signature.

13               (WHEREUPON, the deposition was concluded

14   at 1:13 p.m. PST.)

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Jana Mackelprang (001-409-517-3774)                                     5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

77

1                     I have read the foregoing transcript

2    of my testimony and have indicated the same by my

3    signature.

4

5

6                     _____

                                   MOLLY NOLLETTE
7

8    STATE OF _____

9    CITY OF _____ COUNTY OF _____

10                   Subscribed and sworn to before me by MOLLY

11   NOLLETTE, on this _____, 2022.

12                   My commission expires:_____.

13

14

15

16                   _____

                                   Notary Public
17

18                   _____

                                   Address
19

20

21   Reporter:  JM
     Trial/hearing date:  None
22

23

24

25

Electronically signed by Jana Mackelprang (001-409-517-3774)                                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

30(b)(6) Deposition of Molly Nollette

78

```
1                       CERTIFICATE

2    STATE OF COLORADO          )
                                )ss.
3    CITY AND COUNTY OF DENVER  )

4               I, Jana Mackelprang, Certified Realtime
     Reporter, Registered Professional Reporter, and Notary
5    Public for the State of Colorado, do hereby certify
     that previous to the commencement of the examination,
6    the said MOLLY NOLLETTE was duly sworn by me to testify
     the truth in relation to the matters in controversy
7    between the said parties.
                I further certify that said deposition was
8    taken in shorthand by me and was reduced to typewritten
     form by computer-aided transcription, that the
9    foregoing is a true transcript of the questions asked,
     testimony given, and proceedings had.
10              I further certify that I am not an
     attorney nor counsel nor in any way connected with any
11   attorney or counsel for any of the parties to said
     action or otherwise interested in its event.
12              I further certify that, pursuant to
     Rule 30(e)(1), review of the transcript was requested.
13              IN WITNESS WHEREOF, I hereunto affix my
     hand and notarial seal this 12th day of December, 2022.
14   My commission expires January 24, 2024.

15

16

17                                     _____

18                                     Jana Mackelprang
                                       CRR, RPR, Notary Public
19                                     Calderwood-Mackelprang, Inc.

20

21

22

23

24

25
```

Calderwood-Mackelprang, Inc.  303.477.3500

```
 1   CALDERWOOD-MACKELPRANG, INC.
     9745 East Hampden Avenue, Suite 220
 2   Denver, Colorado  80231
     (303) 477-3500
 3

 4   December 5, 2022

 5   Paul M. Crisalli
     Jeffrey Todd Sprung
 6   Attorney General's Office
     800 5th Avenue, Suite 2000
 7   Seattle, Washington 98104

 8   Re: Cedar Park Assembly of God of Kirkland, WA v.
     Kreidler and Inslee
 9   Deposition of: MOLLY NOLLETTE

10   The deposition in the above-entitled matter is ready
     for reading and signing.  Please attend to this matter
11   by complying with ALL blanks checked below:

12   _____   arranging with us at the number listed below
               to read and sign the deposition in our
13             office.

14     XXX   having deponent read your copy and sign
             amendment sheets, if any (original signature
15           page enclosed.)

16   _____   reading enclosed deposition, signing
               signature page and correction sheets, if any.
17

18     XXX   within 30 days of the date of this letter.

19
     _____   by_____due to trial/hearing date of
20             _____.

21   Please be sure that the signature page and amendment
     sheets, if any, are signed before a notary public and
22   returned to our office.  If this matter has not been
     taken care of within said period of time, the
23   deposition will be filed unsigned pursuant to the Rules
     of Civil Procedure.
24
     JANA MACKELPRANG, CRR, CSR, RPR
25   cc:  Counsel of Record
```

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

1    CALDERWOOD-MACKELPRANG, INC.
     9745 East Hampden Avenue, Suite 220
2    Denver, Colorado  80231
     (303) 477-3500
3

4    Kevin H. Theriot, Esq.
     Alliance Defending Freedom
5    15100 N. 90th Street
     Scottsdale, Arizona 85260
6
     Re: Cedar Park Assembly of God of Kirkland, WA v.
7    Kreidler and Inslee

8    Dear Mr. Theriot:

9    Enclosed is the deposition of:  MOLLY NOLLETTE

10   _____ Previously filed.  Forwarding signature page

11          and amendment sheets.

12   _____ Signed, no changes.

13   _____ Signed, with changes, copy enclosed.

14   _____ Unsigned, notice duly given _____,
            pursuant to the Rules of Civil Procedure.
15
     _____ Not signed, notice duly given _____,
16          since trial is set for _____.

17   _____ No signature required.

18   _____ Signature waived.

19   _____ To be signed in court.

20   _____ Signature pages/amendment sheets to be
            returned to court on date of trial.
21
     _____ Mailed by Priority Mail on _____.
22
     _____ Hand-delivered on approximately _____.
23

24   JANA MACKELPRANG, CRR, CSR, RPR

25   cc:  Counsel of Record

Electronically signed by Jana Mackelprang (001-409-517-3774)                    5c7111a3-6b4c-4267-8d1e-db7b405b3ae7

# Exhibit C

# Deposition of 30(b)(6) Steven Orcutt

# Cedar Park Assembly of God of Kirkland v Kreidler, et al.

# November 21, 2022



**206.287.9066  I  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____
                                    )
CEDAR PARK ASSEMBLY OF GOD OF       )
KIRKLAND, WASHINGTON,               )
                                    )
                                    )
                        Plaintiff,  )
                                    )
            v.                      ) No. 3:19-cv-05181-BHS
                                    )
MYRON "MIKE" KREIDLER, et al.,      )
                                    )
                                    )
                        Defendants. )
_____


30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON

REPRESENTED BY STEVEN ORCUTT - VOLUME I

_____

Taken at Kirkland, Washington

(All participants appearing via videoconference.)




DATE TAKEN:   November 21, 2022

REPORTED BY:  Nicole A. Bulldis, RPR
              AZ No. 50955 | CA No. 14441 | WA No. 3384

Page 2

1                          A P P E A R A N C E S

2

3    FOR PLAINTIFF:

4      (via Zoom)              KEVIN H. THERIOT
                               Alliance Defending Freedom
5                              15100 N. 90th Street
                               Scottsdale, AZ 85260
6                              (480) 444-0020
                               ktheriot@adflegal.org

7

8    FOR DEFENDANTS:

9      (via Zoom)              PAUL M. CRISALLI
                               Office of the Attorney General
10                             800 Fifth Avenue, Suite 2000
                               Seattle, WA 98104
11                             (206) 464-7744
                               paul.crisalli@atg.wa.gov

12

13

14   ALSO PRESENT:            JASON SMITH, Cedar Park

15                             --o0o--

16

17

18

19

20

21

22

23

24

25

Page 3

1       30(b)(6) DEPOSITION OF STEVEN ORCUTT - VOLUME I

2

3                       EXAMINATION INDEX

4   EXAMINATION BY                                      PAGE

5   Mr. Crisalli...................................... 5

6

7

8                        EXHIBIT INDEX

9   EXHIBITS FOR IDENTIFICATION                         PAGE

10   1  Cedar Park 30(b)(6) Notice of Deposition........ 10

11   2  Kaiser Permanente Group Coverage Agreement 2019. 24

12   3  Kaiser Permanente Evidence of Coverage 2021..... 25

13   4  Kaiser Permanente Evidence of Coverage 2020..... 25

14   5  Hansen Email String - 6/12/19................... 38

15   6  Orcutt Email String - 6/17/19................... 40

16   7  Orcutt Email String - 6/25/19................... 41

17   8  Knauss Email String - 7/8/19.................... 44

18   9  Orcutt Email String - 7/15/19................... 47

19   10  Knauss Email String - 7/16/19................... 48

20   11  Hansen Email String - 7/18/19................... 50

21   12  Orcutt Email String - 7/22/19................... 52

22   13  Knauss Email String - 8/13/19................... 54

23   14  Gallagher 2019/2020 Employee Benefit Analysis... 54

24   15  Orcutt Email String - 5/18/20................... 65

25   16  Gallager 2020/2021 Employee Benefit Analysis.... 68

Page 4

1      30(b)(6) DEPOSITION OF STEVEN ORCUTT - VOLUME I

2

3                       EXHIBIT INDEX (Cont'd)

4    EXHIBITS FOR IDENTIFICATION                        PAGE

5    17  Hansen Email String - 7/14/20................... 70

6    18  Hansen Email String and Attachment - 7/14/20.... 72

7    19  Knauss Email String - 3/24/21................... 77

8    20  Gallager 2021/2022 Employee Benefit Analysis.... 79

9    21  Cedar Park Church 2022 Employee Benefit Renewal. 82

10

11                         --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1        REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA

2              Monday, November 21, 2022; 9:01 a.m.

3                         --o0o--

4

5    STEVEN ORCUTT,              witness herein, having been

6                               first duly sworn on oath,

7                               was examined and testified

8                               as follows:

9

10                   E X A M I N A T I O N

11   BY MR. CRISALLI

12       Q.    Hello.  My name is Paul Crisalli.  I'm an

13   Assistant Attorney General for the State of Washington

14   and I'm here to take your deposition.

15           Could you please state your name and spell the

16   last for the record.

17       A.   My name is Steven Glenn Orcutt, O-r-c-u-t-t.

18       Q.   Have you ever had your deposition taken

19   before?

20       A.   Not to my knowledge.

21       Q.   All right.  Well, welcome to your first.  So

22   I'll lay out some ground rules.  You've probably talked

23   with your attorney about these, but just to let you know

24   how I'm going to conduct this deposition.

25           There's going to be a court reporter who is

Page 6

1   going to be writing down everything that's said in this

2   deposition, so it's important -- she's the most

3   important person online right now, aside from you,

4   because she's the person who is tasked with trying to

5   make as accurate of a transcript of this deposition as

6   possible.  As a result -- you've done great thus far --

7   it's important that we not step on each other when

8   talking, and waiting 'til I'm done with my question for

9   you to answer.  And, likewise, I'll do everything that I

10   can to wait 'til you are done with your answer before I

11   ask the next question.

12           Does that work for you?

13       A.   Yes.

14       Q.   Next is because it's being transcribed, it's

15   important that nonverbal or nonwords are not used.  Use

16   words in answering the question.  This means avoiding

17   like "uh-huh" or "huh-uh," and I use that example

18   intentionally because you'll see in the transcript it's

19   going to read the same even though the intonations would

20   have different results if that were to be used.

21           Does that make sense?

22       A.   Yes.

23       Q.   And I like to take a break, oh, every hour or

24   so depending on where we're at in the deposition.  If

25   you ever need a break, please don't hesitate to ask.

c295376b-5358-4733-bac0-a5db45f51f89

Page 7

1   We'll provide it.  The only thing I ask is that you --

2   if there's a question being asked, that you answer the

3   question before taking the break.

4           Does that work for you?

5       A.  Yes.

6       Q.  Is there anything preventing you from

7   testifying truthfully today?

8       A.  No.

9       Q.  And this is a unique circumstance where you're

10  not testifying individually, but on behalf of an

11  organization.  Do you understand that?

12      A.  Yes.

13      Q.  And you understand that the purpose of my

14  questions are largely going to be towards what Cedar

15  Park Assembly of God's positions are and facts

16  surrounding Cedar Park.

17          Throughout this deposition, I'm going to use

18  the term "Cedar Park" to describe Cedar Park Assembly of

19  God of Kirkland, Washington.  Does that work for you?

20      A.  Yes.

21      Q.  Do you understand what that entity is?

22      A.  Yes.

23      Q.  Okay.  And do you understand that your answers

24  could -- in this deposition, could be binding upon Cedar

25  Park for purposes of establishing fact?

c295376b-5358-4733-bac0-a5db45f51f89

Page 8

1      A.   Yes.

2      Q.   What did you do to prepare for the deposition

3   today?

4      A.   I prayed.  I reviewed the information that we

5   provided in the request for proposals, I believe, is

6   what it was called.

7      Q.   Would that be request for production?

8      A.   Production, yes.

9      Q.   Would those be the documents that Cedar Park

10   produced in the course of this case?

11      A.   Yes, specifically the ones I produced.

12      Q.   All right.  Did you review any pleadings like

13   the complaint or supplemental complaint or the motions

14   and the declarations that were filed in this case?

15      A.   Yes.

16      Q.   Did you talk to anyone in preparation for this

17   case?

18      A.   Yes.

19      Q.   Who did you talk with?

20      A.   I spoke with our insurance broker who provides

21   us with our medical plans and my director of human

22   resources who also works with me on renewing our medical

23   plans.

24      Q.   And who is the insurance broker you spoke

25   with?

Page 9

1        A.    Jami Hansen.

2        Q.    Is Jami Hansen with AJG?

3        A.    Gallagher benefits.

4        Q.    Okay.  It was unclear from the email addresses

5   in reviewing the documents.

6              So do you use Galbreath [phonetic] as your

7   broker for insurance?

8        A.    Yes, Gallagher.

9        Q.    Oh, thank you.

10             And what did you talk with Jami about?

11       A.    The process of the renewal after State

12   Bill 6219 was enacted.

13       Q.    And who is the director of HR that you spoke

14   with?

15       A.    Melissa Knauss.

16       Q.    And what did you speak with Melissa about?

17       A.    The emails that we had and the process of our

18   renewal for the 2019 year after House Bill 6219 was put

19   into effect.

20       Q.    You testified that you reviewed the documents

21   that you helped put together for the responses to the

22   requests for production.  What general category of

23   documents did you pull together for purposes of

24   responding to the requests for production?

25       A.    I don't recall which specific requests for

c295376b-5358-4733-bac0-a5db45f51f89

Page 10

1    production.

2         Q.   Were there particular categories of documents

3    that you searched and looked for for purposes of

4    responding to requests for production?

5         A.   Could I see the specific questions for the

6    requests for productions?  Refresh my memory?

7         Q.   Okay.  We'll move along at this point.  Maybe

8    we'll get back to that.

9              Aside from talking with Melissa and Jami, did

10   you talk to anyone else in preparation for this

11   deposition?

12        A.   I talked with Pastor Jay Smith.

13        Q.   Okay.  And what did you talk with Pastor Smith

14   about?

15             MR. THERIOT:  I'm going to object to this

16   line of questioning to the extent that it calls for

17   conversations that took place while counsel was

18   pregnant -- present.  Sorry about that.  That was a

19   little bit of a Freudian slip -- present.  But you may

20   testify as to conversations you had when I or -- or

21   in-house counsel weren't present.

22             THE DEPONENT:  My conversations with

23   Pastor Jay were primarily about the process, the

24   logistics, timing of when we would be deposed.

25                   (Exhibit No. 1 marked.)

Page 11

1   Q.  (By Mr. Crisalli) Okay.  I have in the chat

2   Exhibit 1.  Can you -- you should be able to access

3   that.  And so you'll know, and hopefully I won't have to

4   repeat this for the deposition with the pastor, the way

5   we have worked it is that we will put the exhibit into

6   chat for all those present who would like it to download

7   and view it on their own computer so that way we can

8   have it right there.  If you need a share screen to

9   focus on particular language, please let me know.

10  Hopefully, that will not be required just because of

11  logistics, but we can make that work.  And if you need

12  me to repost it, let me know.

13                    (Pause in the proceedings.)

14                    MR. THERIOT:  Okay.  It's up now for him.

15  Q.  (By Mr. Crisalli) Please take a moment to

16  review if you like.  Let me know when you're ready.

17  A.    All right.  I reviewed that.

18  Q.    All right.  And if you'll go to Page 5.

19         Before we do that, do you recognize this

20  document?

21  A.    Yes.

22  Q.    And do you understand this to include the

23  topics for today's deposition?

24  A.    Yes.

25  Q.    Okay.  On Page 5, it lists the topics.  My

c295376b-5358-4733-bac0-a5db45f51f89

Page 12

1    understanding from discussions with counsel is you are

2    designated to talk -- to testify regarding Topic No. 3;

3    is that correct?

4         A.   Yes.

5         Q.   You are designated to testify regarding Topic

6    No. 4; is that correct?

7         A.   Yes.

8         Q.   You are designated to discuss the Topic 5; is

9    that correct?

10        A.   Yes.

11        Q.   You are designated to testify regarding

12   Topic 6; is that correct?

13        A.   Yes.

14        Q.   And you are designated to testify regarding

15   Topic 8; is that correct?

16        A.   Yes.

17        Q.   There are a couple topics that were left out.

18   I'm just confirming, are there any other topics with

19   which you are designated to testify today?

20        A.   Not to my knowledge.

21        Q.   What is your position at Cedar Park?

22        A.   I'm the chief financial officer.

23        Q.   And how long have you been the chief financial

24   officer at Cedar Park?

25        A.   Approximately, 14 and a half years.

Page 13

1    Q.   Did you have employment before becoming the

2    chief financial officer at Cedar Park?

3    A.   Yes.

4    Q.   Where did you work?

5    A.   Immediately prior to working at Cedar Park, I

6    was a consultant for several small businesses.

7    Q.   What kind of consulting did you do?

8    A.   Financial and general management consulting.

9    Q.   What are your job responsibilities as the

10   chief financial officer for Cedar Park?

11   A.   To oversee the financial operations of Cedar

12   Park, prepare budgets, monitor revenues and expenses.

13   In addition, I'm responsible for human resources and

14   payroll.

15   Q.   And could you briefly describe your education,

16   like, college-level, maybe grad school, and the like?

17   A.   I have a master's degree.

18   Q.   And what's your master's in?

19   A.   Hospital and healthcare administration.

20   Q.   Did any of that focus on insurance coverage

21   for healthcare?

22   A.   To a certain degree, yes.

23   Q.   In which respect?

24   A.   When I got my degree, there was a difference

25   between an MBA and a master's in hospital and healthcare

Page 14

1    administration, most of the business courses were the

2    same, but there were specific courses relating to topics

3    specific to operating a hospital.

4         Q.   And where did you obtain this degree from?

5         A.   Saint Louis University.

6         Q.   And when did you obtain that degree?

7         A.   1979.

8         Q.   And I take it you have an undergraduate

9    degree?

10        A.   Yes.

11        Q.   And where did you get that from?

12        A.   Wheaton College.

13        Q.   And what's the degree in?

14        A.   Economics.

15        Q.   And what year did you obtain that degree?

16        A.   1977.

17        Q.   As part of either your master's or your

18   bachelor degree, do you have any expertise in actuary

19   analyses?

20        A.   The topics were covered in classes, but I

21   can't recall specifics.

22        Q.   Have you personally used any of those classes

23   in the last ten years as your job as CFO for Cedar Park?

24        A.   Yes, I would say.

25        Q.   In which respect?

c295376b-5358-4733-bac0-a5db45f51f89

Page 15

1      A.    The business classes, how to analyze

2  financials, how to read documents, how to set goals in

3  the short-term and long-term based on my job

4  responsibilities.

5      Q.    What is Cedar Park?

6            MR. THERIOT:  Objection.  Vague.

7      Q.  (By Mr. Crisalli) Do you understand the

8  question?

9      A.    Not really.

10     Q.    Okay.  What is Cedar Park Assembly of God of

11  Kirkland, Washington?  What kind of entity is it?

12     A.    It's a church.

13     Q.    Does it conduct services?

14     A.    Yes.

15     Q.    Does it -- and by services, I mean church

16  services where people attend.  Does that make sense?

17  Does that change your answer?

18     A.    No, it does not change my answer.

19     Q.    Does it provide other functions?

20     A.    Yes.

21     Q.    What kinds of functions does Cedar Park

22  provide?

23     A.    Cedar Park offers several ministry services.

24     Q.    Are they broken up in different ways?

25     A.    Yes.

Page 16

1       Q.    How -- how are they broken up?

2       A.    There are primarily churches, outreach

3   ministries, and schools.

4       Q.    Does Cedar Park have any licensed businesses?

5       A.    I believe so.

6       Q.    What are those?

7       A.    I believe we have licenses to operate our

8   churches and schools or ministries in the various towns

9   where we conduct business.

10      Q.    What kind of businesses does Cedar Park have?

11      A.    We operate churches and we operate Christian

12  schools as well as several outreach ministries.

13      Q.    And what do the outreach ministries do?

14      A.    All the ministries support the mission of

15  Cedar Park, to bring the good news of Jesus Christ to

16  anyone we have contact with.

17      Q.    And how do the outreach ministries serve that

18  purpose?  Do they provide services to individuals?  Do

19  they hire individuals?  What -- how do they effectuate

20  that?

21      A.    They provide services, but not necessarily

22  church services like we discussed before.

23      Q.    Is the term there, services, more akin to,

24  like, goods and services as compared to, like, a church

25  service?

c295376b-5358-4733-bac0-a5db45f51f89

Page 17

1          MR. THERIOT:  Objection.  Vague.

2          THE DEPONENT:  I'm not quite sure.  Can

3    you restate that?

4      Q.  (By Mr. Crisalli) I'll restate that.

5          When you say they provide services but not the

6    traditional church services, what kind of services do

7    they provide?

8      A.  We have a chapel of the resurrection funeral

9    home that provides funeral-related services.  We have a

10   missionary car ministry that provides cars to

11   missionaries home on furlough, things like that.

12     Q.  And it sounds like, from your answers, Cedar

13   Park has several churches; is that right?

14     A.  There are several branch churches, yes.

15     Q.  How many?

16     A.  I believe five.

17     Q.  Do you -- aside from the funeral home,

18   missionary car ministry, are there any other outreach

19   ministries that Cedar Park provides?

20     A.  Yes.

21     Q.  And what are those?

22     A.  We provide a Christian counseling network and

23   a Christian club sports program.

24     Q.  Does Cedar Park have a membership?

25     A.  There are members of Cedar Park Church.

Page 18

1      Q.   And how many members are there at Cedar Park

2   Church?

3      A.   I'm not exactly sure.  Probably, somewhere

4   around 400.

5      Q.   For these services -- nonchurch services that

6   are being provided, does Cedar Park pay B&O taxes?

7              MR. THERIOT:  Objection.  Vague.

8      Q.   (By Mr. Crisalli) Do you understand what B&O

9   taxes are?

10     A.   Yes.

11     Q.   Does Cedar Park pay business -- B&O taxes in

12   any way?

13     A.   Yes, as required by law.

14     Q.   And does Cedar Park pay sales taxes to the

15   State?

16     A.   Yes.

17     Q.   What is the estimated yearly revenue of Cedar

18   Park?

19     A.   I should know this off the top of my head.

20   I'm not 100 percent sure.

21     Q.   Is it over a million dollars?

22     A.   Yes.

23     Q.   Is it over $10 million?

24     A.   Yes.

25     Q.   Is it over $20 million?

Page 19

1    A.    Yes, it is.

2    Q.    Is it over $50 million?

3    A.    No.

4    Q.    Is it -- would you guess it's between, like,

5    20 and 25 or 20 and 30?  Is that -- would that be the

6    rough estimate?

7    A.    I think between 25 and 30.

8    Q.    Okay.  And since 2018, have -- has those

9    revenues remained constant?  Have they decreased or have

10   they increased?

11   A.    Since 2019.

12   Q.    Just to make sure we're clear, 2018.

13   A.    '18.  Okay.  They fluctuated, obviously, with

14   COVID in the middle.  And what -- what was your specific

15   question?

16   Q.    Whether the revenues increased, decreased, or

17   remained roughly the same during that time.

18   A.    My recollection is that for the first couple

19   of years, they remained the same.  Last year and this

20   year, they've been higher than norm.

21   Q.    What's the source of revenues for Cedar Park?

22   A.    Primarily, revenues from the ministries for

23   those that charge and tithes and offerings given to all

24   of the ministries.

25   Q.    How many employees does Cedar Park employ

Page 20

1  presently?  Let's start there.

2       A.    Another question I should know, but I'm not

3  positive.  I would say probably 3- to 400.

4       Q.    And since 2018 has that number increased,

5  decreased, or remained fairly the same?

6       A.    It was fairly static in '18 and '19, and has

7  increased in the subsequent years.

8       Q.    You mentioned timing during COVID.  Did any of

9  Cedar Park's businesses apply for and receive what's

10  called a PPP loan?

11                 MR. THERIOT:  Objection.  Vague.

12                 THE DEPONENT:  Can you clarify what

13  exactly you're asking?

14       Q.  (By Mr. Crisalli) Right.  Are you familiar with

15  the -- or heard about the PPP loans that were provided

16  by the federal government during the Coronavirus

17  pandemic?

18       A.    Yes.

19       Q.    Did any of Cedar Park's businesses apply for

20  and receive a PPP loan?

21       A.    Yes.

22       Q.    Did Cedar Park pay back that loan?

23       A.    No.

24       Q.    Was the loan forgiven?

25       A.    Yes.

c295376b-5358-4733-bac0-a5db45f51f89

Page 21

1    Q.   Does Cedar Park offer insurance, just broadly

2  insurance, as a benefit to its employees?

3    A.   What -- what type of insurance are you

4  referring to?

5    Q.   Well, that's -- does Cedar Park offer multiple

6  types of insurance as a benefit to its employees?

7    A.   Yes.

8    Q.   And what types of insurance are included as

9  benefits to its employees?

10    A.   Medical, dental, life insurance, and then some

11  optional insurances that employees can purchase on their

12  own.

13    Q.   For the medical, dental, life insurance, the

14  group of insurance that you talked about that's

15  non-optional, do all the employees receive this benefit?

16            MR. THERIOT:  Objection.  Assumes facts

17  not in evidence.

18            THE DEPONENT:  Repeat your question.

19  There was something you said that I didn't understand.

20    Q.   (By Mr. Crisalli) Okay.  Do all employees

21  receive the benefits of medical insurance at Cedar Park?

22    A.   No.

23    Q.   How does Cedar Park determine who receives

24  medical insurance benefits versus not?

25    A.   We provide the option for medical insurance to

Page 22

1    full-time employees.

2         Q.    Are there full-time employees who do not

3    accept that option at Cedar Park?

4         A.    Yes.

5         Q.    Can you estimate how many employees at Cedar

6    Park receive medical insurance coverage as a benefit

7    presently?

8         A.    Approximately, 135.

9         Q.    Okay.  Has that number increased or decreased

10   or remained the same since 2018?

11        A.    I believe it's increased slightly.

12        Q.    What is your role in terms of procuring health

13   insurance for Cedar Park?

14        A.    I'm responsible to obtain bids, structure,

15   healthcare plan, and present options to Pastor Jay for

16   approval.

17        Q.    And how long have you had that responsibility?

18        A.    I believe for 13 of the last years I've been

19   here.

20        Q.    And you testified your use of Gallagher as a

21   broker; is that right?

22        A.    Yes.

23        Q.    And how long have you used Gallagher as a

24   broker?

25        A.    I believe Gallagher was used prior to my

Page 23

1    assuming the responsibilities.

2         Q.   And what do they do as compared to you for

3    purposes of procuring health insurance for Cedar Park?

4         A.   They obtain bids from different companies

5    providing the type of healthcare I request.

6         Q.   And are they on a yearly contract, or is it

7    automatically renewed?  How do you structure the

8    business relationship with Gallagher?

9         A.   It's a yearly contract.

10        Q.   Okay.  Please generally describe the process

11   for how Cedar Park purchases or renews health insurance

12   for its employees.

13        A.   Throughout the year, we review our healthcare

14   utilization with our broker.  And prior to our renewal,

15   usually four months prior, we begin discussions on any

16   changes that have occurred in the healthcare market and

17   our experience and what options the broker feels we have

18   for renewing our medical plan.

19        Q.   And just a question from earlier, did you

20   assist in providing facts for the complaints in this

21   matter?

22        A.   I believe so, yes.

23        Q.   And what's the kind of information you

24   generally provided in the preparation of the complaints

25   in this matter?

Page 24

1    A.   As I recall, the specifics of the additional

2  costs to Cedar Park to provide a plan that would allow

3  us to uphold our convictions to exclude abortions and

4  abortifacient medications.

5    Q.   And have you signed a declaration or complaint

6  in this matter?

7    A.   I don't believe so.

8    Q.   I just wanted to double-check.  In reviewing

9  the case file, I didn't see it, but I just wanted to

10 make sure I wasn't missing something.

11        Okay.  Let me -- I've got some documents that

12 I'd like to discuss.  These first several I'm hoping we

13 can -- they're somewhat voluminous.  I'm hoping you'll

14 recognize them.  I don't really have many questions

15 regarding them.  I just want to confirm what they are.

16    A.   Okay.

17             (Exhibit No. 2 marked.)

18    Q.  (By Mr. Crisalli) That said, you know, take as

19 long as you need to -- we can start with Exhibit 2.

20    A.   I hope I don't have to read all 61 pages.

21    Q.   I hope not too.

22        And if you want to briefly look through

23 Exhibit 2 and just let me know whether you recognize

24 this document.  And I can represent that this was

25 produced in discovery from Cedar Park.

Page 25

1      A.   Yes.  This looks like the document we get

2   annually from Kaiser when we renew our medical plan with

3   them.

4      Q.   And is -- my apologies.

5           Is this for the year beginning in -- on

6   September 1, 2019?

7      A.   Yes.

8                       (Exhibit No. 3 marked.)

9      Q.  (By Mr. Crisalli) And I apologize that these

10  are out of order.  If you'll look at Exhibit 3.  They

11  were produced out of order.  I don't know why, but I'm

12  just going to keep them in that order for consistency.

13  I suspect, you know, just how filing occurred or

14  something.

15          If you want to take a look at Exhibit 3.

16     A.   It looks like the same, somewhat shorter

17  document for the 2021 year.

18                      (Exhibit No. 4 marked.)

19     Q.  (By Mr. Crisalli) Okay.  And then same for

20  Exhibit 4.

21     A.   Okay.

22     Q.   I think Exhibit 4 -- let me just scroll down.

23  I thought that it had 2020 in it as well.  That's why I

24  had to --

25          Yeah.  If you go to page -- on Exhibit 4,

Page 26

1    Page 116 of the document.

2         A.   Okay.

3         Q.   Okay.  Is it the same document, like Exhibit 2

4    and 3?  It's the plan with Kaiser Permanente for Cedar

5    Park for the year beginning September 1, 2020, starting

6    on Page 116 of Exhibit 4?

7         A.   Yes, that's what it looks like to me.

8         Q.   Okay.  I just want to confirm Exhibits 2, 3,

9    and 4, they appear to be Cedar Park's insurance plan

10   through -- health insurance plan through Kaiser

11   Permanente for the years 2019, 2020, 2021, all of which

12   starting on September 1st of those years; is that right?

13        A.   That's what it appears to be, yes.

14        Q.   Is there a reason -- any reason to doubt that

15   these aren't the insurance plans for Cedar Park during

16   those years?

17        A.   They were plans we provided during the

18   requests for whatever it was?

19        Q.   Yes.  You can see the Bates numbers from Cedar

20   Park to identify that.

21        A.   No.  I would say that -- they appear to be the

22   correct documents.

23        Q.   How long has Cedar Park used Kaiser Permanente

24   as its health insurance carrier?

25        A.   I'm not 100 percent sure.  I would say

Page 27

1  probably at least six years.

2      Q.   Would that be six years total, or six years

3  preceding 2019?

4      A.   Kaiser bought Group Health Cooperative here in

5  the State of Washington.  We had been with Group Health

6  prior to being with Kaiser.

7      Q.   Okay.  And how long were you with Group Health

8  before they did that transition to Kaiser Permanente?

9      A.   I'm not totally sure.

10     Q.   Was it a significantly long time?  Like, let's

11  say -- I'll back up.

12          Would it be -- would you estimate ten years?

13     A.   I would say less than that.

14     Q.   Okay.  As far as you are aware, before the

15  plan that took effect on September 1, 2019, did the

16  health plan for Cedar Park include coverage for abortion

17  services?

18     A.   I believe it did not.

19     Q.   And before the plan taking effect

20  September 1, 2019, did the Kaiser Permanente plans

21  include coverage for all contraceptive services?

22     A.   I believe it did.

23     Q.   Okay.  And as far as you're aware, you used --

24  Cedar Park used Gallagher to purchase these plans; is

25  that right?

Page 28

1       A.   Yes.

2       Q.   In looking at the 2019, 2020, 2021 plan, do

3   those plans include coverage for abortion services?

4       A.   Those were big legal documents that were

5   reviewed by attorneys, but it is my understanding that

6   they do.

7       Q.   And for the 2019, 2020, 2021 plans that we

8   covered, do those plans also include coverage for all

9   contraceptive services?

10      A.   Yes, they do.

11      Q.   And including within that -- you've used the

12  term "abortifacient" already in this deposition.  Would

13  you please define that for your purposes?

14      A.   My understanding is an abortifacient is a

15  pill, device that prevents a fertilized embryo from

16  developing into a child.

17      Q.   And so we're on the same page, is it your

18  understanding -- Cedar Park's understanding that for

19  the 2019, 2020, and 2021 plan, that the plans also

20  include coverage for those kinds of contraceptives

21  within its plan?

22      A.   I believe so.

23      Q.   And I don't think you produced this because of

24  the timing of when the document production occurred.

25  Did Cedar Park renew its plan with Kaiser Permanente

Page 29

1    for 2022 beginning September 1, 2022?

2         A.   Yes, we did.

3         Q.   And does -- do you know whether that plan

4    includes coverage for abortion services?

5         A.   I believe it does.

6         Q.   And do you know whether that plan includes

7    coverage for all contraceptive services including those

8    for what you have defined as abortifacient?

9         A.   I believe it does, yes.

10        Q.   Do you know whether Cedar Park could exercise

11   its -- a religious objection for contraceptives with

12   Kaiser Permanente?

13        A.   We were informed we could not.

14        Q.   Well, is there an option with Kaiser

15   Permanente in any of the times you renewed the plans

16   since -- beginning 2019, where you can express a

17   religious objection to all contraceptives with Kaiser

18   Permanente?

19        A.   We have expressed our objection, but those

20   abortifacients and abortion services are included in our

21   plan.

22        Q.   I understand.  I understand that.  I want to

23   focus on the question that I was asking there which is

24   whether Cedar Park could, had the ability to, express an

25   objection to Kaiser Permanente excluding all

Page 30

1   contraceptives from its plan during 2019 through 2022.

2       A.   I'm still not understanding.  Can you try to

3   rephrase that?

4       Q.   Can -- does Cedar Park know whether it could

5   tell Kaiser Permanente, voice an objection to receiving

6   all contraceptives from Kaiser in its plan?

7       A.   I believe we have done that.

8       Q.   Do you know why Kaiser Permanente will not

9   provide for specific contraceptives to be excluded from

10  Cedar Park's healthcare plan?

11      A.   I believe they informed us that that would be

12  too much -- too much paperwork or too complicated a

13  process, so it was either all contraceptives or no

14  contraceptives.

15      Q.   Okay.  And would Cedar Park agree that

16  that's --

17              THE DEPONENT:  My speaker's not working.

18              MR. CRISALLI:  Can you hear me?

19              THE DEPONENT:  It says my speaker's not

20  working, please check my connection.

21              MR. CRISALLI:  We can -- we can hear you.

22              MR. THERIOT:  I'm not hearing anything.

23              Jeff, can you hear us?

24              MR. CRISALLI:  I can hear you.

25              MR. THERIOT:  We can't hear you, Jeff.

c295376b-5358-4733-bac0-a5db45f51f89

Page 31

1          MR. CRISALLI:  It's Paul, but that's --

2          MR. THERIOT:  I'm not sure what's going

3     on.  Yeah, I can't hear him either.

4               It may be something with your connection,

5     Paul.

6          MR. CRISALLI:  Nicole, can you -- let's

7     go off the record.

8               (Discussion off the record.)

9               (A break was taken from

10                9:53 a.m. to 9:56 a.m.)

11         Q.  (By Mr. Crisalli) Would Cedar Park agree that a

12    business decision -- deciding not to offer a specific

13    service because it involves too much paperwork and would

14    be difficult is a business decision?

15         MR. THERIOT:  Objection.  Vague.

16         THE DEPONENT:  Yeah.  I'm not -- I'm not

17    quite sure what you're asking of me.

18         Q.  (By Mr. Crisalli) Was there any indication to

19    Cedar Park that Kaiser's -- Kaiser Permanente's decision

20    to not offer specific exclusions for contraceptives was

21    based on religion?

22         A.   I don't believe so.

23         Q.   Okay.  What are Cedar Park's goals when

24    purchasing a health insurance policy?

25         A.   We try to purchase the most comprehensive

Page 32

1    policy possible in keeping with our deeply-held

2    religious beliefs that provides our staff with

3    affordable, high-quality healthcare.

4         Q.   Do you have anyone who directly reports to

5    you?

6         A.   Yes.

7         Q.   And how many people directly report to you?

8         A.   Two.

9         Q.   And who are they?

10        A.   The director of human resources and the

11   accounting manager.

12        Q.   Does Cedar Park have an outside accounting or

13   tax accounting firm at all?

14        A.   I'm not sure what you mean.

15        Q.   Does Cedar Park utilize an outside accounting

16   firm for its business?

17        A.   No.  We -- we have an annual audit by an audit

18   firm but not an accounting firm.

19        Q.   Okay.  And which auditing firm is that?

20        A.   Battershell & Nichols.

21        Q.   Okay.  And could you please summarize what

22   that auditing firm does for Cedar Park?

23        A.   As part of our mortgage, we have, for many

24   years, been required to have a full annual audit

25   conducted by an outside CPA firm.

c295376b-5358-4733-bac0-a5db45f51f89

Page 33

1      Q.   And does that annual audit examine all of the

2  business operations or business entities of Cedar Park?

3      A.   Yes.

4      Q.   And do you receive reports from the auditing

5  firm regarding those audits?

6      A.   Yes, we receive an annual audited report.

7      Q.   I think I cut out there.

8      A.   You did.

9           MR. CRISALLI:  Okay.  Could the court

10 reporter repeat the question and --

11     Q.  (By Mr. Crisalli) Did you -- excuse me.  I'll

12 back up.

13          Did you provide a complete response to my

14 question --

15     A.   I think so.

16     Q.   -- before I cut out?

17     A.   I think so.

18          MR. CRISALLI:  Okay.  Could the court

19 reporter please read back the answer?

20                    (Record read back as requested.)

21     Q.  (By Mr. Crisalli) And when you receive these

22 reports, do you read them carefully?

23     A.   Yes.

24     Q.   And is it part of your job responsibilities to

25 review them carefully?

Page 34

1       A.   I would say yes.

2       Q.   And why does your job require you to review

3   these reports carefully?

4             MR. THERIOT:  I'm going to object to this

5   line of questioning because it seems to be outside of

6   the scope of the 30(b)(6) notice.

7       Q.  (By Mr. Crisalli) You may continue.

8       A.   Re -- I just am -- I'm not clear what exactly

9   you're asking me.  Can you --

10      Q.   Why is it part of your job to -- why -- I'll

11  restart.

12            Why does your job require you to review these

13  reports carefully?

14      A.   My job is to oversee the finances of Cedar

15  Park.  The audit is an outside entity that examines how

16  we conduct our business and insures that we are doing

17  everything in accordance with generally accepted

18  accounting principles.

19      Q.   Would you say you have an expertise in

20  sophisticated financial management?

21            MR. THERIOT:  Objection.  Vague.

22            THE DEPONENT:  Yeah.  I'm not sure what

23  you mean by "sophisticated."

24      Q.  (By Mr. Crisalli) Would you classify Cedar

25  Park's business as a sophisticated business relative for

c295376b-5358-4733-bac0-a5db45f51f89

Page 35

1    a church in particular?

2         A.   It certainly is more -- has more facets than a

3    normal church would -- would have.

4         Q.   And you testified that it has revenues of

5    between $25- and $30 million.  Would you consider that

6    to be a substantial revenue for a church?

7         A.   Because Cedar Park's ministries encompass so

8    many different ministries, primarily, the school,

9    it's -- it's a large number, but I -- I don't think

10   it's -- what was the term you used in the question?

11        Q.   Substantial revenues relative to a church.

12        A.   I can't speak to what would be substantial

13   revenue compared to any church but Cedar Park.

14        Q.   All right.  I'm going to move topics now to

15   the 2019 renewal process.  When did Cedar Park start the

16   process to renew its health plan that would begin

17   September 1, 2019?

18        A.   As I believe I stated, we generally start four

19   months prior with a pre-renewal meeting.

20        Q.   For the -- is it okay if I refer to this as

21   the 2019 renewal when we're both talking about the

22   renewal that ultimately took effect September 1, 2019?

23        A.   Yes.

24        Q.   For that renewal, did Cedar Park consider

25   changing from Kaiser Permanente at any point?

Page 36

1    A.    Yes.

2    Q.    Why?

3    A.    Kaiser informed us that they would no longer

4  be able to provide the abortion exemption that they had

5  previously provided because of the Washington 6219 law.

6    Q.    And how did you look at other plans aside from

7  Kaiser?  Who brought those plans in for your review?

8    A.    Our broker.

9    Q.    Did you independently research for any plans

10 for 2019 other than Kaiser Permanente?

11   A.    Not personally, no.

12   Q.    Did you give your broker any instructions when

13 searching for plans for that 2019 renewal other -- that

14 were other than Kaiser Permanente?

15   A.    I believe so.

16   Q.    What were those instructions?

17   A.    We wanted to explore any option that would

18 allow us to provide a quality healthcare plan to our

19 employees that would exclude abortions.

20   Q.    And what was your understanding of the steps

21 that your broker took to effect that?

22   A.    I believe that in 2019, we approached several

23 plans other than the normal plans that we had examined

24 in prior years.

25   Q.    And do you know how many plans you approached

c295376b-5358-4733-bac0-a5db45f51f89

Page 37

1    during that 2019 renewal process other than Kaiser

2    Permanente?

3        A.    I believe there were at least seven others.

4        Q.    And do you recall their names?

5        A.    It should be in the information we provided.

6    Do you want me to --

7        Q.    So is that a no?  You don't recall right now,

8    but you could refer me to the -- your responses to

9    discovery?

10       A.    Yeah.  There's a couple.

11       Q.    Okay.  Was Cigna one of them?

12       A.    Yes.

13       Q.    Was Premera one of them?

14       A.    Yes.

15       Q.    And was it -- just to make sure I'm clear,

16   your broker was the one who searched for these plans;

17   right?

18       A.    Yes, that's true.

19       Q.    And then the broker would present the plans to

20   you as options; is that right?

21       A.    Yes.

22       Q.    When were they -- when was your broker first

23   asked to look for these kinds of plans?

24       A.    During -- we're just talking about the 2019?

25       Q.    2019, yeah.

c295376b-5358-4733-bac0-a5db45f51f89

Page 38

1       A.   I'm not exactly sure.  I'm assuming during the
2   pre-renewal.
3       Q.   Okay.  Did your broker present any plans that
4   provided services consistent with Cedar Park's religious
5   beliefs for the 2019 renewal?
6       A.   Yes.
7       Q.   Do you recall which plans those were?
8       A.   I believe our broker said that the -- the
9   primary way to exclude abortions based on our
10  deeply-held religious beliefs would be to do a
11  self-insured plan.
12      Q.   So did you also examine whether Kaiser
13  Permanente would provide a self-insured plan?
14      A.   Yes, we did.
15      Q.   Was that the only self-insured plan that you
16  looked at during the 2019 renewal?
17      A.   I'm not certain.
18                   (Exhibit No. 5 marked.)
19      Q.  (By Mr. Crisalli) All right.  We're going to go
20  through a few emails.  I'm hoping this will be, again, a
21  shorter process than others, but we shall see.
22                   THE DEPONENT:  So I do click on this to
23  see the file?
24                   MR. THERIOT:  On the chat, do you see the
25  chat?  It's the one with the red dot on it.  It says

Page 39

1    chat.

2                    THE DEPONENT:  Not the one that says

3    leave.

4                    MR. THERIOT:  Right.

5                    THE DEPONENT:  So Exhibit 5.

6        Q.  (By Mr. Crisalli) Please take a moment to

7    review this.

8                    (Pause in the proceedings.)

9        Q.  (By Mr. Crisalli) Now, one thing about these

10   emails is my read of them is that they are in

11   chronological order, not reverse chronological order.

12   So as you go through, it actually gets later in the

13   thread unless there was an email attached that it's

14   referring to.

15       A.   Okay.  That looks right.

16       Q.   Okay.  Now, first some background.  The first

17   page, this appears to be an email from Jami Hansen to

18   you with a cc to Melissa Knauss and Melinda Hansen; is

19   that right?

20       A.   Yes, that's what it appears.

21       Q.   And this is Jami who's been your broker

22   through Gallagher for Cedar Park's health insurance

23   plans; right?

24       A.   Correct, yes.

25       Q.   And the -- Melissa Knauss is the director of

c295376b-5358-4733-bac0-a5db45f51f89

Page 40

1    HR for Cedar Park; correct?

2        A.   Yes.

3        Q.   And as you read through these emails, these

4    are emails between, it appears, Wednesday, June 12th at

5    8:41, through Wednesday, June 12th, at 4:46 discussing

6    the possibility of using Cigna; is that correct?

7        A.   Okay.  Sorry.  I -- I wanted to read those

8    through.  Can you restate your question?

9              MR. CRISALLI:  Could the court reporter

10   please repeat the question?

11                   (Record read back as requested.)

12             THE DEPONENT:  That's what it appears.

13                   (Exhibit No. 6 marked.)

14       Q.  (By Mr. Crisalli) Okay.  Adding the next

15   exhibit.

16             If you want to take a quick minute to

17   familiarize yourself with this document.

18       A.   When it opens.

19             Okay.  And what's your question?

20       Q.   No question yet.

21       A.   Okay.

22       Q.   First, it appears that you received this email

23   on Monday, June 17, at 12:37 p.m.; is that right?

24       A.   That's what the email says, yes.

25       Q.   And it appears to be in response to an email

c295376b-5358-4733-bac0-a5db45f51f89

Page 41

1    from you dated June 16, 2019, about the coverage for

2    Kaiser; is that right?

3         A.   I don't see June 16th anywhere.

4         Q.   If you go under -- still on the first page.

5         A.   Oh.

6         Q.   Right under Jami's signature line.

7         A.   Yup.  I would agree with that, yes.

8         Q.   Okay.  It appears from this document that

9    Cedar Park was still considering and trying to -- strike

10   that.

11            At this time, June 17, Cedar Park was still

12   considering whether to use Kaiser Permanente as an

13   option for its insurance plan; is that right?

14        A.   I would say yes.

15        Q.   And this is around the same time as there was

16   the previous email just a couple days after from --

17   regarding Cigna.  So -- correct?

18        A.   Okay.  That looks correct, yes.

19                       (Exhibit No. 7 marked.)

20        Q.   (By Mr. Crisalli) Exhibit 7.  Please let me

21   know when you're ready.

22        A.   Okay.  Now, what's your question?

23        Q.   My question is:  Is this an email string -- it

24   appears, just judging from the bottom, to start on

25   June 21, 2019, through June 25, 2019, regarding

c295376b-5358-4733-bac0-a5db45f51f89

Page 42

1    different options for express -- for Cedar Park to

2    express its religious objections in purchasing a health

3    plan?

4         A.    And what are the dates you're saying again?

5         Q.    What I see are June 21, which is down --

6    second-to-last email at the bottom part of the string,

7    and then at the top, it appears to be, or I guess bottom

8    now, it appears to be June 25, 2019.

9         A.    That's what it appears to be.

10        Q.    Okay.  Looking at Page 1 and 2, does Cedar

11   Park understand the text beginning with, "Here is

12   Cigna's legal response for both ASO and fully-insured

13   business.  Let me know if you have any questions,"

14   through to Jami Hansen's signature line in the middle of

15   the second page.

16             If you'd look at that, please.  We'll start

17   there.

18        A.    Okay.  Sorry to always be asking this, but

19   what exactly was your question again?

20        Q.    The starting point was to review that part.

21             The question is:  Does Cedar Park understand

22   that part to be Jami Hansen communicating an option from

23   Cigna in which Cedar Park could express its religious

24   objections to abortions and certain contraceptives in

25   purchasing its plan?

Page 43

1      A.    I understand that we could express our
2   objections.
3      Q.    And could you do so by purchasing the Cigna
4   plans that are described in this email?
5      A.    It is my understanding from my discussions
6   with Jami that even if we -- if we expressed our desire
7   to not cover abortions or specific contraceptives, they
8   would be included in our plan.
9      Q.    Where does that -- where -- where does this
10  email state that?
11     A.    Well, it says:  "For an insured plan situated
12  in Washington, policies must cover maternity care and
13  this includes coverage for abortions."
14     Q.    Okay.  What about the third paragraph of that,
15  same section?  Does that provide that an employer with a
16  religious or moral tenet opposed to a specific service
17  is not required to purchase coverage for that service if
18  they object for reason of religion or conscience?  Did I
19  read that correctly?
20     A.    Yes.
21     Q.    There's the next sentence:  "In other words,
22  an employer may exclude coverage for contraceptives and
23  abortion if that employer objects to providing that
24  coverage due to religious or other beliefs."
25              Did I read that section correctly?

c295376b-5358-4733-bac0-a5db45f51f89

Page 44

1        A.    Yes.

2        Q.    As I read that section, it covers both

3   contraceptives and abortion and provides that Cedar Park

4   as an employer with a religious objection may be -- may

5   exclude coverage for those types of services; is that

6   correct?

7        A.    To me, it seems contradictory.  That paragraph

8   says -- or that sentence you read says, "We may exclude

9   coverage," and yet above it, it says, "Our policies must

10  cover maternity care including abortions."

11       Q.    But an employer may exclude coverage for

12  contraceptives and abortion.  That is expressly within

13  this paragraph; is it not?

14       A.    It says we are not required to purchase

15  coverage which seems different to me than what you

16  stated.

17       Q.    I read:  "In other words, an employer may

18  exclude coverage for contraceptives and abortions."

19            Did I read that correctly?

20       A.    Yes.

21       Q.    And this is an email dated June 25, 2019, when

22  you received it; is that right?

23       A.    Yes.

24                  (Exhibit No. 8 marked.)

25       Q.    (By Mr. Crisalli) Adding Exhibit No. 8.

Page 45

1          And please let me know when you're ready.

2     A.    Okay.  I've reviewed it.

3     Q.    Okay.  Is this a series of emails beginning

4  July 8, 2019, at 3:48 p.m., and it appears the last one

5  is July 18, 2019, at 2:22 p.m.?

6     A.    That's what it appears to me, yes.

7     Q.    Okay.  Turning to the first page, this appears

8  to be an email from Ms. Knauss; is that right?

9     A.    That's what it appears to be, yes.

10     Q.    Did you assist in drafting this or review it

11  at all?

12     A.    I don't recall.

13     Q.    And the reason why I ask, it appears to

14  mention your -- what I think is probably your name,

15  "Steve and I are trying to read between the carriers'

16  mumbo-jumbo, legalese, and just get really clear

17  unequivocal answers," in the body of that first email.

18          Did I read that correctly?

19     A.    Yes.

20     Q.    You're probably the Steve that she's

21  referencing in this; right?

22     A.    Yes.

23     Q.    Okay.  And this appears to ask for

24  clarification from both Kaiser and Cigna about how to

25  cover or exclude abortion services and certain

c295376b-5358-4733-bac0-a5db45f51f89

Page 46

1    contraceptive services from a health plan; right?

2         A.   Yes, I would say.

3         Q.   And then it looks like a response was provided

4    by Jami Hansen on July 8, 2019, at 4:16 p.m.; is that

5    right?  I think that's the next email.

6         A.   Yes.

7         Q.   And he appears -- is Jami a he?  She?  They?

8         A.   She.

9         Q.   She -- my apologies -- at least virtually

10   appeared to forward an email from Cigna answering the

11   questions; right?

12        A.   Yeah.  I'm not familiar with Mark Croff, but

13   it says he's from Cigna.  That seems correct.

14        Q.   Yeah.  And then the next email appears to be

15   from July 8, 2019, at 4:29 p.m., from Melissa describing

16   her understanding of Cigna's plan and exclusions; is

17   that right?

18        A.   Yes, that's what that email states.

19        Q.   And then the next email, which is just a few

20   minutes later from Jami says "correct," likely in

21   reference to Melissa's last email.

22        A.   That seems logical.

23        Q.   Okay.  And then down at the bottom, page -- I

24   think it's Page 3 of 4 -- 3 and 4, that appears to be in

25   red, the responses from Kaiser Permanente with respect

c295376b-5358-4733-bac0-a5db45f51f89

Page 47

1    to your questions; right?

2         A.   Yes.

3                        (Exhibit No. 9 marked.)

4         Q.  (By Mr. Crisalli) Okay.  Next, Exhibit No. 9.

5         A.   I've read a lot of emails.  I've read that.

6         Q.   Okay.  And is this an email string between

7    Monday, July 15, at 5:44 p.m., through Tuesday, July 16,

8    at 10:59 a.m.?

9         A.   That's what it appears to be, yes.

10        Q.   And is the discussion on this basically

11   whether Cedar Park would -- was evaluating options

12   between Cigna and Kaiser Permanente for its health

13   insurance plan?

14        A.   That's what it appears, yes.

15        Q.   And these emails discuss the various options

16   with respect to coverage for abortifacient services or

17   abortion services?

18        A.   Yes.

19        Q.   Okay.  Go to the bottom, the one with -- in

20   red.  It has a red line.  I think it's Page 3, Bates

21   stamped Cedar Park 000223.

22        A.   Okay.

23        Q.   I'll try and use those Bates Stamps more often

24   just for both of our ease.

25        A.   Okay.  Thank you.

c295376b-5358-4733-bac0-a5db45f51f89

Page 48

1      Q.   The first response in red talks about:  "If we

2   changed to Cigna, we would need decisions by this

3   Friday, July 19th"; is that correct?

4      A.   That's what it appears Jami's saying, yes.

5      Q.   So did that deadline change at all?

6           And then:  "If we stay with Kaiser, we could

7   go out to July 26th"; is that correct?

8      A.   That's what it says.

9      Q.   Was it actually later?

10     A.   I don't recall.

11                    (Exhibit No. 10 marked.)

12     Q.  (By Mr. Crisalli) Next -- here's the next,

13   Exhibit No. 10.

14          Since it's just one page, I'll start with a

15   question.  It's a string of emails between Tuesday,

16   July 16, at 3:02 p.m., to Wednesday, July 17, 2019, at

17   4:26 p.m.  Does that appear to be correct?

18     A.   Yes.

19     Q.   And it appears to discuss what options Cedar

20   Park would have if it chose Cigna with respect to

21   coverage for its employees.

22     A.   That's not really correct.

23     Q.   Okay.  How is that incorrect?

24     A.   The first email at 3:02, this only is

25   attempting to determine the impact on PPO employees

Page 49

1    comparing Cigna's network to Kaiser's.

2         Q.    Okay.  And did Kaiser have both an HMO and a

3    PPO?

4         A.    Yes.

5         Q.    Do you understand what those terms mean, HMO

6    and PPO?

7         A.    Actually, I do.

8         Q.    What is an HMO?

9         A.    An HMO is a health maintenance organization

10   where care is provided generally through a primary care

11   physician.

12        Q.    And what is a PPO?

13        A.    Again, I'm not a total expert in this, but

14   it's a preferred provider organization with the most

15   significant difference between that and an HMO being

16   that an employee on a PPO plan can choose their own

17   providers.

18        Q.    And do you know whether the employees at Cedar

19   Park have a preference of being in an HMO versus PPO?

20        A.    I can make an assumption based on the number

21   of employees enrolled at that time.  40 percent were

22   enrolled in an HMO and 60 percent were enrolled in a

23   PPO.

24              MR. CRISALLI:  We've been going for a

25   little while.  I know we had a break because of Zoom.

Page 50

1    Do you want to keep going or do you want to take a

2    break?

3                    MR. THERIOT:  I guess, that's a -- I was

4    just going to ask the question:  Do you want to take one

5    break before lunch and then come back?

6                    MR. CRISALLI:  That's fine by me.  I can

7    go forever, but I know other people can't.

8                    MR. THERIOT:  Yeah.  Do you want to take

9    about ten minutes?

10                   THE DEPONENT:  Yeah, I think that'd be

11   great.

12                   MR. CRISALLI:  Off the record.  We'll do

13   a ten-minute break, back at 10:55.

14                       (A break was taken from

15                        10:44 a.m. to 10:55 a.m.)

16                       (Exhibit No. 11 marked.)

17       Q.  (By Mr. Crisalli) And do you still understand

18   that you are under oath for purposes of this deposition?

19       A.   Yes.

20       Q.   Okay.  I put in the chat Exhibit No. 11.

21   Please take a moment to review.  Let me know when you're

22   ready.

23       A.   All right.

24            Okay.

25       Q.   Is this an email string between July 18, at

Page 51

1    11:38 p.m., through July 22nd, 8:06 a.m. of 2019?

2         A.   Yeah, that's the string.

3         Q.   And this string appears to be discussing

4    different kinds of services offered by Cigna's plan; is

5    that correct?

6         A.   Yes.

7         Q.   Including in the email dated July 22, 2019;

8    right?

9         A.   What's your question?

10        Q.   Oh, that -- that email on July 22, 2019,

11   includes discussion about preventative prescription

12   coverage in -- with Cigna.

13        A.   Yes.

14        Q.   Okay.  I think, and I'll get to this later,

15   but on the first page, there appears to be a PDF

16   attached; is that right?

17        A.   Yeah, that's what it looks like.

18        Q.   Okay.  I'll cover this in a subsequent

19   exhibit.  I just wanted to make sure that there was an

20   attachment.

21             Second is -- so you received a proposal for

22   Cigna on July 18, 2019, for purchasing a health plan.

23        A.   Well, I can't see the proposal, but that

24   appears to be what it would look like.

25        Q.   And even notwithstanding this email, did Cedar

c295376b-5358-4733-bac0-a5db45f51f89

Page 52

1   Park receive a proposal for a health plan for 2019 from

2   Cigna?

3        A.    In the summary from the broker listing the

4   plans that we were considering, there were Kaiser plans

5   and Cigna plans.

6                          (Exhibit No. 12 marked.)

7        Q.  (By Mr. Crisalli) All right.  I'm putting in

8   Exhibit 12.  And my only hope -- this is a lengthier

9   group of emails, it appears to be one string from what

10  I've been able to assess from when I reviewed it.

11           Is that just -- this is a string regarding the

12  choice of Cedar Park to renew with Kaiser Permanente for

13  the 2019 health plan.

14       A.    And so the earliest one's at the beginning,

15  the latest one's at the end?

16       Q.    Yeah, I think so.

17       A.    Okay.

18       Q.    Which is at least August 8th, but there

19  might -- that might be in a response to something.

20           It looks like there might be emails even into

21  August 13th.  Really, I'm just hoping that this verifies

22  the communications that were going on at the time for

23  purposes of selecting Kaiser Permanente and not

24  selecting Cigna.

25       A.    Okay.  This just goes forever.  Sorry, I'm

Page 53

1   reading as fast as I can.

2        Q.  (By Mr. Crisalli) No worries.  I think this is

3   the longest one.

4        A.   Praise God.

5                        (Pause in the proceedings.)

6        Q.  (By Mr. Crisalli) What page are you on in your

7   review, because I may be able to shorten this up?

8        A.   31.

9        Q.   Okay.  Let's go to the first -- oh, sorry.

10  That was the next exhibit.  Please continue on.  Sorry,

11  I was trying.

12       A.   Yeah.  A little more than half.

13                       (Pause in the proceedings.)

14              THE DEPONENT:  Okay.  Well, I at least

15  got to the bottom.

16       Q.  (By Mr. Crisalli) Okay.  And this series of

17  emails discusses Cedar Park's choice to pick Kaiser

18  Permanente over -- to pick -- renew its plan with Kaiser

19  Permanente; correct?

20       A.   There's emails in there talking about us

21  picking Kaiser.  I think that email's repeated a few

22  times.  Then, there's other ones about questions that

23  would indicate we were looking at switching to another

24  plan.

25       Q.   Okay.  All right.  We're done with that one.

c295376b-5358-4733-bac0-a5db45f51f89

Page 54

1      A.    Praise God.

2                        (Exhibit No. 13 marked.)

3      Q.  (By Mr. Crisalli) Yes.

4            Exhibit 13, fortunately, much shorter.  And

5  let me just take a quick look.  If you want to just give

6  me a minute, please.

7                        (Pause in the proceedings.)

8      Q.  (By Mr. Crisalli) Okay.  These appear to be

9  emails discussing -- let me pull that up, sorry -- Cedar

10  Park's selection to renew Kaiser Permanente and then how

11  to implement that; correct?

12      A.    Yeah.  That's what it appears to be from my

13  cursory review.

14      Q.    And that includes some discussion on Cedar

15  Park's objection to coverage for abortion and certain

16  contraceptives; right?

17      A.    Yes, that's what it appears.

18                        (Exhibit No. 14 marked.)

19      Q.  (By Mr. Crisalli) Okay.  Now, to -- finally,

20  it's not an email.

21      A.    Yeah.

22      Q.    And, really, I mean, this is a 32-page

23  document.  Do you recognize the document?

24      A.    It looks like the renewal document we get

25  every year after we've made a selection.

c295376b-5358-4733-bac0-a5db45f51f89

Page 55

1    Q.   Okay.  Is it after you make a selection or
2    proposals for how to determine what your selection's
3    going to be?
4    A.   We receive portions of this, primarily, the
5    cost outlines, prior to making a decision and this kind
6    of summarizes everything decided.
7    Q.   Okay.  This was presented in June -- on
8    June 10, 2019 -- is that correct? -- looking at the
9    first page?
10    A.   Well, then my previous answer was incorrect
11    then.  If this was -- I didn't see the date June 10th,
12    so this would've been a document prior to our making a
13    decision.
14    Q.   Okay.  And the reason why I ask that is go to
15    Page 2.
16    A.   Okay.
17    Q.   Is this a discussion of potential plans for
18    Cedar Park to purchase for 2019?
19    A.   Yes, that's what it appears to be.
20    Q.   And it looks like it provides four different
21    fields; right?
22    A.   Yes.
23    Q.   Do you know whether Cedar Park had this
24    information at least in June of 2019?
25    A.   I'm not positive, but I would assume so since

c295376b-5358-4733-bac0-a5db45f51f89

Page 56

1   it's dated June.

2        Q.   But at least Cedar Park probably had this

3   information sometime between June of 2019 and

4   September 1 of 2019; right?

5        A.   Yes.  Yeah.

6        Q.   Okay.  And this covers -- is it providing

7   three different options for a health plan?

8        A.   Yes.

9        Q.   And there's a negotiated Kaiser Permanente, do

10  you know what that is?

11       A.   Yes.

12       Q.   What is that?

13       A.   That is the best proposal that our broker was

14  able to negotiate with Kaiser to renew our prior year's

15  plan.

16       Q.   Okay.  And just to make sure I understand the

17  fields for how one thing you might be looking to

18  evaluate would be combined annual costs.  What does that

19  field represent?  What's your understanding of that

20  field?

21       A.   So are you referring to the one right above

22  the little reminder in blue there at the bottom?

23       Q.   Yeah.  Do you have the -- the field that

24  says -- above that in bold, you've got the combined

25  medical/HSA/HRA annual cost.

c295376b-5358-4733-bac0-a5db45f51f89

Page 57

1      A.    And what's your question?

2      Q.    Do you understand what -- what the field

3   represents?

4      A.    Yes.

5      Q.    What does it represent?

6      A.    That field represents the estimated cost for

7   the next year based on the premiums for employees on a

8   PPO plan, HMO plan, Cedar Park's contribution to a

9   health savings account, and Cedar Park's contribution

10  for health reimbursement arrangements.

11     Q.    Is it appropriate to generally think of this

12  as the total cost for the health insurance plans for

13  Cedar Park?  Excluding dental, how about that?

14     A.    Not -- it's an estimate.

15     Q.    Okay.  That's fair.  But it's an estimate of

16  what the total cost for medical insurance for Cedar Park

17  would be based on prior trend?

18     A.    Yes.

19     Q.    Okay.  And in looking at that, it looks like

20  the negotiated Kaiser Permanente plan would be $916,314.

21  Did I read that correctly?

22     A.    Yes.

23     Q.    And then there's two alternatives that are

24  provided; is that right?

25     A.    Yes.

c295376b-5358-4733-bac0-a5db45f51f89

Page 58

1    Q.   One is from Cigna fully insured.  Did I read
2    that correctly?
3    A.   Yes.
4    Q.   What is your understanding of what that plan
5    would offer?
6    A.   That's a -- a huge question.  Can you be more
7    specific?
8    Q.   Do you know what it -- well, I'll backtrack.
9         The other option is a Cigna alternative --
10   excuse me -- Alternative 2 is Cigna level-funded.  Did I
11   read that correctly?
12   A.   Yes.
13   Q.   Do you have a rough understanding of the
14   difference between a level-funded and a fully funded
15   plan?
16   A.   Well, you mean a fully insured plan and a
17   level --
18   Q.   Yeah.  Fully insured.  Excuse me.  Let me
19   repeat that question so I got the terminology correct.
20        Do you have a rough understanding of the
21   difference between a fully insured plan and a
22   level-funded plan?
23   A.   Yes.
24   Q.   What's the difference?
25   A.   My understanding of the main difference is

c295376b-5358-4733-bac0-a5db45f51f89

Page 59

1    that a fully insured plan provides specific costs for

2    employees on an HMO or a PPO plan per month per

3    employee.  And a level-funded plan is somewhat similar

4    except there is a degree of potential higher risk or

5    gain for an organization with a level-funded plan.

6         Q.   And -- oh, go ahead.

7         A.   I just didn't hear you for a minute.  I

8    thought you might have been muted.

9         Q.   Okay.  Was your answer complete?

10        A.   Yes.

11        Q.   Okay.  Did you understand whether this

12   Alternative 1, fully insured Cigna plan, would be able

13   to accommodate Cedar Park's religious objections to

14   abortion and/or certain contraceptives?

15        A.   I'm not sure that Cigna ever addressed our

16   objections to abortions and abortifacient medications

17   for their fully funded plan.

18        Q.   Okay.  In the remember section, can you read

19   the last bullet point?

20        A.   Okay.

21        Q.   And does that point provide elective abortions

22   are not covered for both the Cigna fully insured and the

23   Cigna level-funded plan?

24        A.   That's what it states.

25        Q.   Okay.  So would you understand the same

c295376b-5358-4733-bac0-a5db45f51f89

Page 60

1   offering to be with -- going back to the question:  Does

2   that change your testimony as to whether you understand

3   the fully insured -- or Cigna alternative plan to

4   accommodate your religious objections to abortion and

5   certain contraceptives?

6       A.   This proposal was June 10th.  And if Jami and

7   the brokers had written that that's what they are

8   excluding there, I believe we requested documentation

9   from Cigna regarding that, in writing, because we were

10  being told by Kaiser and other carriers they would not

11  do that.

12      Q.   And did you receive a response that Cigna

13  would be able to accommodate that in writing?

14      A.   To my understanding, not for a fully insured

15  plan.

16      Q.   Okay.  For the level-funded plan provided by

17  Cigna, would that -- was your understanding -- Cedar

18  Park's understanding that that plan could provide

19  exclusions for abortion and certain contraceptives

20  consistent with Cedar Park's religious beliefs?

21      A.   Yes.

22      Q.   And, in reviewing this, the combined

23  medical/HSA/HRA annual cost for the Alternative 1 Cigna,

24  was that 894 -- $890,408 for 2019?

25      A.   Based on all the same assumptions as the other

c295376b-5358-4733-bac0-a5db45f51f89

Page 61

1   alternates.

2       Q.    And then for the level-funded Cigna,

3   Alternative 2, was estimated at $913,381; is that right?

4       A.    That's what this states, yes.

5       Q.    And you would agree, as a matter of math, that

6   those are both less than $916,314?

7       A.    Mathematically, looking at the numbers, yes.

8       Q.    And Cedar Park did not select either the

9   fully -- did not select the fully insured Cigna plan;

10  correct?

11      A.    Correct.

12      Q.    And Cedar Park did not select the level-funded

13  Cigna plan; correct?

14      A.    Yes, that's correct.

15      Q.    Why did Cedar Park decide not to purchase

16  either of those plans in 2019?

17      A.    Our broker had advised us that Cigna generally

18  brings in a low rate in the first year and then

19  significantly increases rates in future years, so the

20  ability for Cedar Park in future years to provide

21  high-quality health plans for our employees would've

22  been in question because of increased costs among other

23  things.

24      Q.    So Cedar Park selected -- or elected not to

25  purchase Cigna because of the increased costs it thought

Page 62

1    might occur later.  Is that a fair statement of your

2    testimony?

3              MR. THERIOT:  Objection.

4    Mischaracterization of his testimony.

5         Q.  (By Mr. Crisalli) You may answer.

6         A.   That was one consideration.

7         Q.   What other considerations were there?

8         A.   Kaiser does not provide services to any other

9    preferred provider organization, meaning that a switch

10   to Cigna would require all Cedar Park employees and

11   family members using the Kaiser HMO to find new

12   providers.

13        Q.   Would you agree that it is a choice for Cedar

14   Park whether to make a switch based on preferred

15   providers?  In other words, it's not mandated to make a

16   switch or stay with Kaiser Permanente based on whether

17   they use preferred providers or not?

18        A.   I -- I would agree that it's Cedar Park's

19   choice to select its healthcare provider.

20        Q.   And -- and is the selection of -- based on

21   finances related to Cedar Park's religious beliefs?

22        A.   That seems like two questions.

23        Q.   Okay.  You stated that, from what I've heard,

24   the two reasons that Cedar Park did not select Cigna was

25   it thought -- it believed that the cost would increase

Page 63

1    years later.  That's one; correct?

2         A.   That's what we were advised by our broker.

3         Q.   And the other was that the employees would

4    have to change their preferred providers because of

5    switching from the Kaiser system to a Cigna system; is

6    that correct?

7         A.   To Cigna's preferred provider network.  Those

8    were the two I mentioned so far.

9         Q.   Are there other reasons why you decided not to

10   go with Cigna?

11        A.   Yes.

12        Q.   What are those?

13        A.   A fully funded plan -- in a fully funded

14   insurance plan, all risk for claims exceeding premiums

15   is borne by the carrier.  That is not true with a

16   self-funded plan, a level-funded plan.

17        Q.   And when you talk about risk, you're talking

18   about financial risk in paying for the services; is that

19   correct?

20        A.   No.

21        Q.   What kind of risk are you talking about?

22        A.   One of the main criteria that insurance

23   companies use when bidding a fully insured plan or a

24   level-funded plan for Cedar Park is our experience,

25   which is the amount of claims in the -- annually

c295376b-5358-4733-bac0-a5db45f51f89

Page 64

1   compared to the annual premiums.

2       Q.   And you would agree that that analysis is a

3   mathematical technical analysis, not one done based on

4   Cedar Park's religious beliefs; correct?

5       A.   I believe so.

6       Q.   And are there any other reasons why Cedar Park

7   did not select Cigna?

8       A.   Which Cigna plan are we talking about?

9       Q.   Either of them.

10      A.   With the level- -- with any level-funded plan,

11  there is risk and reward to the company with a

12  level-funded plan.  If Cedar Park's utilization of

13  high-cost claims increased, with a level-funded plan,

14  the majority of those costs would likely be passed on to

15  Cedar Park in higher future premiums.

16      Q.   And the analysis of that risk, again, is based

17  on market principles instead of Cedar Park's religious

18  beliefs; correct?

19      A.   I can't speak for the insurance companies, but

20  I would think so.

21      Q.   You have no reason to believe that it's

22  because of Cedar Park's religious beliefs that that risk

23  calculation would -- is altered because Cedar Park's a

24  church as compared to anything else, do you?

25      A.   No.

Page 65

1     Q.   Have you reviewed the complaints and

2   supplemental complaints in preparation for this

3   deposition?

4     A.   I have read them.

5     Q.   Would Cedar Park agree that no complaint or

6   pleading filed by Cedar Park mentions that Cedar Park

7   looked at or considered Cigna as a potential insurance

8   carrier?

9             MR. THERIOT:  Objection to the extent

10   that it calls for a legal conclusion.

11             THE DEPONENT:  Yeah.  I -- I'm not sure.

12             (Exhibit No. 15 marked.)

13     Q.  (By Mr. Crisalli) I have Exhibit 15.

14             Before we go to 15, and this is -- 15's a

15   quick one.  But in your discussions, did you primarily

16   communicate with Jami about the plans and then some

17   Melissa from Gallagher?  Or, excuse me, I think I said

18   Melissa.  I think I meant Melinda.

19     A.   Okay.

20     Q.   Yeah.

21     A.   That was confusing.

22     Q.   Yeah.

23     A.   Primarily, yes, with Jami and Melinda.

24     Q.   Were your communications primarily via email?

25     A.   Primarily.

c295376b-5358-4733-bac0-a5db45f51f89

Page 66

1        Q.   Did you have phone calls with them or

2    in-person meetings with them from time to time?

3        A.   Yes.

4        Q.   And do you -- do you recall any meetings where

5    you discussed Cigna as a potential plan for 2019?

6        A.   I assume, based on your exhibit with the

7    June 10th document, that we would've met in person and

8    had those discussions, yes.

9        Q.   Okay.  That was going to be my next question

10   is:  Were they the kinds of meetings where they present

11   their options to you like what's in Exhibit 14?

12       A.   Was 14 the one we just looked at?

13       Q.   Yes.

14       A.   Yes.

15       Q.   All right.  Turning to Exhibit 15.

16       A.   Well, that was a quick one.  I'm through it.

17       Q.   I'll try and keep those large ones away from

18   you from here on out, but I make no promises.

19            Is this an email string dated May 18, 2020, at

20   8:54 a.m. to May 18, I think, at 9:13 a.m.?

21       A.   Yes, that's what it appears to be.

22       Q.   And it looks, from the first email, that you

23   had forwarded a declaration from me filed in this

24   matter, and I asked questions about a potential plan.

25   Do you recall this?

Page 67

1      A.   I don't recall this specific attachment, but I

2  believe this was in reference to new information from

3  either -- there might have been a Providence health plan

4  that we did not receive a bid on.

5      Q.   And was your understanding the reason you did

6  not receive a bid on it was that Providence had chosen

7  not to enter the King County market?

8      A.   Well, my understanding was that they were only

9  offering -- or maybe that is it.  Hold on.

10          They were only offering individual plans in

11 our service area, yes.

12     Q.   And did you understand that Providence had

13 offered, in other counties, plans that would be

14 consistent with Cedar Park's religious beliefs towards

15 abortion and certain contraceptives?

16     A.   I don't know what relevance that would have,

17 but, no, I wasn't.

18     Q.   Okay.  Are you aware of that now?

19     A.   No.

20     Q.   Then why did you forward this particular plan?

21     A.   Because I wanted to make sure that the plans

22 we reviewed, we had not missed a plan that would have

23 allowed us to provide a health care plan excluding

24 abortions and abortifacients in keeping with our

25 deeply-held religious beliefs.

Page 68

1      Q.   I would like to turn now to the 2020 renewal.

2    Was the process the same for the 2020 renewal as far as

3    seeking -- strike that.

4            Did Cedar Park solicit bids from its broker

5    for plans that excluded abortion or certain

6    contraceptive services in the health plan?

7      A.   For the next year, for 2020?

8      Q.   For the next year beginning September 1, 2020.

9      A.   Based on numerous prior conversations with our

10   broker, I think it's safe to say that Jami knew that if

11   there was a plan that was affordable, did not include

12   significant risk or negatively impact our employees, we

13   would want to know about those plans.

14                      (Exhibit No. 16 marked.)

15     Q.  (By Mr. Crisalli) I think we're on 16 on the

16   current exhibit, so I'm trying to make sure my numbering

17   is staying consistent.

18            Just looking at the first page, is this

19   document like Exhibit 14 but for the 2020 renewal cycle?

20     A.   Yes, this would be a mid-process document.

21     Q.   And it appears that it was presented on

22   July 9, 2020?

23     A.   Yes, now that I know where to look for the

24   date.

25     Q.   Okay.  And looking at the second page, is the

Page 69

1    second page an outline of the costs for options for

2    medical plans for starting September 1, 2020?

3        A.   Yes.   This is showing four -- four columns,

4    essentially two options.

5        Q.   Yeah.   And this one, compared to 2019, it

6    looks to have two options for Kaiser Permanente and then

7    one Cigna option; is that correct?

8        A.   Yes.

9        Q.   And is your understanding that for the 2020,

10   the version -- the Cigna option would exclude abortion

11   and contraceptive services consistent with Cedar Park's

12   religious beliefs?

13       A.   Yes.   Because that is a level-funded plan, we

14   could exclude specific procedures.

15       Q.   And do you know what the difference is between

16   the renewal and the negotiated options from Kaiser

17   Permanente?

18       A.   Yes.

19       Q.   What is it?

20       A.   The second column renewal was Kaiser's

21   original rate increase based on prior years'

22   utilization, and the third column negotiated was a lower

23   rate that our broker was able to negotiate with Kaiser

24   for us.

25       Q.   And the renewal rate was $1,149,384 for the

Page 70

1    estimated annual cost; is that right?  That was combined

2    costs.

3         A.    That was Kaiser's original proposal.

4         Q.    And then the negotiated rate was -- from

5    Kaiser was $1,099,092; is that correct?

6         A.    Yes.

7         Q.    And then the Cigna fund was 1,140,925;

8    correct?

9         A.    According to this document, yes.

10        Q.    Do you know if there were any other plans for

11   the 2020 cycle that your broker reviewed that -- aside

12   from Providence, it sounds like, and Cigna, we'll say,

13   that provided for an exclusion for services to which

14   Cedar Park had a religious objection?

15        A.    So the -- that's seems like two questions

16   again.  Can you clarify?

17        Q.    Yeah.  Were there any other plans, aside from

18   those that we've talked about already, that your broker

19   reviewed as potential plans for 2020 that were

20   consistent with Cedar Park's religious beliefs?

21        A.    There are -- there were no plans other than a

22   level-funded plan or self-funded plan that would allow

23   us to exclude abortions or abortifacient drugs based on

24   Washington State Bill 6219.

25                         (Exhibit No. 17 marked.)

Page 71

1      Q.   (By Mr. Crisalli) Putting in Exhibit 17.

2      A.   This is the same one or a new one?

3      Q.   This is a new one.

4      A.   Okay.  Well, that one I read fast.

5      Q.   Great.

6           Do you recognize this document?

7      A.   Yes.

8      Q.   And this is an email received July 14, 2020?

9      A.   That's what it appears to be.

10     Q.   And it appears to describe, from Cigna's

11   compliance team, their policies towards dealing with

12   religious objections, particularly to contraceptives and

13   abortion; correct?

14     A.   Yes.

15     Q.   And this includes the same language of that

16   other document where we talked about Cigna's compliance

17   or how Cigna implemented a religious objection; is that

18   correct?

19     A.   It appears to be stating that the policy must

20   cover abortions and contraceptives.

21     Q.   But it also includes that third paragraph that

22   provides:  "An employer with a religious or moral tenet

23   opposed to a specific service is not required to

24   purchase coverage for that service if they object for

25   reason of religion or conscience."

c295376b-5358-4733-bac0-a5db45f51f89

Page 72

1     Did I read that first sentence of the third
2 bullet correctly?
3     A.   Yes.
4     Q.   And then the next sentence:  "In other words,
5 an employer may exclude coverage for contraceptives and
6 abortion if that employer objects to providing that
7 coverage due to religious or other beliefs."
8     Did I read that correctly?
9     A.   Yes.
10     Q.   And this is likely with regard to the
11 level-funded plan that was submitted in the 2020
12 alternative presentation; is that correct?
13     A.   Let me check.  July 9th was that proposal.
14 This is July 14th, so that's likely correct.
15     Q.   Hold on a second.  I need to rename a document
16 because my numbering is a little off.
17     A.   Okay.
18           (Exhibit No. 18 marked.)
19     Q.  (By Mr. Crisalli) And do you recognize this
20 document?
21     A.   I don't recall getting the email, but I
22 recognize the content of it.  And it's sent to me, so
23 I'd say yes.
24     Q.   And it appears that -- particularly, beginning
25 on Page 2 through 7 is providing based on different --

Page 73

1    let me take a step back for a bigger picture.

2             What's going on, in your understanding, in

3    Pages 2 through 7 by all the different alternatives?

4    And if you want to speak generally to that, I just want

5    to kind of make sure I know what this document's doing

6    and how it was used by Cedar Park.

7        A.   One of the strategies that -- that Cedar

8    Park's used successfully in the past is, whenever

9    allowed by law, increasing the deductible amount to

10   decrease premium costs, and that, I believe, is what we

11   were doing this year.

12       Q.   So as I read the different alternatives, it's

13   looking at if you change the deductible or premium rate,

14   what the total cost might end up being based on the

15   assumptions built within the model; is that correct?

16       A.   Essentially, yes.

17       Q.   And included within this analysis, beginning

18   on Bates Stamp -- it looks like Cedar Park 000479, they

19   included an analysis with respect to Cigna; right?

20       A.   Yes.

21       Q.   And the same with -- it looks like throughout

22   the document, there's both a Kaiser with multiple

23   alternatives and Cigna with multiple alternatives; is

24   that right?

25       A.   Yes.

Page 74

1      Q.   And this is probably building in the same

2   assumptions about the Cigna plan with respect to the

3   exercise of Cedar Park's objections to abortion and

4   certain contraceptives; correct?

5      A.   What do you mean by that specifically?

6      Q.   In looking at the Cigna plans, embedded is an

7   assumption that there will be an exemption for abortion

8   services and certain contraceptives consistent with

9   Cedar Park's religious beliefs.

10     A.   Yes.  Along with all of the other

11  considerations of a level-funded versus a fully-insured

12  plan, which Cigna chose not to bid that year.

13     Q.   And in the end, for 2020, Cedar Park renewed

14  with Kaiser; right?

15     A.   Yes.

16     Q.   Using the negotiated plan, I would assume?

17     A.   Oh, man.

18     Q.   Or did the -- I'll take a step back.

19          Did Cedar Park purchase the renewed plan or

20  the negotiated plan?

21     A.   What page are you on?  Which page?

22     Q.   It's not a page on this document.  I'm just

23  asking generally.

24          So if you need this document to help refresh

25  your recollection, please feel free to take a look.

Page 75

1    A.    Yeah.   In looking at it, I believe we went

2    with Alternative 2 or 3 because they had higher

3    deductibles and, thus, the total cost was slightly less.

4    Q.    But looking at the -- so as I read that one,

5    on Page 2, which is Bates Stamp 000478, Cedar Park, the

6    combined medical/HSA/HRA annual cost was $1,001,027 for

7    Alternative 2; is that correct?

8    A.    That's what I see, yes.

9    Q.    And then for Alternative 3 it was 1,007,352 or

10   -62?

11   A.    I enlarged my screen, it's -352.

12   Q.    Yeah, we're all getting old.

13         And so, in the end, Cedar Park selected one of

14   these, likely either Alternative 2 or 3, as its plan for

15   the 2020 year; correct?

16   A.    I am almost positive that we went with a

17   higher-deductible plan that year.   I would have to

18   double-check to be certain, but that could be

19   Alternative 2 or 3.   I can't remember what those

20   differences are.

21   Q.    Okay.   Are the reasons that Cedar Park did not

22   select Cigna the same as the reasons it did not select

23   Cigna in 2020 -- or 2019?

24   A.    Primarily, I would say yes.

25   Q.    Okay.   Were there any different reasons why

Page 76

1   Cedar Park did not select Cigna in 2020, either new or

2   situations that didn't apply than those in 2019?

3        A.   Let me check something here.

4             Okay.  I was checking in the proposal.  Repeat

5   the question for me, please?

6        Q.   Were there any reasons why that are different

7   from 2019 as to why Cedar Park did not select Cigna

8   in 2020?

9        A.   There may have been.

10        Q.   Okay.  What might those have been, those

11   different reasons?

12        A.   The fact that Cigna, this year, would not bid

13   a fully funded plan may have been a consideration, and

14   our increased stop-loss experience in the prior fiscal

15   year compared to other fiscal years.

16        Q.   And what's a stop-loss?

17        A.   Those are plans under -- those are plans, I

18   guess, under any of the insurance options where the

19   carrier either puts money into a pool for claims that

20   reach a certain threshold or they buy outside stop-loss

21   insurance where once a claim hits a particular amount,

22   it is paid for by that policy or pool rather than

23   costing the carrier dollar for dollar for all of those

24   claims.

25        Q.   No part of that calculation involves or

Page 77

1    relates to whether Cedar Park has religious beliefs;

2    correct?

3        A.   I don't believe so.

4        Q.   For 2021, the plan beginning in 2021,

5    September 1, 2021, did Cedar Park follow, generally, the

6    same process it had the previous years on using a broker

7    to purchase that insurance plan?

8        A.   Essentially, yes.

9        Q.   Okay.  And, in the end, Cedar Park purchased a

10   Kaiser Permanente plan again; right?

11       A.   Do you have the 2021 proposal from our broker?

12       Q.   I do.  I'm going to first talk about an email

13   then we'll do that, okay?  Just to set up the...

14            Apologies.  I'm renaming something so it takes

15   a minute.

16       A.   Okay.

17            (Exhibit No. 19 marked.)

18            MR. THERIOT:  Do you see it there, Steve?

19       Q.  (By Mr. Crisalli) Yeah, sorry.  Exhibit 19 is

20   in there.

21       A.   I'm enjoying my water too much.

22       Q.   And, really, I'm focusing on Page 1 starting

23   at the -- your email March 24, 2021, at 11:22 a.m.

24       A.   Okay.  I've read that.

25       Q.   In your -- this is an email from you to

Page 78

1    Melissa Knauss on Wednesday, March 24, at 11:22 a.m.; is

2    that correct?

3         A.   Yes, that's what it appears.

4         Q.   And you start off with:  "This is a toned-down

5    email I would like to send to Jami.  I don't want to

6    send it until you and I have had a chance to talk about

7    but I'm hopping mad.  Steve."

8              Do you recall saying that?

9         A.   Well, typing it, I mean, that sounds like me.

10        Q.   Why did you say that you were hopping mad?

11        A.   Because prior to this, every single month, we

12   would get a 12-month rolling report from Kaiser showing

13   our utilization of premiums versus claim costs, and they

14   have just notified us that they wouldn't be doing that

15   anymore.

16        Q.   And what did you use those reports for?

17        A.   Those reports gave us an idea for budgeting

18   purposes of how our utilization looked.  And by

19   calculating the claims utilization to premiums, that

20   would give me an idea of whether or not we seem to be on

21   track for higher premiums or we were in a position to

22   ask for lower premiums in the next plan year.

23        Q.   In the last paragraph, you say:  "You can ask

24   what rate they will give if we don't shop, but I'm

25   pretty done with Kaiser based on this nonsense if I

c295376b-5358-4733-bac0-a5db45f51f89

Page 79

1    don't get my utilization reports, at least for April

2    like before, if that's when they're giving us our

3    proposed rates."

4              Did I read that correctly?

5        A.   Mm-hmm.

6        Q.   So at this point, were you seriously -- was

7    Cedar Park considering leaving Kaiser Permanente?

8        A.   Based on the lack of information I was getting

9    and other points that I referenced here, there was

10   something I can't recall the details about, obesity

11   rates that they were throwing and it seemed to me this

12   was just a play to be able to give us their maximum

13   annual rate increase.

14       Q.   And none of these rates are related to Cedar

15   Park's expression of its religious beliefs; right?

16       A.   I don't believe so.

17       Q.   Did Cedar Park solicit bids for the 2021 year

18   from plans other than Kaiser Permanente?

19       A.   I believe I did.  Do you have our -- is that

20   the thing you just --

21                      (Exhibit No. 20 marked.)

22       Q.   (By Mr. Crisalli) Yes.  I put in Exhibit 21 --

23   or, 20, excuse me.  I'm looking at the first page.

24       A.   Yeah, I'm trying to get the thing to open.

25              Oh, there we are.  Okay.

c295376b-5358-4733-bac0-a5db45f51f89

Page 80

1      Q.   Is this exhibit like Document 18 and, what,
2   16?  Excuse me, Documents 16 and 14?
3      A.   Which are the documents for the '19 and '20
4   plan years from Gallagher?
5      Q.   Yes.
6      A.   Yes.  This would be the similar, not
7   pre-renewal but mid-renewal document from them.
8      Q.   And this is a document that's dated
9   June 28, 2021; right?
10     A.   Yup.
11     Q.   And if you go to the second page, this appears
12  to be the proposal for medical for a different option;
13  is that right?
14     A.   Just a second.  I'm scrolling to make sure I
15  know everything in here.
16          Okay.  Sorry, your question, then, was on
17  Page 2?
18     Q.   Yeah, Page 2.  Is that the presentation of
19  different options for medical for 2021?
20     A.   Yes.
21     Q.   And this appears to just have two options is
22  my read; is that right?
23     A.   Oh, I see.  The Kaiser -- the second column,
24  the Kaiser Permanente, and the Regence BlueShield
25  column, yes.

Page 81

1      Q.    Correct.

2            Do you know if your broker solicited bids from

3      any other healthcare insurance carrier?

4      A.    Yes.

5      Q.    And did they?

6      A.    Yes.

7      Q.    How many did they solicit bids from?

8      A.    Five plans other than Kaiser Permanente.

9      Q.    Okay.  Were you reading anything -- and I'm

10     trying to figure out your counting, but if you were just

11     thinking to yourself and counting?  I didn't know if you

12     were reading something.

13     A.    No, it's Page 17 of the document you just sent

14     me.

15     Q.    Okay.  Okay.  And do you know whether any of

16     those plans included an exception for abortion or

17     contraceptive -- certain contraceptives consistent with

18     Cedar Park's religious beliefs?

19     A.    I don't believe any did with the exception of

20     Cigna.  It doesn't state here, but I believe they were

21     requoting their level-funded plan from the year before.

22     Everything else was fully insured.

23     Q.    And do you know whether the Regence plan,

24     provided on Page 2 as an alternative, whether that plan

25     offered an exemption for abortion and certain

Cedar Park Assembly of God of Kirkland v Kreidler, et al.                    30(b)(6) Steven Orcutt

Page 82

1    contraceptive services consistent with Cedar Park's

2    religious belief?

3        A.   My understanding is they did not.

4        Q.   And Cedar Park again renewed with Kaiser

5    Permanente for 2021; is that correct?

6        A.   Yes.

7        Q.   And why did it choose Kaiser Permanente over

8    Regence BlueShield?

9        A.   All the same factors that we consider always,

10   the cost of the plan, the access to providers that it

11   provides our staff, the likelihood of future increases

12   being exorbitant.  Those are kind of my big three.

13       Q.   And for the 2022 cycle, the plan taking effect

14   September 1, 2022, did Cedar Park approach its broker

15   about soliciting additional bids?

16       A.   Yes.

17       Q.   And did it receive any alternatives?

18       A.   I would have to check.  I don't...

19                    (Exhibit No. 21 marked.)

20       Q.   (By Mr. Crisalli) Okay.  I put in Exhibit 21.

21            So, first, this document looks to me a little

22   different from Exhibits 21 -- or, excuse me -- 20, 16,

23   and 14.  I'm trying to figure out if this is the same

24   kind of presentation that occurred with respect to those

25   documents.

Page 83

1      A.    Okay.   Let me...

2            Okay.   So what's your question again?   Now,

3   I --

4      Q.    Okay.   Just so I -- I'll start over.

5            Do you recognize this document?

6      A.    Yes.

7      Q.    What is this document?

8      A.    It is a mid-renewal document outlining all of

9   our options from Gallagher for the plan beginning

10  September 1, 2022.

11     Q.    And this document's dated June 1, 2022; is

12  that correct?

13     A.    Yup.

14     Q.    As I reviewed this document, I did not see any

15  options provided for health -- a health insurance

16  carrier.   Is there -- is that correct?

17     A.    This document does not include a list of

18  carriers that -- other carriers that were solicited.

19  That's correct.

20     Q.    Okay.   I think it's likely I don't have the

21  analysis document that happens later in the cycle

22  through the course of discovery.   At least, I haven't

23  seen it in my review of the documents for 2022.

24            Can you tell me if you recall what other plans

25  Cedar Park considered for the 2022 purchase?

Page 84

1        A.    Hang on.  Let me check one thing here.

2        Q.    And before you go and check, I just want to --

3    are you looking at Exhibit 21, or are you looking at

4    something else?

5        A.    Yes, 21.  Yeah, I was just -- so go on.

6        Q.    Oh, what -- do you recall what health

7    insurance carriers Cedar Park reviewed for the 2022

8    purchase?

9        A.    I believe that my instruction to my broker --

10   well, my instruction to my broker is always, "Get me

11   options," unless it's in a year where we are negotiating

12   a rate reduction with Kaiser that nobody else would be

13   able to do.  And, in those cases, it's, generally, we

14   won't go out to bid, but you drop your prices to where

15   we feel we couldn't do any better.

16            I believe my broker did go to other carriers

17   this year, and I believe all of them declined to

18   cover -- to quote or felt that they would be

19   noncompetitive.

20       Q.    And, in the end, Cedar Park purchased a Kaiser

21   plan or renewed its Kaiser plan as negotiated; correct?

22       A.    Yes.

23       Q.    Has Cedar Park ever reached out to the Office

24   of Insurance Commissioner to determine whether there was

25   a plan available in the market that would accommodate

Page 85

1    Cedar Park's religious beliefs?

2        A.    I'm not sure.

3        Q.    Did Cedar Park ever access the Office of

4    Insurance Commissioner's website and research what plans

5    are available that might be consistent with Cedar Park's

6    religious beliefs?

7        A.    I don't know.

8        Q.    Did Cedar Park reach out to any other state

9    agency to determine whether there is a health plan

10   available on the market that would accommodate Cedar

11   Park's religious belief?

12       A.    I don't know.

13             MR. CRISALLI:  All right.  So let's go

14   off the record.

15             MR. THERIOT:  Okay.

16                  (Discussion off the record.)

17                  (A break was taken from

18                   12:26 p.m. to 12:34 p.m.)

19       Q.  (By Mr. Crisalli) Sir, do you understand you

20   are still under oath?

21       A.    Yes.

22       Q.    Did Cedar Park conduct any independent

23   research into different ways it could purchase health

24   insurance while exercising its religious objections to

25   abortion and certain contraceptives?

Page 86

1          MR. THERIOT:  Objection.  Vague.

2          THE DEPONENT:  Yeah.  I'm not quite sure

3   what you mean.  Other ways?

4      Q.  (By Mr. Crisalli) To what degree did Cedar Park

5   investigate ways in which it could purchase health

6   insurance consistent with its religious objection to

7   abortion and certain contraceptives?

8      A.  Gallagher is a large, nationwide broker.  They

9   said there were none in King County.  We talked to two

10  other insurance brokers, smaller companies who are eager

11  for our business, to see if they could offer any

12  alternatives, and they could not.

13          We talked to, actually, a nonmedical insurance

14  person in our congregation who just has knowledge of

15  medical to see if there were anything else, and we'd

16  consistently come up to the fact that because of State

17  Bill 6219, there are no plans other than level-funded or

18  self-funded that would allow us to enact a plan in

19  keeping with our deeply-held religious convictions.

20      Q.  Is Cedar Park aware that there are plans

21  currently on the market that offer services consistent

22  with Cedar Park's religious belief?

23      A.  Plans on the market, what do you mean?

24      Q.  I mean health plans -- health insurance plans

25  on the market consistent with Cedar Park's religious

c295376b-5358-4733-bac0-a5db45f51f89

Page 87

1    beliefs.

2         A.   I'm aware of self-funded plans -- level-funded

3    plans or self-insured plans.

4         Q.   Has Cedar Park had any discussions with

5    carriers about offering a plan that would be

6    consistent -- I'm talking carriers, not the broker, but

7    you, yourself, with carriers about offering a plan

8    consistent with Cedar Park's religious beliefs?

9         A.   No, not directly.

10        Q.   And you don't know of different methods in

11   which carriers could effect an exclusion in a plan for

12   abortion or contraceptives while being consistent with

13   Senate Bill 6219?

14        A.   No, I don't.

15        Q.   Have you ever contacted Kaiser Permanente

16   directly about its exclusion -- about whether it could

17   exclude abortion care in its plan?

18        A.   I believe there are documents that we

19   submitted that -- that do address that.

20        Q.   What's your understanding as to why Kaiser

21   Permanente will not offer a plan consistent with Cedar

22   Park's religious beliefs?

23        A.   I believe that perhaps in that 61-page giant

24   email or in other communications, Kaiser has said that

25   after 6219 was enacted, they would not be able to do

Page 88

1   that, exclude abortions or abortifacients.  But if 6219

2   was overturned, they would be able to, mid-plan, exclude

3   those abortion services.

4        Q.   Do you think that -- does Cedar Park take the

5   position that the defendants violate its rights by if

6   Kaiser Permanente engages in an incorrect legal

7   analysis?

8             MR. THERIOT:  Objection.  Calls for a

9   legal conclusion.

10            THE DEPONENT:  Yeah.  I'm not even sure

11   what you're question is.

12       Q.   (By Mr. Crisalli) Let's say Kaiser's wrong in

13   the law and their advice is bad.  I want you to accept

14   that premise.  Okay?  Does that work?

15       A.   Okay.

16       Q.   Are the defendants, in this matter -- does

17   Cedar Park take the position that the defendants, in

18   this matter, are violating Cedar Park's religious rights

19   for that flawed assumption?

20            MR. THERIOT:  Objection.  Calls for a

21   legal conclusion and speculation.

22            THE DEPONENT:  I -- that doesn't make

23   sense to me.

24       Q.   (By Mr. Crisalli) What about it doesn't make

25   sense?

Page 89

1     A.   I don't understand what you're -- why you're

2  talking about Kaiser's lawyers and Cedar Park.

3     Q.   I'm saying what if Kaiser's wrong --

4               MR. THERIOT:  Same objection.

5     Q.  (By Mr. Crisalli) -- is that --

6               MR. CRISALLI:  I'll finish the sentence

7  and allow you to get your objection.

8               MR. THERIOT:  Sorry.

9               MR. CRISALLI:  No worries.

10     Q.  (By Mr. Crisalli) What if Kaiser's wrong on its

11  legal analysis?  There are other plans that have been

12  approved that recognize individuals' or organizations'

13  religious objections.  Is it -- are defendants

14  nonetheless violating Cedar Park's religious rights

15  because Kaiser has engaged in that flawed analysis?

16               MR. THERIOT:  Same objection.

17               THE DEPONENT:  We're not basing our

18  opinion on what Kaiser said.  We're basing it on what

19  every single carrier has told our broker and our reading

20  of the law and our attorney's advice.

21     Q.  (By Mr. Crisalli) Okay.  Then, the same

22  question goes with respect to what if your broker is

23  wrong.  Are the defendants liable or violating your

24  religious rights for a bad opinion by a broker?

25               MR. THERIOT:  Objection.  Vague.  Calls

Page 90

1   for a legal conclusion.

2                  THE DEPONENT:  Again, it's -- it's the

3   broker, but it's also our attorney who has told us that

4   that's what the law says, and our experience that no

5   other -- no one will provide a plan like we had before

6   House Bill 6219 precluded us from excluding abortions as

7   we have in the past.

8      Q.  (By Mr. Crisalli) I don't have any further

9   questions at this point.  Thank you very much for your

10  time.  I appreciate it.

11                 MR. CRISALLI:  Can go off the record?

12                 MR. THERIOT:  Okay.

13                   (Deposition concluded at 12:42 p.m.)

14                   (Signature reserved.)

15                       --o0o--

16

17

18

19

20

21

22

23

24

25

Page 91

1                         C E R T I F I C A T E

2

3    STATE OF ARIZONA     )
                          )
4    COUNTY OF MARICOPA   )

5

6              I, Nicole A. Bulldis, RPR, a Certified Court
     Reporter, do hereby certify under the laws of the State
7    of Washington:

8              That the foregoing 30(b)(6) deposition upon
     oral examination of Cedar Park Assembly of God of
9    Kirkland, Washington designee, Steven Orcutt, was taken
     stenographically by me on November 21, 2022 and
10   transcribed under my direction;

11             That the witness was duly sworn by me to
     testify truthfully, and that the transcript of the
12   deposition is full, true, and correct to the best of my
     ability;

13

14             That I am not a relative, employee, or counsel
     of any party to this action or relative or employee of
     such counsel, and that I am not financially interested
15   in the said action or the outcome thereof.

16

17

18             IN WITNESS WHEREOF, I have hereunto set my

19   hand this 1st day of December 2022.

20

21

22

23   _____
     Nicole A. Bulldis, RPR
24   AZ CCR No. 50955
     WA CCR. No. 3384

25

# Exhibit D



Insurance | Risk Management | Consulting

 

 

## 2019/2020 Employee Benefit Analysis and Recommendations

Proposed Effective Date: September 1, 2019
Jami Hansen, Area-Vice President/Client Consultant
*Melinda Hansen, Client Manager*
*James Stanek, Benefit Analyst*
Date Presented: June 10, 2019

**IMPORTANT:** This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc. This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts. See your policy or contact us for specific information or further details in this regard.



Cedar Park 000082

# Medical
## *Cost Outline*

### PPO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna | Alternative 2<br>Cigna |
|---|---|---|---|---|---|
| | | | | *Fully Insured* | *Level-Funded* |
| Employee Only | 48 | $396.85 | $431.99 | $399.41 | $411.76 |
| Employee + Spouse | 5 | $876.79 | $954.44 | $882.26 | $909.55 |
| Employee + Child(ren) | 7 | $740.31 | $805.87 | $744.87 | $767.91 |
| Employee + Family | 9 | $1,220.25 | $1,328.31 | $1,228.16 | $1,266.14 |
| **PPO Plan Annual Cost** | **69** | **$475,166** | **$517,243** | **$478,204** | **$492,994** |
| *% Change* | | | *8.9%* | *0.6%* | *3.8%* |
| *$ Change* | | | *$42,077* | *$3,038* | *$17,828* |

### HMO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna | Alternative 2<br>Cigna |
|---|---|---|---|---|---|
| | | | | *Fully Insured* | *Level-Funded* |
| Employee Only | 37 | $345.53 | $371.70 | $391.13 | $403.23 |
| Employee + Spouse | 4 | $763.40 | $821.22 | $864.03 | $890.75 |
| Employee + Child(ren) | 4 | $644.58 | $693.39 | $729.47 | $752.03 |
| Employee + Family | 1 | $1,062.45 | $1,142.91 | $1,202.73 | $1,239 93 |
| **HMO Plan Annual Cost** | **46** | **$233,748** | **$251,451** | **$264,584** | **$272,767** |
| *% Change* | | | *7.6%* | *13.2%* | *16.7%* |
| *$ Change* | | | *$17,703* | *$30,836* | *$39,019* |

| | | | | | |
|---|---|---|---|---|---|
| **HSA Annual Contribution** | | $72,500 | $72,500 | $72,500 | $72,500 |
| **HRA Annual Contribution** | | $70,537 | $75,120 | $75,120 | $75,120 |

| | | | | | |
|---|---|---|---|---|---|
| **Combined Medical/HSA/HRA Annual Cost** | **115** | **$851,951** | **$916,314** | **$890,408** | **$913,381** |
| *% Change* | | | *7.6%* | *4.5%* | *7.2%* |
| *$ Change* | | | *$64,363* | *$38,457* | *$61,430* |

 **Remember**

- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.
- HSA funding assumes $500 per individual and $1,000 per family.
- Level Funded Arrangement offers 50% surplus share.
- Cigna Fully Insured rates are estimated based on 3% reduction to the Level-Funded rates.
- Cigna has agreed to pay for Single Billing Services.
- Elective abortions are not covered for both the Cigna Fully Insured and Cigna Level-Funded plans.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 2

Cedar Park 000083

# HRA Administration
## *Cost Comparison and Utilization*

| Administration Costs | | Current | Renewal |
|---|---|---|---|
| | | NMR | NMR |
| Submission Fee (Per Employee) | 22 | $40.00 | $40.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $225.00 |
| **Total Annual Administration Cost** | | **$1,105** | **$1,105** |

| Reimbursement Limits | | Current/Renewal |
|---|---|---|
| | | NMR |
| **PPO Plan Deductible** | | $4,500/$9,000 |
| Employee | 48 | $3,150 |
| Employee & Family | 21 | $6,300 |
| **HMO Plan Deductible** | | $4,500/$9,000 |
| Employee | 37 | $3,150 |
| Employee & Family | 9 | $6,300 |
| **Annual Maximum Liability** | | **$456,750** |

| HRA Utilization Costs and Projections | 2018 Reimbursements | 1/1/2019 - 5/31/2019 Reimbursements | Current Year Completion Projection | Renewal Year Projection |
|---|---|---|---|---|
| **Combined Plan Utilization** | $65,134 | $17,971 | $69,432 | $74,015 |
| **% of Max Utilization** | **14.3%** | **3.9%** | **15.2%** | **16.2%** |

| Total Costs Projection | Current | Renewal |
|---|---|---|
| | Projected | Projected |
| **Total Administration Cost** | $1,105 | $1,105 |
| Utilization Projected costs | $69,432 | $74,015 |
| **Total HRA Annual Cost Projection** | **$70,537** | **$75,120** |

 Remember

- HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.
- HRA projection trend: 6 6%

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 3

Cedar Park 000084

# Medical

*Benefit Outline - PPO Plan*

| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente | | Alternative 1 & 2<br>Cigna | |
|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Medical Plan** | *Access PPO* | | *Open Access Plus* | |
| **Annual Deductible**<br>(Individual/Family) | $4,500/$9,000 | | $4,500/$9,000 | $9,000/$18,000 |
| **Coinsurance** | 10% (5% enhanced)* | 30% | 10% | 30% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,550/$13,100 | | $6,550/$13,100 | $13,100/$26,200 |
| **Preventive Care** | Covered in full | | Covered in full | Not covered |
| **Outpatient Services** | | | | |
| • Office Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Specialist Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Surgery | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Rehabilitation | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 60 visits PCY | | Up to 60 visits PCY | |
| **Other Services** | | | | |
| • Chiropractic Care | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 8 visits PCY | | Up to 12 visits PCY | |
| • Acupuncture | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 12 visits PCY | | Up to 12 visits PCY | |
| **Urgent Care** | 10% after deductible | 30% after deductible | Covered in full after deductible | 30% after deductible |
| **Emergency Room**<br>(copay waived if admitted) | 10% after deductible | | 10% after deductible | |
| **Inpatient Hospitalization** | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| **Prescription Drug Plan** | *At Preferred Pharmacies* | | *At Preferred Pharmacies* | |
| **Annual Deductible**<br>(Individual/Family) | Shared with medical | | Shared with medical | |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | Shared with medical | | Shared with medical | |
| **Retail Pharmacy** (30-day supply) | *After deductible…* | | *After deductible…* | |
| • Generic | $10 | | $10 | |
| • Preferred Brand | $35 ($30*) | | $35 | |
| • Non-Preferred Brand | $70 ($65*) | | $70 | |
| • Specialty | Above cost shares apply | | Above cost shares apply | |
| **Mail Order** (90-day supply) | 3 x enhanced retail cost share* | | 2 x retail cost share | |
| **Part D Creditable/Non-Creditable** | Creditable | | Creditable | |
| **Formulary** | KPWA Formulary | | Cigna Advantage | |

ⓘ **Remember**

• For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

*Enhanced benefit applies when outpatient services are provided at a Kaiser Permanente facility.

Prepared by: 

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 4

Cedar Park 000085

# Medical
## *Benefit Outline - HMO Plan*

| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente<br>In-Network Only | Alternative 1 & 2<br>Cigna<br>In-Network Only |
|---|---|---|
| *Medical Plan* | *Core HMO* | *Open Access Plus* |
| **Annual Deductible**<br>(Individual/Family) | $4,500/$9,000 | $4,500/$9,000 |
| **Coinsurance** | 10% | 10% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,650/$13,300 | $6,650/$13,300 |
| **Preventive Care** | Covered in full | Covered in full |
| **Outpatient Services** | | |
| • Office Visit | 10% after deductible | 10% after deductible |
| • Specialist Visit | 10% after deductible | 10% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 10% after deductible |
| • Surgery | 10% after deductible | 10% after deductible |
| • Rehabilitation | 10% after deductible<br>Up to 60 visits PCY | 10% after deductible<br>Up to 60 visits PCY |
| **Other Services** | | |
| • Chiropractic Care | 10% after deductible<br>Up to 10 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| • Acupuncture | 10% after deductible<br>Up to 12 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| **Urgent Care** | 10% after deductible | Covered in full after deductible |
| **Emergency Room**<br>(copay waived if admitted) | 10% after deductible | 10% after deductible |
| **Inpatient Hospitalization** | 10% after deductible | 10% after deductible |
| *Prescription Drug Plan* | *At Preferred Pharmacies* | *At Preferred Pharmacies* |
| **Annual Deductible**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Retail Pharmacy** (30-day supply) | *After deductible...* | *After deductible...* |
| • Generic | $20 | $10 |
| • Preferred Brand | $40 | $40 |
| • Non-Preferred Brand | $60 | $60 |
| • Specialty | Above cost shares apply | Above cost shares apply |
| **Mail Order** (90-day supply) | 3 x retail cost share | 2 x retail cost share |
| **Part D Creditable/Non-Creditable** | Creditable | Creditable |
| **Formulary** | KPWA Formulary | Cigna Advantage |

 **Remember**

• For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 5

Cedar Park 000086

# Self-Funded Medical
## *Fixed Cost Comparison*

| | Proposed |
|---|---|
| *Administration* | |
| **TPA** | HMA |
| **PBM** | CVS Caremark |
| **Network Option** | Regence BlueShield |
| **Administrative Fees** 115 | |
| • Set-Up | $3,500.00 |
| • Plan Administration | $28.60 |
| • Network | $5.50 |
| • Care Management | $3.75 |
| • Fiduciary | $2.00 |
| • 24-Hour Nurse Line | $0.65 |
| • MD Live Telehealth w/ Behavioral | $1.30 |
| • Care Navigator | $1.50 |
| • Disease Management | $3.00 |
| • Cost Transparency Tool | $1.50 |
| • Maternity Management | $350 per case |
| • Creditable Coverage Determination   2 | $385.00 |
| **Rate Guarantee** | 12 months |
| **Annual Administration Cost** | **$70,234** |

 Remember

• Determination of employer prescription drug coverage meeting Medicare's Creditable Coverage Requirements - $385 (fee is per Plan tested).

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 6

Cedar Park 000087

# Self-Funded Medical
## *Stop Loss Comparison - Financial Analysis*

| | Proposed |
|---|---|
| **Administration** | |
| **TPA** | HMA |
| **Stop Loss** | |
| **Reinsurer** | Symetra |
| **Quote Status** | Preliminary |
| **Individual Stop Loss** (ISL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Deductible | $100,000 |
| • Accumulation Basis | Per member |
| • Annual Maximum | Unlimited |
| • Lifetime Maximum | Unlimited |
| • Run-In Limitation | N/A |
| **Aggregate Stop Loss** (ASL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Corridor | 125% |
| • Annual Maximum | $1,000,000 |
| • Run-In Limitation | N/A |
| **Additional Provisions** | |
| • Aggregating Specific Deductible | None |
| • Specific Advanced Funding | Not Included |
| • Aggregate Accommodation | Not Included |
| • Retiree Coverage | Not covered |
| • Actively at Work | Waived w/ Disclosure |
| • No New Laser/Rate Cap | Not Included |
| **Laser Liability** | None |
| **Rates Subject to Change** | Lock w/ data through May |
| **ISL Composite Rate**   115 | $186.40 |
| **ASL Composite Rate**   115 | $21.42 |
| **Annual Stop Loss Premium** | **$286,792** |

 Remember

• Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 7

Cedar Park 000088

# Self-Funded Medical

*Expected & Maximum Claims Factor Comparison*

|  |  | Proposed |
|---|---|---|
| *Stop Loss* | | |
| **Reinsurer** | | Symetra |
| **Quote Status** | | Preliminary |
| **Individual Stop Loss** (ISL) | | |
| • Lines of Coverage | | Medical/Rx |
| • Contract Terms | | 12/12 |
| • Deductible | | $100,000 |
| • Annual Maximum | | Unlimited |
| **Aggregate Stop Loss** (ASL) | | |
| • Lines of Coverage | | Medical/Rx |
| • Contract Terms | | 12/12 |
| • Corridor | | 125% |
| • Annual Maximum | | $1,000,000 |
| **Laser Liability** | | None |
| *Gallagher Projection* | | |
| **Underwriting Assumptions** | | |
| • Experience Period | | May 2017 - April 2019 |
| • Experience Weight (Prior/Current) | | 33%/67% |
| • Medical/Rx Trend | | 5.7% |
| • Margin | | 2.0% |
| **Expected Claims Factor (PEPM)** | 115 | $452.51 |
| **Gallagher Annual Expected Claims** | | **$624,464** |
| *Maximum Liability* | | |
| **Maximum Claims Factors** (for ASL) | 115 | $619.57 |
| **Maximum Annual Claims Liability** | | **$855,007** |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 8

Cedar Park 000089

# Funding Development

| | Expected Renewal<br>*Based on Gallagher Projection*<br>*Proposed* |
|---|---|
| | *Medical, Rx* |
| **TPA** | HMA |
| **Stop Loss** | Symetra |
| **ISL** | $100,000 |
| **Cost Components** | |
| • Projected Paid Claims | $624,464 |
| • Projected Fixed Cost | $357,026 |
| • Estimated Rx Rebates | ($35,000) |
| **Total Needed Funding** | **$946,489** |
| **Present Funding** | $708,914 |
| **Needed Change to Present Rates** | **33.5%** |

 **Remember**

- Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.
- Needed and Present Funding do not include HSA or HRA funding.
- Needed Funding includes 5.3% commission for Stop Loss only.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 9

Cedar Park 000090

# Self-Funded Medical
## *Stop Loss Comparison - Coverage Analysis*

| Reinsurer Statement | |
|---|---|
| **Coverage Analysis Statement** | |
| **Proposed - Symetra**<br>• Stop Loss Reinsurer: Symetra<br>• Administration TPA: HMA | Symetra agrees their stop loss policy will cover agreed upon benefits. Any claims including fiduciary override such as extra contractual payment or claims that are covered or eligible for coverage by Worker's Compensation will not be covered under the stop loss policy. Also, coverage for prescription drugs is required to be in included in the experience provided to the underwriter and the stop loss coverage is subject to the terms outlined on the Symetra stop loss policy schedule of benefits. |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 10

Cedar Park 000091

# Dental
## Benefit & Cost Outline

| | Current/Renewal Delta Dental of WA | | Alternative 1 Delta Dental of WA | |
|---|---|---|---|---|
| | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* |
| **Dental Plan** | | *MAC* | | *MAC* |
| **Annual Deductible** | $0 per person | $50 per person | $25 per person | |
| (waived for Preventive & Diagnostic) | $0 per family | $150 per family | $75 per family | |
| **Annual Benefit Maximum** | $1,500 per person | | $2,000 per person | |
| **Waiting Period** | 12 months for Major services | | None | |
| **Services** | | | | |
| • Preventive & Diagnostic | No charge | No charge | No charge | No charge |
| • Basic | 20% | 20% after deductible | 10% after deductible | 10% after deduc ible |
| • Major | 50% | 50% after deductible | 40% after deductible | 40% after deduc ible |
| **Periodontics** | Covered under Basic | | Covered under Basic | |
| **Endodontics** | Covered under Basic | | Covered under Basic | |
| **Implants** | Covered under Major | | Covered under Major | |
| **Orthodontia** | | | Children only | |
| • Services | Not covered | | 50% | 50% |
| • Lifetime Benefit Maximum | | | $2,000 per person | |
| **Late Entrant Penalty** | Open Enrollment | | None | |
| **Monthly Rates** | *Current* | *Renewal* | | |
| Employee Only | 94 | $48.95 | $48.95 | $56.49 | |
| Employee + Spouse | 16 | $95.79 | $95.79 | $110.54 | |
| Employee + Child(ren) | 11 | $105.56 | $105.56 | $136.82 | |
| Employee + Family | 14 | $152.41 | $152.41 | $190.88 | |
| **Rate Guarantee** | | 12 mon hs | 12 months | |
| **Total Annual Cost** | 135 | $113,146 | $113,146 | $135,072 | |
| *% Change* | | | *0.0%* | *19.4%* | |
| *$ Change* | | | *$0* | *$21,926* | |



ⓘ **Remember**

• Actual claims paid are subject to maximum allowable charge, frequencies, age limitations, and terms and conditions of the contract.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 11

Cedar Park 000092

## Contribution Outline

| | | Current Total Cost | Current ER Cost | Current EE Cost* | Negotiated Total Cost | Negotiated ER Cost | Negotiated EE Cost* | Alternative 1 Total Cost | Alternative 1 ER Cost | Alternative 1 EE Cost* | Alternative 2 Total Cost | Alternative 2 ER Cost | Alternative 2 EE Cost* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PPO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 48 | $396.85 | $281.85 | $115.00 | $431.99 | $306.81 | $125.18 | $399.41 | $283.65 | $115.75 | $411.76 | $292.43 | $119.33 |
| Employee + Spouse | 5 | $876.79 | $308.97 | $567.82 | $954.44 | $336.34 | $618.10 | $882.26 | $310.95 | $571.31 | $909.55 | $320.57 | $588.98 |
| Employee + Child(ren) | 7 | $740.31 | $303.71 | $436.60 | $805.87 | $330.61 | $475.26 | $744.87 | $305.65 | $439.22 | $767.91 | $315.11 | $452.80 |
| Employee + Family | 9 | $1,220.25 | $322.24 | $898.01 | $1,328.31 | $350.77 | $977.54 | $1,228.16 | $324.30 | $903.86 | $1,266.14 | $334.33 | $931.81 |
| **HMO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 37 | $345.53 | $270.53 | $75.00 | $371.70 | $291.02 | $80.68 | $391.13 | $306.22 | $84.91 | $403.23 | $315.69 | $87.54 |
| Employee + Spouse | 4 | $763.40 | $269.02 | $494.38 | $821.22 | $289.39 | $531.83 | $864.03 | $304.51 | $559.52 | $890.75 | $313.93 | $576.82 |
| Employee + Child(ren) | 4 | $644.58 | $264.44 | $380.14 | $693.39 | $284.46 | $408.93 | $729.47 | $299.32 | $430.15 | $752.03 | $308.58 | $443.45 |
| Employee + Family | 1 | $1,062.45 | $280.56 | $781.89 | $1,142.91 | $301.81 | $841.10 | $1,202.73 | $317.58 | $885.16 | $1,239.93 | $327.40 | $912.53 |
| **Medical Annual Cost** | | $708,914 | $390,285 | $318,629 | $768,694 | $422,935 | $345,759 | $742,788 | $411,495 | $331,293 | $765,761 | $424,222 | $341,539 |
| **Additional Employer Contributions** | | | | | | | | | | | | | |
| Annual HSA Contribution | | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 |
| Annual HRA Contribution | | $70,537 | $70,537 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 |
| **Medical Total Annual Cost** | | $851,951 | $533,323 | $318,629 | $916,314 | $570,555 | $345,759 | $890,408 | $559,115 | $331,293 | $913,381 | $571,842 | $341,539 |
| **Dental Plan** | | DDWA | | | DDWA | | | DDWA | | | DDWA | | |
| Employee | 94 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 |
| Employee + Spouse | 16 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 |
| Employee + Child(ren) | 11 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 |
| Employee + Family | 14 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 |
| **Dental Total Annual Cost** | | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 |
| | | | | | | | | | | | | | |
| **Total Annual Cost** | | $965,097 | $587,669 | $377,429 | $1,029,460 | $624,901 | $404,559 | $1,003,554 | $613,461 | $390,093 | $1,026,527 | $626,188 | $400,339 |
| % Change | | | | | 6.7% | 6.3% | 7.2% | 4.0% | 4.4% | 3.4% | 6.4% | 6.6% | 6.1% |
| $ Change | | | | | $64,363 | $37,233 | $27,130 | $38,457 | $25,793 | $12,664 | $61,430 | $38,519 | $22,911 |

* Under the Affordable Care Act (ACA), coverage is affordable for an employee if the employee's contribution toward the lowest-cost, self-only, minimum value coverage does not exceed a specified percentage of the employee's household income (9.56% for plan years beginning in 2018; 9.86% for plan years beginning in 2019; and 9.86% for plan years beginning in 2020). There are three safe harbors including the Federal Poverty Line safe harbor. To meet the Federal Poverty Line safe harbor for affordability for plan years starting on July 1, 2019 or prior to July 1, 2020, employee contribution for employee-only coverage cannot exceed 9.86% of the Federal Poverty Line which is equal to $102.63 per month for the 48 contiguous states, $128.18 for Alaska and $118.15 for Hawaii. Note: The affordability percentage rate, and therefore the dollar amount, may change annually. Employers may use the poverty guidelines in effect within six months prior to the first day of the plan year. There are two additional safe harbor options that may be used: the Form W-2 Safe Harbor or the Rate of Pay Safe Harbor. Guidance addresses how HRAs, wellness program rewards, flex credits, defined contributions, opt-out payments, and fringe benefit payments required under the Davis-Bacon Act or the Service Contract Act affect the affordability of employer coverage. See Healthcare Reform Guidelines for details.

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 12

Cedar Park 000093

# Voluntary Vision
## *Benefit & Cost Outline*



| Employee Share of Eligible Expenses | | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Base Plan | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Buy-Up Plan | |
|---|---|---|---|---|---|---|
| | | | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Vision Plan** | | | Signature Plan | | Signature Plan | |
| **Routine Exam Copay** | | | $10 | $10 | $10 | $10 |
| **Routine Exam** | | | Covered in full* | Reimbursed up to $50* | Covered in full* | Reimbursed up to $50* |
| **Materials Copay** | | | $25 | $25 | $25 | $25 |
| **Lenses** (per pair) | | | | Reimbursed up to… | | Reimbursed up to… |
| • Single Vision | | | No charge* | $50* | No charge* | $50* |
| • Lined Bifocals | | | No charge* | $75* | No charge* | $75* |
| • Lined Trifocals | | | No charge* | $100* | No charge* | $100* |
| **Frames** | | | $130 allowance then 20% discount* | Reimbursed up to $70* | $130 allowance then 20% discount* | Reimbursed up to $70* |
| **Contact Lenses** (in lieu of eyeglasses) | | | | | | |
| • Fitting and Evaluation | | | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials |
| • Elective Contacts | | | $130 allowance | | $130 allowance | |
| **Frequency** (Exam/Lenses/Frames/Contacts) | | | 12/12/24/12 Months | | 12/12/12/12 Months | |
| **Monthly Rates** | Base | Buy-Up | Current | Renewal | | |
| Employee Only | 32 | 6 | $7.86 | $7.86 | $9.81 | $9.81 |
| Employee + Spouse | 6 | 7 | $12.58 | $12.58 | $15.70 | $15.70 |
| Employee + Child(ren) | 2 | 3 | $12.84 | $12.84 | $16.02 | $16.02 |
| Employee + Family | 5 | 0 | $20.71 | $20.71 | $25.83 | $25.83 |
| **Rate Guarantee** | | | | 12 more months | | 12 more months |
| **Total Annual Cost** | 45 | 16 | **$5,475** | **$5,475** | **$2,602** | **$2,602** |
| *% Change* | | | | *0.0%* | | *0.0%* |
| *$ Change* | | | | *$0* | | *$0* |

*Less any applicable copay.

(i) **Remember**

• Out-of-Network benefits reflect the maximum reimbursement for specific services.
• Members may receive additional discount off of non-covered lens options when services are received from a VSP network provider.
• Frequency applies on a beginning with the first date of service.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 13

Cedar Park 000094

# Life/AD&D
## *Benefit & Cost Outline*



| | Current/Renewal<br>Lincoln Financial Group | |
|---|---|---|
| **Life and AD&D Plan** | | |
| **Benefit Amount** | $10,000 | |
| **Guarantee Issue** | $10,000 | |
| **Additional Features** | | |
| • Accelerated Benefit | Up to 75% | |
| • Conversion | Included | |
| • Portability | Included | |
| • Waiver of Premium | Included | |
| **Benefit begins to reduce at age** | 65 | |

| *Monthly Rates* | *Volume* | *Current* | *Renewal* |
|---|---|---|---|
| **Life** (per $1,000 of benefit) | $1,714,500 | $0.160 | $0.160 |
| **AD&D** (per $1,000 of benefit) | $1,714,500 | $0.020 | $0.020 |
| **Rate Guarantee** | | | 12 more months |
| **Total Annual Cost** | Lives: 179 | **$3,703** | **$3,703** |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Prepared by:



**The Information contained herein is subject to the disclosures**
**and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 14

Cedar Park 000095

# Long-Term Disability
*Benefit & Cost Outline*



| | Current/Renewal Lincoln Financial Group | |
|---|---|---|
| **Long-Term Disability (LTD)** | | |
| Elimination Period | 90 days | |
| Covered Monthly Earnings | 60% | |
| Benefit Maximum | $5,000 | |
| Benefit Minimum | Greater of 10% or $100 | |
| Definition of Earnings | Basic Monthly Earnings | |
| Definition of Disability | 24 months own occupation | |
| Maximum Duration | SSNRA | |
| Tax Free Benefit (Gross Up) | No | |
| **Benefit Limitations** | | |
| • Pre-Existing Condition | 3/12 | |
| • Mental Health & Chemical Dependency | 24 months | |
| • Self-Reported | 24 months | |
| **Additional Features** | | |
| • Conversion | Included | |
| • W2 Prep | Included | |
| • FICA Matching | Included | |
| • Employee Assistance Program | Included with up to 4 face-to-face visits PCY | |

| **Monthly Rates** | Volume | Current | Renewal |
|---|---|---|---|
| **LTD** (per $100 of covered monthly payroll) | $618,198 | $0.180 | $0.180 |
| Rate Guarantee | | | 12 more months |
| Total Annual Cost | Lives: 179 | **$13,353** | $13,353 |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |



# Voluntary Life
## *Benefit & Cost Outline*



| Voluntary Life Monthly Rates | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Employee and Spouse** (per $1,000) | |
| < 25 | $0.057 |
| 25 - 29 | $0.069 |
| 30 - 34 | $0.092 |
| 35 - 39 | $0.103 |
| 40 - 44 | $0.115 |
| 45 - 49 | $0.172 |
| 50 - 54 | $0.264 |
| 55 - 59 | $0.493 |
| 60 - 64 | $0.756 |
| 65 - 69 | $1.456 |
| 70 + | $2.361 |
| **Child(ren)** (per unit) - Birth to Age 26 | $2.500 |

| Voluntary Life Plan | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Benefit Options** | |
| • Employee | 1-5 x earning rounded to $10,000 |
| • Spouse | .5-2.5 x earnings rounded to $5,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 5 x earnings or $500,000 |
| • Spouse | 50% of employees amount or $250,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Guarantee Issue** | |
| • Employee | $210,000 |
| • Spouse | $105,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Accelerated Benefit | 75% to $500,000 |
| • Conversion | Included |
| • Portability | Included |
| • Waiver of Premium | Included |
| **Benefit begins to reduce at age** | 70 |
| **Participation Requirement** | 10 |

Prepared by:    The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.   Cedar Park Assembly of God September 2019 - Page 16

Cedar Park 000097

# Voluntary AD&D
### *Benefit & Cost Outline*

| | Current/Renewal<br>vChoice (Underwritten by Standard) |
|---|---|
| **Voluntary AD&D Plan** | |
| **Benefit Options** | |
| • Employee | $100,000 increments |
| • Spouse | 50% of employee amount |
| • Children (newborn to 26 years) | $10,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 10 x earnings or $500,000 |
| • Spouse | 50% of employee amount or $250,000 |
| • Children (newborn to 26 years) | $10,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Portability | Included |
| • Waiver of Premium | Not included |
| **Participation Requirement** | 10 |
| **Voluntary AD&D Monthly Rates** | |
| **Employee** (per $1,000) | $0.047 |
| **Spouse** (per $1,000) | $0.047 |
| **Child(ren)** (per $1,000) | $0.047 |

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 17

Cedar Park 000098

# Administration Services
## *Cost Outline*

*Single Billing Services*

| Current/Renewal | |
|---|---|
| | GBS Administrators |
| **Total Annual Fees** | **Your fee structure is 2% of monthly medical costs, included in Kaiser's medical premium.** |

- SBS regeneration fee not paying as billed - $50
- Cigna will cover the cost of SBS if medical carriers move

*Benefit Advocate Center*

| Current/Renewal | |
|---|---|
| | GBS |
| **PEPM Administration Fee** | Included |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 18

Cedar Park 000099

# Annual Cost Summary

## *Current*

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $708,914 | $390,285 | $318,629 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$982,154** | **$604,725** | **$377,429** |

## *Negotiated*

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $768,694 | $422,935 | $345,759 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$1,046,517** | **$641,958** | **$404,559** |
| *% Change* | | | *6.6%* | *6.2%* | *7.2%* |
| *$ Change* | | | *$64,363* | *$37,233* | *$27,130* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 19

Cedar Park 000100

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | *Dual Option PPO/HMO $4,500 Ded.* | $708,914 | $390,285 | $318,629 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$982,154** | **$604,725** | **$377,429** |

## Alternative 1

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Fully Insured) | *Dual Option PPO/HMO $4,500 Ded.* | $742,788 | $411,495 | $331,293 |
| HSA Funding | | *$500 per individual/$1,000 per family* | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | *$3,150 per individual/$6,300 per family* | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | *$1,500 annual maximum* | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | *$10,000 flat benefit* | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | *60% to $5,000* | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | *SBS Administration* | Included in Medical | | |
| **Total Annual Cost** | | | **$1,020,611** | **$630,518** | **$390,093** |
| *% Change* | | | *3.9%* | *4.3%* | *3.4%* |
| *$ Change* | | | *$38,457* | *$25,793* | *$12,664* |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 20

Cedar Park 000101

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $708,914 | $390,285 | $318,629 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Alternative 2

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Level-Funded) | Dual Option PPO/HMO $4,500 Ded. | $765,761 | $424,222 | $341,539 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $1,043,584 | $643,244 | $400,339 |
| % Change | | | 6.3% | 6.4% | 6.1% |
| $ Change | | | $61,430 | $38,519 | $22,911 |

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 21

Cedar Park 000102

# Carriers Invited To Bid

| Self-Insured Plan Administration (TPA) | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HMA | Shown in Proposal | Net of commission | $0.00 to $40.00 PEPY |
| First Choice | Not shown - Base PEPM Admin Fee 53.8% over HMA | N/A | Not Applicable |

| Stop Loss | AM Best Rating | Response | RFI Available | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|---|
| Symetra | A | Shown in Proposal | Yes | 5 3% | 2.5% of Premium |
| HM | A | DTQ - 37% over current (expected) / 59% over (maximum) | Yes | N/A | 3.0% of Premium |

| Fully-Insured Medical Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Kaiser Permanente WA | Current Carrier - Shown in Proposal | 5 3% | Not Applicable |
| Cigna | Shown in Proposal | $29.41 PEPM | $0.00 to $28.00 PEPY |
| Regence BlueShield | Not shown - 22.9% over current and 6.6% over renewal | N/A | $0.00 to $40.00 PEPY |
| Premera Blue Cross | Not shown - 32.9% over current and 15 5% over renewal | N/A | 0.0% to 0.8% of medical premium |
| Business Health Trust | Not shown - 30.4% over current and 13 3% over renewal | N/A | Not Applicable |
| United Healthcare | DTQ - Per UHC: "We have conducted a review of your request and have determined that our rates our uncompetetive and we coming in over the 2019 renewal" | N/A | Not Applicable |
| Aetna | DTQ - Per Aetna: "We have evaluated all aspects of this group and we have determined we will not be competetive" | N/A | $0 00 to $30 00 PMPY |
| Christian Brothers | DTQ - Group must be part of the Catholic Church to participate | N/A | Not Applicable |

| Gallagher vChoice Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Vision - Vision Service Plan | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Fully-Insured Dental Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Delta Dental of Washington | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Miscellaneous Benefit Lines | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HRA Administration - NMR | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Benefit Advocate Center - GBS | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Single Billing Services - GBSA | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

# Carriers Invited To Bid

| Life/AD&D and Disability Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Lincoln Financial Group | A+ | Current Carrier - Shown in Proposal | Life: 20% LTD: 10% | 1.0% to 4 5% of Premium |

| Gallagher vChoice Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Life - Unum | A | Current Carrier - Shown in Proposal | 20.0% | 1 25% of Premium |
| AD&D - Standard | A | Current Carrier - Shown in Proposal | 25.0% | 1.5% to 2.25% of Premium |
| Pet Insurance - PetsBest | N/A | Current Carrier - Not Shown | 7 5% | Not Applicable |
| Additional Administrative Fee | N/A | Current Carrier - Shown in Proposal | $1.25 PEPM | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

While GBS does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier or HMO.  There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com).  Generally, agencies that provide ratings of U.S. Health Insurers, including traditional insurance companies and other managed care (e.g., HMO) organizations, reflects their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.

## A.M. Best's Rating Scale

| Level | Category | Level | Category | Level | Category |
|---|---|---|---|---|---|
| A++, A+ | Superior | B, B- | Fair | D | Poor |
| A, A- | Excellent | C++, C+ | Marginal | E | Under Regulatory Supervision |
| B++, B+ | Very Good | C, C- | Weak | F | In Liquidation |
| | | | | S | Rating Suspended |

### Financial Size Categories

| | | |
|---|---|---|
| FSC I ...........................Up to $1,000 | FSC IX.................................$250,000 to $500,000 | |
| FSC II .........................$1,000 to $2,000 | FSC X.................................$500,000 to $750,000 | |
| FSC III ........................$2,000 to $5,000 | FSC XI................................$750,000 to $1,000,000 | |
| FSC IV ........................$5,000 to $10,000 | FSC XII...............................$1,000,000 to $1,250,000 | |
| FSC V .........................$10,000 to $25,000 | FSC XIII..............................$1,250,000 to $1,500,000 | |
| FSC VI ........................$25,000 to $50,000 | FSC XIV..............................$1,500,000 to $2,000,000 | |
| FSC VII .......................$50,000 to $100,000 | FSC XV...............................$2,000,000 Or More | |
| FSC VIII ......................$100,000 to $250,000 | (In $000 of Reported Policyholders' Surplus Plus Conditional Reserve Funds) | |

Best's Insurance Reports, published annually by A.M. Best Company, Inc., presents comprehensive reports on the financial position, history and transactions of insurance companies operating in the United States and Canada.  Companies licensed to do business in the United States are assigned a Best's Rating which attempts to measure the comparative position of the company or association against industry averages.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 23

Cedar Park 000104

# Non-Grandfathered Status

You had a health policy in effect prior to March 23, 2010, and because you have made significant enough plan changes to have lost your grandfathered status, you must comply with the additional requirements under the Affordable Health Care Act (ACA).

**Examples of plan changes that could have caused you to lose grandfathered status include, but may not be limited to**

- Significantly cut or reduce benefits; or
- Add or reduce annual dollar limits; or
- Raise coinsurance percentages; or
- Increase deductibles or out-of-pocket maximums by more than the amounts allowed based on medical inflation*; or
- Increase employee contribution percentage by more than 5% of the contribution rate on March 23, 2010 (determined contribution rate based on COBRA valuation for self-insured plans).

*Medical inflation is the increase since March 2010 in the overall medical care component of the Consumer Price Index for All Urban Consumers (CPI-U) (unadjusted) published by the Department of Labor.

Your plan must comply with the provisions that apply to grandfathered plans in addition to the provisions that apply to non-grandfathered plans. The additional requirements that apply to non-grandfathered plans include, but are not limited to:

- Provide coverage to children to age 26 regardless of whether they are eligible for their own employment-based coverage; and
- Provide coverage of recommended preventive services with no cost sharing; and
- Include patient protections such as guaranteed access to emergency room services and OB-GYNs and pediatricians; and
- Include new claims appeal rules including both internal and external review; and
- Comply with nondiscrimination rules for fully insured health plans under Code §105(h) which prohibit discrimination in favor of highly compensated individuals as to benefits and eligibility requirements (pending release of final regulations).

**For plan years starting on or after January 1, 2014**, plans that have lost grandfathered status will also have to comply with the following:

- No discrimination against individuals participating in clinical trials (insured plans only); and
- No discrimination based on health status; and
- Provide essential benefits (insured plans only) and prohibit cost sharing in excess of the limits for qualified high deductible health plans; and
- No discrimination against healthcare providers acting within the scope of their professional license and applicable State law; and
- Prohibit out-of-pocket limits in excess of applicable out of pocket limits as determined by HHS for plan years starting on or after January 1, 2015.

*NOTE: This is only a brief summary of ACA guidance, intended to highlight points with the most universal impact. It is not intended to be a complete summary of requirements, changes, or regulations.  Further guidance and probable changes are expected to continue.*

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 24

Cedar Park 000105

# Employer Shared Responsibility Mandate/ACA Compliance

| | | |
|---|---|---|
| **Employer Shared Responsibility Mandate (ESRM)**<br>    Applicable Large Employer | 50+ full-time equivalent employees | An employer that employed at least 50 full time equivalent employees (FTE) in the preceding calendar year is required to offer affordable, minimum value health coverage to substantially all FTEs and dependent children or pay a penalty. |
| **Member of Controlled Group?** | Subject to Employer Determination | If the total of FTEs for all employers in the controlled group is at least 50, each separate company is and applicable large employer and is subject to the employer mandate. Penalties are then imposed based on the offer of coverage provided by each separate company. |
| **Medical Plan(s) meet Minimum Essential Coverage?** | Yes | A plan must meet the minimum essential coverage requirement for an applicable large employer to meet employer mandate requirement.<br>The Summary of Benefits & Coverage is required to reflect if the plan is minimum essential coverage. |
| **Offering to 95% of full-time employees?** | Subject to Employer Determination | An applicable large employer is required to offer minimum essential coverage to at least 95% of full-time employees or be subject to a penalty. |
| **Medical Plan(s) meet Minimum Value?\*** | Yes | If the plan is not of a minimum value, then an employee will be eligible to seek premium assistance from the Marketplace (Exchange). If the employee receives premium assistance through the Marketplace, the employer will be subject to a penalty. The SBC is required to reflect whether the plan is of a minimum value. |
| **Affordable Coverage?\*** | Subject to Employer Determination | If the cost of health coverage for the employee is unaffordable, then an employee will be eligible to seek premium assistance to purchase a plan from the Marketplace. If the employee receives premium assistance to purchase health coverage, then the employer would be subject to a penalty. |

\*ACA requires employers covered by the Fair Labor Standards Act to notify employees about the availability of health insurance options for the public marketplaces/exchanges.  The Marketplace Notice you provide to new employees may need to be updated if the minimum value and/or affordable coverage status of your plan changes.

*NOTE: The answers outlined here are based on the recommendations of this proposal.  If these options are not chosen, are modified or final contributions differ, you may be subject to fees and penalties.*

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 25
Cedar Park 000106

# Proposal Assumptions

**General Assumptions**

- Carriers reserve the right to revise rates should any federal, state or local authority mandate a change in benefits or impose or change a tax on plan revenue during the contract period.
- A group health plan may not reduce its coverage of the costs of pediatric vaccines (as defined under section 1928(h)(6) of the Social Security Act as amended by section 13830 of the Omnibus Budget Reconciliation Act of 1993) below the coverage it provided as of May 1, 1993. If the preventive care benefit which includes immunizations is currently in or is added to your medical plan it cannot in the future be deleted.
- Generally all lines of coverage within a carrier must be packaged and have common eligibility.
- Retirees are not eligible for coverage unless they qualify for a COBRA extension.
- Final rates will be based on actual enrollment, participation, employer contribution and other underwriting guidelines.
- Effective date of September 1, 2019. Unless otherwise indicated, rates will be guaranteed for 12 months.
- For plan years ending on or after October 1, 2017, group health plans will be assessed a $2.39 per life per year Patient-Centered Outcomes Research Institute Fee (PCORI).
  For plan years ending on or after 10/1/18 but before 10/1/19, the fee will be $2.45 per life per year. Fees will be based on the average number of lives covered under the plan during that year. The fee will be paid by the insurer for insured plans and by the plan sponsor for self-insured health plans. For any renewal effective on or after 10/2/18 PCORI does not apply (unless there is a short plan year). If plan year ends on 9/30/19, PCORI does apply.
- **Employer Contribution**  Please refer to contribution page.
- **Eligible Employees**  Employees must work 30 hours per week to be eligible.
- **Probationary Period**  First of month following date of hire.

**Kaiser Permanente**

- Rates are guaranteed for 12 months until September 1, 2020.
- The employer must contribute at least 50% of the employee-only monthly premium, and the contributions may not be made in a discriminatory manner.
- The proposed rates and benefits assume that 75% of all eligible employees are enrolled in a company-sponsored plan, excluding those who have documented other qualified coverage.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 26

Cedar Park 000107

# Proposal Assumptions

**Cigna**
- Rates are guaranteed for 12 months until September 1, 2020.
- The proposed rates and benefits assume that enrollment in the Cigna HealthCare administered plan is at least 50% of the total eligible population identified as 183.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

**Level Funded Arrangement**
- Current Specific Stop Loss Deductible is $50,000.
- Aggregate Corridor is 120%.
- Includes Rx claims for the Individual Stop Loss (ISL) coverage.
- Includes Rx claims for the Aggregate Stop Loss (ASL) coverage.
- Stop Loss contract covers claims incurred since policy inception and are paid during the current policy year. The paid period will be extended in the year of termination to include the 15 months immediately following.
- **Stop Loss Rates**

| OAP Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $159.67 | $15.40 |
| Emp + Spouse | $352.71 | $34.00 |
| Emp + Child(ren) | $297.78 | $28.71 |
| Emp + Family | $490.98 | $47.34 |

| OAP ( N) Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $145.59 | $15.92 |
| Emp + Spouse | $321.61 | $35.16 |
| Emp + Child(ren) | $271.53 | $29.69 |
| Emp + Family | $447.69 | $48.95 |

**HMA**
- Rates are guaranteed for 12 months until September 1, 2020.
- HMA requires that their clients partners  with one our their Preferred Stop Loss Partners. These include SunLife, Symetra, HM, HCC Tokio Marine, Optum Health, QBE, Physicians, Voya, Munich Re, SwissRe, ISU, Commencement Bay Risk Management and Reliance Standard.
- As stated in "General Assumptions."

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 27

Cedar Park 000108

# Proposal Assumptions

**Symetra**

- Rates are guaranteed for 12 months until September 1, 2020.
- Plan sponsor's Plan Document or Plan Document Amendment is due no later than 90 days after the proposed effective/renewal date of Excess Loss Insurance coverage.
- Please provide details on any individual who has been hospital confined for 30 days or more in the most recent 12 months or is currently on an organ transplant list.
- Any unfunded or pended claims balance must be disclosed, otherwise such claims will not be considered eligible under the Excess Loss Policy.
- This proposal is based upon the following network(s): Blues ASO
- Network Fees are ineligible expenses.
- Retirees are excluded from coverage under the Stop Loss Policy.
- Completed Symetra Disclosure Statement including: diagnosis, treatment received, current status, expected treatment and amount paid during the experience period as of the effective date of cove
- Terms are subject to change if final enrollment varies by more than 10% from proposal assumptions. Current census must be received at least 14 days prior to the effective date.
- Updated Large Claims data as well as Monthly Paid Claims and Enrollments as of 90 days prior to the effective date

**Delta Dental of WA**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**Lincoln Financial**

- Rates are guaranteed for 12 more months until September 1, 2020.
- All employees must be actively at work on their effective date in order to be covered.
- As stated in "General Assumptions."
- Your Plan is potentially discriminatory if it provides a better life insurance benefit to key employees; either on the basis of eligibility, difference in flat amount of
  benefit, or difference in multiplier. There are nondiscrimination tests that should be reviewed.  If your Plan is discriminatory,
  you would have to tax your key employees on the value of the total amount of employer-paid life insurance.

**NMR**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**GBS Administrators**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 28

Cedar Park 000109

# Proposal Assumptions

**Gallagher vChoice (Voluntary Vision - Underwritten by VSP)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Life - Underwritten by Unum)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary AD&D - Underwritten by Standard)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Pet Insurance - Underwritten by PetsBest)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 29

Cedar Park 000110

# Gallagher Benefit Services Disclaimers

**Coverage**

This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company.   t does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language.  See the policies and contracts for actual language.  This proposal (analyses, report, etc.) is not a contract and offers no contractual obligation on behalf of GBS.

**Renewal/Financial**

This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.

**Legal**

The intent of this analysis [report, letter, etc ] is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment.  t should not be construed as, nor is it intended to provide, legal advice.  Laws may be complex and subject to change.  This information is based on current interpretation of the law and is not guaranteed.  Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 30

Cedar Park 000111

# Gallagher Benefit Services Privacy Policy Disclosure

6/10/2019

Cedar Park Assembly of God
Steve Orcutt
16300 112 Ave NE
Bothell, WA - 98011

RE: Privacy Policy Disclosure

Dear Steve Orcutt,

Gallagher Benefit Services, Inc. (Gallagher) treats your personal privacy with care and respect. Because we value our client relationships, we do not disclose our clients' nonpublic personal, financial or health information with third parties, except for the specific purposes listed in the enclosed Privacy Policy Summary or as otherwise permitted by law.  Personal information is any information that can be used to identify, locate or contact you or your employees.  Personal information does not include publicly available information or individually identifiable business contact information of employees such as name, title, business address, business telephone number or business email address.

Applicable law requires Gallagher to provide our clients with notice of our Privacy Policy, a summary of which is enclosed here (the full text of the Gallagher Privacy Policy can be retrieved at the following URL: http://www.ajg.com/privacy-policy/).  This policy does not apply to our efforts to market our products and services to you, so you may receive information from us regarding products that may suit your needs.

Gallagher has always been mindful of our clients' privacy.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Thank you for choosing Gallagher Benefit Services, Inc. We appreciate your business and value our relationship.

Enclosure: Privacy Policy Summary

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 31

Cedar Park 000112

# Gallagher Benefit Services Privacy Policy Disclosure

This Privacy Policy Disclosure outlines and summarizes our information sharing practices to help you understand how we protect your privacy and that of your employees when we collect and use information about you and your employees, and the measures we take to safeguard that information.

**Information We May Collect.** We may collect the following nonpublic personal, financial or health information about you or your employees including:

- Information we receive from you and your employees on applications or questionnaires, such as occupation, current employer and social security number;
- Information about your transactions with us, our affiliates or previous insurers; such as your policy coverage, claim information, premiums and payment history;
- Information we receive from consumer-reporting agencies such as Equifax-that is obtained for the purpose of ascertaining credit histories. These reports are obtained as underwriting tools to determine bill paying habits and credit worthiness for certain individual, personal insurance products. These reports are not subject to race, gender or income.
- Information that allows us to communicate with you or your employees, such as name, user name, password, age, marital status, occupation, mailing address, telephone numbers, email address, or other addresses that allow us to send a message;
- Information that assists us to conduct business with you or your employees, such as types of products or services that may be of interest, employee financial information, or information on your company's size, revenue, type, industry codes, demographics, locations, and financial information;
- Information about your transactions with us, our affiliates, or your previous providers;

**Information We Disclose.** We do not disclose any nonpublic personal, financial or health information about our clients, former clients or their employees to anyone, except for the purposes of placing your insurance coverage(s), fulfilling your requests for products or services and related activities, responding to your requests for a call or email, processing transactions you request, telling you about products or services we offer and as otherwise permitted by law.

**Information Security.** We restrict access to nonpublic personal, financial or health information about you and your employees to those employees and subcontractors who have a need to know that information to provide products or services to you or your employees. We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 32

Cedar Park 000113

# Exhibit E



**Melissa Knauss <melissa.k@cedarpark.org>**

## Coverage Question
2 messages

**Steve Orcutt** <steve.o@cedarpark.org>                                         Tue, Jun 25, 2019 at 2:03 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

How long has CP covered Abortifacient medications?  Was it just with Kaiser?  Or also with Group Health?  Thanks.  Steve.

On Tue, Jun 25, 2019 at 12:52 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:

Here is Cigna's legal response for both ASO and Fully Insured business. Let me know if you have any questions.

For a self-funded plan:

·      Plans must cover contraceptives under the ACA;

·      Under the ACA, an organization that objects to coverage of contraceptives based on religious beliefs or moral objections cannot be required to provide coverage for contraceptives.

·      A client that qualifies for a religious or moral exemption (e.g. "eligible organization") must notify Sales who must ensure that the proper indicator is selected in ePRO so that contraceptive benefits can be excluded from their plan, and an accommodation set up, if applicable (see * below). Only the employer can determine if they qualify for the full exemption. Cigna will not require proof.

·      For abortion coverage, the Pregnancy Discrimination Act (PDA) requires the coverage of therapeutic abortions (where the life of the mother is endangered). However, the PDA does not apply to tax exempt church groups. (Cigna's standard policy is to apply these requirements to all plans, including non-ERISA tax-exempt church plans.  Upon request of a church plan, coverage of these benefits can be excluded.)


For an insured plan sitused in WA:


·      Policies must cover maternity care and this includes coverage for abortions;

·      Policies must cover contraceptives;

·      An employer with a religion or moral tenet opposed to a specific service is not required to purchase coverage for that service if they object for reason of religion or conscience. In other words, an employer may exclude coverage for contraceptives and abortion if that employer objects to providing that coverage due to religious or other beliefs.

·      Enrollees shall not be denied coverage to any service excluded from their benefit package as a result of the employer's opposition to providing a specific service.

·      Cigna will send a letter to enrollees notifying them of their rights to access these excluded services outside of their plan.


***_Eligible Organizations and Optional Contraceptive Accommodation; Disclosure Requirements_**


If a fully insured client is eligible for and voluntarily elects an optional contraceptive accommodation (opt out), Cigna will pay for all FDA-approved contraceptive coverage for eligible employees (subscribers and dependents) under a separate contraceptive-only PPO account that is set up for these customers.  For self-insured clients, the current administrator for that client must arrange for an insurer to pay for the coverage.  In both cases, Cigna will fund the contraceptive coverage regardless of funding type. Cigna will segregate premium revenue collected from the client from the monies used to provide payment for contraceptives.


Cigna will only pay for in-network medical contraceptive procedures and generic prescription contraceptives or brand prescription contraceptives with no generic equivalent or alternative. Out of network medical services and brand prescription drugs that have a generic equivalent or alternative are not covered under these plans.

Cedar Park 000155

The client will be responsible for certifying that they will not be covering contraceptives due to their religious or moral beliefs and eligibility for the optional accommodation. If a client elects the accommodation, they will not have the option to pick and choose which contraceptives they will cover and exclude due to the complexity of administering a variable customized benefit for each client.  Clients must sign and return the attached self-certification or notify HHS using the attached model notice or other alternate written notification.

Cigna will notify the employees of the eligible clients of the availability of separate payments for contraceptive coverage by providing them with a custom letter substantially similar to the model notice.  The notice will be sent to subscribers (and to dependents with privacy restrictions) annually at renewal and to new hires once eligibility has been finalized on the employer's group plan.

Existing clients who are under a current accommodation arrangement may keep or revoke this accommodation. If the client chooses to revoke, Cigna will provide notice to the affected employees explaining that they will no longer have contraceptive coverage through Cigna.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jun 25, 2019, at 11:30 AM, Steve Orcutt <steve.o@cedarpark.org> wrote:

> [EXTERNAL]

> Kaiser seems to be quite focused on answering the question they want to answer rather than the one we keep asking.

> So I'll ask a different question that hopefully should be simple enough that they can give us a yes or no answer.

> 1. Under the **Eligible organization** option, is Kaiser currently paying for all contraceptive coverage options for any of their clients.  And by "paying for" I mean that all approved contraceptives are paid for 100% by Kaiser, not by the employee (as they are currently being paid for under our present Kaiser policy since no religious employer of eligible organization options are signed and in place.
> 2. Can you please check with Cigna to see what options we would have with them to exclude abortions and abortifacient but continue to provide all other contraceptives?

> Thanks!  And of course, I need this ASAP!  Steve.

> On Mon, Jun 24, 2019 at 4:42 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:
> I heard back from Kaiser:

> We have provided the definitions for religious employer and eligible organization via previous emails. We do not know the corporate structure of the group and cannot make the determination for the group on whether they are a religious employer or eligible organization.

> **Religious employer** is defined to include any nonprofit entity that is described under the existing tax code definition which applies to group health plan houses of worship. This would include a house of worship that operates a soup kitchen or parochial school.
> ·      Required to execute a form that certifies that the entity meets the requirements of a full "religious employer" definition to claim the exemption.

> **Eligible organization** is a non-profit organization that hold itself out as a religious organization and opposes providing coverage for some or all contraceptive services on account of religious objections. This could include hospitals, universities or other entities with religious affiliations.
> Required to execute a form self-certifying the entity qualifies for an accommodation

> Let me know if you have any additional questions.

> Jami Hansen
> Area Vice President
> Arthur J Gallagher
> 425-891-1325

Cedar Park 000156

On Jun 24, 2019, at 2:14 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

> **Be Aware:** You are receiving this e-mail from someone outside of the organization. Do NOT click links or open attachments unless you recognize the sender's e-mail address and know the content is safe.

Hi Jami,

It sure sounds to me as if *Kaiser* doesn't fully understand what it is asking us to sign, which makes it pretty difficult for *us* to know what we're signing.  What do you advise?

All the best,



On Mon, Jun 24, 2019 at 1:13 PM Jami Hansen <Jami_Hansen@ajg.com> wrote:
See below from Kaiser:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

**Hi Jami –**

**Regarding the questions below, I was able to confirm that KP will not provide legal advice to the group. We cannot answer the questions regarding legal interpretation.  I have responded to the questions regarding benefits.**

1)   It would seem that all Religious Employers would also be Eligible Organizations but not all Eligible Organizations would be Religious Employers. Please see above

2)   In further clarifying #1, while an Eligible Organization would not have the option of the Religious Employer, it appears that a Religious Employer would have the option of either. Please see above

3)   It appears that Cedar Park can sign the Eligible Organization without jeopardizing their status as a Religious Employer.  Nothing about signing the Eligible Organization form, or within its mentioned CFRs, would cause Cedar Park to inadvertently: Please see above

   a)   State that Cedar Park *does not qualify* as a Religious Employer.

   b)   *Denounce* their Religious Employership.

   c)   Effect any other religious exemptions they receive *inside* of medical, such as, but not limited to, their ability to preclude coverage of domestic partners.

Cedar Park 000157

d)   Effect any other religious exemptions they receive *outside* of medical, such as, but not limited to, the exemptions they receive with regard to hiring decisions under the Equal Employment Opportunity Act.

5.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering abortifacients, included Copper IUDs, and abortions? KPWA is still working to understand the new WA state mandate and the impact it has on groups.

6.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering birth control that is *not* deemed medically necessary? KPWA is still working to understand the new WA state mandate and the impact it has on groups.

7.)  If the Eligible Organization Form is signed and KFHPWA, as the fully-insured issuer, provides coverage for an item that is not covered under the Cedar Park Assembly of God group plan, and such provision results in an out-of-pocket expense to the claimant, does the out-of-pocket amount go toward the claimants deductible under the Cedar Park Assembly of God group plan? If a service is not covered it does not count toward deductible or out of pocket max.

8.)  If the Religious Employer Form is signed and a claimant pays out-of-pocket for a precluded item, does *that* amount go toward the claimant's deductible under the Cedar Park Assembly of God group plan? If a service is not covered it does not count toward deductible or out of pocket max.

9.)  Does the Religious Employer Form allow Cedar Park to provide birth control if it is deemed *medically necessary*?  (Abortifacients, included Copper IUDs, and abortions must still be excluded.) Per earlier conversations coverage is all or nothing. Groups may not pick and choose which preventive birth control services to include and which to exclude. Additionally KPWA is still working to understand the new state mandate, how this impacts large group employer plans and what carriers are required to cover.

If questions 1 or 2 above are not correct, please also answer these questions as well:

On the bottom half of the Eligible Organization document it states:  Please see above, KPWA cannot advise

"Note: An organization that offers coverage through the same group health plan as a religious employer **and/or** an eligible organization, and that is part of the same group of corporations as, or under common control with, such employer **and/or** organization, may certify that it holds itself out as a religious organization."

1.)  It would appear that the "**and/or**" statements in the Note above would allow a Religious Employer to also be the Eligible Organization. Please describe the error in this logic.

2.)  Within that text the Eligible Organization document states an eligible employer is defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); and 45 CFR 147.131(b) and that a Religious Employer is defined in 45 CFR 147.131(a).  What factors should Cedar

Cedar Park 000158

Park look at that preclude it, or may preclude it, from qualifying as both?

---

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Sent:** Friday, June 21, 2019 2:13 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Steve Orcutt <steve.o@cedarpark.org>
**Subject:** More Questions about the forms

Be Aware: You are receiving this e-mail from someone outside of the organization. Do NOT click links or open attachments unless you recognize the sender's e-mail address and know the content is safe.

Hi Jami,

Steve and I are still trying to understand the complete ramifications of each form. Thank you for bearing with us as we do. While **we understand that we can and will only sign one form**, we're trying to understand each form from an integrity standpoint as well as the potential consequences of choosing one form over the other. Can you please work with Kaiser's legal team and/or GBS's legal team to **confirm or correct** the following statements and questions?

1)   It would seem that all Religious Employers would also be Eligible Organizations but not all Eligible Organizations would be Religious Employers.

2)   In further clarifying #1, while an Eligible Organization would not have the option of the Religious Employer, it appears that a Religious Employer would have the option of either.

3)   It appears that Cedar Park can sign the Eligible Organization without jeopardizing their status as a Religious Employer. Nothing about signing the Eligible Organization form, or within its mentioned CFRs, would cause Cedar Park to inadvertently:

   a)   State that Cedar Park *does not qualify* as a Religious Employer.

   b)   *Denounce* their Religious Employership.

   c)   Effect any other religious exemptions they receive *inside* of medical, such as, but not limited to, their ability to preclude coverage of domestic partners.

   d)   Effect any other religious exemptions they receive *outside* of medical, such as, but not limited to, the exemptions they receive with regard to hiring decisions under the Equal Employment Opportunity Act.

5.)   Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering abortifacients, included Copper IUDs, and abortions?

Cedar Park 000159

6.)  Does the Eligible Organization Form allow Cedar Park to restrict KFHPWA, as the fully-insured issuer, from covering birth control that is *not* deemed medically necessary?

7.)  If the Eligible Organization Form is signed and KFHPWA, as the fully-insured issuer, provides coverage for an item that is not covered under the Cedar Park Assembly of God group plan, and such provision results in an out-of-pocket expense to the claimant, does the out-of-pocket amount go toward the claimants deductible under the Cedar Park Assembly of God group plan?

8.)  If the Religious Employer Form is signed and a claimant pays out-of-pocket for a precluded item, does *that* amount go toward the claimant's deductible under the Cedar Park Assembly of God group plan?

9.)  Does the Religious Employer Form allow Cedar Park to provide birth control if it is deemed *medically necessary*?  (Abortifacients, included Copper IUDs, and abortions must still be excluded.)

If questions 1 or 2 above are not correct, please also answer these questions as well:

On the bottom half of the Eligible Organization document it states:

"Note: An organization that offers coverage through the same group health plan as a religious employer **and/or** an eligible organization, and that is part of the same group of corporations as, or under common control with, such employer **and/or** organization, may certify that it holds itself out as a religious organization."

1.)  It would appear that the "**and/or"** statements in the Note above would allow a Religious Employer to also be the Eligible Organization. Please describe the error in this logic.

2.)  Within that text the Eligible Organization document states an eligible employer is defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); and 45 CFR 147.131(b) and that a Religious Employer is defined in 45 CFR 147.131(a).  What factors should Cedar Park look at that preclude it, or may preclude it, from qualifying as both?

Thank you!



**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error,

please notify the sender immediately by reply e-mail and permanently delete this e-mail and any
attachments without reading, forwarding or saving them.  Thank you.

---

**Jami Hansen** <Jami_Hansen@ajg.com>                              Tue, Jun 25, 2019 at 3:23 PM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Hi Steve,

KP/Group health has always covered this.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

[Quoted text hidden]

Exhibit F



**Melissa Knauss <melissa.k@cedarpark.org>**

---

## Direct Answers
7 messages

---

**Melissa Knauss** <melissa.k@cedarpark.org>                          Mon, Jul 8, 2019 at 3:48 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

Hi Jami,

I know you're working working really hard on this and we truly appreciate it.  Steve and I are trying to read between the carriers' mumbo-jumbo, legaleese, and just get really clear unequivocal answers.  Please ask the carrier(s) to answer the following by selecting Yes or No and providing the details if they select Yes.

> <u>FOR KAISER</u>
> Is there anything Cedar Park Assembly of God can do between now and renewal to ensure abortifacient, including Copper IUDs, are excluded from our current 2018-2019 plan?
> [ ] YES, this is what must be done: _____
> [ ] NO, there is nothing that can be done to exclude abortifacients, including Copper IUDs, from the current 2018-2019 plan based on the information we have at this time.
>
> <u>FOR KAISER AND CIGNA</u>
> Will Cedar Park Assembly of God be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives, at renewal for the 2019-2020 plan year?
> [ ] YES, this is what must be done: _____
> [ ] NO, at renewal for the plan effective 9/2019 you will *not* be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives based on the information we have at this time.

All the best,



---

**Jami Hansen** <Jami_Hansen@ajg.com>                          Mon, Jul 8, 2019 at 4:16 PM
To: "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>

See below:

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325


Begin forwarded message:

> **From:** "Croff, Mark R      303" <Mark.Croff@Cigna.com>
> **Date:** July 8, 2019 at 4:09:39 PM PDT
> **To:** Jami Hansen <Jami_Hansen@AJG.com>
> **Subject: Re: [External] Fwd: Direct Answers**
>
> ┌──────────────────────────────┐
> │ [EXTERNAL]                    │
> └──────────────────────────────┘
>
> Yes. Legal and administrative approval from CIGNA.
>
> ---
>
> > **From:** Melissa Knauss <melissa.k@cedarpark.org>
> > **Date:** July 8, 2019 at 3:48:55 PM PDT
> > **To:** Jami Hansen <Jami_Hansen@ajg.com>
> > **Cc:** Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>

**Subject: Direct Answers**

[EXTERNAL]

[Quoted text hidden]

----------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error,
please immediately notify the sender by e-mail at the address shown.
This email transmission may contain confidential information.  This
information is intended only for the use of the individual(s) or entity to
whom it is intended even if addressed incorrectly.  Please delete it from
your files if you are not the intended recipient.  Thank you for your
compliance.  Copyright (c) 2019 Cigna
============================================================================

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                 Mon, Jul 8, 2019 at 4:29 PM
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Ok.  So Cigna is on board for our 2019 plan year to allow us to exclude our current exclusions plus expand the Plan B exclusion to all
ages, add Copper IUDs to the exclusion, and exclude any other abortifacients.  Thanks, Jami!

All the best,



[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                        Mon, Jul 8, 2019 at 4:33 PM
To: Melissa Knauss <melissa.k@cedarpark.org>
Cc: Steve Orcutt <steve.o@cedarpark.org>

Correct!

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jul 8, 2019, at 4:30 PM, Melissa Knauss <melissa.k@cedarpark.org> wrote:

[EXTERNAL]

[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>                                        Mon, Jul 15, 2019 at 10:37 AM
To: Melissa Knauss <melissa.k@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

See below from Kaiser:

*Jami M. Hansen,*
*Area Vice President*

Health and Welfare Consulting

Cedar Park 000201



Insurance | Risk Management | Consulting

777 108th Avenue NE, Suite 200 | Bellevue, WA 98004

P: 425.974.3275 | F: 425.201.2774

www.ajg.com



*This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law.*

*Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.*

---

**From:** Nicole M. Gomez <Nicole.M1.Gomez@kp.org>
**Sent:** Monday, July 15, 2019 10:36 AM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Subject:** RE: Direct Answers

> [EXTERNAL]

Hi Jami,

Please see responses below in red.

<u>FOR KAISER</u>

Is there anything Cedar Park Assembly of God can do between now and renewal to ensure abortifacient, including Copper IUDs, are excluded from our current 2018-2019 plan?

[ ]  YES, this is what must be done:  _____

[ ]  NO, there is nothing that can be done to exclude abortifacients, including Copper IUDs, from the current 2018-2019 plan based on the information we have at this time. No, there is nothing that can be done within the 2018-2019 plan year at this time as the group did not self-certify prior to the plan year (2018). KP cannot retroactively make plan changes to 9/1/2018. As a reminder termination of pregnancy (abortion) is not covered by Cedar Park in the 2018 plan year.

<u>FOR KAISER AND CIGNA</u>

Will Cedar Park Assembly of God be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives, at renewal for the 2019-2020 plan year?

[ ]  YES, this is what must be done:  _____

[ ] NO, at renewal for the plan effective 9/2019 you will *not* be able to exclude abortions and abortifacients, including Copper IUDs, while still providing non-abortifacient contraceptives based on the information we have at this time. At this time KP is waiting for further clarification regarding exclusions of abortions for 2019. KP does have the ability to remove contraceptives. Please note that the group must self-certify prior new plan year 9/1/2019-9/1/2020 in order to remove contraceptives. Removal of contraceptives is all or nothing. KP does not have the ability to carve out specific contraceptives/abortifacient contraceptives at the groups request. If the group self-certifies, the group does not pay for contraceptives within the plan, however KP would cover the cost of all contraceptives for members that were seeking these services.

**Nicole Nieswand (Gomez)**

Account Manager II, Large Group Sales

**Kaiser Foundation Health Plan of Washington**

601 Union Street, Suite 3100

Seattle, WA 98101

**Office**: 206-448-2845

**Cell:** 206-218-6395

**Email:** Nicole.M1.Gomez@kp.org



*The Office of Insurance Commissioner in Washington State advises that the following activities require a producer license: Dealing directly with consumers in taking applications for insurance or giving advice and counsel relative to coverage, solicitation, negotiating with underwriters, and binding. The following activities do not require a producer license: Taking premium payments on existing policies provided the unlicensed person does not give advice on coverage or policy issues, gathering information so that a licensed individual can finish an insurance transaction, taking claims information but not interpreting or commenting on coverage, and reception and/or clerical activities that do not involve offering advice or counsel to consumers about insurance. For more information: http://www.insurance.wa.gov/for-producers/*

Kaiser Permanente complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or gender.

Language Assistance

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-888-901-4636 (TTY: 1-800-833-6388 / 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-888-901-4636 (TTY:1-800-833-6388 / 711).

**From:** Melissa Knauss <melissa.k@cedarpark.org>
**Date:** July 8, 2019 at 3:48:55 PM PDT
**To:** Jami Hansen <Jami_Hansen@ajg.com>
**Cc:** Steve Orcutt <steve.o@cedarpark.org>, Melinda Hansen <melinda_hansen@ajg.com>
**Subject: Direct Answers**

[EXTERNAL]

Hi Jami,

[Quoted text hidden]

Cedar Park 000203

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**NOTICE TO RECIPIENT:**  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                              Thu, Jul 18, 2019 at 2:00 PM
To: Steve Orcutt <steve.o@cedarpark.org>

[Quoted text hidden]

---

**Melissa Knauss** <melissa.k@cedarpark.org>                                              Thu, Jul 18, 2019 at 2:22 PM
To: Jay Smith <jay.s@cedarpark.org>, Steve Orcutt <steve.o@cedarpark.org>

---------- Forwarded message ---------
From: **Jami Hansen** <Jami_Hansen@ajg.com>
[Quoted text hidden]
[Quoted text hidden]

Cedar Park 000204

Exhibit G

                                              **Melissa Knauss <melissa.k@cedarpark.org>**

---

## Fwd: [External] Cedar Park
1 message

**Jami Hansen** <Jami_Hansen@ajg.com>                          Thu, Jul 18, 2019 at 9:58 AM
To: Steve Orcutt <steve.o@cedarpark.org>, "melissa.k@cedarpark.org" <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>


Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325


Begin forwarded message:


**From:** "Croff, Mark R    303" <Mark.Croff@Cigna.com>
**Date:** July 16, 2019 at 11:28:47 AM PDT
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Subject: Re: [External] Cedar Park**

[EXTERNAL]

All of the answers provided apply to both Level and Fully insured with the exception of transgender services which can only be excluded on Level.

---

**From:** Jami Hansen <Jami_Hansen@AJG.com>
**Date:** July 16, 2019 at 12:25:30 PM MDT
**To:** Croff, Mark R 303 <Mark.Croff@Cigna.com>
**Subject:** [External] Cedar Park

All of the questions I've asked you would only apply to level funded correct?  I need to know how it would apply to your fully insured plan.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

-----------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error,
please immediately notify the sender by e-mail at the address shown.
This email transmission may contain confidential information.  This
information is intended only for the use of the individual(s) or entity to
whom it is intended even if addressed incorrectly.  Please delete it from
your files if you are not the intended recipient.  Thank you for your
compliance.  Copyright (c) 2019 Cigna
=============================================================================

# Exhibit H

 Gmail

**Melissa Knauss <melissa.k@cedarpark.org>**

## Updated Proposal
6 messages

---

**Jami Hansen** <Jami_Hansen@ajg.com>
To: Steve Orcutt <steve.o@cedarpark.org>, Melissa Knauss <melissa.k@cedarpark.org>
Cc: Melinda Hansen <Melinda_Hansen@ajg.com>

Thu, Jul 18, 2019 at 11:38 AM

Here is the updated proposal with the lower Cigna rates.

Jami M. Hansen,
Area Vice President
Health and Welfare Consulting

777 108th Avenue NE, Suite 200 | Bellevue, WA 98004
P: 425.974.3275 | F: 425.201.2774
www.ajg.com

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain
confidential material and/or material protected by law.
Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and
delete the material from any computer.

---

 **CPAG_Proposal_201909.pdf**
872K

---

**Steve Orcutt** <steve.o@cedarpark.org>
To: Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Thu, Jul 18, 2019 at 2:46 PM

Thanks.  Any response from Nicole on specific Kaiser current coverage yet?

RU 486, Plan B, Ella and all generic equivalents and copper IUDs.  Thanks!  Steve.
[Quoted text hidden]

---

**Jami Hansen** <Jami_Hansen@ajg.com>
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Melissa Knauss <melissa.k@cedarpark.org>, Melinda Hansen <Melinda_Hansen@ajg.com>

Thu, Jul 18, 2019 at 4:22 PM

Not yet but she Emailed me saying she's working on it.

Jami Hansen
Area Vice President
Arthur J Gallagher
425-891-1325

On Jul 18, 2019, at 2:47 PM, Steve Orcutt <steve.o@cedarpark.org> wrote:

[EXTERNAL]
[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>
To: Steve Orcutt <steve.o@cedarpark.org>, Jami Hansen <Jami_Hansen@ajg.com>
Cc: Melissa Knauss <melissa.k@cedarpark.org>

Fri, Jul 19, 2019 at 7:47 AM

Hi Steve and Melissa,


Cigna would cover the diabetes prescriptions at 100% as Kaiser does today.


Thank you,


**Melinda Hansen**   Client Manager

Health & Welfare Consulting



Insurance | Risk Management | Consulting


Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

www.**ajg**.com

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004





This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.


**From:** Steve Orcutt <steve.o@cedarpark.org>
**Sent:** Thursday, July 18, 2019 2:47 PM
**To:** Jami Hansen <Jami_Hansen@AJG.com>
**Cc:** Melissa Knauss <melissa.k@cedarpark.org>; Melinda Hansen <Melinda_Hansen@AJG.com>
**Subject:** Re: Updated Proposal


[EXTERNAL]

[Quoted text hidden]

 **image003.png**
19K

---

**Steve Orcutt** <steve.o@cedarpark.org>                                        Fri, Jul 19, 2019 at 7:52 AM
To: Melinda Hansen <Melinda_Hansen@ajg.com>
Cc: Jami Hansen <Jami_Hansen@ajg.com>, Melissa Knauss <melissa.k@cedarpark.org>

Super thanks!  Were you able to check the whole list from Kaiser? I think it also had high blood pressure medications and was a total of about 100 different preventative medications.  Thanks!  Steve.

On Jul 19, 2019, at 7:47 AM, Melinda Hansen <Melinda_Hansen@ajg.com> wrote:

Hi Steve and Melissa,

Cigna would cover the diabetes prescriptions at 100% as Kaiser does today.

Thank you,

**Melinda Hansen**   Client Manager

Health & Welfare Consulting

<image001.png>

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004

<image002.jpg> <image004.png>

This e-mail and any files transmitted with it are intended only for the person or entity to which it is addressed and may contain confidential material and/or material protected by law. Any retransmission or use of this information may be a violation of that law. If you received this in error, please contact the sender and delete the material from any computer.

[Quoted text hidden]

---

**Melinda Hansen** <Melinda_Hansen@ajg.com>                                    Mon, Jul 22, 2019 at 8:06 AM
To: Steve Orcutt <steve.o@cedarpark.org>
Cc: Jami Hansen <Jami_Hansen@ajg.com>, Melissa Knauss <melissa.k@cedarpark.org>

Hi Steve,


All preventative prescription on the HSA are covered at 100% at Cigna. The attached two list is favorable to what you have today.
These are the standard list and do not reflect any exclusions approvals already made.


Let me know if you have any other questions.


Thank you,


**Melinda Hansen**   Client Manager

Health & Welfare Consulting




 

Direct 425.974.4459  |  fax: 425.201.2730

melinda_hansen@ajg.com

**www.ajg.com**

777 – 108th Ave NE, Suite 200, Bellevue, WA 98004




[Quoted text hidden]
[Quoted text hidden]

---

**3 attachments**

**image003.png**
19K

Cedar Park 000239



**Pharmacy%202019%20Generics%20Only%20Preventive%20Drug%20List%20Without%2....pdf**
335K

**Pharmacy%202018%20No%20Cost%20Share%20Preventive%20Drug%20List.pdf**
92K

# Exhibit I



Insurance | Risk Management | Consulting

 

 

## 2019/2020 Employee Benefit Analysis and Recommendations

Proposed Effective Date: September 1, 2019
Jami Hansen, Area-Vice President/Client Consultant
*Melinda Hansen, Client Manager*
*James Stanek, Benefit Analyst*
Date Presented: June 10, 2019

**IMPORTANT:** This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company. It does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language. See the policies and contracts for actual language. This proposal is not a contract and offers no contractual obligation on behalf of GBS. This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc. This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts. See your policy or contact us for specific information or further details in this regard.



Cedar Park002136

# Medical
## Cost Outline



### PPO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna<br>*Fully Insured* | Alternative 2<br>Cigna<br>*Level-Funded* | | Alternative 3<br>Cigna<br>*Fully Insured* | Alternative 4<br>Cigna<br>*Level-Funded* |
|---|---|---|---|---|---|---|---|---|
| Employee Only | 48 | $396.85 | $431.99 | $399.41 | $411.76 | 85 | $393.42 | $405.58 |
| Employee + Spouse | 5 | $876.79 | $954.44 | $882.26 | $909.55 | 9 | $869.03 | $895.91 |
| Employee + Child(ren) | 7 | $740.31 | $805.87 | $744.87 | $767.91 | 11 | $733.70 | $756.39 |
| Employee + Family | 9 | $1,220.25 | $1,328.31 | $1,228.16 | $1,266.14 | 10 | $1,209.73 | $1,247.15 |
| **PPO Plan Annual Cost** | **69** | **$475,166** | **$517,243** | **$478,204** | **$492,994** | **115** | **$737,156** | **$759,955** |
| *% Change* | | | *8.9%* | *0.6%* | *3.8%* | | | |
| *$ Change* | | | *$42,077* | *$3,038* | *$17,828* | | | |

### HMO Plan

| Monthly Rates | | Current<br>Kaiser Permanente | Negotiated<br>Kaiser Permanente | Alternative 1<br>Cigna<br>*Fully Insured* | Alternative 2<br>Cigna<br>*Level-Funded* | Alternative 3<br>Cigna<br>*Eliminate HMO* | Alternative 4<br>Cigna<br>*Eliminate HMO* |
|---|---|---|---|---|---|---|---|
| Employee Only | 37 | $345.53 | $371.70 | $391.13 | $403.23 | | |
| Employee + Spouse | 4 | $763.40 | $821.22 | $864.03 | $890.75 | | |
| Employee + Child(ren) | 4 | $644.58 | $693.39 | $729.47 | $752.03 | | |
| Employee + Family | 1 | $1,062.45 | $1,142.91 | $1,202.73 | $1,239.93 | | |
| **HMO Plan Annual Cost** | **46** | **$233,748** | **$251,451** | **$264,584** | **$272,767** | | |
| *% Change* | | | *7.6%* | *13.2%* | *16.7%* | | |
| *$ Change* | | | *$17,703* | *$30,836* | *$39,019* | | |
| | | | | | | | |
| HSA Annual Contribution | | $72,500 | $72,500 | $72,500 | $72,500 | $72,500 | $72,500 |
| HRA Annual Contribution | | $70,537 | $75,120 | $75,120 | $75,120 | $75,120 | $75,120 |
| | | | | | | | |
| **Combined Medical/HSA/HRA Annual Cost** | **115** | **$851,951** | **$916,314** | **$890,408** | **$913,381** | **$884,776** | **$907,575** |
| *% Change* | | | *7.6%* | *4.5%* | *7.2%* | *3.9%* | *6.5%* |
| *$ Change* | | | *$64,363* | *$38,457* | *$61,430* | *$32,825* | *$55,623* |

**ⓘ Remember**

- All plan options meet the requirements to be considered Minimum Essential Coverage and a Minimum Actuarial Value Plan.
- HSA funding assumes $500 per individual and $1,000 per family.
- Level-Funded Arrangement offers 50% surplus share.
- Cigna Fully Insured rates are estimated based on 3% reduction to the Level-Funded rates.
- Alternative 3 and 4 assume PPO plan is the only plan offered with Cigna. Rates are estimated at 1.5% below dual plan rates.
- Kaiser PPO rates would increase if HMO plan was eliminated.
- Cigna has agreed to pay for Single Billing Services.
- Elective abortions are not covered for both the Cigna Fully Insured and Cigna Level-Funded plans.

Cedar Park002137

Prepared by:

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**
Cedar Park Assembly of God
September 2019 - Page 2

# HRA Administration
### *Cost Comparison and Utilization*

| Administration Costs | | Current<br>NMR | Renewal<br>NMR |
|---|---|---|---|
| Submission Fee (Per Employee) | 22 | $40.00 | $40.00 |
| Renewal Fee Per Plan Per Year | | $225.00 | $225.00 |
| **Total Annual Administration Cost** | | **$1,105** | **$1,105** |

| Reimbursement Limits | | Current/Renewal<br>NMR |
|---|---|---|
| **PPO Plan Deductible** | | $4,500/$9,000 |
| Employee | 48 | $3,150 |
| Employee & Family | 21 | $6,300 |
| **HMO Plan Deductible** | | $4,500/$9,000 |
| Employee | 37 | $3,150 |
| Employee & Family | 9 | $6,300 |
| **Annual Maximum Liability** | | **$456,750** |

| HRA Utilization Costs and Projections | 2018<br>Reimbursements | 1/1/2019 - 5/31/2019<br>Reimbursements | Current Year<br>Completion Projection | Renewal Year<br>Projection |
|---|---|---|---|---|
| **Combined Plan Utilization** | $65,134 | $17,971 | $69,432 | $74,015 |
| **% of Max Utilization** | **14.3%** | **3.9%** | **15.2%** | **16.2%** |

| Total Costs Projection | Current<br>Projected | Renewal<br>Projected |
|---|---|---|
| **Total Administration Cost** | $1,105 | $1,105 |
| **Utilization Projected costs** | $69,432 | $74,015 |
| **Total HRA Annual Cost Projection** | **$70,537** | **$75,120** |

 Remember

- HRA Utilization Projection is calculated based on current plan designs. If plan designs are changed, it will cause a change in utilization pattern. Actual utilization may vary.
- HRA projection trend: 6 6%

Cedar Park002138

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 3

# Medical

## Benefit Outline - PPO Plan



| PCY = Per Calendar Year | Current/Renewal Kaiser Permanente | | Alternative 1 & 2 Cigna | |
|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Medical Plan** | *Access PPO* | | *Open Access Plus* | |
| **Annual Deductible** (Individual/Family) | $4,500/$9,000 | | $4,500/$9,000 | $9,000/$18,000 |
| **Coinsurance** | 10% (5% enhanced)* | 30% | 10% | 30% |
| **Annual Out-of-Pocket Maximum** (Individual/Family) | $6,550/$13,100 | | $6,550/$13,100 | $13,100/$26,200 |
| **Preventive Care** | Covered in full | | Covered in full | Not covered |
| **Outpatient Services** | | | | |
| • Office Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Specialist Visit | 10% (5%*) after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Surgery | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| • Rehabilitation | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 60 visits PCY | | Up to 60 visits PCY | |
| **Other Services** | | | | |
| • Chiropractic Care | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 8 visits PCY | | Up to 12 visits PCY | |
| • Acupuncture | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| | Up to 12 visits PCY | | Up to 12 visits PCY | |
| **Urgent Care** | 10% after deductible | 30% after deductible | Covered in full after deductible | 30% after deductible |
| **Emergency Room** (copay waived if admitted) | 10% after deductible | | 10% after deductible | |
| **Inpatient Hospitalization** | 10% after deductible | 30% after deductible | 10% after deductible | 30% after deductible |
| **Prescription Drug Plan** | *At Preferred Pharmacies* | | *At Preferred Pharmacies* | |
| **Annual Deductible** (Individual/Family) | Shared with medical | | Shared with medical | |
| **Annual Out-of-Pocket Maximum** (Individual/Family) | Shared with medical | | Shared with medical | |
| **Retail Pharmacy** (30-day supply) | *After deductible…* | | *After deductible…* | |
| • Generic | $10 | | $10 | |
| • Preferred Brand | $35 ($30*) | | $35 | |
| • Non-Preferred Brand | $70 ($65*) | | $70 | |
| • Specialty | Above cost shares apply | | Above cost shares apply | |
| **Mail Order** (90-day supply) | 3 x enhanced retail cost share* | | 2 x retail cost share | |
| **Part D Creditable/Non-Creditable** | Creditable | | Creditable | |
| **Formulary** | KPWA Formulary | | Cigna Advantage | |

ⓘ **Remember**

- For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

  *Enhanced benefit applies when outpatient services are provided at a Kaiser Permanente facility.

Cedar Park002139

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

# Medical
## *Benefit Outline - HMO Plan*



| PCY = Per Calendar Year | Current/Renewal<br>Kaiser Permanente<br>In-Network Only | Alternative 1 & 2<br>Cigna<br>In-Network Only |
|---|---|---|
| *Medical Plan* | *Core HMO* | *Open Access Plus* |
| **Annual Deductible**<br>(Individual/Family) | $4,500/$9,000 | $4,500/$9,000 |
| **Coinsurance** | 10% | 10% |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | $6,650/$13,300 | $6,650/$13,300 |
| **Preventive Care** | Covered in full | Covered in full |
| **Outpatient Services** | | |
| • Office Visit | 10% after deductible | 10% after deductible |
| • Specialist Visit | 10% after deductible | 10% after deductible |
| • Diagnostic Lab & X-ray | 10% after deductible | 10% after deductible |
| • Surgery | 10% after deductible | 10% after deductible |
| • Rehabilitation | 10% after deductible<br>Up to 60 visits PCY | 10% after deductible<br>Up to 60 visits PCY |
| **Other Services** | | |
| • Chiropractic Care | 10% after deductible<br>Up to 10 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| • Acupuncture | 10% after deductible<br>Up to 12 visits PCY | 10% after deductible<br>Up to 12 visits PCY |
| **Urgent Care** | 10% after deductible | Covered in full after deductible |
| **Emergency Room**<br>(copay waived if admitted) | 10% after deductible | 10% after deductible |
| **Inpatient Hospitalization** | 10% after deductible | 10% after deductible |
| *Prescription Drug Plan* | *At Preferred Pharmacies* | *At Preferred Pharmacies* |
| **Annual Deductible**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Annual Out-of-Pocket Maximum**<br>(Individual/Family) | Shared with medical | Shared with medical |
| **Retail Pharmacy** (30-day supply) | *After deductible...* | *After deductible...* |
| • Generic | $20 | $10 |
| • Preferred Brand | $40 | $40 |
| • Non-Preferred Brand | $60 | $60 |
| • Specialty | Above cost shares apply | Above cost shares apply |
| **Mail Order** (90-day supply) | 3 x retail cost share | 2 x retail cost share |
| **Part D Creditable/Non-Creditable** | Creditable | Creditable |
| **Formulary** | KPWA Formulary | Cigna Advantage |

 **Remember**

• For plan years beginning in 2019, non-grandfathered health plans must include embedded in-network self-only out-of-pocket limits for each family member if the family deductible or out-of-pocket maximum is over $7,900.

Cedar Park002140

Prepared by:

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 5

Gallagher

# Self-Funded Medical
## *Fixed Cost Comparison*

| | Proposed |
|---|---|
| *Administration* | |
| **TPA** | HMA |
| **PBM** | CVS Caremark |
| **Network Option** | Regence BlueShield |
| **Administrative Fees** 115 | |
| • Set-Up | $3,500.00 |
| • Plan Administration | $28.60 |
| • Network | $5.50 |
| • Care Management | $3.75 |
| • Fiduciary | $2.00 |
| • 24-Hour Nurse Line | $0.65 |
| • MD Live Telehealth w/ Behavioral | $1.30 |
| • Care Navigator | $1.50 |
| • Disease Management | $3.00 |
| • Cost Transparency Tool | $1.50 |
| • Maternity Management | $350 per case |
| • Creditable Coverage Determination 2 | $385.00 |
| **Rate Guarantee** | 12 months |
| **Annual Administration Cost** | **$70,234** |

 **Remember**

• Determination of employer prescription drug coverage meeting Medicare's Creditable Coverage Requirements - $385 (fee is per Plan tested).

Cedar Park002141

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 6

# Self-Funded Medical

*Stop Loss Comparison - Financial Analysis*

| | Proposed |
|---|---|
| **Administration** | |
| **TPA** | HMA |
| **Stop Loss** | |
| **Reinsurer** | Symetra |
| **Quote Status** | Preliminary |
| **Individual Stop Loss** (ISL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Deductible | $100,000 |
| • Accumulation Basis | Per member |
| • Annual Maximum | Unlimited |
| • Lifetime Maximum | Unlimited |
| • Run-In Limitation | N/A |
| **Aggregate Stop Loss** (ASL) | |
| • Lines of Coverage | Medical/Rx |
| • Contract Terms | 12/12 |
| • Corridor | 125% |
| • Annual Maximum | $1,000,000 |
| • Run-In Limitation | N/A |
| **Additional Provisions** | |
| • Aggregating Specific Deductible | None |
| • Specific Advanced Funding | Not Included |
| • Aggregate Accommodation | Not Included |
| • Retiree Coverage | Not covered |
| • Actively at Work | Waived w/ Disclosure |
| • No New Laser/Rate Cap | Not Included |
| **Laser Liability** | None |
| **Rates Subject to Change** | Lock w/ data through May |
| **ISL Composite Rate** 115 | $186.40 |
| **ASL Composite Rate** 115 | $21.42 |
| **Annual Stop Loss Premium** | **$286,792** |

ⓘ Remember

• Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.

Cedar Park002142

Prepared by:

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**
Cedar Park Assembly of God
September 2019 - Page 7

# Self-Funded Medical

*Expected & Maximum Claims Factor Comparison*

|  |  | Proposed |
|---|---|---|
| **Stop Loss** | | |
| **Reinsurer** | | Symetra |
| **Quote Status** | | Preliminary |
| **Individual Stop Loss** (ISL) | | |
| • Lines of Coverage | | Medical/Rx |
| • Contract Terms | | 12/12 |
| • Deductible | | $100,000 |
| • Annual Maximum | | Unlimited |
| **Aggregate Stop Loss** (ASL) | | |
| • Lines of Coverage | | Medical/Rx |
| • Contract Terms | | 12/12 |
| • Corridor | | 125% |
| • Annual Maximum | | $1,000,000 |
| **Laser Liability** | | None |
| **Gallagher Projection** | | |
| **Underwriting Assumptions** | | |
| • Experience Period | | May 2017 - April 2019 |
| • Experience Weight (Prior/Current) | | 33%/67% |
| • Medical/Rx Trend | | 5.7% |
| • Margin | | 2.0% |
| **Expected Claims Factor (PEPM)** | 115 | $452.51 |
| **Gallagher Annual Expected Claims** | | $624,464 |
| **Maximum Liability** | | |
| **Maximum Claims Factors** (for ASL) | 115 | $619.57 |
| **Maximum Annual Claims Liability** | | $855,007 |

Cedar Park002143

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 8

# Funding Development

| | Expected Renewal<br>*Based on Gallagher Projection*<br>*Proposed* |
|---|---|
| | *Medical, Rx* |
| **TPA** | HMA |
| **Stop Loss** | Symetra |
| **ISL** | $100,000 |
| **Cost Components** | |
| • Projected Paid Claims | $624,464 |
| • Projected Fixed Cost | $357,026 |
| • Estimated Rx Rebates | ($35,000) |
| **Total Needed Funding** | **$946,489** |
| **Present Funding** | $708,914 |
| **Needed Change to Present Rates** | **33.5%** |

 **Remember**

- Second year stop loss renewal would be loaded by 15% for maturation factor. This does not include trend or claims renewal increases.
- Needed and Present Funding do not include HSA or HRA funding.
- Needed Funding includes 5.3% commission for Stop Loss only.

Cedar Park002144

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 9

# Self-Funded Medical
*Stop Loss Comparison - Coverage Analysis*

| Reinsurer Statement | |
|---|---|
| *Coverage Analysis Statement* | |
| **Proposed - Symetra**<br>• Stop Loss Reinsurer: Symetra<br>• Administration TPA: HMA | Symetra agrees their stop loss policy will cover agreed upon benefits. Any claims including fiduciary override such as extra contractual payment or claims that are covered or eligible for coverage by Worker's Compensation will not be covered under the stop loss policy. Also, coverage for prescription drugs is required to be in included in the experience provided to the underwriter and the stop loss coverage is subject to the terms outlined on the Symetra stop loss policy schedule of benefits. |

Cedar Park002145

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 10

# Dental
## Benefit & Cost Outline

| | Current/Renewal<br>Delta Dental of WA | | Alternative 1<br>Delta Dental of WA | |
|---|---|---|---|---|
| | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* | *Delta Dental PPO Dentist* | *Delta Dental Premier or Non-Participating Dentist* |
| **Dental Plan** | | *MAC* | | *MAC* |
| **Annual Deductible** | $0 per person | $50 per person | $25 per person | |
| (waived for Preventive & Diagnostic) | $0 per family | $150 per family | $75 per family | |
| **Annual Benefit Maximum** | $1,500 per person | | $2,000 per person | |
| **Waiting Period** | 12 months for Major services | | None | |
| **Services** | | | | |
| • Preventive & Diagnostic | No charge | No charge | No charge | No charge |
| • Basic | 20% | 20% after deductible | 10% after deductible | 10% after deduc ible |
| • Major | 50% | 50% after deductible | 40% after deductible | 40% after deduc ible |
| **Periodontics** | Covered under Basic | | Covered under Basic | |
| **Endodontics** | Covered under Basic | | Covered under Basic | |
| **Implants** | Covered under Major | | Covered under Major | |
| **Orthodontia** | | | Children only | |
| • Services | Not covered | | 50% | 50% |
| • Lifetime Benefit Maximum | | | $2,000 per person | |
| **Late Entrant Penalty** | Open Enrollment | | None | |
| **Monthly Rates** | *Current* | *Renewal* | | |
| Employee Only | 94 | $48.95 | $48.95 | $56.49 |
| Employee + Spouse | 16 | $95.79 | $95.79 | $110.54 |
| Employee + Child(ren) | 11 | $105.56 | $105.56 | $136.82 |
| Employee + Family | 14 | $152.41 | $152.41 | $190.88 |
| **Rate Guarantee** | | 12 mon hs | 12 months | |
| **Total Annual Cost** | 135 | $113,146 | $113,146 | $135,072 |
| *% Change* | | | *0.0%* | *19.4%* |
| *$ Change* | | | *$0* | *$21,926* |



(i) **Remember**

• Actual claims paid are subject to maximum allowable charge, frequencies, age limitations, and terms and conditions of the contract.

Cedar Park002146

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 11

## Contribution Outline

| | | Current | | | Negotiated | | | Alternative 1 | | | Alternative 2 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | *Total Cost* | *ER Cost* | *EE Cost** | *Total Cost* | *ER Cost* | *EE Cost** | *Total Cost* | *ER Cost* | *EE Cost** | *Total Cost* | *ER Cost* | *EE Cost** |
| **PPO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 48 | $396.85 | $281.85 | $115.00 | $431.99 | $306.81 | $125.18 | $399.41 | $283.65 | $115.75 | $411.76 | $292.43 | $119.33 |
| Employee + Spouse | 5 | $876.79 | $308.97 | $567.82 | $954.44 | $336.34 | $618.10 | $882.26 | $310.95 | $571.31 | $909.55 | $320.57 | $588.98 |
| Employee + Child(ren) | 7 | $740.31 | $303.71 | $436.60 | $805.87 | $330.61 | $475.26 | $744.87 | $305.65 | $439.22 | $767.91 | $315.11 | $452.80 |
| Employee + Family | 9 | $1,220.25 | $322.24 | $898.01 | $1,328.31 | $350.77 | $977.54 | $1,228.16 | $324.30 | $903.86 | $1,266.14 | $334.33 | $931.81 |
| **HMO Medical Plan** | | Kaiser Permanente | | | Kaiser Permanente | | | Cigna (Fully Insured) | | | Cigna (Level-Funded) | | |
| Employee | 37 | $345.53 | $270.53 | $75.00 | $371.70 | $291.02 | $80.68 | $391.13 | $306.22 | $84.91 | $403.23 | $315.69 | $87.54 |
| Employee + Spouse | 4 | $763.40 | $269.02 | $494.38 | $821.22 | $289.39 | $531.83 | $864.03 | $304.51 | $559.52 | $890.75 | $313.93 | $576.82 |
| Employee + Child(ren) | 4 | $644.58 | $264.44 | $380.14 | $693.39 | $284.46 | $408.93 | $729.47 | $299.32 | $430.15 | $752.03 | $308.58 | $443.45 |
| Employee + Family | 1 | $1,062.45 | $280.56 | $781.89 | $1,142.91 | $301.81 | $841.10 | $1,202.73 | $317.58 | $885.16 | $1,239.93 | $327.40 | $912.53 |
| **Medical Annual Cost** | | $708,914 | $390,285 | $318,629 | $768,694 | $422,935 | $345,759 | $742,788 | $411,495 | $331,293 | $765,761 | $424,222 | $341,539 |
| **Additional Employer Contributions** | | | | | | | | | | | | | |
| Annual HSA Contribution | | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 | $72,500 | $72,500 | $0 |
| Annual HRA Contribution | | $70,537 | $70,537 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 | $75,120 | $75,120 | $0 |
| **Medical Total Annual Cost** | | $851,951 | $533,323 | $318,629 | $916,314 | $570,555 | $345,759 | $890,408 | $559,115 | $331,293 | $913,381 | $571,842 | $341,539 |
| **Dental Plan** | | DDWA | | | DDWA | | | DDWA | | | DDWA | | |
| Employee | 94 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 | $48.95 | $28.95 | $20.00 |
| Employee + Spouse | 16 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 | $95.79 | $35.79 | $60.00 |
| Employee + Child(ren) | 11 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 | $105.56 | $45.56 | $60.00 |
| Employee + Family | 14 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 | $152.41 | $52.41 | $100.00 |
| **Dental Total Annual Cost** | | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 | $113,146 | $54,346 | $58,800 |
| | | | | | | | | | | | | | |
| **Total Annual Cost** | | $965,097 | $587,669 | $377,429 | $1,029,460 | $624,901 | $404,559 | $1,003,554 | $613,461 | $390,093 | $1,026,527 | $626,188 | $400,339 |
| *% Change* | | | | | 6.7% | 6.3% | 7.2% | 4.0% | 4.4% | 3.4% | 6.4% | 6.6% | 6.1% |
| *$ Change* | | | | | $64,363 | $37,233 | $27,130 | $38,457 | $25,793 | $12,664 | $61,430 | $38,519 | $22,911 |

* Under the Affordable Care Act (ACA), coverage is affordable for an employee if the employee's contribution toward the lowest-cost, self-only, minimum value coverage does not exceed a specified percentage of the employee's household income (9.56% for plan years beginning in 2018; 9.86% for plan years beginning in 2019; and 9.86% for plan years beginning in 2020). There are three safe harbors including the Federal Poverty Line safe harbor. To meet the Federal Poverty Line safe harbor for affordability for plan years starting on July 1, 2019 or prior to July 1, 2020, employee contribution for employee-only coverage cannot exceed 9.86% of the Federal Poverty Line which is equal to $102.63 per month for the 48 contiguous states, $128.18 for Alaska and $118.15 for Hawaii. Note: The affordability percentage rate, and therefore the dollar amount, may change annually. Employers may use the poverty guidelines in effect within six months prior to the first day of the plan year. There are two additional safe harbor options that may be used: the Form W-2 Safe Harbor or the Rate of Pay Safe Harbor. Guidance addresses how HRAs, wellness program rewards, flex credits, defined contributions, opt-out payments, and fringe benefit payments required under the Davis-Bacon Act or the Service Contract Act affect the affordability of employer coverage. See Healthcare Reform Guidelines for details.

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park002147

Prepared by:



# Voluntary Vision
## *Benefit & Cost Outline*



| | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Base Plan | | Current/Renewal<br>vChoice (Underwritten by VSP)<br>Buy-Up Plan | |
|---|---|---|---|---|---|
| *Employee Share of Eligible Expenses* | | *In-Network* | *Out-of-Network* | *In-Network* | *Out-of-Network* |
| **Vision Plan** | | *Signature Plan* | | *Signature Plan* | |
| **Routine Exam Copay** | | $10 | $10 | $10 | $10 |
| **Routine Exam** | | Covered in full* | Reimbursed up to $50* | Covered in full* | Reimbursed up to $50* |
| **Materials Copay** | | $25 | $25 | $25 | $25 |
| **Lenses** (per pair) | | | Reimbursed up to… | | Reimbursed up to… |
| • Single Vision | | No charge* | $50* | No charge* | $50* |
| • Lined Bifocals | | No charge* | $75* | No charge* | $75* |
| • Lined Trifocals | | No charge* | $100* | No charge* | $100* |
| **Frames** | | $130 allowance then 20% discount* | Reimbursed up to $70* | $130 allowance then 20% discount* | Reimbursed up to $70* |
| **Contact Lenses** (in lieu of eyeglasses) | | | | | |
| • Fitting and Evaluation | | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials | Up to $60 copay after 15% discount | Reimbursed up to $105 for services and materials |
| • Elective Contacts | | $130 allowance | | $130 allowance | |
| **Frequency** (Exam/Lenses/Frames/Contacts) | | 12/12/24/12 Months | | 12/12/12/12 Months | |

| *Monthly Rates* | Base | Buy-Up | *Current* | *Renewal* | | |
|---|---|---|---|---|---|---|
| Employee Only | 32 | 6 | $7.86 | $7.86 | $9.81 | $9.81 |
| Employee + Spouse | 6 | 7 | $12.58 | $12.58 | $15.70 | $15.70 |
| Employee + Child(ren) | 2 | 3 | $12.84 | $12.84 | $16.02 | $16.02 |
| Employee + Family | 5 | 0 | $20.71 | $20.71 | $25.83 | $25.83 |
| **Rate Guarantee** | | | | 12 more months | | 12 more months |
| **Total Annual Cost** | 45 | 16 | **$5,475** | **$5,475** | **$2,602** | **$2,602** |
| *% Change* | | | | *0.0%* | | *0.0%* |
| *$ Change* | | | | *$0* | | *$0* |

*Less any applicable copay.

## ⓘ Remember

• Out-of-Network benefits reflect the maximum reimbursement for specific services.
• Members may receive additional discount off of non-covered lens options when services are received from a VSP network provider.
• Frequency applies on a beginning with the first date of service.

Cedar Park002148

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 13



# Life/AD&D
## *Benefit & Cost Outline*



| | Current/Renewal<br>Lincoln Financial Group | |
|---|---|---|
| **Life and AD&D Plan** | | |
| **Benefit Amount** | $10,000 | |
| **Guarantee Issue** | $10,000 | |
| **Additional Features** | | |
| • Accelerated Benefit | Up to 75% | |
| • Conversion | Included | |
| • Portability | Included | |
| • Waiver of Premium | Included | |
| **Benefit begins to reduce at age** | 65 | |

| *Monthly Rates* | *Volume* | *Current* | *Renewal* |
|---|---|---|---|
| **Life** (per $1,000 of benefit) | $1,714,500 | $0.160 | $0.160 |
| **AD&D** (per $1,000 of benefit) | $1,714,500 | $0.020 | $0.020 |
| **Rate Guarantee** | | | 12 more months |
| **Total Annual Cost** | Lives: 179 | **$3,703** | **$3,703** |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Cedar Park002149

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 14

# Long-Term Disability
## *Benefit & Cost Outline*



| | Current/Renewal | |
|---|---|---|
| | Lincoln Financial Group | |
| **Long-Term Disability (LTD)** | | |
| **Elimination Period** | 90 days | |
| **Covered Monthly Earnings** | 60% | |
| **Benefit Maximum** | $5,000 | |
| **Benefit Minimum** | Greater of 10% or $100 | |
| **Definition of Earnings** | Basic Monthly Earnings | |
| **Definition of Disability** | 24 months own occupation | |
| **Maximum Duration** | SSNRA | |
| **Tax Free Benefit (Gross Up)** | No | |
| **Benefit Limitations** | | |
| • Pre-Existing Condition | 3/12 | |
| • Mental Health & Chemical Dependency | 24 months | |
| • Self-Reported | 24 months | |
| **Additional Features** | | |
| • Conversion | Included | |
| • W2 Prep | Included | |
| • FICA Matching | Included | |
| • Employee Assistance Program | Included with up to 4 face-to-face visits PCY | |
| **Monthly Rates** | Volume | Current | Renewal |
| **LTD** (per $100 of covered monthly payroll) | $618,198 | $0.180 | $0.180 |
| **Rate Guarantee** | | | 12 more months |
| **Total Annual Cost** | Lives: 179 | **$13,353** | $13,353 |
| *% Change* | | | *0.0%* |
| *$ Change* | | | *$0* |

Cedar Park002150

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

# Voluntary Life
## *Benefit & Cost Outline*



| **Voluntary Life Monthly Rates** | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Employee and Spouse** (per $1,000) | |
| < 25 | $0.057 |
| 25 - 29 | $0.069 |
| 30 - 34 | $0.092 |
| 35 - 39 | $0.103 |
| 40 - 44 | $0.115 |
| 45 - 49 | $0.172 |
| 50 - 54 | $0.264 |
| 55 - 59 | $0.493 |
| 60 - 64 | $0.756 |
| 65 - 69 | $1.456 |
| 70 + | $2.361 |
| **Child(ren)** (per unit) - Birth to Age 26 | $2.500 |

| **Voluntary Life Plan** | Current/Renewal vChoice (Underwritten by Unum) |
|---|---|
| **Benefit Options** | |
| • Employee | 1-5 x earning rounded to $10,000 |
| • Spouse | .5-2.5 x earnings rounded to $5,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 5 x earnings or $500,000 |
| • Spouse | 50% of employees amount or $250,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Guarantee Issue** | |
| • Employee | $210,000 |
| • Spouse | $105,000 |
| • Children (6 months to 26 years) | $10,000 |
| • Infant (newborn to 6 months) | $1,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Accelerated Benefit | 75% to $500,000 |
| • Conversion | Included |
| • Portability | Included |
| • Waiver of Premium | Included |
| **Benefit begins to reduce at age** | 70 |
| **Participation Requirement** | 10 |

Cedar Park002151



# Voluntary AD&D
## *Benefit & Cost Outline*

|  | Current/Renewal<br>vChoice (Underwritten by Standard) |
|---|---|
| **Voluntary AD&D Plan** | |
| **Benefit Options** | |
| • Employee | $100,000 increments |
| • Spouse | 50% of employee amount |
| • Children (newborn to 26 years) | $10,000 |
| **Benefit Maximum** | Lesser of… |
| • Employee | 10 x earnings or $500,000 |
| • Spouse | 50% of employee amount or $250,000 |
| • Children (newborn to 26 years) | $10,000 |
| **Definition of Earnings** | Base salary + commissions |
| **Additional Features** | |
| • Portability | Included |
| • Waiver of Premium | Not included |
| **Participation Requirement** | 10 |
| **Voluntary AD&D Monthly Rates** | |
| **Employee** (per $1,000) | $0.047 |
| **Spouse** (per $1,000) | $0.047 |
| **Child(ren)** (per $1,000) | $0.047 |

Cedar Park002152

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 17

# Administration Services
### *Cost Outline*

*Single Billing Services*

| | Current/Renewal<br>GBS Administrators |
|---|---|
| **Total Annual Fees** | **Your fee structure is 2% of monthly medical costs, included in Kaiser's medical premium.** |

- SBS regeneration fee not paying as billed - $50
- Cigna will cover the cost of SBS if medical carriers move

*Benefit Advocate Center*

| | Current/Renewal<br>GBS |
|---|---|
| **PEPM Administration Fee** | Included |

Cedar Park002153

Prepared by:
 Gallagher

The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.

Cedar Park Assembly of God
September 2019 - Page 18

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $708,914 | $390,285 | $318,629 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Negotiated

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $768,694 | $422,935 | $345,759 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $1,046,517 | $641,958 | $404,559 |
| % Change | | | 6.6% | 6.2% | 7.2% |
| $ Change | | | $64,363 | $37,233 | $27,130 |

Cedar Park002154

Prepared by:

 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 19

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $708,914 | $390,285 | $318,629 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Alternative 1

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Fully Insured) | Dual Option PPO/HMO $4,500 Ded. | $742,788 | $411,495 | $331,293 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $1,020,611 | $630,518 | $390,093 |
| % Change | | | 3.9% | 4.3% | 3.4% |
| $ Change | | | $38,457 | $25,793 | $12,664 |

Cedar Park002155

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 20

# Annual Cost Summary

## Current

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Kaiser Permanente | Dual Option PPO/HMO $4,500 Ded. | $708,914 | $390,285 | $318,629 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $70,537 | $70,537 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $982,154 | $604,725 | $377,429 |

## Alternative 2

| Coverage | Carrier | Benefit/Plan Option | Total Cost | ER Cost | EE Cost |
|---|---|---|---|---|---|
| Medical | Cigna (Level-Funded) | Dual Option PPO/HMO $4,500 Ded. | $765,761 | $424,222 | $341,539 |
| HSA Funding | | $500 per individual/$1,000 per family | $72,500 | $72,500 | $0 |
| Estimated HRA Utilization | NMR | $3,150 per individual/$6,300 per family | $75,120 | $75,120 | $0 |
| Dental | Delta Dental of WA | $1,500 annual maximum | $113,146 | $54,346 | $58,800 |
| Life/AD&D | Lincoln Financial Group | $10,000 flat benefit | $3,703 | $3,703 | $0 |
| Long-Term Disability | Lincoln Financial Group | 60% to $5,000 | $13,353 | $13,353 | $0 |
| Single Billing Services | GBS Administrations | SBS Administration | Included in Medical | | |
| Total Annual Cost | | | $1,043,584 | $643,244 | $400,339 |
| % Change | | | 6.3% | 6.4% | 6.1% |
| $ Change | | | $61,430 | $38,519 | $22,911 |

Cedar Park002156

Prepared by:
 Gallagher

**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 21

# Carriers Invited To Bid

| Self-Insured Plan Administration (TPA) | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HMA | Shown in Proposal | Net of commission | $0.00 to $40.00 PEPY |
| First Choice | Not shown - Base PEPM Admin Fee 53.8% over HMA | N/A | Not Applicable |

| Stop Loss | AM Best Rating | Response | RFI Available | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|---|
| Symetra | A | Shown in Proposal | Yes | 5 3% | 2.5% of Premium |
| HM | A | DTQ - 37% over current (expected) / 59% over (maximum) | Yes | N/A | 3.0% of Premium |

| Fully-Insured Medical Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Kaiser Permanente WA | Current Carrier - Shown in Proposal | 5 3% | Not Applicable |
| Cigna | Shown in Proposal | $29.41 PEPM | $0.00 to $28.00 PEPY |
| Regence BlueShield | Not shown - 22.9% over current and 6.6% over renewal | N/A | $0.00 to $40.00 PEPY |
| Premera Blue Cross | Not shown - 32.9% over current and 15 5% over renewal | N/A | 0.0% to 0.8% of medical premium |
| Business Health Trust | Not shown - 30.4% over current and 13 3% over renewal | N/A | Not Applicable |
| United Healthcare | DTQ - Per UHC: "We have conducted a review of your request and have determined that our rates our uncompetetive and we coming in over the 2019 renewal" | N/A | Not Applicable |
| Aetna | DTQ - Per Aetna: "We have evaluated all aspects of this group and we have determined we will not be competetive" | N/A | $0 00 to $30 00 PMPY |
| Christian Brothers | DTQ - Group must be part of the Catholic Church to participate | N/A | Not Applicable |

| Gallagher vChoice Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Vision - Vision Service Plan | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Fully-Insured Dental Plans | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| Delta Dental of Washington | Current Carrier - Shown in Proposal | 10.0% | Not Applicable |

| Miscellaneous Benefit Lines | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|
| HRA Administration - NMR | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Benefit Advocate Center - GBS | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |
| Single Billing Services - GBSA | Current Carrier - Shown in Proposal | Net of commission | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

Cedar Park002157

Prepared by:
Gallagher

The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.

Cedar Park Assembly of God
September 2019 - Page 22

# Carriers Invited To Bid

| Life/AD&D and Disability Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Lincoln Financial Group | A+ | Current Carrier - Shown in Proposal | Life: 20% LTD: 10% | 1.0% to 4 5% of Premium |

| Gallagher vChoice Plans | AM Best Rating | Response | Commission or Broker Fee | Supplemental Compensation |
|---|---|---|---|---|
| Life - Unum | A | Current Carrier - Shown in Proposal | 20.0% | 1 25% of Premium |
| AD&D - Standard | A | Current Carrier - Shown in Proposal | 25.0% | 1.5% to 2.25% of Premium |
| Pet Insurance - PetsBest | N/A | Current Carrier - Not Shown | 7 5% | Not Applicable |
| Additional Administrative Fee | N/A | Current Carrier - Shown in Proposal | $1.25 PEPM | Not Applicable |

*Gallagher companies may receive supplemental compensation referred to in a variety of terms and definitions, such as contingent commissions, additional commissions and supplemental commission.*

While GBS does not guarantee the financial viability of any health insurance carrier or market, it is an area we recommend that clients closely scrutinize when selecting a health insurance carrier or HMO.  There are a number of rating agencies that can be referred to including, A.M. Best, Fitch, Moody's, Standard & Poor's, and Weiss Ratings (TheStreet.com).  Generally, agencies that provide ratings of U.S. Health Insurers, including traditional insurance companies and other managed care (e.g., HMO) organizations, reflects their opinion based on a comprehensive quantitative and qualitative evaluation of a company's financial strength, operating performance and market profile.  However, these ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations.

## A.M. Best's Rating Scale

| Level | Category | Level | Category | Level | Category |
|---|---|---|---|---|---|
| A++, A+ | Superior | B, B- | Fair | D | Poor |
| A, A- | Excellent | C++, C+ | Marginal | E | Under Regulatory Supervision |
| B++, B+ | Very Good | C, C- | Weak | F | In Liquidation |
| | | | | S | Rating Suspended |

### Financial Size Categories

| | | | |
|---|---|---|---|
| FSC I ..........................Up to $1,000 | FSC IX.........................$250,000 to $500,000 | | |
| FSC II ........................$1,000 to $2,000 | FSC X..........................$500,000 to $750,000 | | |
| FSC III .......................$2,000 to $5,000 | FSC XI.........................$750,000 to $1,000,000 | | |
| FSC IV .......................$5,000 to $10,000 | FSC XII........................$1,000,000 to $1,250,000 | | |
| FSC V .......................$10,000 to $25,000 | FSC XIII.......................$1,250,000 to $1,500,000 | | |
| FSC VI .......................$25,000 to $50,000 | FSC XIV.......................$1,500,000 to $2,000,000 | | |
| FSC VII ......................$50,000 to $100,000 | FSC XV........................$2,000,000 Or More | | |
| FSC VIII .....................$100,000 to $250,000 | (In $000 of Reported Policyholders' Surplus Plus Conditional Reserve Funds) | | |

Best's Insurance Reports, published annually by A.M. Best Company, Inc., presents comprehensive reports on the financial position, history and transactions of insurance companies operating in the United States and Canada.  Companies licensed to do business in the United States are assigned a Best's Rating which attempts to measure the comparative position of the company or association against industry averages.

Cedar Park002158

Prepared by:
Gallagher

The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.

Cedar Park Assembly of God
September 2019 - Page 23

# Non-Grandfathered Status

You had a health policy in effect prior to March 23, 2010, and because you have made significant enough plan changes to have lost your grandfathered status, you must comply with the additional requirements under the Affordable Health Care Act (ACA).

**Examples of plan changes that could have caused you to lose grandfathered status include, but may not be limited to**

- Significantly cut or reduce benefits; or
- Add or reduce annual dollar limits; or
- Raise coinsurance percentages; or
- Increase deductibles or out-of-pocket maximums by more than the amounts allowed based on medical inflation*; or
- Increase employee contribution percentage by more than 5% of the contribution rate on March 23, 2010 (determined contribution rate based on COBRA valuation for self-insured plans).

*Medical inflation is the increase since March 2010 in the overall medical care component of the Consumer Price Index for All Urban Consumers (CPI-U) (unadjusted) published by the Department of Labor.

Your plan must comply with the provisions that apply to grandfathered plans in addition to the provisions that apply to non-grandfathered plans. The additional requirements that apply to non-grandfathered plans include, but are not limited to:

- Provide coverage to children to age 26 regardless of whether they are eligible for their own employment-based coverage; and
- Provide coverage of recommended preventive services with no cost sharing; and
- Include patient protections such as guaranteed access to emergency room services and OB-GYNs and pediatricians; and
- Include new claims appeal rules including both internal and external review; and
- Comply with nondiscrimination rules for fully insured health plans under Code §105(h) which prohibit discrimination in favor of highly compensated individuals as to benefits and eligibility requirements (pending release of final regulations).

**For plan years starting on or after January 1, 2014**, plans that have lost grandfathered status will also have to comply with the following:

- No discrimination against individuals participating in clinical trials (insured plans only); and
- No discrimination based on health status; and
- Provide essential benefits (insured plans only) and prohibit cost sharing in excess of the limits for qualified high deductible health plans; and
- No discrimination against healthcare providers acting within the scope of their professional license and applicable State law; and
- Prohibit out-of-pocket limits in excess of applicable out of pocket limits as determined by HHS for plan years starting on or after January 1, 2015.

*NOTE: This is only a brief summary of ACA guidance, intended to highlight points with the most universal impact. It is not intended to be a complete summary of requirements, changes, or regulations.  Further guidance and probable changes are expected to continue.*

Cedar Park002159

Prepared by:



**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 24

# Employer Shared Responsibility Mandate/ACA Compliance

| | | |
|---|---|---|
| **Employer Shared Responsibility Mandate (ESRM)**<br>Applicable Large Employer | 50+ full-time equivalent employees | An employer that employed at least 50 full time equivalent employees (FTE) in the preceding calendar year is required to offer affordable, minimum value health coverage to substantially all FTEs and dependent children or pay a penalty. |
| **Member of Controlled Group?** | Subject to Employer Determination | If the total of FTEs for all employers in the controlled group is at least 50, each separate company is and applicable large employer and is subject to the employer mandate. Penalties are then imposed based on the offer of coverage provided by each separate company. |
| **Medical Plan(s) meet Minimum Essential Coverage?** | Yes | A plan must meet the minimum essential coverage requirement for an applicable large employer to meet employer mandate requirement.<br>The Summary of Benefits & Coverage is required to reflect if the plan is minimum essential coverage. |
| **Offering to 95% of full-time employees?** | Subject to Employer Determination | An applicable large employer is required to offer minimum essential coverage to at least 95% of full-time employees or be subject to a penalty. |
| **Medical Plan(s) meet Minimum Value?*** | Yes | If the plan is not of a minimum value, then an employee will be eligible to seek premium assistance from the Marketplace (Exchange). If the employee receives premium assistance through the Marketplace, the employer will be subject to a penalty. The SBC is required to reflect whether the plan is of a minimum value. |
| **Affordable Coverage?*** | Subject to Employer Determination | If the cost of health coverage for the employee is unaffordable, then an employee will be eligible to seek premium assistance to purchase a plan from the Marketplace. If the employee receives premium assistance to purchase health coverage, then the employer would be subject to a penalty. |

*ACA requires employers covered by the Fair Labor Standards Act to notify employees about the availability of health insurance options for the public marketplaces/exchanges.  The Marketplace Notice you provide to new employees may need to be updated if the minimum value and/or affordable coverage status of your plan changes.

*NOTE: The answers outlined here are based on the recommendations of this proposal.  If these options are not chosen, are modified or final contributions differ, you may be subject to fees and penalties.*

Cedar Park002160

Prepared by:

**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 25

Gallagher

# Proposal Assumptions

**General Assumptions**

- Carriers reserve the right to revise rates should any federal, state or local authority mandate a change in benefits or impose or change a tax on plan revenue during the contract period.
- A group health plan may not reduce its coverage of the costs of pediatric vaccines (as defined under section 1928(h)(6) of the Social Security Act as amended by section 13830 of the Omnibus Budget Reconciliation Act of 1993) below the coverage it provided as of May 1, 1993. If the preventive care benefit which includes immunizations is currently in or is added to your medical plan it cannot in the future be deleted.
- Generally all lines of coverage within a carrier must be packaged and have common eligibility.
- Retirees are not eligible for coverage unless they qualify for a COBRA extension.
- Final rates will be based on actual enrollment, participation, employer contribution and other underwriting guidelines.
- Effective date of September 1, 2019. Unless otherwise indicated, rates will be guaranteed for 12 months.
- For plan years ending on or after October 1, 2017, group health plans will be assessed a $2.39 per life per year Patient-Centered Outcomes Research Institute Fee (PCORI).
  For plan years ending on or after 10/1/18 but before 10/1/19, the fee will be $2.45 per life per year. Fees will be based on the average number of lives covered under the plan during that year. The fee will be paid by the insurer for insured plans and by the plan sponsor for self-insured health plans. For any renewal effective on or after 10/2/18 PCORI does not apply (unless there is a short plan year). If plan year ends on 9/30/19, PCORI does apply.
- **Employer Contribution**  Please refer to contribution page.
- **Eligible Employees**  Employees must work 30 hours per week to be eligible.
- **Probationary Period**  First of month following date of hire.

**Kaiser Permanente**

- Rates are guaranteed for 12 months until September 1, 2020.
- The employer must contribute at least 50% of the employee-only monthly premium, and the contributions may not be made in a discriminatory manner.
- The proposed rates and benefits assume that 75% of all eligible employees are enrolled in a company-sponsored plan, excluding those who have documented other qualified coverage.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

Cedar Park002161

Prepared by:


**The Information contained herein is subject to the disclosures and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 26

# Proposal Assumptions

**Cigna**

- Rates are guaranteed for 12 months until September 1, 2020.
- The proposed rates and benefits assume that enrollment in the Cigna HealthCare administered plan is at least 50% of the total eligible population identified as 183.
- If enrollment or demographic impact at initial sale effective date has changed by 10% or more from what was bid, the carrier reserves the right to re-rate that new business.
- ACA requires non-grandfathered plans to provide in-network coverage of recommended preventive services with no cost sharing.
- The Mental Health Parity and Addiction Equity Act requires benefits for mental health and substance abuse be similar to those applied to medical/surgical benefits.
- As stated in "General Assumptions."

**Level Funded Arrangement**

- Current Specific Stop Loss Deductible is $50,000.
- Aggregate Corridor is 120%.
- Includes Rx claims for the Individual Stop Loss (ISL) coverage.
- Includes Rx claims for the Aggregate Stop Loss (ASL) coverage.
- Stop Loss contract covers claims incurred since policy inception and are paid during the current policy year. The paid period will be extended in the year of termination to include the 15 months immediately following.
- **Stop Loss Rates**

| OAP Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $159.67 | $15.40 |
| Emp + Spouse | $352.71 | $34.00 |
| Emp + Child(ren) | $297.78 | $28.71 |
| Emp + Family | $490.98 | $47.34 |

| OAP ( N) Plan | Individual Stop Loss | Aggregate Stop Loss |
|---|---|---|
| Employee | $145.59 | $15.92 |
| Emp + Spouse | $321.61 | $35.16 |
| Emp + Child(ren) | $271.53 | $29.69 |
| Emp + Family | $447.69 | $48.95 |

**HMA**

- Rates are guaranteed for 12 months until September 1, 2020.
- HMA requires that their clients partners  with one our their Preferred Stop Loss Partners. These include SunLife, Symetra, HM, HCC Tokio Marine, Optum Health, QBE, Physicians, Voya, Munich Re, SwissRe, ISU, Commencement Bay Risk Management and Reliance Standard.
- As stated in "General Assumptions."

Cedar Park002162

Prepared by:
Gallagher
The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.
Cedar Park Assembly of God
September 2019 - Page 27

# Proposal Assumptions

**Symetra**

- Rates are guaranteed for 12 months until September 1, 2020.
- Plan sponsor's Plan Document or Plan Document Amendment is due no later than 90 days after the proposed effective/renewal date of Excess Loss Insurance coverage.
- Please provide details on any individual who has been hospital confined for 30 days or more in the most recent 12 months or is currently on an organ transplant list.
- Any unfunded or pended claims balance must be disclosed, otherwise such claims will not be considered eligible under the Excess Loss Policy.
- This proposal is based upon the following network(s): Blues ASO
- Network Fees are ineligible expenses.
- Retirees are excluded from coverage under the Stop Loss Policy.
- Completed Symetra Disclosure Statement including: diagnosis, treatment received, current status, expected treatment and amount paid during the experience period as of the effective date of cove
- Terms are subject to change if final enrollment varies by more than 10% from proposal assumptions. Current census must be received at least 14 days prior to the effective date.
- Updated Large Claims data as well as Monthly Paid Claims and Enrollments as of 90 days prior to the effective date

**Delta Dental of WA**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**Lincoln Financial**

- Rates are guaranteed for 12 more months until September 1, 2020.
- All employees must be actively at work on their effective date in order to be covered.
- As stated in "General Assumptions."
- Your Plan is potentially discriminatory if it provides a better life insurance benefit to key employees; either on the basis of eligibility, difference in flat amount of
  benefit, or difference in multiplier. There are nondiscrimination tests that should be reviewed.  If your Plan is discriminatory,
  you would have to tax your key employees on the value of the total amount of employer-paid life insurance.

**NMR**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

**GBS Administrators**

- Rates are guaranteed for 12 months until September 1, 2020.
- As stated in "General Assumptions."

Cedar Park002163

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 28

# Proposal Assumptions

**Gallagher vChoice (Voluntary Vision - Underwritten by VSP)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Life - Underwritten by Unum)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary AD&D - Underwritten by Standard)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

**Gallagher vChoice (Voluntary Pet Insurance - Underwritten by PetsBest)**

- Rates are guaranteed for a minimum of twenty four months after initial effective date and subject to change at renewal thereafter.
- A minimum participation of 10 employees is required.
- As stated in "General Assumptions."

Cedar Park002164

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 29

# Gallagher Benefit Services Disclaimers

**Coverage**

This proposal is an outline of the coverages proposed by the carrier(s) based upon the information provided by your company.   t does not include all the terms, coverages, exclusions, limitations, and conditions of the actual contract language.  See the policies and contracts for actual language.  This proposal (analyses, report, etc.) is not a contract and offers no contractual obligation on behalf of GBS.

**Renewal/Financial**

This analysis is for illustrative purposes only, and is not a proposal for coverage or a guarantee of future expenses, claims costs, managed care savings, etc. There are many variables that can affect future health care costs including utilization patterns, catastrophic claims, changes in plan design, health care trend increases, etc.  This analysis does not amend, extend, or alter the coverage provided by the actual insurance policies and contracts.  See your policy or contact us for specific information or further details in this regard.

**Legal**

The intent of this analysis [report, letter, etc ] is to provide you with general information regarding the status of, and/or potential concerns related to, your current employee benefits environment.   t should not be construed as, nor is it intended to provide, legal advice.  Laws may be complex and subject to change.  This information is based on current interpretation of the law and is not guaranteed.  Questions regarding specific issues should be addressed by legal counsel who specializes in this practice area.

Cedar Park002165

Prepared by:



**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 30

# Gallagher Benefit Services Privacy Policy Disclosure

6/10/2019

Cedar Park Assembly of God
Steve Orcutt
16300 112 Ave NE
Bothell, WA - 98011

RE: Privacy Policy Disclosure

Dear Steve Orcutt,

Gallagher Benefit Services, Inc. (Gallagher) treats your personal privacy with care and respect. Because we value our client relationships, we do not disclose our clients' nonpublic personal, financial or health information with third parties, except for the specific purposes listed in the enclosed Privacy Policy Summary or as otherwise permitted by law.  Personal information is any information that can be used to identify, locate or contact you or your employees.  Personal information does not include publicly available information or individually identifiable business contact information of employees such as name, title, business address, business telephone number or business email address.

Applicable law requires Gallagher to provide our clients with notice of our Privacy Policy, a summary of which is enclosed here (the full text of the Gallagher Privacy Policy can be retrieved at the following URL: http://www.ajg.com/privacy-policy/).  This policy does not apply to our efforts to market our products and services to you, so you may receive information from us regarding products that may suit your needs.

Gallagher has always been mindful of our clients' privacy.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Thank you for choosing Gallagher Benefit Services, Inc. We appreciate your business and value our relationship.

Enclosure: Privacy Policy Summary

Cedar Park002166

Prepared by:


**The Information contained herein is subject to the disclosures
and disclaimers on the Assumptions pages of this marketing presentation.**

Cedar Park Assembly of God
September 2019 - Page 31

# Gallagher Benefit Services Privacy Policy Disclosure

This Privacy Policy Disclosure outlines and summarizes our information sharing practices to help you understand how we protect your privacy and that of your employees when we collect and use information about you and your employees, and the measures we take to safeguard that information.

**Information We May Collect.** We may collect the following nonpublic personal, financial or health information about you or your employees including:

- Information we receive from you and your employees on applications or questionnaires, such as occupation, current employer and social security number;
- Information about your transactions with us, our affiliates or previous insurers; such as your policy coverage, claim information, premiums and payment history;
- Information we receive from consumer-reporting agencies such as Equifax that is obtained for the purpose of ascertaining credit histories. These reports are obtained as underwriting tools to determine bill paying habits and credit worthiness for certain individual, personal insurance products. These reports are not subject to race, gender or income.
- Information that allows us to communicate with you or your employees, such as name, user name, password, age, marital status, occupation, mailing address, telephone numbers, email address, or other addresses that allow us to send a message;
- Information that assists us to conduct business with you or your employees, such as types of products or services that may be of interest, employee financial information, or information on your company's size, revenue, type, industry codes, demographics, locations, and financial information;
- Information about your transactions with us, our affiliates, or your previous providers;

**Information We Disclose.** We do not disclose any nonpublic personal, financial or health information about our clients, former clients or their employees to anyone, except for the purposes of placing your insurance coverage(s), fulfilling your requests for products or services and related activities, responding to your requests for a call or email, processing transactions you request, telling you about products or services we offer and as otherwise permitted by law.

**Information Security.** We restrict access to nonpublic personal, financial or health information about you and your employees to those employees and subcontractors who have a need to know that information to provide products or services to you or your employees.  We maintain physical, electronic, and procedural safeguards that comply with federal and state regulations to guard your nonpublic personal, financial and health information and that of your employees.

Cedar Park002167



Exhibit J



# DEPOSITION TRANSCRIPT NOTICE

**DATE:** 12/01/2022

**TO:**   Kevin H. Theriot

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**WITNESS:**  30(b)(6) Steven Orcutt

**DATE TAKEN:**  11/21/2022

The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date.  Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:
Paul M. Crisalli

## ERRATA

**CASE NAME**: Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN**: 11/21/2022

**WITNESS**: 30(b)(6) Steven Orcutt

## CORRECTIONS

| Page | Line | Now Reads | Should Read | Reason |
|------|------|-----------|-------------|--------|
| 17 | 22-23 | "We provide a Christian counseling network and a Christian club sports program." | "We have over a dozen different ministries including a Christian counseling network and a Christian club sports program." | Misspoke. |
| 22 | 18-19 | "I believe for 13 of the last years I've been here." | "I believe for 13 of the last 14 & 1/2 years I've been here." | Misspoke or transcription error. |
| 32 | 17-18 | "No. We—we have an annual audit by an audit firm but not an accounting firm." | "Yes." | Misspoke or misunderstood question. |
| 69 | 13-14 | "Yes. Because that is a level-funded plan, we could exclude specific procedures." | "Yes it would have excluded abortion and contraceptive services. Because that is a level-funded plan, we could have excluded specific procedures." | Clarify answer to compound question and clarify record to be consistent with previous testimony. |
| 74 | 10-12 | "Yes. Along with all of the other considerations of a level-funded versus a fully-insured plan, which Cigna chose not to bid that year." | "Yes there was an assumption of an exemption for abortion services and certain contraceptives. Along with all of the other considerations of a level-funded versus a fully-insured plan, which Cigna chose not to bid that year." | Clarify answer to compound question and clarify record to be consistent with previous testimony. |

_Signature of Deponent_



# DECLARATION

**CASE NAME:**  Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**  30(b)(6) Steven Orcutt

     I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

30(b)(6) Steven Orcutt

Signed on the __29__ day of __DECEMBER__, 202_2_

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com  www.buellrealtime.com

# Exhibit K

# Deposition of 30(b)(6) Jason Smith

# Cedar Park Assembly of God of Kirkland v Kreidler, et al.

# November 21, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 92

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____
                                  )
CEDAR PARK ASSEMBLY OF GOD OF     )
KIRKLAND, WASHINGTON,             )
                                  )
                                  )
                    Plaintiff,    )
                                  )
          v.                      )  No. 3:19-cv-05181-BHS
                                  )
MYRON "MIKE" KREIDLER, et al.,    )
                                  )
                                  )
                    Defendants.   )
_____


30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON

REPRESENTED BY JASON SMITH - VOLUME II

_____

Taken at Kirkland, Washington

(All participants appearing via videoconference.)




DATE TAKEN:   November 21, 2022

REPORTED BY:  Nicole A. Bulldis, RPR
              AZ No. 50955 | CA No. 14441 | WA No. 3384

Page 93

```
 1                    A P P E A R A N C E S

 2

 3   FOR PLAINTIFF:

 4     (via Zoom)          KEVIN H. THERIOT
                           Alliance Defending Freedom
 5                         15100 N. 90th Street
                           Scottsdale, AZ 85260
 6                         (480) 444-0020
                           ktheriot@adflegal.org
 7

 8   FOR DEFENDANTS:

 9     (via Zoom)          PAUL M. CRISALLI
                           Office of the Attorney General
10                         800 Fifth Avenue, Suite 2000
                           Seattle, WA 98104
11                         (206) 464-7744
                           paul.crisalli@atg.wa.gov
12

13

14                         --o0o--

15

16

17

18

19

20

21

22

23

24

25
```

Page 94

1          30(b)(6) DEPOSITION OF JASON SMITH - VOLUME II

2

3                         EXAMINATION INDEX

4     EXAMINATION BY                                    PAGE

5     Mr. Crisalli....................................... 95

6

7

8                          EXHIBIT INDEX

9     EXHIBITS FOR IDENTIFICATION                       PAGE

10    22   Cedar Park By-Laws............................ 103

11    23   Smith Letter to Kaiser Permanente - 7/19/19..... 109

12    24   Smith Letter to Kaiser Permanente - 8/23/19..... 110

13    25   Second Amended Verified Complaint for

14         Injunctive and Declaratory Relief.............. 112

15    26   Declaration of Jason "Jay" Smith............... 117

16    27   Exhibit A to Declaration of Jason "Jay" Smith... 117

17    28   Supplemental Verified Complaint for Injunctive

18         and Declaratory Relief......................... 119

19    29   Orcutt Email String - 3/5/19................... 123

20

21                          --o0o--

22

23

24

25

Page 95

1          REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA

2                  Monday, November 21, 2022; 1:45 p.m.

3                               --o0o--

4

5    JASON SMITH,                    witness herein, having been

6                                    first duly sworn on oath,

7                                    was examined and testified

8                                    as follows:

9

10                   E X A M I N A T I O N

11   BY MR. CRISALLI

12        Q.    And could you please state your name and spell

13   the last name for the record?

14        A.    Jason Smith, S-m-i-t-h.

15        Q.    Okay.  And you sat in on the deposition that

16   occurred this morning with Mr. Orcutt; is that correct?

17        A.    Yes, that's correct.

18        Q.    And you heard me give a little preview of some

19   of the ground rules for the deposition; is that right?

20        A.    Yeah.

21        Q.    Do you recall those?  I'm asking whether you

22   want me to repeat all those, or if we could just have a

23   general agreement that those ground rules will apply

24   equally here.

25        A.    I recall them, and I -- I agree that they

Page 96

1    would be applied here.

2         Q.   Okay.  Great.  Thank you.

3              I have Exhibit 1 in the chat for you to

4    download and review.  And we are using consecutive

5    exhibits, so you'll see what's going to happen is

6    there's going to be an Exhibit 1, and then the next for

7    you will be, like, Exhibit 22.

8         A.   Okay.  Yes, I have Exhibit 1.

9         Q.   And do you understand that you have been

10   designated by Cedar Park to testify on its behalf as an

11   organization today?

12        A.   Yes.

13        Q.   Okay.  And do you understand that your answers

14   can be binding as to Cedar Park for purposes of this

15   case?

16        A.   Yes.

17        Q.   All right.  And my understanding is that you

18   have been designated to testify as to Topic 1; is that

19   right?

20        A.   Yes.

21        Q.   That you have been designated to testify as to

22   Topic 2; is that correct?

23        A.   That's correct.

24        Q.   And then Number 6; is that correct?

25        A.   Yes.

Page 97

1    Q.   And Topic 7; is that correct?

2    A.   Yes.

3    Q.   Are there any other of these topics that you

4    believe you have been designated to testify on behalf of

5    Cedar Park today?

6    A.   Not to my knowledge.

7    Q.   What is your position at Cedar Park?

8    A.   Senior pastor.

9    Q.   And how long have you been senior pastor at

10   Cedar Park?

11   A.   Seven years.

12   Q.   And going back, one more clarification.  As we

13   did in the last dep, I'm going to use the term "Cedar

14   Park."  Do you understand that to be Cedar Park Assembly

15   of God of Kirkland, Washington, the plaintiff in this

16   matter?

17   A.   Yes, I do.

18   Q.   Okay.  Could you briefly describe your

19   education?

20   A.   I have an undergraduate degree, a Bachelor of

21   Arts in Biblical Literature and New Testament Greek,

22   and -- and that's the extent of degrees that I have.

23   I've had some seminary that I've worked with in various

24   things, but a bachelor of arts in Bible.

25   Q.   Okay.  Did you obtain any certification

Page 98

1   through seminary to become a pastor?

2       A.   I -- I am ordained with the Assemblies of God

3   as a minister.

4       Q.   And the Assemblies of God, is that -- how

5   would you describe what that is compared to other

6   branches of the Christian religion?

7       A.   It is a denomination.

8       Q.   That's the word I was looking for.  Thank you.

9            And who ordained you as a minister through the

10  Assemblies of God, as in, is there a council or a test

11  or some sort of group of individuals who review and make

12  those kind of determinations that you can be ordained as

13  a minister?

14      A.   Yes.  It's a combination of the Northwest

15  District Executive Presbytery and the National

16  Presbytery for our denomination.

17      Q.   And are you involved presently with either of

18  those as far as -- well, I'll leave it there.

19           Are you involved with either of those two

20  organizations?

21      A.   I'm a minister in good standing with both of

22  those organizations.

23      Q.   Not fully knowing the structure of how

24  Assemblies of God works, but are you in any kind of

25  leadership position with respect to those two

Page 99

1   organizations as opposed to just Cedar Park?

2        A.   I am not.

3        Q.   Before becoming a senior pastor at Cedar Park,

4   what did you do before that?

5        A.   Over the last 22 years, I have served in

6   various ministerial positions with Cedar Park, with

7   youth, young adults, as well as pastoring one of our

8   campus locations.

9        Q.   And who makes the decision for you to be

10  appointed to those particular positions?

11       A.   Each of those positions were in the hiring

12  discretion of the previous senior pastor.

13       Q.   Okay.  And what process did you undergo to be

14  selected as senior pastor with Cedar Park Church?

15       A.   It was a process of interviewing with a

16  selection committee as well as our Board of Directors,

17  and then, eventually, a process with -- which requires a

18  vote of our entire membership or congregational body.

19       Q.   And that would be Cedar Park, as a whole,

20  having a vote?  Whoever voted would make that decision;

21  is that right?  That ultimate vote you're describing.

22  I'm just trying to make sure it's Cedar Park's

23  membership that's making that decision.

24       A.   Yes, that's correct.  The membership of Cedar

25  Park has the prerogative to vote on the appointment of a

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 100

1    new senior pastor.

2         Q.   What is the senior pastor's relationship with

3    the Board of Directors?

4         A.   The senior pastor serves as the president of

5    the organization as well as of the Board and works in

6    cooperation with the official Board in making many

7    decisions as well as in cooperation with our

8    congregational vote in making other decisions.

9         Q.   Does the senior pastor have veto power of

10   decisions of the Board of Directors?

11        A.   Not as such.

12        Q.   Does the Board of Directors theoretically have

13   veto power over decisions made by the senior pastor?

14        A.   Those are not words that are used in our

15   nomenclature.

16        Q.   That's fair.

17             To what extent do those two Assembly of God

18   organizations review the teachings and views of Cedar

19   Park?

20        A.   There is no official review via denomination

21   of the teachings of Cedar Park Assembly of God, as such,

22   but the affiliation is with the minister themselves.

23        Q.   And I'm trying to understand, like, if Cedar

24   Park took a position that's contrary to the position of

25   one of these affiliations, would there be potentially

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 101

1    any consequence to Cedar Park?

2        A.    Well, being that the official doctrinal

3    positions of the Assemblies of God are the official

4    doctrinal position of Cedar Park Assembly of God, if

5    there were discrepancies, then that would be a matter of

6    discipline with the individual minister.  And the bylaws

7    of the church state clearly our agreement with the

8    doctrinal positions of the denomination.

9        Q.    Thank you.

10            Part of what I'm trying to just get out is the

11   difference or how the Assembly of God Doctrine works

12   from the affiliates to the church itself to understand

13   the level of difference that might occur or not occur,

14   so appreciate it.

15            Do you have any expertise in actuary analyses?

16       A.    No.

17       Q.    Do you have any expertise in market economics?

18       A.    No.

19       Q.    Okay.  You listened to Mr. Orcutt describe

20   what Cedar Park does in its various business

21   organizations; right?

22       A.    Yes.

23       Q.    Do you agree with his description of Cedar

24   Park, the organization, and the testimony that he

25   provided?

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 102

1      A.   Yes.   However, the title of business

2   organization isn't something that we use broadly to

3   describe our activities.   As such, we view every

4   activity of Cedar Park as an official reach of ministry

5   and of the church.   Even though it may look like

6   business in the eyes of, you know, a school is a school

7   is a school, but our underlying mission is the gospel of

8   Christ.

9      Q.   Well, and thanks for that.

10          I just want to make sure I understand that

11   there are arms of Cedar Park where they accept payment

12   for goods and services like school, like the missionary

13   car program, et cetera; is that correct?

14      A.   To an extent, that is correct, with the

15   exception, for instance, the missionary car is

16   exclusively on a donation basis.

17      Q.   Okay.   But you don't dispute that Cedar Park

18   pays B&O taxes, for example, on -- or sales taxes;

19   correct?

20      A.   I'll let Mr. Orcutt's response satisfy that

21   there.

22      Q.   That's all I need.   Thank you.

23          What are Cedar Park's beliefs with respect to

24   abortion?

25      A.   Cedar Park's beliefs with respect to human

Page 103

1    life is that it is indeed created in the image of God

2    and that any means to harm that life is an affront to

3    God and to his ways.  Specifically, on the issue of

4    abortion, Cedar Park's beliefs and explicitly-stated

5    teachings are that abortion itself is a sin and that --

6    for the reason that it -- it is the harming of an

7    innocent human life.

8         Q.   Okay.  Thank you.

9              And is this part of Cedar Park's Doctrine as a

10   member of the Assembly of God?

11        A.   Yes.  It is in agreement with the teachings of

12   the Bible and of the doctrinal statements of the

13   Assemblies of God.

14                     (Exhibit No. 22 marked.)

15        Q.  (By Mr. Crisalli) Okay.  I have Exhibit 22 in

16   there, if you'd like to take a look at it.

17        A.   There we go.

18             Hold on here.  I see all of the previous

19   exhibits from Mr. Orcutt.

20        Q.   Yes.

21        A.   Let me see if I can pull that up one more

22   time.

23        Q.   And you may -- or, you know, I won't be

24   returning back to, I think, any of them unless I bring

25   them up separately.

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 104

1      A.   Okay.  I have Exhibit 22.

2      Q.   Okay.  Do you recognize this document?

3      A.   Yes.

4      Q.   What is this document?

5      A.   It is a portion of Cedar Park's Constitution

6   and Bylaws.

7      Q.   Okay.  And I take it Page 2 is -- includes

8   provisions regarding sanctity of human life; is that

9   correct?

10     A.   Yes, that's correct.

11     Q.   And would this be where, at least within the

12  bylaws, you could find the doctrine of Cedar Park with

13  respect to its views on human life and potentially

14  abortion?

15     A.   Yes.

16     Q.   Are there any other provisions that you're

17  aware of within its bylaws that cover this subject?

18     A.   This is the -- the section that abortion

19  itself is explicitly stated.

20     Q.   And do you know if this is identically worded

21  to what the -- those affiliate organizations might

22  include as part of their constitution or bylaws?

23     A.   I'm not aware of that.

24     Q.   Okay.  Do you know who wrote this?

25     A.   I'm not specifically aware of who penned these

Page 105

1    exact words.

2        Q.    Are you familiar with the process that was

3    undertaken to adopt these bylaws?

4        A.    Broadly, yes.

5        Q.    Is it a similar kind of process as used for,

6    like, selection of a senior pastor where there's a vote

7    by the membership to adopt these bylaws?

8        A.    As far as the original adoption of bylaws, it

9    would have been an agreement of the founding members.

10   And as per any changes to those bylaws, a supermajority,

11   two-thirds majority of the voting body of our members

12   would be required along with all of the conditional

13   discussion, debate, and so forth.

14       Q.    I'm trying to understand, for Cedar Park, what

15   does it consider constitutes its doctrine?  Is it the

16   bylaws and constitution?

17       A.    The doctrine of the church or, essentially,

18   the teachings of the church are informed by the

19   scriptures themselves and they are outlined and

20   explicitly stated in the documents of the church.  But

21   the constitution and bylaws, as is stated in the

22   position immediately below our position regarding

23   sanctity of human life, states that the constitution and

24   bylaws do not exhaust the extent of our beliefs, but the

25   Bible itself as the inspired and infallible word of God

Page 106

1    that speaks with final authority concerning issues of

2    truth, morality, and conduct, is the sole and final

3    source of all that we believe.

4         Q.   And the reason why I'm -- do you deliver

5    sermons at your church?

6         A.   I do.

7         Q.   Do you consider -- does Cedar Park consider

8    every sermon you've ever given to be the doctrine of the

9    church?

10        A.   Every sermon is given in light of the doctrine

11   of the church, and thereby should be in agreement with

12   the doctrines of the church, but do not carry the same

13   matters of final authority that the scriptures

14   themselves, nor even our legal documents of our

15   constitution and bylaws.

16        Q.   Okay.  Thank you.  I just wanted to draw that

17   line and make sure I understood when it became doctrine

18   versus not.

19             Does Cedar Park have a doctrinal view with

20   respect to contraceptives?

21        A.   Insomuch as contraceptives deal with a formed

22   human life, our statement on the sanctity of human life

23   would, as well, inform any teachings that the church

24   might have on contraceptives themselves.

25        Q.   Okay.  So in layman's terms, this means that

6dd1ef90-c703-4fca-8857-71e9b1c1b352

Page 107

1   some -- it believes that some contraceptives constitute

2   a sin based on how they affect their purpose and others

3   are not deemed a sin.  Would that be a correct

4   statement?

5       A.   The measuring line that we would hold of where

6   sin comes into the equation wouldn't have much to do

7   with contraception itself, but has everything to do with

8   the ending of a fertilized embryo, which, in the

9   teachings of the scripture and the belief of the church,

10  is the definition of a life.  So life itself is the

11  measuring line for us rather than contraception

12  specifically.

13      Q.   Okay.  Thank you.

14           What are Cedar Park's beliefs with respect to

15  maternity care?

16      A.   That maternity care insofar as it is in

17  support of human life being that of both the conceived

18  infant and of the mother and family that she represents

19  is a moral obligation.

20      Q.   And is part of the basis for that belief from

21  the same provision in the bylaw that we've been talking

22  about?

23      A.   Certainly.

24      Q.   Does Cedar Park have any doctrinal beliefs on

25  whether there should be a regulated free market for

Page 108

1   goods and services?

2       A.   Not specifically, no.

3       Q.   What was your involvement in Cedar Park's

4   procurement of health insurance for its employees

5   since 2018?

6       A.   My involvement was to instruct our CFO and

7   human resources to gather the best information so that I

8   could make a final decision as to what plans were going

9   to be in the best pursuit of caring for our employees in

10  alignment with our doctrinal beliefs and our

11  religiously-held convictions.

12      Q.   In 2019, were you the individual who

13  ultimately made the decision whether to purchase Kaiser

14  Permanente versus Cigna?

15      A.   Yes.   That decision is in the authority of the

16  senior pastor.

17      Q.   We heard Mr. Orcutt lay out the reasoning in

18  his deposition as to why Cedar Park purchased a

19  particular plan in 2019 through 2022.   Do you have any

20  different reasons for why those particular plans were

21  chosen other than what -- when you made your decision

22  other than what Mr. Orcutt decided -- or, excuse me --

23  testified to?

24      A.   I agree with the analysis of Mr. Orcutt in his

25  testimony, and I would add that all of the decisions

Page 109

1    that we have made have been in pursuit of what we deem,

2    based on our doctrinal positions, based on our

3    understanding of best business practices, would be in

4    the best interest of Cedar Park and its employees.  Yes.

5                    (Exhibit No. 23 marked.)

6        Q.  (By Mr. Crisalli) In 2019, did you find --

7    well, I'll just put this in here so it's nice and

8    simple.  I'm putting in Exhibit 23.

9        A.   I'm looking at Exhibit 23.

10       Q.   All right.

11                   (Pause in the proceedings.)

12                   THE DEPONENT:  Is there a question?

13       Q.  (By Mr. Crisalli) I wanted to make sure you had

14   an opportunity to review.

15           Do you recognize this document?

16       A.   I do.

17       Q.   And is this a letter with -- dated

18   July 19, 2019, with your signature at the bottom?

19       A.   Yes, it is.

20       Q.   And did you write this letter yourself, or did

21   someone else write it for your signature?

22       A.   The letter was the product of my direct

23   concerns in consulting and working with others.

24       Q.   So did you write the letter yourself, or did

25   someone else write it for you at your direction?

Page 110

1      A.   To my recollection, the letter was a

2  collaborative effort written by myself along with voice

3  from legal counsel and others.

4      Q.   Okay.  And do you recall why this letter was

5  sent?

6      A.   Yes.

7      Q.   Why is that?

8      A.   It was sent upon discovering that forms of

9  contraception that we were under the assumption that

10  were excluded from our plan were, indeed, not excluded

11  from our plan.  And so discovering that, we promptly

12  made the request to our insurance carrier to exclude

13  those from our plan, exempt them from our -- our

14  coverage.

15      Q.   And how did you come to learn that your plan

16  did not include those exclusions?  How did Cedar Park

17  come to learn that its plan did not include those

18  exclusions for certain contraceptives?

19      A.   I don't recall the exact happenings of that.

20  I could review and get back to you on that.

21                 (Exhibit No. 24 marked.)

22      Q.   (By Mr. Crisalli) Okay.  Exhibit 24.

23      A.   Okay.

24      Q.   Okay.  Do you recognize this document?

25      A.   I do, yes.

Page 111

1      Q.   Is this a letter dated August 23, 2019, with

2  your signature at the bottom?

3      A.   It is, yes.

4      Q.   And do you recall whether you drafted this

5  letter or whether it was drafted for you for your

6  signature?

7      A.   I believe that I did write this letter.

8      Q.   At the bottom -- do you recall why you sent

9  this letter?

10     A.   We sent this letter at the time when we were

11  needing to renew our insurance plan for the calendar

12  year ahead, under the knowledge that the previous

13  understanding that our religious beliefs would allow us

14  to not include coverage for abortion or abortion-causing

15  drugs would no longer be possible in any fully insured

16  plan.  Knowing that that was not an option because of

17  Senate Bill 6219, we had no other choice than to renew

18  our plan but to do so under protest.

19     Q.   Well, were you presented with the options from

20  Mr. Orcutt for different plans that you could purchase

21  for 2019?

22     A.   I was.

23     Q.   Did that include the Cigna plan?

24     A.   It did.

25     Q.   Taking the last paragraph:  "Please consider

Page 112

1   this a formal request that Kaiser Permanente separately

2   pay for the cost of all contraceptives."

3          Did I read that correctly?

4      A.   Yes.

5      Q.   Do you know whether Cedar Park has ever

6   utilized the conscience or religious objection for

7   contraceptives for Kaiser Permanente -- through Kaiser

8   Permanente?

9      A.   Can you clarify the question in terms of the

10  timeframe that you're referring to?

11     Q.   Since 2019, has Cedar Park ever utilized the

12  religious objection -- its religious objection for all

13  contraceptives through Kaiser Permanente's plan?

14     A.   At this point, I don't believe that we have

15  for the reason that we do not object to all forms of

16  contraceptives, merely those that interfere with and

17  prohibit the development of a fertilized human life.

18                  (Exhibit No. 25 marked.)

19     Q.   (By Mr. Crisalli) Okay.  I'm going to be

20  changing subjects.  So if you want to put these away,

21  that's fine.

22          I'll go through this more fully, but let's

23  start with the first page.  This is a document entitled

24  the "Second Amended Verified Complaint for Injunctive

25  and Declaratory Relief."  It's Cedar Park Assembly of

Page 113

1    God of Kirkland versus Myron "Mike" Kreidler and

2    Jay Inslee.

3            Do you recognize this pleading at all?

4        A.   Yes, I do.

5        Q.   If you go down, let's make sure it's the

6    last -- I believe it's the last page -- not last, of

7    course.  Page 29.

8            Are you down on Page 29?

9        A.   Yes.

10       Q.   Is that your declaration under penalty of

11   perjury?

12       A.   Yes, that is my signature.

13       Q.   Okay.  Did you review this document in signing

14   it -- before signing it?

15       A.   Yes, of course.

16       Q.   And did you assist in adding or providing

17   facts that were ultimately put into this document?

18       A.   Yes.

19       Q.   Okay.  Without telling me what you told

20   counsel, what I'm most focused on is what facts you

21   provided to -- are in this complaint.  And you can speak

22   generally, if you'd like, at first, and then we can get

23   into some of the specifics.

24       A.   I believe, generally, it would be the biblical

25   and doctrinal positions, beliefs of Cedar Park Church.

Page 114

1      Q.   And did you provide any of the information
2   about, like, what Cedar Park does, or would that have
3   come through, like, Mr. Orcutt?
4                MR. THERIOT:  Objection.  Vague.
5                THE DEPONENT:  Would you mind rephrasing
6   that question?
7      Q.  (By Mr. Crisalli) Yeah.  In looking at, like --
8   as I read this complaint, I'm assuming -- let me know if
9   I'm wrong.  Like a lot -- the legal analysis is not
10  coming from you or anyone at Cedar Park that's legal, a
11  lawyer's legal analysis; right?  So I'm looking at the
12  facts, which begin on Page 5.  Is that roughly the first
13  part where facts provided by Cedar Park appear in this
14  pleading?
15     A.   Yes.
16     Q.   Now, does this pleading mention anywhere that
17  Cedar Park had been considering purchasing a plan from
18  Cigna?
19     A.   Can -- am I understanding you to ask if the --
20  this amended complaint references a Cigna plan in it?
21  Is that what your question is?
22     Q.   Correct.
23     A.   Well, I don't have it memorized, but I
24  don't -- I don't believe it refers specifically to them
25  as a carrier.

Page 115

1        Q.   And going to Page 8, the Paragraph 43, my

2   understanding from reviewing this is this is the only

3   discussion of Cedar Park considering an alternative plan

4   for a health care plan.  Is that a fair reading of the

5   complaint?  Do you have any reason to disagree with

6   that?

7               MR. THERIOT:  Objection in that it

8   calls -- to the extent that it calls for a legal

9   conclusion.

10              THE DEPONENT:  In my understanding, this

11  paragraph in the complaint is a reference to the --

12  other than a fully insured plan, which is what we have

13  and what we have had previous to Senate Bill 6219, which

14  allowed us to exclude things that were morally

15  reprehensible to us, the only option available to us

16  that would allow us to exercise those rights would be a

17  self-insured -- either fully self-insured or

18  level-funded plan.

19              So what you read in this paragraph is

20  what the analysis of what the potential initial

21  first-year increase of expense with that plan as opposed

22  to a fully insured plan, which we had previous to there

23  with religious convictions intact and which we currently

24  have under the current arrangement which makes those

25  religious exemptions impossible.

Page 116

1    Q.  (By Mr. Crisalli) Well, all right.  So this

2    states, second sentence:  "It would cost Cedar Park

3    approximately $243,125 in additional annual costs to

4    become self-insured."

5              Do you know where that number came from?

6                   MR. THERIOT:  Object to the extent it's

7    outside of the scope of the topics that he's been

8    designated to.

9    Q.  (By Mr. Crisalli) Well, you signed this

10   document; right?

11   A.   The number is on the basis of some analysis

12   that our broker did at our request based on where in the

13   year that this was signed, where our current utilization

14   was, and it was an estimate and analysis of what the

15   next year under those same assumptions would -- would

16   cost us additional to what we were paying.

17   Q.   Was this number, the $243,125 in increased

18   costs referenced only to a self-insured plan provided by

19   Kaiser Permanente?

20   A.   I don't know the specifics of what it was --

21   which plan it was in reference to.

22   Q.   Were you aware at the time of signing this

23   that Cigna had offered a plan that was cheaper than

24   Kaiser's plan and would allow for Cedar Park to exercise

25   its religious objections to abortion and certain

Page 117

1    contraceptives?

2         A.   I don't recall that.

3                   (Exhibit Nos. 26 and 27 marked.)

4         Q.  (By Mr. Crisalli) Let's go to Exhibit 26.

5              All right.  I'm doing 26 and 27.  They're --

6    the reason why I have them as two exhibits is because of

7    how they are in the filing system with the federal

8    courts, but they're connected documents in that 27 is

9    the -- should be the exhibit to 26.

10             Let's start with 26 and we can get to 27 if

11   it's needed.

12        A.   Okay.

13        Q.   All right.  Do you recognize this document?

14        A.   I do.

15        Q.   And is this your declaration signed on

16   September 13, 2019?

17        A.   Yes, it is.

18        Q.   And in this document, you discuss your

19   communications with Kaiser Permanente regarding

20   purchasing a health plan through that carrier; is that

21   correct?

22        A.   Yes.

23        Q.   And Exhibit A, which is Exhibit 27 to this

24   deposition, if you want to take a quick look there.

25        A.   Is there a specific portion of that or should

Page 118

1    I review the entire document?

2        Q.    It's just a brief skim to confirm these are

3    the emails referenced in your exhibit discussing what

4    Kaiser's plan would be like with respect to coverage for

5    abortion services and certain contraceptives.

6             Are you ready?

7        A.    Sure, yes.

8        Q.    Okay.  I didn't know if you were done yet.

9    I'm sorry.

10       A.    Sorry.  No, I just finished and was awaiting.

11       Q.    Zoom, it's still awkward.

12            Going -- so does -- is Exhibit 27 the emails

13   discussed in the declaration which is provided as

14   Exhibit 26?

15       A.    Yes.

16       Q.    In reviewing Exhibit 26, at any point, does

17   this declaration mention that Cedar Park had considered

18   a plan from Cigna for 2019?

19       A.    It broadly refers to self-insured plans of

20   which the level-funded plan offered by Cigna is a form

21   of self-insurance.

22       Q.    But is there any reference in there that this

23   is -- have you done any analysis to see whether that

24   243,125 in costs connects to the cost it would be for

25   Cigna?

Page 119

1    A.   I have no reason to doubt that the 243- was on

2  the best assumptions of our broker as they analyzed what

3  we put before them.

4    Q.   Did you review, in 2019, the comparison of

5  benefits and costs that were provided by the broker to

6  determine whether to purchase Kaiser or Cigna?

7    A.   Yes, in coordination with Mr. Orcutt.

8                     (Exhibit No. 28 marked.)

9    Q.  (By Mr. Crisalli) Okay.  I have put in

10  Exhibit 28.  At least this is a shorter version than the

11  second supplemental -- or second verified complaint, so

12  if you want to take a quick moment.

13    A.   Okay.

14    Q.   Okay.  Is -- on the last page of Exhibit 28,

15  is that your declaration under penalty of perjury dated

16  the 2nd day of October 2019?

17    A.   It is.

18    Q.   And did -- do you recall reviewing this

19  document before signing that?

20    A.   Yes, I do.

21    Q.   And in -- anywhere in this document, does it

22  reference that Cedar Park considered purchasing Cigna

23  for 2019 as its health insurance carrier?

24    A.   It does not mention Cigna or any other carrier

25  that we declined to purchase coverage from.

Page 120

1      Q.    And my next question:  At any point in this,

2  does it reference that Cedar Park had reviewed and

3  considered other carriers aside from Cigna or Kaiser

4  Permanente that would provide plans consistent with its

5  religious beliefs?

6      A.    This document does not state as such.

7      Q.    Okay.  We can put these to the side so you

8  don't need to worry about these anymore.

9            What burdens does Cedar Park believe exist

10  when exercising its religious beliefs when purchasing a

11  healthcare plan for its employees?

12            MR. THERIOT:  Objection.  Calls for a

13  legal conclusion.

14      Q.    (By Mr. Crisalli) You may answer.

15      A.    The fact that in order to purchase a plan that

16  meets the needs of our employees, the only option that

17  we have viable or available to us in the fully insured

18  plans precludes us from exempting abortion and/or

19  abortion-causing drugs.  It is indeed a great burden to

20  us.  It violates the expression of our understandings of

21  the Bible and it forces us to make the only choice that

22  we have is to purchase a plan and to do so under --

23  under great objection because we have really been

24  shoehorned into purchasing a product that there was no

25  other -- no other viable choice.

Page 121

1    Q.   Does Cedar Park have in its doctrine any

2  religious tenet which requires it to purchase a fully

3  insured plan as opposed to any other kind of plan?

4    A.   In the official doctrinal statements of the

5  church, there is no reference to insurance, fully

6  funded, or otherwise, but it would be an extrapolation

7  of our understanding of the things needed to support our

8  moral and doctrinal obligation to support human life.

9    Q.   Do you believe -- does Cedar Park believe that

10  a level-funded plan does not support human life?

11    A.   That is not a statement I would make.

12    Q.   What religious burden is there on Cedar Park

13  to have to negotiate, if it has to negotiate with

14  carriers, in order to conform with its -- for them to

15  present plans that conform with its religious beliefs?

16            MR. THERIOT:  Objection.  Vague.

17            THE DEPONENT:  I was -- would you mind

18  restating that question?

19    Q.  (By Mr. Crisalli) I'll restate it.

20    A.   Sure.

21    Q.   Is there any burden to Cedar Park's religious

22  beliefs in having to negotiate with carriers to develop

23  a plan that conforms with Cedar Park's religious

24  objections?

25    A.   No.  In fact, that's what we've been

Page 122

1   endeavoring to do for these last four years.

2        Q.   Does Cedar Park have a doctrinal or dogmatic

3   view as to whether it must use a large group health

4   plan?

5        A.   No.  And, again, our choice based on large

6   group plan and/or otherwise is merely in pursuit of the

7   greatest means for us to support life in a manner that

8   is consistent with biblical teaching.

9        Q.   So you would have the same answer if I were to

10  ask regarding small health plans, small group health

11  plans?

12       A.   I'm not familiar with the details of small

13  group health plans.  Sorry.

14       Q.   Is Cedar Park taking the position that it

15  cannot exercise its religious views unless all

16  businesses must provide services consistent with Cedar

17  Park's religious beliefs?

18       A.   No, our -- our argument is not with any

19  business.

20       Q.   Have you ever -- well, strike that.

21            Is Cedar Park aware of any law, statutes or

22  rule that mandates Cedar Park to use Kaiser Permanente

23  as its insurance carrier?

24       A.   No.

25                 MR. CRISALLI:  Okay.  So let's take

Page 123

1   ten minutes so I can go over my notes, and then that

2   might be it.  I might have some follow-up.  We'll see.

3                    MR. THERIOT:  Thanks.

4                    THE DEPONENT:  Okay.

5                    MR. CRISALLI:  Thanks.  Off the record.

6                         (A break was taken from

7                          2:43 p.m. to 2:52 p.m.)

8        Q.  (By Mr. Crisalli) Do you understand that you're

9   still under oath?

10       A.   Yes.

11                    (Exhibit No. 29 marked.)

12       Q.  (By Mr. Crisalli) Okay.  I have Exhibit 29, and

13   do you recall ever seeing this document?

14       A.   Yes.

15       Q.   When did you -- what's your recollection of

16   reviewing this document?

17       A.   I don't recall a specific time or instance.

18       Q.   Okay.  And this is an email from Steve Orcutt

19   to Melissa Knauss and Jami Hansen.  I realize you're not

20   on this, but I'll represent I, during the break, went

21   through and searched all the discovery in this matter to

22   determine whether -- where the 243,125 came from, and

23   this was the only place in the document production from

24   plaintiffs that I found this number.

25            Do you believe that this might have been the

Page 124

1    source of that number that was in the pleadings?  Does

2    Cedar Park believe -- did Cedar Park base its number for

3    additional costs of 243,125 from this email?

4         A.   I'm not sure that the basis of it would come

5    from this email.  It appears that this email is

6    referencing a number that Gallagher has confirmed in

7    their analysis of what self-insurance would cost

8    additionally.

9         Q.   And --

10        A.   So --

11        Q.   Sorry.  Go ahead.  I don't want to interrupt

12   you.

13        A.   That was a complete answer.

14        Q.   Okay.  And this email nowhere describes what

15   it means to be self-insured let alone who would

16   administrate it; correct?

17        A.   This email does not appear to be a

18   comprehensive description of self-insurance, no.

19        Q.   Okay.  Do you know of any other place -- does

20   Cedar Park know of any other place where this 243,125

21   might have come from after March 5, 2019?

22              MR. THERIOT:  Object to the extent that

23   it's outside of the scope of what he's been designated

24   to testify as to.

25              THE DEPONENT:  I'm not aware of that.

Page 125

1        MR. CRISALLI:  Okay.  Those are all the

2  questions I have.  I'm going to leave it open on this

3  just one -- well, any subsequent issues just because --

4  but we'll leave it at that.

5              Thank you very much for your time.

6              Do you have any questions, Kevin?

7        MR. THERIOT:  I don't have any questions.

8  I -- actually, let me take five minutes and then come

9  back.  I may have one question.

10             MR. CRISALLI:  Okay.

11                 (A break was taken from

12                  2:56 p.m. to 2:59 p.m.)

13                 (Deposition concluded at 2:59 p.m.)

14                 (Signature reserved.)

15                    --o0o--

16

17

18

19

20

21

22

23

24

25

Page 126

1                        C E R T I F I C A T E

2

3    STATE OF ARIZONA      )
                           )
4    COUNTY OF MARICOPA  )

5

6            I, Nicole A. Bulldis, RPR, a Certified Court
     Reporter, do hereby certify under the laws of the State
7    of Washington:

8            That the foregoing 30(b)(6) deposition upon
     oral examination of Cedar Park Assembly of God of
9    Kirkland, Washington designee Jason Smith was taken
     stenographically by me, via Zoom, on November 21, 2022,
10   and transcribed under my direction;

11           That the witness was duly sworn by me to
     testify truthfully, and that the transcript of the
12   deposition is full, true, and correct to the best of my
     ability;

13
             That I am not a relative, employee, or counsel
14   of any party to this action or relative or employee of
     such counsel, and that I am not financially interested
15   in the said action or the outcome thereof.

16

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 1st day of December 2022.

20

21

22   _____
     Nicole A. Bulldis, RPR
23   WA CCR. No. 3384

24

25

Exhibit L



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  12/01/2022

**TO:**   Kevin H. Theriot

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**WITNESS:**  30(b)(6) Jason Smith

**DATE TAKEN:**  11/21/2022

The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date.  Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:

Paul M. Crisalli



# E R R A T A

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**      30(b)(6) Jason Smith

## CORRECTIONS*

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 102 | 4 | "reach" | "outreach" |
| 107 | 8 | "the ending of a fertilized embryo" | "the ending of the life of a fertilized embryo" |
| 107 | 10 | "is the definition of life" | "meets the definition of life..." |

**\*Reason for corrections: transcription error or misspoke.**

_____
                                        Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**   Cedar Park Assembly of God of Kirkland v. Kreidler, et al.

**DATE TAKEN:** 11/21/2022

**WITNESS:**      30(b)(6) Jason Smith

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
30(b)(6) Jason Smith

Signed on the _____ day of _____, 202___.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com  www.buellrealtime.com