1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

10

CEDAR PARK ASSEMBLY OF GOD
OF KIRKLAND, WASHINGTON,

                    Plaintiff,

    v.

MYRON KREIDLER and JAY
INSLEE,

                  Defendants.

CASE NO. C19-5181 BHS

ORDER

11

12

13

14

15

16

17

18

19

20

21

22

Plaintiff Cedar Park Assembly of God asserts that a 2018 Washington State law requiring all health insurance plans that provide maternity coverage to provide substantially equivalent abortion coverage violates its First Amendment rights because facilitating abortion is against its religious beliefs. Defendants Jay Inslee and Myron Kreidler ("the State") argue that Cedar Park falls under an exception to the law and that they are therefore able to bargain with insurance companies for plans that exclude abortion coverage. Aside from disputing the merits of the case, the State argues that Cedar Park lacks standing to bring its claims because it could obtain substantially similar coverage excluding abortion services and thus has not been injured by the law.

ORDER - 1

1    This matter comes before the Court on the State's Motion to Dismiss for lack of

2    standing, Dkt. 88, and the parties' cross Motions for Sanctions, Dkts. 107, 109.

3                    I.    FACTUAL BACKGROUND

4    In 2018, the State enacted SB 6219, codified as RCW 48.43.072 and RCW

5    48.43.073. Dkt. 20, ¶ 4. RCW 48.43.072 requires all health plans issued or renewed on or

6    after January 1, 2019, to cover all FDA-approved prescription and over-the-counter

7    contraceptive drugs, devices, and products. RCW 48.43.073 requires all health plans

8    issued or renewed on or after January 1, 2019, that provide coverage for maternity care or

9    services to provide the covered person "with substantially equivalent coverage to permit

10   the abortion of a pregnancy."

11   Under the Affordable Care Act, employers with over fifty employees are required

12   to provide health insurance for their employees. 26 U.S.C. § 4980H. That health

13   insurance plan must include access to maternity care services. 42 U.S.C.

14   § 18022(b)(1)(D). The effect of SB 6219 is therefore to require all non-exempt employers

15   in Washington to provide their employees health insurance coverage for abortion

16   services. Washington law exempts certain employers and health insurance plans from SB

17   6219. RCW 48.43.005(31), 48.43.065(2).

18   One of those exemptions is for "[e]mployer-sponsored self-funded health plans."

19   RCW 48.43.005(31)(j). This type of insurance is frequently referred to in this case as

20   "self-insurance." *See, e.g.*, Dkt. 93 at 5. A self-funded plan differs from a fully insured

21   plan in that it requires the employer to take on more risk and to purchase a stop-loss

22   insurance policy to cover any costs over a set amount. Dkt. 93-6, ¶¶ 18–28. Similarly, the

1   parties frequently discuss "level-funded plans," which again require the employer to take

2   on more risk. *Id.* Cedar Park maintains, and this Court agrees, that self-funded and level-

3   funded plans are not comparable to fully insured plans like it had, and still has, with

4   Kaiser Permanente.

5         For health insurance purchasers, Washington law provides that "[n]o individual or

6   organization with a religious or moral tenet opposed to a specific service may be required

7   to purchase coverage for that service or services if they object to doing so for reasons of

8   conscience or religion." RCW 48.43.065(3)(a). While individuals and organizations do

9   not have to purchase that coverage, enrollees must still be able to access it: "The

10  provisions of this section shall not result in an enrollee being denied coverage of, and

11  timely access to, any service or services excluded from their benefits package as a result

12  of their employer's or another individual's exercise of the conscience clause in (a)."

13  RCW 48.43.065(3)(b). The statute also provides that the health carrier, facility, or

14  provider is not required "to provide any health care services without appropriate payment

15  of premium or fee." RCW 48.43.065(4).

16        In contrast, "[n]o individual health care provider, religiously sponsored health

17  carrier, or health care facility may be required by law or contract in any circumstances to

18  participate in the provision of or payment for a specific service if they object to doing so

19  for reasons of conscience or religion." RCW 48.43.065(2)(a). This exemption,

20  specifically for health care providers, religiously sponsored health carriers, and health

21  care facilities, does not have the same language disallowing denial of coverage of

22  excluded services. Rather, it states that "[t]he provisions of this section are not intended

1    to result in an enrollee being denied timely access to any service included in the basic

2    health plan services." RCW 48.43.065(2)(b).

3          Cedar Park is a Christian church in Kirkland, Washington, that also provides other

4    faith-based services in the community. Dkt. 20, ¶ 5. Cedar Park asserts that, prior to SB

5    6219, it did not provide coverage for abortion or abortifacient contraceptives in its

6    employee health insurance plan. *Id*. Cedar Park also asserts that it "offer[ed] health

7    insurance coverage to its employees in a way that does not also cause it to pay for

8    abortions or abortifacient contraceptives, including, *inter alia*, emergency contraception

9    and intrauterine devices" and that its pre-SB 6219 plan "exclude[d] coverage for

10   abortions or abortifacient contraceptives." *Id*. ¶¶ 46–47. Approximately 185 of Cedar

11   Park's employees are eligible for its health insurance coverage. *Id*. ¶ 20. Employees are

12   required to sign a statement agreeing to follow Cedar Park's standards of conduct, which

13   includes its teachings on the sanctity of life both at work and outside of work. *Id*. ¶¶ 31–

14   32.

15         As an employer of over fifty employees, Cedar Park is required under federal law

16   to purchase health insurance for its employees that includes maternity services. Under SB

17   6219, it is therefore also required to provide "substantially equivalent coverage to permit

18   the abortion of a pregnancy" unless it qualifies for an exemption. Prior to SB 6219, Cedar

19   Park was not required to, and did not, provide such coverage.

20         Cedar Park sued the State in an effort to enjoin enforcement of the bill prior to it

21   taking effect. *See* Dkt. 1. Based on evidence presented in support of the State's instant

22   motion to dismiss, Cedar Park was engaged in negotiations with health insurance

1   providers regarding the availability of health insurance plans excluding abortion coverage

2   until July or August of 2019. *See generally* Dkt. 89-1 at 132–224. Prior to the enactment

3   of SB 6219, Cedar Park purchased health insurance coverage under a Kaiser plan that

4   excluded abortion services. Dkt. 88 at 4. Kaiser informed Cedar Park that, if the church

5   renewed its plan with Kaiser, coverage for abortion services would be included in the

6   plan. *See, e.g.*, Dkt. 89-1 at 195.

7       Cedar Park was also in negotiations with Cigna at the time. Cigna represented to

8   Cedar Park that it could provide it with a plan that excluded abortion coverage. *See, e.g.*,

9   Dkt. 89-1 at 138. Cedar Park asserts that, despite Cigna's representations, under SB 6219

10  the plan would still facilitate access to abortion and that the only Cigna plan that would

11  have actually excluded abortion was a self-funded plan.[1] Dkt. 93 at 7–8. The parties seem

12  to disagree on this point. Nevertheless, it seems that Cigna never specified to Cedar Park

13  how the costs of any abortion-related services would be distributed, leaving open the

14  possibility that Cedar Park would be paying for those services, just not under the

15  "abortion" label. Moreover, even if Cedar Park was not paying for those services, its

16  employees would still have had access to them under the plan—something Cedar Park

17  objects to as "facilitating" access to abortion. Dkt. 93 at 7–8.

18      Cedar Park was also apparently skeptical about Cigna's insurance plan from a

19  financial standpoint. It claims its insurance broker advised that Cigna often offers a low

20  _____

21      [1] It is sometimes unclear whether Cedar Park's references to Cigna's "self-funded plan" refers to self-insurance or Cigna's level-funded plan. For the purposes of the instant motions, the distinction is unimportant because the Court does not view either as comparable to a fully

22  insured plan.

1   rate in the first year of coverage and increases that rate significantly in subsequent years.

2   Dkt. 93 at 9. For these reasons, Cedar Park asserts that the Cigna plan was not

3   comparable to its pre-SB 6219 Kaiser plan and that it would not have complied with its

4   religious beliefs.

5         In sum, Cedar Park asserts that, because of SB 6219, it had two general options:

6   (1) renew its plan with Kaiser in violation of its own religious tenets; or (2) purchase self-

7   insurance which would allow it to exclude abortion services completely. According to

8   Cedar Park, self-insurance was not a viable option from a financial standpoint. It

9   therefore renewed its coverage with Kaiser, reluctantly providing abortion coverage to its

10  employees.

11        The State apparently had no knowledge of the plan until after the Ninth Circuit's

12  remand and this Court had no knowledge of the proposed Cigna plan prior to the State's

13  instant motion to dismiss.

## II.   PROCEDURAL HISTORY

15        Cedar Park sued on March 8, 2019, alleging that SB 6219 violates the Free

16  Exercise and Establishment Clauses of the First Amendment, Cedar Park's right to

17  religious autonomy guaranteed by those clauses, and the Equal Protection Clause of the

18  Fourteenth Amendment. Dkt. 1. Cedar Park seeks declaratory and injunctive relief

19  against SB 6219. *Id*.

20        The State moved to dismiss in 2019, Dkt. 25, and the Court granted that motion,

21  concluding that Cedar Park lacked standing and that its claims were not ripe. Dkt. 45. The

22  Court permitted Cedar Park to amend its complaint, however, concluding that there was a

1   conceivable set of facts under which Cedar Park could allege a cognizable injury. *Id.* at

2   22. Cedar Park amended its complaint, Dkt. 46, the State again moved to dismiss, Dkt.

3   53, and the Court again dismissed Cedar Park's complaint for lack of standing, Dkt. 60.

4          Cedar Park appealed, and the Ninth Circuit reversed in part, concluding that Cedar

5   Park had standing to assert its Free Exercise claims because it "plausibly alleged that, due

6   to the enactment of SB 6219, its health insurer (Kaiser Permanente) stopped offering a

7   plan with abortion coverage restrictions and Cedar Park could not procure comparable

8   replacement coverage." Dkt. 65. It affirmed the Court's holding that Cedar Park lacked

9   standing to assert its Equal Protection Clause claim. *Id.* Cedar Park failed to appeal the

10  Court's dismissal of its Establishment Clause claim, and the Ninth Circuit therefore held

11  that it forfeited argument on that claim. *Id.*

12         On remand, the parties disagreed about what claims remained. *See* Dkt. 67 at 1–2;

13  Dkt. 69; Dkt. 72; Dkt. 73. The Court clarified that the only remaining claims were Cedar

14  Park's Free Exercise claim and its religious autonomy claim, to the extent that claim was

15  based on the Free Exercise Clause of the First Amendment. Dkt. 75.

16         The State again moves to dismiss Cedar Park's complaint for lack of standing.

17  Dkt. 88. It alleges that Cedar Park failed to disclose the Cigna plan, which it asserts was a

18  comparable health insurance policy that would have excluded abortion services and

19  abortifacients, consistent with its religious beliefs. *Id.* at 12–14. It argues that the Ninth

20  Circuit's reversal of this Court's judgment was based on the lack of a comparable health

21  insurance plan excluding abortion coverage and that the Ninth Circuit's holding would

22  have been different had Cedar Park properly disclosed the existence of the Cigna plan. *Id.*

1   Cedar Park asserts that Cigna's plan still facilitated abortion in violation of its

2   religious beliefs and that it was not comparable to the previous plan Cedar Park had with

3   Kaiser. Dkt. 93. It therefore argues that the Ninth Circuit's mandate necessitates the

4   denial of the State's motion. *Id.*

5   The State also moves to sanction Cedar Park for allegedly lying in its filings to the

6   Court regarding the existence, or lack thereof, of a comparable plan that excluded

7   abortion services. Dkt. 107. Cedar Park opposes that motion, Dkt. 108, and moves for

8   sanctions against the State for having to defend what it considers to be a frivolous motion

9   for sanctions, Dkt. 109.

10   The parties also filed cross motions for summary judgment. Dkts. 103, 104. Those

11   motions will be addressed in a separate order.

12   ### III.   DISCUSSION

13   At the outset, the Court will articulate what it views as the central issue to provide

14   a framework for the parties' numerous motions. The parties appear to disagree on

15   whether SB 6219, in conjunction with Washington's conscience statute, RCW 48.43.065,

16   require religious organizations to "facilitate access to" or provide health insurance

17   coverage for abortion services.

18   Cedar Park objects to purchasing an insurance plan that provides coverage for

19   abortion services, and the State argues that, under RCW 48.43.065(3)(a), it explicitly is

20   not required to do so. Cedar Park argues, however, that the remaining relevant portions of

21   the conscience statute mean that its employees must still be covered for abortion services

22   despite Cedar Park's religious objection. The statute also explicitly provides that the

1    insurer cannot be required to pay for those services. The statutory scheme leaves unclear

2    who, then, would be paying for such services through an "appropriate payment of

3    premium or fee." RCW 48.43.065(4). The State acknowledges that the costs of those

4    services can be distributed in numerous ways, leaving the cost distribution decision to

5    each insurer.

6         The State asserts that, when read together, these statutes mean that individuals

7    who are employed by conscientious objectors are covered for abortion services outside

8    their plan and, because the employer is not directly paying for abortion services, they are

9    "excluded."

10        Cedar Park, in contrast, asserts that this exclusion is without substance and does

11   not actually exempt it from anything. It argues, in part, that if the insurance company, the

12   employee, and the provider are not required to pay for the objectionable services, and the

13   State itself is not paying for those services, the cost must be falling back on the employer.

14   Indeed, the regulations seem to allow those costs to be distributed back to the employer,

15   even though the service is excluded from the plan. *See* WAC 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. Cedar Park

16   further argues that, even if the cost was not being distributed back to it, the fact that its

17   employees were still covered for abortion services under the same insurance policy for

18   which it pays premiums means it would be facilitating abortion against its religious

19   beliefs.

20        The parties thus seem to generally agree on how the laws work but disagree as to

21   whether the statutory and regulatory scheme requires Cedar Park to "facilitate access to"

22   abortion services. The State views the connection as tangential, while Cedar Park views it

1    as a fundamental deprivation of its First Amendment rights. The facilitation question

2    explains the parties' vehement disagreement over whether Cedar Park has plausibly

3    alleged an injury and whether either party's conduct is sanctionable.

4    **A.      Motions for Sanctions**

5          Federal Rule of Civil Procedure 11 allows a court to sanction an attorney, law

6    firm, or party that presents a filing for an improper purpose, asserts frivolous legal

7    arguments, makes factual representations without evidentiary support, or unreasonably

8    denies factual contentions. The rule requires service under Rule 5, which does not permit

9    service via email unless the receiving party has consented to service via email in writing.

10   *See* Fed. R. Civ. P. 11(c)(2) (citing Fed. R. Civ. P. 5).

11         When a "complaint is the primary focus of Rule 11 proceedings, a district court

12   must conduct a two-prong inquiry to determine (1) whether the complaint is legally or

13   factually baseless from an objective perspective, and (2) if the attorney has conducted a

14   reasonable and competent inquiry before signing and filing it." *Christian v. Mattel, Inc.*,

15   286 F.3d 1118, 1127 (9th Cir. 2002) (internal quotation omitted). A filing is "frivolous" if

16   it is "both baseless and made without a reasonable or competent inquiry." *Holgate v.*

17   *Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (internal quotation and alterations omitted).

18         **1.      The Court will Not Sanction Cedar Park.**

19         The State seeks Rule 11 sanctions against Cedar Park, its Pastor, and its Chief

20   Financial Officer, arguing that they made misrepresentations in their pleadings by

21   alleging that they could not obtain an affordable and comparable health insurance plan

22   that excluded abortion coverage. Dkt. 107. Specifically, the State argues that Cigna

1   offered Cedar Park a health insurance plan, which Cedar Park failed to disclose in its

2   pleadings and other filings, that was less expensive than its Kaiser plan and excluded

3   abortion coverage. *Id.* at 4.

4        Cedar Park first argues that the Court should deny the State's motion because it

5   improperly served the motion via email. Dkt. 108 at 6–8. Cedar Park also argues that it

6   never made misrepresentations to the Court because the Cigna plan did not exclude

7   abortion coverage, was not comparable to its Kaiser plan, and "facilitated" access to

8   abortion. *Id.* at 8–13.

9        The State replies that Cedar Park previously agreed to receive service via email.

10   Dkt. 110 at 2–3 (citing Dkt. 67 at 4). It points to the parties' joint status report in which

11   they agreed that "discovery requests, responses, initial disclosures, deposition notices,

12   and other case-related materials not filed with this Court can be served electronically via

13   e-mail." Dkt. 67 at 4. It further argues that emails Cedar Park produced in discovery

14   prove that the less expensive and comparable Cigna plan would have excluded abortion

15   coverage. Dkt. 110 at 3–6.

16        As to service, the parties agreed that "case-related materials not filed with this

17   Court" could be served via email. *See* Dkt. 67 at 4. Under Fed. R. Civ. P. 11(c)(2), the

18   State was required to serve Cedar Park with the motion 21 days prior to filing it with the

19   Court. The parties seem to disagree on whether the motion falls under their stipulation

20   given that, upon original service, it was not filed with the Court. If the motion were

21   meritorious, the Court would likely excuse any mistake as to service, especially given it

22   was made in good faith and Cedar Park received actual notice. Nevertheless, the Court

1   ultimately concludes that sanctions are not warranted against either party in this case and

2   therefore need not decide whether service was proper.

3          Although Cedar Park does not raise this as an issue, the Court cannot sanction

4   Cedar Park's Pastor or CFO under Rule 11 given that they are not parties to this suit. The

5   Court could, however, sanction the nonparties under its inherent authority. The State does

6   not assert that the Court should do so, and the Court therefore will not consider such an

7   argument. The remaining question is therefore whether Rule 11 sanctions are warranted

8   against Cedar Park itself.

9          The Court concludes that Cedar Park did not make factual misrepresentations to

10  this Court or to the Ninth Circuit. The State takes issue with four filings specifically, and

11  the Court reviews those in an effort to explain why it disagrees with the State's assertion

12  that Cedar Park made misrepresentations.

13         First, the State points to Cedar Park's Second Amended Complaint, Dkt. 46. The

14  State takes issue with Cedar Park's assertion that it was forced "to choose between

15  violating the law and violating its deeply held religious beliefs." Dkt. 107 at 5. But Cedar

16  Park asserts in its complaint that it violates its religious beliefs not just to directly pay for

17  abortion, but to facilitate access to abortion. Dkt. 46, ¶ 29. While much of Cedar Park's

18  complaint focuses on direct payment for abortion services, it makes clear in multiple

19  instances that its criticism of SB 6219 is broader than that. *See, e.g., id.* ¶ 71 ("Carriers

20  are permitted to pass along the cost of covering abortion and abortifacients to the

21  objecting organization in the form of increased premiums, characterized as 'overhead' or

22  otherwise."); *id.* ¶ 78 ("Defendants have made no allowance for the religious freedom of

1   religious employers and churches, such as Cedar Park, who object to . . . facilitating

2   access to or providing insurance coverage for abortion or abortifacient contraceptives

3   under any circumstance."); *id.* ¶ 92 ("Cedar Park's religious beliefs further prohibit it

4   from purchasing or contracting for a group health insurance plan that covers voluntary or

5   elective abortions or abortifacient contraceptives.").

6       Second, the State points to Cedar Park's Supplemental Verified Complaint, Dkt.

7   52-1. In that filing, Cedar Park added information about its discussions with Kaiser and

8   Kaiser's refusal to exclude abortion services from its health insurance plan. *See generally*

9   *id.* The State takes issue with the fact that Cedar Park failed to disclose any conversations

10  it had with Cigna, effectively representing to the Court that "Kaiser was Cedar Park's

11  only viable option." *See* Dkt. 107 at 4–5. This is certainly the most concerning document.

12  Nevertheless, Cedar Park has effectively explained that it viewed Cigna's plan as having

13  the same problem as Kaiser's. Thus, in Cedar Park's view, Cigna's plan was somewhat

14  irrelevant. The plan still "facilitated access" to abortion, according to Cedar Park, and

15  switching to the Cigna plan would have required many of its employees to change

16  providers. To the extent Cedar Park was going to be required to "facilitate access" to

17  abortion under either plan, the obvious choice was to remain with Kaiser and the Cigna

18  plan made no difference.

19      Third, the State points to Pastor Jason Smith's Declaration, Dkt. 50. This

20  document provides the best explanation of why sanctions are not warranted in this case.

21  Pastor Smith asserts:

22

1

> It violates the religious beliefs of Cedar Park to provide any sort of
> payment, premium, or fee for a health care plan that provides coverage of
> or facilitates access to abortion or abortifacient drugs, either directly or
> indirectly. Accordingly, it would violate Cedar Park's beliefs to pay an
> extra premium, fee, or any payment to its insurer for the payment of
> abortions and abortifacient contraceptives for plan beneficiaries, even in an
> instance where Cedar Park's health insurance plan did not *directly* provide
> coverage of abortion or abortifacient drugs.

2

3

4

5

Dkt. 50, ¶ 6. Pastor Smith's declaration clarifies Cedar Park's position: even where the

6

church is not *directly* paying for abortion services, its employees still have access to such

7

services which they would not otherwise have absent their Cedar Park sponsored health

8

insurance plan. In other words, it is irrelevant, under Cedar Park's view, whether the

9

abortion services are labeled as such on its bill, classified as overhead, or even wholly

10

paid for by the health insurance company; what is important is that, without Cedar Park

11

providing health insurance coverage, its employees would otherwise not have insurance

12

coverage for those services. This is the Court's understanding of Cedar Park's central

13

complaint: that under SB 6219, it is required to *facilitate* its employees' access to

14

abortions.

15

Finally, the State points to Cedar Park's filings before the Ninth Circuit. *See*

16

*Cedar Park Assembly of God v. Kreidler*, No. 20-35507, Dkts. 19 and 36. Again, Cedar

17

Park's filings align with its current assertions. For example, in its reply, Cedar Park

18

asserts that "Washington law—at the very least—requires secular insurers like Kaiser

19

Permanente to include *indirect* abortion coverage in Cedar Park's group health

20

plan . . . . And that indirect coverage violates Cedar Park's religious beliefs just as much

21

as direct abortion coverage would." *Cedar Park*, No. 20-35507, Dkt. 36 at 19 (emphasis

22

1   in original) (internal citation and footnote omitted). Similarly, in its opening brief, Cedar

2   Park asserts that it objects to "facilitating access to . . . abortion or abortifacient coverage

3   *under any circumstance* . . . . It does not matter whether the payment or facilitation of

4   abortion is direct or indirect." *Id.*, Dkt. 19 at 24 (emphasis in original) (internal citation

5   omitted).

6          Cedar Park did not make misrepresentations in its filings either to this Court or to

7   the Ninth Circuit. It has consistently asserted that SB 6219 requires it to facilitate access

8   to abortion and the Court accepts that Cedar Park believed in good faith that Cigna's

9   plan, like Kaiser's plan or any other plan available to it aside from self-insurance,

10  required that facilitation. The State's disagreement with that assertion does not mean

11  Cedar Park lied or misrepresented facts to the Court.

12         Therefore, the State's Motion for Sanctions, Dkt. 107, is DENIED.

13         **2.      The Court will Not Sanction the State.**

14         Cedar Park seeks Rule 11 sanctions against Defendants and their counsel, arguing

15  that the State's motion for sanctions is frivolous. Dkt. 109. It first argues that, under the

16  Ninth Circuit's remand order in this case and its holding in *Skyline*, all it needed to show

17  to establish standing was that SB 6219 caused it to lose its health insurance plan, not that

18  it was unable to obtain another comparable plan. *Id.* at 6–8. It further argues that the

19  State's assertions regarding Cedar Park's religious beliefs and the availability of a plan

20  excluding abortion are inaccurate and misleading. *Id.* at 9–15.

21         The State argues that the Ninth Circuit did, in fact, rely on Cedar Park's

22  representation that no comparable health insurance plans were available following the

1   enactment of SB 6219. Dkt. 116 at 6–8. Further, it asserts that its representations

2   regarding available plans and Cedar Park's religious beliefs have been accurate. *Id.* at 9–

3   12.

4        In reply, Cedar Park reiterates many of its same arguments from its other various

5   pending motions, responses, and replies. *See generally* Dkt. 117.

6        The Court agrees that it was somewhat misleading, though likely unintentional, for

7   Cedar Park to omit the existence of the Cigna plan. In fact, it is unclear why they did so.

8   In the Court's view, Cedar Park's articulation of the flaws in the Cigna plan helps to

9   explain its argument. Further, it could have helped combat the State's argument in its

10  previous motion to dismiss that "[t]he only fact Cedar Park has established is that one

11  carrier declined to accommodate Cedar Park's [religious] objection." Dkt. 53 at 8.

12  Nevertheless, the Court has concluded that the omission, while confusing, is not

13  sanctionable. While the Court agrees with Cedar Park that the State's motion is not

14  meritorious, it is not frivolous.

15       Therefore, Cedar Park's Motion for Sanctions, Dkt. 109, is DENIED.

16  **B.**     **Motion to Dismiss**

17       "A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if the action . . . is

18  not a case or controversy within the meaning of the Constitution"—i.e., if the plaintiff

19  lacks standing to assert a claim. *United Transp. Union v. Burlington N. Santa Fe R.R.*

20  *Co.*, No. C06-5441 RBL, 2007 WL 26761, at *2 (W.D. Wash. Jan. 2, 2007), *aff'd*, 528

21  F.3d 674 (9th Cir. 2008). As with other motions based on subject matter jurisdiction, the

22  plaintiff has the burden of demonstrating that standing exists. *Stock West, Inc. v.*

1    *Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Defendants can assert either a

2    "facial attack" against standing, which is limited to the complaint's allegations, or a

3    "factual attack," which allows the court to consider evidence outside the complaint. *Safe*

4    *Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

5        A plaintiff has standing to sue only if they present a legitimate "case or

6    controversy," meaning the issues are "definite and concrete, not hypothetical or abstract."

7    *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). To

8    establish Article III standing, he must show that he (1) suffered an injury in fact that is (2)

9    fairly traceable to the alleged conduct of the defendants, and that is (3) likely to be

10   redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61. A

11   plaintiff who faces a threat of future injury "has standing to sue if the threatened injury is

12   certainly impending, or there is a substantial risk" that the injury will occur. *In re*

13   *Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (citing *Susan B. Anthony List v.*

14   *Driehaus*, 573 U.S. 149, 158 (2014)).

15       The State argues that, had the Ninth Circuit known about the Cigna plan, its ruling

16   on whether Cedar Park suffered an injury in fact would have been different. It bases its

17   argument on this conclusion from the Ninth Circuit: "Kaiser Permanente dropped Cedar

18   Park's abortion coverage restrictions due to SB 6219, and there is no evidence in the

19   record clearly demonstrating that Cedar Park could obtain acceptable coverage at the time

20   it filed its complaint." Dkt. 65 at 3–4. It therefore argues that the Ninth Circuit's mandate

21   does not bind this Court's decision on its renewed motion because new facts are now

22   available that change the analysis.

1    The Ninth Circuit's decision focused on Kaiser ceasing to offer a plan with

2    abortion restrictions and Cedar Park's inability to obtain comparable coverage. *Id.* at 2–4.

3    Disclosure of the Cigna plan does not change the fact that Kaiser dropped Cedar Park's

4    abortion coverage restrictions. As to Cedar Park's ability to obtain comparable coverage,

5    as the Court understands it, the only plan that would have restricted abortion in a manner

6    consistent with Cedar Park's religious beliefs was self-insurance. Self-insurance was not

7    a viable option financially for Cedar Park and it is not comparable to a fully insured plan.

8    Thus, the Ninth Circuit's remand requires that the Court deny the State's motion to

9    dismiss.

10    Therefore, the State's Motion to Dismiss, Dkt. 88, is DENIED.

11    **IV.   ORDER**

12    Therefore, it is hereby **ORDERED** that Defendants Jay Inslee and Myron

13    Kreidler's Motion to Dismiss, Dkt. 88, is **DENIED**, and their Motion for Sanctions, Dkt.

14    107, is **DENIED**. Plaintiff Cedar Park's Motion for Sanctions, Dkt. 109, is **DENIED**.

15    Dated this 16th day of May, 2023.

16

17

18                          BENJAMIN H. SETTLE
                            United States District Judge

19

20

21

22

ORDER - 18