**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON, | Nos. 23-35560 23-35585 |
| *Plaintiff-Appellant / Cross-Appellee*, | D.C. No. 3:19-cv-05181-BHS |
| v. | |
| MYRON KREIDLER, AKA Mike Kreidler, in his official capacity as Insurance Commissioner for the State of Washington; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington, | OPINION |
| *Defendants-Appellees / Cross-Appellants*. | |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted August 15, 2024
San Francisco, California

Filed March 6, 2025

Before:  Susan P. Graber, Consuelo M. Callahan, and Lucy
H. Koh, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Callahan

## SUMMARY[*]

## Standing/Free Exercise

Vacating the district court's summary judgment for
Washington state defendants and remanding with
instructions to dismiss the action, the panel held that the
Cedar Park Assembly of God of Kirkland, Washington,
lacked standing to challenge Washington's Reproductive
Parity Act (the "Parity Act") under the Free Exercise Clause
of the First Amendment.

The Parity Act, enacted in 2018, requires insurance
carriers to provide health coverage for all federally approved
contraceptives and, if maternity care is covered, for
abortions. The Act's 2019 implementing regulations do not
diminish or affect any rights provided under Washington's
existing conscientious-objection statute, which enables
insurance carriers to accommodate an employer's religious
objections to an insurance plan. The conscientious-
objection statute also provides that employees can obtain
coverage for abortion services through their employer's

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

insurance carrier, even when the plan itself does not include that coverage.

Cedar Park asserts that after the enactment of the Parity Act, but before its implementing regulations clarifying the availability of conscience-based exemptions, its insurer stopped accommodating the abortion exclusion. Cedar Park alleged that although Cigna has since offered a health plan that excluded abortion, the plan was not comparable, and Cedar Park has been unable to secure a substitute plan that would accommodate its religious objections.

The panel first held that its earlier determination that Cedar Park adequately pleaded an injury in fact to survive a motion to dismiss did not bind it under the law-of-the-case doctrine when reviewing a ruling on summary judgment. After full discovery, Cedar Park failed to establish causation.

The panel held that Cedar Park failed to establish that its claimed injury was traceable to the Parity Act or redressable. Taken together, the Parity Act, its implementing regulation, and Washington's conscientious-objection statute and regulations operate to make Cedar Park's desired no-abortion group health coverage possible. Nothing in the challenged law prevents any insurance company from offering Cedar Park a health plan that excludes direct coverage for abortion services. Cedar Park's injury is premised on the alleged acts and independent decisions of non-parties to this action—independent health insurers. And nothing in the record suggests that Cedar Park's alleged injury would be redressed if the Parity Act was struck down because invalidation of the Parity Act could not and would not force insurers to offer a no-abortion plan to Cedar Park.

The panel rejected Cedar Park's contention that an employer purchasing a no-abortion plan in Washington still indirectly facilitates the provision of abortion services because employees can still obtain abortion coverage through the employer's insurance carrier, and that this kind of facilitation is injurious. The panel held that general disapproval of the actions that others might decide to take does not create standing, even when some tenuous connection may exist between the disapproving plaintiff and the offense-causing action. Even were the panel to accept the basic premise of Cedar Park's theory, it still would lack standing because its claimed injury was premised entirely on speculation.

Dissenting, Judge Callahan stated that Cedar Park has standing to challenge the Parity Act. Although Cedar Park can choose not to purchase abortion coverage for its "benefits package," the Parity Act still requires it to facilitate access to abortion coverage simply by entering into a contract with an insurer servicing the State of Washington, in violation of its Free Exercise of religion. Moreover, Cedar Park's insurer stopped providing a health plan that excludes abortion coverage, and Cedar Park cannot procure a comparable replacement.

---

## COUNSEL

Rory T. Gray (argued) and David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; John J. Bursch and Kristen K. Waggoner, Alliance Defending Freedom, Washington, D.C.; James A. Campbell and Kevin H. Theriot, Alliance Defending Freedom, Scottsdale, Arizona; for Plaintiff-Appellant.

Tera M. Heintz (argued), Deputy Solicitor General; Cristina Sepe, Assistant Attorney General; Marta DeLeon, Senior Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendants-Appellees.

Joseph D. Spate and Thomas T. Hydrick, Assistant Deputy Solicitors General; J. Emory Smith Jr., Deputy Solicitor General; Robert Cook, Solicitor General; Alan Wilson, South Carolina Attorney General; Office of the South Carolina Attorney General, Columbia, South Carolina; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Treg Taylor, Alaska Attorney General, Office of the Alaska Attorney General, Anchorage, Alaska; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; Christopher M. Carr, Georgia Attorney General, Office of the Georgia Attorney General, Atlanta, Georgia; Raúl R. Labrador, Idaho Attorney General; Office of the Idaho Attorney General, Boise, Idaho; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Jeff Landry, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Marty Jackley, South Dakota Attorney General, Office of the South

Dakota Attorney General, Pierre, South Dakota; Jonathan Skrmetti, Tennessee Attorney General, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Jason Miyares, Virginia Attorney General, Office of the Virginia Attorney General, Richmond, Virginia; Patrick Morrisey, West Virginia Attorney General, Office of the West Virginia Attorney General, Charleston, West Virginia; for Amici Curiae the States of South Carolina, Alabama, Alaska, Arkansas, Georgia, Idaho, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Dakota, Tennessee, Texas, Virginia, and West Virginia.

Deborah J. Dewart, Hubert, North Carolina, for Amicus Curiae Institute for Faith and Family.

James Bopp Jr. and Richard E. Coleson, The Bopp Law Firm PC, Terre Haute, Indiana, for Amicus Curiae Oregon Right to Life.

Christopher T. Holinger, Robertson Center for Constitutional Law, Virginia Beach, Virginia, for Amicus Curiae Robertson Center for Constitutional Law.

Ryan Lawson and Emily Jones, Jones Law Firm PLLC, Billings, Montana, for Amicus Curiae Montana Public Policy Center, Inc..

Catherine W. Short and Sheila A. Green, Life Legal Defense Foundation, Ojai, California, for Amicus Curiae Life Legal Defense Foundation.

Daniel W. Bowers, Hilty Bower Haws & Seable PLLC, Nampa, Idaho; William C. Duncan, Sutherland Institute, Salt Lake City, Utah; for Amicus Curiae Sutherland Institute.

Noel J. Francisco and Megan L. Owen, Jones Day,
Washington, D.C.; Eric C. Rassbach, The Hugh and Hazel
Darling Religious Liberty Clinic, Pepperdine University,
Caruso School of Law, Malibu, California; for Amici Curiae
Christian Legal Society and The Becket Fund for Religious
Liberty.

Francesca G. Matozzo and John Meiser, Notre Dame Law
School Religious Liberty Clinic, Notre Dame, Indiana, for
Amicus Curiae Notre Dame Law School Religious Liberty
Clinic.

Samuel T. Grover and Samantha F. Lawrence, Freedom
From Religion Foundation Inc., Madison, Wisconsin, for
Amicus Curiae Freedom From Religion Foundation.

Bradley Girard and Jenny Samuels, Americans United for
Separation of Church and State, Washington, D.C., for
Amici Curiae Americans United for Separation of Church
and State, The Interfaith Alliance, The Reconstructionist
Rabbinical Association, and The Sikh Coalition.

Aida Babahmetovic and Brennen Johnson, Johnson Graffe
Keay Moniz & Wick LLP, Seattle, Washington; Christine L.
Stanley, Planned Parenthood Great Northwest Hawaii
Alaska Indiana Kentucky, Seattle, Washington; for Amici
Curiae Planned Parenthood Great Northwest Hawaii Alaska
Indiana Kentucky, Cedar River Clinics, and Legal Voice.

Taryn M. Darling and Adrien Leavitt, American Civil
Liberties Union of Washington Foundation, Seattle,
Washington, for Amici Curiae American Civil Liberties
Union of Washington Foundation and Northwest Health
Law Advocates.

## OPINION

GRABER, Circuit Judge:

Plaintiff Cedar Park Assembly of God of Kirkland, Washington, is a church that objects, on religious grounds, to abortion and to some forms of contraception. Plaintiff provides group health insurance to its employees. In this action, Plaintiff challenges the Reproductive Parity Act (the "Parity Act"), a Washington statute requiring insurance carriers to provide coverage for all federally approved contraceptives and, if maternity care is covered, for abortions. Plaintiff alleges that the Parity Act violates the Free Exercise Clause of the First Amendment and the church's right to religious autonomy. The district court entered summary judgment in favor of Defendants Myron Kreidler and Jay Inslee, who are named in their official capacities as, respectively, the State of Washington's insurance commission and governor. Plaintiff timely appealed, and Defendants timely cross-appealed. Reviewing de novo, Cottonwood Env't L. Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1079 (9th Cir. 2015),[1] we hold that Plaintiff lacks standing.[2]

---

[1] The dissenting opinion repeatedly highlights the district court's decision on standing, but our review is de novo. "De novo review means that the reviewing court 'do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.'" Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009) (brackets in original) (emphasis added) (quoting United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988)).

[2] We GRANT Plaintiff's motion to supplement the record (Dkt. No. 103).

## BACKGROUND

### A.  Washington's Statutory Framework

Two laws lie at the center of this case:  Washington's conscientious-objection statute and the Parity Act.

Enacted in 1995, the conscientious-objection statute provides, in relevant part, that "[n]o individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion."   Wash. Rev. Code § 48.43.065(3)(a).  At the same time, the statute mandates that enrollees in insurance plans be able to access those services that their plan's provider—such as an employer— find objectionable.  Id. § 48.43.065(3)(b).  Insurance carriers, not employers, are responsible for ensuring access to the objected-to services and for notifying insured individuals about how to avail themselves of such services. Id. § 48.43.065(3)(c); Wash. Admin. Code § 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(1), (3).  For example, a carrier might include a notice in the health plan's documents that states something like: "Your employer does not provide these services; however, you can still access them through us, your carrier, and here's how."

The conscientious-objection statute and its implementing regulations thus enable insurance carriers to accommodate an employer's religious objections.  Before offering a tailored health plan, however, the insurance carrier must submit the plan—along with a description of the "process [the carrier] will use to recognize an organization['s] . . . exercise of conscience based on a religious belief or conscientious objection to the purchase of coverage for a specific service"—to Washington's insurance

commissioner for approval. Wash. Admin. Code § 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(1).

Meanwhile, Washington enacted the Parity Act in 2018. Reproductive Parity Act, ch. 119, 2018 Wash. Sess. Laws 689 (codified at Wash. Rev. Code §§ 48.43.072, 48.43.073). The Parity Act applies to health plans that are issued or renewed after January 1, 2019. Id. §§ 48.43.072(1) (2018), 48.43.073(1)(a), 2018 Wash. Sess. Laws at 691–92. The general definitions section of Washington's Insurance Code defines "health plan" to mean "any policy, contract, or agreement offered by a health carrier to provide, arrange, reimburse, or pay for health care services." Wash. Rev. Code § 48.43.005(33).[3]

One practical effect of the Parity Act is to require all Washington employers that are covered by the Patient Protection and Affordable Care Act (42 U.S.C. §§ 18001–18122) to provide coverage for abortion services. That is because the Affordable Care Act requires employers like Plaintiff, which offer insurance to employees through a group health plan (rather than self-insuring) and which have more than fifty employees, to provide health insurance that includes maternity coverage. 26 U.S.C. § 4980H; 42 U.S.C. § 18022(b)(1)(D). And the Parity Act, in turn, requires health plans that provide maternity coverage to provide "substantially equivalent coverage to permit the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(1)(a).[4]

---

[3] Section 48.43.005(33) includes several exceptions that are not relevant here.

[4] An implementing regulation further defines "substantially equivalent coverage," stating that "[f]or the coverage to be substantially equivalent, a health plan . . . must not apply coverage limitations differently for abortion and related services than for maternity care and its related

Additionally, the Parity Act requires health plans to provide coverage for all contraceptives approved by the Food and Drug Administration and for all related services. Id. § 48.43.072(1)(a), (c). According to Plaintiff, that provision covers some contraceptives "that act to destroy an embryo post-fertilization," the use of which runs counter to Plaintiff's religious beliefs.[5]

The Parity Act does not mention the conscientious-objection statute. But, in November 2019, an implementing regulation clarified that the Parity Act "does not diminish or affect any rights" provided under Washington's conscientious-objection statute. 19-24 Wash. Reg. 39 (Nov. 26, 2019); Wash. Admin. Code § 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(3) (effective Dec. 27, 2019). Acting consistently with that regulation, Washington's insurance commissioner has approved several group health plans that do not cover abortion.

B. The Present Action

Before the passage of the Parity Act, Plaintiff held a group plan from Kaiser Permanente that excluded abortion coverage. In the summer of 2019—after the enactment of the Parity Act but before the promulgation of the implementing regulation that clarified the availability of conscience-based exemptions—Kaiser stopped

---

services unless the difference provides the enrollee with access to care and treatment commensurate with the enrollee's specific medical needs, without imposing a surcharge or other additional cost to the enrollee." Wash. Admin. Code § 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(2)(a).

[5] For convenience and brevity, in the remainder of this opinion we will refer only to Plaintiff's challenge to the Parity Act's abortion-services provision. But the same analysis applies to Plaintiff's challenge to the Parity Act's provision pertaining to the forms of contraceptives to which Plaintiff objects.

accommodating the abortion exclusion.  Supposedly unable to find a suitable replacement, Plaintiff agreed to renew its Kaiser plan even though that plan would cover abortion services from that point forward.  More than four years later, Plaintiff still holds that same plan.

Plaintiff initiated its challenge to the Parity Act in 2019. At the pleading stage, the district court dismissed the relevant claims for lack of standing.  We reversed, holding that Plaintiff plausibly alleged an injury in fact that was fairly traceable to the Parity Act.  Cedar Park Assembly of God of Kirkland v. Kreidler, 860 F. App'x 542, 543 (9th Cir. 2021) (unpublished).  On remand, the parties engaged in discovery and filed cross-motions for summary judgment. The district court reached the merits of the dispute and entered summary judgment in favor of Defendants.  Plaintiff timely appealed, and Defendants, arguing once more that Plaintiff has failed to establish constitutional standing, timely cross-appealed.  Countering, Plaintiff invokes our prior ruling and the law-of-the-case doctrine.

## DISCUSSION

### A. Law-of-the-Case Doctrine

Contrary to Plaintiff's assertions, our earlier determination that Plaintiff adequately pleaded an injury in fact to survive a motion to dismiss does not bind us under the law-of-the-case doctrine when reviewing a ruling on summary judgment.  A prior ruling from this court that a plaintiff has standing is treated as law of the case only "when the case return[s] 'in virtually the same procedural posture.'" Grand Canyon Tr. v. Provencio, 26 F.4th 815, 821 (9th Cir. 2022) (quoting Nordstrom v. Ryan, 856 F.3d 1265, 1270 (9th Cir. 2017)).  But this case entered a new procedural phase after our 2021 decision, in which we reviewed the

district court's order regarding Defendants' motion to dismiss.

Over the lifetime of a case, the task of establishing constitutional standing evolves. That is to say, Article III standing requirements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Jones v. L.A. Cent. Plaza LLC, 74 F.4th 1053, 1057 (9th Cir. 2023) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).

As pertinent here, the burden to allege standing at the pleading stage and the burden to demonstrate standing at the summary judgment stage differ. At the pleading stage, a plaintiff need only "allege sufficient facts that, taken as true, 'demonstrat[e] each element of Article III standing.'" Id. (alteration in original) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). Summary judgment presents a higher hurdle. At that point, a plaintiff must "'offer evidence and specific facts [that demonstrate] each element' of Article III standing." Id. at 1058 (quoting Ctr. for Biological Diversity v. Exp.-Imp. Bank, 894 F.3d 1005, 1012 (9th Cir. 2018)); see also Murthy v. Missouri, 144 S. Ct. 1972, 1986 (2024) (stating that, once the parties have taken discovery, the plaintiff "cannot rest on 'mere allegations,' but must instead point to factual evidence" to support standing (quoting Lujan, 504 U.S. at 561)).[6] We previously concluded only that "Cedar Park's complaint plausibly alleged that, due to the enactment of [the Parity Act], its health insurer (Kaiser

---

[6] The dissenting opinion appears to place this burden on Defendants, Dissent at 45, but it is Plaintiff, the party seeking to invoke the federal court's jurisdiction, that must demonstrate that it has standing.

Permanente) stopped offering a plan with abortion coverage restrictions." Cedar Park, 860 F. App'x at 543 (emphasis added). After full discovery, Plaintiff has failed to establish causation.

In sum, Plaintiff's invocation of the law-of-the-case doctrine is unavailing. We turn, then, to an analysis of standing on the summary judgment record.[7]

B. Article III Standing

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Jones, 74 F.4th at 1057 (alteration in original) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)).

Plaintiff presents two theories of standing, asserting that the Parity Act injured Plaintiff by requiring it to facilitate abortion access (1) directly, by providing health plans to its

---

[7] Despite the dissenting opinion's suggestion to the contrary, it is neither relevant nor "surpris[ing]" that most amici failed to address the issue of standing. Dissent at 30. Their failure is not relevant because we have an independent obligation to examine our jurisdiction and to decide only cases that satisfy the requirements of Article III. E. Bay Sanctuary Covenant v. Garland, 994 F.3d 962, 974 (9th Cir. 2020). Nor is their failure surprising; most amici, like Plaintiff, would prefer that we reach the merits. Moreover, after amici filed their briefs, the Supreme Court issued its opinion in FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024). That decision is directly relevant to the standing issue here, and the parties submitted supplemental briefs addressing its effect.

employees that cover abortion, and (2) indirectly, by offering plans that enable its employees to access abortion services, even when the plan itself does not include that coverage.  Neither theory is persuasive.**[8]**

### 1. Plaintiff's Theory of Direct Facilitation

Plaintiff maintains that it has Article III standing because the Parity Act has forced it to maintain a health plan that covers abortion. We disagree. Washington's conscientious-objection statute exempts employers like Plaintiff from the consequences of the Parity Act.

#### a. Injury in Fact

Plaintiff asserts that it suffered an injury in fact because it lost access to its no-abortion health plan and was unable to secure a substitute plan that would accommodate its religious objections.  Plaintiff adequately pleaded standing at the motion-to-dismiss stage by alleging that, due to the Parity Act, "[Kaiser] stopped offering a plan with abortion coverage restrictions and [Plaintiff] could not procure comparable replacement coverage."  Cedar Park, 860 F. App'x at 543.

We note that, more than three months before Plaintiff filed the operative complaint, Cigna offered Plaintiff a health plan that was cheaper than Kaiser's plan and that similarly excluded abortion.  If Cigna's plan was comparable to the plan that Kaiser previously offered, Plaintiff's alleged injury

---

[8] The parties dispute whether we should analyze this case as a pre-enforcement or a post-enforcement challenge for the purposes of standing.  We assume, without deciding, that this is a post-enforcement challenge and apply ordinary principles of standing.  We note, however, that any enforcement action premised on the Parity Act would be aimed at insurance carriers, rather than at an employer like Plaintiff.

would be "[p]urely self-inflicted" and, consequently, would not suffice to establish standing. Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care, 968 F.3d 738, 748 (9th Cir. 2020) (internal quotation marks omitted); see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013) ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves . . . ."). Because the parties continue to dispute the comparability of the Cigna plan, we assume, without deciding, that the plan offered by Cigna was not comparable to the Kaiser plan that Plaintiff held before the enactment of the Parity Act and that Plaintiff suffered an injury in fact.

### b. Traceability

Plaintiff's claimed injury is not traceable to the Parity Act. Taken together, the Parity Act, its implementing regulation, and Washington's conscientious-objection statute and regulations operate to make Plaintiff's desired no-abortion group health coverage possible. Nothing in the challenged law prevents any insurance company, including Kaiser, from offering Plaintiff a health plan that excludes direct coverage for abortion services.[9]   Therefore, an

---

[9] Indeed, before the release of the Parity Act's implementing regulation, Plaintiff's insurance broker asked Kaiser whether Plaintiff would be able to exclude abortion from its plan if the regulation, once promulgated, provided for religious-based exemptions.   Kaiser answered in the affirmative, explaining that, though it could not retroactively exclude any services that plan members might have received in the meantime, the company could "support a mid-year change."   Nothing in the record explains whether (or why) Kaiser actually offered such a plan after November 2019, when the implementing regulation made clear that the exception Plaintiff sought had existed all along.   Importantly, after the implementing regulation was issued, Plaintiff failed to seek further discovery from Kaiser on this question.   Any gap in the record is a result of Plaintiff's own inaction.   See Clapper, 568 U.S. at 418 ("[S]elf-

insurance company's independent business decision not to offer such a plan is not traceable to the Parity Act.**[10]**

Murthy is instructive on this point. There, users of social media, plus two states, sued several federal Executive Branch officials and agencies.   They claimed that the defendants had pressured social media platforms to censor their speech in violation of the First Amendment. Murthy, 144 S. Ct. at 1984. The district court granted a preliminary injunction in the plaintiffs' favor, but the Supreme Court reversed.   The Court held that the plaintiffs had failed to show causation because they proffered no evidence tracing their alleged injuries to actions of the federal government, as opposed to actions of independent, non-party social media platforms. Id. at 1989–91.

Here, as in Murthy, traceability is lacking because Plaintiff's injury is premised on the alleged acts and independent decisions of non-parties to this action—Kaiser and other independent insurers. See All. for Hippocratic Med., 602 U.S. at 390 (holding that the plaintiffs lacked standing because federal conscience laws allowing the plaintiffs to refuse to perform abortions without retribution "break[] any chain of causation"); see also Washington v. U.S. FDA, 108 F.4th 1163, 1175 (9th Cir. 2024) (deeming the "causal chain" too "attenuated" because "[t]he

---

inflicted injuries are not fairly traceable to the Government's purported activities."). "[P]laintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" All. for Hippocratic Med., 602 U.S. at 383 (quoting Clapper, 568 U.S. at 415 n.5).

[10] For the same reason, Plaintiff's claim that it is ineligible for the approved no-abortion plans for geographic reasons is not relevant. The Parity Act does not tell insurance carriers where to sell their products.

links . . . depend[ed] on the independent actions" of others, whose "decisionmaking is informed by a wide range of individualized considerations that are difficult to predict").

### c. Redressability

Nothing in the record suggests that Plaintiff's alleged injury would be redressed if we struck down the Parity Act. Far from demonstrating that Defendants pressure insurers to refuse to offer no-abortion plans, the record shows the opposite. Washington's statutes and implementing regulation enable insurance carriers to provide exactly the sort of coverage that Plaintiff requires. Indeed, as we note above, some carriers do precisely that.[11]

Again, Murthy is instructive. After addressing traceability, the Supreme Court concluded that the plaintiffs had not proved redressability. 144 S. Ct. at 1995–96. The Court reasoned that, even assuming that the federal government initially coerced social media platforms to censor speech, "without evidence of continued pressure from the defendants, it appears that the platforms remain free to enforce, or not to enforce, those policies." Id. at 1995.

---

[11] The dissenting opinion asserts that we cannot consider the existence of no-abortion plans under the standard framework of standing—as opposed to an inquiry into mootness—because no such plans had been approved by Washington's insurance commissioner before Plaintiff filed the operative complaint. Dissent at 38–39. That contention might have merit if we relied on later-approved plans to conclude that Plaintiff had not been injured because it currently has access to plans comparable to the one it held before passage of the Parity Act. But, as explained above, we assume an injury in fact at the time the complaint was filed. The post-complaint approval of no-abortion plans simply illustrates that traceability and redressability, which also are necessary to establish standing, have always been lacking.

Here, redressability is likewise lacking.  Just as the defendants in <u>Murthy</u> were free to enforce, or not to enforce, the challenged policies, Washington insurers are free to offer, or not to offer, no-abortion health plans.  Because their decision-making in that regard is independent of the Parity Act, a declaration that the statute is unconstitutional would not redress Plaintiff's alleged inability to obtain acceptable coverage.  <u>See id.</u> at 1986 ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (quoting <u>Simon v. E. Ky. Welfare Rts. Org.</u>, 426 U.S. 26, 41–42 (1976))).

Plaintiff's reliance on <u>Skyline</u> is misplaced.  There, a governmental agency issued a directive requiring seven insurers to remove restrictions on abortion services from their health plans.  968 F.3d at 748–50.  Each of those providers complied, and the plaintiff lost its plan as a result, facts that demonstrated causation.  <u>Id.</u> at 750.  <u>Skyline</u> explained that the redressability inquiry should "focus[] on whether the predictable effect of an order granting the relief Skyline seeks is that at least one insurer would be willing to sell it a plan that accords with its religious beliefs."  <u>Id.</u> Given the insurers' pre-directive practices, that inquiry favored the plaintiff.  By contrast, the record here—far from demonstrating that Defendants have ever ordered any insurance carrier, including Kaiser, to cease the sale of abortion-excluding plans—shows that Defendants have approved such plans.

### d.  Conclusion

Permeating the dissenting opinion is the incorrect premise that Washington law requires Plaintiff to provide abortion coverage for its employees.  <u>E.g.</u>, Dissent at 30 n.2,

31, 33–35. To the contrary, under the conscientious-objection statute and the Parity Act, <u>employers</u> with a religious objection need not purchase coverage for abortion services for their employees; employees simply have the right to obtain such coverage through their <u>insurers</u> when their employers do not provide it. That distinction is not one of semantics, but of substance.[12] Insurers could offer no-abortion health plans to employers both before and after passage of the Parity Act. Invalidation of the Parity Act—the relief that Plaintiff seeks—thus could not and would not force any insurer to offer a no-abortion plan to Plaintiff. If Plaintiff cannot find such a plan in the marketplace, or cannot find it at an acceptable price, that would be true with or without the Parity Act. Accordingly, Plaintiff cannot establish traceability or redressability under its direct-facilitation theory.[13]

---

[12] The dissenting opinion tries to put distance between the Parity Act and the conscientious-objection statute by asserting that the Parity Act requires insurers to cover abortion in their "health plans," whereas the conscientious-objection statute applies only to "benefits packages." <u>E.g.,</u> Dissent at 39–40. But the fact remains that "[n]o individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion." Wash. Rev. Code § 48.43.065(3)(a). And the Parity Act "does not diminish or affect any rights or responsibilities provided under [the conscientious-objection statute]." Wash. Admin. Code § 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(3).

[13] The dissenting opinion places considerable reliance on <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682 (2014). <u>E.g.,</u> Dissent at 32–35. But <u>Hobby Lobby</u>, a case about the Religious Freedom Restoration Act, did not meaningfully address standing. Moreover, we note again that, under Washington's conscientious-objection statute, <u>insurance carriers</u>, not employers, are responsible for notifying employees about how they can access objected-to services despite their exclusion from the employer's benefit package. Wash. Rev. Code § 48.43.065(3)(c); Wash.

## 2. Plaintiff's Theory of Indirect Facilitation

Plaintiff contends, in the alternative, that an employer purchasing a no-abortion plan in Washington still "indirectly facilitates" the provision of abortion services to its employees. Plaintiff relies on but-for reasoning. As noted above, under the conscientious-objection statute, employees can obtain coverage for abortion services through their insurance carrier, whether or not the employer has a religious objection. Wash. Rev. Code § 48.43.065(3)(b). So, Plaintiff's argument goes, employees receive coverage that they would not have but for the existence of the health plan provided by their employer, even if the employer's plan does not itself provide that coverage. In Plaintiff's view, that kind of "facilitation," though indirect, is equally injurious.

We reject this theory as well. The general disapproval of the actions that others might decide to take does not create standing, even when some tenuous connection may exist between the disapproving plaintiff and the offense-causing action.

---

Admin. Code § 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(1), (3). So, contrary to the dissenting opinion's assertion, Dissent at 33–35, Cedar Park is not required to "contract, arrange, pay, or refer for" coverage of objected-to services. Hobby Lobby, 573 U.S. at 723 n.33. The dissenting opinion also asserts, incorrectly, that our decision conflicts with Korte v. Sebelius, 735 F.3d 654 (7th Cir. 2013), and Wieland v. United States Department of Health & Human Services, 793 F.3d 949 (8th Cir. 2015). Dissent at 34 n.4. In Korte, the court relied on the fact that the contraception mandate required contraception coverage in the plaintiffs' employee health plans. Korte, 735 F.3d at 667. Similarly, in Wieland, the court relied on the fact that the state was required to transfer employees to a health care plan that covered contraceptives, or else face significant penalties. Wieland, 793 F.3d at 955–56. By contrast, Washington law does not require abortion coverage.

The Supreme Court's precedents concerning taxpayer standing are informative in this context. For example, in Doremus v. Board of Education of Borough of Hawthorne, 342 U.S. 429 (1952), the plaintiffs brought a suit as citizens and taxpayers. They argued that a New Jersey law authorizing public school teachers to read from the Bible in classrooms violated the Establishment Clause of the First Amendment. Id. at 430. The Court dismissed the action for lack of standing, determining that the plaintiffs merely "sought to litigate . . . a religious difference" and lacked a "direct and particular financial interest." Id. at 434–35. The Court further explained that, had the plaintiffs "established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant inducement to action was more religious than mercenary." Id. In other words, the plaintiffs' standing in Doremus hinged "not [on] a question of motivation but of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." Id. at 435; see also Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 599–601 (2007) (plurality opinion) (stating that taxpayers lacked standing where their asserted basis was opposition to the use of taxpayer appropriations to advance and promote religion).

Plaintiff's "indirect facilitation" theory is similarly attenuated. Plaintiff does not challenge the Washington law that establishes its employees' individual right to choose to have an abortion. Wash. Rev. Code § 9.02.100(2). That unchallenged right exists independent of the Parity Act. That is, the Parity Act does not increase the theoretical possibility that an employee or a member of an employee's family would seek an abortion. Instead, the real-world effect of the Parity Act's complained-of provision is simply that

CEDAR PARK ASSEMBLY OF GOD V. KREIDLER

providing a group health plan might potentially make an employee's hypothetical abortion more affordable than it would be if the employer self-insured. An employer makes it financially easier for its employees to buy <u>any</u> goods or services simply by compensating the employees for their labor, but that fact does not tie the employer to those purchases. Imagine that an employer sincerely objects to the consumption of alcohol because the employer practices a religion that strictly forbids it, but one of its employees uses her minimum-wage paycheck to buy alcohol. That employer would not have standing to challenge a state's minimum-wage law on the theory that, by having to pay the minimum wage, the employer had been forced to facilitate the employee's purchase. In short, an employer's provision of wages or benefits that merely makes it easier for an employee to obtain something to which the employer objects does not suffice to establish the employer's standing. <u>See All. for Hippocratic Med.</u>, 602 U.S. at 374 (holding that a plaintiff's desire to make abortion "less available <u>for others</u> does not establish standing to sue").

And even were we to accept the basic premise of Plaintiff's theory, which we do not, Plaintiff still would lack standing because its claimed injury is premised <u>entirely</u> on speculation.

First, to the extent that Plaintiff and the dissenting opinion claim that Plaintiff risks being forced to subsidize abortion more directly because an insurance carrier might pass on the cost of such services to Plaintiff by raising premiums, Dissent at 44–45, there is no evidence in the record that Plaintiff has incurred such costs or is likely to do so in the future. Once again, we point out that Plaintiff has the burden to establish standing. But its "highly attenuated chain of possibilities[] does not satisfy the [standing]

requirement that threatened injury must be certainly impending." Clapper, 568 U.S. at 410.

Second, the record reveals no indication that any of Plaintiff's employees or their family members have ever used, plan to use, or might even consider using their workplace health plan to procure any services to which Plaintiff objects. Plaintiff's own pleadings allege the contrary. Plaintiff "expects its employees to abide by and agree with the church's moral and ethical standards, including its religious beliefs and teachings on abortion, in both their work life and private life." And Plaintiff makes those expectations explicit; all of Plaintiff's employees must sign a code of conduct, in which they agree to "refrain from behavior that conflicts or appears inconsistent with evangelical Christian standards as determined in the sole and absolute discretion of Cedar Park." Plaintiff now invites us to overlook those representations, the sincerity of which we have no reason to doubt, to hold—without any evidence whatsoever—that Plaintiff has faced, or is imminently likely to face, the indirect injury that it asserts. Because Article III standing cannot be supported by "long chain[s] of hypothetical contingencies," Lake v. Fontes, 83 F.4th 1199, 1204 (9th Cir. 2023) (per curiam) (citation omitted), cert. denied, 144 S. Ct. 1395 (2024), Plaintiff cannot maintain this action.

**VACATED and REMANDED with instructions to dismiss the action for lack of standing. Costs are taxed against the Plaintiff-Appellant.**

CALLAHAN, Circuit Judge, dissenting:

Before the State of Washington passed the Reproductive
Parity Act, plaintiff-appellant Cedar Park Assembly of God
was able to provide a health plan to its employees that
excluded abortion coverage. Now it cannot. This is because
the Parity Act mandates that Cedar Park's health plan
"provide . . . coverage to permit the abortion of a pregnancy."
Wash. Rev. Stat. § 48.43.073(1)(a). Cedar Park has standing
to challenge the Parity Act, and the majority errs in
concluding otherwise. I dissent.

I

A

The makings of this case date back to the 2010 enactment
of the Patient Protection and Affordable Care Act ("ACA"),
Pub. L. No. 111-148, 124 Stat. 119. The ACA requires
employers with 50 or more full-time employees to have "a
group health plan or group health insurance coverage" that
provides "minimum essential coverage." 26 U.S.C.
§ 5000A(f)(2); §§ 4980H(a), (c)(2). This includes
"[m]aternity and newborn care," 42 U.S.C.
§ 18022(b)(1)(D), but excludes coverage of abortions, *id.*
§ 18023(b). Employers who do not comply with the ACA
face hefty penalties, including potential fines of $100 per day
for each affected employee. 26 U.S.C. §§ 4980D(a)-(b).

Cedar Park is a Christian church in the State of
Washington that has over 180 full-time employees, so
provides an ACA mandated health plan that covers maternity
care. Cedar Park is associated with the Assemblies of God[1]

---

[1] The Assemblies of God is a religious denomination that has nearly
13,000 associated churches in the United States. *See* THE ASSEMBLIES

and holds the religious belief that "abortion itself is a sin."
The church therefore aims to avoid participating in,
facilitating access to, or paying for an abortion through its
health plan. For nearly a decade, Cedar Park was able to
provide its employees health insurance consistent with the
ACA and its own religious beliefs by contracting with an
insurer for a plan that excluded abortion coverage.

This ended when Washington passed the Parity Act in
2018. The state's legislature determined that restricting
abortion coverage interferes with a woman's "protected right
to safe and legal medical abortion care," 2018 Wash. Sess.
Laws, ch. 119, § 1, so required all health plans with
maternity coverage to "provide . . . coverage to permit the
abortion of a pregnancy," Wash. Rev. Code
§ 48.43.073(1)(a). The Parity Act is just one of the state's
many healthcare laws that is subject to another statute
exempting employers with religious objections to certain
health services from having to "purchase coverage" for those
services for an employee "benefits package." Wash. Rev.
Code §§ 48.43.065(3)(a)–(b) ("conscience statute"). While
the employer does not need to "purchase coverage" for the
objected-to service, the conscience statute ensures that such
opting out does not result "in an enrollee being denied
coverage of, and timely access to, any service or services
excluded from their benefits package." *Id.*

Soon after the Parity Act came into effect, Cedar Park's
long-time health insurer—Kaiser Permanente—told Cedar
Park that it would no longer accommodate "abortion
exclusions" for the church's health plan. According to
Kaiser Permanente, this was because "[u]pon review of [the

---

OF GOD," https://ag.org/About/About-the-AG (last visited Feb. 19,
2025).

Parity Act], fully insured health plans . . . that cover maternity care or services must cover substantially equivalent coverage for abortion." Cedar Park subsequently brought suit in federal court to challenge the Parity Act, contending that the law requires it to choose between violating state and federal law or violating its deeply held religious beliefs.

B

This is now the second time Cedar Park and the State of Washington are before us contesting the constitutionality of the Parity Act. The first time was on appeal from the district court's dismissal of Cedar Park's complaint for lack of standing. The district court thought that Cedar Park did not suffer a cognizable injury because another insurer besides Kaiser Permanente had offered a health plan that excluded abortion coverage. In the district court's view, this "potential availability of suitable alternatives" undermined the church's injury. The district court also held that Cedar Park's injury was not "fairly traceable" to the Parity Act because it was market economics—not the Parity Act—that caused insurers to stop offering Cedar Park a health plan excluding abortion coverage.

We reversed. *Cedar Park Assembly of God of Kirkland, Wa. v. Kreidler*, 860 Fed. App'x 542 (9th Cir. July 22, 2021) ("*Cedar Park I*"). We held that Cedar Park had plausibly alleged that Kaiser Permanente stopped offering a plan excluding abortion coverage "due to the enactment" of the Parity Act and that Cedar Park could not procure comparable replacement coverage. *Id.* at 543. Relying on *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738 (9th Cir. 2020) ("*Skyline*"), we held that Cedar Park's inability to obtain a comparable

replacement to Kaiser Permanente's plan is "sufficient to
state an injury in fact that is fairly traceable to [the Parity
Act]." 860 Fed. App'x at 543. We explained that, as in
*Skyline*, the fact that Cedar Park had access to an acceptable
plan before the Parity Act is "strong evidence that Cedar
Park could obtain a similar plan from Kaiser Permanente or
another health insurer if the state is enjoined from enforcing
[the Parity Act]." *Id.* Finally, we rejected the state's
argument that Cedar Park lacked standing because a
November 2019 regulation enacted by the state's insurance
commissioner clarified that insurers could offer health plans
excluding abortion coverage. We held that, notwithstanding
this regulation, "Kaiser Permanente reasonably understood
the plain language of [the Parity Act] as precluding" the
provision of such a plan. *Id.*

On remand the parties engaged in discovery after which
the state renewed its motion to dismiss for lack of standing
and moved to sanction Cedar Park for not disclosing that it
had "received six or seven bids for plans that offered
coverage for services consistent with Cedar Park's religious
beliefs." Cedar Park opposed the motion and cross-moved
for sanctions. While these motions were pending, the parties
cross-moved for summary judgment on the merits. The state
did not contest Cedar Park's standing in its summary
judgment motion; the parties instead focused their attention
on whether the Parity Act violates the First Amendment.

The district court denied the state's motion to dismiss
and the motions for sanctions. The court first explained how
under the conscience statute "the costs of [excluded] services
can be distributed in numerous ways, leaving the cost
distribution decision to each insurer." *See* Wash. Rev. Code
§ 48.43.065(4). The district court said this supports Cedar
Park's view that the right to not "purchase coverage" for

abortions is illusory: if the insurer and employee are not required to pay for the abortion coverage, and the state itself is not paying for the abortion coverage, "the cost must be falling back on the employer." The district court then rejected the state's argument that Cedar Park received bids for health plans excluding abortion coverage that are "comparable" to Kaiser Permanente's plan, and held that the church has standing pursuant to *Cedar Park I*.

The district court, however, granted the state's summary judgment motion on the merits. Preliminarily, the district court explained that it is "undisputed and undoubtedly true" that the Parity Act "requires Cedar Park to facilitate access to covered abortion services contrary to Cedar Park's religious beliefs" because "its employees would not have access to covered abortion services absent Cedar Park's post-[Parity Act] plan." Still, notwithstanding Cedar Park's standing, the district court concluded that the Parity Act does not violate the First Amendment because it is a "neutral law of general applicability" that is "rationally related to a legitimate governmental purpose." *See Emp. Div. Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064 (9th Cir. 2015).

*         *         *

To briefly recap, we previously held that Cedar Park has standing; the district court rejected the state's renewed motion to dismiss for lack of standing; the state did not contest standing in its summary judgment motion; and the district court's summary judgment order found it "undisputed" that Cedar Park has standing. Accordingly, Cedar Park did not address standing in its opening brief on appeal, and of the thirteen amici briefs filed in this appeal,

only one addressed Cedar Park's standing.[2]   Imagine
everyone's surprise when they read the majority opinion
holding that Cedar Park *lacks* standing.

## II

### A

We begin with what the district court called "the crux"
of Cedar Park's claimed injury, which is that the Parity Act
requires Cedar Park to facilitate its employees' access to
abortion coverage.

Here is how that happens.  Cedar Park provides its
employees a "health plan" that covers maternity care in
compliance with the federal ACA,[3] and under the Parity Act,
such a plan "must also provide a covered person with
substantially equivalent coverage to permit the abortion of a
pregnancy."  Wash. Rev. Code § 48.43.073(1)(a).  Under
Washington's conscience statute, Cedar Park does not need
to "purchase" abortion coverage from an insurer for its
employee "benefits package," but the insurer must still
provide "coverage of, and timely access to" abortions as part

---

[2] The majority finds it meaningful that, after amici filed their briefs, the
Supreme Court issued its opinion in *FDA v. Alliance for Hippocratic
Medicine*, 602 U.S. 367 (2024).  But *FDA* is not relevant to the standing
issue here because in that case the plaintiff doctors and medical
associations challenged a regulation that did not "require[] the plaintiffs
to do anything or to refrain from doing anything."  602 U.S. at 385.  Here,
the Parity Act requires Cedar Park to enter into a health plan that will
provide abortion coverage.

[3] A "health plan" means "any policy, contract, or agreement offered by
a health carrier to provide, arrange, reimburse, or pay for health care
services."  Wash. Rev. Code § 48.43.005(33).  A "health carrier" means
an "insurance company," like Kaiser Permanente.  *See id.*
§ 48.43.005(32); 42 U.S.C. § 300gg-91(b)(2).

of Cedar Park's health plan. Wash. Rev. Code § 48.43.065(3)(a)–(b). Therefore, while Cedar Park can choose to not purchase abortion coverage for its "benefits package," it must still enter into a contract with an insurer for a "health plan" that provides coverage of abortions. It follows that, under the Parity Act, Cedar Park employees have access to abortion coverage vis-à-vis the church's "health plan" with an insurer.

The majority does not dispute that Cedar Park's health plan under the Parity Act will provide abortion coverage, but says that this compelled facilitation of abortion coverage in violation of Cedar Park's beliefs is too "attenuated" to establish a legally cognizable injury. In the majority's view, Cedar Park's concern about facilitating access to abortion coverage amounts to "general disapproval of the actions that others might decide to take" and is akin to a taxpayer's concern with how money is spent. This is wrong, and the majority's reliance on *Doremus v. Board of Education of Borough of Hawthorne*, 342 U.S. 429 (1952), shows why.

In *Doremus*, plaintiffs challenged a New Jersey law that provided for the reading of Old Testament verses in public schools. 342 U.S. at 430. The majority reasons that the *Doremus* plaintiffs did not have standing because they lacked a "financial interest" in the allegedly unconstitutional law, and here, Cedar Park's facilitation of abortion coverage is "similarly attenuated" from the Parity Act. The majority fails to mention some important facts that distinguish *Doremus* from this case, however.

For example, the plaintiffs in *Doremus* did not assert that their "religious practices have been interfered with" or that the law conflicted with their religious "convictions." 342 U.S. at 431. Here, Cedar Park did precisely that. In

*Doremus*, there was no "religious sect" that was a party to the lawsuit. *Id.* Here, there is. There was also a "stipulation" in *Doremus* allowing any student to "be excused during the Bible reading." *Id.* at 432. Here, the Parity Act does not allow Cedar Park to "be excused" from entering into a contract with insurers for a health plan that covers abortions. So yes, the majority is correct that plaintiffs in *Doremus* brought a "taxpayer's grievance" and claimed to suffer an injury "in some indefinite way in common with people generally," but Cedar Park does not assert an injury that is "in common with people generally." *Id.* at 433–34. Cedar Park asserts an injury to its religious practices and convictions that is unique unto itself.

A brief discussion of *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014), can help further illustrate Cedar Park's injury. In *Hobby Lobby*, three for-profit corporations challenged the ACA's requirement that employers provide health plans covering certain contraceptive methods. 573 U.S. at 692. The federal government had established exemptions from this requirement for nonprofits but did not extend a similar exemption to for-profit companies that asserted First Amendment religious exercise rights. If a nonprofit was exempted, the nonprofit's insurer was required to "exclude contraceptive coverage from the employer's plan." *Id.* at 698–99. The objective of this exemption was to protect employers objecting to contraceptive coverage on religious grounds "from having to contract, arrange, pay, or refer for such coverage." *Id.* at 723 n.33 (citing 78 Fed. Reg. 39871).

The Supreme Court explained how the contraceptive coverage demanded that the plaintiff corporations "engage in conduct that seriously violates their religious beliefs" because the employers were required "to arrange for such coverage." *Id.* at 720. The Court recognized that arranging

for contraceptive coverage did not simply mean having to "pay" for it, but also included having to "contract" for it. *See id.* at 723 n.33. Basically, anything short of fully excluding the objected-to contraceptive methods from the employer's health plan would burden the employers' religious beliefs. The Court explained how the employers' belief that it was "immoral" to provide the contraceptive coverage "implicates a difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." *Id.* at 724; *see also id.* n.34 (framing this belief as the "ethics of cooperation in wrongdoing").

The same thing is happening here. Cedar Park believes it is immoral to provide abortion coverage, and that contracting with an insurer for a health plan that includes such coverage means the church is "cooperating in wrongdoing." The majority accepts that this is what Cedar Park believes, but says Cedar Park is not injured by "providing a group health plan" that covers abortion because providing the plan only makes an employee's hypothetical abortion more affordable. *Hobby Lobby* forecloses this reasoning. Whether or not an employee's hypothetical abortion is more affordable, the thrust of Cedar Park's injury remains that it is actually "providing" a health plan that covers abortion, contrary to its religious beliefs. In other words, the Parity Act requires that Cedar Park "arrange for such coverage." *See Hobby Lobby*, 573 U.S. at 720.

Critically, unlike the exemption for religious employers in *Hobby Lobby*, the Parity Act is written in such a way that there is no way to "exclude" abortion coverage from Cedar Park's "plan." *Id.* at 698–99. Thus, Cedar Park necessarily

facilitates access to abortion coverage simply by entering into a contract with an insurer servicing the State of Washington. For Cedar Park, like the employers in *Hobby Lobby*, this is tantamount to "cooperation in wrongdoing,." The majority's attempt to compare Cedar Park's injury to a "taxpayer grievance" fails to appreciate Cedar Park's religious beliefs.**[4]**

The majority halfheartedly advances a hypothetical that exposes its misunderstanding of Cedar Park's injury. It compares Cedar Park to an employer that objects on religious grounds to the consumption of alcohol and then brings suit to challenge a minimum-wage law because its employees can now buy alcohol using their paycheck. The analogy is inapt. Cedar Park is not challenging the law requiring it to provide an employee health plan, which is the equivalent to the hypothetical minimum-wage law. Cedar Park is challenging *another* law—the Parity Act—that ties abortion to the required health plan. For the majority's hypothetical to work, there would need to be another law that ties consuming alcohol to the required minimum-wage, like mandating that employers offer employees a bottle of wine each pay period. But more to the point, contrary to what the majority believes, this case is not about an employer expressing "general disapproval of the actions that others

---

[4] The majority also places us in conflict with sister circuits that recognize standing where an employer seeks to "refrain from putting [objectionable health] coverage in place because doing so would make them complicit in the morally wrongful act of another." *See, e.g.*, *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) ("Compelling a person to do an act his religion forbids, or punishing him for an act his religious requires, are paradigmatic religious-liberty injuries sufficient to invoke the jurisdiction of federal courts."); *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 957 (8th Cir. 2015).

might decide to take" or concern that its health plan somehow "makes it easier" for employees to obtain an abortion. This case is about a state law requiring Cedar Park to violate its own religious beliefs by entering into a contractual agreement with insurers to provide abortion coverage in the first place.

Finally, the majority argues that Cedar Park's claimed injury is speculative because "[t]he record reveals no indication that any of [Cedar Park's] employees or their family members have ever used, plan to use, or might even consider using their workplace health plan to procure" abortions. The majority further notes that Cedar Park has its employees sign a code of conduct and "expects its employees to abide by and agree with the church's moral and ethical standards, including its religious beliefs and teachings on abortion, in both their work and private life."

This argument was rejected in *Hobby Lobby*. An employer in that case had a mission statement to "operate in a professional environment founded upon the highest ethical, moral, and Christian principles" and had a "Statement on the Sanctity of Human Life" saying that "human life begins at conception." 573 U.S. at 701–02. Another employer had its employees sign "a pledge" to act "in a manner consistent with Biblical principles." *Id.* at 703. The Supreme Court was not concerned with what the employees would actually do if given contraceptive coverage; what mattered was what the plaintiff *employers* were required to do. The same is true here. What matters is that plaintiff Cedar Park Assembly of God is required to provide its employees a health plan that covers abortions in violation of its Free Exercise of religion.

B

Cedar Park also has standing because the Parity Act caused Kaiser Permanente to stop providing a health plan that excludes abortion coverage and the church cannot procure a comparable replacement. Recall that soon after the Washington legislature passed the Parity Act, Kaiser Permanente informed Cedar Park that, "[u]pon review" of the new law, it would no longer exclude abortion coverage from the church's health plan. This turn of events was entirely predictable, of course, because the Parity Act requires insurers to provide Cedar Park a health plan that *includes* abortion coverage. If an insurer provides Cedar Park a health plan that *excludes* abortion coverage, it may be subject to criminal and civil penalties. *See* Wash. Rev. Code § 48.01.080.

1.

We held that nearly identical facts established a church's standing in *Skyline*. There, California mandated that abortion coverage be offered in all health insurance plans and "issued a directive" to that effect. 968 F.3d at 744. Before this directive, Skyline Wesleyan Church had provided a health plan to its employees that excluded abortions in accordance with its religious views. *Id.* After the directive, however, the church could no longer do so.

The district court in *Skyline* granted summary judgment to the state after concluding that the church lacked standing. The district court "assumed without deciding that Skyline had a cognizable injury" but held that the injury was not redressable because it was caused by independent action from a non-party health insurer. *Id.* at 746. We reversed. We held that Skyline's injury was traceable to the state because there was a "direct chain of causation" from the

state's directive to the church losing access to the health plan it wanted. *Id.* at 748. We also held that the church's injury was redressable because the "predictable effect" of enjoining application of the state's directive would be that "at least one of the many insurers who do business in California would agree to offer the type of plan Skyline seeks." *Id.* at 750.

The majority makes the same mistake today as the district court did in *Skyline*. After assuming without deciding that Cedar Park suffered an injury, the majority concludes that this injury is not caused by the Parity Act but rather by an insurer's "independent business decision."[5] But such reasoning fails to account for the fact "that insurers had previously offered plans that were acceptable to [Cedar Park]." 968 F.3d at 750. Like in *Skyline*, this is "strong evidence" that if we enjoined the Parity Act, "at least one" insurer would agree to offer the type of plan that Cedar Park seeks. *Id.* The majority thus errs in viewing Kaiser Permanente's decision in a vacuum. Kaiser Permanente did not make an "independent business decision" to stop providing Cedar Park coverage; it stopped providing a health plan that excluded abortion due to the Parity Act.

The majority's attempt to distinguish *Skyline* also fails. The majority says that Washington never "ordered" insurers "to cease the sale of abortion-excluding plans" the way California did in *Skyline*. But the Washington legislature

---

[5] The majority opinion discusses "traceability" separately from "redressability," but these standing requirements may be considered together because they are "flip sides of the same coin." *FDA*, 602 U.S. at 380 (quoting *Sprint Commc'n. Co. v. APPC Servs., Inc.*, 554 U.S. 269, 288 (2008)). As the Supreme Court noted, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury. So the two key questions in most standing disputes are injury in fact and causation." *Id.*

most certainly "ordered" all insurers to cover abortions through the Parity Act and its accompanying penalties for noncompliance. Similar to how the insurers in *Skyline* were required to "comply with California law," 968 F.3d at 750, the Parity Act is not optional for insurers operating in the State of Washington. The same way that state action targeted insurers in *Skyline*, state action targets insurers here. *Skyline* requires a finding that Cedar Park has standing.

2.

The majority mentions two health plans purporting to exclude abortion coverage to say that Cedar Park lacks standing because nothing in the Parity Act "prevents any insurance company, including Kaiser, from offering [Cedar Park] a health plan that excludes direct coverage for abortion services." This argument is flawed for a number of reasons, not the least of which is that it relies on facts not in existence at the time Cedar Park filed the operative complaint. "[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008), but the two health plans did not exist as of October 2, 2019, when Cedar Park filed its operative complaint.

Even if properly framed as an issue of mootness, *see Meland v. Weber*, 2 F.4th 838, 849 (9th Cir. 2021), the majority's reliance on the two health plans doesn't pass muster. Cedar Park is not eligible for these two plans, and the church submitted a declaration attesting to the fact that it cannot procure a health plan excluding abortion coverage that is comparable to the one it received from Kaiser Permanente. Indeed, we rejected in *Skyline* an argument similar to the one the majority advances, holding that the

church had standing because it "offered evidence" that available health plan alternatives were not comparable to the plan it had before the state's directive. 968 F.3d at 749. Here, too, the two health plans purporting to exclude abortion do not cut against Cedar Park's standing because they are not comparable to the plan Kaiser Permanente provided before the Parity Act.

The majority similarly reads too much into the November 2019 regulation enacted by the state's insurance commissioner. That regulation says the Parity Act does not "diminish or affect any rights or responsibilities provided under [the conscience statute]." Wash. Admin. Code § 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(3). But recall what "rights" the conscience statute gives Cedar Park: the right to not "purchase" abortion coverage for its employee "benefits package." Wash. Rev. Code § 48.43.065(3)(a)–(b). The conscience statute, however, *does not* allow insurers to exclude abortion coverage from Cedar Park's "health plan," and the Parity Act mandates inclusion of such coverage. *See City of Los Angeles v. Barr*, 941 F.3d 931, 939 (9th Cir. 2019) ("[I]t is generally 'our duty to give effect, if possible, to every clause and word of a statute'") (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Indeed, a representative from the state's insurance commissioner testified that, because of the Parity Act, even if Cedar Park does not "purchase coverage" for abortions, "[t]he plan actually provides for access" to abortions. The majority thus mistakenly holds that the conscience statute relieves Cedar Park from the consequences of the Parity Act. It doesn't.

The majority also has no answer to our holding in *Cedar Park I* that "Kaiser Permanente reasonably understood the plain language of [the Parity Act]" as prohibiting health plans that exclude abortion coverage, notwithstanding the

existence of the conscience statute and November 2019 regulation. *Cedar Park I*, 860 Fed. App'x at 543. The best the majority can do is express disbelief as to why Kaiser Permanente does not provide Cedar Park a health plan excluding abortion, commenting that "[n]othing in the record explains" why Kaiser Permanente behaves this way, especially after the November 2019 regulation "made clear that the exception [Cedar Park] sought had existed all along." Apparently the November 2019 regulation was not as "clear" as the majority thinks.

We were well aware of the November 2019 regulation in *Cedar Park I*, yet still concluded that Kaiser Permanente's reading of the Parity Act was reasonable. Our reasoning remains sound. Imagine for a moment that you are Kaiser Permanente's lawyer and told that a large church near Seattle wants to purchase a health plan that includes coverage for maternity care but excludes coverage for abortions. What do you say? Probably that you can't meet the church's needs. While the church is not required to purchase abortion coverage for its employee "benefits package," the "health plan" itself cannot exclude abortion coverage pursuant to the Parity Act.

Guess what: this is exactly what Kaiser Permanente did when another religious employer, Seattle's Jesuit College Preparatory, sought a health plan that excluded abortions. Kaiser Permanente refused to provide it. The school then filed a complaint with the state's insurance commissioner, and the commissioner investigated Kaiser Permanente's decision. The insurance commissioner concluded that Kaiser Permanente was "compliant with state insurance laws" because it "made a decision to make sure all their group plans complied with the abortion mandate and they would not offer employers plans that excluded abortion."

This strongly suggests that Kaiser Permanente is not making an "independent business decision" separate and apart from the Parity Act, as the majority would have you believe. "[V]iewing the evidence and drawing all reasonable inferences in the light most favorable to [Cedar Park]," *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 914 (9th Cir. 2024), Kaiser Permanente refuses to provide Cedar Park a health plan that excludes abortion coverage due to the Parity Act notwithstanding the conscience statute's protections.    The majority's conclusion to the contrary obtusely disregards Kaiser Permanente's real-world decision making and Cedar Park's continued inability to obtain a health plan that excludes abortion coverage.[6]

Finally, the majority relies heavily of *Murthy v. Missouri*, 603 U.S. 43 (2024), but that case only further demonstrates why Cedar Park has standing here. In *Murthy*, plaintiffs sued federal government officials and agencies for pressuring social media platforms to suppress plaintiffs' speech. The Supreme Court held that the plaintiffs failed to show "specific causation" between their injuries and the defendant's conduct because the injuries existed *before* the government's alleged interference. *Id.* at 59–60; *see id.* at

---

[6] The majority faults Cedar Park for not seeking "further discovery" from Kaiser Permanente after issuance of the November 2019 regulation to find out whether Kaiser Permanente would provide a health plan excluding abortion coverage. Again, the majority ascribes magical powers to the commissioner's regulation that simply do not exist. As we explained in *Cedar Park I*, Kaiser Permanente reasonably understood the Parity Act to preclude the provision of health plans that exclude abortions *notwithstanding* the November 2019 regulation and conscience statute.    Moreover, Cedar Park learned of Kaiser Permanente's continued refusal to provide no-abortion health plans during its deposition of the state's insurance commissioner on November 16, 2022. No "further discovery" was needed on this issue.

68 ("Facebook was targeting her pages before almost all of its communications with the White House and the CDC").

The majority states in conclusory fashion that "[h]ere, as in *Murthy*, traceability is lacking because [Cedar Park's] injury is premised on the alleged acts and independent decisions of non-parties to this action—Kaiser and other independent insurers." This isn't quite right. There was no traceability in *Murthy* because the social media platforms made their own decisions "even before the defendants entered the scene." 603 U.S. at 73. Here, the insurers decided to stop providing Cedar Park its preferred health plan only *after* the state "entered the scene" by passing the Parity Act. *Id.* The "specific causation" that was missing in *Murthy* is therefore present here. The majority also cites *Murthy*'s discussion of redressability, but in that case there was no evidence of "continued pressure from the defendants" because "the frequent, intense communications that took place in 2021" between the social media platforms and the defendants "had considerably subsided" by the time plaintiffs brought suit. *Id.* at 71–73. An injunction was therefore of no help. *Id.* Here, by contrast, the Parity Act remains the law in Washington, so enjoining its application to Cedar Park's health plan would allow the church to once again obtain a health plan in accordance with its religious beliefs.

Ultimately, the majority never comes to grips with the fact that the Parity Act requires insurers to cover abortions in Cedar Park's health plan. The majority says that insurers can offer Cedar Park a health plan that excluding abortion coverage. But how? The majority doesn't tell us, and its conclusion flies in the face of the plain language of the Parity Act, which requires ACA-mandated health plans to "provide

. . . coverage to permit the abortion of a pregnancy," Wash. Rev. Code § 48.43.073(1)(a).

Tellingly, the majority has no answer for the conscience statute distinguishing a "health plan" from a "benefits package," *see Barr*, 941 F.3d at 939 (requiring that we give effect to "every clause and word of a statute"), and instead doubles down on the statute exempting Cedar Park from having to "purchase coverage" for abortions. But again, purchasing coverage is only one way Cedar Park "engage[s] in conduct that seriously violates their religious beliefs." *Hobby Lobby*, 573 U.S. at 720. Cedar Park's religious beliefs are violated by having to "contract," "arrange," *or* "pay" for abortion coverage. *See id.* at 723 n.33. So here, while Cedar Park might not have to "pay" for abortion coverage, it most certainly must still enter into a health plan—*i.e.*, a "contract," Wash. Rev. Code § 48.43.005(33)—to provide such coverage. Indeed, the majority even concedes this point, saying that under the conscience statute employees have the right to obtain abortion coverage "through their insurers." Why can employees obtain abortion coverage "through their insurers?" Because their employer has entered into a health plan—a contract—with the insurer. The inverse is also true. If Cedar Park *does not* enter into a health plan with an insurer, its employees *cannot* obtain abortion coverage "through their insurer."

\*        \*        \*

We got it right the first time around. Kaiser Permanente stopped offering a health plan to Cedar Park that excluded abortion coverage "due to the enactment of [the Parity Act]," and Cedar Park cannot acquire comparable coverage today.

*Cedar Park I*, 860 Fed. App'x at 543. Cedar Park has standing to challenge the Parity Act.

## C

Even if the conscience statute means that Cedar Park does not have to directly pay for abortion coverage, Cedar Park might still end up paying more for its health plan because of the Parity Act. This is because the Parity Act mandates abortion coverage and the conscience statute permits insurers to pass this cost along on to employers. Accordingly, while Cedar Park might not have to "purchase" abortion coverage for its employee "benefits package," Wash Rev. Code § 48.43.065(3)(a)–(b), the cost of the "health plan" may indirectly include the cost to the insurer for providing such coverage. Cedar Park has standing to challenge the Parity Act for this additional reason.

Consider the interplay of the Parity Act and the conscience statute. The Parity Act requires that all health plans covering maternity care also provide "coverage to permit the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(1)(a). Under the conscience statute, although Cedar Park can decline to "purchase coverage" for abortions, Wash. Rev. Code § 48.43.065(3)(a), Cedar Park employees must still receive "coverage of and timely access to" abortions," *id.* § 48.43.065(3)(b). So, if Cedar Park does not "purchase coverage" for abortions, who does? The statute says the insurer does not need to provide coverage for abortions "without appropriate payment of premium or fee," *id.* § 48.43.065(4), and that the "insurance commissioner shall establish by rule a mechanism or mechanisms to . . . assure prompt payment to service providers" for abortions, *id.* § 48.43.065(2)(c). Well, the "rule" established by the insurance commissioner leaves it up to the insurer to decide

how "prompt payment" will be made.  *See* Wash. Admin. Code § 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.  Insurers can therefore pass along to employers the cost of abortion coverage mandated by the Parity Act.

In fact, the state conceded that Cedar Park might have to indirectly pay for the newly required abortion coverage, and a prior Washington Attorney General acknowledged as much.  *See* Wash. Att'y Gen. Op. 2002 No. 5 (explaining that the conscience statute does not "preclude all mechanisms whereby an employer would provide payments to others without direct purchase of the services to which the employer objects").  And, as the district court pointed out, if the insurer and employee are not required to pay for the abortion coverage, and the state itself is not paying, "the cost must be falling back on the employer."

Notwithstanding the state's concession, the majority argues that Cedar Park cannot show injury because "there is no evidence that [Cedar Park] has incurred such costs or is likely to do so in the future."  But this misplaces the burden on Cedar Park.  The majority repeats its favorite hit, saying that Cedar Park "has the burden to establish standing," but it's *the state* that moved for summary judgment, so it was *the state* that bore the "burden of production" to negate Cedar Park's standing.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything."  *Id.* at 1102–03.  Here, the moving party—the state—did not challenge Cedar Park's standing to sue and even conceded that the church might indirectly pay for the newly required abortion coverage.  Notwithstanding the majority's best efforts to litigate for the state defendants, there was no earthly reason for Cedar Park to produce evidence for

something the state conceded. The majority errs in faulting
Cedar Park for not producing evidence on this issue.

### III

Cedar Park finds itself in a catch-22: it either contracts
with an insurer for a health plan that covers abortions (in
violation of its religious belief) or it cancels its health plan
(in violation of state and federal law). Before the Parity Act,
Cedar Park was able to provide its employees with a health
plan in accordance with its religious beliefs. Now, because
of the Parity Act, it cannot do so. The majority fails to
appreciate our prior opinion where we found that Cedar Park
has standing, and now uses the new procedural posture of
this case to boot Cedar Park from court. I respectfully
dissent.